UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**FEDERAL TRADE COMMISSION and
PEOPLE OF THE STATE OF NEW YORK,
by Letitia A. James, Attorney
General of the State of New York,**

Plaintiffs,

- against -

**QUINCY BIOSCIENCE HOLDING COMPANY,
INC., QUINCY BIOSCIENCE, LLC,
PREVAGEN, INC. d/b/a Sugar River
Supplements, QUINCY BIOSCIENCE
MANUFACTURING, LLC, MARK UNDERWOOD,
and MICHAEL BEAMAN,**

Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/24/19

17 Civ. 124 (LLS)

**OPINION & ORDER**

Plaintiffs Federal Trade Commission ("FTC") and the People
of the State of New York brought this action alleging violations
of the Federal Trade Commission Act and New York law for
deceptive advertising of a dietary supplement ("Prevagen")
purporting to improve one's memory. Defendants move to dismiss
the complaint for failure to state a claim upon which relief
can be granted and for lack of personal jurisdiction over
Mark Underwood and Michael Beaman. For the following
reasons, the motion is granted in part and denied in part.

## BACKGROUND

The following facts are as alleged in the Complaint (Dkt.
No. 1).

Defendant Quincy Bioscience Holding Company, Inc.

-1-

("Quincy") is a Wisconsin corporation. Defendants Quincy Bioscience, LLC, Prevagen, Inc., and Quincy Bioscience Manufacturing, LLC are wholly-owned subsidiaries of Quincy.

Defendants Mark Underwood and Michael Beaman are Quincy's co-founders and two largest shareholders; Mr. Underwood owns 33% and Mr. Beaman owns 22% of its stock. Mr. Underwood is Quincy's President and Mr. Beaman is its Chief Executive Officer and former President. Each is also a director of Quincy Bioscience, LLC, Prevagen, Inc., and Quincy Bioscience Manufacturing, LLC.

Defendants manufacture and sell a dietary supplement known as Prevagen. Prevagen's active ingredient, apoaequorin (pronounced: ā-poe-ē-kwôr-ĭn), is a dietary protein originally derived from the jellyfish Aequorea victoria. Prevagen is sold to consumers through Defendants' websites and various pharmacies and retail establishments. Between 2007 and mid-2015, sales of Prevagen in the United States totaled $165 million.

Defendants advertise Prevagen on their websites and through infomercials, short-form television commercials, social media, newspapers, and magazines. Their advertising includes representations that "Prevagen improves memory," that it "has been clinically shown to improve memory," that "A landmark double-blind and placebo controlled trial demonstrated Prevagen improved short-term memory, learning, and delayed recall over 90

-2-

days," that Prevagen "Helps with memory problems associated with aging," that it "is clinically shown to help with mild memory problems associated with aging," and that it can support "healthier brain function, a sharper mind and clearer thinking."

Those representations rely primarily on the results of a double-blind, placebo-controlled human clinical study called the Madison Memory Study, which tested 218 subjects who were given either 10 milligrams of Prevagen or a placebo. The subjects were assessed on nine computerized tasks to assess cognitive skills like memory and learning at various intervals over a period of 90 days.

The Madison Memory Study did not show a statistically significant improvement in the treatment group over the placebo group as a whole on any of the nine computerized tasks.

The researchers conducted more than 30 post hoc analyses of the study's results, looking at data broken down by several variations of smaller subgroups for each of the nine computerized cognitive tasks. The researchers found a few positive findings on isolated tasks for small subgroups of the study population, but the majority of the post hoc comparisons failed to show statistical significance. Nevertheless, Defendants cited the Madison Memory Study as support for the claims made in their Prevagen advertisements.

Additionally, Defendants' claims about Prevagen rely on the

-3-

theory that its dietary protein, apoaequorin, enters the human brain to supplement proteins that are lost during the aging process. However, Defendants do not have evidence showing that orally-administered apoaequorin can cross the human blood brain barrier and enter the brain. Rather, Defendants' studies show that apoaequorin is rapidly digested in the stomach and broken down into amino acids and small peptides like any other dietary protein.

On April 6, 2017, Defendants moved to dismiss the complaint on the following grounds: (1) the complaint fails adequately to allege that the representations in the advertising materials violate sections 5(a) and 12 of the FTC Act; (2) the complaint fails adequately to allege that the representations violate section 63(12) of the New York Executive Law and sections 349 and 350 of the New York General Business Law; (3) the relief sought amounts to an unconstitutional restraint on commercial speech; (4) the action was commenced ultra vires as the FTC lacked a quorum to authorize it; (5) the court lacks personal jurisdiction over Mr. Underwood and Mr. Beaman; and (6) the complaint fails adequately to allege a claim for individual liability against Mr. Underwood and Mr. Beaman.

On September 28, 2017, this court dismissed the complaint for failure to state a claim under the FTC Act, declined to exercise supplemental jurisdiction over the New York law claims,

-4-

and did not address Defendants' other arguments. On April 15, 2019, the Second Circuit vacated that ruling and remanded to this court, stating "We note that Defendants-Appellees have raised several grounds for affirmance that the district court did not consider. We express no opinion on these arguments, and the district court may consider them in the first instance on remand."

Defendants now move to dismiss on those grounds, and have withdrawn their argument that this action constitutes an unconstitutional restraint on commercial speech.

This court now considers the remaining issues on the motions to dismiss: (1) the validity of the FTC quorum, (2) personal jurisdiction over Mr. Underwood and Mr. Beaman, and (3) the individual liability of Mr. Underwood and Mr. Beaman.

## DISCUSSION

### Validity of the FTC Quorum

The FTC has five seats. When the FTC authorized this lawsuit, there were three appointed Commissioners and two vacant seats. Two Commissioners voted in favor of issuing the Complaint, and the third stated that she was "not participating." Tabor Decl. (Dkt. No. 71).

Defendants argue that a quorum of three Commissioners is required as a majority of the five "members of the Commission."

-5-

They argue that only two Commissioners voted, that a two-person quorum is invalid, and that this action was thus commenced ultra vires.

The word "quorum" does not describe the number of votes. It defines the number of persons required to be present in order for the business of the meeting to be conducted. As defined in Black's Law Dictionary (10th ed. 2014), it is "The smallest number of people who must be present at a meeting so that official decisions can be made; specif., the minimum number of members (a majority of all the members, unless otherwise specified in the governing documents) who must be present for a deliberative assembly to legally transact business."

In the case of the FTC, Rule 4.14(b) of its Procedures and Rules of Practice states, "A majority of the members of the Commission in office and not recused from participating in a matter (by virtue of 18 U.S.C. 208 or otherwise) constitutes a quorum for the transaction of business in that matter." 70 Fed. Reg. 53296-01 (Sept. 8, 2005) (codified at 16 C.F.R. § 4.14(b)).

That rule makes clear that the relevant number of Commissioners is not the number authorized by law (five) but those actually in office (three). That determination was well within the FTC's power. See Falcon Trading Group, Ltd. v. SEC, 102 F.3d 579, 582 (D.C. Cir. 1996) (dealing with identical situation at Securities Exchange Commission).

-6-

The three Commissioners present comprised the quorum: the "number of people who must be present at a meeting so that official decisions can be made," see Black's Law Dictionary, supra. The actual FTC voting record on the motion to approve the filing of the Complaint shows that none of the three Commissioners in office was absent; two voted in favor of issuing the Complaint, and the third stated that she was "not participating." Tabor Decl. That voting was the conduct of the business; it was valid because there was a quorum to conduct it.

In fact, the outcome would be the same even if the "not participating" member had voted against the filing of the Complaint: the majority vote of two to one would uphold it.

Personal Jurisdiction Over Mr. Underwood and Mr. Beaman

Defendants argue that the court does not have personal jurisdiction over Mr. Underwood or Mr. Beaman because they are not residents of New York and have not engaged in any direct, personal business transactions in New York. Plaintiffs argue that the individual defendants' contacts with New York are irrelevant because section 13(b) of the FTC Act authorizes nationwide service and nationwide personal jurisdiction over Mr. Underwood and Mr. Beaman.

Section 13 of the FTC Act "empowers this Court to grant injunctive and other equitable relief to prevent and remedy violations of any provision of law enforced by the FTC and

-7-

authorizes service in an action brought by the FTC wherever the

defendant 'may be found.'" F.T.C. v. 1263523 Ontario, Inc., 205

F. Supp. 2d 205, 208 (S.D.N.Y. 2002) (quoting 15 U.S.C.

§ 53(b)(2)). Specifically, section 13(b) states,

> Any suit may be brought where such person, partnership, or
> corporation resides or transacts business, or wherever venue
> is proper under section 1391 of title 28. In addition, the
> court may, if the court determines that the interests of
> justice require that any other person, partnership, or
> corporation should be a party in such suit, cause such
> other person, partnership, or corporation to be added as a
> party without regard to whether venue is otherwise proper
> in the district in which the suit is brought. In any suit
> under this section, process may be served on any person,
> partnership, or corporation wherever it may be found.

15 U.S.C. § 53(b)(2).

Under Fed. R. Civ. P. 4(k)(1)(C), "Serving a summons or

filing a waiver of service establishes personal jurisdiction

over a defendant . . . when authorized by a federal statute."

Plaintiffs argue that because Congress provides for nationwide

service of process wherever the defendant "may be found" under

the FTC Act, it permits nationwide personal jurisdiction over

defendants. See Dynegy Midstream Servs. v. Trammochem, 451 F.3d

89, 95-96 (2d Cir. 2006) ("[W]hen Congress intends to permit

nationwide personal jurisdiction it uses language permitting

service 'wherever the defendant may be found' or 'anywhere in

the United States.'"); F.T.C. v. Navestad, No. 09 Civ. 6329

(MAT), 2010 WL 743899, at *1 (W.D.N.Y. Feb. 25, 2010) ("Because

the Federal Trade Commission Act authorizes service of process

-8-

to be effectuated on any defendant wherever that defendant may
be found, this court may exercise personal jurisdiction over
such a defendant pursuant to Rule 4 of the Federal Rules of
Civil Procedure, which provides in relevant part that this court
has personal jurisdiction over parties which may be lawfully
served pursuant to federal law."); BNSF Ry. Co. v. Tyrrell, 137
S. Ct. 1549, 1555-56 (2017)

> Congress' typical mode of providing for the exercise
> of personal jurisdiction has been to authorize service of
> process. See, e.g., 15 U.S.C. § 22 (Clayton Act provision
> stating that "all process in [cases against a corporation
> arising under federal antitrust laws] may be served in the
> district of which [the defendant] is an inhabitant, or wherever
> [the defendant] may be found"); § 53(a) (under Federal Trade
> Commission Act, "process may be served on any person,
> partnership, or corporation wherever it may be found").

(alterations in original).

Defendants argue that "the FTC must first demonstrate that
the defendant 'resides or transacts business' or is properly
venued in this district" before it can "take advantage of the
provision that follows regarding nationwide service of process."
Defs. Br. at 8. They argue that the phrase "In any suit under
this section" refers only to suits that satisfy the previous
venue provision. In support of that argument, Defendants cite
Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 423 (2d Cir.
2005), which held that the Clayton Act's "service of process
provision applies (and, therefore, establishes personal
jurisdiction) only in cases in which its venue provision is

-9-

satisfied." Section 12 of the Clayton Act's service provision

states,

> Any suit, action, or proceeding under the antitrust
> laws against a corporation may be brought not only in the
> judicial district whereof it is an inhabitant, but also in
> any district wherein it may be found or transacts business;
> and all process in such cases may be served in the district
> of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22. The Second Circuit explained that the phrase "in

such cases" "plainly refers to those cases qualifying for venue

in the immediately preceding clause," and "It is 'in such

cases,' i.e., such venued cases, that Section 12 makes worldwide

service of process available." Daniel, 428 F.3d at 423-24. The

Second Circuit also distinguished the Clayton Act from the

Racketeer Influenced and Corrupt Organizations ("RICO") Act,

which has a service of process provision that operates

independently from the statute's venue provision:

> While Section 12 of the Clayton Act discusses venue and
> service of process in one sentence, RICO separates these
> provisions into non-sequential, lettered subsections. Compare
> 15 U.S.C. § 22 *with* 18 U.S.C. § 1965(a), (d). More important
> still is a textual difference between the two statutes. The
> language of RICO's service of process provision does not limit
> its application to "such cases" as are referred to in the
> statute's venue provision. Rather, in RICO, Congress
> specifically provides for the service of process provision to
> apply "in any action or proceeding under this chapter," that
> is, the chapter dealing with racketeering. Given that the
> Clayton Act served as a model for RICO, these language and
> structural differences between the two statutes in their
> treatment of venue and process only reinforce the conclusion
> that Congress was rendering independent under RICO concepts
> that it had plainly linked under Clayton Act Section 12.

Id. at 427 (emphasis in original) (citations omitted).

-10-

The language in the FTC Act is similar to that of the RICO Act, not the Clayton Act. First, it does not discuss venue and service of process in the same sentence. Second, it does not limit the application of the service of process provision to "such cases" in which the venue provision is satisfied. Rather, it states that nationwide service can be effectuated "in any suit under this section," which refers to section 13 of the FTC Act (15 U.S.C. § 53), which is the section of the statute dealing with false advertising, injunctions, and restraining orders. Because this action seeks injunctive and other relief for false advertising, it is a "suit under this section," and the nationwide service provision applies.

Because the FTC Act provides for nationwide service and nationwide personal jurisdiction, the relevant inquiry is not whether the individual defendants have minimum contacts with the state of New York but rather whether they have minimum contacts with the United States. In Mariash v. Morrill, 496 F.2d 1138, 1142-43 (2d Cir. 1974), the court stated that because the Securities Exchange Act authorizes nationwide service of process, "It is not the State of New York but the United States which would exercise its jurisdiction over them" and "where, as here, the defendants reside within the territorial boundaries of the United States, the minimal contacts, required to justify the federal government's exercise of power over them, are present."

(citation and internal quotation marks omitted). See also S.E.C. v. Morton, No. 10 Civ. 1720 (LAK) (MHD), 2011 WL 1344259, at *12 (S.D.N.Y. Mar. 31, 2011) ("When the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nation-wide service of process, however, the Fifth Amendment applies, and the Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state."); Hetchkop v. George Harms Excavating Corp., No. 92 Civ. 2239 (JFK), 1993 WL 88106, at *2 (S.D.N.Y. Mar. 26, 1993) ("Long-settled law in the Second Circuit provides that where federal jurisdiction is conferred by a federal statute in which Congress provided for nationwide service of process, defendant is subject to personal jurisdiction without regard to state long-arm statutes."); Navestad, 2010 WL 743899, at *1 (in case brought under § 13(b) of the FTC Act, "To pass constitutional muster, the defendant over which the court purports to have jurisdiction must have 'minimum contacts' with the United States as a whole, and assertion of jurisdiction over the defendant must be reasonable and comport with traditional notions of fair play and justice."); 1 Stephanie W. Kanwit, Fed. Trade Comm'n. § 3:12 (2018) ("Because this provision of the FTCA permits nationwide service of process, a federal district court hearing an FTC

-12-

action under § 13(b) of the FTCA has personal jurisdiction over any defendant who has minimum contacts with the United States, rather than a particular jurisdiction within the United States.").

Mr. Underwood and Mr. Beaman have substantial contacts with the United States. The companies they founded and control (Quincy, Quincy Bioscience, LLC, Prevagen, Inc., and Quincy Bioscience Manufacturing, LLC) are based in Wisconsin. They admit that they would be subject to personal jurisdiction in Wisconsin and do not argue that they lack sufficient contacts with the United States. Defs. Supplemental Br. at 15. Nor do they dispute that service was proper and that they waived service in this action.

"If the plaintiff shows that defendants had substantial contacts with the United States, the court next must determine whether the assertion of personal jurisdiction comports with traditional notions of fair play and substantial justice—that is, whether it is reasonable under the circumstances of the case." Morton, 2011 WL 1344259, at *12 (citation and internal quotation marks omitted). "As a general matter, such unfairness will rarely be found, see, e.g., Asahi Metal Indus. Co. v. Supreme Court of Calif., 480 U.S. 102, 116 (1987) (Brennan, J., concurring), and such a result is still less likely in a federal-question case coupled with nationwide service of

-13-

process." Id. There is nothing in this case to suggest that asserting personal jurisdiction over the individual defendants would be unreasonable or unfair: the advertisements were distributed nationally. Compl. ¶ 9.

Mr. Underwood and Mr. Beaman further argue that if the FTC Act is the basis for personal jurisdiction, there is no personal jurisdiction over them with respect to the New York law claims. However, "under the doctrine of pendent personal jurisdiction, where a federal statute authorizes nationwide service of process, and the federal and state claims derive from a common nucleus of operative fact, the district court may assert personal jurisdiction over the parties to the related state law claims even if personal jurisdiction is not otherwise available." IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1056 (2d Cir. 1993)) (citation and internal quotation marks omitted).

Because the federal and state law claims derive from the same facts concerning the alleged false advertising of Prevagen, there is personal jurisdiction over Mr. Underwood and Mr. Beaman with respect to both the FTC Act and New York claims.

Individual Liability of Mr. Underwood and Mr. Beaman

Mr. Underwood and Mr. Beaman argue that the Complaint fails to state a claim against them for individual liability under the FTC Act, section 63(12) of the New York Executive Law, and

-14-

sections 349 and 350 of the New York General Business Law.

"An individual may be held liable under the FTCA for a corporation's deceptive acts or practices if, with knowledge of the deceptive nature of the scheme, he either participate[s] directly in the practices or acts or ha[s] authority to control them." F.T.C. v. Moses, 913 F.3d 297, 306 (2d Cir. 2019) (alterations in original) (citations and internal quotation marks omitted).

Under NY Exec. Law § 63(12) and NYGBL §§ 349 and 350, "Officers and directors of a corporation may be held liable for fraud if they participate in it or have actual knowledge of it." People by Abrams v. Apple Health & Sports Clubs, Ltd., Inc., 80 N.Y.2d 803, 807 (1992).

The Complaint adequately alleges that Mr. Underwood has the authority to control the corporate defendants' advertising practices. It alleges that he is a co-founder and the President of Quincy, Quincy Bioscience, LLC, and Prevagen, Inc., as well as a director of Quincy Bioscience, LLC, Prevagen, Inc., and Quincy Bioscience Manufacturing, LLC. He is the largest shareholder of Quincy, owning 33% of shares. Additionally, he is "the final decision maker on advertising claims across all channels of distribution and media platforms." See Moses, 913 F.3d at 307 ("Authority to control the company can be evidenced by active involvement in business affairs and the making of

-15-

corporate policy, including assuming the duties of a corporate

officer.") (quoting F.T.C. v. Amy Travel Service, Inc., 875 F.2d

564, 573 (7th Cir. 1989)).

The Complaint also describes Mr. Underwood's involvement

with the advertisements:

> Underwood is a member of the marketing creative team, serving
> as the final decision maker on advertising claims across all
> channels of distribution and media platforms. Underwood
> coordinates advertising claim language review with counsel,
> translates scientific data into marketing language, and
> directs research programs and activities. Underwood has
> appeared in infomercials aired nationwide, including in New
> York, touting Prevagen's memory improvement benefits and has
> co-authored studies on Prevagen. Underwood also authored the
> "Brain Health Guide," a user guide disseminated nationwide,
> including in New York, that describes how Prevagen works and
> the purported science behind this dietary supplement.

The statements that Mr. Underwood made final decisions on

advertising claims, wrote advertising materials, and appeared in

Prevagen advertisements sufficiently allege that Mr. Underwood

participated directly in the alleged false advertising of

Prevagen.

The allegations that he directed the research, translated

scientific data into marketing language, and wrote a user guide

explaining the science behind Prevagen support an inference that

he knew what the research and studies concluded and thus had

knowledge of the deceptive nature of the advertisements. See

F.T.C. v. Med. Billers Network, 543 F. Supp. 2d 283, 320

(S.D.N.Y. 2008) ("An individual's degree of participation in

business affairs is probative of knowledge."). Under the FTC

Act, "The knowledge requirement is satisfied by actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." Id. (citation and internal quotation marks omitted). Accordingly, Plaintiffs have adequately stated a claim for individual liability against Mark Underwood under both the FTC Act and New York law.

Like Mr. Underwood, Mr. Beaman also has the authority to control the corporate defendants' advertising practices. He is a co-founder, former President, and current CEO of Quincy, Quincy Bioscience, LLC, and Prevagen, Inc. He is the Chair of the Board of Directors for Quincy Bioscience, LLC, Prevagen, Inc., and Quincy Bioscience Manufacturing, LLC. He is the second largest shareholder of Quincy, owning 22% of shares. He also pre-approved research proposals and reviewed the corporate defendants' advertising.

However, the Complaint does not adequately allege that Mr. Beaman participated in the alleged deceptive acts or had knowledge of them. Other than its conclusory statement that Mr. Beaman "participated in the acts and practices of Quincy . . . including the acts and practices set forth in this Complaint," the Complaint merely alleges that he "has given media interviews, signed research agreements, pre-approved research

-17-

proposals, and reviewed Defendants' advertising." Those assertions are insufficient to show that he knew the results of the research or participated in the false advertising. Accordingly, the claims against Michael Beaman are dismissed, with leave to replead facts supporting an inference that he had knowledge of and participated in the alleged deceptive scheme.

## CONCLUSION

The motion to dismiss the Complaint with respect to the validity of the FTC quorum and against Mark Underwood are denied. The motion to dismiss the claims against Michael Beaman is granted, with leave to amend.

So ordered.

Dated:    New York, New York
          July 24, 2019

                                   _Louis L. Stanton_

                                   LOUIS L. STANTON
                                   U.S.D.J.

-18-