# Exhibit A

Page 1

1              Sano - rough draft

2         THE VIDEOGRAPHER:  Good morning,

3    counsel.  My name is Phil Rizzuti.  I am a

4    legal videographer in association with

5    TSG Reporting, Inc.

6         Due to the severity of the COVID-19

7    and following the practice of social

8    distancing, I will not be in the same room

9    with the witness.  Instead, I will record

10   this videotaped deposition remotely.

11        The reporter, Jeffrey Benz, also will

12   not be in the same room and will swear the

13   witness remotely.

14        Do all parties stipulate to the

15   validity of this video recording, and

16   remote swearing, and that it will be

17   admissible in the courtroom as if it had

18   been taken following Rule 30 of the Federal

19   Rules of Civil Procedure and the state's

20   rules where this case is pending?

21        MS. METZINGER:  Yes for the Quincy

22   corporate defendants.

23        MR. GLENNON:  Yes for the FTC.

24        THE VIDEOGRAPHER:  Thank you.

25        MS. MATUSCHAK:  Yes for the New York

Page 2

1      Sano - rough draft
2   State Attorney General's office.
3         THE VIDEOGRAPHER:  Thank you.
4         This is the start of media labeled
5   Number 1 of the video-recorded deposition
6   of Dr. Mary Sano, in the matter of the
7   Federal Trade Commission and the People of
8   the State of New York, by Letitia James,
9   Attorney General of the State of New York,
10  versus Quincy Bioscience Holding Company,
11  Inc., a corporation, et al., in the United
12  States District Court for the Southern
13  District of New York,
14  Case Number 117 CV 00124 LLS.
15        This deposition is being held on
16  October 22, 2021, at approximately
17  10:01 a.m.
18        My name is Phil Rizzuti.  I am the
19  legal video specialist from TSG Reporting,
20  Inc.  The court reporter is Jeffrey Benz in
21  association with TSG Reporting.  Counsel
22  please introduce yourself.
23        MS. METZINGER:  Good morning.  Jaclyn
24  Metzinger from Kelley Drye & Warren for the
25  Quincy corporate defendants.  And I have

Page 3

1      Sano - rough draft
2   with me today my colleagues, Geoffrey
3   Castello, Glenn Graham, and Lauren
4   Margolies.
5         MR. DE LEEUW:  Michael de Leeuw on
6   behalf of Mark Underwood.  I have with me
7   today Tamar Wise.
8         MR. GLENNON:  This is Edward Glennon
9   for the Federal Trade Commission.  Also
10  participating for the FTC are attorneys
11  Andrew Warren and Annette Soberats and
12  investigator Will Ducklow.
13        MS. MATUSCHAK:  This is Kate
14  Matuschak, and I'm here for the New York
15  State Attorney General's office.
16        THE VIDEOGRAPHER:  Thank you.
17        Will the court reporter please swear
18  in the witness.
19  DR. MARY SANO,
20      called as a witness, having been first
21      duly sworn by Jeffrey Benz, a Notary
22      Public within and for the State of New
23      York, was examined and testified as
24      follows:
25  EXAMINATION BY MS. METZINGER:

Page 4

1      Sano - rough draft
2      Q.   Good morning, Dr. Sano.  We met
3   briefly before we got on the record, but again,
4   my name is Jaclyn Metzinger.  And I represent
5   the Quincy corporate defendants -- excuse me --
6   in this matter.
7        Have you been deposed before,
8   Dr. Sano?
9      A.   I have.
10     Q.   How many times have you been deposed?
11     A.   I'm not sure.  It's been many years.
12     Q.   Would you say less than five times?
13     A.   Maybe between five and ten times.
14     Q.   And have those depositions been given
15  in your professional capacity or personal
16  capacity?
17     A.   They have.
18     Q.   Were you designated as an expert
19  witness in any of the matters in which you gave
20  a deposition?
21     A.   I was.
22     Q.   In all of them?
23     A.   Yes.
24     Q.   And do you recall any of the names of
25  the cases in which you gave your deposition?

Page 5

1      Sano - rough draft
2      A.   I do not.
3      Q.   Do you recall whether you were
4   retained as an expert on behalf of the plaintiff
5   or the defendant in those cases?
6      A.   I had -- on both.
7      Q.   Have you ever been retained as an
8   expert witness by the Federal Trade Commission
9   in a prior matter?
10     A.   I have not.
11     Q.   Have you ever been retained as an
12  expert witness by the New York Attorney
13  General's office?
14     A.   I have not.
15     Q.   Have you ever been retained as an
16  expert witness by any other governmental agency?
17     A.   I think I have.  By the U.S. Attorney
18  General.
19     Q.   Do you recall what that matter
20  involved?
21     A.   I don't recall.
22     Q.   Have any of the matters in which
23  you've been retained as an expert witness
24  involved a dietary supplement product?
25     A.   They have not.

Page 34

```
 1            Sano - rough draft
 2   "competent and reliable scientific evidence,"
 3   has been incorporated into any state or federal
 4   law?
 5            MR. GLENNON:  Objection.  Outside the
 6       scope of the witness's expert report in
 7       this matter.
 8            You can answer, Dr. Sano.
 9       A.   Okay.  Yeah.  I -- I don't know.
10            I've not looked at the law so...
11       Q.   Okay.  And do you agree that Prevagen
12   is a dietary supplement?
13       A.   I don't know how it's -- what -- how
14   it identifies itself.  I don't know that it's
15   specific dietary supplement medical food, et
16   cetera.
17       Q.   It's not a drug, though, correct?
18       A.   I don't know that it markets itself as
19   a drug or that it is a drug.
20       Q.   Are you familiar with the document
21   titled "Dietary Supplements and Advertising
22   Guide for Industry"?
23       A.   I am not.
24       Q.   You've never reviewed the -- I'm going
25   to refer to this document as the FTC guidance.
```

Page 35

```
 1            Sano - rough draft
 2   You've never reviewed the FTC guidance before?
 3       A.   I do not -- I don't recall that I
 4   have.
 5       Q.   And do you recall seeing references to
 6   the FTC guidance in the expert reports that
 7   are -- have been submitted by Quincy?
 8       A.   I believe there was references to the
 9   guidance.
10       Q.   And --
11       A.   In -- I would need a review to see
12   exactly what was said there.
13       Q.   And after seeing references to the FTC
14   guidance in Quincy's expert reports, you did not
15   then go and review the FTC guidance?
16       A.   No, I did not.
17       Q.   So you're not offering an opinion
18   today rebutting anything that Quincy's experts
19   had said with respect to the FTC guidance?
20       A.   I don't believe I am.  My -- my
21   commentary is based on the work that I reviewed,
22   the primary works that I reviewed.
23       Q.   And are you offering an opinion that
24   the marketing claims for Prevagen comply with
25   the FTC guidance?
```

Page 36

```
 1            Sano - rough draft
 2       A.   I'm not making any statements about
 3   the marketing claims.
 4       Q.   Are you aware that the FTC guidance
 5   has its own definition of "competent and
 6   reliable scientific evidence"?
 7       A.   I'm not aware.
 8       Q.   Is there any reason why you chose not
 9   to review the FTC guidance after seeing
10   references to it in Quincy's experts' reports?
11       A.   It wasn't part of the work I was
12   engaged to do.
13       Q.   And can you explain to me exactly what
14   your assignment was in this case?
15       A.   It was --
16            MR. GLENNON:  Excuse me, sorry.
17       Sorry, could you read -- I didn't hear the
18       question.  Could you please -- could the
19       court reporter read it back, please.
20            (The record was read back.)
21            MR. GLENNON:  Thank you.
22       A.   I believe it's as stated as in the
23   report.  I was reviewing the -- the material
24   that was provided to me to determine if it was
25   coming to conclusions that one would expect,
```

Page 37

```
 1            Sano - rough draft
 2   given the standards of how that data is
 3   collected.
 4       Q.   And that standard is your definition
 5   of "competent and reliable scientific evidence";
 6   is that correct?
 7            MR. GLENNON:  Objection.
 8       A.   Yes.  My standard is the standards of
 9   the material in the field -- of the expectations
10   in the field.
11       Q.   Did you draft that phrase, "competent
12   and reliable scientific evidence"?  Did you come
13   up with that phrase for your report?
14       A.   I believe I did.  I edited -- I
15   created the first version of the report, and I
16   believe it was in there, but I'm not -- I'm not
17   sure.
18            It may have -- the words may have
19   occurred separately.  I don't remember the
20   versions.
21       Q.   And -- but you said that you don't
22   recall seeing that exact phrase prior to
23   being -- working in this case.  Is that correct?
24       A.   Can you ask the question again?
25       Q.   Sure.  I believe you testified earlier
```

Page 258

```
 1            Sano - rough draft
 2         MR. GLENNON:  Objection.
 3     A.   What people know.  Marketing claims.
 4     Q.   And you're not qualified to offer an
 5  opinion on whether a marketing claim is
 6  adequately substantiated.  Is that correct?
 7         MR. GLENNON:  Objection.
 8     A.   I don't know about marketing claims.
 9         I know about claims about cognition
10  and memory.
11         MS. METZINGER:  I don't have any
12     further questions.  Thank you for your
13     time, Dr. Sano.
14         THE VIDEOGRAPHER:  Is that it?  Anyone
15     else?
16         MR. DE LEEUW:  Nothing for Mark
17     Underwood.
18         MR. GLENNON:  Okay, this is Ed Glennon
19     for FTC.  I would like to take a break.  We
20     might have some clarifications questions
21     for -- or cross, rather.
22         THE VIDEOGRAPHER:  Okay.
23         MR. GLENNON:  Can we go off the
24     record.
25         THE VIDEOGRAPHER:  The time is
```

Page 259

```
 1            Sano - rough draft
 2     6:38 p.m. and we are going off the record.
 3         (A recess was taken from 6:38 to
 4     time    .)
 5         THE VIDEOGRAPHER:  The time is
 6     7:28 p.m. and we are back on the record.
 7  EXAMINATION BY MR. GLENNON:
 8     Q.   Hi, Dr. Sano.
 9         So, earlier, today, you were asked
10  about clinical meaningfulness with regard to the
11  Madison Memory Study.  Do you remember that?
12     A.   I do.
13     Q.   Okay.
14         And paragraph 13 of your rebuttal
15  report, which is Exhibit 2, can I direct you to
16  that paragraph, please?
17     A.   Okay.  I'm there.
18     Q.   Okay.
19         So, for the record, the first sentence
20  of that paragraph reads, finally with regard to
21  the results of the Madison Memory Study I see no
22  evidence that any purported improvements on the
23  cog state tasks would be clinically meaningful.
24         Do you see that statement?
25     A.   I do.
```

Page 260

```
 1            Sano - rough draft
 2     Q.   Do you still agree with that statement
 3  in your report?
 4     A.   I do.
 5     Q.   Okay.
 6     A.   Yes.
 7     Q.   Okay.  And could you -- take a look at
 8  the rest of that paragraph, there.
 9     A.   Uh-huh.  Yes.
10     Q.   Paragraph 13.  Do you still stand by
11  the other statements made in paragraph 13?
12     A.   I do.
13     Q.   Okay.
14         Do you consider yourself to be an
15  expert in the field of memory?
16     A.   Yes.  I do.
17     Q.   Okay.  Did you consider standards in
18  that field of memory when opining on what
19  constitutes competent or reliability scientific
20  evidence in this case?
21     A.   I did.  Yes.
22     Q.   Okay.
23         Do you consider yourself to be an
24  expert in the field of cognition?
25     A.   Yes.
```

Page 261

```
 1            Sano - rough draft
 2     Q.   Did you consider standards in that
 3  field when opining on what constitutes competent
 4  and reliable scientific evidence, in this case?
 5     A.   Yes, I did.
 6         MR. DE LEEUW:  Objection to the form
 7     of the question.  W sorry.
 8     Q.   Okay.  You can answer it Dr. Sano.
 9     A.   Yes, I did.
10     Q.   Do you consider yourself to be an
11  expert in the field of cognitive impairment?
12     A.   I do.  Yes.
13     Q.   Did you consider standards in that
14  field when appointing on what constitutes
15  competent and reliable scientific evidence, in
16  this case?
17     A.   I did.
18         MR. DE LEEUW:  Objection to form.
19     Q.   What was your answer, Dr. Sano?
20     A.   Yes, I did.
21     Q.   Okay.
22         And do you -- yourself to be an expert
23  in the field of neuro psychology?
24     A.   Yes, I do.
25     Q.   And did you consider standards in that
```

Page 262

Sano - rough draft

1
2  field when opining on what constitutes competent
3  and reliable scientific evidence, in this case?
4       MR. DE LEEUW:  Objection to the form
5    of the question.
6    A.   Yes, I did.
7    Q.   Okay.
8       And do you consider yourself to be an
9  experts notice field of neuroscience of aging
10 and dementia?
11   A.   Yes, I'm an expert in those areas.
12   Q.   Okay.  Did you consider standards in
13 those feels when opining on what constitutes
14 competent and reliable scientific evidence, in
15 this case?
16      MR. DE LEEUW:  Object to the form of
17   the question.
18   A.   Yes, I did.
19   Q.   Okay.
20      Now, you've testified earlier today,
21 also about the protocol, and standards, for
22 standards in the field of clinical trials, for
23 reporting elements of a protocol.  Do you
24 remember that?
25   A.   I do.

Page 263

Sano - rough draft

1
2    Q.   Did you consider the protocol of the
3  Madison Memory Study in determining whether the
4  analyses of the AD8 zero to 1 and zero to 2 sub
5  groups were post hoc?
6       MR. DE LEEUW:  Objection to the form
7    of the question.  Leading.
8    A.   I did.  Consider it.  The protocol
9  didn't mention them.  And I considered them to
10 be after the protocol was developed.
11   Q.   Have you stated in your report, that
12 the protocol does not refer to the subgroup
13 analyses?
14      MR. DE LEEUW:  Object to the form.
15   A.   I -- stated in the report that
16 there's -- that there was no description of
17 those subgroups in the protocol.
18   Q.   Okay.
19      Okay.  And I will refer you to the
20 document that was marked earlier today as
21 Exhibit 3.
22      Do you see that?
23      Do you see it?
24   A.   I do see it, yes.
25   Q.   Okay.  And were you asked about

Page 264

Sano - rough draft

1
2  whether you had seen that document, prior to
3  today?
4    A.   Yes, I was asked that.
5    Q.   Okay.  A would you like to modify your
6  answer, that you gave previously?
7    A.   Yeah.  Yes.  Thank you.  I --
8       MS. METZINGER:  Objection.  Hold on,
9    Dr. Sano.  I'm going to place an objection
10   to that question.
11      THE WITNESS:  I'm sorry.
12      Okay.
13   A.   I didn't hear what you said, it broke
14 up.  So where do we --
15      MR. DE LEEUW:  We were both note be
16   our objections.
17   A.   Okay.
18   Q.   Have you seen that document prior to
19 today?
20   A.   I have not seen the whole document.  I
21 would clarify and say that I've seen a paragraph
22 from the document.
23   Q.   Okay.  I have no --
24   A.   I -- I saw the paragraph, I did not
25 receive the document.

Page 265

Sano - rough draft

1
2       MR. GLENNON:  Okay.  I have no further
3    questions.
4       MS. METZINGER:  We're going to have to
5    take another break.  Can we take five
6    minutes, please.
7       THE VIDEOGRAPHER:  The time is
8    7:34 p.m., and we are going off the record.
9       (A recess was taken from 7:34 to
10   7:39.)
11      THE VIDEOGRAPHER:  The time is
12   7:39 p.m. and we are back on the record.
13 EXAMINATION BY MS. METZINGER:
14   Q.   Dr. Sano, did you speak with any other
15 experts in the field of memory to determine
16 whether they agree with the opinions set forth
17 in your report?
18   A.   Did not.
19   Q.   Did you speak with any other experts
20 in the field of cognition to determine whether
21 they agreed with the opinions expressed in your
22 reports?
23   A.   I did not.
24   Q.   Did you speak with any experts in the
25 field of cognitive impairment to determine

Page 266

```
 1            Sano - rough draft
 2   whether they agreed with the opinions expressed
 3   in your reports?
 4        A.   I did not.
 5        Q.   Did you speak with any other experts
 6   in the field of neuropsychology to determine
 7   whether they agree with the opinions expressed
 8   in your report?
 9        A.   I did not.
10        Q.   Did you speak with any experts in the
11   field of neurosciences of aging and dementia, to
12   determine whether they agreed with the opinions
13   expressed in your report?
14        A.   I did not.
15        Q.   I would like to draw your attention
16   back to Exhibit 3, please.
17        A.   To Exhibit 3, is that what you said?
18   DIR  Q.   Yes.
19             Which paragraph in this document have
20   you seen before today?
21             MR. GLENNON:  I'll object.  On the
22        basis of work product, and instruct the
23        witness not to answer that.
24        Q.   Are you --
25             MR. DE LEEUW:  She assessed, just want
```

Page 267

```
 1            Sano - rough draft
 2        to respond to the objection she testified
 3        that she saw one paragraph.  I think --
 4        we're then allowed to ask her which
 5        paragraph that was.  You can say that --
 6        you can certainly -- you know interpose an
 7        objection about any discussion you had
 8        about it but she specifically testified
 9        that she reviewed a paragraph.  And
10        therefore we're entitled to find out what
11        that was.
12             MR. GLENNON:  I disagree.
13        Q.   Dr. Sano when did you see this
14   unidentified paragraph from Exhibit 3?
15        A.   Yesterday.
16        Q.   Was that the first time that you saw
17   this -- this paragraph from the unidentified
18   Exhibit 3?
19        A.   It is.
20        Q.   And is that why it's not listed in
21   your report?
22        A.   That's correct.
23        Q.   Either your reports?
24        A.   That's correct.
25             MR. GLENNON:  Objection.
```

Page 268

```
 1            Sano - rough draft
 2        Q.   Did counsel remind you, over a break,
 3   that he had shown you this paragraph yesterday
 4   in preparation for today's deposition?
 5        A.   I don't recall whether or not counsel
 6   reminded me or I recalled it as we were meeting.
 7        Q.   Did you have that recollection during
 8   a conversation with counsel over the break?
 9        A.   Did I -- I did have the recollection.
10   Over the --
11        Q.   While you were speaking with counsel
12   over a break?
13        A.   I did.
14        Q.   Dr. Sano, did you see the unidentified
15   referenced paragraph, prior to submitting either
16   of your reports in this case?
17        A.   Never.
18             MS. METZINGER:  And Mr. Glennon, I
19        just wanted to confirm that you're
20        directing Dr. Sano not 0 identify which
21        paragraph of the dietary supplement
22        guidelines that she has reviewed prior to
23        today, are you instruct her not answer?
24             MR. GLENNON:  Yes, I am.
25             MS. METZINGER:  Okay.  Then we're
```

Page 269

```
 1            Sano - rough draft
 2   going to have to leave Dr. Sano's
 3   deposition open because we're going to go
 4   to seek a ruling from Judge Stanton on that
 5   point.  The despite of -- a fair amount of
 6   this deposition today, has been based on
 7   the fantastic that Dr. Sano testified that
 8   she had never seen the FTC dietary
 9   supplement guide prior to today's
10   deposition.  And we're going to reserve the
11   right to question Dr. Sano about that
12   paragraph, and any other paragraphs from
13   the dietary supplement guidance that we see
14   fit.
15   A.   So can I make a comment.
16        MR. GLENNON:  Hole on.  I understand
17   your position, Jaclyn, I disagree with it,
18   I don't believe you're entitled to keep the
19   deposition open.  I think -- which
20   paragraph she reviewed, is -- which -- the
21   that we reviewed with her is privileged so
22   yes that's the basis of my instruction.
23        And I -- ask the witness not to --
24        MS. METZINGER:  I will disagree with
25   that, and I will remind you that during
```