# Exhibit 1

# In the Matter of:

# FTC, et al. v. Quincy Bioscience Holding, et al.

*August 4, 2020*
*Todd Olson - Individual*
*Vol. 1*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

                                                                13

1    arises, if a question is asked that invokes a
2    privilege, I would like us to have a mechanism by
3    which I can consult with the witness.
4         And I would propose that we do that by all
5    of us pausing the deposition and stepping outside of
6    the virtual room.  And I would do that by way of a
7    telephone call through Mr. Olson's cell phone.
8         MR. GLENNON:  Okay.  That's great.  We can
9    just -- for Zoom purposes, I guess we can just -- we
10   don't have to do anything specific, but I believe
11   for Agilelaw I can suspend the deposition.
12        But that's fine.
13   BY MR. GLENNON:
14   Q    Okay.  Mr. Olson, by whom are you
15   employed?
16   A    By Quincy Bioscience.
17   Q    Is that Quincy Bioscience Holding Company,
18   Inc.?
19   A    Yes.
20   Q    Okay.  How long have you -- I'll refer to
21   that entity as Quincy, if that's okay.
22        How long have you been with Quincy?
23   A    Since 2007.
24   Q    Okay.  And what is your current position
25   there?

                                                                14

1    A    My title is Market Development Director.
2    Q    Okay.  How long have you been in that
3    role?
4    A    A couple of years with that title.  A year
5    and a half, something like that.
6    Q    What was your previous position there?
7    A    Very similar.  It was Market Development
8    Manager.
9    Q    Is that a position you started in at
10   Quincy?
11   A    Right.
12   Q    Okay.  Who was your previous employer
13   before Quincy?
14   A    Glaxo SmithKline.
15   Q    And what did you do for them?
16   A    I was a pharmaceutical sales
17   representative.
18   Q    Okay.  How long were you there?
19   A    About three years.  Three and a half
20   years.
21   Q    And how did you come to work at Quincy?
22   A    Mark Underwood is my brother-in-law, and
23   told me about the job position and its availability.
24   Q    Okay.  You're married to his sister.  Is
25   that correct?

                                                                15

1    A    Correct.
2    Q    Okay.  What are your primary
3    responsibilities as market development director?
4    A    I oversee our digital marketing team.  I
5    am an account -- the main account representative or
6    account manager for several regional retail
7    accounts, and point on some national accounts, as
8    well as helping with various public relations
9    efforts as they may come up.  So those are the main
10   areas.
11   Q    Okay.  And you referenced the digital
12   marketing team.  Is that correct?
13   A    Correct.
14   Q    What does that mean?  What is the digital
15   marketing team?
16   A    They engage in various, you know, digital
17   activities, whether it's e-mail marketing, social
18   media marketing, website marketing.  Those aspects
19   of digital.
20   Q    And did you have different
21   responsibilities in your previous role at Quincy?
22   A    I'm sorry.  I didn't hear the question.
23   Q    Yeah.
24        In a previous role at Quincy, did you have
25   different responsibilities?

                                                                16

1    A    I would say the digital marketing team has
2    come more in focus over the years.  And so it wasn't
3    a defined team as such, but has developed into one.
4    Q    Okay.  So is it correct, then, that you
5    had roughly the same responsibilities then in your
6    previous role?
7    A    Yes.
8    Q    Okay.  To whom do you report as market
9    development director?
10   A    Mark Underwood.
11   Q    Directly to him?
12   A    Yes.
13   Q    Okay.  Does anyone report to you?
14   A    Yes.
15   Q    Okay.  And who is that?
16   A    Ben Sosalla, Megan Gaza, Jennifer Ramsden,
17   Elizabeth Bauer, and Steven Holmquist.
18   Q    Okay.
19        MR. GLENNON:  Okay.  I think I'll -- I'll
20   attempt to call up a document on the Agilelaw
21   program.  And it's the first time I've done this in
22   a full deposition, so I'd ask for everyone's
23   patience.  Hopefully, this will go okay.
24        And for everyone, and especially, of
25   course, you, Mr. Olson, please let me know if I'm

21

BY MR. GLENNON:
Q   In the sense of creating, does he create content for TV marketing?
A   Well, I mean, he -- he helps lead the production effort of it. The aspect of it might be -- the nature of the creative might be, you know, part of a group decision, a group discussion, but he helps lead the production effort of it and the media buying for it.
Q   And he does the same for radio. Is that correct?
A   Yeah.
Q   Any other forms of media? Is he involved in any other forms of media in terms of creative effort?
A   Occasionally we do print. It's not as much of a focus as it perhaps used to be, but when that comes up, there may be involvement there as well.
Q   Okay. And we'll probably get into this a little bit later, but is TV -- what form of media is the primary form of marketing for Quincy for the Prevagen product?
       Sorry. Let's me ask that a little bit more clear.

23

A   He engages in Google AdWord spends. He oversees that aspect of it.
Q   Anything else?
A   No. That's what I'm aware of.
Q   Okay. And getting back to the accounts, you said Tom Dvorak is, I believe -- oversees the national accounts with retailers. Is that right?
A   Right.
Q   Do you have any involvement with accounts for other retailers?
A   I do, yeah.
Q   You do?
A   Yes.
Q   Okay. Which retailers? With which retailers are you involved?
A   Kroger. GNC. There are regional retailers like HEB, Hy-Vee, Meyer, Kinney Drug in New York. Bartell Drug. UNFI/Supervalu.
Q   Okay. And what do you do with relation to those accounts?
A   Help increase their sales of Prevagen.
Q   And just generally, what does that involve on your part?
A   It generally involves working with the category manager at those retailers and helping them

22

[redacted]

24

merchandise Prevagen to their customers.
Q   And does that involve working with them in terms of marketing?
A   On occasion, yes, as it relates to maybe a promotional program.
Q   What type of promotional program?
A   Putting our bottle picture in a circular ad. It could be that basic.
Q   Okay. Do you have any other examples of that?
A   Bringing in a display, what we call a secondary placement for the product in the store, an end cap or on the shelf.
Q   And is that something that Quincy would design?
A   Sometimes it's a partnership, sometimes we design it. It depends on the account.
Q   What about the circulars that you mentioned, would Quincy create the content of those?
A   Not typically. They typically just feature a bottle image, and they take copy right off the bottle and put it in the ad.
Q   Does Quincy provide them with rights to do that?
       MR. CASTELLO: Objection.

**29**

1  discussions?
2  A  I believe he probably is.  I don't know to
3  what extent, if it's an overall number or on a
4  monthly basis, but I'm sure he's aware of what the
5  spend is.
6  Q  Okay.  All right.  With those people you
7  mentioned, who would make decisions about allocating
8  the advertising budget among types of media?
9  A  I mean, you are asking me to say something
10 about meetings that I'm not participating in, so my
11 guess would be Tom.  But, again, I'm not part of
12 those meetings.
13 Q  I understand.
14 A  Yeah.
15 Q  And I'll ask, if you know, was Quincy's
16 advertising generally national in scope?
17 A  It is, yes.
18 Q  And, again, if you know, did Quincy
19 allocate spending toward particular geographical
20 markets on occasion?
21 A  My understanding is that generally it's
22 national in scope.  Regional advertising may only
23 come up through selected print opportunities in
24 certain markets.  But by and large, the media
25 budget, as I understand, is national.

**30**

1  Q  Do you have any understanding of what
2  geographical markets might be targeted?
3         MR. CASTELLO:  Objection.
4         THE WITNESS:  There might be, for example,
5  community newspapers or magazines of interest in an
6  area like Florida, for example.
7  BY MR. GLENNON:
8  Q  And why would Florida be an area of
9  interest?
10 A  25 million people there.
11 Q  Would Quincy target specific geographical
12 areas based on sales of its products?
13 A  Again, we really didn't, and to my
14 knowledge don't focus on geographic areas.  It's a
15 national spend.
16 Q  Okay.  Did Quincy monitor the performance
17 of its advertising?
18 A  Certainly in the aggregate, as I
19 understand it, yes.
20 Q  How would it do that?
21 A  Well, broadly speaking, looking at sales
22 lift from the media spend.
23 Q  And what -- with regard to what types of
24 media did it have the ability to do that?
25 A  Well, it's really hard to pinpoint which

**31**

1  specific media provided a sales lift, so it's a more
2  broad generalization on total spend and total lift.
3  Q  Are you involved in that type of
4  monitoring?
5  A  To the extent that we look at sales data,
6  national sales data, and sales data perhaps by
7  retailer that's available, yes.
8  Q  Is it something you do on a regular basis?
9  A  It depends on the account.
10 Q  Okay.  How so?
11 A  Some accounts provide sales data, some do
12 not, and so we may purchase sales data.
13 Q  Okay.  Which accounts provide sales data?
14 A  So of my accounts, Meyer provides sales
15 data, Kroger provides sales data, GNC provides sales
16 data.
17 Q  And are those some of the larger of your
18 accounts?
19 A  Yes.
20 Q  Do you know whether any of the national
21 accounts provides sales data to Quincy?
22 A  I believe they do.
23 Q  Do you know which ones?
24 A  These aren't reports that I see on a
25 regular basis.  But I believe Walgreens does,

**32**

1  Walmart does, and I believe CVS does.
2  Q  And is it correct from what you said, do
3  those provide sales data -- well, let me ask.
4         Do those accounts that you mentioned that
5  they provide sales data, do they do that pursuant to
6  an agreement they have with Quincy?
7  A  You know, for most of those accounts, and
8  I can't say conclusively, but we typically have an
9  agreement to essentially pay that -- it's a revenue,
10 another revenue stream for the retailers, so they
11 charge vendors to receive weekly or monthly sales
12 data.
13 Q  Okay.  So for your accounts, you mentioned
14 Meyer, GNC, and Kroger, does Quincy pay for those
15 sales data?
16 A  In the case of Kroger, yes.
17        In the case of GNC and Meyer, I think that
18 might be provided without charge.
19 Q  How often does Quincy receive those
20 reports?
21 A  Typically weekly.  In those accounts that
22 I mentioned for me, they're weekly.
23 Q  Do you know who else, if anyone, at Quincy
24 monitors the performance of media?
25 A  So the people we named, Tom Dvorak.

8 (Pages 29 to 32)

37

1  Q   Has he mentioned making changes with
2  regard to advertising based on sales figures?
3  A   You know, there's a host of components
4  that go into whether, whether we spend a certain
5  amount of advertising, as I understand it.  So it
6  isn't just how are sales doing.  It's not that
7  simple.
8  Q   Is it a component, though, of that
9  decision-making process?
10  A   I would imagine, yes.
11  Q   And, again, would Tom Dvorak be the person
12  who would know most about that topic?
13     MR. CASTELLO:  Objection.
14     THE WITNESS:  Yes, I believe so.
15  BY MR. GLENNON:
16  Q   Are you a person involved in creating
17  content for any marketing materials?
18  A   I'm involved in the process.  It depends
19  on which marketing materials you're talking about.
20  Some more, some less.
21  Q   Okay.  Well, which materials are you
22  involved with to any extent?
23  A   Well, e-mail marketing, for example.
24  Q   What do you do with regard to e-mail
25  marketing?

38

1  A   We sit down with our team and review past
2  performance and develop new creatives.
3  Q   Okay.  And to whom would the e-mails go?
4  A   Subscribers who have signed up for our
5  newsletters, our electronic newsletters.
6  Q   And are these consumers who purchased --
7  are these consumers or are these retailers?
8  A   Consumers.
9  Q   And how would people sign up or subscribe?
10  A   There's several places on our website
11  where they can subscribe.
12  Q   Is that Prevagen.com?
13  A   Mm-hmm.  Yeah, I --
14  Q   Go ahead.
15  A   I was going to say we have sign-ups on
16  each of our websites.
17  Q   Okay.  And how are you involved in
18  creating the content, you know, for that, those
19  e-mails marketing?  What do you do specifically?
20  A   Well, we talk about what messages are
21  being received positively, based on the data, and we
22  work to create content that our subscribers like.
23  Q   All right.  Any other forms of marketing
24  in which you're involved with content creation?
25  A   Occasionally print ads.

39

1  Q   Anything else?
2  A   Those are the primary ones.
3  Q   What about press releases, are you
4  involved in putting those together?
5  A   Yes.
6  Q   Okay.  What do you do with regard to press
7  releases?
8  A   Well, it depends on the press release, but
9  typically I may draft a press release, or I may
10  issue it for distribution to a company who then
11  distributes it.
12  Q   How frequently does Quincy issue press
13  releases?
14  A   Not too often.
15  Q   Does it issue them for any particular
16  purpose?
17  A   Typically maybe a milestone event.
18  Q   Could you give me an example of that?
19  A   Sure.  Pharmacy Times recently completed
20  their OTC guide, which is an annual survey of
21  pharmacists and their recommended brands for OTC
22  products in a hundred -- over a hundred different
23  categories, everything from cough, cold, to various
24  dietary supplements.
25        And in the category of cognitive support,

40

1  Prevagen was picked as the number one
2  pharmacist-recommended brand for memory support.  So
3  we did a press release about that.
4  Q   Okay.  And when was that?
5  A   June of this year.
6  Q   How did Quincy become involved in that?
7  Was it a survey of pharmacists that the Pharmacy
8  Times conducted?
9     MR. CASTELLO:  Objection.
10     THE WITNESS:  Yeah, Pharmacy Times
11  conducted a survey.
12  BY MR. GLENNON:
13  Q   Okay.  And how did Quincy become involved
14  in that survey?
15     MR. CASTELLO:  Objection.
16     THE WITNESS:  The Pharmacy Times, as I
17  understand it, develops categories of dietary
18  supplements that they want to survey pharmacists
19  about.  It could be senior multi-vitamins.  It could
20  be probiotics or joint care.  And two years ago
21  memory support was added to that list of dietary
22  supplement conditions.
23  BY MR. GLENNON:
24  Q   Did Quincy do anything or have to do
25  anything to be considered --

10 (Pages 37 to 40)

61

1  Q  Okay. And I think your earlier testimony
2  related to the first two pages of the document. Is
3  that right?
4  A  I was commenting on the nature of the
5  exchange. It looked like an e-mail that had been
6  sent from Tom to Mark.
7  Q  And then sort of the top e-mail, there
8  appears that there are a number of attachments. Is
9  that correct?
10 A  Yeah. Tom says there are four script
11 documents I want to send to Tesh.
12    So, yes, I would agree with that.
13 Q  Okay. Are these all scripts for radio
14 advertisements?
15 A  If it was John Tesh, yes.
16 Q  Okay. Was it a national program?
17 A  I guess it would be fair to characterize
18 him as national. I don't know how many affiliates
19 his show had, but I know it was spread throughout
20 the country. I just don't know how big a footprint.
21 Q  Okay. Stepping back just a little bit,
22 maybe at a higher level, what kind of radio
23 advertising did Quincy have?
24    What types of radio ads did Quincy run?
25 A  You know, we did a variety of ads from,

62

1  you know, 15-second branded spots to something like
2  a John Tesh script, where it would be a personality
3  read that would take maybe 60 seconds to go through.
4  Q  Okay. Did Quincy also arrange for radio
5  interviews with Mark Underwood?
6  A  We did.
7  Q  Okay.
8     Did it arrange for radio interviews with
9  anyone else at Quincy?
10 A  Well -- can you repeat the question?
11 Q  Yeah.
12    Did any other Quincy employees do radio
13 interviews?
14 A  Mark was the primary one. It's possible
15 that other people may have filled in, but it was
16 primarily Mark.
17 Q  Who might have filled in?
18 A  I did one --
19    MR. CASTELLO: Objection.
20    THE WITNESS: -- radio interview one time.
21    Sorry, Geoff.
22    MR. CASTELLO: Go ahead.
23    THE WITNESS: Yeah, I did one radio
24 interview one time. And I don't know if anybody
25 else did. But it was primarily Mark.

63

1  BY MR. GLENNON:
2  Q  Okay. For the radio ads that had scripts,
3  who drafted the scripts?
4  A  My best recollection is this was a team
5  effort also to come up with the verbiage.
6  Q  And who would make up the team?
7  A  The people I mentioned before, Mark
8  Underwood, Tom Dvorak, myself. Dakota Miller would
9  have been in on radio script development.
10 Q  Was the radio advertising typically
11 national in scope?
12 A  There was -- there actually isn't a
13 typical. I mean, the -- radio interviews could be
14 on one station in one town in one state, or it could
15 be a 15-second branded interview that is on a
16 nationally syndicated talk show.
17 Q  Who at Quincy was involved in deciding
18 where to run ads, radio ads?
19 A  Again, that goes back to the media buying
20 component, so that would be Tom Dvorak and Mark
21 Underwood and Ryan Liebl.
22 Q  Do you know when Quincy began advertising
23 by radio?
24 A  No, I don't know exactly when.
25 Q  Do you have a rough idea?

64

1  A  I would say probably sometime in 2008.
2  Q  When did you begin at Quincy?
3  A  2007.
4  Q  And has Quincy advertised using radio
5  throughout the time from roughly 2008 to the
6  present?
7  A  You cut off there in the middle of the
8  question. I didn't hear it.
9  Q  Oh.
10    Has Quincy advertised using radio ever
11 since 2008?
12 A  I would say, more or less, yes.
13 Q  Was there any period of time during which
14 they, Quincy, did not advertise using radio ad?
15 A  I can't say for sure.
16 Q  Okay. Is Quincy currently running radio
17 ads?
18 A  Yes.
19 Q  With -- radio ads with set scripts?
20 A  No. They're more the short, branded
21 15-second or 30-second spots.
22 Q  What about Mark Underwood, is he still
23 doing radio interviews?
24 A  No.
25 Q  Okay. When did he stop doing that?

16 (Pages 61 to 64)

```
                                                            77
 1    the end of the commercial to let people know where
 2    they can find Prevagen.
 3        Q    And is it correct that Quincy began to
 4    focus on that specific brand of advertising -- or
 5    when did Quincy begin to focus?
 6        A    Yeah.  My best recollection, it was
 7    probably around 2013/2014, again.
 8        Q    Did Mark Underwood also appear for
 9    interviews on TV?
10        A    I believe he did, again, in a more
11    regional or targeted market, wherever the health
12    shows who particularly interviewed him happened to
13    air.
14        Q    And does Quincy maintain a log of those
15    interviews?
16        A    So that wasn't under my purview, so I'm
17    not sure about that.
18        Q    And whose purview would that be?
19        A    Dakota Miller.
20        Q    Are you not aware of a log of TV
21    interviews?
22        A    No.
23        Q    I'm sorry?
24        A    I'm not, no.
25        Q    Okay.
```

```
                                                            78
 1        Okay.  How does the creative process for
 2    TV commercials, how does that work?
 3        MR. CASTELLO:  Objection.
 4        THE WITNESS:  An idea gets brought up
 5    somehow by someone.  I can't tell you exactly what
 6    the creative process is.  And it would get -- it
 7    would get often drafted, we would discuss it, and --
 8    and, you know, depending on which commercial it was,
 9    we might -- we might test it with some initial runs
10    and see how it performed.  If it performed well,
11    then we would -- we would scale it up.
12    BY MR. GLENNON:
13        Q    And who would draft the content?
14        A    So there was, you know, typically a team
15    of video production people and marketing people that
16    might work together on that.
17        So, again, Tom Dvorak generally led the
18    production effort.  And, you know, certainly I was a
19    part of many of those discussions as far as ideas.
20    Dakota Miller, Mark Underwood.  Those were the
21    primary people.
22        And we worked with -- or work with Seth
23    Taylor, whom you mentioned earlier, who helps with
24    that -- or he actually does the technical video
25    production side of it.
```

```
                                                            79
 1        Q    Is he still at Quincy, Mr. Taylor?
 2        A    He still works with us, yes.
 3        Q    Okay.  And is it correct you don't know
 4    his status, whether he is an employee?
 5        A    I believe he is an independent
 6    representative or contract employee.
 7        I don't know the exact nature of his
 8    employee status.  I know that he has a Quincy
 9    Bioscience e-mail address, but that doesn't actually
10    say anything about his full-time status.
11        Q    Did Quincy work with any outside parties
12    to come up with content?
13        A    Yes, for a period of time we did.
14        Q    Who were those parties?
15        A    The Richards Group was -- was one party.
16        Q    Anyone else?
17        A    Earlier on, in the infomercial direct
18    response time period, we worked with a company to
19    help produce that.
20        Q    What company was that?
21        A    It was called Avalanche.  I believe
22    A-V-A-L-A-U-N-C-H-E [sic].  Avalanche.
23        Q    Any other third parties?
24        A    On television ad production, no.  That's
25    who I'm aware of.
```

```
                                                            80
 1        Q    Have you heard of a company, I believe
 2    it's called CBS Creative 2?
 3        A    I've heard of CBS.
 4        Q    Right.  But not CBS Creative, or CBS
 5    Creative 2?
 6        A    Not specifically that name, no.
 7        Q    So are you aware of anyone with a similar
 8    name with which Quincy worked to come up with
 9    content for ads?
10        A    Yeah, I know that we partnered with a CBS
11    affiliate at one time to develop a creative.  I
12    don't know the name of that company.  It sounds like
13    what you might be bringing up.
14        Q    Okay.  How did that work?  I mean, it was
15    an affiliate?  Was it a station?  Or just can you
16    explain how that relationship worked?
17        A    I wasn't involved in that one.  So that
18    was -- that was Tom Dvorak's area.
19        THE COURT REPORTER:  That was a "what"
20    area?  I'm sorry, for clarification.
21        THE WITNESS:  Yeah, sorry.
22        It's Tom Dvorak oversaw that project with
23    a CBS affiliate.
24    BY MR. GLENNON:
25        Q    And how would, when you said Quincy
```

                                                                                                     93

 1         We did a local sleep study.
 2         We did some earlier on studies that were
 3   open-label studies of Prevagen for memory, what we
 4   call quality of life studies.
 5         And I believe we did a study in people
 6   with fibromyalgia as it relates to cognition.
 7     Q   Any other studies?
 8     A   That's what comes to mind right now.
 9         MR. GLENNON:  I'll be right back.
10         (Short pause)
11         MR. GLENNON:  Okay.  I'm going to mark
12   another document.  And this will be marked as TO 7.
13         (Deposition Exhibit TO 7 was introduced
14           into the record.)
15   BY MR. GLENNON:
16     Q   Okay.  Do you see that on your screen?
17     A   I do.
18     Q   Okay.  Have you seen this document before?
19     A   It may have been in my binders in
20   preparation for this.
21     Q   Okay.
22         Okay.  I'm just going to use it for a
23   reference purpose, Mr. Olson.  It's a little
24   difficult to navigate this document because there
25   are actually no page numbers, so that's what's

                                                                                                     94

 1   taking me a little while to find my place.
 2         Okay.  If you go to page 6, I believe, of
 3   the document.
 4     A   Mm-hmm, yeah.
 5     Q   Okay.  In response to Question 4 there, in
 6   the middle of the page, roughly.
 7         You see where I am?
 8     A   Yeah.
 9     Q   Okay.  The -- let me see, the fourth
10   bullet point down there.
11         Do you see that?
12     A   I do.
13     Q   Referring to you, okay.
14         It says -- the question in Number 4, for
15   the record, reads:
16           "Identify each person responsible for
17            developing, reviewing and/or evaluating
18            scientific substantiation for all product
19            advertising claims."
20         And then the bullet that we just mentioned
21   states:
22           "Todd Olson, Marketing Development
23            Manager, involved in the clinical trial
24            recruitment assistance with translation
25            of scientific data into marketing

                                                                                                     95

 1            language."
 2         Do you see that text?
 3     A   I do.
 4     Q   Okay.  I'm going to focus on the last part
 5   of that.
 6         Your assistance -- where it says:
 7   "Assistance with translation of scientific data into
 8   marketing language," what does that mean?
 9     A   That's working with the team to find -- or
10   take the findings that we had from the study and
11   help translate that into advertising or marketing
12   language or copy that would be understandable to a
13   consumer.
14     Q   Which study are you referring to?
15     A   The Madison Memory Study.
16     Q   Okay.  And what forms of media would you
17   try to use AD8 from the Madison Memory Study?
18         MR. CASTELLO:  I'm sorry.  I did not hear
19   the whole question.
20         If the court reporter did hear that, if
21   you could read it back, please.
22         (The record was read aloud as follows:
23         "QUESTION:  Okay.  And what was the media
24           that you tried to use from the Madison
25           Memory Study?")

                                                                                                     96

 1         MR. CASTELLO:  Objection.
 2         MR. GLENNON:  I'm sorry.  I'm not sure if
 3   it came out completely then.
 4   BY MR. GLENNON:
 5     Q   What forms of media did you attempt to use
 6   or translate scientific data from the Madison Memory
 7   Study?
 8         MR. CASTELLO:  Objection.
 9         THE WITNESS:  It wasn't media specific.
10   There were just general -- general pieces of
11   marketing content or copy that we were able to come
12   together as a team and decide that we would want to
13   use in various pieces of marketing, whether that be
14   a website or print ad or a TV ad.  So it wasn't
15   media specific.
16   BY MR. GLENNON:
17     Q   Okay.  And is this team made up of the
18   same members we discussed previously?
19     A   Yes.  The marketing team, yes.
20     Q   Did it function the same way as you've
21   described previously?
22     A   With the caveat being, if this is the
23   scientific data coming from a study, that, you know,
24   there would be other people helping say what the
25   data means that is coming from the study.