# Exhibit 2

# In the Matter of:

# FTC, et al. v. Quincy Bioscience Holding, et al.

*August 20, 2020*
*Mark Underwood - 30(b)(6) - Confidential*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

```
                                              17                                                    19
 1      Q. And are those the only two instances where       1           MR. CASTELLO: Objection.
 2   you've testified?                                      2           THE WITNESS: A verbatim is a term for how our
 3      A. Yes.                                             3   sales team would answer questions from consumers.
 4      (Deposition Exhibit Number MU-2, 11/13/13 Miller    4           BY MS. SOBERATS:
 5   Email Re: Verbatims #3, was marked for identification.) 5     Q. And the people in the To line of this email, are
 6          BY MS. SOBERATS:                                6   those the individuals who would have been a part of the
 7      Q. Okay. Mr. Underwood, I'm showing you what's      7   sales team?
 8   been marked as Exhibit MU-2. It is Bates stamped       8      A. Yes.
 9   QUI-FTCNY-00104382. Do you recognize this document?    9      Q. So they were receiving these verbatims, were
10          MR. CASTELLO: Annette, can you publish that for 10   they expected to use these verbatims in their
11   us?                                                   11   communications with consumers who called in asking about
12          MS. SOBERATS: I revealed it. Are you able to   12   Prevagen?
13   see it, Mr. Underwood?                                13      A. I don't know what instruction accompanied this,
14          THE WITNESS: I see it on the AgileLaw screen,  14   because the email was from Dakota to them. So I don't
15   yes.                                                  15   know the context of the communication.
16          MS. SOBERATS: Is anyone else having difficulty 16      Q. Do you know for what purpose these verbatims
17   seeing this exhibit?                                  17   were used?
18          MR. DELEEUW: No, it's showing up for me.       18      A. Not specifically, because that's not included in
19          MS. SOBERATS: Okay. Geoff, are you looking at  19   the communication.
20   the left panel?                                       20      Q. But are you aware of how these verbatims were
21          MR. CASTELLO: It just came up. I refreshed.    21   used?
22   I'm sorry. I'm sorry about that.                      22      A. Typically they were used to answer frequently
23          BY MS. SOBERATS:                               23   asked questions from consumers.
24      Q. That's all right.                               24      Q. Okay. And these would be consumers who called
25      Mr. Underwood, my question was whether you         25   in to Quincy to place an order?

                                              18                                                    20
 1   recognized this document.                              1      A. That would be an example of one. One
 2      A. I do not.                                        2   circumstance.
 3      Q. So this appears to be an email from Dakota       3      Q. So can you give me other examples of when these
 4   Miller, it's dated November 13th, 2013, and it has the 4   verbatims would be used?
 5   subject line, "Emailing: Verbatims #3."                5      A. Well, a consumer may ask a question via the
 6         Let's start out with Dakota Miller. Who is       6   phone, via an email, via a letter. I mean, so --
 7   Dakota Miller?                                         7      Q. And were these verbatims intended to assist the
 8      A. He's our director of sales and marketing.        8   sales team in answering questions from consumers?
 9      Q. And who are the individuals listed in the To     9      A. I don't know what Dakota was communicating in
10   line?                                                 10   this specific email, this is the first time I've seen
11      A. At the time, they were some of the account      11   it.
12   managers that reported to Dakota Miller.              12      Q. I've seen other verbatims in the Defendants'
13      Q. Okay. And if you look at the attached document, 13   production. Are they updated annually?
14   that starts on page 2, Mr. Underwood, what is this    14          MR. CASTELLO: Before the witness answers,
15   document?                                             15   Ms. Soberats, which topic is this related to?
16      A. That appears to be some guidance on how to      16          MS. SOBERATS: This is related to topic F(c)(2).
17   handle common questions from consumers.               17   He just testified that they were used by the sales team
18      Q. Do you know who wrote it?                       18   when consumers called in.
19      A. I'm not certain who wrote it. The way the email 19          MR. CASTELLO: For the record, topic F(c)(2)
20   reads, it looks like Dakota wrote it.                 20   reads, "Direct consumer sales," and direct consumer
21      Q. Okay. And did you review this document before   21   sales as written here means sales made directly from the
22   today? Have you seen it before today?                 22   company to consumers as opposed to through a retail or
23      A. I have not.                                     23   other channel.
24      Q. Do you know how these verbatims were used at    24          MS. SOBERATS: That's right, and he just
25   Quincy?                                               25   testified that the sales team at Quincy uses these
```

5 (Pages 17 to 20)

Page 81

 1   issues that you've identified here?
 2       A. Potentially other members of our board,
 3   shareholders. To be honest, friends and family. I
 4   mean, those are the people that Mike focuses his
 5   attention on.
 6       Q. Did you share this document with anyone else?
 7       A. This email only is sent to Michael Beaman.
 8       Q. Did you and Mr. Beaman have meetings to discuss
 9   how, if at all, Quincy would revise its advertising in
10   response to the 2012 FDA warning letter?
11       A. No.
12       MR. CASTELLO: Objection.
13       BY MS. SOBERATS:
14       Q. So Mr. Beaman never asked to be briefed on FDA's
15   warning letter and the company's response?
16       MR. CASTELLO: Objection.
17       THE WITNESS: No, we just took care of it. I
18   mean --
19       BY MS. SOBERATS:
20       Q. When you say "we just took care of it," what do
21   you mean by that?
22       A. Well, internally, you know, we had our team, you
23   know, review the letter, review the items that were
24   listed in the letter, and we worked in conjunction with
25   counsel to address any alleged issues and addressed

Page 82

 1   them.
 2       Q. And who is we?
 3       A. At the time, our team, let's see, would have
 4   been -- excuse me. I mean, a lot of people on our
 5   advertising -- marketing and advertising team, or our
 6   digital marketing team were part of that process. We
 7   took the items that were presented to us very seriously
 8   and worked together to, you know, make sure that we had
 9   all of our advertising and marketing, including websites
10   or social media that are referenced here, to have the
11   appropriate content and remove anything that FDA was
12   less than comfortable with. We did that in conjunction
13   with the advice of counsel.
14       Q. And the digital marketing team that was in
15   charge of looking at the ads and taking care of concerns
16   raised in the FDA's warning letter, did they report to
17   you on their actions?
18       A. Well --
19       MR. CASTELLO: Objection.
20       THE WITNESS: I mean, we all worked on this
21   together. So it wasn't like a direct -- you know, a
22   situation where they had to just tell Mark they did it.
23   Most of our digital marketing team reports up through
24   Todd Olson, but it wasn't just their -- their effort or
25   their project, we all worked on it together. And

Page 83

 1   different questions that we had, we would consult with
 2   counsel to make sure we, you know -- I don't know, I
 3   guess were doing it right -- "right".
 4       BY MS. SOBERATS:
 5       Q. Did you discuss the --
 6       A. I'm sorry.
 7       Q. Did you discuss the FDA warning letter at board
 8   meetings?
 9       A. Yes.
10       Q. And what was the nature of those discussions?
11       MR. CASTELLO: I'm going to caution the witness
12   that if in order to answer that question he would be
13   required to divulge communications that the company had
14   with its counsel, that he not answer that question.
15       THE WITNESS: Geoff is correct.
16       BY MS. SOBERATS:
17       Q. So after the company -- well, did the company
18   engage in any corrective actions in response to the FDA
19   warning letter?
20       A. Yes.
21       MR. CASTELLO: Objection. I'm going to caution
22   the witness that if in order to answer that question he
23   would be required to divulge any communications that the
24   company had with its counsel, that he not answer it.
25       MR. DELEEUW: And this is Michael deLeeuw, I

Page 84

 1   just want to remind the witness to give a quick second
 2   for Geoff to impose an objection if there's one that's
 3   appropriate before answering.
 4       BY MS. SOBERATS:
 5       Q. And I just want to clarify in response to
 6   objections raised by counsel that I am not asking about
 7   communications that you had with in-house counsel or
 8   outside counsel, I'm asking about whether the company
 9   engaged in any corrective actions in response to the FDA
10   warning letter.
11       MR. CASTELLO: And I -- the way that that
12   question is posed might elicit communications that the
13   company had with its counsel, so on that basis, I'm
14   going to make the same caution for the witness. If you
15   were to rephrase it, I could listen to that question and
16   we could give that one a shot, but the way that question
17   is phrased, it calls for what I understand to be
18   potentially privileged communication.
19       MS. SOBERATS: Well, it's a yes or no question,
20   but I will rephrase the question, Geoff.
21       MR. CASTELLO: Yeah, that's fine. And I don't
22   want to belabor this, but you can ask questions that
23   pack into the question substance and that a yes or no
24   response could divulge the substance, and that's what
25   I'm trying to be very cautious about here and to ask the

157

1    Q. Okay. It does have a UPC number, correct?
2    A. In typical printing it would, yeah. UPC is
3  applied at the printer.
4    Q. Okay.
5    A. Yeah.
6    Q. And if you can please look at the three -- the
7  three-bar chart here under Clinically Tested.
8    A. Um-hmm.
9    Q. Can you tell me in this chart what outcome from
10 the Madison Memory Study is this chart based on?
11   A. Based on our previous conversations, I'm not
12 certain.
13   Q. And who created this three-bar chart?
14   A. I don't know the date of the packaging. There's
15 no version number on what you've provided. So I don't
16 know when this was -- and by the way, this is just the
17 artwork with the bleed and the varnish on it for the
18 printer to use. So I don't know the exact time frame.
19   Q. Okay. Mr. Castello, Mr. Underwood was
20 designated as the corporate representative for topic C,
21 which pertains to advertising, that would include this
22 bar chart which was included in Prevagen's advertising,
23 and I've been unable to get any answers from him about
24 what outcome from the Madison Memory Study this bar
25 chart is based on. He's unable to tell me who created

158

1  this bar chart. And my colleagues tried to elicit this
2  information from Mr. Olson, who has marketing
3  responsibilities at Quincy, and from Kenneth Lerner, who
4  was, as you know, the principal investigator of the
5  Madison Memory Study, and no witness has been able to
6  answer these very basic questions about this chart which
7  was prominently featured in advertising for Prevagen.
8       So we will need to follow up on this issue.
9  We've tried multiple ways and multiple times and we're
10 simply not getting the information that should be
11 readily forthcoming from the corporate representative
12 and the other witnesses that we have deposed during fact
13 discovery.
14      MR. CASTELLO: If you wanted testimony from a
15 corporation through Rule 30(b)(6) to this level of
16 granularity, there should be a topic that sets forth,
17 with specificity, exactly what you intended to do by
18 using that chart or whatever iteration. So I disagree.
19 I would be happy to talk to you in a meet and confer
20 context to see what we can do to provide that
21 information, but reading this 30(b)(6) notice that has
22 been marked as this deposition today, at that level of
23 granularity, it is not -- it is not called for in the
24 topic list.
25      MS. SOBERATS: And I would refer you,

159

1  Mr. Castello, to the very last sentence of topic C,
2  which very clearly states that it includes the creation,
3  development, revision, evaluation and approval of the
4  specific advertising and marketing materials attached as
5  exhibits to the complaint, and as I've established in my
6  questioning, this bar chart appeared in the complaint.
7  We had excerpts of it on multiple pages of the
8  complaint, and it was also attached in exhibits to the
9  complaint.
10      And we've also asked for this information -- we
11 have asked for information about this bar chart in the
12 interrogatories that we served on the Defendants.
13 Presumably the corporate representative would have
14 reviewed those interrogatory responses and been on
15 notice that we would be asking about this chart.
16      MR. CASTELLO: We are in disagreement, but as I
17 said, we'll meet and confer and attempt to come to a
18 resolution.
19      MS. SOBERATS: Okay. Thank you.
20      I would also like to note that we are going to
21 have to keep this deposition open, since Mr. Underwood
22 did not answer my questions about research at Quincy
23 that was started after the Madison Memory Study. Those
24 questions pertain to an ongoing dispute that is
25 currently being briefed in the Southern District of New

160

1  York, and so we will keep this deposition open pending
2  resolution of that discovery dispute.
3       MR. CASTELLO: Just for the record, my silence
4  is not accepted as an admission that Plaintiffs are
5  entitled to it. It is the company's, the Defendants'
6  position that, in fact, the Plaintiffs are not entitled
7  to that information, but yes, it is the subject of an
8  open dispute.
9       MS. SOBERATS: Thank you.
10      Kate, do you have any questions that you would
11 like to ask of the witness?
12      MS. MATUSCHAK: I have no questions today, but I
13 may have questions if and when this deposition resumes
14 after our discovery dispute is resolved.
15      MS. SOBERATS: Geoff, do you -- Mr. Castello, do
16 you have any redirect?
17      MR. CASTELLO: No.
18      MS. SOBERATS: Okay. Well, that concludes our
19 30(b)(6) deposition, but as I said, we will keep it open
20 pending resolution of the ongoing discovery dispute.
21      MR. CASTELLO: And I'll refer to my most recent
22 statement on that topic.
23      MR. DELEEUW: Could you guys say it one more
24 time?
25      VIDEO TECHNICIAN: This concludes today's

40 (Pages 157 to 160)