# Exhibit 3

# In the Matter of:

# FTC, et al. v. Quincy Bioscience Holding, et al.

*August 21, 2020*
*Mark Underwood - Individual - Confidential*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Q. That's fine. I guess let me rephrase my question.**
A. Okay.
**Q. After you and Mr. Underwood --**
A. I am Mr. Underwood.
**Q. Sorry, after you and Mr. Beaman receive communications on regulatory matters, do the two of you sit down to discuss the company's response?**
A. No, not without counsel.
**Q. But the two of you -- but the two of you and counsel discuss these matters?**
A. Oh, yes, with counsel.
MR. CASTELLO: Objection.
THE WITNESS: Yes.
(Deposition Exhibit Number MU-28, Quincy Bioscience Holding Company's Answers to the Federal Trade Commission's Civil Investigative Demand Interrogatories, was marked for identification.)
BY MS. SOBERATS:
**Q. Mr. Underwood, I have just revealed a new exhibit, this has been marked as Exhibit MU-28. And these are Quincy Bioscience Holding Company's Answers to the Federal Trade Commission's Civil Investigative Demand Interrogatories. This document is dated September 15th, 2015. Do you see this on your screen?**

A. I do.
**Q. Okay. Let's turn to page 5 of this document. And I want you to look at the answer for interrogatory 3.**
A. Yes.
**Q. According to this response, you are "part of the marketing team" at Quincy. Can you explain your role and responsibilities as a member of Quincy's marketing team?**
A. Sure. I help to lead discussions or participate in discussions, clearly with my title, there is always a bit of a presumption of leadership, because some of the staff, of course, you know, works for me. But anyway, participating in a creative session related to any form of media that we're interested in marketing through, print, radio, TV, digital. That covers most everything.
Working on ways that we develop messaging that connects with our target consumer audience. Working to see that everyone does their part to develop their responsibilities within the team. Sometimes bringing in other team members that are not, you know, internal to Quincy, but agency resources, other designers, other specialized marketers.
And again, I don't do all that myself, but that's part of the team activity and sort of, you know,

coordinating all that activities -- all those activities.
And then working to get it to be a finished advertisement and ultimately placed. You know, that placement -- I don't place any ads. Ryan places probably 95 percent of our ads, maybe 90 percent. And see that during the process everyone gets along with everyone else.
**Q. The Ryan that you just mentioned, is that Ryan Liebl?**
A. Yeah. Yeah.
**Q. Thank you.**
**(Deposition Exhibit Number MU-29, 8/24/16 Richards Group Correspondence, was marked for identification.)**
BY MS. SOBERATS:
**Q. I have just marked Exhibit MU-29, that should show up on your screen. And this is Bates stamped QUI-FTCNY-00171215. Mr. Underwood, do you see this document on your screen?**
A. I do.
**Q. And do you recognize it?**
A. I do.
**Q. What is it?**
A. Well, it's a communication between Quincy

[redacted]

**conducted entirely in-house now?**
A. What do you mean by advertising functions? Buying the media?
**Q. Right, and creating -- putting together advertising creatives, disseminating those advertising -- new advertisements.**
A. We -- we buy our own media, so that's done in-house. But I mean, that's always been done in-house. Developing creatives is done in-house, like I mentioned, sort of the collaborative work of our marketing team.
[redacted]

[redacted]

Underwood/Olson/Seney Email Exchange, was marked for identification.)
BY MS. SOBERATS:
**Q. And I have just marked a new exhibit, Mr. Underwood, this is Exhibit MU-30. It is Bates stamped QUI-FTCNY-00164660. Do you recognize this document?**
A. Yes.
**Q. What is it?**
A. It's email correspondence or a chain between myself, Todd and Ryan Seney looking at -- I guess I'd call it packaging. Packaging edits.
**Q. Okay, and who is Ryan Seney?**
A. Ryan Seney at this time was the former employee, he used to do some of our graphics in-house and he left to start his own -- I guess his own shingle. And so he continued to help us out with some of our graphics needs, but under his own -- his own company name.
**Q. And would that company be Burn United Records, LLC?**
A. Yes. He was in a band, he was really excited about doing graphics for different bands.
**Q. Okay.**
A. But he continued to do some graphics for us, too.
**Q. Does Quincy have a business relationship with**

**Burn United Records, LLC?**
A. We don't anymore, no, but we did for a while, yeah.
**Q. And what was the nature of that relationship?**
A. We paid him hourly as a 1099 employee to adjust our labeling or do some -- I'll call him a -- he did projects for us, and this was mostly in an interim between us having a full-time person in-house. So I think he did this for us for maybe a year.
**Q. Okay. And I'd like you to go to page 2, and locate the email that you sent to Ryan on February 25th, 2016 at 10:07 a.m.**
A. Whoops. Okay.
**Q. So, Mr. Underwood, in this email, I see various bullet points to Mr. Seney with very specific edits that you wanted to be made to Prevagen's packaging. Do you see those bullets?**
A. Yes.
**Q. And why were you asking for these changes in 2016?**
A. Which particular change?
**Q. All of these.**
A. All of them?
**Q. Why so many changes to the packaging of Prevagen -- of the Prevagen products in 2016?**

Case 1:17-cv-00124-LLS Document 214-3 Filed 03/18/22 Page 5 of 9
Underwood - Individual - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.
8/21/2020



Page 57 — [redacted]

Page 58 — [redacted]

Page 59 — [redacted]

Page 60

    BY MS. SOBERATS:
 Q. And did you approve edits to Prevagen's packaging?
 A. I would be one of the people that approved edits to Prevagen's packaging, but not the sole individual.
 Q. Who else would approve edits to Prevagen's packaging?
 A. Internally, people that are part of our marketing and advertising team, as well as counsel.
 Q. Does Mr. Beaman approve edits to Prevagen's packaging?
 A. He does not.
 Q. Is he consulted before substantive changes to Prevagen's packaging?
 A. He is not.
 Q. Let's talk about the Brain Health Guide for a few moments. Have there been five editions to the Brain Health Guide?
 A. I don't know exactly.
 Q. Okay. Have you authored all of the editions of the Brain Health Guide?
 A. I have not.
 Q. Who else has authored them?
 A. We have different content contributors, both inside the company and outside the company.

15 (Pages 57 to 60)

**Walgreens or CVS, is that an example of branded advertising?**
A. Yes.
**Q. And why was the decision made to transition to branded advertising in the spring of 2014?**
A. It was a more scalable business model, because we had increased retail distribution, and would be better -- the consumers would be better served to purchase Prevagen because it was basically, you know, in their neighborhood now instead of having to be ordered from us directly and shipped to them to their household, for instance.
**Q. And do you recall which retail partners Quincy had at the time that you made this transition?**
A. Well, not in their entirety. We had Walgreens, RiteAid and CVS would probably be the three largest at the time.
**Q. Okay.**
A. We have -- we have a couple of thousand accounts, so --
**Q. Understood.**
A. Yeah, okay.
**Q. So in the spring of 2014, I have that year right, correct? 2014?**
A. I think you do.

**Q. Okay.**
A. If I have it correct, you have it correct.
**Q. Okay, I just wanted to make sure I was being consistent with what you said.**
A. Yeah.
**Q. So spring of 2014, was that when Quincy moved away from the use of infomercials?**
A. We transitioned from the direct response model to the branded model, yeah. So that would include the infomercial. Or the cessation of the infomercial.
**Q. Okay. And the Better Memory Show, was that disseminated nationally?**
A. It was in local markets and then it was on some cable networks. So the answer would be yes and no, depending on the media buy.
**Q. Okay, and which local markets are we talking about?**
A. Dozens of local markets.
**Q. Was New York one of the local markets?**
A. It probably was.
**Q. And which cable market are we talking about?**
A. Well, I would -- I'll give you an example. Like if you purchased time on, let's say Discovery, the Discovery Channel, that would be a national network, but at the same time that we would buy a Discovery Channel

slot, we may also buy a Houston, Texas spot. And so --
**Q. Okay.**
A. -- every day or week was different. So we had a mix of local and national spots.
**Q. And was the Better Memory Show only disseminated on TV or was it also disseminated via Internet?**
A. You know, it probably was on YouTube, but that's not really broadcast. I mean, so it was on -- I think it was on YouTube, yeah.
**Q. Did it ever appear on any of Quincy's websites?**
A. It might have, but I think technically, you would have to link to YouTube to watch it.
**Q. Okay.**
A. I think that's probably a little bit behind the curtain of how it actually works, but --
**Q. And you appeared in the Better Memory Show, correct?**
A. I did.
**Q. Who selected Teri Barr and Cyndi Edwards as the host of the Better Memory Show?**
A. Well, we had worked with Teri -- Teri was a journalist, and Teri had interviewed me back in the early years of the company before Prevagen -- with Prevagen, when we were just doing the research. And she reported on the company. And so I got to know her back

in like 2005 or '06, or I don't recall exactly when. And we had kept in touch, and she was really interested in what we did, because, you know, she followed the science, she followed the development of things ever since, you know, we started out in just the lab and just in rodents.
And then we connected for the opportunity to work on the infomercial together and we talked about it, our advertising team and her, and it was a good fit because she had a genuine interest in the product, and it wasn't -- it wasn't new to her, so she was keenly interested in it. And that's how we chose Teri.
**Q. And Cyndi Edwards, who chose her as the host?**
A. We came to know her through a TV station in Tampa, but I don't remember the specific details. I'm not sure if they interviewed me on -- on their show and then we decided to work together on the infomercial together, but involved in making the decision was the same people on our advertising team, myself, Tom Dvorak, but I don't recall those circumstances. I hadn't known Cyndi for as many years as I knew Teri.
**Q. Do you recall the show that Cyndi Edwards was doing at the time where you appeared for an interview?**
A. I don't.
**Q. And was the Better Memory Show done in-house or**

**did you work with a third party?**
A. Well, when we did it with Teri, we brought in a production team to film the show, and then when we did it with Cyndi, we used their studio, and it was near Tampa. And I want to say the name of her show was like Good Day Tampa, or -- I don't know, Morning Sunshine Tampa.
**Q. And the Better Memory Show with Cyndi as the host, that was disseminated, correct?**
MR. CASTELLO: Objection.
THE WITNESS: Yeah.
BY MS. SOBERATS:
**Q. Your answer is yes?**
A. Yes, it is.
**Q. Okay. We haven't -- the reason I'm asking is because we haven't received dissemination information on that version of the Better Memory Show, Mr. Castello, so I will be talking with you about that later.**
**So you said you brought a production team on board for the taping with Teri Barr.**
A. Um-hmm.
**Q. Which production team was that?**
A. Gee. They were based here in Madison, but I can't remember their name.
**Q. Okay. And where was the Better Memory Show**

**taped when you had Teri Barr as the host?**
A. Here in Madison.
**Q. And who wrote the script for the Better Memory Show?**
A. We did internally, with Teri's assistance.
**Q. Were you involved in drafting the script?**
A. Well, I had to answer the questions she asked, so a lot of the script was done like a real interview.
**Q. Okay.**
A. So my lines weren't necessarily pre -- prewritten. I wasn't reading off of a teleprompter.
**Q. So you were speaking in the moment when -- during this --**
A. Yeah, yeah. I mean, not that it wasn't, you know, thought about, but it wasn't scripted.
**Q. And, Mr. Underwood, you're referred to as a neuroscientist throughout the Better Memory Show, and you were introduced as a neuroscientist, but we previously discussed that you never obtained a formal neuroscience degree. So why did the infomercial refer to you as a neuroscientist?**
MR. DELEEUW: Object to the form.
THE WITNESS: Well, in my capacity here at Quincy, I've sponsored more research than many people that are in academics with degrees related to the

neurosciences.
BY MS. SOBERATS:
**Q. And this next question relates to a point you made earlier about your direct response advertising. The infomercial featured a toll-free number that viewers could call to place an order, and I actually have that number here, it's 888-928-1928. Is that a number that would route callers to Quincy Bioscience?**
A. I'm not sure. We used dozens of different numbers.
**Q. So when consumers called those toll-free numbers, where were they led to?**
MR. CASTELLO: Objection.
THE WITNESS: To our internal call center.
BY MS. SOBERATS:
**Q. Okay.**
A. And at times to external call centers.
**Q. Okay.**
A. But usually our own.
**Q. And --**
A. We found that working with others, which we did in the very beginning, we didn't have the quality of person on the phone that we wanted, and so that's why we did it in-house.
**Q. Do you recall --**

A. We answered the calls in-house. Sorry.
**Q. Do you recall the time period in which calls were answered in-house?**
A. Well, we still answer calls in-house.
**Q. But calls --**
A. So -- I mean, so we still -- we still get people to call some of those same numbers that we haven't advertised in about six years.
**Q. But at the time that you had your direct response marketing -- well, the time frame during which you had these toll-free numbers would have been the time frame that you -- that Quincy used its direct response marketing. Is that correct?**
MR. CASTELLO: Objection.
THE WITNESS: Well, the phone numbers are still being called by consumers that saw ads literally six years ago. So that activity still happens, although it's -- it's not -- those phone numbers still -- excuse me, those phone numbers aren't currently displayed in advertising, yet consumers still call based off of that older advertising.
BY MS. SOBERATS:
**Q. So who at Quincy answers calls from consumers?**
A. Our account managers.
**Q. Okay. And do they use scripts during their**

A. Yeah.

**Q. And I'd like you to turn to page 6, and just for the record, these are Defendant Quincy Bioscience Holding Company, Inc.'s Responses -- Answers to the FTC's Civil Investigative Demand Interrogatories. If you go to page 6, Mr. Underwood, I'd like you to look at interrogatory 4. The answer lists you, Mark Underwood, as president and it states that you're involved in translation of scientific data into marketing language. Can you explain to me what that means?**

A. Sure. You've read a lot of our research, and you probably would also agree and recognize that some of the topics that we research don't roll off the tongue real clearly if you don't have a background in neurosciences. And so we try to make that messaging connect with people that don't have Ph.D.s. So in a sense we need to make sure that the things we learn in the lab are translated into appropriate consumer language.

So part of that is for just clear communication, and part of that is probably more importantly to make sure that we don't overextend or overpromise the type of claim that we're making from research because, as you know, there are different agencies that are in charge of such, and we're never looking to be on the bad side of

them. So if data comes out of a lab that maybe shows some sort of like -- I'll call it a disease-like response, or dizzy -- treatment like, you know, status, even though that's scientifically valid, we have to make sure that we don't convey that to a consumer because it would become an issue with perhaps the Food and Drug Administration.

So part of it is, again, you knew, clear communication to the consumer, and part of it is making sure that we know our audience so that we don't break a rule when it comes to sharing what we might have learned, we don't necessarily have the right to share that fully with a consumer audience because of the regulations we fall under.

**Q. And you're involved in this process that you've just described?**

A. I am, in conjunction with counsel. But yes.

**Q. Is Mr. Beaman involved in this process?**

A. No, he is not. To add, our entire team is involved in this process in terms of our marketing and advertising personnel, and we continue to learn and we continue to take those lessons that we learn along the way and implement them into -- into our collective experience so that we do it better and better, hopefully, as time goes by.

**Q. And, Mr. Underwood, you testified earlier that you have communications multiple times a week with Mr. Underwood -- Mr. Beaman, pardon. And that you keep him informed on research. Why do you keep Mr. Beaman informed on research?**

A. Well, it does affect some of the bigger picture items in our company, and so I mean, he's interested in how well the company is doing. He's interested in things like, you know, what the future might hold in terms of what we're looking at developing and the path we're going for the future.

So, yeah, I do inform them of what's going on with research, although we do talk several times a week, we rarely talk about research because we don't have research updates several times a week. We have operational things, the basic running of the business that, you know, we might discuss, you know, one topic or the next.

**Q. And has he requested to have these regular communications with you?**

A. No.

MR. CASTELLO: Objection.

THE WITNESS: And by regular, they're not -- they're not programmed, they're not scheduled. They're on occasion. I haven't talked with Mike on the phone

for a couple weeks, actually. At this current date.

BY MS. SOBERATS:

**Q. Has Mr. Beaman requested to have communications with you multiple times a week?**

A. No.

MR. DELEEUW: Object to the form.

BY MS. SOBERATS:

**Q. And do you feel that you need to keep Mr. Beaman updated on developments at Quincy?**

MR. CASTELLO: Objection.

MR. DELEEUW: Object to the form.

THE WITNESS: No, I don't.

BY MS. SOBERATS:

**Q. I want to talk specifically about the Madison Memory Study. What was your role in that study?**

A. Well, similar to what we talked about for my role in other -- you know, in clinical studies and preclinical studies. The same -- the same type of thing. Helping to organize the staff that conducts the research, looking at the overall goals or aims of the study. You know, I guess participating in the concepts of what we wanted the protocol or the study goals to be, and then letting our staff execute on those goals.

**Q. Did you review the recruitment ads for the Madison Memory Study?**

213

214

proceedings.)

VIDEO TECHNICIAN: Going on the record at 4:23.

MS. SOBERATS: Counsel, I am done with my questions for today. I would just note for the record that Plaintiffs will keep this deposition open since Mr. Underwood did not answer a question pertaining to research started after the Madison Memory Study that is a question and answer that relates to an ongoing discovery dispute that is being briefed at the Southern District of New York, and we will keep this deposition open pending resolution of that dispute.

Kate, do you -- does the New York Attorney General's Office have any questions that they would like to ask at this time?

MS. MATUSCHAK: Thank you, no, we don't have any questions today, but we may have questions if and when this deposition continuous.

MS. SOBERATS: And, counsel, do you have any redirect?

MR. CASTELLO: This is Castello, no.

MR. DELEEUW: DeLeeuw, we have a couple of hours. No, no, we're done. We have nothing.

MS. SOBERATS: Okay.

THE WITNESS: Thank you very much.

MS. SOBERATS: Thank you, Mr. Underwood.

215

THE WITNESS: I hope you guys have a great weekend.

VIDEO TECHNICIAN: This concludes today's deposition of Mark Underwood as an individual. Going off the record at 4:24.

(Reading and signature reserved.)

(Whereupon, at 4:25 p.m., Central time; 5:25 Eastern time, the deposition was adjourned.)

216

DISTRICT OF COLUMBIA, to wit:

I, Sally Jo Quade, CERT, the officer before whom the foregoing deposition was taken, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me, according to law, was examined by counsel.

I further certify that the examination was recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any of the parties, nor an employee of counsel, nor related to any of the parties, nor in any way interested in the outcome of this action.

As witness my hand and notarial seal this 24th day of August, 2020.

s/Sally Jo Quade
Sally Jo Quade, CERT
Notary Public

MY COMMISSION EXPIRES:
7/14/2023