# Graham Ex. A

## 1

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF NEW YORK
 3
 4   FEDERAL TRADE COMMISSION and  )
 5   THE PEOPLE OF THE STATE OF    )
 6   NEW YORK, BY LETITIA JAMES,   )
 7   ATTORNEY GENERAL OF THE STATE )
 8   OF NEW YORK,                  )
 9        Plaintiffs,              )
10        -vs-                     ) Case No.
11   QUINCY BIOSCIENCE HOLDING     ) 1:17-CV-00124-LLS
12   COMPANY, INC., a corporation, )
13   et al.,                       )
14        Defendants.              )
15   -----------------------------)
16
17          CONFIDENTIAL - ATTORNEYS' EYES ONLY
18
19        The individual videotape deposition of
20   KENNETH LERNER was taken on Thursday, August 6,
21   2020, commencing at 8:45 a.m., remotely, before
22   Tammy S. Newton, Notary Public.
23
24
25
```

## 2

```
 1            A P P E A R A N C E S
 2     ON BEHALF OF PLAINTIFF:
 3         MICHELLE RUSK, ESQUIRE
 4         ANNETTE SOBERATS, ESQUIRE
 5         EDWARD GLENNON, ESQUIRE
 6         WILL DUCKLOW, ESQUIRE
 7         Federal Trade Commission
 8         600 Pennsylvania Avenue, N.W.
 9         Washington, D.C. 20850
10         (202) 326-3148
11         mrusk@ftc.gov
12              and
13         KATE MATUSCHAK, ESQUIRE
14         Attorney General of the State of
15         New York
16         Assistant Attorney General
17         Consumer Frauds and Protection Bureau
18         28 Liberty Street
19         New York, New York 10005
20         (212) 416-6189
21         kate.matuschak@ag.ny.gov
22
23
24
25
```

## 3

```
 1     ON BEHALF OF CORPORATE DEFENDANTS:
 2         JACLYN M. METZINGER, ESQUIRE
 3         GEOFFREY W. CASTELLO, III, ESQUIRE
 4         GLENN T. GRAHAM, ESQUIRE
 5         Kelley Drye & Warrent
 6         101 Park Avenue
 7         New York, New York 10178
 8         (212) 808-7800
 9         jmetzinger@kelleydrye.com
10
11     ON BEHALF OF DEFENDANT UNDERWOOD:
12         MICHAEL B. de LEEUW, EQUIRE
13         TAMAR S. WISE, ESQUIRE
14         Cozen O'Connor
15         45 Broadway Atrium, Suite 1600
16         New York, New York 10006
17         (212) 908-1331
18         mdeleeuw@cozen.com
19
20     ALSO PRESENT:
21         Isaac Horner, Videotape Operator
22
23
24
25
```

## 4

```
 1                 C O N T E N T S
 2   EXAMINATION OF KENNETH LERNER              PAGE:
 3       By Ms. Rusk                            8, 127
 4
 5   30(b)(6) EXAMINATION OF KENNETH LERNER
 6       By Ms. Rusk                               42
 7
 8   DEPOSITION EXHIBITS                        PAGE:
 9   Number KL1   Notice of Deposition             11
10   Number KL2   Notice of Deposition of 30(b)(6)
11                Witness                          13
12   Number KL3   Curriculum Vitae                 16
13   Number KL4   Madison Memory Study Protocol    59
14   Number KL5   E-mail                           83
15   Number KL6   Randomization Unblinded xls      83
16   Number KL7   E-mail                           98
17   Number KL8   Data Extract Attachment          98
18   Number KL9   QBQ 0011 Madison Memory Study
19                Complete Data Analysis          111
20   Number KL10  E-mail                          127
21   Number KL11  Metadata Document               137
22   Number KL12  Data Output From Cogstate       140
23   Number KL13  GMCT AD8 2-6                    141
24   Number KL14  Data Analysis for AD8
25                Score 2-3                       143
```

5

| | DEPOSITION EXHIBITS | PAGE: |
|---|---|---|
| 1 | | |
| 2 | Number KL15 E-mail | 144 |
| 3 | Number KL16 Results for ISL AD8 1 | |
| 4 | Through AD8 5 | 144 |
| 5 | Number KL17 MMS2.1 Book.xlsx | 148 |
| 6 | Number KL18 E-mail Chain | 158 |
| 7 | Number KL19 Complaint, January 9, 2017 | 162 |
| 8 | Number KL20 Enlarged Graph | 165 |
| 9 | Number KL21 E-mail | 176 |
| 10 | Number KL22 Invoice | 186 |
| 11 | Number KL23 Protocol for Distance Memory | |
| 12 | Trial | 187 |
| 13 | Number KL24 Letter | 189 |
| 14 | Number KL25 E-mail | 191 |
| 15 | Number KL26 E-mail | 194 |
| 16 | Number KL27 Defendant's Supplemental Responses | |
| 17 | and Objections to Plaintiff's First | |
| 18 | Set of Interrogatories | 200 |
| 19 | Number KL28 Manual of Operations | 203 |
| 20 | Number KL29 E-mail and Attachments | 211 |
| 21 | Number KL30 Protocol for MS Hope Trial | 222 |
| 22 | Number KL31 E-mail Chain | 227 |
| 23 | Number KL32 Prevagen Professional | |
| 24 | Fibromyalgia/Chronic Fatigue | |
| 25 | Study | 233 |

6

P R O C E E D I N G S

VIDEOTAPE OPERATOR: Here begins Disk 1 in the video deposition of Kenneth Lerner taken in the matter of Federal Trade Commission, et al. V Quincy Bioscience Holding Company, Inc., et al. in the United States District Court, Southern District of New York, Case Number 1:17-CV-00124-LLS.

Today's date is August 6, 2020, and the time on the video monitor is 8:45 a.m. Central Daylight Time. This deposition is being held remotely via video conference. The court reporter is Tammy Newton on behalf of For The Record. The video camera operator is Isaac Horner on behalf of For the Record.

Will counsel, please, introduce themselves and state whom they represent beginning with the party noticing the deposition.

MS. RUSK: Yeah. This is Michelle Rusk. I'm an attorney with the Federal Trade Commission, and I have with me Ed Glennon, also with the FTC, Annette Soberats, also with the FTC, and Will Ducklow with the FTC.

MS. METZINGER: Good morning. This is Jaclyn Metzinger of Kelley Drye & Warren, LLP,

7

counsel for the corporate defendants, and I have with me my colleagues Geoffrey Castello and Glenn Graham, also of Kelley Drye & Warren, as well as Michael de Leeuw and Tamar Wise from Cozen O'Connor, counsel for the individual defendant, Mark Underwood.

MS. RUSK: And we have New York as well.

MS. MATUSCHAK: Yes. This is Kate Matuschak with the office of the New York State Attorney General, plaintiff in this matter, and also noticing this deposition.

VIDEOTAPE OPERATOR: Will the court reporter, please, swear in the witness.

COURT REPORTER: Okay. My stipulation I'll put on first.

Does everyone stipulate to the following: No party to the litigation will object to the remote deposition on the grounds that the stenographer may not have the legal authority to swear in the witness?

MS. RUSK: Yes.
MS. METZINGER: Yes.
MR. de LEEUW: Yes.
KENNETH LERNER,

8

after having been duly sworn remotely by the stenographer, was examined and testified as follows:

MS. METZINGER: Michelle, just before we get started, I'd like to proceed in the same way that we did earlier this week with Mr. Olson's deposition and in accordance with the protective order treating the deposition as confidential until we receive a copy and have the opportunity to make our confidentiality designations.

MS. RUSK: Yes. I understand, and I -- that's consistent with our protective order.

MS. METZINGER: Thank you.

EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
BY MS. RUSK:

Q    Mr. Lerner, good morning.
     I'd like to go over a few procedures before we get started. First of all, if you do not understand any question that I ask, please let me know, and I'll try to rephrase it. If you realize that an earlier answer that you gave was inaccurate or incomplete, let me know, and I'll give you a chance to correct or supplement your earlier answer.

Page 121

1   BY MS. RUSK:
2       Q   Okay. Let me -- let me try asking one
3   point of clarification.
4           If you're not looking for statistical
5   significance between the treatment and the
6   control arm, why have a placebo-controlled study?
7       A   We are looking for statistical
8   significance between the placebo and the control
9   arm.
10      Q   Okay. Thank you.
11          So you're not sure that these numbers
12  in the bottom right column are indicating the P
13  value for the difference between the two arms of
14  the study?
15      A   I believe that's what it is, but I'm
16  sorry, I don't remember.
17      Q   Okay. Can you tell me, do you know
18  whether, when the analysis was done of the
19  complete study population on each of these
20  outcomes, were there any tasks where you found
21  statistical significance at Day 90 between the
22  treatment and the control arm?
23      A   Without going over the results, I --
24  I -- I can't say that -- I can't say one way or
25  another. I mean --

Page 122

1       Q   So you -- you wouldn't remember
2   whether the study population as a whole found
3   statistically significant results between the two
4   arms?
5           MS. METZINGER: Objection.
6           THE WITNESS: We -- the -- the purpose
7   of the study, Michelle, was to look at people who
8   were cognitively normal, if you will.
9   BY MS. RUSK:
10      Q   Was that in the protocol that we went
11  over?
12      A   That's not a protocol, but that's --
13  that's the market for the product, and that's why
14  we did -- why the AD8 was administered so that we
15  would have a way to know -- I -- I guess
16  segregate for what people -- how people work.
17  I'm not trained and neither were any of the other
18  individuals proctoring the test, so we used
19  commonly accepted tests for -- for stratifying
20  people who might have issues of cognitive
21  functioning.
22      Q   Was there any discussion of
23  stratifying the population in the protocol?
24      A   There's -- there's no language to
25  that.

Page 123

1       Q   Okay. I understand what you're saying
2   about marketing. I'm asking about study design
3   so -- because you -- you testified earlier that
4   there were participants in the study with scores
5   3 and higher on the AD8; is that correct?
6       A   I don't remember testifying that, but
7   there were individuals that were 3 and higher.
8       Q   Okay. And is that indicating a higher
9   level of impairment?
10          [Inaudible]
11          COURT REPORTER: What -- what was
12  that? I'm sorry.
13          MS. METZINGER: This is Ms. Metzinger.
14          I just objected to the question.
15  BY MS. RUSK:
16      Q   Is someone with a AD8 score of 3
17  considered mildly impaired?
18      A   Someone with a -- I -- I do not
19  remember the gradation, but someone -- people
20  with AD8 scores of 3 and above are considered to
21  have some impairment.
22      Q   Okay. Are they your intended market
23  population?
24      A   No.
25      Q   But they participated in the study?

Page 124

1       A   Yes, they participated in the study.
2       Q   Okay. I have just a few more
3   questions, and then I think it's going to be a
4   good time for a lunch break.
5           So I'd like to ask you, Mr. Lerner,
6   about some of the analyses that were done on this
7   study that looks at subgroups of the complete
8   population. So not the 218 but smaller subgroups
9   of the total participants, okay?
10          I -- I didn't -- I -- I saw you say
11  okay, but your sound just cut out.
12      A   Yes.
13      Q   Okay. I think you'll have to speak up
14  just -- and then over lunch maybe we can get you
15  on a phone line.
16      A   Sure.
17      Q   Can you tell me when a decision was
18  made to do analyses of subgroups of the full --
19  full study participants?
20      A   The intention for the study was to
21  test people who this project's designed for,
22  which is people who are some -- cognitively
23  normal or have a slight -- slight issues. The
24  AD8 -- AD8 test was added in because we had
25  had -- in our previous qualitative studies in '09

125

1   and '010, we -- we didn't have any -- those
2   were -- those were very broad based.
3       We didn't say I want people with no
4   issues or mild issues. And I noticed in looking
5   at the data, it was very difficult if -- say we
6   were asking someone about how this affected their
7   sleep. If I'm asking someone who's getting eight
8   hours of sleep at night did it improve their
9   sleep or their quality of their sleep, I'm going
10  to be doing something really significant to
11  change that person's sleep.
12      And so we knew that we had to look at
13  people who had -- who had -- we would look at
14  people who were a -- had some mild issues. So
15  the AD8 was a way to -- it was a way, because I
16  don't have the skills and no one else did, to
17  have some- -- something that was recognized as a
18  screen.
19      Q   Okay. I'm going to ask you -- I
20  appreciate the explanation. I'm going to ask you
21  just very specifically about the analyses of the
22  data.
23      When was the decision made to do
24  analyses of the data on specific subgroups?
25      A   I -- I believe that decision was

126

1   made -- that was the -- that was the intention
2   once we started the study.
3       Q   So at the beginning of the study?
4       A   I don't --
5       Q   All right. Excuse me. I may just
6   about be done before we break for lunch.
7       Okay. I actually think, Mr. Lerner,
8   this would be a good time for us to break for
9   lunch, if that works for you. And what I'd like
10  to suggest is we resume at 12:45 Central, so 1:45
11  Eastern, which will give -- give you about
12  50 minutes.
13      Is that all right?
14      A   Mm-hmm.
15      MS. RUSK: Okay. So if you could
16  either try to charge your headphones, or we
17  should probably experiment before then with using
18  a phone line so we can resolve this down.
19      THE WITNESS: All right.
20      VIDEOTAPE OPERATOR: Going off the
21  record at 11:54.
22      (A lunch recess was taken.)
23      VIDEOTAPE OPERATOR: Going on the
24  record at 12:53.
25      MS. RUSK: Okay, Mr. Lerner, at this

127

1   point, I have concluded the portion of my
2   deposition of you for today as a 30(b)(6)
3   witness. So we're going to return to deposing
4   you as an individual fact witness, and for the
5   rest of today, I'm going to be asking you
6   questions as an individual fact witness.
7       Is that clear?
8       THE WITNESS: Yes.
9           * * *
10      (The following questions are in Mr. Lerner's
11  individual capacity.)
12  BY MS. RUSK:
13      Q   Okay. And we have noted for the
14  record that that is -- we are now in the
15  individual fact witness portion, correct, for the
16  record?
17      Okay. I am going to introduce a new
18  exhibit that is marked as Exhibit KL10, and the
19  document Bates number for this is
20  QUI-FTCNY-00169152.
21      (Exhibit Number KL10 was marked by Counsel.)
22  BY MS. RUSK:
23      Q   And, Mr. Lerner, do you see that
24  document on your screen?
25      A   Yes, I can.

128

1       Q   Okay. And it looks like this is an
2   e-mail from you to Mark Underwood dated
3   November 23rd, 2016; is that correct?
4       A   Yes.
5       Q   Does this look familiar to you, this
6   e-mail?
7       A   Yes.
8   [remainder of page redacted]

Case 1:17-cv-00124-LLS   Document 222-1   Filed 04/14/22   Page 6 of 7
Lerner - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    8/6/2020

169

1  Q  So would this be an example of a
2  recall task?
3  A  Groton Maze Recall?
4  Q  Yes.
5  A  Yes. You're -- you're trying to
6  remember the task you had done earlier in the --
7  in -- in the testing session.
8  Q  Okay. Okay. Do these percentages in
9  the experimental arm for Day 8, 30, and 90, do
10 they seem to line up with the top chart?
11 A  I'm not sure what seem -- you mean by
12 "seem." The Groton Maze looks at a decrease -- I
13 mean a -- a better result is a decrease in
14 whatever is being measured here. It may be --
15 it's either time or it's errors, and the graph is
16 going the other way.
17 Q  Okay. But so would 6.59 percent be an
18 improvement of 6.59 percent at Day 0 -- at Day 8?
19 A  On the chart 3, 6.59 percent is a
20 re- -- is a reduction in the amount of either
21 time or errors. I can't -- I don't remember the
22 variable in what it took you compared to Day 0.
23 Q  Okay. So you don't know whether this
24 chart -- this bar chart at the top, is the
25 translation of this graph from the GMR complete?

170

1  A  I can't say that, no.
2  Q  You don't know, other than Casey
3  Syvrud, who might know the answer to that
4  question?
5      MS. METZINGER: Objection.
6      THE WITNESS: I don't -- I can't tell
7  you from looking at the chart where it's from,
8  and I don't know who else was involved in that.
9  BY MS. RUSK:
10 Q  Okay. Mr. Underwood [sic], we talked
11 earlier about the subgroups of the Madison
12 Memory, and two of the subgroups analyzed for
13 participants were for scores of AD8 0-1 and 0-2;
14 is that correct?
15 A  I believe you just referred to me as
16 Mr. Underwood.
17 Q  I did. I'm sorry. Because I was
18 going to ask you a question about whether
19 Mr. Underwood would know about this chart, so I
20 had his name lingering in my brain. I apologize
21 for promoting you.
22     We talked earlier, Mr. Lerner, about
23 the subgroups that -- that you looked at for the
24 Madison Memory Study, and two of those were AD8
25 0-1 and 0-2; is that correct?

171

1  A  Those were -- those were the target
2  market for the study -- I mean for -- that's
3  what -- why we did the studies, those subgroups.
4  Q  Is it accurate to say that those two
5  subgroups represent people with normally --
6  normal to minimally impaired cognition?
7  A  I believe that would be accurate.
8  Q  Okay. Did anyone at Quincy ever
9  discuss with you during a follow-up study on
10 Prevagen just on a population of normal to
11 minimally-impaired participants?
12     MS. METZINGER: Objection. I'm going
13 to caution the witness that if to answer that
14 question he would be required to divulge
15 communications that either he or the company had
16 with counsel, that he would refrain from
17 answering that question.
18     MS. RUSK: Counsel, is there in-house
19 counsel at Quincy?
20     MR. METZINGER: At what points in
21 time? There's -- there's currently not, no.
22     MS. RUSK: Has there ever been?
23     MS. METZINGER: Do you want to go off
24 the record and confer on this, Michelle?
25     MS. RUSK: Yes, please.

172

1      MS. METZINGER: Okay.
2      VIDEOTAPE OPERATOR: Going off the
3  record at 2:10.
4      (A brief recess was taken.)
5      VIDEOTAPE OPERATOR: Going on the
6  record at 2:43.
7  BY MS. RUSK:
8  Q  Okay, Mr. Lerner, I'm going to attempt
9  to ask you a question that I asked you before the
10 break and see if you are able to answer it.
11     My question is, Did you ever discuss
12 with a Quincy employee doing a follow-up study on
13 Prevagen for populations with normal or mildly
14 impaired cognition?
15     MS. METZINGER: Mr. Lerner, I'm going
16 to instruct you not to answer that question on
17 the basis of the attorney-client privilege and
18 the attorney work product doctrine.
19     MS. RUSK: Okay. And I would like to,
20 for the record -- I'm sorry, Jaclyn. You
21 instructed him not to answer at all, correct?
22     MS. METZINGER: Correct.
23     MS. RUSK: I would like to note for
24 the rec- -- record that we do not think this is a
25 valid basis for preventing the witness from

I, Kenneth Lerner, hereby certify that I have read and examined the transcript of the deposition of Kenneth Lerner, which occurred on August 6, 2020, and hereby make the following corrections to the transcript of my deposition:

| PAGE | LINE | CORRECTION | REASON |
| --- | --- | --- | --- |
| 112 | 13 | Replace "chases" with "changes" | Transcription Error |
| 112 | 18 | Replace "radiograph" with "regular graph" | Transcription Error |
| 113 | 13 | Replace "ISO" with "ISL" | Transcription Error |
| 115 | 10 | Replace "2.05" with ".05" | Typo |
| 116 | 9 | Replace "P .870" with "P=0.87" | Transcription Error |
| 159 | 16 | Replace "or" with "on" | Transcription Error |
| 173 | 20 | Replace "direct" with "directed" | Transcription Error |
| 195 | 8 | Replace "Sivesind" with "Syvrud" | Typo |
| 229 | 21 | Replace "knew" with "new" | Typo |

I declare under penalty of perjury that the foregoing is true and correct. Executed at Bayfield, Wisconsin on September 8, 2020.

KENNETH LERNER

1