# Graham Ex. B

**Page 1**

```
 1          UNITED STATES DISTRICT COURT
 2          SOUTHERN DISTRICT OF NEW YORK
 3
 4  FEDERAL TRADE COMMISSION and  )
 5  THE PEOPLE OF THE STATE OF    )
 6  NEW YORK, BY LETITIA JAMES,   )
 7  ATTORNEY GENERAL OF THE STATE )
 8  OF NEW YORK,                  )
 9       Plaintiffs,              )
10       -vs-                     ) Case No.
11  QUINCY BIOSCIENCE HOLDING     ) 1:17-CV-00124-LLS
12  COMPANY, INC., a corporation, )
13  et al.,                       )
14       Defendants.              )
15  ------------------------------)
16
17       CONFIDENTIAL - ATTORNEYS' EYES ONLY
18
19       The 30(b)(6) deposition of KENNETH
20  LERNER was taken on Friday, August 7, 2020,
21  commencing at 8:37 a.m., remotely, before
22  Tammy S. Newton, Notary Public.
```

**Page 2**

```
            A P P E A R A N C E S
    ON BEHALF OF PLAINTIFF:
        MICHELLE RUSK, ESQUIRE
        ANNETTE SOBERATS, ESQUIRE
        EDWARD GLENNON, ESQUIRE
        WILL DUCKLOW, ESQUIRE
        Federal Trade Commission
        600 Pennsylvania Avenue, N.W.
        Washington, D.C. 20850
        (202) 326-3148
        mrusk@ftc.gov
            and
        KATE MATUSCHAK, ESQUIRE
        Attorney General of the State of
        New York
        Assistant Attorney General
        Consumer Frauds and Protection Bureau
        28 Liberty Street
        New York, New York 10005
        (212) 416-6189
        kate.matuschak@ag.ny.gov
```

**Page 3**

```
    ON BEHALF OF CORPORATE DEFENDANTS:
        JACLYN M. METZINGER, ESQUIRE
        GEOFFREY W. CASTELLO, III, ESQUIRE
        GLENN T. GRAHAM, ESQUIRE
        Kelley Drye & Warrent
        101 Park Avenue
        New York, New York 10178
        (212) 808-7800
        jmetzinger@kelleydrye.com

    ON BEHALF OF DEFENDANT UNDERWOOD:
        MICHAEL B. de LEEUW, ESQUIRE
        TAMAR S. WISE, ESQUIRE
        Cozen O'Connor
        45 Broadway Atrium, Suite 1600
        New York, New York 10006
        (212) 908-1331
        mdeleeuw@cozen.com

    ALSO PRESENT:
        Isaac Horner, Videotape Operator
```

**Page 4**

```
              I N D E X
WITNESS:                                    PAGE:
KENNETH LERNER - 30(b)(6)
    By Ms. Rusk                                 8
    By Ms. Metzinger                          148
KENNETH LERNER - INDIVIDUAL
    By Ms. Rusk                               146

EXHIBITS:                                   PAGE:
Number KL33 E-mail Chain                      15
Number KL34 Defendant's Quincy Bioscience,
            et al., Supplemental Response    20
Number KL35 E-mail                            24
Number KL36 Write-up on the Madison Memory
            Test                              40
Number KL37 Write-up on the Madison Memory
            Test                              58
Number KL38 Publication in "Advances in
            Mind-Body Medicine Journal"       76
Number KL39 E-mail Chain                      90
Number KL40 E-mail Chain                      96
Number KL41 Clinical Trial Synopsis of
            the Madison Memory Study          99
Number KL42 Cover E-mail                     121
Number KL43 August 2016 Synopsis             122
```

Page 5

```
1    Number KL44 Metadata                    123
2    Number KL45 E-mail                      130
3    Number KL46 Madison Memory Study Document  132
4    Number KL47 E-mail                      138
```

Page 6

        VIDEOTAPE OPERATOR: Here begins Disk 1 in the 30(b)(6) video deposition of Kenneth Lerner taken in the matter of Federal Trade Commission, et al., V Quincy Bioscience Holding Company, Inc., et al., in the United States District Court, Southern District of New York, Case Number 1:17-CV-00124-LLS.
        Today's date is August 7th, 2020, and the time on the video monitor is 8:37 a.m. Central Daylight Time. This deposition is being held remotely via video conference.
        The court reporter is Tammy Newton on behalf of For the Record. The video camera operator is Isaac Horner on behalf of For the Record.
        Will Counsel, please, introduce themselves and state whom they represent beginning with the party noticing the deposition.
        MS. RUSK: This is Michelle Rusk from the Federal Trade Commission. I have with me my colleagues Annette Soberats, Ed Glennon, and Will Ducklow.
        And Kate, you want to introduce yourself?
        MS. MATUSCHAK: Sure.

Page 7

This is Kate Matuschak. I'm with the Office of the New York States Attorney General.
        MS. METZINGER: Jaclyn Metzinger from Kelley Drye & Warren, LLP, counsel for the corporate defendants. I have with me my colleagues Geoffrey Castello and Glenn Graham also from Kelley Drye & Warren, and Michael de Leeuw and Tamar Wise from Cozen O'Connor who are counsel for individual defendant Mark Underwood.
        VIDEOTAPE OPERATOR: Will the court report, please, swear in the witness.
        COURT REPORTER: Okay. Before I do, does everyone stipulate to the following: No party to the litigation will object to the remote deposition on the grounds that the stenographer may not have the legal authority to swear in the witness?
        MS. RUSK: This is the FTC, yes.
        MS. METZINGER: Yes for the corporate defendants.
        MS. MATUSCHAK: Yes for the New York Attorney General.
        MR. de LEEUW: Yes for Mark Underwood.
        KENNETH LERNER,

Page 8

after having been duly sworn remotely by the stenographer, was examined and testified as follows:
    EXAMINATION BY COUNSEL FOR THE PLAINTIFF FTC
BY MS. RUSK:
    Q   Good morning, Mr. Lerner. I know that -- that we went over a bunch of instructions yesterday, but I was going to just quickly go over them again today.
        I'll just remind you that if you don't hear a question or you don't understand the question, be sure to ask me, and I'll make sure that it's clear. You can -- if you realize an earlier answer was inaccurate or incomplete, let me know, and I'll allow you to correct it.
        If you want to take a break, I only request that you -- if there's a qui- -- question pending, answer the question first, and then we can take a break. If you answer the question, I'll assume that you heard it and understood it. And please remember to answer verbally so the court reporter can take down your response.
        The reminders about the remote deposition is that there should be no off-camera or unate- -- unannounced persons attending today.

21

1   Madison Memory Study, indicate the number of
2   participants enrolled in the study broken down by
3   treatment and control group, the number of
4   dropouts in each group, and the number of
5   participants in each group who completed the
6   study."
7           Is that accurate?
8       A   I believe you read it correctly, yes.
9       Q   Okay. And if you could go to the next
10  page, please, I'm interested in the response that
11  starts towards the bottom of Page 21. And I will
12  read that into the record. It says, "Defendants
13  further respond that a total of 218 participants
14  were enrolled in the study with 211 completing
15  the study.
16          "There were 100 individuals in the
17  target pop- -- population (AD8 0-2). Sixty of
18  those individuals received apoaequorin, and 40 of
19  those individuals received a placebo.
20  Individuals with AD8 scores of 3 or higher were
21  not included in the study. 118 individuals with
22  an AD8 score of 3 or higher were enrolled but not
23  included in the study."
24          So my question is, Can you explain to
25  me what is meant in that response by "not

22

1   included in the study" where it says, "118
2   individuals with AD8 scores of 3 or higher were
3   enrolled but not included in the study"?
4       A   Those were individuals who were not
5   in -- whose AD8 score placed them outside the
6   target of the apoaequorin supplement.
7       Q   When you say "target," are you saying
8   target of intended consumer or target of the
9   Madison Memory Study?
10      A   The -- the -- the -- the intended
11  consumer.
12      Q   Okay. But in what sense were those
13  118 individuals not included in the Madison
14  Memory Study?
15      A   They were not -- they're not included
16  in -- individuals with AD8 scores of 3 or higher
17  were not the target -- were not the target for
18  the product and what we were looking at in the
19  study. We were -- the study was performed to
20  determine the effect of the supplement on our
21  target market, which is individuals with AD8 0-2.
22      Q   Was there anything in the protocol
23  that specified that people with AD8 scores of 3
24  or higher would not be included in the study?
25      A   No. I believe there -- no, there was

23

1   not.
2       Q   Was there anything about the AD8 score
3   listed as an exclusion criteria for the study?
4       A   No.
5       Q   Was there anything in the protocol
6   indicating that the study was limited to a
7   population of AD8 0-2?
8       A   No.
9       Q   Mr. Lerner, were you involved in
10  writing different papers presenting the results
11  of the Madison Memory Study?
12      A   I was involved in writing various
13  papers. I don't know if -- I wasn't involved in
14  writing all papers --
15      Q   Okay.
16      A   -- to my knowledge.
17      Q   For those you were involved with, has
18  the Madison Memory Study ever been described in
19  any of those papers as a study of 100 people?
20      A   I don't -- I don't remember.
21      Q   So you don't know if any write-up of
22  any paper you were involved with writing, whether
23  it was published on the website or published in
24  the journal, ever indicated that 118 people were
25  not included in the study?

24

1       A   No, I don't remember.
2       Q   Okay. Well, we'll go over those
3   write-ups.
4           Did any of those write-ups that you
5   were involved in indicate that a score of 3 or
6   above on the AD8 was an exclusion criteria?
7       A   I d- -- I don't believe those words
8   were ever used.
9       Q   Was there any write-up that you were
10  involved in that recorded only results from the
11  AD8 0-2 group?
12      A   I don't remember.
13      Q   Okay. Well -- I'm sorry. I didn't
14  mean to cut off.
15      A   I don't -- I don't remember.
16      Q   Okay. Well, why don't we go through
17  some of those write-ups.
18          I am introducing as Exhibit KL35 a
19  document with -- excuse me. I'm having trouble
20  with my mail -- a document with the Bates Number
21  QUI-FTCNY-00107408.
22      (Exhibit Number KL35 was marked by Counsel.)
23  BY MS. RUSK:
24      Q   And, Mr. Lerner, if you just want to
25  take a minute to look through that document.

65

1  page.  I'm looking at two things here I wanted to
2  ask you about -- well, perhaps three.
3       In the methods, it lists a Cogstate
4  battery, but I believe it does not list the
5  number of Cogstate outcomes; is that correct?
6    A   I'm sorry.  You said "Cogstate
7  outcomes"?
8    Q   Cogstate tasks.  Does it identify how
9  many Cogstate tasks were administered in this
10 study?
11   A   In the -- there's nothing in the
12 methods section about that.  I believe that is in
13 the -- in the cognitive measurement tasks and
14 tools tab, a heading at the bottom of the page.
15   Q   Okay.  You're correct.  On the next
16 page, Page 6, is that where you were looking at
17 the top?  It says --
18   A   Bottom of -- bottom of Page 5 and then
19 all of Page 6.
20   Q   Okay.  Okay.  So looking at the top of
21 Page 6, it lists the tasks used in the study, and
22 I'm just going to count:  GML, GMR, ISL, ISL-DR,
23 OCL, TWOB, ONEB, DET, and -- and IND.  That's
24 nine Cogstate tasks there.
25       Why does it not mention -- in the

66

1  earlier study, it -- it indicated there were 11.
2  Why does it not mention the other two?
3       MS. METZINGER:  Objection.
4       THE WITNESS:  I don't -- I don't know.
5  BY MS. RUSK:
6    Q   Okay.  Was the SET test administered
7  as the Cogstate task in this study?
8    A   I'm sorry.  Your question again.
9    Q   There was a -- when we went over the
10 raw data yesterday, we -- we talked about a
11 series of entries with scores on the spreadsheet
12 that referred to SET, various SET outcomes, and
13 I'm asking why that isn't identified in this list
14 of tasks.
15   A   I do not know why the SET checking
16 test is not here.
17   Q   Okay.  And at the bottom of Page 5,
18 under "AD8 Score," the last sentence says, "An
19 AD8 score of 2 was used as a cutoff value to
20 discriminate between cognitively normal
21 individuals with some level and individuals with
22 some levels of cognitive impairment."
23       Do you see that?
24   A   Yes, ma'am.
25   Q   But it doesn't say -- it says that

67

1  value is used to discriminate between those two
2  groups.  Does it say that the individuals with
3  some levels of impairment are not included in the
4  study?
5    A   The sentence says that an AD8 score of
6  2 was used as a cutoff value.
7    Q   Correct.
8    A   That's all the sentence says.
9    Q   And then it says "to discriminate
10 between" two groups, the normal and the
11 individuals with some level of cognitive
12 impairment, correct?
13   A   Yes.
14   Q   So it's not saying the study isn't
15 looking at individuals with some level of
16 cognitive impairment.  It's saying it's
17 discriminating between those two groups, correct?
18   A   That's what the statement says,
19 sentence says.
20   Q   Okay.  In this write-up, in fact,
21 there are results reported for individuals with
22 scores above 2.  So let's look at some of those
23 results.
24       Okay.  If you go to Page 13 of the
25 document, it shows the ISL AD8 2-5 and the ISL-DR

68

1  AD8 2-5; is that correct?
2    A   I believe it shows the ISL-DR, the --
3  the -- the delayed recall.  Both of those charts
4  are delayed recall.
5    Q   Oh.  Excuse me.  You're right.
6        But the -- but the score's for AD8
7  2-5, correct?
8    A   Yes.
9    Q   So if you're using -- if the paper
10 says it's using a score of 2 as a cutoff between
11 the two groups to discriminate between those two
12 groups, why report a result that includes 2 and
13 goes up to 5?  That would be presumably both
14 groups that you're saying you're discriminating
15 between.
16   A   I don't understand your question.  I'm
17 sorry.
18   Q   The discussion of AD8 score says 2 --
19 the value of 2 was used as a cutoff to
20 discriminate between two groups of the study,
21 people who were normal and people who were
22 impaired.  And this report, this subgroup,
23 includes both.  It includes people with a score
24 of 2 and people with a score higher than 2, and
25 I'm asking why.

I, Kenneth Lerner, hereby certify that I have read and examined the transcript of the deposition of Kenneth Lerner, which occurred on August 7, 2020, and hereby make the following corrections to the transcript of my deposition:

| PAGE | LINE | CORRECTION | REASON |
| --- | --- | --- | --- |
| 63 | 8 | Replace "selection" with "selecting" | Typo |
| 70 | 24 | Replace "in" with "is" | Transcription Error |
| 113 | 12 | Replace "MSS" with "MMS" | Typo |
| 120 | 24 | Replace "There's" with "They're" | Transcription Error |

I declare under penalty of perjury that the foregoing is true and correct. Executed at Bayfield, Wisconsin on September 8, 2020.

_____
KENNETH LERNER

1