# Graham Ex. C

**Page 1**

```
 1            UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF NEW YORK
 3
 4   FEDERAL TRADE COMMISSION and    )
 5   THE PEOPLE OF THE STATE OF      )
 6   NEW YORK, by LETITIA JAMES,     ) Matter No.
 7   Attorney General of the State   ) 1:17-cv-00124-LLS
 8   of New York,                    ) CONFIDENTIAL
 9           Plaintiffs,             ) ATTORNEYS' EYES
10        v.                         ) ONLY
11   QUINCY BIOSCIENCE HOLDING       )
12   COMPANY, et al.,                )
13           Defendants.             )
14   -----------------------------------)
15
16                   Friday, August 21, 2020
17                   Via Zoom
18
19        The above-entitled matter came on for the
20   deposition of MARK YANCEY UNDERWOOD, in his individual
21   capacity, pursuant to notice, at 8:33 a.m., Central
22   time; 9:33 a.m., Eastern time.
23
24
25
```

**Page 2**

```
 1   APPEARANCES:
 2
 3   ON BEHALF OF THE FEDERAL TRADE COMMISSION:
 4        ANNETTE SOBERATS, ESQ.
 5        MICHELLE RUSK, ESQ.
 6        EDWARD GLENNON, ESQ.
 7        Federal Trade Commission
 8        600 Pennsylvania Avenue, N.W.
 9        Washington, DC 20580
10        (202) 326-2921
11        asoberats@ftc.gov
12
13
14   ON BEHALF OF THE STATE OF NEW YORK:
15        KATE MATUSCHAK, ESQ.
16        Assistant Attorney General for the
17          State of New York
18        Consumer Frauds and Protection Bureau
19        120 Broadway
20        New York, New York 10271
21        (212) 416-6189
22        kate.matuschak@ag.ny.gov
23
24
25
```

**Page 3**

```
 1   ON BEHALF OF DEFENDANTS:
 2        GEOFFREY W. CASTELLO, ESQ.
 3        JACLYN M. METZINGER, ESQ.
 4        GLENN T. GRAHAM, ESQ.
 5        Kelley Drye & Warren
 6        One Jefferson Road
 7        Second Floor
 8        Parsippany, New Jersey 07054
 9        (973) 503-5922
10        gcastello@kelleydrye.com
11
12
13   ON BEHALF OF THE WITNESS:
14        MICHAEL B. DeLEEUW, ESQ.
15        TAMAR WISE, ESQ.
16        Cozen O'Connor
17        45 Broadway
18        16th Floor
19        New York, New York 10006
20        (212) 908-1331
21        mdeleeuw@cozen.com
22
23
24   ALSO PRESENT:
25        William Ducklow, FTC
```

**Page 4**

```
 1                FEDERAL TRADE COMMISSION
 2                       I N D E X
 3
 4   WITNESS:                                EXAMINATION:
 5   MARK YANCY UNDERWOOD
 6   BY MS. SOBERATS:                              9
 7
 8
 9   EXHIBITS          DESCRIPTION              FOR ID
10   Number MU-26  Underwood Notice of            13
                  Deposition
11
     Number MU-27  Underwood Biographical         14
12                Sketch
13   Number MU-28  Quincy Bioscience Holding      45
                  Company's Answers to the
14                Federal Trade Commission's
                  Civil Investigative Demand
15                Interrogatories
16   Number MU-29  8/24/16 Richards Group         47
                  Correspondence
17
     Number MU-30  2/25/16                        54
18                Underwood/Olson/Seney Email
                  Exchange
19
     Number MU-31  Alzheimer's Conference         99
20                Announcement
     Number MU-32  8/29/11 Olson/Benson Email    101
21                Exchange
22
     Number MU-33  3/7/12 Olson/Benson Email     104
23                Exchange
     Number MU-34  Advances Madison Memory       110
24                Study Publication
25
```

1 (Pages 1 to 4)

Page 5

| | EXHIBITS | DESCRIPTION | FOR ID |
|---|---|---|---|
| 1 | | | |
| 2 | Number MU-35 | 12/18/15 Underwood/Beaman Email Re: Prevagen Scientific Summary | 118 |
| 3 | | | |
| 4 | Number MU-36 | 12/15/18 Underwood/Beaman Email Re: Systemic Review of Prevagen Science | 142 |
| 5 | | | |
| 6 | Number MU-37 | Underwood/Prendamano Email | 145 |
| 7 | Number MU-38 | 11/1/10 Underwood/Klein Email Exchange | 150 |
| 8 | | | |
| 9 | Number MU-39 | 3/19/14 Adams/Moran Email | 162 |
| 10 | Number MU-40 | 5/22/15 Underwood/Moran Email Exchange | 168 |
| 11 | Number MU-41 | Quincy GRAS Submission | 175 |
| 12 | Number MU-42 | 10/16/12 FDA Warning Letter | 181 |
| 13 | Number MU-43 | 7/5/11 Beaman/Dvorak Email | 191 |
| 14 | Number MU-44 | Underwood/Beaman Email Re: Congressman Burgess | 195 |
| 15 | | | |
| 16 | Number MU-45 | 11/23/15 Warren/Underwood Email Exchange | 199 |
| 17 | Number MU-46 | Prevagen Professional Markup | 201 |
| 18 | | | |
| 19 | Number MU-47 | 7/25/14 Underwood/Olson/Lerner Email Exchange | 203 |
| 20 | | | |
| 21 | Number MU-48 | Olson/Underwood/Lerner Email Re: Madison Memory Study VL 9-30-15 | 207 |
| 22 | | | |
| 23 | OTHER EXHIBITS REFERENCED | | PAGE |
| 24 | MU-3 | | 64 |
| 25 | | | |

Page 6

P R O C E E D I N G S
- - - - -

VIDEO TECHNICIAN: Here begins disk 1 in the video deposition of Mark Underwood as an individual, taken in the matter of Federal Trade Commission, et al. v. Quincy Bioscience Holding Company, Inc., et al. in the United States District Court, Southern District of New York, Case Number 1:17-cv-00124-LLS.

Today's date is August 21st, 2020, and the time on the video monitor is 8:34 a.m. Central Daylight time. This deposition is being held remotely via videoconference. The court reporter is Sally Quade on behalf of For The Record. The video camera operator is Isaac Hoerner on behalf of For The Record.

Will counsel please introduce themselves and state whom they represent, beginning with the party noticing the deposition.

MS. SOBERATS: Good morning. Appearing for the Federal Trade Commission are attorneys Annette Soberats, Michelle Rusk and Edward Glennon, and investigator Will Ducklow.

MS. MATUSCHAK: And this is Kate Matuschak on behalf of the office of the New York State Attorney General.

MR. CASTELLO: Good morning. Geoffrey Castello,

Page 7

Kelley Drye & Warren, LLP. I have with me my colleagues, Jaclyn Metzinger and Glenn Graham on behalf of the corporate defendants. Also appearing today on behalf of Defendant Mark Underwood, Michael deLeeuw and Tamar Wise, Cozen O'Connor, LLP.

VIDEO TECHNICIAN: Would the court reporter please swear in the witness.

Whereupon--

MARK YANCEY UNDERWOOD

a witness, called for examination, having been first duly sworn, was examined and testified as follows:

MS. SOBERATS: Mr. Castello, before we get started, I think you're muted.

MR. CASTELLO: I'm not muted, I'm having a problem with my headset here. Go ahead, Annette.

MS. SOBERATS: I thought before we would get started, we would discuss the agreement that we reached yesterday. Yesterday the parties reached an agreement on the duration of Mr. Underwood's 30(b)(6) deposition and his deposition in his individual capacity. We agreed that for the portion of the 30(b)(6), the Plaintiffs would be entitled to five hours of testimony, and for the individual deposition, Plaintiffs would have seven hours of testimony. One of the terms of that agreement was, based on my understanding, that Mr.

Page 8

Underwood's testimony as a 30(b)(6) witness would be adopted into his testimony as an individual -- as an individual witness.

I just wanted to place that stipulation on the record at the beginning and give you an opportunity to add anything that you would like to add.

MR. CASTELLO: Sure. At this point, I, of course, we don't know what questions you intend to ask today, I would ask, respectfully, that you not cover ground that was explicitly covered yesterday. In that case, Mr. Underwood would adopt his testimony from yesterday in his role as a 30(b)(6) designee, as his role today as an individual witness.

MS. SOBERATS: Okay, and I --

MR. CASTELLO: And just to make sure that Mr. DeLeeuw agrees with that.

MR. DELEEUW: Absolutely.

MS. SOBERATS: And I will just clarify that I did state yesterday that nothing in our agreement barred Plaintiffs from covering the same topics, so long as they were asking new questions.

MR. CASTELLO: I agree. I do, Annette, have to take this on a question-by-question basis, and I'll let Mr. DeLeeuw speak for himself, but I certainly intend to stick with the spirit of our agreement in practical

Case 1:17-cv-00124-LLS   Document 222-3   Filed 04/14/22   Page 4 of 6
Underwood - Individual - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                             8/21/2020

57

1        MR. CASTELLO:  I'm going to caution the witness
2    that if in order to answer that question he be required
3    to divulge any communication that the company had with
4    counsel, that he not answer the question.
5        THE WITNESS:  Yeah, I'll have to heed Geoff's
6    counsel.
7        BY MS. SOBERATS:
8    [REDACTED]

21    Q. And does it refer to Quincy's interpretations of
22    the results for the Groton Maze Recall task?
23        MR. CASTELLO:  I'm going to caution the witness
24    that if in order to answer that question he be required
25    to divulge any information that the company had with

58

1    counsel, that he not answer that question.
2        THE WITNESS:  I'm going to have to follow
3    Geoff's counsel.
4        BY MS. SOBERATS:
5    [REDACTED]
8        MR. CASTELLO:  Is that question independent of
9    communications that the company had with counsel?
10       MS. SOBERATS:  Yes.
11       MR. CASTELLO:  So to the extent that the witness
12   can answer independent of any independent communications
13   that the company may have had with counsel on that
14   subject, he can answer.
15   [REDACTED]

59

[REDACTED]

60

1        BY MS. SOBERATS:
2    Q. And did you approve edits to Prevagen's
3    packaging?
4    A. I would be one of the people that approved edits
5    to Prevagen's packaging, but not the sole individual.
6    Q. Who else would approve edits to Prevagen's
7    packaging?
8    A. Internally, people that are part of our
9    marketing and advertising team, as well as counsel.
10   Q. Does Mr. Beaman approve edits to Prevagen's
11   packaging?
12   A. He does not.
13   Q. Is he consulted before substantive changes to
14   Prevagen's packaging?
15   A. He is not.
16   Q. Let's talk about the Brain Health Guide for a
17   few moments.  Have there been five editions to the Brain
18   Health Guide?
19   A. I don't know exactly.
20   Q. Okay.  Have you authored all of the editions of
21   the Brain Health Guide?
22   A. I have not.
23   Q. Who else has authored them?
24   A. We have different content contributors, both
25   inside the company and outside the company.



15 (Pages 57 to 60)

85

1   A. Yeah.
2   Q. And I'd like you to turn to page 6, and just for
3   the record, these are Defendant Quincy Bioscience
4   Holding Company, Inc.'s Responses -- Answers to the
5   FTC's Civil Investigative Demand Interrogatories. If
6   you go to page 6, Mr. Underwood, I'd like you to look at
7   interrogatory 4. The answer lists you, Mark Underwood,
8   as president and it states that you're involved in
9   translation of scientific data into marketing language.
10  Can you explain to me what that means?
11  A. Sure. You've read a lot of our research, and
12  you probably would also agree and recognize that some of
13  the topics that we research don't roll off the tongue
14  real clearly if you don't have a background in
15  neurosciences. And so we try to make that messaging
16  connect with people that don't have Ph.D.s. So in a
17  sense we need to make sure that the things we learn in
18  the lab are translated into appropriate consumer
19  language.
20      So part of that is for just clear communication,
21  and part of that is probably more importantly to make
22  sure that we don't overextend or overpromise the type of
23  claim that we're making from research because, as you
24  know, there are different agencies that are in charge of
25  such, and we're never looking to be on the bad side of

86

1   them. So if data comes out of a lab that maybe shows
2   some sort of like -- I'll call it a disease-like
3   response, or dizzy -- treatment like, you know, status,
4   even though that's scientifically valid, we have to make
5   sure that we don't convey that to a consumer because it
6   would become an issue with perhaps the Food and Drug
7   Administration.
8       So part of it is, again, you knew, clear
9   communication to the consumer, and part of it is making
10  sure that we know our audience so that we don't break a
11  rule when it comes to sharing what we might have
12  learned, we don't necessarily have the right to share
13  that fully with a consumer audience because of the
14  regulations we fall under.
15  Q. And you're involved in this process that you've
16  just described?
17  A. I am, in conjunction with counsel. But yes.
18  Q. Is Mr. Beaman involved in this process?
19  A. No, he is not. To add, our entire team is
20  involved in this process in terms of our marketing and
21  advertising personnel, and we continue to learn and we
22  continue to take those lessons that we learn along the
23  way and implement them into -- into our collective
24  experience so that we do it better and better,
25  hopefully, as time goes by.

87

1   Q. And, Mr. Underwood, you testified earlier that
2   you have communications multiple times a week with Mr.
3   Underwood -- Mr. Beaman, pardon. And that you keep him
4   informed on research. Why do you keep Mr. Beaman
5   informed on research?
6   A. Well, it does affect some of the bigger picture
7   items in our company, and so I mean, he's interested in
8   how well the company is doing. He's interested in
9   things like, you know, what the future might hold in
10  terms of what we're looking at developing and the path
11  we're going for the future.
12      So, yeah, I do inform them of what's going on
13  with research, although we do talk several times a week,
14  we rarely talk about research because we don't have
15  research updates several times a week. We have
16  operational things, the basic running of the business
17  that, you know, we might discuss, you know, one topic or
18  the next.
19  Q. And has he requested to have these regular
20  communications with you?
21  A. No.
22      MR. CASTELLO: Objection.
23      THE WITNESS: And by regular, they're not --
24  they're not programmed, they're not scheduled. They're
25  on occasion. I haven't talked with Mike on the phone

88

1   for a couple weeks, actually. At this current date.
2       BY MS. SOBERATS:
3   Q. Has Mr. Beaman requested to have communications
4   with you multiple times a week?
5   A. No.
6       MR. DELEEUW: Object to the form.
7       BY MS. SOBERATS:
8   Q. And do you feel that you need to keep Mr. Beaman
9   updated on developments at Quincy?
10      MR. CASTELLO: Objection.
11      MR. DELEEUW: Object to the form.
12      THE WITNESS: No, I don't.
13      BY MS. SOBERATS:
14  Q. I want to talk specifically about the Madison
15  Memory Study. What was your role in that study?
16  A. Well, similar to what we talked about for my
17  role in other -- you know, in clinical studies and
18  preclinical studies. The same -- the same type of
19  thing. Helping to organize the staff that conducts the
20  research, looking at the overall goals or aims of the
21  study. You know, I guess participating in the concepts
22  of what we wanted the protocol or the study goals to be,
23  and then letting our staff execute on those goals.
24  Q. Did you review the recruitment ads for the
25  Madison Memory Study?

22 (Pages 85 to 88)

I, Mark Underwood, hereby certify that I have read and examined the transcript of the deposition of Mark Underwood, which occurred on August 21, 2020, and hereby make the following corrections to the transcript of my deposition:

| PAGE | LINE(S) | CORRECTION | REASON |
|---|---|---|---|
| 18 | 25 | Replace "syllabus" with "similar" | Transcription error |
| 43 | 22 | Replace "established" with "establish" | Transcription error |
| 82 | 18 | Replace "Milwaukee Journal" with "Milwaukee Business Journal" | Transcription error |
| 153 | 10 | Replace "acquorin" with "aequorin" | Typo |

I declare under penalty of perjury that the foregoing is true and correct. Executed at Madison, Wisconsin on September 21, 2020.

*[signature]*

MARK UNDERWOOD

1