# Graham Ex. D

Case 1:17-cv-00124-LLS   Document 222-4   Filed 04/14/22   Page 2 of 7
Underwood - 30(b)(6) - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                        8/20/2020

**Page 1**

```
                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION and    )
THE PEOPLE OF THE STATE OF      )
NEW YORK, by LETITIA JAMES,     ) Matter No.
Attorney General of the State  ) 1:17-cv-00124-LLS
of New York,                    ) CONFIDENTIAL
        Plaintiffs,             ) ATTORNEYS' EYES
    v.                          ) ONLY
QUINCY BIOSCIENCE HOLDING       )
COMPANY, et al.,                )
        Defendants.             )
--------------------------------)

                        Thursday, August 20, 2020
                        Via Zoom

    The above-entitled matter came on for the
30(b)(6) deposition of MARK YANCEY UNDERWOOD, pursuant
to notice, at 9:43 a.m., Central time; 10:43 a.m.,
Eastern time.
```

**Page 2**

```
APPEARANCES:

ON BEHALF OF THE FEDERAL TRADE COMMISSION:
    ANNETTE SOBERATS, ESQ.
    MICHELLE RUSK, ESQ.
    EDWARD GLENNON, ESQ.
    Federal Trade Commission
    600 Pennsylvania Avenue, N.W.
    Washington, DC 20850
    (202) 326-2921
    asoberats@ftc.gov


ON BEHALF OF THE STATE OF NEW YORK:
    KATE MATUSCHAK, ESQ.
    Assistant Attorney General for the
      State of New York
    Consumer Frauds and Protection Bureau
    120 Broadway
    New York, New York 10271
    (212) 416-6189
    kate.matuschak@ag.ny.gov
```

**Page 3**

```
ON BEHALF OF CORPORATE DEFENDANTS:
    GEOFFREY W. CASTELLO, ESQ.
    JACLYN M. METZINGER, ESQ.
    GLENN T. GRAHAM, ESQ.
    Kelley Drye & Warren
    One Jefferson Road
    Second Floor
    Parsippany, New Jersey 07054
    (973) 503-5922
    gcastello@kelleydrye.com


ON BEHALF OF THE DEFENDANT UNDERWOOD:
    MICHAEL B. DeLEEUW, ESQ.
    TAMAR WISE, ESQ.
    Cozen O'Connor
    45 Broadway
    16th Floor
    New York, New York 10006
    (212) 908-1331
    mdeleeuw@cozen.com


ALSO PRESENT:
    William Ducklow, FTC
```

**Page 4**

```
                FEDERAL TRADE COMMISSION
                       I N D E X

WITNESS:                                    EXAMINATION:
MARK YANCEY UNDERWOOD
BY MS. SOBERATS:                                 9


EXHIBITS            DESCRIPTION             FOR ID
Number MU-1   Underwood 30(b)(6) Notice        13
              of Deposition

Number MU-2   11/13/13 Miller Email Re:        17
              Verbatims #3
Number MU-3   Complaint Exhibits               24
Number MU-4   Goodman Draft Report             28
Number MU-5   Talati/FDA Letter                43
Number MU-6   Custom Biologics Animal ID       46
Number MU-7   Custom Biologics Report          50
Number MU-8   September 2012 Helina            56
              Communication

Number MU-9   Helina Abstract                  61

Number MU-10  Pencharz Letter                  72

Number MU-11  2/17/16 Talati/FDA Letter        76

Number MU-12  12/22/12 Underwood/Beaman        79
              Summary Email
Number MU-13  Collins v. Quincy                92
              Bioscience Settlement
```

1 (Pages 1 to 4)

Page 5

| | EXHIBITS | DESCRIPTION | FOR ID |
|---|---|---|---|
| | Number MU-14 | 1/9/17 FTC v. Quincy Bioscience Complaint | 95 |
| | Number MU-15 | 7/31/19 CFO Financial Presentation | 103 |
| | Number MU-16 | Underwood/Lerner/Syvrud 2017 Email | 108 |
| | Number MU-17 | Defendants' Third Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories | 112 |
| | Number MU-18 | Defendants' Supplemental Responses and Objections to Plaintiffs' Second Set of Interrogatories | 114 |
| | Number MU-19 | 3-GMR Complete Graphic | 119 |
| | Number MU-20 | Alzheimer's Association International Conference Poster | 127 |
| | Number MU-21 | A Novel Mechanism for Cognitive Enhancement in Aged Dogs With the Use of a Calcium-Buffering Protein | 128 |
| | Number MU-22 | Merrick/Milgram Correspondence | 130 |
| | Number MU-23 | Madison Memory Study | 141 |
| | Number MU-24 | 6/23/14 Beaman/Miller Email Exchange | 152 |
| | Number MU-25 | Prevagen Extra Strength Packaging | 156 |

Page 6

P R O C E E D I N G S
- - - - -

VIDEO TECHNICIAN: Here begins disk 1 in the video deposition of Mark Underwood, taken in the matter of Federal Trade Commission, et al. v. Quincy Bioscience Holding Company, Inc., et al. in the United States District Court, Southern District of New York, Case Number 1:17-cv-00124-LLS.

Today's date is August 20th, 2020, and the time on the video monitor is 9:43 a.m., Central Daylight time. This deposition is being held remotely via videoconference. The court reporter is Sally Quade, on behalf of For The Record. The video camera operator is Isaac Hoerner on behalf of For The Record.

Will counsel please introduce themselves and state whom they represent, beginning with the party noticing the deposition.

MS. SOBERATS: Appearing for the Federal Trade Commission are attorneys Annette Soberats, Michelle Rusk and Edward Glennon, as well as investigator Will Ducklow.

MS. MATUSCHAK: This is Kate Matuschak here for the New York State Office of the Attorney General.

MR. CASTELLO: Good morning. This is Geoffrey Castello, Kelley, Drye & Warren, LLP. I have with me

Page 7

today my colleagues Jaclyn Metzinger and Glenn Graham. And also Michael deLeeuw and Tamar Wise with Cozen O'Connor who are appearing on behalf of Mr. Underwood.

VIDEO TECHNICIAN: Will the court reporter please swear in the witness.

Whereupon--

MARK YANCEY UNDERWOOD

a witness, called for examination, having been first duly sworn, was examined and testified as follows:

MS. SOBERATS: And, Mr. Underwood, before we get started, the attorneys are going to handle a couple of preliminary issues. So Plaintiffs were notified a few minutes before we were set to begin today's deposition that Defendants were taking the position that Plaintiffs were entitled to a little over 30 minutes for today's 30(b)(6) deposition of Mr. Underwood. We informed Defendants that that was not our view. We believe that under Rule 30(d)(1) we are entitled to a full seven hours for today's deposition. We believe that the 2000 Advisory Committee Note to Rule 30 makes it very clear that the duration of today's 30(b)(6) deposition of Mr. Underwood is seven hours.

However, in the interest of time, the parties met and conferred prior to beginning today's deposition and we've reached an agreement. So for today's 30(b)(6)

Page 8

deposition of Mr. Underwood, Plaintiffs will be given five hours of deposition time and we will proceed tomorrow with Mr. Underwood's deposition in his individual capacity and Plaintiffs will have a full seven hours for that deposition.

Geoff, is there anything you would like to add?

MR. CASTELLO: Yes, this is Castello on behalf of the corporate defendants. Corporate defendants disagree with counsel's preamble argument. We disagree with the position that Plaintiffs have taken; however, we do agree that we have allowed for five hours of deposition testimony today, seven hours tomorrow in Mr. Underwood's individual capacity. We are, however, going to review the topic list after the deposition is closed today, the 30(b)(6) topic list, and try to come to a determination of areas of testimony that Mr. Underwood gives today and advise Plaintiffs that Mr. Underwood would adopt that testimony on questions relating to same subject matter in his individual capacity.

Mr. DeLeeuw, have I missed anything?

MR. DELEEUW: No, that's exactly right.

MR. CASTELLO: And then, Annette, one other issue. We are going to designate this transcript as attorneys' eyes only, and we will revert to the procedure in the protective order with respect to final

**41**

1   biology.  So -- it also states that -- it does say more
2   than 90 percent of the protein was digested, therefore
3   not all of it was digested.  So by that math, there's
4   still protein left.  So there's likely protein left.
5   There's likely peptides left.  Because it wasn't a
6   complete digestion in this artificial environment in the
7   first place.
8       Q.  And you talked earlier -- you testified earlier
9   about how this was intended to be a simulation.  Was
10  this intended to be a simulation of the stomach or the
11  entire GI tract?
12      A.  Well, neither.  This is intended to simulate a
13  protein that's being broken down by pepsin.  So that you
14  can compare it to other proteins that have also been
15  broken down by pepsin and you can compare their --
16  excuse the -- the breakdownability, the digestibility of
17  the proteins to assess them and compare them against
18  other known proteins and their digestibility to see if
19  they're likely to be an allergenic.
20      Q.  Your -- Quincy's expert, Dr. Richard Goodman,
21  stated in his expert report in the Racies case that the
22  assays used in this report were not designed to confirm
23  the presence of small peptides.  Would you agree with
24  that statement?
25          MR. CASTELLO:  Objection.

**42**

1           THE WITNESS:  He's the expert in the field.  I
2   have no reason to contradict our expert.
3           BY MS. SOBERATS:
4       Q.  Did Quincy perform any analytical work to
5   determine whether there were, in fact, any peptides
6   resulting from -- from the degradation of the protein?
7           MR. CASTELLO:  Objection.
8           THE WITNESS:  I don't -- I'm sorry.  I don't
9   believe so because the goal of this study was just to
10  assess allergenicity, not to assess what was left over.
11  It was -- is it likely to be safe or is it not?  I mean,
12  that was the -- the reason for the study.
13          BY MS. SOBERATS:
14      Q.  Understood, but subsequent to this study, let's
15  put this study aside for a moment.  Has Quincy performed
16  any analytical work to determine whether there are, in
17  fact, any peptides that result from the digestion of the
18  apoaequorin protein?
19      A.  No, we have not.
20      Q.  Does Quincy have any research showing that any
21  fragments from apoaequorin survive digestion in the
22  human GI tract?
23      A.  We've never performed that study.
24      Q.  And I'll ask this question also, does Quincy
25  have any research showing that if any fragments do

**43**

1   survive digestion that they enter the bloodstream?
2       A.  In the canine study, we do show that.  So I
3   guess -- I'm sorry, I guess the answer would be we have
4   detected the full protein, but we didn't look for
5   peptides.  So I'm sorry, maybe that doesn't answer your
6   question.
7       Q.  When you say that you detected the full protein
8   in the canine study, can you elaborate on what you mean
9   by that?
10      A.  There was detectable levels, all be them low, in
11  the cerebrospinal fluid and in the blood plasma of the
12  canines that were tested with the oral administration of
13  apoaequorin.  In those cases, the full protein was
14  detected.  So -- so we have conducted tests related to
15  what you're asking, but it wasn't specifically looking
16  for other peptides, it was looking for the full -- the
17  full protein.
18      Q.  And again, the canine study that you're
19  referring to is the data that's reported on by Custom
20  Biologics?
21      A.  Yeah, Custom Biologics performed that work, yes.
22      Q.  Just to be clear.
23      A.  Yes, thank you.
24          (Deposition Exhibit Number MU-5, Talati/FDA
25  Letter, was marked for identification.)

**44**

1           BY MS. SOBERATS:
2       Q.  Mr. Underwood, I have just marked and revealed a
3   new exhibit.  This is MU-5, and it is Bates labeled
4   Quincy-FTC-547151.  Do you recognize this document?
5       A.  I do.
6       Q.  And what is it?
7       A.  This is a letter produced by our regulatory
8   attorneys that was addressed to the Minneapolis office
9   of the FDA.
10      Q.  Okay.  And Amin Talati I believe you just stated
11  is the law firm that represents Quincy Bioscience
12  Manufacturing, Inc.?
13      A.  One of them, yes.
14      Q.  Okay.  Let's go to the top of page 2, the very
15  first paragraph.  In this letter, Amin Talati states
16  that apoaequorin meets the definition of a dietary
17  ingredient because, among other things, it is quickly
18  digested by the stomach into safe, naturally-occurring
19  alpha amino acids and apoaequorin is principally a
20  source of amino acids.  Do you see where it says this?
21      A.  I do.
22          MR. CASTELLO:  Ms. Soberats, before you go on, I
23  just want to confirm which topic we're on right now.
24          MS. SOBERATS:  We're on the same topic, topic H.
25  And also, Geoff, I'll point out that this -- this also

145

1  Q. Okay. So who is the graphic designer who
2  created this chart?
3  A. Well, I don't know, because I don't know when
4  you took the screenshot. Like I mentioned before, this
5  is a web screenshot that's been cut and pasted into a
6  complaint -- or I think that's the right term. I have
7  no idea of its origin. I don't know if it was taken
8  from a commercial on a website, if it was a static image
9  on a website, and I just -- I have no data reference for
10 it. To answer your question means I don't know what
11 designer was employed by us that would have created the
12 chart. Or if it was created by an outside group.
13 Q. Okay. But you did testify earlier that charts
14 that were an approximation of this chart on page 25 of
15 MU-14 were used in marketing for Prevagen.
16 A. I testified that charts that are similar to
17 this. The only reason I even qualify that is because I
18 can't tell you exactly where this chart came from.
19 Q. Understood.
20 A. I don't mean to be argumentative, but a
21 three-bar chart is certainly used in many forms of
22 advertising. I'm not -- I'm not debating that one bit,
23 but in terms of the specificity of this chart versus
24 something used in a TV spot, I just can't tell what --
25 where this is from.

146

1  Q. Who created the bar charts that were similar to
2  the one depicted here for Exhibit MU-14 on page 25?
3     MR. CASTELLO: Objection.
4     THE WITNESS: Those have been -- I'm sorry,
5  Geoff, were you objecting?
6     MR. CASTELLO: Yeah, but you can answer.
7     THE WITNESS: At different times in the company,
8  we've employed different graphic designers. We've also,
9  for different advertising projects, worked with
10 combinations of inside and outside groups, whether
11 that's designers, graphic artists or even agencies. So
12 I don't have any way of knowing who created this chart.
13    BY MS. SOBERATS:
14 Q. Can you provide me with the names of your
15 graphic designers?
16 A. Sure. Currently our lead graphic designer's
17 name is Casey Syvrud.
18 Q. And when did she assume that position?
19 A. I don't know exactly. I would -- I would say
20 about three years ago, though, I think. Maybe four.
21 And so if this was put in your complaint, this would
22 predate here. So I -- sort of -- I don't know if it's
23 my role to do the forensics of this, but prior to that,
24 our graphic designer was a gentleman by the name of Mike
25 Moran, M O R A N.

147

1  Q. Okay. And when was he a graphic -- during which
2  time period was he the graphic designer?
3  A. You know, he started with our company -- boy.
4  Like 2006. And I'm not sure if he ran all the way up to
5  the time that we hired Casey, but given this is a
6  relatively simplistic graph, someone else on our team
7  could have created it that has digital marketing skills.
8  I just don't know.
9     Externally, we've had commercials or
10 advertisements produced by -- you know, other outside
11 groups.
12 Q. Who was the graphic designer between 2010 and --
13 2012 and 2016?
14 A. Well, Mike Moran was there for part of it, but I
15 don't think he went all the way to 2016. I just don't
16 recall that. It's not that we couldn't provide that. I
17 presume we can provide that.
18 Q. Okay. If you could turn to page 10.
19 A. Of the complaint?
20 Q. Of MU-14, the complaint, yes.
21 A. Okay.
22 Q. My apologies.
23 A. Not a problem.
24 Q. The graphic that we've titled here Back Label,
25 who designed this bar chart?

148

1  A. I'm not sure when this packaging -- I'm not sure
2  the lot number of this packaging. If I knew the lot
3  number, then I could tell you who did the artwork. If
4  it was -- in general terms, it was likely Mike Moran,
5  but it's not 100 percent because of I'm not sure when
6  this was actually photographed.
7  Q. And who was in charge of design --
8  A. I'm sorry.
9  Q. I'm sorry, let me --
10 A. I'm sorry, I scrolled inadvertently.
11 Q. Let me rephrase my question.
12 A. Sure.
13 Q. Who at Quincy designed artwork for the Prevagen
14 label?
15 A. Well, at what period of time?
16 Q. From 2012 to 2016?
17 A. Well, Mike Moran was part of that time frame.
18 Part of the design was also done by our label
19 manufacturing. And then all of our labeling is reviewed
20 by counsel, so their feedback is always incorporated in
21 the process.
22 Q. Does Quincy have in-house counsel?
23 A. No.
24 Q. Has it ever had in-house counsel?
25 A. No.

I, Mark Underwood, hereby certify that I have read and examined the transcript of the Federal Rule of Civil Procedure 30(b)(6) deposition of Mark Underwood, which occurred on August 20, 2020, and hereby make the following corrections to the transcript of my deposition:

| PAGE | LINE(S) | CORRECTION | REASON |
|---|---|---|---|
| 38 | 21 | Replace "allergistic" with "allergenic" | Transcription Error |
| 55 | 20 | Replace "Neutrics" with "Neutricks" | Typo |
| 56 | 3, 9 | Replace "Neutrics" with "Neutricks" | Typo |
| 57 | 4 | Replace "Helina" with "Halina" | Typo |
| 58 | 8 | Replace "Helina" with "Halina" | Typo |
| 59 | 6, 15 | Replace "Helina" with "Halina" | Typo |
| 60 | 2 | Replace "Helina" with "Halina" | Typo |
| 62 | 16 | Replace "Helina" with "Halina" | Typo |
| 63 | 20 | Replace "Helina" with "Halina" | Typo |
| 69 | 24 | Replace "Helina" with "Halina" | Typo |

I declare under penalty of perjury that the foregoing is true and correct. Executed at Madison, Wisconsin on September 21, 2020.

_____
MARK UNDERWOOD