# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL TRADE COMMISSION and <br><br> THE PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, <br><br>                Plaintiffs, <br><br>         v. <br><br> QUINCY BIOSCIENCE HOLDING COMPANY, INC., a corporation; <br><br> QUINCY BIOSCIENCE, LLC, a limited liability company; <br><br> PREVAGEN, INC., a corporation d/b/a/ SUGAR RIVER SUPPLEMENTS; <br><br> QUINCY BIOSCIENCE MANUFACTURING, LLC, a limited liability company; and <br><br> MARK UNDERWOOD, individually and as an officer of QUINCY BIOSCIENCE HOLDING COMPANY, INC., QUINCY BIOSCIENCE, LLC, and PREVAGEN, INC., <br><br>            Defendants. | Case No. 1:17-cv-00124-LLS <br><br><br><br><br><br> **RESPONSE TO DEFENDANT MARK UNDERWOOD'S RULE 56.1 STATEMENT BY PLAINTIFF PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK** |

Pursuant to Local Rule 56.1, Plaintiff People of the State of New York, by Letitia James, Attorney General of the State of New York ("NYAG"), hereby submits the following response to the Rule 56.1 Statement in Support of Mark Underwood's Motion for Summary Judgment (filed Mar. 18, 2022) [Dkt. No. 212]. The NYAG submits that the majority of purported material facts

1

cited by Mr. Underwood are not, in fact, material to any issue in the case, and the NYAG intends to challenge the admissibility of Mr. Underwood's evidentiary support at the appropriate time.

With respect to the purported undisputed facts cited by Mr. Underwood, the NYAG responds as follows:

1.     Mark Underwood is not a resident of New York, has never lived in New York, does not own property in New York (and never has), and does not personally transact business in New York. (Declaration of Mark Underwood dated March 18, 2022 ("Underwood Decl.") at ¶¶ 1-3.)

**RESPONSE:**  Disputed.  Mark Underwood, through the Corporate Defendants, does transact business in New York.  Through Defendants Quincy Bioscience Holding Company, Inc., Quincy Bioscience, LLC, Prevagen, Inc., and Quincy Bioscience Manufacturing, LLC (collectively, the "Corporate Defendants"), Underwood advertised, and continues to advertise, in the State of New York, and has sold more than ▮▮▮▮▮▮ worth of Prevagen products in the State. (Rule 56.1 Statement in Support of Mark Underwood's Motion for Partial Summary Judgment (filed Mar. 18, 2022) [Dkt. No. 212] ¶ 10 ("Advertising and marketing for Prevagen is national in scope."); Declaration of Kate Matuschak in Support of NYAG's Opp. to Def. Underwood's Mot. for Partial Summary Judgment (May 6, 2022) (filed contemporaneously herewith) ("Matuschak Decl.") Ex. B (Defs.' Resps. to Pls.' 1st Requests for Admission (Sept. 30, 2020)) at 63 (admitting that Underwood "is part of the marketing creative team, translates scientific data into marketing language, and directs research programs and activities"); Matuschak Decl. Ex. C (Defs.' 2d Supp. Resps. to Pls.' 2nd Interrogatories (Oct. 23, 2020)), Nos. 3, 4, & Ex. A (detailing dissemination schedule for television and radio advertisements, including advertisements that aired nationally, including in New York, and on New York-specific television and radio stations); *id.* No. 8 (discussing claims made on Prevagen packaging); Matuschak Decl. Ex. D (Defs.' 4th Supp. Resps. to Pls.' 1st Interrogatories (Oct. 23, 2020)), at 11 & Ex. C (detailing number of bottles of Prevagen

sold and shipped to New York addresses, and revenue received from such sales); *id.* Ex. E

(detailing number and amount of direct-to-consumer sales to consumers in New York); Matuschak

Decl. Ex. E (Underwood 8/20/20 Tr.) at 99:5-11 (describing Underwood's involvement in

determining what data to include in an advertisement); Matuschak  Decl.  Ex. F (Underwood

8/21/20 Tr.) at 46:6-47:11 (discussing leadership role in developing marketing messaging); *id.* at

60:2-5 (discussing Underwood's role in approving edits to Prevagen's packaging); *id.* at 67:16-

68:12 (discussing Underwood's role in an infomercial that aired in New York); *id.* at 80:16-82:5

(same); *id.* at 85:2-86:17 (discussing Underwood's role in translating scientific data into marketing

language); Matuschak Decl. Ex. G (Olson 8/4/20 Tr.) at 55:8-56:12 (discussing Defendants'

advertising in national publications).)  Indeed, Defendants do not dispute that "Prevagen

advertisements have been disseminated to consumers nationwide, including in the State of New

York, through a variety of media, including television, radio, print, the internet, social media,

product labeling and packaging, and press releases, including during the time periods shown in

[Exhibit H to the Matuschak Declaration]."  (Matuschak Decl. Ex. I (Defs.' Resps. & Proposed

Counter-Findings to Pls.' Proposed Findings of Fact (Mar. 3, 2022) at 15 (finding 35).)

      2.     Mr. Underwood is a co-founder and President of Quincy. [1] (Compl. ¶ 13.)

**RESPONSE:**  Undisputed.

      3.     Quincy's operations are handled by its now approximately 80 employees and

governed by a board of directors comprised of a majority of independent directors. (Underwood

Decl. at ¶ 4.)

      **RESPONSE:**  Disputed in part.  Underwood has direct oversight over Corporate

Defendants' departments of sales and marketing and research and development, among other

---

[1] As used herein, the term "Quincy" refers to Quincy Bioscience Holding Company, Inc., along with its subsidiaries, including the other corporate defendants, Quincy Bioscience, LLC, Prevagen, Inc., and/or Quincy Bioscience Manufacturing, LLC.

departments.  Corporate Defendants' director and Vice President of sales and marketing report directly to him.  (Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 40:19-41:21.)  Additionally, Underwood may have been the sole individual responsible for reviewing and editing packaging and advertisements, and translating scientific research into language used in marketing when Corporate Defendants first began operating and/or began advertising and marketing Prevagen. (*Id.* at 28:16-24; *id.* at 33:16-34:21.).)  Underwood is the final decision maker on final advertising claims.  (Matuschak Decl. Ex. B (Defs.' Resps. to Pls.' First Requests for Admission (Sept. 30, 2020)), at 62-63; Matuschak Decl. Ex. J (Quincy's Answers to FTC's CID Interrogatories (Sept. 15, 2015), at 6 ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ ; Matuschak Decl. Ex. E (Underwood 8/20/20 Tr. at 99:5-11 (describing Underwood's involvement in determining what data to include in an advertisement); Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 60:2-5 (discussing role in approving edits to Prevagen's packaging).  Indeed, when the company was first founded, Underwood's responsibilities included "everything" because "[t]here was no one else here" and he had "direct oversights over . . . every department from finance to research and development to sales and marketing."  (*Id.* at 34:5-16.)

     4.    Quincy has employed marketing professionals since its inception. (Underwood Decl. at ¶ 5.)

**RESPONSE:**  Disputed.  Underwood may have been the sole individual responsible for reviewing and editing packaging and advertisements, and translating scientific research into language used in marketing when Corporate Defendants first began operating and/or began advertising and marketing Prevagen.  (Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 28:16-24; *id.* at 33:16-34:21.)  Indeed, when the company was first founded, Underwood's responsibilities

included "everything" because "[t]here was no one else here" and he had "direct oversights over . . . every department from finance to research and development to sales and marketing." (*Id*. at 34:5-16.)

5.       Currently, at least five senior sales and marketing executives oversee and manage Quincy's sales and marketing department, headed by Thomas Dvorak. (Underwood Decl. at ¶¶ 6, 8.) Mr. Dvorak leads "the production effort of [television, radio and print marketing] and the media buying for it." (Declaration of Michael de Leeuw dated March 18, 2022 ("de Leeuw Decl."), Ex. 1, Deposition of Todd Olson as Individual, at 21:2-19.)

**RESPONSE:**  Disputed in part.  The cited evidence does not support the purported finding that "at least five senior sales and marketing executives oversee and manage Quincy's sales and marketing department."  Moreover, Underwood may have been the sole individual responsible for reviewing and editing packaging and advertisements, and translating scientific research into language used in marketing when Corporate Defendants first began operating and/or began advertising and marketing Prevagen.  (Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 28:16-24; *id*. at 33:16-34:21.)  Indeed, when the company was first founded, Underwood's responsibilities included "everything" because "[t]here was no one else here" and he had "direct oversights over . . . every department from finance to research and development to sales and marketing." (*Id*. at 34:5-16.)  Underwood is the final decision maker on final advertising claims. (Matuschak Decl. Ex. B (Defs.' Resps. to Pls.' First Requests for Admission (Sept. 30, 2020)), at 62-63; Matuschak Decl. Ex. J (Quincy's Answers to FTC's CID Interrogatories (Sept. 15, 2015), at 6 ██████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████; Matuschak Decl. Ex. E (Underwood 8/20/20 Tr. at 99:5-11 (describing Underwood's involvement in determining what data to include in an

advertisement).  Moreover, Corporate Defendants' directors of sales and marketing, market development, business development, and media procurement all report directly to Underwood. (Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 34:1-21; *id.* at 40:19-41:21.)

6.     Quincy also has a Director of Sales (Dakota Miller) as well as a Media Director (Ryan Liebl). (Underwood Decl. at ¶¶ 7, 9.)

**RESPONSE:** Disputed in part.  While there is evidence indicating that Dakota Miller is the "Director of Sales and Marketing," there also is evidence indicating that Tom Dvorak is the Vice President of "Sales and Marketing." (Matuschak Decl. Ex. K (Olson 8/4/20 Tr. Ex. 1) (organizational chart); Matuschak Decl. Ex. G (Olson 8/4/20 Tr.) at 19:3-12, 25:9-19.)  Indeed, when the company was first founded, Underwood's responsibilities included "everything" because "[t]here was no one else here" and he had "direct oversights over . . . every department from finance to research and development to sales and marketing."  (Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 34:5-16.)

7.     Todd Olson, Quincy's market development director, is the main account representative or account manager for several regional retail accounts, and point on some national accounts. (de Leeuw Decl., Ex. 1 (Olson dep.) at 15:2-10.)

**RESPONSE:** Disputed in part.  Underwood may have been the sole individual responsible for reviewing and editing packaging and advertisements, and translating scientific research into language used in marketing when Corporate Defendants first began operating and/or began advertising and marketing Prevagen.  (Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 28:16-24; *id.* at 33:16-34:21.)  Indeed, when the company was first founded, Underwood's responsibilities included "everything" because "[t]here was no one else here" and he had "direct oversights over . . . every department from finance to research and development to sales and marketing."  (*Id.* at 34:5-16.)  Moreover, Corporate Defendants' directors of sales and marketing,

market development, business development, and media procurement all report directly to Underwood. (*Id.* at 34:1-21, 40:19-41:21.)

8.    The media budget and spend for marketing relating to Prevagen is, and has always been, national. (Underwood Decl. at ¶ 13.)

**RESPONSE:** Disputed in part.  Because this purported fact is vague and ambiguous, the NYAG cannot determine whether it is disputed for the purposes of this motion.

9.    The media budget for Prevagen is decided by a group of Quincy employees, including Mr. Underwood, Mr. Dvorak, and Mr. Miller, among others. (Underwood Decl. at ¶ 14.)

**RESPONSE:** Disputed in part.  When the company was first founded, Underwood's responsibilities included "everything" because "[t]here was no one else here" and he had "direct oversights over . . . every department from finance to research and development to sales and marketing."  (Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 34:5-16.)

10.    Advertising and marketing for Prevagen is national in scope. Prior to 2015, advertising and marketing for Prevagen included direct response advertising, meaning that infomercials were played on regional television and radio channels. (Underwood Decl. at ¶ 15.)

**RESPONSE:** Disputed.  Defendants' advertising has targeted specific areas of the United States, including the State of New York.  Specifically, Defendants' national advertising has aired in New York, and Defendants have also placed specific television and radio advertisements on New York television and radio stations.  (Matuschak Decl. Ex. C (Defs.' 2d Supp. Resps. to 2d Interrogatories) Ex. A (showing networks on which Defendants' television and radio advertisements aired).)  Moreover, Defendants have advertised on their website, which was and is available to New York consumers.  (Matuschak Decl. Ex. G (Olson 8/4/20 Tr.) at 33:24-36.) Defendants also made advertising claims on their product packaging, which was distributed to

New York consumers.  (Matuschak Decl. Ex. C (Defs.' 2d Supp. Resps. to Pls.' 2d Interrogatories (Oct. 23, 2020)) No. 3 (describing claims made on Prevagen label and packaging); Matuschak Decl. Ex. D (Defs.' 4th Supp. Resps. to Pls.' 1st Interrogatories) at 11 & Ex. C (detailing number of bottles of Prevagen sold and shipped to New York addresses); *id.* Ex. E (detailing number of bottles shipped directly to consumers in New York).)  Additionally, Defendants have sent marketing materials directly to consumers via email later than 2015.  (Matuschak Decl. Ex. L (FTC-0000136.0001-FTC-0000136.0004) (3/25/19 Email from prevagen.com to Jackson); Matuschak Decl. Ex. M (FTC-0004073) (7/10/17 Email from prevagen.com to Rusk).)

11.    Prevagen infomercials have never been targeted to a specific geographic market, including New York. (Underwood Decl. at ¶ 16.)

**RESPONSE:** Disputed.  Defendants' infomercials aired in the State of New York. (Matuschak Decl. Ex. C (Defs.' 2d Supp. Resps. to Pls.' 2d Interrogatories (Oct. 23, 2020)) No. 3 & Ex. A (detailing dissemination schedule for infomercials, including advertisements that aired nationally, including in New York, and on New York-specific television stations).)

12.    To place these infomercials, Quincy's media buyers would buy spot purchases for television and radio slots on television and radio channels throughout the country. (Underwood Decl. at ¶ 17.) Quincy's marketing and advertising team would send infomercials to these channels to be aired.  (*Id.*)

**RESPONSE:** Disputed in part.  Underwood may have made media purchases when Corporate Defendants first began operating and/or began advertising and marketing Prevagen. (Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 28:16-24; *id.* at 33:16-34:21.)

13.    Quincy's media buyers would analyze the response to the infomercials that had aired in different markets and then decide whether the advertisements were successful enough to purchase additional spots for infomercials in those markets. (Underwood Decl. at ¶ 18.) These

decisions were made by the media buyers who reported directly to Mr. Miller as part of this process. (*Id.*)

**RESPONSE:** Disputed in part. Underwood may have made media purchases when Corporate Defendants first began operating and/or began advertising and marketing Prevagen. (Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 28:16-24; *id.* at 33:16-34:21.)

14. Mr. Underwood was not involved in directing any New York-market specific advertising for Prevagen, nor did he purchase any media spots. (Underwood Decl. at ¶¶ 19-20.)

**RESPONSE:** Disputed. Underwood has direct oversight over Corporate Defendants' departments of sales and marketing and research and development, among other departments. Corporate Defendants' director and Vice President of sales and marketing report directly to him. (Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 40:19-41:21.) Additionally, Underwood may have been the sole individual responsible for reviewing and editing packaging and advertisements, and translating scientific research into language used in marketing when Corporate Defendants first began operating and/or began advertising and marketing Prevagen. (*Id.* at 28:16-24; *id.* at 33:16-34:21.) Underwood has participated in creating content for television and radio ads and is the final decision maker on final advertising claims. (Matuschak Decl. Ex. B (Defs.' Resps. to Pls.' First Requests for Admission (Sept. 30, 2020)), at 62-63; Matuschak Decl. Ex. J (Quincy's Answers to FTC's CID Interrogatories (Sept. 15, 2015), at 6 ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

███████ ; Matuschak Decl. Ex. E (Underwood 8/20/20 Tr. at 99:5-11 (describing Underwood's involvement in determining what data to include in an advertisement); Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 46:6-47:11 (discussing leadership role in developing marketing messaging); *id.* at 60:2-5 (discussing role in approving edits to Prevagen's packaging); *id.* at

67:16-68:12 (discussing Underwood's role in an infomercial that aired in New York); *id.* at 80:16-82:5 (same); *id.* at 85:2-86:17 (discussing Underwood's role in translating scientific data into marketing language); Matuschak Decl. Ex. G (Olson 8/4/20 Tr.) at 63:2-9 (discussing Underwood's role in drafting scripts for radio advertisements); *id.* at 78:1-21 (describing Underwood as one of the "primary people" drafting content for television commercials).) Defendants specifically directed advertising to television stations airing in New York and New York radio stations.  (Matuschak Decl. Ex. C (Defs.' 2d Supp. Resps. to Pls.' 2d Interrogatories (Oct. 23, 2020)) Ex. A.)  Additionally, Underwood may have made media purchases when Corporate Defendants first began operating and/or began advertising and marketing Prevagen. (Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 28:16-24; *id.* at 33:16-34:21.)

15.     Quincy does not have, and has never had, a New York-specific marketing, sales or advertising team, nor has it ever made any New York-specific marketing claims for Prevagen. (Underwood Decl. at ¶¶ 10, 21.)

**RESPONSE:** Disputed in part.  Defendants have targeted and tailored ads to New York. (Matuschak Dec. Ex. C (Defs.' 2d Supp. Resps. to Pls.' 2nd Interrogatories (Oct. 23, 2020)), Nos. 3, 4, & Ex. A (detailing dissemination schedule for television and radio advertisements, including advertisements that aired on New York-specific television and radio stations); *id.* No. 8 (discussing claims made on Prevagen packaging); Matuschak Decl. Ex. D (Defs.' 4th Supp. Resps. to Pls.' 1st Interrogatories (Oct. 23, 2020)), at 11 & Ex. C (detailing number of bottles of Prevagen sold and shipped to New York addresses, and revenue received from such sales); *id.* Ex. E (detailing number and amount of direct-to-consumer sales to consumers in New York); Matuschak Decl. Ex. N (7/31/15 Email from Dvorak to Olson, Underwood, Miller (QUI-FTCNY-00114971-972)

███████████████████████████████████████████████████████████.)

16.     Quincy's marketing department collectively made decisions about advertising and marketing content, (de Leeuw Decl. Ex. 2, Deposition of Mark Underwood Pursuant to Rule 30(b)(6), at 81:20-82:13; de Leeuw Decl. Ex. 1 (Olson dep.) at 37:16-38:22), or otherwise outsourced marketing and media placement responsibilities to third-party companies (de Leeuw Decl. Ex. 3, Deposition or Mark Underwood as Individual, at 46:20-23.)

**RESPONSE:** Disputed in part.  Underwood may have been the sole individual responsible for reviewing and editing packaging and advertisements, and translating scientific research into language used in marketing when Corporate Defendants first began operating and/or began advertising and marketing Prevagen.  (Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 28:16-24; *id.* at 33:16-34:21.)  Underwood is the final decision maker on final advertising claims. (Matuschak Decl. Ex. B (Defs.' Resps. to Pls.' First Requests for Admission (Sept. 30, 2020)), at 62-63; Matuschak Decl. Ex. J (Quincy's Answers to FTC's CID Interrogatories (Sept. 15, 2015), at 6 ███████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████ ; Matuschak Decl. Ex. E (Underwood 8/20/20 Tr. at 99:5-11 (describing Underwood's involvement in determining what data to include in an advertisement); Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 46:6-47:11 (discussing leadership role in developing marketing messaging); *id.* at 60:2-5 (discussing Underwood's role in approving edits to Prevagen's packaging).)  Additionally, when the company was first founded, Underwood's responsibilities included "everything" because "[t]here was no one else here" and he had "direct oversights over . . . every department from finance to research and development to sales and marketing."  (*Id.* at 34:5-16.)

17.     Mr. Underwood testified that he is "part of the marketing team" at Quincy, and that Quincy's marketing is all done as a "team activity" involving the entire marketing team. (de Leeuw

Decl. Ex. 3 (Underwood Individual dep.) at 46:24-47:2.)

    **RESPONSE:** Disputed in part.  Underwood has direct oversight over Corporate

Defendants' departments of sales and marketing and research and development, among other

departments. Corporate Defendants' director and Vice President of sales and marketing report

directly to him.  (Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 40:19-41:21.)  Underwood

may have been the sole individual responsible for reviewing and editing packaging and

advertisements, and translating scientific research into language used in marketing when

Corporate Defendants first began operating and/or began advertising and marketing Prevagen.

(*Id.* at 28:16-24; *id.* at 33:16-34:21.)  Underwood is the final decision maker on final advertising

claims.  (Matuschak Decl. Ex. B (Defs.' Resps. to Pls.' First Requests for Admission (Sept. 30,

2020)), at 62-63; Matuschak Decl. Ex. J (Quincy's Answers to FTC's CID Interrogatories (Sept.

15, 2015), at 6 ███████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████ ; Matuschak Decl. Ex. E (Underwood 8/20/20

Tr. at 99:5-11 (describing Underwood's involvement in determining what data to include in an

advertisement); Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 46:6-47:11 (discussing

leadership role in developing marketing messaging); *id.* at 60:2-5 (discussing role in approving

edits to Prevagen's packaging); *id.* at 67:16-68:12 (discussing Underwood's role in an infomercial

that aired in New York); *id.* at 80:16-82:5 (same); *id.* at 85:2-86:17 (discussing Underwood's role

in translating scientific data into marketing language); Matuschak Decl. Ex. G (Olson 8/4/20 Tr.)

at 63:2-9 (discussing Underwood's role in drafting scripts for radio advertisements); *id.* at 78:1-21

(describing Underwood as one of the "primary people" drafting content for television

commercials.)  Indeed, when the company was first founded, Underwood's responsibilities

included "everything" because "[t]here was no one else here" and he had "direct oversights over .

. . every department from finance to research and development to sales and marketing."
(Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 34:5-16.)

      18.     Quincy developed the creatives for its advertising in-house, collaboratively among
its marketing team. (de Leeuw Decl. Ex. 3 (Underwood Individual dep.) at 53:9-10.)

    **RESPONSE:** Disputed in part.  Mr. Underwood has direct oversight over Corporate
Defendants' departments of sales and marketing and research and development, among other
departments. Corporate Defendants' director and Vice President of sales and marketing report
directly to him.  (Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 40:19-41:21.)  Additionally,
Underwood may have been the sole individual responsible for reviewing and editing packaging
and advertisements, and translating scientific research into language used in marketing when
Corporate Defendants first began operating and/or began advertising and marketing Prevagen.
(*Id*. at 28:16-24; *id*. at 33:16-34:21.)  Underwood has participated in creating content for
television and radio ads and is the final decision maker on final advertising claims.  (Matuschak
Decl. Ex. B (Defs.' Resps. to Pls.' First Requests for Admission (Sept. 30, 2020)), at 62-63;
Matuschak Decl. Ex. J (Quincy's Answers to FTC's CID Interrogatories (Sept. 15, 2015), at 6

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████; Matuschak Decl. Ex. E (Underwood 8/20/20 Tr. at 99:5-11 (describing
Underwood's involvement in determining what data to include in an advertisement); Matuschak
Decl. Ex. F (Underwood 8/21/20 Tr.) at 46:6-47:11 (discussing leadership role in developing
marketing messaging); *id*. at 60:2-5 (discussing role in approving edits to Prevagen's packaging);
*id*. at 67:16-68:12 (discussing Underwood's role in an infomercial that aired in New York); *id*. at
80:16-82:5 (same); *id*. at 85:2-86:17 (discussing Underwood's role in translating scientific data
into marketing language); Matuschak Decl. Ex. G (Olson 8/4/20 Tr.) at 63:2-9 (discussing

Underwood's role in drafting scripts for radio advertisements); *id.* at 78:1-21 (describing Underwood as one of the "primary people" drafting content for television commercials).) Additionally, Underwood provided his own content, unscripted, in at least one of Defendants' Prevagen infomercials.  (Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 73:25-74:15.)

19.     Mr. Underwood is one of the people that approved edits to Prevagen's packaging, but not the sole individual. Instead, this group included marketing and advertising personnel at Quincy, as well as counsel. (de Leeuw Decl. Ex. 3 (Underwood Individual dep.) at 60:2-9.)

**RESPONSE:** Disputed in part.  Underwood may have been the sole individual responsible for reviewing and editing packaging and advertisements, and translating scientific research into language used in marketing when Corporate Defendants first began operating and/or began advertising and marketing Prevagen.  (Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 28:16-24; *id.* at 33:16-34:21.)  Underwood is the final decision maker on final advertising claims. (Matuschak Decl. Ex. B (Defs.' Resps. to Pls.' First Requests for Admission (Sept. 30, 2020)), at 62-63; Matuschak Decl. Ex. J (Quincy's Answers to FTC's CID Interrogatories (Sept. 15, 2015), at 6 █████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████; Matuschak Decl. Ex. E (Underwood 8/20/20 Tr. at 99:5-11 (describing Underwood's involvement in determining what data to include in an advertisement); Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 46:6-47:11 (discussing leadership role in developing marketing messaging); *id.* at 60:2-5 (discussing role in approving edits to Prevagen's packaging).)

20.     The entire marketing and advertising team at Quincy is involved in the process of translating scientific data into marketing language. (de Leeuw Decl. Ex. 3 (Underwood Individual dep.) at 85:2-86:25.)

**RESPONSE:** Disputed in part.  Underwood may have been the sole individual responsible for reviewing and editing packaging and advertisements, and translating scientific research into language used in marketing when Corporate Defendants first began operating and/or began advertising and marketing Prevagen.  (Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 28:16-24; *id.* at 33:16-34:21.)  Underwood has participated in creating content for television and radio ads and is the final decision maker on final advertising claims.  (Matuschak Decl. Ex. B (Defs.' Resps. to Pls.' First Requests for Admission (Sept. 30, 2020)), at 62-63; Matuschak Decl. Ex. J (Quincy's Answers to FTC's CID Interrogatories (Sept. 15, 2015), at 6 ████████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████ ; Matuschak Decl. Ex. E (Underwood 8/20/20 Tr. at 99:5-11 (describing Underwood's involvement in determining what data to include in an advertisement); Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 46:6-47:11 (discussing leadership role in developing marketing messaging); *id.* at 60:2-5 (discussing role in approving edits to Prevagen's packaging).)

21.     Scripts for Quincy's radio ads are drafted by a team comprised of Todd Olson, Mark Underwood, Tom Dvorak, and Dakota Miller. (de Leeuw Decl. Ex. 3 (Underwood Individual dep.) at 63:2-9.)

**RESPONSE:** Disputed in part.  Underwood may have been the sole individual responsible for reviewing and editing packaging and advertisements, and translating scientific research into language used in marketing when Corporate Defendants first began operating and/or began advertising and marketing Prevagen.  (Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 28:16-24; *id.* at 33:16-34:21.)  Underwood has participated in creating content for television and radio ads and is the final decision maker on final advertising claims.  (Matuschak Decl. Ex. B (Defs.' Resps. to Pls.' First Requests for Admission (Sept. 30, 2020)), at 62-63; Matuschak Decl. Ex. J

(Quincy's Answers to FTC's CID Interrogatories (Sept. 15, 2015), at 6 ██████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████.)

22.     Content for Quincy's television commercials is done by a team of video production people and marketing personnel at Quincy, including Dakota Miller, Tom Dvorak, Todd Olson, and Mr. Underwood. (de Leeuw Decl. Ex. 1 (Olson dep.) at 78:1-25.)

**RESPONSE:** Disputed in part.  Underwood may have been the sole individual responsible for reviewing and editing packaging and advertisements, and translating scientific research into language used in marketing when Corporate Defendants first began operating and/or began advertising and marketing Prevagen.  (Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 28:16-24; *id.* at 33:16-34:21.)  Underwood has participated in creating content for television and radio ads and is the final decision maker on final advertising claims.  (Matuschak Decl. Ex. B (Defs.' Resps. to Pls.' First Requests for Admission (Sept. 30, 2020)) at 62-63; Matuschak Decl. Ex. J (Quincy's Answers to FTC's CID Interrogatories (Sept. 15, 2015), at 6 ████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████; Matuschak Decl. Ex. E (Underwood 8/20/20 Tr. at 99:5-11 (describing Underwood's involvement in determining what data to include in an advertisement); Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 46:6-47:11 (discussing leadership role in developing marketing messaging).)

23.     Quincy's marketing team took the findings from the Madison Memory Study and helped translate them into advertising or marketing language or copy. (de Leeuw Decl. Ex. 1 (Olson dep.) at 95:6-96:19.).

**RESPONSE:** Disputed.  Underwood has participated in creating content for television and radio ads and is the final decision maker on final advertising claims.  (Matuschak Decl. Ex. B (Defs.' Resps. to Pls.' First Requests for Admission (Sept. 30, 2020)), at 62-63; Matuschak Decl. Ex. J (Quincy's Answers to FTC's CID Interrogatories (Sept. 15, 2015), at 6 ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████; Matuschak Decl. Ex. E (Underwood 8/20/20 Tr. at 99:5-11 (describing Underwood's involvement in determining what data to include in an advertisement); Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 46:6-47:11 (discussing leadership role in developing marketing messaging); *id.* at 60:2-5 (discussing role in approving edits to Prevagen's packaging); *id.* at 67:16-68:12 (discussing Underwood's role in an infomercial that aired in New York); *id.* at 80:16-82:5 (same); *id.* at 85:2-86:17 (discussing Underwood's role in translating scientific data from the Madison Memory Study into marketing language); Matuschak Decl. Ex. G (Olson 8/4/20 Tr.) at 63:2-9 (discussing Underwood's role in drafting scripts for radio advertisements); *id.* at 78:1-21 (describing Underwood as one of the "primary people" drafting content for television commercials).)

24.     Mr. Underwood sat for two depositions in this litigation. The first was on August 20, 2020, during which he testified as a Rule 30(b)(6) witness on behalf of Quincy. The second was on August 21, 2020, during which he testified in his individual capacity. Counsel for the New York Attorney General was present at both depositions but declined the opportunity to ask Mr. Underwood any questions. (de Leeuw Decl., Ex. 2 (Underwood 30(b)(6) dep.), at 160; de Leeuw Decl., Ex. 3 (Underwood Individual dep.) at 214.)

**RESPONSE:** Disputed in part.  Counsel for the NYAG stated that the NYAG might have additional questions if and when either of the Underwood depositions resume.  (Matuschak Decl.

Ex. E (Underwood 8/20/20 Tr.) at 160:12-14; Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 214:15-17.)

### The NYAG's Statement of Additional Material Facts

1.      Quincy Bioscience Holding Company, Inc., wholly owns: Prevagen, Inc., which markets, manufactures, and sells Prevagen Products to consumers nationwide; Quincy Bioscience Manufacturing, LLC; and Quincy Bioscience, LLC, the holder of Prevagen-related patents and trademarks. (Matuschak Decl. Ex. C (Defs.' 2d Supp. Resps. to Pls.' 2d Interrogatories (Oct. 23, 2020)) No. 18; Matuschak Decl. Ex. B (Defs.' Resps. to Pls.' Requests for Admission (Sept. 30, 2020)) at 6.)

2.      Corporate Defendants share the same officers, including individual Defendant Mark Y. Underwood. (Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 37:13-38:6.)

3.      Corporate Defendants share the same Board of Directors, and Underwood serves on that board. (Matuschak Decl. Ex. F (Underwood 8/21 Tr.) at 37:13-38:6.)

4.      Underwood is the co-founder, President, and Chief Operating Officer of Corporate Defendants. (Matuschak Decl. Ex. B (Defs.' Resps. to Pls.' 1st Requests for Admission (Sept. 30, 2020)) No. 99.)

5.      Underwood has participated in creating content for Prevagen television and radio ads and is the final decision maker on final advertising claims. (Matuschak Decl. Ex. B (Defs.' Resps. to Pls.' 1st Requests for Admission (Sept. 30, 2020) at 62-63; Matuschak Decl. Ex. J (Quincy's Answers to FTC's CID Interrogatories (Sept. 15, 2015) at 6 ███████████████

█████████████████████████████████████████████

████████████████████████████████████████████;

Matuschak Decl. Ex. E (Underwood 8/20/20 Tr.) at 99:5-11 (describing Underwood's involvement in determining what data to include in an advertisement); Matuschak Decl. Ex. F (Underwood

8/21/20 Tr.) at 46:6-47:11 (discussing leadership role in developing marketing messaging); *id.* at 60:2-5 (discussing role in approving edits to Prevagen's packaging); *id.* at 67:16-68:12 (discussing Underwood's role in an infomercial that aired in New York); *id.* at 80:16-82:5 (same); *id.* at 85:2-86:17 (discussing Underwood's role in translating scientific data into marketing language); Matuschak Decl. Ex. G (Olson 8/4/20 Tr.) at 63:2-9 (discussing Underwood's role in drafting scripts for radio advertisements); *id.* at 78:1-21 (describing Underwood as one of the "primary people" drafting content for television commercials).)

6.    Underwood is the largest individual shareholder of Quincy Bioscience Holding Company, Inc.  (Matuschak Decl. Ex. O (9/19/2016 Executed Corporate Financial Form) at 3 & Item 7.)

7.    Underwood originated the idea to create Prevagen with the active ingredient apoaequorin based on independent research he did as a hobby while he was an undergraduate student.  (Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 29:12-32:6.)

8.    Underwood participated in naming Prevagen and designing and editing the product labels and packaging.  (Matuschak Dec. Ex. F (Underwood 8/21/20 Tr.) at 60:2-5.)

9.    Underwood is listed as an inventor on patents for aequorin (from which Prevagen's active ingredient, apoaequorin, was derived) and apoaequorin.  (Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 31:23-32:6.)

10.   Underwood has appeared in infomercials on TV and radio to promote Prevagen. (Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 51:14-52:7 (discussing appearance on untitled infomercial); *id.* at 67:16-68:12 (discussing appearance on infomercial "The Better Memory Show"); *id.* at 80:16-82:5 (same); Matuschak Decl. Ex. G (Olson 8/4/20 Tr.) at 62:4-25 (noting that Mr. Underwood was "the primary" person who conducted radio interviews advertising Prevagen).) At least one of those infomercials in which Underwood appeared aired on specific television

stations in the State of New York.  (Matuschak Decl. Ex. C (Defs.' 2d Supp. Resps. to Pls.' 2d

Interrogatories (Oct. 23, 2020)) Ex. A (detailing dissemination schedule for infomercials that aired

on New York-specific television and radio stations).)

11.     Underwood has direct oversight over Corporate Defendants' financial condition,

research and development, and sales and marketing.  Corporate Defendants' chief financial officer

and the directors of sales and marketing, market development, business development, systems and

logistics, national accounts, human resources, technical and quality, manufacturing sciences, and

media procurement all report directly to Underwood.  (Matuschak Decl. Ex. F (Underwood 8/21

Tr.) at 34:1-21, 40:19-41:21.)

12.     In his role as President of Corporate Defendants, Underwood oversaw, and

continues to oversee, the development, conduct, and evaluation of scientific research, including the

Madison Memory Study, on which Defendants' advertising claims are based.  (Matuschak Decl.

Ex. J (Quincy's Answers to FTC's CID Interrogatories (Sept. 15, 2015)) No. 4 ██████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████; Matuschak Decl. Ex. P (Lerner 8/6/20 Tr.) at 30:8-24 (noting that Underwood was

involved in discussions about the Madison Memory Study and in writing up the results); *id.* at

43:17-24 (noting that Underwood was the sole person who decided to conduct the Madison

Memory Study); Matuschak Decl. Ex. F (Underwood 8/21/20 Tr.) at 82:24-84:23 (discussing

Underwood's role in the Madison Memory Study); *id.* at 88:14-90:9 (same); *id.* at 91:11-92:20

(same).)

13.     Prevagen advertisements have been disseminated to consumers nationwide,

including in the State of New York, through a variety of media, including but not limited to

television, radio, the internet, and product labeling and packaging.  ((Rule 56.1 Statement in

Support of Mark Underwood's Motion for Partial Summary Judgment (filed Mar. 18, 2022) [Dkt. No. 212] ¶ 10 ("Advertising and marketing for Prevagen is national in scope."); Defs.' Answer (Aug. 7, 2019) [Dkt. No. 73] ¶¶ 23-24 (confirming that Prevagen has been advertised through various means, including television); Matuschak Decl. Ex. C (Defs.' 2d Supp. Resps. to Pls.' 2d Interrogatories) No. 3 & Ex. A (television); *id*. No. 4 & Ex. A thereto (radio); *id*. no. 8 (labeling and packaging); Matuschak Decl. Ex. G (Olson 8/4/20 Tr. at 33:24-34:6 (internet).)  Indeed, Defendants do not dispute that "Prevagen advertisements have been disseminated to consumers nationwide, including in the State of New York, through a variety of media, including television, radio, print, the internet, social media, product labeling and packaging, and press releases, including during the time periods shown in [Exhibit H to the Matuschak Declaration]." (Matuschak Decl. Ex. I (Defs.' Resps. & Proposed Counter-Findings to Pls.' Proposed Findings of Fact (Mar. 3, 2022)) at 15.)

14.     Defendants have marketed Prevagen nationally on television since at least ███. (Matuschak Dec. Ex. I (Defs.' Resps. & Proposed Counter-Findings to Pls.' Proposed Findings of Fact (Mar. 3, 2022)) at 15.)  Defendants do not dispute that Prevagen has been marketed on the radio since at least ███.  (*Id*. at 24.)

15.     Defendants' television, radio, and internet advertisements, as well as Prevagen product packaging, have made the claims at issue in this case.  (Matuschak Decl. Ex. I (Defs.' Resps. & Proposed Counter-Findings to Pls.' Proposed Findings of Fact (Mar. 3, 2022) at 15-33.)

16.     Defendants, including Mr. Underwood, created, edited, reviewed, approved, and placed the advertisements for Prevagen.  (Matuschak Decl. Ex. C (Defs.' 2d Supp. Resps. to Pls.' 2d Interrogatories (Oct. 23, 2020)) No. 7.)

17.     Defendants' New York State sales, from 2011 to present, totaled (in terms of bottles and revenue amount, for each year):

[2]

(Matuschak Decl. Ex. D (Defs.' 4th Supp. Resps. to Pls.' 1st Interrogatories (Oct. 23, 2020)) No.

1.)


Date:   May 6, 2022

                        Respectfully submitted,

                        LETITIA JAMES
                        Attorney General of the State of New York


                           /s/ *Kate Matuschak*
                        Jane M. Azia
                        Bureau Chief
                        Kate Matuschak
                        Assistant Attorney General
                        28 Liberty Street
                        New York, NY 10005
                        Tel: (212) 416-6189; Fax: (212) 4416-2003
                        Email: kate.matuschak@ag.ny.gov

---

[2] Defendants continue to sell Prevagen in the State of New York, but the NYAG has not yet received the updated data from Defendants. (*See* Matuschak Decl. ¶ 17.)

## CERTIFICATE OF SERVICE

I certify that on this 6th day of May 2022, I served via ECF the foregoing Response to

Defendant Mark Underwood's Rule 56.1 Statement by Plaintiff People of the State of New York,

by Letitia James, Attorney General of the State of New York, to the attorneys of record on the

Service List below.

　　　　　　　　　　　　　　　　　　　　_/s/ *Kate Matuschak*　　　　　　　　　
　　　　　　　　　　　　　　　　　　　　Kate Matuschak

Geoffrey W. Castello, III.
Glenn T. Graham
Jaclyn M. Metzinger
Kelley Drye & Warren LLP
3 WTC, 175 Greenwich St.
New York, NY 10007
(212) 808-7800
gcastello@kelleydrye.com
ggraham@kelleydrye.com
jmetzinger@kelleydrye.com
*Attorneys for Quincy Bioscience Holding*
*Co., Inc., Quincy Bioscience, LLC, Prevagen*
*Inc., Quincy Bioscience Manufacturing, LLC*

John H. Villafranco
Kelley Drye & Warren LLP
Washington Harbour, Suite 400
3050 K Street, NW Washington,
D.C.  20007
(202) 342-8423
jvillafranco@kelleydrye.com
*Attorneys for Quincy Bioscience Holding*
*Co., Inc., Quincy Bioscience, LLC, Prevagen*
*Inc., Quincy Bioscience Manufacturing, LLC*

Michael B. de Leeuw
Tamar S. Wise
Cozen O'Connor
3 WTC, 175 Greenwich St
55th Floor
New York, NY 10007
(212) 908-1331
mdeleeuw@cozen.com
twise@cozen.com
*Attorneys for Mark Underwood*

John B. Kelly
Wachtell, Lipton, Rosen & Katz
51 W. 52nd Street
New York, NY 10019
(212) 413-1000
jbkelly@wlrk.com
*Attorneys for Mark Underwood*

Annette Soberats
Edward Glennon
Andrew Wone
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, DC 20850
(202) 326-2921
asoberats@ftc.gov
eglennon@ftc.gov
awone@ftc.gov
*Attorneys for Plaintiff Federal Trade Commission*