# Exhibit F

# In the Matter of:

# FTC, et al. v. Quincy Bioscience Holding, et al.

*August 21, 2020*
*Mark Underwood - Individual - Confidential*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**1**

```
1              UNITED STATES DISTRICT COURT
2              SOUTHERN DISTRICT OF NEW YORK
3
4   FEDERAL TRADE COMMISSION and    )
5   THE PEOPLE OF THE STATE OF      )
6   NEW YORK, by LETITIA JAMES,     ) Matter No.
7   Attorney General of the State   ) 1:17-cv-00124-LLS
8   of New York,                    ) CONFIDENTIAL
9              Plaintiffs,          ) ATTORNEYS' EYES
10       v.                         ) ONLY
11  QUINCY BIOSCIENCE HOLDING       )
12  COMPANY, et al.,                )
13             Defendants.          )
14  -----------------------------------)
15
16              Friday, August 21, 2020
17                  Via Zoom
18
19       The above-entitled matter came on for the
20  deposition of MARK YANCEY UNDERWOOD, in his individual
21  capacity, pursuant to notice, at 8:33 a.m., Central
22  time; 9:33 a.m., Eastern time.
23
24
25
```

**2**

```
1   APPEARANCES:
2
3   ON BEHALF OF THE FEDERAL TRADE COMMISSION:
4        ANNETTE SOBERATS, ESQ.
5        MICHELLE RUSK, ESQ.
6        EDWARD GLENNON, ESQ.
7        Federal Trade Commission
8        600 Pennsylvania Avenue, N.W.
9        Washington, DC 20580
10       (202) 326-2921
11       asoberats@ftc.gov
12
13
14  ON BEHALF OF THE STATE OF NEW YORK:
15       KATE MATUSCHAK, ESQ.
16       Assistant Attorney General for the
17        State of New York
18       Consumer Frauds and Protection Bureau
19       120 Broadway
20       New York, New York 10271
21       (212) 416-6189
22       kate.matuschak@ag.ny.gov
23
24
25
```

**3**

```
1   ON BEHALF OF DEFENDANTS:
2        GEOFFREY W. CASTELLO, ESQ.
3        JACLYN M. METZINGER, ESQ.
4        GLENN T. GRAHAM, ESQ.
5        Kelley Drye & Warren
6        One Jefferson Road
7        Second Floor
8        Parsippany, New Jersey 07054
9        (973) 503-5922
10       gcastello@kelleydrye.com
11
12
13  ON BEHALF OF THE WITNESS:
14       MICHAEL B. DeLEEUW, ESQ.
15       TAMAR WISE, ESQ.
16       Cozen O'Connor
17       45 Broadway
18       16th Floor
19       New York, New York 10006
20       (212) 908-1331
21       mdeleeuw@cozen.com
22
23
24  ALSO PRESENT:
25       William Ducklow, FTC
```

**4**

```
1              FEDERAL TRADE COMMISSION
2                    I N D E X
3
4   WITNESS:                              EXAMINATION:
5   MARK YANCY UNDERWOOD
6   BY MS. SOBERATS:                           9
7
8
9   EXHIBITS          DESCRIPTION           FOR ID
10  Number MU-26 Underwood Notice of          13
                 Deposition
11
    Number MU-27 Underwood Biographical       14
12               Sketch
13  Number MU-28 Quincy Bioscience Holding    45
                 Company's Answers to the
14               Federal Trade Commission's
                 Civil Investigative Demand
15               Interrogatories
16  Number MU-29 8/24/16 Richards Group       47
                 Correspondence
17
    Number MU-30 2/25/16                      54
18               Underwood/Olson/Seney Email
                 Exchange
19
    Number MU-31 Alzheimer's Conference       99
20               Announcement
21  Number MU-32 8/29/11 Olson/Benson Email  101
                 Exchange
22
    Number MU-33 3/7/12 Olson/Benson Email   104
23               Exchange
24  Number MU-34 Advances Madison Memory     110
                 Study Publication
25
```

1 (Pages 1 to 4)

Underwood - Individual - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                                    8/21/2020

25

1      A. Yes.  Through PAK, yes.
2      Q. Okay, and what was his position at PAK
3  Technologies?
4      MR. CASTELLO:  Objection.
5      THE WITNESS:  Well, he didn't work at PAK
6  Technologies.
7      BY MS. SOBERATS:
8      Q. Okay.
9      A. We were a customer of his.
10      Q. I see.
11      A. Well, we were a customer of his company that was
12  called Quincy Resource Group.
13      Q. Okay.  And what year did you meet Mr. Beaman?
14      A. 2002 or 2003, I would guess.
15      Q. Okay.  Does Quincy have a business relationship
16  with PAK Technologies?
17      A. Which Quincy?
18      Q. Quincy Bioscience Holding Company and all of its
19  subsidiaries.
20      A. No.  None at all.  No.
21      Q. Okay.  So according to this biographical sketch,
22  in 2004, you co-founded Quincy Bioscience and served as
23  president and COO.  Is that correct?
24      A. Yes.
25      Q. And COO stands for chief operating officer,

26

1  correct?
2      A. Yes.
3      Q. What was the full legal name of Quincy
4  Bioscience when you co-founded it in 2004?
5      MR. CASTELLO:  Objection.
6      THE WITNESS:  Oh, gee.  We've -- I'm not
7  recalling the -- what we started out with.
8      BY MS. SOBERATS:
9      Q. Okay.
10      A. Because we had to later change to a C
11  corporation, so we were QRG Bioscience, I believe.
12      Q. And is that QRG the same Quincy Resource Group
13  that Mr. Beaman was --
14      A. It's not the same business, it was the same
15  acronym.  It was stupid.  And so instead of people
16  calling us QRG, which doesn't really roll off the
17  tongue, we changed the QRG to Quincy, because it -- it
18  made more sense.

[redacted]

25      Q. Why did you and Mr. Beaman -- well, actually,

27

1  was Mr. Beaman the other co-founder of Quincy
2  Bioscience?
3      A. Yes.
4      Q. And why did you and Mr. Beaman decide to start
5  Quincy Bioscience?
6      A. We had gotten to know each other through our
7  relationship, like I said, through PAK and Quincy
8  Resource Group.  We had similar ideas on running a
9  business and he wanted me to come and work for him at
10  his company, and I was interested in leaving PAK.  We
11  got together for lunch, he didn't know about this --
12  this idea for this business, but I made mention of it at
13  lunch, and we decided that we were going to pursue it.
14  And, you know, invest in the research to see if what I
15  had put together as a hypothesis would work.  And we
16  determined to do that in early 2004, and then we started
17  the company in June of 2004.
18      Q. And what was the hypothesis that you had put
19  together for Mr. Beaman when you sat down to talk about
20  this in 2004?
21      MR. CASTELLO:  Objection.
22      THE WITNESS:  Well, just to slightly
23  recharacterize this, this is the same hypothesis that I
24  had developed in college, so I didn't prepare it for
25  him.  It already had existed.  And until I walked into

28

1  the Applebee's restaurant, I didn't really even have an
2  idea that I was going to bring it up to him.  He had
3  simply thought I was good at my job at PAK and was
4  looking to enhance his organization by bringing me on
5  board, which was flattering, and I wasn't opposed to
6  that, but as we got to naturally talking, we saw the
7  opportunity to pursue this project together.
8      BY MS. SOBERATS:
9      Q. And what was that project?
10      A. Looking to see if there is a -- a benefit to
11  health, and particularly brain health, by utilizing the
12  protein that had been discovered in jellyfish back in
13  the 1960s.
14      Q. And would that be apoaequorin?
15      A. Yeah.
16      Q. What were your responsibilities as president
17  when Quincy Bioscience first started?
18      A. Well, I mean, in a sense everything because
19  there was no one else.  I --
20      Q. How many employees were at the company at the
21  time?
22      A. It was just --
23      Q. 2004?
24      A. Just Mike and I.
25      Q. Okay.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

29

1  A. Yeah.
2  Q. And what were Mr. Beaman's responsibilities in
3  2004 when the company first started?
4  A. You know, he basically kept to running Quincy
5  Resource Group, the packaging company, and let me sort
6  of do what I needed to do. Develop relationships with
7  labs to do the research, develop our intellectual
8  property portfolio.
9  Q. Okay.
10  A. So he's been hands-off from the beginning,
11  really.
12  Q. And who came up with the name Prevagen?
13  A. Well, that wasn't done for several years, but
14  myself, Mike Moran and Dakota Miller were the -- the
15  only three employees at the time, so it was amongst the
16  three of us.
17  Q. And you said the only three employees at
18  the time, when were Dakota Miller and Mike Moran brought
19  on board?
20  A. I want to -- I want to correct something. I
21  believe we also had Dr. Moran on board.
22  Q. Dr. Moran. So that would be Dr. Dan Moran?
23  A. Yeah. He was not involved in the naming of
24  Prevagen.
25  Q. Okay.

30

1  A. He's a scientist, he's not real good at
2  marketing.
3  Q. Okay.
4  A. So -- the dates of Mike Moran and Dakota Miller,
5  I don't know the exact dates. It was within the first
6  year or two of starting the business, I think.
7  Q. Okay. And when was Prevagen first sold to
8  consumers? What year was that?
9  A. 2007.
10  Q. Okay. Do you recall who designed the label?
11  A. Well, we worked on it together, but Mike Moran
12  was the -- well, would have put, you know, mouse to
13  keyboard, so to speak, in terms of doing the graphics
14  for it.
15  Q. Okay.
16  A. We also worked with counsel on that design.
17  Q. And who else was part of the "we" in your answer
18  for designing the label?
19  A. Oh, well, I mean, at the time, there was just
20  me, Mike and Cody. I don't recall anyone else.
21  Q. And again, Cody is the nickname for Dakota
22  Miller?
23  A. I'm sorry, yeah.
24  Q. Correct?
25  A. Yeah. I'll try to stick with one name.

31

1  Q. So how did you settle on apoaequorin as the
2  active ingredient for Prevagen?
3  A. Well, apoaequorin was what I've been interested
4  in since the middle of the '90s. I mean --
5  Q. Okay. So it goes back to your interest in the
6  protein to the 1990s in your undergraduate work?
7  A. Well, it wasn't part of my undergraduate work,
8  it was done while I was an undergraduate.
9  Q. Okay.
10  A. I -- I did this on my own volition. It wasn't
11  under instruction of a professor or anything.
12  Q. This was independent research?
13  A. Well, it was my hobby.
14  MR. DELEEUW: Folks, I just have to say, you're
15  starting to talk over each other, so you should get some
16  pauses before the next person speaks, please.
17  BY MS. SOBERATS:
18  Q. Go ahead, Mr. Underwood.
19  A. Sure thing. Yeah, I started working on this
20  research independent of my relationship with the
21  university. It happened to overlap while I was a
22  student, though.
23  Q. And it's my understanding that there are a
24  couple of patents that have been filed, one for acquorin
25  and one for apoaequorin. Is that correct?

32

1  A. Yes.
2  Q. And you're listed as the inventor in those
3  patents. Is that correct?
4  A. Yes.
5  Q. And why are you listed as the inventor?
6  A. Because I'm the guy who came up with the idea.
7  Q. Do you recall when retail sales of Prevagen
8  began?
9  A. In 2007.
10  Q. So retail sales started at the same time as
11  direct-to-consumer sales?
12  A. Oh, well, within the same couple of months. I
13  don't recall exactly.
14  Q. Okay. So we talked about how Quincy Bioscience
15  was founded in 2004, but the product Prevagen was not
16  brought to market until 2007. So can you explain to me
17  what happened between 2004 and 2007 at the company?
18  A. Well, we were working on the research with the
19  laboratory at UW Milwaukee, and testing the protein to
20  see if it had benefit, which it did show neuroprotective
21  benefit in Dr. Moyer's lab. We were also working on --
22  because we had, you know, positive results, we were then
23  working on a manner in which we could produce the
24  protein, which is why Dr. Moran was part of our team.
25  Q. And apoaequorin -- Prevagen, pardon, is produced

8 (Pages 29 to 32)

Underwood - Individual - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                    8/21/2020

---

33

1  in-house?
2      MR. CASTELLO:  Objection.
3      THE WITNESS:  Well, I mean, we oversee the
4  contract manufacturers, so we don't have a factory here
5  right now.
6      BY MS. SOBERATS:
7      Q.  Okay.  And there's some background noise.  I'm
8  not sure where it's coming from, but it's just a
9  reminder to please mute yourself if you're not speaking.
10      So, Mr. Underwood, let's talk about how your
11  responsibilities may have changed over time as the
12  company grew.  Other than president and chief operating
13  officer, have you had any other titles?
14      A.  Well, I'm the co-founder.  Sometimes that gets
15  mentioned, but --
16      Q.  Did you ever serve as vice president of product
17  development?
18      A.  That was a title I had in the beginning, yeah.
19      Q.  And during which period of time did you have
20  that title?
21      A.  Just right in the beginning.  I mean, I've
22  always been the co-founder, so the fact that I have any
23  title doesn't sort of matter.  The fact -- I mean,
24  technically I'm the COO, but I don't even carry that on
25  my business card.  I just go by president.

---

34

1      Q.  So you're still the chief operating officer?
2      A.  We -- sure.  It's not a --
3      Q.  Okay.
4      A.  It's not a distinction that matters.
5      Q.  And what were your responsibilities as vice
6  president of product development?
7      A.  Well, like I said earlier, everything.  There
8  was no one else here.
9      Q.  Okay.  And how would you describe your current
10  responsibilities?
11      A.  I have responsibility for the oversight of the
12  financial conditions at the company.  I have direct
13  oversights over -- I guess every department from finance
14  to research and development to sales and marketing.  I
15  work as the point person with counsel on anything that
16  they're involved with.  That's most of it, I guess.
17      Q.  Do you report to anyone?
18      A.  Well, we have shareholders, so I have a
19  responsibility to our shareholders.
20      Q.  Do you report to Mr. Beaman?
21      A.  No.
22      Q.  Are you overseeing any current research
23  projects?
24      A.  Yes.
25      Q.  Can you describe them?

---

35

9      BY MS. SOBERATS:
10      Q.  Okay.  So this is a study that would be
11  conducted in Japan?
12      A.  Yes.
13      Q.  And what's going to serve as the principal
14  investigator of that research?
15      A.  The parent company, it's a research -- a
16  contract research organization, so they're taking care
17  of everything.
18      Q.  Is that research looking into memory or
19  cognitive benefits from apoaequorin?
20      A.  No.
21      Q.  And then I just want to go back to this bio
22  sketch, if you can look at page 2, you're listed as the
23  co-founder and president of Quincy Animal Health
24  starting in 2010.
25      A.  Um-hmm.

---

36

1      Q.  To present.  Is that correct?
2      A.  Yes.
3      Q.  And then in 2011 it states that you co-founded
4  Quincy Drug Discovery, which was renamed CalciGenix.  Is
5  that correct?
6      A.  Yes.
7      Q.  And does Quincy Drug Discovery still exist?
8      A.  It's been renamed as CalciGenix, as it says on
9  the sketch.
10      Q.  Okay.
11      A.  And remains as CalciGenix.
12      Q.  It remains as CalciGenix.
13      A.  Yep.
14      Q.  Did Quincy ever explore the idea of marketing
15  Prevagen as a drug?
16      A.  No.
17      Q.  And a couple of questions on business
18  relationships for Quincy.  Does it have a business
19  relationship with Quincy Financial Services, LLC?
20      A.  No.
21      Q.  Does Quincy Bioscience have a business
22  relationship with the Beaman Capital Group?
23      A.  No.
24      Q.  Do you know what the Beaman Capital Group is?
25      A.  No.

---

9 (Pages 33 to 36)

Underwood - Individual - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                    8/21/2020

37

1   Q.  Do you know what Quincy Financial Services, LLC
2   is?
3   A.  No.
4   Q.  And I just --
5   A.  Let me rephrase.  Not specifically.  I believe
6   it's how Mike handles his finances, so I know that it
7   exists, I just don't know what he does with that.
8   Q.  And this answer that you just gave me, does that
9   relate to the Beaman Capital Group or Quincy Financial
10   Services, LLC?
11   A.  Quincy Financial Services.  I don't know what
12   Beaman Capital Group does at all.
13   Q.  Okay.  And I just want to confirm for the
14   record, when you say that you are the
15   president/co-founder, does that apply to Quincy
16   Bioscience Holding Company and all of the other
17   corporate defendants, and those would be Quincy
18   Bioscience, LLC, Prevagen, Inc., and Quincy Bioscience
19   Manufacturing?
20   A.  Yes, that's correct.
21   Q.  And you co-founded all of these corporate
22   entities with Mr. Beaman?
23   A.  Yes.
24   Q.  Are you on the board of directors for these
25   companies?

38

1   A.  Yes.  We operate with just one board of
2   directors, though, since they are -- since it's all
3   under one umbrella.
4   Q.  And that umbrella would be Quincy Bioscience
5   Holding Company?



16   Q.  And do any of your family members work for any
17   of the corporate defendants?
18   A.  Yes.
19   Q.  And who are they?
20   A.  My daughter does some part-time social media
21   support for our digital marketing team.  She's 17.

39

22   Q.  And did any of your family members, friends or
23   acquaintances participate in Quincy's human clinical
24   research?
25   A.  No.

40

1   Q.  Do any of Mr. Beaman's family members work for
2   the corporate defendants?
3   A.  Yes.  Nathan Beaman.
4   Q.  Okay, and what's his title?
5   A.  He's the director of financial planning.
6   Q.  Okay.  Can you provide me with the email
7   addresses that you use at work?
8   A.  Sure.  Munderwood@quincybioscience.com.
9   Q.  And I've also seen -- oh, I didn't mean to
10   interrupt you.  Go ahead.
11   A.  I also have munderwood@prevagen.com.  That email
12   exists, but it autoforwards to the quincybioscience.com.
13   And those are the only two I currently have.

17   Q.  Do you use that for work as well?
18   A.  No, I do not.
19   Q.  Mr. Underwood, which employees at Quincy
20   currently report to you?
21   A.  Okay, my direct reports would be our chief
22   financial officer -- do you want their titles and names?
23   Q.  Yes, please.
24   A.  Okay.  Our chief financial officer, Tony Cords,
25   C O R D S.  Our director -- excuse me -- of market

10 (Pages 37 to 40)

Underwood - Individual - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                              8/21/2020

---

41

1   development, Todd Olson.  Our vice president of sales
2   and marketing, Tom Dvorak, D V O R A K.  Our director of
3   business development -- well, is that his title?  Excuse
4   me.  I'll start with his name, Dakota Miller, D A K O T
5   A, Miller.  He's our director of sales and marketing.
6   Sorry.
7       KC Lerner, capital K, capital C, which stands
8   for Kenneth Charles, Lerner, L E R N E R.  He is in
9   charge of our intellectual property and business
10  development.  Our systems and logistics manager, Chad
11  Scasny, S C A S N Y.  Andrew Shefka, who is a national
12  accounts director.  That's Shefka, S H E F K A.
13      Currently, our human resources manager, Anthony
14  Kern, K E R N, reports to me.  Our director of technical
15  and quality, Mark Roeder, R O E D E R.  I'm really
16  embarrassed if I'm leaving someone out.
17      Q.  That's all right.
18      A.  Let me -- our director of manufacturing
19  sciences, Dr. Dan Moran, M O R A N.  Our media
20  procurement specialist, Ryan Liebl, that's L I E B L.
21  And I think that's it.
22      Q.  Thank you.  Could you provide me with a current
23  address for Quincy Bioscience?
24      A.  Sure.  726 Heartland, H E A R T L A N D, Trail,
25  Suite 300, Madison, Wisconsin, 53717.

---

42

1       Q.  And what's the address for the Texas office?
2       A.  We no longer have a Texas office.
3       Q.  Okay.
4       A.  We ended -- we suspended the lease -- or excuse
5   me, the lease expired the end of July, and with Covid,
6   we have not re-established the office.
7       Q.  Okay.  And so where does Mr. Beaman work out of
8   currently?
9       A.  His home.
10      Q.  Okay.  Was he the only employee at the Texas
11  office, by the way?
12      A.  Nathan Beaman also worked at our Texas office.
13  The address was 1717 Main Street, it just no longer is
14  occupied by us.
15      Q.  Okay.  Does Mr. Beaman ever visit the Wisconsin
16  office?
17      A.  He has.
18      Q.  How often?
19      A.  Maybe twice a year.
20      Q.  And between visits, how do you communicate with
21  him?
22      A.  Phone or email.
23      Q.  Do you have regular meetings with him?
24      MR. CASTELLO:  Objection.
25      THE WITNESS:  I'm sorry, did someone --

---

43

1       MR. CASTELLO:  You can answer.
2       THE WITNESS:  Oh, I'm sorry, I thought I heard
3   something else.  I speak with Mike frequently, yeah.
4   Yeah.
5       BY MS. SOBERATS:
6       Q.  What do you mean by frequently?
7       A.  A couple times a week.
8       Q.  And on what matters do you seek Mr. Beaman's
9   input or approval?
10      A.  You know --
11      MR. DELEEUW:  Object to the form.  You can
12  answer, I was just objecting to the form.
13      THE WITNESS:  Oh, okay.  You know, we were
14  talking about things that might be related to our board,
15  our shareholders, you know, for all company performance.
16  Mostly the higher level things.
17      BY MS. SOBERATS:
18      Q.  Do you speak with him about advertising and
19  marketing functions?
20      A.  We typically talk about budgets, not just he and
21  I, but also our CFO and our vice president of sales and
22  marketing.  So we do established budgets for
23  marketing -- excuse me, for marketing and advertising.
24      Q.  And do you speak with him about research
25  projects at Quincy?

---

44

1       A.  Yeah.
2       Q.  And can you explain to me the nature of your
3   discussions with Mr. Beaman when you inform him about
4   research projects at Quincy?
5       A.  Sure.  It's sort of like what we talked about
6   yesterday, you know, when we are going to be starting a
7   new pursuit, we'll discuss it.  When we get, you know,
8   final results or, you know, some sort of interim --
9   maybe it's not a published result, but results out of
10  the lab or the entity, we'll discuss the -- the results.
11      Q.  Do you bring regulatory matters to Mr. Beaman's
12  attention as they arise?
13      MR. CASTELLO:  Objection.
14      THE WITNESS:  Generally speaking, if a
15  regulatory matter arises, he's receiving a copy of the
16  letter or the communication from the entity itself or
17  through counsel.
18      BY MS. SOBERATS:
19      Q.  Do you speak with him independent of those
20  letter communications?
21      MR. CASTELLO:  Objection.
22      THE WITNESS:  Well, the letter communication
23  typically conveys what the regulator has to say, so I
24  don't need to interpret it.
25      BY MS. SOBERATS:

---

11 (Pages 41 to 44)

FTC, et al. v. Quincy Bioscience Holding, et al.                    8/21/2020

---

45

1    Q. That's fine. I guess let me rephrase my
2  question.
3    A. Okay.
4    Q. After you and Mr. Underwood --
5    A. I am Mr. Underwood.
6    Q. Sorry, after you and Mr. Beaman receive
7  communications on regulatory matters, do the two of you
8  sit down to discuss the company's response?
9    A. No, not without counsel.
10    Q. But the two of you -- but the two of you and
11  counsel discuss these matters?
12    A. Oh, yes, with counsel.
13    MR. CASTELLO: Objection.
14    THE WITNESS: Yes.
15    (Deposition Exhibit Number MU-28, Quincy
16  Bioscience Holding Company's Answers to the Federal
17  Trade Commission's Civil Investigative Demand
18  Interrogations, was marked for identification.)
19    BY MS. SOBERATS:
20    Q. Mr. Underwood, I have just revealed a new
21  exhibit, this has been marked as Exhibit MU-28. And
22  these are Quincy Bioscience Holding Company's Answers to
23  the Federal Trade Commission's Civil Investigative
24  Demand Interrogations. This document is dated
25  September 15th, 2015. Do you see this on your screen?

---

46

1    A. I do.
2    Q. Okay. Let's turn to page 5 of this document.
3  And I want you to look at the answer for interrogatory
4  3.
5    A. Yes.
6    Q. According to this response, you are "part of the
7  marketing team" at Quincy. Can you explain your role
8  and responsibilities as a member of Quincy's marketing
9  team?
10    A. Sure. I help to lead discussions or participate
11  in discussions, clearly with my title, there is always a
12  bit of a presumption of leadership, because some of the
13  staff, of course, you know, works for me. But anyway,
14  participating in a creative session related to any form
15  of media that we're interested in marketing through,
16  print, radio, TV, digital. That covers most everything.
17    Working on ways that we develop messaging that
18  connects with our target consumer audience. Working to
19  see that everyone does their part to develop their
20  responsibilities within the team. Sometimes bringing in
21  other team members that are not, you know, internal to
22  Quincy, but agency resources, other designers, other
23  specialized marketers.
24    And again, I don't do all that myself, but
25  that's part of the team activity and sort of, you know,

---

47

1  coordinating all that activities -- all those
2  activities.
3    And then working to get it to be a finished
4  advertisement and ultimately placed. You know, that
5  placement -- I don't place any ads. Ryan places
6  probably 95 percent of our ads, maybe 90 percent. And
7  see that during the process everyone gets along with
8  everyone else.
9    Q. The Ryan that you just mentioned, is that Ryan
10  Liebl?
11    A. Yeah. Yeah.
12    Q. Thank you.
13    (Deposition Exhibit Number MU-29, 8/24/16
14  Richards Group Correspondence, was marked for
15  identification.)
16    BY MS. SOBERATS:
17    Q. I have just marked Exhibit MU-29, that should
18  show up on your screen. And this is Bates stamped
19  QUI-FTCNY-00171215. Mr. Underwood, do you see this
20  document on your screen?
21    A. I do.
22    Q. And do you recognize it?
23    A. I do.
24    Q. What is it?
25    A. Well, it's a communication between Quincy

---

48

1  Bioscience, which would be in this email myself and Tom
2  Dvorak, and our contacts or our liaison at an
3  advertising agency called The Richards Group.
4    Q. Okay. And this is dated August 24th, 2016,
5  correct?
6    A. Yes.
7    Q. So The Richards Group, was that -- was The
8  Richards Group retained by Quincy to work on its TV ads?
9    A. And other ads, but yes.
10    Q. What other ads?
11    A. I think they pitched some concepts on print and
12  radio as well.
13    Q. And were those concepts ultimately put into ads
14  that were disseminated?
15    MR. CASTELLO: Objection.
16    THE WITNESS: I don't think we -- I'm sorry. I
17  don't think we went with their print or radio ideas.
18    BY MS. SOBERATS:
19    Q. But you went with their TV ad ideas?
20    A. We went with one of them.

25    Q. Okay. And do you recall when Quincy retained

---

12 (Pages 45 to 48)

---

**49**

1    The Richards Group?



25    Q. Okay. And did Avalaunch Media also work on

---

**50**

1    Quincy's TV ads or radio ads?
2    A. So we've had two vendors that are both very
3    similarly named and spelled.
4    Q. Okay.
5    A. Which one are you referring to?
6    Q. Avalaunch.
7    A. Launch, okay. So Avalaunch is an entity that
8    we've worked with in the past couple years. Avalanche
9    is an entity that we worked with back in 2007.
10    Q. Okay. And Avalaunch, did you work with them on
11    TV ads?
12    A. I don't believe we have.
13    Q. Did you work with them on radio ads, then?
14    A. Oh, Avalaunch. Avalaunch, that's an explainer
15    video. They made an explainer video for us, so that's
16    not a TV ad.
17    Q. And does that explainer video appear on your
18    website?
19    A. I think it does. Yeah. It's the digital piece.
20    Q. And can you describe it for me?
21    A. Well, it's an animation and sort of walks a
22    person through the story of how Prevagen came to be and
23    where it's available. It's not quite a chalkboard
24    animation, but it's -- it's not live human actors.
25    Q. Okay, and are you still working with Avalaunch

---

**51**

1    Media?
2    A. We don't have any open projects with them, I
3    don't think.
4    Q. Okay. And you mentioned Avalanche -- I'm sorry,
5    were you going to complete your answer?
6    A. I was complete.
7    Q. Okay. You also mentioned Avalanche Media.
8       Oh, if we could just mute the lines.
9       Sorry. Avalanche.
10    A. That's okay.
11    Q. What work did they do --
12    A. Honestly, it's cute that we have to do this with
13    Covid. You know, I mean --
14       Avalanche. Sorry, to get back to your question,
15    Avalanche we worked with to produce an infomercial, and
16    that was back in 2007.
17    Q. And that infomercial, was it the Better Memory
18    Show?
19    A. No.
20    Q. What was the name of the infomercial?
21    A. Oh, terribly produced and overpriced, I think it
22    was called. No, I don't recall that it had a title.
23    Q. Did you appear in the infomercial?
24    A. I did. Clearly we lacked budget.
25    Q. So you were -- were you interviewed in the

---

**52**

1    infomercial?
2    A. I think I -- I think I did more of a speaking
3    oration role. That -- that didn't play very long.
4    Q. And did anyone else appear from Quincy in that
5    infomercial?
6    A. I don't think he made the final cut, but Dakota
7    Miller was a stand-in on an exercise ball.
8    Q. Okay. I want you to scroll to the bottom of
9    page 3 of Exhibit MU-29.
10    A. Okay.
11    Q. There's a box that's at the very bottom and
12    there's a column that says, "Client: MU/TD." Does
13    MU/TD stand for Mark Underwood/Tom Dvorak?
14    A. I mean, I guess so. I don't know. That's The
15    Richards Group form.
16    Q. Were you and Tom Dvorak points of contact for
17    Quincy with The Richards Group?
18    A. Yeah, some of them, yeah.
19    Q. And actually, Mr. Underwood, let me ask you, do
20    you -- does Quincy currently have any advertising firms
21    working on projects for the company?
22    A. Well, we don't work with The Richards Group
23    anymore. We don't have an ad agency. I don't think --
24    no, we don't have any agencies working for us right now.
25    Q. Are current advertising functions being

---

13 (Pages 49 to 52)

Underwood - Individual - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                                      8/21/2020

53

1    conducted entirely in-house now?
2        A. What do you mean by advertising functions?
3    Buying the media?
4        Q. Right, and creating -- putting together
5    advertising creatives, disseminating those
6    advertising -- new advertisements.
7        A. We -- we buy our own media, so that's done
8    in-house. But I mean, that's always been done in-house.
9    Developing creatives is done in-house, like I mentioned,
10   sort of the collaborative work of our marketing team.
11       Q. Okay. Let's go to the top of page 3 in Exhibit
12   MU-29.



20       Q. How would you describe Quincy's target age group
21   for marketing purposes?
22       A. We're interested in helping anyone that has a
23   brain health issue. Mild memory loss associated with
24   aging generally means that that consumer is 40 years or
25   older.

54

5        Q. Who were the points of contact for Quincy at The
6    Richards Group?
7        A. Ryan Liebl, Tom Dvorak -- let's see, sometimes
8    our accounting team, different members, Tricia Tuschen.
9    For coordinating a meeting, I might be contacted, but in
10   terms of day-to-day stuff, was normally Tom and Ryan.
11       Q. Okay, and I'm sorry, I think you misunderstood
12   my question, or maybe I didn't phrase it --
13       A. Oh, I'm sorry.
14       Q. Maybe I didn't phrase it correctly. Who were --
15   who were the points of contact for The Richards Group
16   contract?
17       A. Oh, I'm sorry. At Richards Group. I'm terribly
18   sorry. Jeff -- well, on the email here, we've got Jeff
19   Warren, and David Hall.
20       Q. Okay.
21       A. Yeah. David was the account manager, and Jeff
22   was sort of his right-hand man.
23       Q. Okay. Thank you.
24       A. Yeah.
25           (Deposition Exhibit Number MU-30, 2/25/16

55

1    Underwood/Olson/Seney Email Exchange, was marked for
2    identification.)
3            BY MS. SOBERATS:
4        Q. And I have just marked a new exhibit, Mr.
5    Underwood, this is Exhibit MU-30. It is Bates stamped
6    QUI-FTCNY-00164660. Do you recognize this document?
7        A. Yes.
8        Q. What is it?
9        A. It's email correspondence or a chain between
10   myself, Todd and Ryan Seney looking at -- I guess I'd
11   call it packaging. Packaging edits.
12       Q. Okay, and who is Ryan Seney?
13       A. Ryan Seney at this time was the former employee,
14   he used to do some of our graphics in-house and he left
15   to start his own -- I guess his own shingle. And so he
16   continued to help us out with some of our graphics
17   needs, but under his own -- his own company name.
18       Q. And would that company be Burn United Records,
19   LLC?
20       A. Yes. He was in a band, he was really excited
21   about doing graphics for different bands.
22       Q. Okay.
23       A. But he continued to do some graphics for us,
24   too.
25       Q. Does Quincy have a business relationship with

56

1    Burn United Records, LLC?
2        A. We don't anymore, no, but we did for a while,
3    yeah.
4        Q. And what was the nature of that relationship?
5        A. We paid him hourly as a 1099 employee to adjust
6    our labeling or do some -- I'll call him a -- he did
7    projects for us, and this was mostly in an interim
8    between us having a full-time person in-house. So I
9    think he did this for us for maybe a year.
10       Q. Okay. And I'd like you to go to page 2, and
11   locate the email that you sent to Ryan on February 25th,
12   2016 at 10:07 a.m.
13       A. Whoops. Okay.
14       Q. So, Mr. Underwood, in this email, I see various
15   bullet points to Mr. Seney with very specific edits that
16   you wanted to be made to Prevagen's packaging. Do you
17   see those bullets?
18       A. Yes.
19       Q. And why were you asking for these changes in
20   2016?
21       A. Which particular change?
22       Q. All of these.
23       A. All of them?
24       Q. Why so many changes to the packaging of
25   Prevagen -- of the Prevagen products in 2016?

14 (Pages 53 to 56)

Underwood - Individual - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    8/21/2020

57

1    MR. CASTELLO: I'm going to caution the witness
2  that if in order to answer that question he be required
3  to divulge any communication that the company had with
4  counsel, that he not answer the question.
5    THE WITNESS: Yeah, I'll have to heed Geoff's
6  counsel.
7    BY MS. SOBERATS:



23    MR. CASTELLO: I'm going to caution the witness
24  that if in order to answer that question he be required
25  to divulge any information that the company had with

58

1  counsel, that he not answer that question.
2    THE WITNESS: I'm going to have to follow
3  Geoff's counsel.
4    BY MS. SOBERATS:

8    MR. CASTELLO: Is that question independent of
9  communications that the company had with counsel?
10    MS. SOBERATS: Yes.
11    MR. CASTELLO: So to the extent that the witness
12  can answer independent of any independent communications
13  that the company may have had with counsel on that

59

60

1    BY MS. SOBERATS:
2    Q. And did you approve edits to Prevagen's
3  packaging?
4    A. I would be one of the people that approved edits
5  to Prevagen's packaging, but not the sole individual.
6    Q. Who else would approve edits to Prevagen's
7  packaging?
8    A. Internally, people that are part of our
9  marketing and advertising team, as well as counsel.
10    Q. Does Mr. Beaman approve edits to Prevagen's
11  packaging?
12    A. He does not.
13    Q. Is he consulted before substantive changes to
14  Prevagen's packaging?
15    A. He is not.
16    Q. Let's talk about the Brain Health Guide for a
17  few moments. Have there been five editions to the Brain
18  Health Guide?
19    A. I don't know exactly.
20    Q. Okay. Have you authored all of the editions of
21  the Brain Health Guide?
22    A. I have not.
23    Q. Who else has authored them?
24    A. We have different content contributors, both
25  inside the company and outside the company.

15 (Pages 57 to 60)

Underwood - Individual - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                    8/21/2020

---

61

1    Q. And have you authored any of the editions?
2    A. I've contributed to some of them, yes.
3    Q. And who have been the outside contributors to
4  the Brain Health Guide?
5    A. We use an outfit called Writer's Access, so when
6  we need to have something written on a topic, maybe it's
7  the value of blueberries and nutrition in brain health,
8  or the value of exercise, or the value of -- I don't
9  know, doing crossword puzzles. An outside writer will
10  contribute to that edition or that version.
11    Q. And what have been your contributions to the
12  Brain Health Guide?
13    MR. CASTELLO: Objection.
14    THE WITNESS: Really very minimally, that's
15  taken -- that responsibility has been taken up by our
16  marketing and advertising team. It hits my name once
17  there have been other contributors. It would have been
18  inaccurate for me to have my name on it as an author,
19  because I was no longer contributing to it.
20    BY MS. SOBERATS:
21    Q. But you were listed as an author at one point of
22  the Brain Health Guide. Is that correct?
23    A. True. Yeah, in the beginning, yeah.
24    Q. Can you give me a time frame for when you were
25  listed as an author?

---

62

1    A. I don't know the start and stop of that.
2    Q. Is there a new edition to -- of the Brain Health
3  Guide to be released?
4    MR. CASTELLO: Objection.
5    THE WITNESS: I'm not aware of one.
6    BY MS. SOBERATS:
7    Q. And at the beginning you mentioned that you were
8  listed as the author, correct?
9    A. Yes.
10    Q. So what contributions did you make to the Brain
11  Health Guide when you were listed as the author?
12    A. Well, I helped to compose a lot of the copy that
13  was in that first edition.
14    Q. Do you recall what sections you helped compose?
15    A. No, I -- I haven't even looked at the thing in
16  years.
17    Q. Why did you decide to write the Brain Health
18  Guide?
19    A. We often fielded a lot of questions from
20  consumers about tips for brain health, and it was
21  important for us, since we had an audience, to let them
22  know about the different things that could be done for
23  brain health, whether that's nutrition, diet, exercise,
24  reducing sugar, you know, things they would perhaps not
25  normally know they could do to benefit their health and

---

63

1  we could provide that information to them. And within
2  those guides, we also talked a little bit about Prevagen
3  and its potential for them. But we've always felt that
4  having a well-rounded approach to brain health and to
5  have an informed consumer was the best way to, you know,
6  address brain health issues.
7    Q. Just give me one moment.
8    VIDEO TECHNICIAN: Ms. Soberats, this is the
9  videographer, we're approaching our click limit, if it's
10  okay to go off the record here in a minute or two.
11    MS. SOBERATS: Yes, that's fine.
12    VIDEO TECHNICIAN: Would you like to do so now?
13    MS. SOBERATS: Yes, let's do so now and I'm
14  actually going to take a five-minute break while you do
15  that.
16    VIDEO TECHNICIAN: Sure. Going off the record
17  at 10:00 a.m.
18    (Whereupon, there was a recess in the
19  proceedings.)
20    VIDEO TECHNICIAN: Going on the record at 10:12.
21    (Deposition Exhibit Number MU-3, Complaint
22  Exhibits, was referenced for identification.)
23    BY MS. SOBERATS:
24    Q. Mr. Underwood, I have just revealed a new
25  exhibit. This is marked Exhibit MU-3. Do you see that

---

64

1  on your screen?
2    A. I do.
3    Q. These are the complaint exhibits, Plaintiffs'
4  complaint exhibits to the complaint that we -- that the
5  Plaintiffs filed in the Southern District of New York in
6  2017, and this is marked MU-3 because we did introduce
7  this yesterday.
8    I'd like you to turn to page 62 of this
9  document. And do you recognize this document at page
10  62?
11    A. Yes.
12    Q. And what is it?
13    A. The fourth edition of the Brain Health Guide.
14    Q. Okay. And if you look at the bottom of that
15  page, it lists you -- it lists your name, correct?
16    A. Yes.
17    Q. So were you the author of the fourth edition of
18  the Brain Health Guide?
19    A. Yeah, one of them.
20    Q. Are any other authors listed?
21    A. Not listed, but we had other contributors.
22    Q. Okay. And I'd like you to scroll to page 67.
23  Do you see what appears on this page? Are you at page
24  67?
25    A. Yes.

---

16 (Pages 61 to 64)

Underwood - Individual - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                    8/21/2020

---

65

1    Q.  And what is this?
2    A.  It's titled the Prologue.
3    Q.  And you're listed here, correct?
4    A.  Yes.
5    Q.  As the author of this as well?
6    A.  Not here.  I'm listed as the president and
7  co-founder.
8    Q.  Okay.  Is anyone else listed on this page?
9    A.  No, but on page 63, it's produced by Quincy
10  Bioscience.
11   Q.  Okay.  And, Mr. Underwood, is this the most
12  recent version of the Brain Health Guide?
13   A.  I don't believe so.
14   Q.  Is there a fifth edition?
15   A.  I don't recall how many editions we have, but I
16  do recall that it's no longer authored by me on the
17  title page, so I know we have -- I know we have editions
18  subsequent to this.
19   Q.  Okay.  Did Mr. Beaman review the Brain Health
20  Guide?
21   A.  No.
22   Q.  He's never looked at it?
23   A.  In terms of reviewing, do you mean in creating
24  the document?
25   Q.  Did he review a draft copy before it was

---

66

1  disseminated?
2    A.  No.
3    Q.  And, Mr. Underwood, I've seen another
4  publication referenced in the documents that we
5  received, it's titled Gift from the Sea:  How a Protein
6  From Jellyfish Fights the Aging Process.
7    A.  Yes.
8    Q.  Are you familiar with that publication?
9    A.  Yes.
10   Q.  Did you author that?
11   A.  Yes.
12   Q.  And what is it?
13   A.  It's a book about the concept of the jellyfish
14  and the research that we were embarking upon.
15   Q.  And what year did you write that?
16   A.  I don't recall.
17   Q.  And I don't believe we have a copy of that book
18  in the production in electronic form.  Can you tell me
19  if it's a research paper or a marketing piece?
20   A.  It's neither.
21   Q.  What is it?
22   A.  It's just a summary of my ideas related to the
23  jellyfish protein.
24   Q.  And was Gift From the Sea ever provided to
25  Quincy's customers?

---

67

1    A.  I don't recall.
2        MR. CASTELLO:  Objection.
3        BY MS. SOBERATS:
4    Q.  Was it ever provided to Quincy's distributors or
5  retail partners?
6    A.  I don't believe so.
7    Q.  If we go back to Exhibit MU-3, I'd like you to
8  go to page 65, the table of contents.
9        And this is just a reminder to please mute your
10  lines if you are not speaking.
11       So are you at page 65, Mr. Underwood?
12   A.  I am.
13   Q.  And can you scroll down this list of chapters
14  and let me know which of these chapters you authored.
15   A.  Oh, I don't recall.
16   Q.  Okay, I want to spend some time speaking with
17  you about the Better Memory Show.  What was the Better
18  Memory Show?
19   A.  That was what we titled the advertisement that
20  generally featured myself and Teri Barr, I believe.
21   Q.  And was there a second host?
22   A.  Yes, but I am not recalling her name.
23   Q.  Would --
24   A.  Cyndi something.
25   Q.  Cyndi Edwards?

---

68

1    A.  There you go.
2    Q.  Okay.  Do you recall when the Better Memory Show
3  aired?
4    A.  Not -- not exactly.
5    Q.  Is it still airing?
6    A.  No.
7    Q.  Do you remember why it stopped airing?
8    A.  We transitioned our -- our advertising methods
9  from direct response to branded advertising in the
10  spring, I believe, of 2014.  And so I don't recall the
11  exact cessation time for the -- for the spots, but in
12  general, about that time frame, I believe.
13   Q.  Can you explain to me what you mean by branded
14  advertising?
15   A.  We used to do a lot of advertising that elicited
16  a phone call.  The ads would contain a phone number or
17  maybe a website, and then they were -- you know,
18  replaced by advertisements that made the main offer of
19  purchasing Prevagen at a retail location.  So that's
20  typically what we refer to as branded advertising, as
21  opposed to direct response.  That's our own just
22  internal vernacular, I guess.  Other people do the same
23  thing, but that was our description.
24   Q.  So just to make sure I understand what you're
25  saying, when your TV ads end with a line that references

---

17 (Pages 65 to 68)

Underwood - Individual - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                                    8/21/2020

---

69

1    Walgreens or CVS, is that an example of branded
2    advertising?
3        A. Yes.
4        Q. And why was the decision made to transition to
5    branded advertising in the spring of 2014?
6        A. It was a more scalable business model, because
7    we had increased retail distribution, and would be
8    better -- the consumers would be better served to
9    purchase Prevagen because it was basically, you know, in
10   their neighborhood now instead of having to be ordered
11   from us directly and shipped to them to their household,
12   for instance.
13       Q. And do you recall which retail partners Quincy
14   had at the time that you made this transition?
15       A. Well, not in their entirety. We had Walgreens,
16   RiteAid and CVS would probably be the three largest at
17   the time.
18       Q. Okay.
19       A. We have -- we have a couple of thousand
20   accounts, so --
21       Q. Understood.
22       A. Yeah, okay.
23       Q. So in the spring of 2014, I have that year
24   right, correct?  2014?
25       A. I think you do.

---

70

1        Q. Okay.
2        A. If I have it correct, you have it correct.
3        Q. Okay, I just wanted to make sure I was being
4    consistent with what you said.
5        A. Yeah.
6        Q. So spring of 2014, was that when Quincy moved
7    away from the use of infomercials?
8        A. We transitioned from the direct response model
9    to the branded model, yeah.  So that would include the
10   infomercial.  Or the cessation of the infomercial.
11       Q. Okay.  And the Better Memory Show, was that
12   disseminated nationally?
13       A. It was in local markets and then it was on some
14   cable networks.  So the answer would be yes and no,
15   depending on the media buy.
16       Q. Okay, and which local markets are we talking
17   about?
18       A. Dozens of local markets.
19       Q. Was New York one of the local markets?
20       A. It probably was.
21       Q. And which cable market are we talking about?
22       A. Well, I would -- I'll give you an example.  Like
23   if you purchased time on, let's say Discovery, the
24   Discovery Channel, that would be a national network, but
25   at the same time that we would buy a Discovery Channel

---

71

1    slot, we may also buy a Houston, Texas spot.  And so --
2        Q. Okay.
3        A. -- every day or week was different.  So we had a
4    mix of local and national spots.
5        Q. And was the Better Memory Show only disseminated
6    on TV or was it also disseminated via Internet?
7        A. You know, it probably was on YouTube, but that's
8    not really broadcast.  I mean, so it was on -- I think
9    it was on YouTube, yeah.
10       Q. Did it ever appear on any of Quincy's websites?
11       A. It might have, but I think technically, you
12   would have to link to YouTube to watch it.
13       Q. Okay.
14       A. I think that's probably a little bit behind the
15   curtain of how it actually works, but --
16       Q. And you appeared in the Better Memory Show,
17   correct?
18       A. I did.
19       Q. Who selected Teri Barr and Cyndi Edwards as the
20   host of the Better Memory Show?
21       A. Well, we had worked with Teri -- Teri was a
22   journalist, and Teri had interviewed me back in the
23   early years of the company before Prevagen -- with
24   Prevagen, when we were just doing the research.  And she
25   reported on the company.  And so I got to know her back

---

72

1    in like 2005 or '06, or I don't recall exactly when.
2    And we had kept in touch, and she was really interested
3    in what we did, because, you know, she followed the
4    science, she followed the development of things ever
5    since, you know, we started out in just the lab and just
6    in rodents.
7            And then we connected for the opportunity to
8    work on the infomercial together and we talked about it,
9    our advertising team and her, and it was a good fit
10   because she had a genuine interest in the product, and
11   it wasn't -- it wasn't new to her, so she was keenly
12   interested in it.  And that's how we chose Teri.
13       Q. And Cyndi Edwards, who chose her as the host?
14       A. We came to know her through a TV station in
15   Tampa, but I don't remember the specific details.  I'm
16   not sure if they interviewed me on -- on their show and
17   then we decided to work together on the infomercial
18   together, but involved in making the decision was the
19   same people on our advertising team, myself, Tom Dvorak,
20   but I don't recall those circumstances.  I hadn't known
21   Cyndi for as many years as I knew Teri.
22       Q. Do you recall the show that Cyndi Edwards was
23   doing at the time where you appeared for an interview?
24       A. I don't.
25       Q. And was the Better Memory Show done in-house or

---

18 (Pages 69 to 72)

Case 1:17-cv-00124-LLS Document 241-6 Filed 05/06/22 Page 16 of 21
Underwood - Individual - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    8/21/2020

73

1 did you work with a third party?
2     A. Well, when we did it with Teri, we brought in a
3 production team to film the show, and then when we did
4 it with Cyndi, we used their studio, and it was near
5 Tampa. And I want to say the name of her show was like
6 Good Day Tampa, or -- I don't know, Morning Sunshine
7 Tampa.
8     Q. And the Better Memory Show with Cyndi as the
9 host, that was disseminated, correct?
10     MR. CASTELLO: Objection.
11     THE WITNESS: Yeah.
12     BY MS. SOBERATS:
13     Q. Your answer is yes?
14     A. Yes, it is.
15     Q. Okay. We haven't -- the reason I'm asking is
16 because we haven't received dissemination information on
17 that version of the Better Memory Show, Mr. Castello, so
18 I will be talking with you about that later.
19        So you said you brought a production team on
20 board for the taping with Teri Barr.
21     A. Um-hmm.
22     Q. Which production team was that?
23     A. Gee. They were based here in Madison, but I
24 can't remember their name.
25     Q. Okay. And where was the Better Memory Show

74

1 taped when you had Teri Barr as the host?
2     A. Here in Madison.
3     Q. And who wrote the script for the Better Memory
4 Show?
5     A. We did internally, with Teri's assistance.
6     Q. Were you involved in drafting the script?
7     A. Well, I had to answer the questions she asked,
8 so a lot of the script was done like a real interview.
9     Q. Okay.
10     A. So my lines weren't necessarily pre --
11 prewritten. I wasn't reading off of a teleprompter.
12     Q. So you were speaking in the moment when --
13 during this --
14     A. Yeah, yeah. I mean, not that it wasn't, you
15 know, thought about, but it wasn't scripted.
16     Q. And, Mr. Underwood, you're referred to as a
17 neuroscientist throughout the Better Memory Show, and
18 you were introduced as a neuroscientist, but we
19 previously discussed that you never obtained a formal
20 neuroscience degree. So why did the infomercial refer
21 to you as a neuroscientist?
22     MR. DELEEUW: Object to the form.
23     THE WITNESS: Well, in my capacity here at
24 Quincy, I've sponsored more research than many people
25 that are in academics with degrees related to the

75

1 neurosciences.
2     BY MS. SOBERATS:
3     Q. And this next question relates to a point you
4 made earlier about your direct response advertising.
5 The infomercial featured a toll-free number that viewers
6 could call to place an order, and I actually have that
7 number here, it's 888-928-1928. Is that a number that
8 would route callers to Quincy Bioscience?
9     A. I'm not sure. We used dozens of different
10 numbers.
11     Q. So when consumers called those toll-free
12 numbers, where were they led to?
13     MR. CASTELLO: Objection.
14     THE WITNESS: To our internal call center.
15     BY MS. SOBERATS:
16     Q. Okay.
17     A. And at times to external call centers.
18     Q. Okay.
19     A. But usually our own.
20     Q. And --
21     A. We found that working with others, which we did
22 in the very beginning, we didn't have the quality of
23 person on the phone that we wanted, and so that's why we
24 did it in-house.
25     Q. Do you recall --

76

1     A. We answered the calls in-house. Sorry.
2     Q. Do you recall the time period in which calls
3 were answered in-house?
4     A. Well, we still answer calls in-house.
5     Q. But calls --
6     A. So -- I mean, so we still -- we still get people
7 to call some of those same numbers that we haven't
8 advertised in about six years.
9     Q. But at the time that you had your direct
10 response marketing -- well, the time frame during which
11 you had these toll-free numbers would have been the time
12 frame that you -- that Quincy used its direct response
13 marketing. Is that correct?
14     MR. CASTELLO: Objection.
15     THE WITNESS: Well, the phone numbers are still
16 being called by consumers that saw ads literally six
17 years ago. So that activity still happens, although
18 it's -- it's not -- those phone numbers still -- excuse
19 me, those phone numbers aren't currently displayed in
20 advertising, yet consumers still call based off of that
21 older advertising.
22     BY MS. SOBERATS:
23     Q. So who at Quincy answers calls from consumers?
24     A. Our account managers.
25     Q. Okay. And do they use scripts during their

19 (Pages 73 to 76)

Underwood - Individual - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                                              8/21/2020

---

77

1  calls?
2       A. No.
3       Q. Are they trained on what to say during the
4  calls?
5       A. Yes. They're given -- they're given guidelines
6  on what can be spoken about and what can't be.
7       Q. And can you give me the name of the document
8  that has those guidelines?
9       A. I don't know that it's contained in one
10  document.
11       Q. Can you give me a list of documents that would
12  contain the guidelines that are given to the account
13  managers?
14       A. I don't know that there are documents that
15  contain those guidelines.
16       Q. So how are the guidelines given to the account
17  managers?
18       A. They're trained by their supervisors.
19       Q. And how are they trained?
20       A. Well, I guess through verbal instruction. A lot
21  of times we listen to phone calls and talk with them
22  about their -- I guess what's the word I'm looking for?
23  The appropriateness of their response.
24       Q. Can you --
25       A. As they learn -- sorry.

---

78

1       Q. Can you describe the guidelines that are given
2  to the account managers to field calls?
3       A. A lot of things cover frequently asked
4  questions. Things like making sure that there's no type
5  of disease claim made during the call. Making sure if
6  there is a manufacturing defect that's reported to us
7  that gets channeled to our quality control department.
8  If there's an adverse event that it's channeled to the
9  appropriate people which are now at SafetyCall that take
10  care of those adverse events.
11       So for those specific calls we do have SOPs and
12  training that happens periodically, including, you know,
13  basically your first day of work type of training, your
14  introductory training to the position. So that's done
15  and that is catalogued in our procedures.
16       Q. Did Quincy keep track of how many consumers
17  called in because they viewed the Better Memory Show?
18       A. No.
19       Q. Do you know if sales changed after the airing of
20  the Better Memory Show?
21       A. What do you mean by changed?
22       MR. CASTELLO: Objection.
23       BY MS. SOBERATS:
24       Q. Go ahead, Mr. Underwood.
25       A. I'm sorry, what do you mean by changed?

---

79

1       Q. Did sales increase, decrease, after the airing
2  of the Better Memory Show?
3       A. Which airing?
4       Q. Well, let's start with the Teri Barr Better
5  Memory Show. Did sales increase or decrease or remain
6  the same after that airing?
7       A. But I mean, which airing? I mean, it aired for
8  a couple of years. Which date?
9       Q. I'm asking generally.
10       A. Okay, well, that's why --
11       Q. If you compare the sales of Prevagen before you
12  had the Better Memory Show, and after the Better Memory
13  Show, was there a change in sales?
14       MR. CASTELLO: Objection.
15       THE WITNESS: Well, some -- sorry. Some airings
16  were profitable for us and some we lost money on.
17       BY MS. SOBERATS:
18       Q. Which airings did you -- were you profitable on?
19       A. I don't --
20       MR. DELEEUW: Object to the form.
21       THE WITNESS: I don't have any recollection
22  of -- I mean, we did hundreds of airings, so I don't
23  know which ones -- I don't know which ones did well and
24  which ones didn't.
25       BY MS. SOBERATS:

---

80

4       Q. Okay. The infomercial discussed a money-back
5  guarantee, and I just wanted to ask you briefly, what is
6  that money-back guarantee and how does it work?
7       A. Any consumer has any type of desire to return
8  the product, we repay it 100 percent.
9       Q. Is there a time by which consumers need to
10  request a refund?
11       A. No.
12       Q. And does Quincy still have a money-back
13  guarantee?
14       A. We do. We have that with individual consumers
15  and we have that with our retailers as well.
16       Q. So I want to take to you very briefly about the
17  Brain Health Show, not the Better Memory Show, the Brain
18  Health Show. I've seen that referenced in some
19  documents. What is the Brain Health Show?
20       A. I'm sorry, is that different than the Better
21  Memory Show?
22       Q. My understanding is that it -- it also featured
23  you and Teri Barr, but it may have been in radio format.
24  Is that -- does that ring a bell?
25       A. Oh, that could be -- is that the name of the

---

20 (Pages 77 to 80)

81

1    radio show?  I'm sorry, I don't --
2       **Q.  At least that's how it's described in documents.**
3       A.  I'm sorry, I just presumed the name you gave to
4    the TV show was correct.  So if the difference is
5    between TV and radio, then yes, that was with Teri.
6       **Q.  Okay, so is that the same as the Better Memory**
7    **Show that we were just discussing with the exception**
8    **that one aired on TV and one aired on radio?**
9       A.  Yes.
10      **Q.  And did Quincy pay Teri Barr for her appearance**
11   **on the Better Memory Show?**
12      A.  Yes.
13      **Q.  Do you remember how much she was paid?**
14      A.  I do not.
15      **Q.  Did Quincy pay Cyndi Edwards for her appearance**
16   **on the Better Memory Show?**
17      A.  I don't recall if we paid Cyndi or if we paid
18   her -- her studio or her show.  She was compensated in a
19   form, yes.
20      **Q.  Can you give me a few examples of other TV and**
21   **radio programs where you've appeared to promote**
22   **Prevagen?**
23      A.  I've been on Know the Cause with Doug Hoffman.
24   I've been interviewed in different news outlets.  I've
25   been on a show with Dr. Ward Bond.

82

1       **Q.  Can you -- sorry.  Dr. -- say that one more**
2    **time.**
3       A.  Dr. Ward Bond.
4       **Q.  Can you spell that for me?**
5       A.  First name W A R D, last name bond, B O N D.
6       **Q.  And can you give me a few examples of major**
7    **newspapers and magazines where you were featured or**
8    **interviewed promoting Prevagen?**
9       A.  Magazines or newspapers?  Gee.  I know some of
10   have done articles on us, I don't know that I've
11   participated in any interviews.  In any major ones.
12      **Q.  Has Mr. Beaman been interviewed on TV or radio**
13   **to promote Prevagen?**
14      A.  No.
15      **Q.  Has he been interviewed in newspapers or**
16   **magazines to promote Prevagen?**
17      A.  No.  I think the last time we were interviewed
18   was for the Milwaukee Journal, but that was
19   pre-Prevagen, I believe.
20      **Q.  So before -- before Prevagen was sold on the**
21   **market?**
22      A.  No -- I think so.  It was -- it was really early
23   in the company.
24      **Q.  Okay.  Mr. Underwood, how would you describe**
25   **your role with respect to human clinical research on**

83

1    **Prevagen?**
2       A.  Well, I oversaw the staff that conducted the
3    Madison Memory Study, and the open-label trials.  I
4    participated with that staff in coming up with the
5    protocols for the trials, making sure that we were able
6    to get the inventory we needed for the trial, both the
7    treatment compound as well as the placebos manufactured.
8       **Q.  Are you involved in study design for the human**
9    **clinical trials?**
10      A.  Yeah, part of the protocol development
11   certainly, yeah.
12      **Q.  Were you involved in actually conducting the**
13   **research?**
14      A.  No.
15      **Q.  Were you involved in analyzing the data from**
16   **Quincy's human clinical research?**
17      A.  No.
18      **Q.  And were you involved in writing up the results**
19   **of the data from Quincy's human clinical research?**
20      A.  I participated when we did the -- the verbal
21   learning peer-reviewed publication.  Because that was a
22   limited scope of the entire Madison Memory Study.  But
23   in general, I wasn't writing the papers.
24      **Q.  The verbal learning peer-reviewed publication**
25   **that you just identified, is that the 2014 version of**

84

1    **the Madison Memory Study?  The 2014 writeup of the**
2    **Madison Memory Study?**
3       A.  It was in the Advances in Mind-Body Medicine
4    journal.
5       **Q.  And have you ever served as a principal**
6    **investigator of Quincy's preclinical or human clinical**
7    **research?**
8       A.  No, I generally coordinated getting the
9    principal investigator the resources to do their work.
10      **Q.  Okay.  And what do you mean by coordinated with**
11   **the principal investigator?**
12      A.  So the canine studies done by Dr. Milgram, I
13   mean, we had to coordinate the work to understand the
14   scope of what he was going to investigate with the Moyer
15   lab.  You know, coordinate the scope of what Dr. Moyer
16   was going to investigate, not doing the work, but having
17   discussions with him about basically, you know, what
18   budget does he need to do the work, how long will that
19   take to get that work, how do we make sure he has the
20   staff to do the work.
21      At the same time, I mean, I don't, you know,
22   feed the rats, don't do the math, don't -- you know, do
23   the physical part of any research.
24      **Q.  Let's go back to Exhibit MU-28, which should**
25   **appear on that left panel of documents that you have.**

21 (Pages 81 to 84)

Case 1:17-cv-00124-LLS   Document 241-6   Filed 05/06/22   Page 19 of 21
Underwood - Individual - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    8/21/2020

85

1  A. Yeah.
2  Q. And I'd like you to turn to page 6, and just for
3  the record, these are Defendant Quincy Bioscience
4  Holding Company, Inc.'s Responses -- Answers to the
5  FTC's Civil Investigative Demand Interrogatories. If
6  you go to page 6, Mr. Underwood, I'd like you to look at
7  interrogatory 4. The answer lists you, Mark Underwood,
8  as president and it states that you're involved in
9  translation of scientific data into marketing language.
10  Can you explain to me what that means?
11  A. Sure. You've read a lot of our research, and
12  you probably would also agree and recognize that some of
13  the topics that we research don't roll off the tongue
14  real clearly if you don't have a background in
15  neurosciences. And so we try to make that messaging
16  connect with people that don't have Ph.D.s. So in a
17  sense we need to make sure that the things we learn in
18  the lab are translated into appropriate consumer
19  language.
20  So part of that is for just clear communication,
21  and part of that is probably more importantly to make
22  sure that we don't overextend or overpromise the type of
23  claim that we're making from research because, as you
24  know, there are different agencies that are in charge of
25  such, and we're never looking to be on the bad side of

86

1  them. So if data comes out of a lab that maybe shows
2  some sort of like -- I'll call it a disease-like
3  response, or dizzy -- treatment like, you know, status,
4  even though that's scientifically valid, we have to make
5  sure that we don't convey that to a consumer because it
6  would become an issue with perhaps the Food and Drug
7  Administration.
8  So part of it is, again, you knew, clear
9  communication to the consumer, and part of it is making
10  sure that we know our audience so that we don't break a
11  rule when it comes to sharing what we might have
12  learned, we don't necessarily have the right to share
13  that fully with a consumer audience because of the
14  regulations we fall under.
15  Q. And you're involved in this process that you've
16  just described?
17  A. I am, in conjunction with counsel. But yes.
18  Q. Is Mr. Beaman involved in this process?
19  A. No, he is not. To add, our entire team is
20  involved in this process in terms of our marketing and
21  advertising personnel, and we continue to learn and we
22  continue to take those lessons that we learn along the
23  way and implement them into -- into our collective
24  experience so that we do it better and better,
25  hopefully, as time goes by.

87

1  Q. And, Mr. Underwood, you testified earlier that
2  you have communications multiple times a week with Mr.
3  Underwood -- Mr. Beaman, pardon. And that you keep him
4  informed on research. Why do you keep Mr. Beaman
5  informed on research?
6  A. Well, it does affect some of the bigger picture
7  items in our company, and so I mean, he's interested in
8  how well the company is doing. He's interested in
9  things like, you know, what the future might hold in
10  terms of what we're looking at developing and the path
11  we're going for the future.
12  So, yeah, I do inform them of what's going on
13  with research, although we do talk several times a week,
14  we rarely talk about research because we don't have
15  research updates several times a week. We have
16  operational things, the basic running of the business
17  that, you know, we might discuss, you know, one topic or
18  the next.
19  Q. And has he requested to have these regular
20  communications with you?
21  A. No.
22  MR. CASTELLO: Objection.
23  THE WITNESS: And by regular, they're not --
24  they're not programmed, they're not scheduled. They're
25  on occasion. I haven't talked with Mike on the phone

88

1  for a couple weeks, actually. At this current date.
2  BY MS. SOBERATS:
3  Q. Has Mr. Beaman requested to have communications
4  with you multiple times a week?
5  A. No.
6  MR. DELEEUW: Object to the form.
7  BY MS. SOBERATS:
8  Q. And do you feel that you need to keep Mr. Beaman
9  updated on developments at Quincy?
10  MR. CASTELLO: Objection.
11  MR. DELEEUW: Object to the form.
12  THE WITNESS: No, I don't.
13  BY MS. SOBERATS:
14  Q. I want to talk specifically about the Madison
15  Memory Study. What was your role in that study?
16  A. Well, similar to what we talked about for my
17  role in other -- you know, in clinical studies and
18  preclinical studies. The same -- the same type of
19  thing. Helping to organize the staff that conducts the
20  research, looking at the overall goals or aims of the
21  study. You know, I guess participating in the concepts
22  of what we wanted the protocol or the study goals to be,
23  and then letting our staff execute on those goals.
24  Q. Did you review the recruitment ads for the
25  Madison Memory Study?

22 (Pages 85 to 88)

Underwood - Individual - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                    8/21/2020

---

89

1    A. I have seen some of them, yeah.
2    Q. Who created those ads?
3    A. They were created internally with different
4  members of our team.
5    Q. And which members would those be?
6    A. At the time, Todd Olson, myself, Peggy Sivesind,
7  who no longer works with us. I'll spell that, I think
8  it's S I V E S E N D [sic]. Mike Moran likely
9  contributed to those. KC Lerner may have contributed to
10  those.
11    Q. Were you involved in recruiting participants for
12  the Madison Memory Study?
13    A. Only in trying to make sure that the marketing
14  materials were appropriate.
15    Q. Okay. And were you involved in administering
16  the Cogstate Battery?
17    A. No, not to participants, no.
18    Q. Did you analyze the results of the Madison
19  Memory Study?
20    A. No. I analyzed Taylor's results of her analysis
21  of the memory study, but not performing the statistics
22  myself.
23    Q. And did you participate in meetings to discuss
24  the results of the Madison Memory Study?
25    A. Yes.

---

90

1    Q. And can you describe who else participated in
2  meetings to discuss the results of the Madison Memory
3  Study?
4    A. Well, sure, it would have been our whole
5  research team at the time. Myself, Todd Olson, KC
6  Lerner, Taylor Gabourie, Peggy Sivesind, Stephanie
7  Hobbins, Amadeus Benitez, Kelsey Harter, Dr. Moran.
8    Q. That's Dan Moran?
9    A. Yeah.
10    Q. Okay. Did Mr. Beaman review the protocol of the
11  Madison Memory Study?
12    A. No.
13    Q. Did he participate in meetings to discuss the
14  results of the Madison Memory Study?
15    A. Not until the study was completed, so not in
16  a -- in an interim basis. He's aware of the final
17  report and the final publications.
18    Q. And when did he become aware of the final report
19  and publications?
20    A. I don't know.
21    Q. Who was involved in the initial decision to do
22  the Madison Memory Study?
23    A. Basically the team that I just described. That
24  team was involved in every step of the study.
25    Q. Who came up with the idea to do the Madison

---

91

1  Memory Study?
2    A. It was a team effort. There wasn't really
3  anyone individually.
4    Q. So other than knowing about the results of the
5  Madison Memory Study, what role did Mr. Beaman have in
6  that study?
7    A. None. Mike's not involved in operation of
8  things here at the company at all. He's only interested
9  in things that are related to the overall performance of
10  the company.
11    Q. And who decided that the AD8 questionnaire
12  should be a part of the Madison Memory Study?
13    A. We had a -- definitely myself, KC Lerner, Todd
14  Olson, Peggy Sivesind. We reviewed several different
15  categorization methodologies and we determined that AD8
16  was the most accepted in publications at the time.
17    Q. And is the AD8 questionnaire a screening tool?
18    A. Well, it's an assessment tool. So when you go
19  into a doctor's office, a neurologist will typically
20  give you an AD8 survey as an assessment. And so your
21  responses will often be the introductory or the first
22  parts of a patient exam where you get a medical history,
23  you talk with the patient, you talk with the family --
24  the close family members of the patient, and the AD8
25  assessment tool helps the doctor to get a little bit of

---

92

1  a basis for what your memory impairment levels are.
2    Q. And what is the AD8 questionnaire intended to
3  assess?
4    A. Memory impairment, or levels of memory
5  impairment.
6    Q. When was the decision made to use the AD8
7  questionnaire?
8    A. I don't recall the date.
9    Q. Who decided to use the Cogstate Battery?
10    A. We reviewed several software programs at the
11  time, myself, Todd Olson, KC Lerner and Peggy Sivesind.
12  There were other programs available, but Cogstate was at
13  the time, you know, earning a very good reputation, it
14  had a very reasonable licensing fee, and so we opted to
15  go with Cogstate because we wanted to have quantitative
16  data, meaning, you know, the computer can actually
17  measure the cognitive performance for the participants
18  that were in the study, and it's primarily designed for
19  people that have, you know, mild to moderate cognitive
20  impairment.
21    Q. When the Madison Memory Study was completed, was
22  there an analysis of the results for the study
23  population as a whole?
24    A. Yes.
25    Q. And what did those results show?

---

23 (Pages 89 to 92)

Underwood - Individual - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    8/21/2020

213



15      Q.  Okay.  Counsel, I'm going to take just a
16  five-minute break to make sure that I have covered
17  everything so that I can wrap up.
18          MR. CASTELLO:  Great.  Thank you so much.  I
19  would just say I thought we did that already.  We took a
20  20-minute break and it turned into a 30-plus minute
21  break, so I would appreciate it if we could keep it to
22  five minutes so we can get done today.
23          MS. SOBERATS:  Thank you.
24          VIDEO TECHNICIAN:  Going off the record at 4:19.
25          (Whereupon, there was a recess in the

215

1          THE WITNESS:  I hope you guys have a great
2  weekend.
3          VIDEO TECHNICIAN:  This concludes today's
4  deposition of Mark Underwood as an individual.  Going
5  off the record at 4:24.
6          (Reading and signature reserved.)
7          (Whereupon, at 4:25 p.m., Central time; 5:25
8  Eastern time, the deposition was adjourned.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

214

1  proceedings.)
2          VIDEO TECHNICIAN:  Going on the record at 4:23.
3          MS. SOBERATS:  Counsel, I am done with my
4  questions for today.  I would just note for the record
5  that Plaintiffs will keep this deposition open since Mr.
6  Underwood did not answer a question pertaining to
7  research started after the Madison Memory Study that is
8  a question and answer that relates to an ongoing
9  discovery dispute that is being briefed at the Southern
10  District of New York, and we will keep this deposition
11  open pending resolution of that dispute.
12          Kate, do you -- does the New York Attorney
13  General's Office have any questions that they would like
14  to ask at this time?
15          MS. MATUSCHAK:  Thank you, no, we don't have any
16  questions today, but we may have questions if and when
17  this deposition continuous.
18          MS. SOBERATS:  And, counsel, do you have any
19  redirect?
20          MR. CASTELLO:  This is Castello, no.
21          MR. DELEEUW:  DeLeeuw, we have a couple of
22  hours.  No, no, we're done.  We have nothing.
23          MS. SOBERATS:  Okay.
24          THE WITNESS:  Thank you very much.
25          MS. SOBERATS:  Thank you, Mr. Underwood.

216

1  DISTRICT OF COLUMBIA, to wit:
2
3          I, Sally Jo Quade, CERT, the officer before whom
   the foregoing deposition was taken, do hereby certify
4  that the within-named witness personally appeared before
   me at the time and place herein set out, and after
5  having been duly sworn by me, according to law, was
   examined by counsel.
6          I further certify that the examination was
7  recorded stenographically by me and this transcript is a
   true record of the proceedings.
8          I further certify that I am not of counsel to
   any of the parties, nor an employee of counsel, nor
9  related to any of the parties, nor in any way interested
   in the outcome of this action.
10
          As witness my hand and notarial seal this 24th
11  day of August, 2020.
12
13
14
                    s/Sally Jo Quade
15                  Sally Jo Quade, CERT
                    Notary Public
16
17
18  MY COMMISSION EXPIRES:
19      7/14/2023
20
21
22
23
24
25

54 (Pages 213 to 216)