# Exhibit G

# In the Matter of:

# FTC, et al. v. Quincy Bioscience Holding, et al.

*August 4, 2020*
*Todd Olson - Individual*
*Vol. 1*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

## Page 1

```
 1            UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF NEW YORK
 3               Case No. 1:17-cv-00124-LLS
 4   FEDERAL TRADE COMMISSION and        )
     THE PEOPLE OF THE STATE OF NEW YORK,)
 5   by LETITIA JAMES, Attorney General  )
     of the State of New York,           )
 6                                       )
                Plaintiffs,              )
 7        v.                             )   VOLUME 1
                                         )
 8   QUINCY BIOSCIENCE HOLDING COMPANY,  )
     INC., a corporation;                )
 9                                       )
     QUINCY BIOSCIENCE, LLC, a limited   )
10   liability company;                  )
                                         )
11   PREVAGEN, INC., a corporation d/b/a )
     SUGAR RIVER SUPPLEMENTS;            )
12                                       )
     QUINCY BIOSCIENCE MANUFACTURING,    )
13   LLC, a limited liability company;   )
                                         )
14   MARK UNDERWOOD, individually and as )
     an officer of QUINCY BIOSCIENCE     )
15   HOLDING COMPANY, INC., QUINCY       )
     BIOSCIENCE, LLC, and PREVAGEN, INC.;)
16   and                                 )
     MICHAEL BEAMAN, individually and as )
17   an officer of QUINCY BIOSCIENCE     )
     HOLDING COMPANY, INC., QUINCY       )
18   BIOSCIENCE LLC, AND PREVAGEN, INC., )
                                         )
19              Defendants.              )
20
21             Tuesday, August 4, 2020
22              ATTORNEYS EYES ONLY
23       VIDEOTAPED INDIVIDUAL DEPOSITION
24                     OF
25                 TODD OLSON
```

## Page 2

```
 3      The videotaped individual deposition of
 4   TODD OLSON was taken on Tuesday, August 4, 2020,
 5   commencing at 8:36 a.m., Central Daylight Time, via
 6   online videoconference, by Bess A. Avery, RMR and
 7   Notary Public.
```

## Page 3

```
 1   APPEARANCES:
 2      ON BEHALF OF THE FEDERAL TRADE COMMISSION:
 3         EDWARD GLENNON, ESQ.
 4         MICHELLE RUSK, ESQ.
 5         ANNETTE SOBERATS, ESQ.
 6         Federal Trade Commission
 7         600 Pennsylvania Avenue, N.W.
 8         Washington, D.C.  20850
 9         (202) 326-2136
10         eglennon@ftc.gov
11         mrusk@ftc.gov
12         asoberats@ftc.gov
13
14      ON BEHALF OF THE ATTORNEY GENERAL OF THE
15      STATE OF NEW YORK:
16         KATE MATUSCHAK, ESQ.
17         Assistant Attorney General
18         Office of the New York State
19         Attorney General
20         28 Liberty Street
21         New York, New York  10005
22         (212) 416-6189
23         kate.matuschak@ag.ny.gov
24
25   ALSO PRESENT:  Will Ducklow, FTC Investigator
```

## Page 4

```
 1   APPEARANCES (Continued)
 2
 3      ON BEHALF OF QUINCY BIOSCIENCE HOLDING COMPANY,
 4      INC.; QUINCY BIOSCIENCE, LLC; PREVAGEN, INC.;
 5      QUINCY BIOSCIENCE MANUFACTURING, LLC:
 6         GEOFFREY W. CASTELLO, III, ESQ.
 7         GLENN T. GRAHAM, ESQ.
 8         JACLYN M. METZINGER, ESQ.
 9         Kelley Drye & Warren LLP
10         101 Park Avenue
11         New York, New York  10178
12         (212) 808-7800
13         gcastello@kelleydrye.com
14         ggraham@kelleydrye.com
15         jmetzinger@kelleydrye.com
16
17      ON BEHALF OF DEFENDANT MARK UNDERWOOD:
18         TAMAR S. WISE, ESQ.
19         MICHAEL B. de LEEUW, ESQ.
20         Cozen O'Connor
21         45 Broadway Atrium, Suite 1600
22         New York, New York  10006
23         (212) 908-1331
24         twise@cozen.com
25         mdeleeuw@cozen.com
```

1 (Pages 1 to 4)

17

```
 1  turning my head and you can't hear me and my audio
 2  fades out, please let me know.
 3          (Deposition Exhibit TO 1 was introduced
 4           into the record,)
 5  BY MR. GLENNON:
 6      Q   Okay.  I've revealed and marked a
 7  document.
 8          Can you see that on your screen,
 9  Mr. Olson?
10      A   I see a Document 1 in the left margin.
11      Q   Oh, okay.
12          You don't have anything on your screen
13  right now?
14      A   Okay.  I had to click on the document and
15  then it revealed on the right side.
16      Q   Okay.
17      A   Yeah, I see this.
18      Q   Okay.  Do you recognize this document?
19      A   It looks like an org chart.
20      Q   Okay.  You want to focus on the portion in
21  which your name appears.  It's off to the right
22  side.
23          Do you see that?
24      A   I do.
25      Q   Okay.  Okay.
```

18

```
 1          Okay.  And Lizzie -- do the people listed
 2  under you who report to you, Lizzie Malzfeldt -- is
 3  that correct?
 4      A   Yes.  That's her -- I mean, she's married
 5  now.
 6      Q   Okay.  So that's the Liz Bauer you
 7  referred to earlier?
 8      A   Mm-hmm, yes.
 9      Q   Okay.  And then to the right of that box
10  there's a Casey Syvrud?
11      A   Syvrud, yeah.
12      Q   Okay.  Is she still there?
13      A   Yep, she is.  Oh, I may have left her out.
14  I apologize.  Yes, she's still here.
15      Q   Okay.  And then there's a series of --
16          Let me minimize this on my screen a little
17  bit so I can see it better.
18          Okay.  The people listed as reporting to
19  you, there in those boxes, are those all the people
20  who report to you directly?  Is that correct?
21      A   Yes.
22      Q   And are their titles accurate on this
23  chart?
24      A   Under Lizzie's title, she's actually also
25  a -- we took out the customer service
```

19

```
 1  representative.  She's a content coordinator, social
 2  media and content coordinator.
 3      Q   Okay.  All right.
 4          And then moving up a row.  To the right --
 5  as you look at the screen -- of your name, it says:
 6          "VP sales and marketing."
 7          Do you see that?
 8      A   I do, yeah.
 9      Q   And then under it is Tom Dvorak?
10      A   Yes.
11      Q   Is he currently in that position of VP
12  sales and marketing?
13      A   Yes.
14      Q   Okay.  And how do his responsibilities, if
15  at all, differ from yours?
16      A   He's mainly focused on the large national
17  accounts, the largest national accounts.  He's point
18  on those, as well as he oversees our media
19  component, our national commercial campaigns.
20      Q   Okay.  When you say accounts, you know, as
21  in national accounts?  What do you mean by accounts?
22      A   Walgreens, CVS, Walmart, Rite Aid.
23      Q   So those are accounts with retailers of
24  the Prevagen products?
25      A   Correct.
```

20

```
 1      Q   And what are those main accounts?  Could
 2  you list them again, please.
 3      A   Walgreens, Walmart, CVS, and Rite Aid.
 4      Q   Okay.  And then you said he also oversees
 5  media as well?
 6      A   (Witness nodding)
 7      Q   Or what aspect or what type of media does
 8  he oversee?
 9      A   He works as a -- really a point person in
10  helping develop commercial creatives, as well as the
11  media buying efforts.
12      Q   Okay.  And creatives for which -- what
13  types of media?
14      A   Mainly television and radio.
15      Q   And --
16          MR. CASTELLO:  This is Castello.
17          Mr. Glennon, before you move on -- and I
18  may have neglected to -- certainly neglected to ask
19  you before and may not have heard you.
20          Are you conducting the Rule 30(b)(6)
21  deposition at this point, or is this the deposition
22  of Mr. Olson in his individual capacity?
23          MR. GLENNON:  This is, yes, in his
24  individual capacity.
25          MR. CASTELLO:  Thank you.
```

21

```
 1       BY MR. GLENNON:
 2          Q   In the sense of creating, does he create
 3       content for TV marketing?
 4          A   Well, I mean, he -- he helps lead the
 5       production effort of it.  The aspect of it might
 6       be -- the nature of the creative might be, you know,
 7       part of a group decision, a group discussion, but he
 8       helps lead the production effort of it and the media
 9       buying for it.
10          Q   And he does the same for radio.  Is that
11       correct?
12          A   Yeah.
13          Q   Any other forms of media?  Is he involved
14       in any other forms of media in terms of creative
15       effort?
16          A   Occasionally we do print.  It's not as
17       much of a focus as it perhaps used to be, but when
18       that comes up, there may be involvement there as
19       well.
20          Q   Okay.  And we'll probably get into this a
21       little bit later, but is TV -- what form of media is
22       the primary form of marketing for Quincy for the
23       Prevagen product?
24              Sorry.  Let's me ask that a little bit
25       more clear.
```

22

```
 1              What form of media does Quincy use as its
 2       primary means to market the Prevagen product?
 3          A   I don't do the media buying, but my
 4       understanding would be television.
 5          Q   And that would be -- do you know what that
 6       would be followed by, what form of media?
 7              MR. CASTELLO:  Objection.
 8              THE WITNESS:  Yeah.  Again, I don't know
 9       the rank order of spends.  My guess would then be
10       radio.
11       BY MR. GLENNON:
12          Q   Okay.  Just turning back to the chart
13       here, is there a Dakota Miller who works for Quincy?
14          A   Yes.
15          Q   And what does he do?
16          A   He oversees our sales effort for
17       independent health food stores and independent
18       pharmacies.  He also works in -- he helps lead our
19       Amazon sales effort, and works in the loss
20       control/loss prevention area.
21          Q   Okay.  What is loss control/loss
22       prevention?
23          A   Helping to minimize the amount of Prevagen
24       that is lost in retail due to theft and -- so, yeah.
25          Q   Okay.  Any other duties for Dakota Miller?
```

23

```
 1          A   He engages in Google AdWord spends.  He
 2       oversees that aspect of it.
 3          Q   Anything else?
 4          A   No.  That's what I'm aware of.
 5          Q   Okay.  And getting back to the accounts,
 6       you said Tom Dvorak is, I believe -- oversees the
 7       national accounts with retailers.  Is that right?
 8          A   Right.
 9          Q   Do you have any involvement with accounts
10       for other retailers?
11          A   I do, yeah.
12          Q   You do?
13          A   Yes.
14          Q   Okay.  Which retailers?  With which
15       retailers are you involved?
16          A   Kroger.  GNC.  There are regional
17       retailers like HEB, Hy-Vee, Meyer, Kinney Drug in
18       New York.  Bartell Drug.  UNFI/Supervalu.
19          Q   Okay.  And what do you do with relation to
20       those accounts?
21          A   Help increase their sales of Prevagen.
22          Q   And just generally, what does that involve
23       on your part?
24          A   It generally involves working with the
25       category manager at those retailers and helping them
```

24

```
 1       merchandise Prevagen to their customers.
 2          Q   And does that involve working with them in
 3       terms of marketing?
 4          A   On occasion, yes, as it relates to maybe a
 5       promotional program.
 6          Q   What type of promotional program?
 7          A   Putting our bottle picture in a circular
 8       ad.  It could be that basic.
 9          Q   Okay.  Do you have any other examples of
10       that?
11          A   Bringing in a display, what we call a
12       secondary placement for the product in the store, an
13       end cap or on the shelf.
14          Q   And is that something that Quincy would
15       design?
16          A   Sometimes it's a partnership, sometimes we
17       design it.  It depends on the account.
18          Q   What about the circulars that you
19       mentioned, would Quincy create the content of those?
20          A   Not typically.  They typically just
21       feature a bottle image, and they take copy right off
22       the bottle and put it in the ad.
23          Q   Does Quincy provide them with rights to do
24       that?
25              MR. CASTELLO:  Objection.
```

6 (Pages 21 to 24)

Page 25

1  THE WITNESS: I'm not -- I guess, because
2  we have a vendor agreement signed, probably within
3  there is the right to market our product.
4  BY MR. GLENNON:
5  Q  I was just referring to the image. I
6  mean, so would Quincy provide images of its bottle
7  to the retailers for them to use?
8  A  Yes, typically.
9  Q  All right. And then just getting back to
10 some of the other possible employees. Also on the
11 org chart, does Dakota Miller appear here? Am I
12 just not seeing him currently?
13 A  Yeah, he's --
14    [Inaudible]
15    (Reporter requests clarification)
16 A  There's a blue rectangle about five over
17 from me to the left. Director of sales and
18 marketing, hyphen -- or slash, director of loss
19 prevention.
20 Q  Right. Thank you.
21    And is there a Seth Taylor who works at
22 Quincy?
23 A  He's a video production specialist that we
24 work with.
25 Q  Is he employed by Quincy?

Page 26

1  A  I don't know the exact nature of his
2  employment with us.
3  Q  You don't know if he is self-employed, for
4  instance?
5  A  Yeah, I know he's got a Quincy Bioscience
6  e-mail address. I believe he might be an
7  independent representative. But I don't -- I
8  haven't -- I interact with Seth, but we haven't -- I
9  don't know his exact status in terms of whether he's
10 a full-time employee or independent rep.
11 Q  Okay.
12    How about Mike Moran, is there a Mike
13 Moran there?
14 A  No.
15 Q  Okay. Was there a Mike Moran previously
16 at Quincy?
17 A  Yeah.
18 Q  Okay. How, you know -- or when did he
19 leave?
20 A  Boy, I don't recall exactly the year. I
21 would have -- I would have to guess 2012, 2013.
22 Q  What about Andrew Shefka?
23 A  Yes, he's here.
24 Q  What does he do?
25 A  He's a retail account manager.

Page 27

1  Q  And what are his duties? Do you know?
2  A  Similar in the sense that he oversees
3  certain regional chain retail accounts. Typically
4  he's got more grocery accounts, a few drug --
5  drugstore chain accounts.
6  Q  Okay. Mike Moran, when he was there, do
7  you know what his title was, his position?
8  A  I believe he was a marketing
9  communications manager.
10 Q  And what does that mean?
11 A  Well, before we had a formal digital
12 marketing team, he oversaw two people that helped --
13 a developer that helped develop the website. And
14 it's sort of an e-mail content person. So he really
15 helped get our website off the ground, and oversaw a
16 couple of people that helped, you know, develop
17 those things.
18 Q  Do you know why he left the company?
19 A  Another opportunity.
20    MR. GLENNON: Excuse me.
21 BY MR. GLENNON:
22 Q  Okay. I'm just going to ask a few
23 questions about Quincy's advertising of Prevagen
24 products generally.
25    Quickly, can you please give me a quick

Page 28

1  overview of the various types of media Quincy has to
2  use to market its Prevagen products?
3  A  Well, I guess, as we mentioned, TV, radio,
4  and print would be the dominant forms.
5     There's online advertising as it relates
6  to Google AdWords, and display advertising.
7     E-mail marketing to people who come to our
8  website. And that would encompass probably 95,
9  98 percent of all of our marketing outreach.
10 Q  Okay. Has Quincy established an annual
11 budget for advertising?
12 A  That's not my area of responsibility.
13 Q  I understand. But do you know?
14 A  I know that numbers on media spend are
15 discussed on a regular basis. But, again, I'm not
16 part of those meetings.
17 Q  Okay. Who would be part of those
18 meetings?
19 A  That would be Tom Dvorak and Ryan Liebl,
20 primarily.
21 Q  And how do you spell Liebl?
22 A  L-I-E-B-L.
23 Q  And what is his position?
24 A  He's our media buyer.
25 Q  Is Mark Underwood involved in those

**Page 29**

1  discussions?
2  A  I believe he probably is. I don't know to
3  what extent, if it's an overall number or on a
4  monthly basis, but I'm sure he's aware of what the
5  spend is.
6  Q  Okay. All right. With those people you
7  mentioned, who would make decisions about allocating
8  the advertising budget among types of media?
9  A  I mean, you are asking me to say something
10  about meetings that I'm not participating in, so my
11  guess would be Tom. But, again, I'm not part of
12  those meetings.
13  Q  I understand.
14  A  Yeah.
15  Q  And I'll ask, if you know, was Quincy's
16  advertising generally national in scope?
17  A  It is, yes.
18  Q  And, again, if you know, did Quincy
19  allocate spending toward particular geographical
20  markets on occasion?
21  A  My understanding is that generally it's
22  national in scope. Regional advertising may only
23  come up through selected print opportunities in
24  certain markets. But by and large, the media
25  budget, as I understand, is national.

**Page 30**

1  Q  Do you have any understanding of what
2  geographical markets might be targeted?
3       MR. CASTELLO: Objection.
4       THE WITNESS: There might be, for example,
5  community newspapers or magazines of interest in an
6  area like Florida, for example.
7  BY MR. GLENNON:
8  Q  And why would Florida be an area of
9  interest?
10  A  25 million people there.
11  Q  Would Quincy target specific geographical
12  areas based on sales of its products?
13  A  Again, we really didn't, and to my
14  knowledge don't focus on geographic areas. It's a
15  national spend.
16  Q  Okay. Did Quincy monitor the performance
17  of its advertising?
18  A  Certainly in the aggregate, as I
19  understand it, yes.
20  Q  How would it do that?
21  A  Well, broadly speaking, looking at sales
22  lift from the media spend.
23  Q  And what -- with regard to what types of
24  media did it have the ability to do that?
25  A  Well, it's really hard to pinpoint which

**Page 31**

1  specific media provided a sales lift, so it's a more
2  broad generalization on total spend and total lift.
3  Q  Are you involved in that type of
4  monitoring?
5  A  To the extent that we look at sales data,
6  national sales data, and sales data perhaps by
7  retailer that's available, yes.
8  Q  Is it something you do on a regular basis?
9  A  It depends on the account.
10  Q  Okay. How so?
11  A  Some accounts provide sales data, some do
12  not, and so we may purchase sales data.
13  Q  Okay. Which accounts provide sales data?
14  A  So of my accounts, Meyer provides sales
15  data, Kroger provides sales data, GNC provides sales
16  data.
17  Q  And are those some of the larger of your
18  accounts?
19  A  Yes.
20  Q  Do you know whether any of the national
21  accounts provides sales data to Quincy?
22  A  I believe they do.
23  Q  Do you know which ones?
24  A  These aren't reports that I see on a
25  regular basis. But I believe Walgreens does,

**Page 32**

1  Walmart does, and I believe CVS does.
2  Q  And is it correct from what you said, do
3  those provide sales data -- well, let me ask.
4       Do those accounts that you mentioned that
5  they provide sales data, do they do that pursuant to
6  an agreement they have with Quincy?
7  A  You know, for most of those accounts, and
8  I can't say conclusively, but we typically have an
9  agreement to essentially pay that -- it's a revenue,
10  another revenue stream for the retailers, so they
11  charge vendors to receive weekly or monthly sales
12  data.
13  Q  Okay. So for your accounts, you mentioned
14  Meyer, GNC, and Kroger, does Quincy pay for those
15  sales data?
16  A  In the case of Kroger, yes.
17       In the case of GNC and Meyer, I think that
18  might be provided without charge.
19  Q  How often does Quincy receive those
20  reports?
21  A  Typically weekly. In those accounts that
22  I mentioned for me, they're weekly.
23  Q  Do you know who else, if anyone, at Quincy
24  monitors the performance of media?
25  A  So the people we named, Tom Dvorak.

### Page 33

1    Mark Underwood would know in the
2  aggregate, although not usually specific to certain
3  accounts.
4    Andrew Shefka.
5    Those are the people that are typically
6  looking at those numbers fairly regularly.
7    Q   And I believe you mentioned performance of
8  media in terms of sales lift, I think. Is that
9  correct?
10   A   Uh-huh.
11   Q   Were there other metrics that Quincy used
12 in monitoring performance advertising?
13   A   That's the primary way. That's ultimately
14 what businesses need to know, whether or not their
15 marketing is working, so sales lift is the number
16 one way.
17   Q   Okay. Like, for -- as an example, for
18 websites, would Quincy monitor traffic on its
19 websites?
20   A   Yes. Yeah.
21   Q   And who would be involved in that?
22   A   It would be Ben Sosalla and myself,
23 typically.
24   Q   What websites does Quincy use with regard
25 to its Prevagen product?

### Page 34

1    A   There's our corporate site,
2  QuincyBioscience.com.
3       And then we have our main branded website,
4  Prevagen.com.
5       And we have two other eCommerce sites,
6  BuyPrevagen.com and PrevagenOutlet.com.
7    Q   What was the second one? I'm sorry.
8  BuyPrevagen.com and?
9    A   And PrevagenOutlet.com. Prevagen Outlet.
10   Q   I believe there's a PrevagenPro.com?
11   A   We ran that for a while. And I believe,
12 if it still exists, it's possibly just a page with a
13 number to call to talk to a representative.
14   Q   Okay. Do you know for what time period
15 Quincy ran that site?
16   A   I don't know the exact dates.
17   Q   Can you give me a rough idea?
18   A   Yes. 2008 until -- well, as I said, it
19 might still be up today with just a phone number on
20 a landing page.
21   Q   It sounds like it's a change from more
22 substantive content to what exists today. Is that
23 right?
24       MR. CASTELLO: Objection.
25       THE WITNESS: It changed in terms of how

### Page 35

1  we interact with the healthcare providers.
2  BY MR. GLENNON:
3    Q   How did it change?
4    A   It was more of a focus on phone
5  conversations than website interaction.
6    Q   Okay. And getting back to monitoring the
7  performance of advertising, were there reports of ad
8  performance that were distributed to personnel at
9  Quincy?
10   A   Can you clarify that question.
11   Q   Yeah.
12       Was there like a -- for instance, a
13 distribution list used to provide reports related to
14 performance of advertising?
15   A   There's no formal distribution list, but I
16 know that sales performance would get shared with
17 some of the team members that I mentioned.
18       You know, there was -- we have an analyst
19 who helps to monitor performance. And while he
20 doesn't necessarily directly monitor the accounts
21 that I'm on as much as the larger national accounts,
22 that information is shared with people on the team.
23   Q   Okay. Were there -- and with these
24 reports -- I'm asking if there were regular reports
25 sent out to people at Quincy about ad performance,

### Page 36

1  like, on a weekly basis, for instance?
2    A   Yeah. So Tom Dvorak has a report of, you
3  know, the large retailers that he will share. And
4  it isn't necessarily on ad performance, per se, as
5  much as it is just weekly sales.
6    Q   Is there anything like that with regard to
7  performance of advertising?
8    A   Well, there's -- as I said, there's a
9  tracking of media spend, and there is a tracking of
10 retail sales. So, you know, there's the natural
11 correlation one might make to see how our sales are
12 going relative to advertising spend.
13   Q   Okay. And would Quincy, taking a look at
14 those sales figures, would Quincy make changes to
15 advertising if the sales figures weren't
16 satisfactory?
17       MR. CASTELLO: Objection.
18       THE WITNESS: I mean, again, I'm not in
19 those meetings, so I can't tell you for sure. It
20 would be natural to think that there would be
21 adjustments made, but I'm not in those meetings.
22 BY MR. GLENNON:
23   Q   Have you discussed that with anyone at
24 Quincy who was in those meetings?
25   A   I'll talk with Tom occasionally.

Page 53

```
 1  Florida area.  It's a free circular.
 2      Q   Where does it appear?
 3      A   You know, in news stands all over south
 4  Florida area.  It could be any kind of store.  It
 5  can be a drugstore, health food store.  It could be
 6  any kind of retail location.
 7      Q   Okay.  And the final sentence of your
 8  e-mail, it says:
 9          "With your approval today, we can still
10           get this in the March edition."
11          Do you see that?
12      A   Yes, I do.
13      Q   For example, are you submitting an ad to
14  Mark Underwood for his approval?
15      A   Correct.
16      Q   Would you typically do this with regard to
17  ads of this type?
18          MR. CASTELLO:  Objection.
19          THE WITNESS:  You know, it depended on the
20  nature of the creative.  If there was a small
21  change, probably not; if there was something, you
22  know, substantively different, then we may, you
23  know, want to get approval on that.
24  BY MR. GLENNON:
25      Q   Looking at the second page of the
```

Page 54

```
 1  document, which is the ad itself, was there a reason
 2  about this -- or something about this ad that made
 3  you submit it to Mr. Underwood for his approval?
 4      A   I don't recall what might have been the
 5  change that prompted that e-mail, in this ad.
 6      Q   Okay.  Who at Quincy decided in what
 7  publications print ads would run?
 8      A   Well, it was depending, again, on the
 9  publication.  It was somewhat of a collaborative
10  effort.  It was somewhat of a who found -- who might
11  have found out about an opportunity and brought it
12  to, you know, the marketing group to decide if it's
13  worth it.
14          Boomer Times, for example, is something
15  that I had learned about and brought to the team,
16  and we decided it was worth advertising in it.
17      Q   When you refer to the "team," to whom are
18  you referring?
19      A   Yeah.  Typically, Tom Dvorak, Mark
20  Underwood.  And perhaps Ryan Liebl might be in on
21  that, who may ultimately conduct the purchase
22  agreement as the media buyer.
23      Q   Would the team typically make decisions
24  about print ads?  It would be a team process?
25          MR. CASTELLO:  Objection.
```

Page 55

```
 1          THE WITNESS:  I mean, again, it would
 2  depend on the specific ad or the specific title, the
 3  publication that it's going to or -- or the creative
 4  content that's contained within the ad.  It
 5  really -- there wasn't a standard way every print ad
 6  was handled.
 7  BY MR. GLENNON:
 8      Q   Okay.  Has Quincy run print ads on a
 9  national basis?
10      A   So, by "national basis," what do you mean
11  by that?
12      Q   Well, nationwide.
13      A   So, I guess -- I mean, yes, at various
14  times national would probably be fair to say for
15  certain publications.
16      Q   And what publications were national?
17      A   I would regard Reader's Digest as a
18  national publication.
19      Q   Any others?
20      A   I believe Prevention magazine.
21      Q   I'm sorry.  What was that?
22      A   Prevention magazine.
23      Q   Any others?
24      A   Those are the only two that come to mind
25  that are probably national in scope.
```

Page 56

```
 1      Q   Can you give me a couple of examples of
 2  regional publications?
 3      A   Well, this Boomer Times was a regional
 4  one.  That's just in the south Florida area.
 5          For a time we ran something in a
 6  publication called Amazing Wellness.  This was a
 7  health food store specific publication.  I don't
 8  know the exact regional footprint of that one, but I
 9  know it's not national.
10      Q   Thanks.
11          Any other examples you can think of?
12      A   Those are the two that come to mind.
13      Q   Okay.
14          MR. GLENNON:  I guess we've been going for
15  an hour and a half.  I think I would like to take
16  maybe just a quick break, maybe like ten minutes, if
17  that's okay with --
18          Geoff, does that work for you?
19          MR. CASTELLO:  Yeah.
20          THE WITNESS:  That's great.
21          MR. GLENNON:  So why don't we try to
22  reconvene around ten after 11:00 Eastern Time.
23          THE VIDEOGRAPHER:  Going off the record at
24  9:57.
25          (Recess taken -- 9:57 to 10:19 a.m. CDL)
```

14 (Pages 53 to 56)

**57**

1   THE VIDEOGRAPHER: Going on the record at
2   10:19.
3   BY MR. GLENNON:
4   Q   Okay. Mr. Olson, I'm going to introduce
5   another document.
6       (Deposition Exhibit TO 4 was introduced
7        into the record.)
8   MR. GLENNON: And for the court reporter,
9   I'm going to mark this as TO 4.
10  BY MR. GLENNON:
11  Q   Okay. So, Mr Olson, does the document
12  Number 4 appear to the left-hand side of your
13  screen?
14  A   Not yet. It's still a black screen.
15  Q   Okay. If you have a bar of documents to
16  the left-hand side of your screen.
17  A   No, I'm not showing that.
18  Q   Okay.
19  MR. GLENNON: Will, is that -- Will, I
20  don't know if you are on right now. Do you know why
21  that might be the case?
22  MR. DUCKLOW: I think you might have
23  cleared the screen.
24  MR. GLENNON: I haven't done anything with
25  regard to this document.

**58**

1   MR. DUCKLOW: I have document Number 4.
2   TO 4 is up on my screen.
3   MR. GLENNON: Okay. And, Geoff, to get
4   that up on your screen, did you have to click on the
5   document on the left-hand side of the screen?
6   MR. CASTELLO: Yes. And there are yellow
7   tabs that read: 1, 2, 3, and 4. And when I click
8   on one of those yellow tabs, the document populates
9   on the screen.
10  MR. GLENNON: Okay.
11  And, Mr. Olson, you're not seeing anything
12  similar?
13  THE WITNESS: No. It's a black screen. I
14  wonder, does it time out with inactivity? I mean,
15  should I refresh the page?
16  MR. GLENNON: Well, let me try this.
17  Okay. Will, yeah, I -- all right. I
18  guess that's the case, Will. If I do clear the
19  screen on the previous document, then he would look
20  at a blank document the next time I introduce a
21  document? Is that right?
22  MR. DUCKLOW: You have to unclear the
23  screen. Yeah, it toggles on and off.
24  MR. GLENNON: Okay.
25  MS. RUSK: Excuse me.

**59**

1   Ed, you don't need to clear the screen
2   between exhibits, so you can just not do that.
3   MR. GLENNON: Yeah, I -- I mean, I just --
4   right. In some case, I just was going to -- all
5   right. Sorry, again, for the technical glitches.
6   BY MR. GLENNON:
7   Q   Mr. Olson, do you see anything now?
8   A   Now I do, yes.
9   Q   Okay. Great.
10  All right. Okay. I think that will clear
11  things up moving forward, so thanks.
12  Okay. And again, this is an exhibit
13  that's been marked TO 4.
14  Do you recognize this document?
15  (Witness reviews document)
16  THE WITNESS: Yeah, I've read through it
17  now.
18  BY MR. GLENNON:
19  Q   Do you recognize the document?
20  A   I don't recall this e-mail specifically,
21  but I recognize the subject matter.
22  Q   And what is the subject matter?
23  A   It appears to be a radio script that was
24  being used by a radio personality by the name of
25  John Tesh for advertising Prevagen. And it's an

**60**

1   e-mail exchange about said script.
2   Q   The exhibit actually is -- I have five
3   pages. Well -- so, I'm not sure.
4   Have you scrolled through the entire --
5   A   Oh, no, no. Sorry. I just thought it was
6   two or three pages, yeah.
7   Q   And for something that might be helpful, I
8   think you have this option, and this might be useful
9   for counsel as well.
10  On the left-hand side of the screen, do
11  you have a page preview bar? Possibly at the top of
12  the list of revealed documents.
13  Mr. Olson, do you see anything like that?
14  A   I see reveal order and exhibit number as
15  options on the left-hand -- top left-hand side of
16  the screen.
17  Q   What about at the bottom of that, is there
18  a page preview option at the bottom?
19  A   Yep, yep.
20  Q   Okay. If you click on that, I think that
21  will give you a thumbnail.
22  A   Here we go, yeah.
23  Q   That might make it easier to scroll
24  through the documents.
25  A   Got it. Yeah, I see five pages.

                                                                                61

1    Q   Okay. And I think your earlier testimony
2  related to the first two pages of the document. Is
3  that right?
4    A   I was commenting on the nature of the
5  exchange. It looked like an e-mail that had been
6  sent from Tom to Mark.
7    Q   And then sort of the top e-mail, there
8  appears that there are a number of attachments. Is
9  that correct?
10   A   Yeah. Tom says there are four script
11 documents I want to send to Tesh.
12       So, yes, I would agree with that.
13   Q   Okay. Are these all scripts for radio
14 advertisements?
15   A   If it was John Tesh, yes.
16   Q   Okay. Was it a national program?
17   A   I guess it would be fair to characterize
18 him as national. I don't know how many affiliates
19 his show had, but I know it was spread throughout
20 the country. I just don't know how big a footprint.
21   Q   Okay. Stepping back just a little bit,
22 maybe at a higher level, what kind of radio
23 advertising did Quincy have?
24       What types of radio ads did Quincy run?
25   A   You know, we did a variety of ads from,

                                                                                62

1  you know, 15-second branded spots to something like
2  a John Tesh script, where it would be a personality
3  read that would take maybe 60 seconds to go through.
4    Q   Okay. Did Quincy also arrange for radio
5  interviews with Mark Underwood?
6    A   We did.
7    Q   Okay.
8        Did it arrange for radio interviews with
9  anyone else at Quincy?
10   A   Well -- can you repeat the question?
11   Q   Yeah.
12       Did any other Quincy employees do radio
13 interviews?
14   A   Mark was the primary one. It's possible
15 that other people may have filled in, but it was
16 primarily Mark.
17   Q   Who might have filled in?
18   A   I did one --
19       MR. CASTELLO: Objection.
20       THE WITNESS: -- radio interview one time.
21       Sorry, Geoff.
22       MR. CASTELLO: Go ahead.
23       THE WITNESS: Yeah, I did one radio
24 interview one time. And I don't know if anybody
25 else did. But it was primarily Mark.

                                                                                63

1  BY MR. GLENNON:
2    Q   Okay. For the radio ads that had scripts,
3  who drafted the scripts?
4    A   My best recollection is this was a team
5  effort also to come up with the verbiage.
6    Q   And who would make up the team?
7    A   The people I mentioned before, Mark
8  Underwood, Tom Dvorak, myself. Dakota Miller would
9  have been in on radio script development.
10   Q   Was the radio advertising typically
11 national in scope?
12   A   There was -- there actually isn't a
13 typical. I mean, the -- radio interviews could be
14 on one station in one town in one state, or it could
15 be a 15-second branded interview that is on a
16 nationally syndicated talk show.
17   Q   Who at Quincy was involved in deciding
18 where to run ads, radio ads?
19   A   Again, that goes back to the media buying
20 component, so that would be Tom Dvorak and Mark
21 Underwood and Ryan Liebl.
22   Q   Do you know when Quincy began advertising
23 by radio?
24   A   No, I don't know exactly when.
25   Q   Do you have a rough idea?

                                                                                64

1    A   I would say probably sometime in 2008.
2    Q   When did you begin at Quincy?
3    A   2007.
4    Q   And has Quincy advertised using radio
5  throughout the time from roughly 2008 to the
6  present?
7    A   You cut off there in the middle of the
8  question. I didn't hear it.
9    Q   Oh.
10       Has Quincy advertised using radio ever
11 since 2008?
12   A   I would say, more or less, yes.
13   Q   Was there any period of time during which
14 they, Quincy, did not advertise using radio ad?
15   A   I can't say for sure.
16   Q   Okay. Is Quincy currently running radio
17 ads?
18   A   Yes.
19   Q   With -- radio ads with set scripts?
20   A   No. They're more the short, branded
21 15-second or 30-second spots.
22   Q   What about Mark Underwood, is he still
23 doing radio interviews?
24   A   No.
25   Q   Okay. When did he stop doing that?

                                                               16 (Pages 61 to 64)

77
1    the end of the commercial to let people know where
2    they can find Prevagen.
3       Q    And is it correct that Quincy began to
4    focus on that specific brand of advertising -- or
5    when did Quincy begin to focus?
6       A    Yeah.  My best recollection, it was
7    probably around 2013/2014, again.
8       Q    Did Mark Underwood also appear for
9    interviews on TV?
10      A    I believe he did, again, in a more
11   regional or targeted market, wherever the health
12   shows who particularly interviewed him happened to
13   air.
14      Q    And does Quincy maintain a log of those
15   interviews?
16      A    So that wasn't under my purview, so I'm
17   not sure about that.
18      Q    And whose purview would that be?
19      A    Dakota Miller.
20      Q    Are you not aware of a log of TV
21   interviews?
22      A    No.
23      Q    I'm sorry?
24      A    I'm not, no.
25      Q    Okay.

78
1            Okay.  How does the creative process for
2    TV commercials, how does that work?
3            MR. CASTELLO:  Objection.
4            THE WITNESS:  An idea gets brought up
5    somehow by someone.  I can't tell you exactly what
6    the creative process is.  And it would get -- it
7    would get often drafted, we would discuss it, and --
8    and, you know, depending on which commercial it was,
9    we might -- we might test it with some initial runs
10   and see how it performed.  If it performed well,
11   then we would -- we would scale it up.
12   BY MR. GLENNON:
13      Q    And who would draft the content?
14      A    So there was, you know, typically a team
15   of video production people and marketing people that
16   might work together on that.
17           So, again, Tom Dvorak generally led the
18   production effort.  And, you know, certainly I was a
19   part of many of those discussions as far as ideas.
20   Dakota Miller, Mark Underwood.  Those were the
21   primary people.
22           And we worked with -- or work with Seth
23   Taylor, whom you mentioned earlier, who helps with
24   that -- or he actually does the technical video
25   production side of it.

79
1       Q    Is he still at Quincy, Mr. Taylor?
2       A    He still works with us, yes.
3       Q    Okay.  And is it correct you don't know
4    his status, whether he is an employee?
5       A    I believe he is an independent
6    representative or contract employee.
7            I don't know the exact nature of his
8    employee status.  I know that he has a Quincy
9    Bioscience e-mail address, but that doesn't actually
10   say anything about his full-time status.
11      Q    Did Quincy work with any outside parties
12   to come up with content?
13      A    Yes, for a period of time we did.
14      Q    Who were those parties?
15      A    The Richards Group was -- was one party.
16      Q    Anyone else?
17      A    Earlier on, in the infomercial direct
18   response time period, we worked with a company to
19   help produce that.
20      Q    What company was that?
21      A    It was called Avalanche.  I believe
22   A-V-A-L-A-U-N-C-H-E [sic].  Avalanche.
23      Q    Any other third parties?
24      A    On television ad production, no.  That's
25   who I'm aware of.

80
1       Q    Have you heard of a company, I believe
2    it's called CBS Creative 2?
3       A    I've heard of CBS.
4       Q    Right.  But not CBS Creative, or CBS
5    Creative 2?
6       A    Not specifically that name, no.
7       Q    So are you aware of anyone with a similar
8    name with which Quincy worked to come up with
9    content for ads?
10      A    Yeah, I know that we partnered with a CBS
11   affiliate at one time to develop a creative.  I
12   don't know the name of that company.  It sounds like
13   what you might be bringing up.
14      Q    Okay. How did that work?  I mean, it was
15   an affiliate?  Was it a station?  Or just can you
16   explain how that relationship worked?
17      A    I wasn't involved in that one.  So that
18   was -- that was Tom Dvorak's area.
19           THE COURT REPORTER:  That was a "what"
20   area?  I'm sorry, for clarification.
21           THE WITNESS:  Yeah, sorry.
22           It's Tom Dvorak oversaw that project with
23   a CBS affiliate.
24   BY MR. GLENNON:
25      Q    And how would, when you said Quincy