# Exhibit P

# In the Matter of:

# FTC, et al. v. Quincy Bioscience Holding, et al.

*August 6, 2020*
*Kenneth Lerner - Confidential*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Case 1:17-cv-00124-LLS  Document 241-16  Filed 05/06/22  Page 3 of 7
Lerner - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                  8/6/2020

### Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF NEW YORK
 3
 4   FEDERAL TRADE COMMISSION and  )
 5   THE PEOPLE OF THE STATE OF    )
 6   NEW YORK, BY LETITIA JAMES,   )
 7   ATTORNEY GENERAL OF THE STATE )
 8   OF NEW YORK,                  )
 9        Plaintiffs,              )
10          -vs-                   ) Case No.
11   QUINCY BIOSCIENCE HOLDING     ) 1:17-CV-00124-LLS
12   COMPANY, INC., a corporation, )
13   et al.,                       )
14        Defendants.              )
15   -----------------------------)
16
17         CONFIDENTIAL - ATTORNEYS' EYES ONLY
18
19         The individual videotape deposition of
20   KENNETH LERNER was taken on Thursday, August 6,
21   2020, commencing at 8:45 a.m., remotely, before
22   Tammy S. Newton, Notary Public.
23
24
25
```

### Page 2

```
 1               A P P E A R A N C E S
 2      ON BEHALF OF PLAINTIFF:
 3          MICHELLE RUSK, ESQUIRE
 4          ANNETTE SOBERATS, ESQUIRE
 5          EDWARD GLENNON, ESQUIRE
 6          WILL DUCKLOW, ESQUIRE
 7          Federal Trade Commission
 8          600 Pennsylvania Avenue, N.W.
 9          Washington, D.C. 20850
10          (202) 326-3148
11          mrusk@ftc.gov
12              and
13          KATE MATUSCHAK, ESQUIRE
14          Attorney General of the State of
15          New York
16          Assistant Attorney General
17          Consumer Frauds and Protection Bureau
18          28 Liberty Street
19          New York, New York 10005
20          (212) 416-6189
21          kate.matuschak@ag.ny.gov
22
23
24
25
```

### Page 3

```
 1      ON BEHALF OF CORPORATE DEFENDANTS:
 2          JACLYN M. METZINGER, ESQUIRE
 3          GEOFFREY W. CASTELLO, III, ESQUIRE
 4          GLENN T. GRAHAM, ESQUIRE
 5          Kelley Drye & Warrent
 6          101 Park Avenue
 7          New York, New York 10178
 8          (212) 808-7800
 9          jmetzinger@kelleydrye.com
10
11      ON BEHALF OF DEFENDANT UNDERWOOD:
12          MICHAEL B. de LEEUW, EQUIRE
13          TAMAR S. WISE, ESQUIRE
14          Cozen O'Connor
15          45 Broadway Atrium, Suite 1600
16          New York, New York 10006
17          (212) 908-1331
18          mdeleeuw@cozen.com
19
20      ALSO PRESENT:
21          Isaac Horner, Videotape Operator
22
23
24
25
```

### Page 4

```
 1                C O N T E N T S
 2   EXAMINATION OF KENNETH LERNER                PAGE:
 3      By Ms. Rusk                              8, 127
 4
 5   30(b)(6) EXAMINATION OF KENNETH LERNER
 6      By Ms. Rusk                                  42
 7
 8   DEPOSITION EXHIBITS                          PAGE:
 9   Number KL1   Notice of Deposition               11
10   Number KL2   Notice of Deposition of 30(b)(6)
11                Witness                            13
12   Number KL3   Curriculum Vitae                   16
13   Number KL4   Madison Memory Study Protocol     59
14   Number KL5   E-mail                             83
15   Number KL6   Randomization Unblinded xls        83
16   Number KL7   E-mail                             98
17   Number KL8   Data Extract Attachment            98
18   Number KL9   QBQ 0011 Madison Memory Study
19                Complete Data Analysis            111
20   Number KL10  E-mail                            127
21   Number KL11  Metadata Document                 137
22   Number KL12  Data Output From Cogstate         140
23   Number KL13  GMCT AD8 2-6                      141
24   Number KL14  Data Analysis for AD8
25                Score 2-3                         143
```

### Page 29

1 mean by "team."
2     Q   Is there a group of people whose job
3 primarily is to do research or to be involved in
4 the research?
5     A   In a clinical -- from a clinical
6 standpoint?
7     Q   Yes, human research. Yes.
8     A   It would be the people I just
9 described.
10    Q   Okay.
11    A   There -- there are other people who
12 get involved, but that would be the team who are
13 typically involved in research.
14    Q   Okay. And is Mr. Underwood involved
15 in research in the human research that he does?
16        MS. METZINGER: Objection.
17 BY MS. RUSK:
18    Q   Mr. Lerner, that -- that will happen
19 throughout the deposition, and you can feel free
20 to go ahead and answer. She's objecting to put
21 on the record.
22    A   Mr. Underwood's involved in research
23 in that when the -- when we were discussing the
24 possible study, when I got a draft of a protocol
25 or working on some ideas, I typically would be

### Page 30

1 with meeting him and bouncing this back and
2 forth. Occasionally Mr. Olson would be -- Todd
3 Olson would be in there along with members of
4 what I'll say -- call my staff, some of the
5 people I had listed earlier. So involvement,
6 it -- it would be there, we were working with the
7 protocol, and --
8    Q   I'm sorry. I'm -- I'm just asking
9 about Mr. Underwood right now. So is there any
10 other thing he does with respect to research?
11    A   Are you asking whether he's performing
12 tests? I --
13    Q   I'm asking you what role he has with
14 respect -- with respect to human research
15 projects.
16    A   He was -- he would be -- he would be
17 in the meetings where we were looking at
18 development of protocol when we were going
19 through the analysis. He did not perform the
20 research itself.
21    Q   Was he involved in writing up results?
22       MS. METZINGER: Objection.
23       THE WITNESS: I would say in the edit
24 team.
25 BY MS. RUSK:

### Page 31

1    Q   Okay. And can you tell me if Michael
2 Beaman had any role when it came to human
3 clinical research of the company?
4    A   I think -- I may have had some
5 discussions with him, but no day-to-day role.
6    Q   Okay. Does Mr. Beaman have to approve
7 a new human research project?
8       MS. METZINGER: Objection.
9       THE WITNESS: I do not -- no, I do not
10 believe he has to approve.
11 BY MS. RUSK:
12    Q   Do you know if he has to approve
13 stunding -- excuse me -- funding for research
14 studies?
15       MS. METZINGER: Objection.
16       THE WITNESS: I'm not aware of if
17 any -- that -- that discussion takes place.
18 BY MS. RUSK:
19    Q   Can you tell me if you typically
20 inform Mr. Beaman of new studies that the company
21 is starting?
22    A   I think --
23       MS. METZINGER: Objection.
24       THE WITNESS: I believe in
25 conversa- -- I do occasionally have conversations

### Page 32

1 with Mr. Beaman about some studies, but I
2 don't -- it's not -- wasn't par- -- it isn't and
3 wasn't part of my duties to inform him that
4 "We're starting this study."
5 BY MS. RUSK:
6    Q   The same question for whether you
7 report to him the results of human clinical
8 studies.
9    A   I don't officially report to him.
10    Q   Okay.
11    A   He may -- he may call and ask me or I
12 may call and tell him something, but I don't
13 report that to him specifically.
14    Q   Okay. When you're doing a human
15 clinical study, do you have meetings with the
16 other people involved in the research project?
17    A   Yes.
18    Q   And during a study, how regular are
19 those meetings?
20       MS. METZINGER: Objection.
21       THE WITNESS: I would say those
22 meetings occur on a -- sometimes weekly but more
23 frequently biweekly -- biweekly or monthly.
24 BY MS. RUSK:
25    Q   And are there notes kept on those

**Page 33**

```
 1   meetings?
 2           MS. METZINGER:  Objection.
 3           THE WITNESS:  I may have taken some
 4   notes.  Other people may have taken notes.  But I
 5   can't -- there wasn't a -- there is not, to my
 6   knowledge, a record.  No one was acting as a --
 7   as a scribe to take down notes of a meeting.
 8   BY MS. RUSK:
 9      Q    Okay.  Can you tell me if you ever
10   report to the board of directors on research
11   being done at Quincy?
12      A    I --
13           MS. METZINGER:  Objection.
14           THE WITNESS:  I presented to the board
15   of directors, I believe, twice on the -- on -- I
16   know one time it involved research.  The other
17   time -- I don't remember whether it involved
18   research or intellectual property.
19   BY MS. RUSK:
20      Q    Okay.
21      A    I do not regularly communicate --
22   communicate with the board about research.
23      Q    Okay.  All right.  Thank you.
24           Mr. Lerner, I'm going to focus in a
25   moment on the Madison Memory Study, and then I
```

**Page 34**

```
 1   will have questions for you later today on some
 2   other human clinical studies on apoaequorin and
 3   Prevagen.  And I may refer to apoaequorin as AQ
 4   for simplicity, if that is okay.  And first I
 5   have some general questions about human clinical
 6   research in general done at Quincy.
 7      A    Michelle --
 8           MS. METZINGER:  Michelle, are you
 9   switching to the 30(b)(6) deposition right now?
10           MS. RUSK:  No, I am not.  I'm just
11   giving him a heads-up for what I'm going to be
12   covering.
13           MS. METZINGER:  Okay.  Thank you.
14           THE WITNESS:  Michelle.
15   BY MS. RUSK:
16      Q    Yes.
17      A    Not to throw a wrench at you.  If you
18   could refer to apoaequorin instead of AQ as APO
19   AQ.
20      Q    Sure.
21      A    That's -- that's the shorthand I use
22   for apoaequorin.  AQ for me is just aequorin, so
23   I don't want to get confused.
24      Q    I will try to do that.  That will be a
25   little bit easier for the court reporter than the
```

**Page 35**

```
 1   full word.  If I do slip up, I will not be
 2   talking about aequorin today.  So if I do slip
 3   up, I do mean APO AQ.
 4           So some general questions about human
 5   clinical research at Quincy.  First of all, is
 6   the human research all done in Q- -- in-house in
 7   Quincy?
 8           MS. METZINGER:  Objection.
 9           THE WITNESS:  All of the clinical
10   research we've done at Quincy have been done
11   in-house.
12   BY MS. RUSK:
13      Q    Okay.  Has Quincy, during your time at
14   the company, ever contracted with anyone outside
15   the company to do clinical research on
16   apoaequorin?
17      A    I don't believe I can answer that
18   question because our attorneys were involved in
19   some discussions with that.
20      Q    Well, I'm not asking you about your
21   questions with attorneys.  I'm just asking if you
22   have -- if -- if you are aware of Quincy
23   contracting out clinical research projects.
24           MS. METZINGER:  I will object here and
25   caution the witness that if, to answer that
```

**Page 36**

```
 1   question, he would be required to divulge
 2   privileged information, that he refrain from
 3   answering that question.
 4           MS. RUSK:  Yes.  I understand.  I'm
 5   not asking for communications.  I'm just asking
 6   for a fact whether or not Quincy contracted out
 7   on human clinical research.  It's a yes or no.
 8           MS. METZINGER:  If you want to ask him
 9   about a specific study, I would let him answer
10   that question.  But --
11           MS. RUSK:  But you're instructing him
12   not to answer this question?
13           MS. METZINGER:  As -- as phrased, yes.
14           MS. RUSK:  Well, let me try to
15   rephrase this.
16   BY MS. RUSK:
17      Q    Without discussing communications with
18   counsel, Mr. Lerner, can you tell me whether
19   Quincy has contracted with any outside party to
20   do clinical research?
21           MS. METZINGER:  I'm going to maintain
22   that objection, Michelle.  That question,
23   while -- while you're excluding communications
24   with counsel, that question may call for
25   privileged information in Mr. Lerner's
```

9 (Pages 33 to 36)

**Page 37**

1  discussions.
2       MS. RUSK:  All right.  I'm going to
3  come back to that at the end because I -- I don't
4  think you have a basis for claiming privilege to
5  a simple question about whether or not Quincy
6  used outside parties for research, but I'm going
7  to move on now.
8       MS. METZINGER:  Okay.
9       MS. RUSK:  We may have to hold open
10  the deposition if we have a lot of objections
11  like that.
12  BY MS. RUSK:
13     Q   Are there any outside entities who
14  have ever been involved in doing work for Quincy
15  on any human research on apoaequorin?
16       MS. METZINGER:  Same objection.
17       I'm going to caution Mr. Lerner that
18  if to answer that question, he would have to
19  divulge privileged information, that he refrain
20  from answering that question.
21  BY MS. RUSK:
22     Q   Mr. Lerner, can you answer my question
23  without divulging privileged communications with
24  your attorneys?
25     A   I'm going to follow Counsel's

**Page 38**

1  instructions to not answer the question.
2     Q   She said you could answer if you could
3  do it without divulging privileged communication.
4       MS. METZINGER:  Michelle, maybe if I
5  can take a moment to speak with Mr. Lerner,
6  there -- there might be a way around -- around
7  these objections.
8       MS. RUSK:  Okay.  Shall we take a
9  five-minute break?
10       MS. METZINGER:  Sure.  That should
11  work.
12       MS. RUSK:  Okay.
13       VIDEOTAPE OPERATOR:  Going off the
14  record at 9:25.
15        (A brief recess was taken.)
16       VIDEOTAPE OPERATOR:  Going on the
17  record at 9:34.
18       MS. RUSK:  Okay.  Mr. Lerner, I'm
19  going to be -- actually, could I have the court
20  reporter read the last question that I asked.
21        (The record was read by the reporter.)
22       MS. METZINGER:  I'm going to maintain
23  that objection.  I conferred with Mr. Lerner, and
24  I am instructing him not to answer that question
25  on the basis of attorney-client privilege and

**Page 39**

1  work product.
2       MS. RUSK:  Okay.  I do not agree that
3  that -- on that basis, so we can return to this
4  at the end of the day, and we may have to hold
5  open this deposition and get this resolved by the
6  Court.  But I'm going to move on for now.
7       MS. METZINGER:  Okay.
8  BY MS. RUSK:
9     Q   Mr. Lerner, can you tell me,
10  specifically with respect to human clinical
11  research on APO AQ, do you design the protocols
12  for that research?
13       MS. METZINGER:  Objection.
14       THE WITNESS:  I -- yes, I design most
15  of the protocols for that research.
16  BY MS. RUSK:
17     Q   Okay.  Is Mr. Underwood ever involved
18  in the design of clinical research?
19       MS. METZINGER:  Objection.
20       THE WITNESS:  I believe that if the
21  original design comes up from -- I create the
22  original designs.  There -- Mr. Underwood may
23  make comments or suggestions, ask questions.
24       MS. RUSK:  Okay.  Can the videographer
25  get a good sound read on -- on Mr. Lerner because

**Page 40**

1  he's shorting out a little bit.
2       VIDEOTAPE OPERATOR:  He was breaking
3  up a little bit.
4       If you could just try speaking up, I
5  think that might correct the issue.
6       THE WITNESS:  Okay.
7  BY MS. RUSK:
8     Q   Can you tell me if you worked with
9  anybody else at Quincy at the design stage of a
10  study?
11       MS. METZINGER:  Objection.
12       MS. RUSK:  Can I ask what the
13  objection is?
14       MS. METZINGER:  Yeah.  I don't know
15  which study you're talking about.
16       MS. RUSK:  I'm talking about studies
17  generally.  These questions all are about
18  clinical research generally at the company.
19       MS. METZINGER:  Okay.  Well, without
20  knowing which -- which studies you're talking
21  about, I believe the question's ambiguous, so
22  that's the basis of my question.
23  BY MS. RUSK:
24     Q   Okay.  Mr. Lerner, you can answer.
25     A   I've actually written up the original

10 (Pages 37 to 40)

41

1 protocol for the study based upon looking at
2 similar protocols, and I involve other people to
3 add a comment, refine.
4     Q   Can you identify those other people
5 for me?
6     A   I've -- Peggy Sivesind, Todd Olson,
7 Mark Underwood, and those are the names that come
8 to mind.
9     Q   Okay. Since I'm getting so many
10 objections on research generally, I'm going to
11 move on now, Mr. Lerner, and I'm going to start
12 asking you questions specifically about the
13 Madison Memory Study. And as I explained earlier
14 and for counsel's benefit and for the
15 videographer and the transcriber, for this part
16 of your deposition, you should respond to my
17 questions as the 30(b)(6) witness, so you are
18 answering on behalf of Quincy rather than as an
19 individual.
20        And, again, I'm doing this hopefully
21 to save time and avoid needing to go over the
22 same questions in your deposition tomorrow.
23        Is that clear?
24     A   Yes.
25        MS. RUSK: So for the court reporter,

42

1 the videographer, can you, please, note for the
2 record that this portion of the deposition is a
3 30(b)(6) deposition, and the time I believe is
4 9:38 Central; is that correct?
5        VIDEOTAPE OPERATOR: Yes.
6        MS. RUSK: Okay.
7              * * *
8        (The following questions are in Mr.
9 Lerner's 30(b)(6) capacity.)
10 BY MS. RUSK:
11     Q   When I refer to the Madison Memory
12 Study, do you know what study I am asking you
13 about?
14     A   Yes.
15     Q   So there is only one study that you
16 would refer to as the Madison Memory Study?
17     A   Yes.
18     Q   Okay. Can you give me just a very
19 brief description about the -- the design in
20 terms of number of participants, length of the
21 study?
22     A   The Madison Memory Study was a
23 quantitative double-blind placebo-controlled
24 study of -- for over 90 days looking at --
25 looking for changes in a variety of areas of

43

1 cognitive function for participants using an
2 apoaequorin supplement compared to a placebo.
3     Q   How many participants were in that
4 study?
5     A   By protocol, we wanted 100 people. We
6 enrolled -- I believe it was 211 people completed
7 all 90 days. We enrolled -- initially I think we
8 enrolled 273, but a variety of those people did
9 not -- did not start the study, did not
10 progress -- didn't show up for their first
11 appointment, or there were just -- they were
12 disenrolled.
13     Q   Okay. I'm going to ask you more about
14 dropouts in a minute, but you said 211 completed
15 the study?
16     A   I think that's the number, yes.
17     Q   Okay. Can you tell me who made the
18 decision at Quincy to conduct this study?
19     A   I believe the decision was made by
20 Mark Underwood, but -- it was made by Mark
21 Underwood.
22     Q   Okay. Was anyone else involved in
23 that decision?
24     A   In the decision, no.
25     Q   Okay. And who, if anybody, approved

44

1 going forward with the study?
2     A   I believe that would have been Mark
3 Underwood.
4     Q   Okay. And were you the lead on
5 designing the protocol for that study?
6     A   Yes, I was.
7     Q   And were you also the principal
8 investigator?
9     A   Yes.
10     Q   Can you tell me who was involved in
11 recruiting participants?
12     A   The individuals working under me,
13 Peggy Sivesind, Amadeus Benitez.
14        COURT REPORTER: What -- what -- what
15 was that second name?
16 BY MS. RUSK:
17     Q   I'm sorry. Was that Amadeus Benitez?
18     A   Yes.
19     Q   Okay.
20     A   Some of the other college students,
21 Kelsey Harter, I believe -- those I know were
22 involved. There may have been others.
23     Q   Okay. And who was involved in
24 administering the study?
25     A   The study was administered by the

11 (Pages 41 to 44)