# EXHIBIT I

FILED UNDER SEAL

# In the Matter of:

## FTC, et al. v. Quincy Bioscience Holding, et al.

*September 29, 2021*
*Mindy Kurzer, Ph.D. - Confidential*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Case 1:17-cv-00124-LLS   Document 259-9   Filed 06/16/22   Page 3 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          SOUTHERN DISTRICT OF NEW YORK
 3
 4   FEDERAL TRADE COMMISSION and   )
 5   THE PEOPLE OF THE STATE OF     )
 6   NEW YORK, by LETITIA JAMES,    )
 7   Attorney General of the State )
 8   of New York,                   )
 9            Plaintiffs,           )
10   vs.                            ) CASE NO.
11                                  ) 1:17-CV-00124-LLS
12   QUINCY BIOSCIENCE HOLDING      )
13   COMPANY, INC., a corporation,  )
14   et al,                         )
15            Defendants.           )
16   ------------------------------)
17
18      CONFIDENTIAL - ATTORNEYS' EYES ONLY
19
20      VIDEOTAPED DEPOSITION of MINDY KURZER, Ph.D.
21   taken by Plaintiffs, held remotely, commencing at
22   8:32 A.M., on September 29, 2021, before Gary
23   Schneider, RPR, CRR, RMR, TLCR and Notary Public
24   within and for the State of Tennessee.
25
```

2

```
 1            A P P E A R A N C E S:
 2   ON BEHALF OF PLAINTIFFS:
 3       ANDREW WONE, ESQ.
 4       ANNETTE SOBERATS, ESQ.
 5       EDWARD GLENNON, ESQ.
 6       WILLIAM DUCKLOW
 7       Federal Trade Commission
 8       600 Pennsylvania Avenue, N.W.
 9       Washington, D.C. 20850
10       (202) 326-2934
11       awone@ftc.gov
12       (202) 326-2921
13       asoberates@ftc.gov
14       (202) 326-3126
15       eglennon@ftc.gov
16            and
17       KATE MATUSCHAK, ESQ.
18       Attorney General of the State of
19       New York
20       Assistant Attorney General
21       Consumer Frauds and Protection Bureau
22       28 Liberty Street
23       New York, New York 10005
24       (212) 416-6189
25       kate.matuschak@ag.ny.gov
```

3

```
 1   ON BEHALF OF CORPORATE DEFENDANTS:
 2       JACLYN M. METZINGER, ESQ.
 3       GEOFFREY W. CASTELLO, III, ESQ.
 4       GLENN T. GRAHAM, ESQ.
 5       CAITLIN HICKEY, ESQ.
 6       Kelley Drye & Warren
 7       101 Park Avenue
 8       New York, New York 10178
 9       (212) 808-7800
10       jmetzinger@kelleydrye.com
11       gcastello@kelleydrye.com
12       ggraham@kelleydrye.com
13       chickey@kelleydrye.com
14
15   BEHALF OF DEFENDANT UNDERWOOD:
16       MICHAEL B. de LEEUW, ESQ.
17       Cozen O'Connor
18       45 Broadway Atrium, Suite 1600
19       New York, New York 10006
20       (212) 908-1331
21       mdeleeuw@cozen.com
22
23   ALSO PRESENT:
24       Eric Vavrasek, Videographer
25
```

4

```
 1                  I N D E X
 2   WITNESS: MINDY KURZER
 3          INDEX OF EXAMINATIONS
 4                              Page/Line
 5   By Mr. Wone                  8   15
 6   By Ms. Matuschak            277   2
 7          INDEX OF EXHIBITS
 8                              Page/Line
 9   Exhibit MK1  Kurzer Report             13  10
10   Exhibit MK2  042_detert2013.pdf        100  18
11   Exhibit MK3  092_Lerner(2016).pdf      105   4
12   Exhibit MK4  001_AdvMindBodyJournal.pdf 05  16
13   Exhibit MK5  ████████████████          110   1
14
15   Exhibit MK6  ████████████              146   8
16
17
18
19   Exhibit MK7  Wangen 2001               179   2
20   Exhibit MK8  Samavat 2016              182   6
21   Exhibit MK9  7 - Cogstate Data         214   4
22               Guidelines for
23               Analysis_QUINCYFTC-010623
24
25
```



Page 5

INDEX OF EXHIBITS (Continued)

                                              Page/Line
Exhibit MK10 050_Eichstaedt2013.pdf    229  18
Exhibit MK11 ███████████████████       232   3
            ███████████████████
Exhibit MK12 070_Grung2017.pdf          256  22
Exhibit MK13 077_Hu2018.pdf             263  11

REPORTER'S NOTES:

QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT NECESSARILY REFLECT A DIRECT QUOTE

PROPER NAMES ARE PHONETICALLY SPELLED UNLESS STATED ON THE RECORD

Page 6

P R O C E E D I N G S
- - - - -
STIPULATION:
All counsel present stipulate that the witness shall be sworn remotely by the court reporter
* * *
THE VIDEOGRAPHER: Here begins disk 1 in the video deposition of Mindy Kurzer, Ph.D., taken in the matter of Federal Trade Commission and the People of the State of New York by Letitia James, Attorney General of the State of New York v. Quincy Bioscience Holding Company, et al., in the United States District Court, Southern District of New York, matter number 1:17-cv-00124-LLS.

Today's date is September 29th, 2021. The time on the video monitor is 8:32 A.M. Central. This deposition is being held remotely via Zoom video teleconference.

The court reporter is Gary Schneider on behalf of For The Record,

Page 7

Inc. The video camera operator is Eric Vavrasek on behalf of For The Record, Inc.

Will counsel please introduce themselves and state whom they represent beginning with the party noticing the deposition.

MR. WONE: Good morning. My name is Andrew Wone, and I'm appearing on behalf of the Federal Trade Commission. Also appearing on behalf of the Federal Trade Commission are attorneys Edward Glennon and Annette Soberats. And Investigator William Ducklow is also present.

MS. MATUSCHAK: This is Kate Matuschak, and I'm here for the New York State Attorney General's Office.

MS. METZINGER: This is Jaclyn Metzinger from Kelley Drye & Warren, LLC, on behalf of Quincy Bioscience Holding Company, Quincy Bioscience Science, LLC, Prevagen, Inc., and Quincy Bioscience Manufacturing, LLC. Also -- and for Dr. Kurzer as well.

Page 8

Also with me today from Kelley Drye are Geoffrey Castello, Glenn Graham, and Caitlin Hickey.

MR. de LEEUW: Michael de Leeuw from Cozen O'Connor on behalf of Mark Underwood.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

Whereupon --
MINDY KURZER, Ph.D.,
was called as a witness and, after having been first duly sworn, testified as follows:
E X A M I N A T I O N
BY MR. WONE:
Q.   Good morning, Doctor.
A.   Good morning.
Q.   How do you pronounce your last name?
A.   Kurzer.
Q.   Kurzer.
A.   I'm sorry, Mr. Wone. You were -- you were a little bit -- your audio wasn't following your video for a moment.
Q.   Okay. Can you hear me fine now?

2 (Pages 5 to 8)

Kurzer, Ph.D. - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

---

9

1    A.   I can hear you fine now.
2    Q.   Great.
3         So I'll start off this morning
4    thanking you for joining us today.  I want to go
5    over a few procedures which hopefully will make
6    things a little bit easier for both of us today.
7    Okay?
8    A.   Yes.
9    Q.   Today I'll be asking you a
10   series of questions.  If you don't hear a
11   question, please say so and I'll repeat it.  If
12   you don't understand a question, please say so and
13   I will try to rephrase it.
14        If you realize an answer that
15   you gave earlier was inaccurate or incomplete,
16   please let me know and you'll have -- you want to
17   correct it or supplement it and -- you'll have a
18   chance to do so.
19        If you'd like to take a break at
20   any point, please let me know and we can
21   accommodate you.  My only request is if a question
22   is pending, that you answer the question before we
23   take a break.
24        Do you understand?
25   A.   I do, yes.

---

10

1    Q.   If you answer a question, I'll
2    assume you've heard it, understood it, and given
3    me your best recollection.
4         Because the court reporter is --
5    because the deposition is being taken remotely,
6    it's important that you answer all questions
7    verbally.  The court reporter cannot record hand
8    gestures or nodding or shaking of heads.
9         Do you understand?
10   A.   I do, yes.
11   Q.   It's also important that only
12   one person speak at a time, so if you could please
13   let me finish my question before you begin your
14   answer, and I will make sure to let you finish
15   your answer before I ask my next question.
16        Today you should testify from
17   your memory and from using the exhibits that were
18   introduced.
19        Were you able to access
20   AgileLaw?
21   A.   Yes.
22   Q.   Okay.  So that program -- as we
23   discussed last week in the trial run, that program
24   will display all of the documents that you should
25   use during today's deposition.  I ask that you not

---

11

1    consult other sources of information, so any
2    papers, notes, cellphones, computers, tablets or
3    any other device or document during the
4    deposition.
5         Do you understand?
6    A.   I do understand, yes.
7    Q.   During the deposition, when
8    we're on the record, you cannot communicate with
9    anyone else, including your attorneys.
10        Do you understand?
11   A.   Yes.
12   Q.   The only exception to that is
13   during breaks.  During breaks, you're free to talk
14   with your attorneys.
15        During the deposition, I will be
16   showing you documents through AgileLaw.  You'll
17   have a chance to look at them, and then I will ask
18   you some questions.  The documents will be marked,
19   like you saw last week in the lower right-hand
20   corner of the first page, with an exhibit number.
21   And during the course of the deposition, we'll be
22   referring to those exhibit numbers for what
23   document you should be looking at at a particular
24   moment.
25        Do you understand the

---

12

1    instructions?
2    A.   I do understand the
3    instructions, yes.
4    Q.   And is there --
5         MS. METZINGER:  And --
6         MR. WONE:  -- any reason --
7         MS. METZINGER:  Sorry.  Go
8    ahead.
9         MR. WONE:  No, go on.
10        MS. METZINGER:  I was just going
11   to ask that, as we've done in prior
12   depositions, designate the transcript,
13   at least provisionally, as attorneys'
14   eyes only pursuant to the protective
15   order, and we will follow-up with more
16   specific designations once we receive
17   the transcript.
18        MR. WONE:  Okay.
19        MS. METZINGER:  Thank you.
20   BY MR. WONE:
21   Q.   Dr. Kurzer, do you understand
22   the instructions I gave you?
23   A.   I do understand the
24   instructions, yes.
25   Q.   And can you think of any reason

---

Case 1:17-cv-00124-LLS   Document 259-9   Filed 06/16/22   Page 6 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

13

1   why you wouldn't be able to answer my questions
2   today truthfully and fully?
3        A.   No, there is no reason.
4        Q.   Can you please state and spell
5   your name for the record.
6        A.   My name is Mindy Kurzer,
7   M-I-N-D-Y, last name K-U-R-Z-E-R.
8        Q.   Okay.  I've introduced and
9   marked the first Exhibit as MK1.
10            (Marked Exhibit MK1.)
11   BY MR. WONE:
12        Q.   You should see that on your
13   screen, Dr. Kurzer.
14        A.   I do.
15        Q.   Is Exhibit MK1 the expert report
16   that you prepared for -- on behalf of the
17   defendants in this case?
18        A.   Yes, it is.
19        Q.   And if you could turn to
20   Exhibit A of your expert report or what's been
21   designated as MK1, please.
22        A.   And would that be at the very
23   end or where -- where would that -- where would
24   the exhibit be?
25        Q.   It should start on approximately

14

1   page 50, 50 out of 65.
2        A.   Okay.  Yes.
3        Q.   And what is Exhibit A,
4   Dr. Kurzer?
5        A.   Exhibit A is my curriculum
6   vitae.
7        Q.   Where did you get your
8   undergraduate degree, Mr. Kurzer?
9        A.   My undergraduate degree was from
10   the State University of New York at Buffalo.
11        Q.   And what did you study at
12   Buffalo?
13        A.   I studied history and
14   philosophy.
15        Q.   And when did you graduate?
16        A.   I graduated in 1973.
17        Q.   And what did you do after you
18   graduated?
19        A.   After I graduated, I did some
20   various kinds of work, and then I started a
21   master's program at the University of California
22   at Berkeley, master's in nutrition.
23        Q.   And what was the nature of your
24   work between graduating Buffalo and starting your
25   master's program?

15

1        A.   I was a mail handler at the Post
2   Office, and that was the primary work.  I also was
3   a substitute teacher in daycare centers.
4        Q.   Can you describe your graduate
5   program?
6        A.   My graduate program was in
7   nutritional science.  I have a master's degree in
8   nutritional science from the University of
9   California Berkeley, and I also have a Ph.D. in
10   nutritional science from the University of
11   California at Berkeley.  And nutritional science
12   is a combination of physiology and biochemistry.
13   It's a science-based degree, and I would say that
14   it is an applied science.  So it's the -- and I
15   focused on human nutrition in my research.  So
16   I -- for my -- both my master's and my doctorate,
17   I performed research and I published papers from
18   that research, and they were primarily human
19   clinical studies.
20        Q.   Can you describe the topics or
21   areas that your research focused on?
22        A.   Sure.
23        So my doctoral project was a
24   clinical study investigating the effect of a
25   low-calorie diet on reproductive hormones in young

16

1   women.
2        Q.   Did you conduct that study
3   yourself?
4        A.   I was the -- as a student, I was
5   not the principal investigator.  My major advisor
6   was the principal investigator for purposes of
7   reporting and regulation, et cetera.  I did -- I
8   was the person who ran the study.  I recruited the
9   participants.  I worked with them on the -- on a
10   daily basis on all of the aspects of the study.
11   And I also analyzed the data and wrote reports for
12   publication.
13        Q.   Was that study a randomized
14   controlled trial?
15        A.   It was not, no.
16        Q.   What kind of study was it?
17        A.   It was a -- it was a study in
18   which each person was their own control.  So
19   rather -- a randomized control trial will have two
20   separate groups, like parallel arm study, and this
21   was -- this was not.  So each person -- and it was
22   a small study.  They there were only six people.
23   And the reason is because the University of
24   California at Berkeley had a metabolic unit in
25   which many of the studies that have been used to

4 (Pages 13 to 16)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                        9/29/2021

17

1    define requirements for nutrients such as protein
2    were done on very small populations.  It's a
3    live-in unit where six people -- there were six
4    beds.  And metabolic -- this was a metabolic study
5    and -- in which you study a small amount of people
6    and you study them very intensively.  And my study
7    was designed to be performed in that metabolic
8    unit.  And, unfortunately, the metabolic unit
9    grant was not renewed, and so my study was done on
10   an outpatient basis.  And -- and as a result, it
11   was -- you know, we had to shift gears and pivot
12   to do it on an outpatient basis.  But it was a
13   very small number of people.  It was six woman,
14   and they consumed either a regular diet, and I
15   followed them for about six weeks, or I put them
16   on a very low-calorie diet, about 40 percent of
17   their required calories, for six weeks.  And I
18   measured reproductive hormones every other day
19   because I was interested in the effect on the
20   menstrual cycle, how energy deprivation and a
21   low-calorie diet affects the menstrual cycle and
22   reproductive hormones in young women.  And so we
23   measured hormones every other day on these women.
24   Even though it was an outpatient study, they came
25   into the -- to the facility, to the clinical

18

1    facility.
2          Q.    Were you involved in the design
3    of the study?
4          A.    I was, yes.
5          Q.    Were you involved in any other
6    research during your master's or Ph.D. programs at
7    Berkeley?
8          A.    Yes.  I did some -- I
9    participated and actually ran a few clinical
10   trials because I had a gap of a couple of years
11   between my master's and my Ph.D. during which I
12   worked as a research scientist in the department
13   and I ran a couple of different clinical trials,
14   one of which was to evaluate the effect of
15   consumption of beans, legumes, on gas production.
16   And so we had a group of men who consumed a meal
17   of beans and we collected their intestinal gas and
18   measured it in order to -- and we gave them
19   different fractions, different processed parts of
20   the beans in order to determine what part --
21   portion of the beans was responsible for producing
22   the gas.  So that was one study that we did.
23          Another study was a study in
24   which we had participants in the metabolic ward
25   consuming exactly the same diet that they had

19

1    consumed on the outside for a period of about
2    two months.  These participants lived in the
3    metabolic ward for two or three months and they
4    consumed a liquid diet.  And in this case, in
5    this -- generally.  But in this study, they
6    consumed the same diet that they had consumed on
7    the outside.  And the purpose was to try to
8    validate the results of the real-life study with a
9    controlled study in a controlled environment.  And
10   that was not a study that I designed.  That was a
11   study that I supervised, ran, recruited
12   participants for, worked with the participants as
13   an employee.
14          Q.    When you say "running clinical
15   trials," did it involve analyzing data?
16          A.    For my own research, for the
17   research that was part of my master's and my Ph.D.,
18   yes, it involved analyzing data.  For the research
19   which I -- in which I was acting as a staff
20   member, I was not involved in analyzing the data.
21   I was involved in running the trial, basically.
22          Q.    Okay.  Were you involved in
23   running any other trials?
24          A.    At that point, no.  Those --
25   those were the studies that I was involved and

20

1    highly responsible for as a student.
2          Q.    Okay.  Did any of your research
3    work or coursework involve cognitive function?
4          A.    No, only my own.
5          Q.    And what was that?  Oh, only
6    your own.
7          A.    Yes.
8          Q.    Meaning yourself.
9          A.    Yes.  Sorry.
10         Q.    I understand.
11               Okay.  So what did you do after
12   you finished your Ph.D. at Berkeley?
13         A.    After I finished my Ph.D. at
14   Berkeley, I was a postdoctoral fellow
15   in San Francisco at the University of California
16   San Francisco where I did very basic science work
17   on endocrinology.  I was very interested in the
18   relationship between diet, nutrition, and
19   hormones.  And so I worked with a very
20   well-known -- particularly reproductive hormones.
21   So I worked with a very well-known scientist in
22   the field of estrogen metabolism at the University
23   of California San Francisco, and I did
24   self-culture studies looking at the effects of
25   various compounds on estrogen synthesis primarily

5 (Pages 17 to 20)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

21

1   in adipose cells.
2        Q.    You used the phrase "basic
3   science."  What did you mean?
4        A.    By this I mean I did not have
5   human subjects.  This was wet lab cell culture
6   work, in vitro, in vitro work as opposed to human
7   studies.
8        Q.    Did any of your postgraduate
9   work involve any aspect of cognitive functions?
10       A.    No, it did not.
11       Q.    What did you do after you
12  finished this postgraduate work?
13       A.    After I finished that
14  postgraduate work, I actually -- I'm sorry, I'm
15  getting two things chronologically mixed up.
16  Directly after my -- my Ph.D., before I went to
17  San Francisco, I received a NATO postdoctoral
18  fellowship to work in Europe for a year to do
19  research.  And so for a year, in between Berkeley
20  and San Francisco, I lived in Rome, and then I
21  lived in Denmark performing nutrition research
22  with -- with scientists there as a continuation of
23  my training.  So that was my first postdoc.  And
24  then the second postdoc was in San Francisco.
25       Q.    What was the -- what was the

22

1   focus of the first postdoc in Europe?
2        A.    I did two different things.  In
3   Rome -- I was in Rome for four months and I worked
4   at the National Institute of Nutrition in Rome
5   with the director, and I helped them with some
6   epidemiological studies of children, looking at
7   reproductive hormones and diet at different ages
8   in children.  And so that was kind of a little bit
9   of a training experience for me to just get to see
10  what they were doing.
11       From there, I went to Odense,
12  Denmark, to the University of Odense, and I worked
13  in a lab with Loris Garbi, who was an expert in
14  energy expenditure and energy metabolism, and I
15  spent almost a year with him working on studies
16  looking at energy expenditure and the factors that
17  influence it in young people.
18       Q.    Did any of your research in
19  Europe involve randomized controlled trials?
20       A.    No.
21       Q.    Did any of your research in
22  Europe -- while in Europe involve cognitive
23  function?
24       A.    No.
25       Q.    So after you finished that

23

1   postdoctorate work experience in Europe, then you
2   went to San Francisco?
3        A.    That's right, exactly.  I came
4   home, and then I started at San Francisco, and I
5   was there for two and a half years.
6        Q.    Okay.  And what did you do after
7   those two and a half years in San Francisco?
8        A.    After the two and a half years
9   in San Francisco, I took a position at the
10  University of Minnesota as an assistant professor,
11  and I've been there for over 30 years.
12       Q.    Can you describe your work at
13  the University of Minnesota?
14       A.    Yes.  At the University of
15  Minnesota, I have a few different major
16  responsibilities.  One is research program, and my
17  research program over the 30 years has focused --
18  it's shifted somewhat, but most of the 30 years
19  has focused on human clinical studies, evaluating
20  the effects of dietary substances and dietary
21  supplements on health endpoints in humans and --
22  with particular interest in cancer prevention and
23  heart health, et cetera, looking at biomarkers of
24  these -- of these disease states.  So not looking
25  at the diseases themselves, but looking at markers

24

1   of them.  So that's been a lot of what I've done
2   for my research.
3        I've had a pretty big research
4   program.  It has been primarily funded by the
5   National Institutes of Health and other federal
6   agencies, the Department of Defense, and very -- I
7   have a little bit of corporate sponsorship of --
8   of some of my research, but very little.  It's
9   mainly federal sources.  So that's been my
10  research program.
11       I also teach.  I teach
12  nutrition.  I've taught a few different courses.
13  The main -- my main responsibility has been
14  Introductory Nutrition which I teach to freshmen
15  through senior primarily at the university.  And
16  so it's an overview of nutritional science.  So
17  that's my main teaching responsibility.
18       I also for the last ten or so
19  years have had a big responsibility for
20  administration.  I direct an institute at the
21  University of Minnesota called the Healthy Food,
22  Healthy Lives Institute which focuses on the food
23  and health and the integration of health science
24  and agriculture because I am -- although I
25  consider myself to be in allied health science,

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

25

1    I'm in a college of agriculture.  So we have a
2    unique opportunity to bring together agriculture
3    and food production with the -- with health and --
4    with human health.  And so that's what my
5    institute does, which I've been spending a lot of
6    time directing for the last ten years.
7            Q.    If I understood you correctly,
8    you mentioned your research program involved human
9    randomized controlled trials?
10           A.    Yes.
11           Q.    And what was your role in these
12   randomized controlled trials?
13           A.    Principal investigator.  I
14   have -- I have received grants for and been the
15   principal investigator of seven or eight clinical
16   trials.  I was responsible for writing the
17   protocol, in some cases working with colleagues on
18   it, in some cases having almost the entire
19   responsibility myself, in some cases leading a
20   research team.  But I've been in a leadership
21   position with all of them, running the trials,
22   supervising graduate students who would be
23   interacting with participants, working with
24   statisticians closely to analyze the data,
25   writing -- writing the publications or supervising

26

1    my students.
2            I -- as -- because I'm an
3    educator, I -- it's very important to me that
4    graduate students have experience writing
5    publications.  So even though in some cases it
6    might be easier for me to write the paper, the
7    students would write the first draft, and then I
8    would work with them on many iterations until
9    published so that I would feel that if my name's
10   on the paper, then I can stand behind anything
11   that's in it.
12           So I would say that my role in
13   the trials that I'm talking about here has been
14   very primary.
15           I've always done quite a bit of
16   collaborative work with -- in which other
17   researchers were the principal investigators on
18   the clinical trial and I was a collaborator or a
19   co-investigator and was involved in aspects of the
20   study but not -- I did not have primary
21   responsibility for the study.
22           Q.    And in those studies that you
23   played a collaborative role, what was your -- can
24   you describe how you were generally involved in
25   the study?

27

1            A.    I was involved as a member of
2    the team.  And so there would be, for example,
3    conference calls periodically to discuss the
4    trial.  When the -- when the study -- in the
5    beginning when the study was being designed, when
6    the study -- when the grant was being written, I
7    was involved and consulted about the writing of
8    the grant, about the study design, about the
9    endpoints that I was focused on, which were my
10   area of expertise in relation to the study which
11   was phytoestrogens and -- in -- in most of these
12   studies and -- so that before the study, I was
13   involved as a consultant in a way on the design.
14   And I wasn't the driver, but I was part of a team.
15   And then during the study, there were regular
16   meetings to discuss how the study was going,
17   problem solve, et cetera.  And then I did not take
18   primary responsibility for writing the
19   publications, but I read and edited and was
20   involved in the writing of all of the publications
21   that -- that have my name on it that came from
22   those collaborative studies.
23           Q.    When you say you were a
24   consultant in the design, did that include working
25   on the protocol for the study?

28

1            A.    Yes.  In particular, the part of
2    the protocol that I was the most involved with.
3            Q.    And what part would that be?
4            A.    That would be the -- because --
5    I'm thinking of one study in particular which was
6    a study of the effect of dietary soy constituents
7    called isoflavones which are phytoestrogens, plant
8    estrogens.  The study was looking at the effects
9    on bone health in -- in postmenopausal women and
10   perimenopausal women in order to see if these
11   exogenous phytoestrogens might prevent bone loss
12   with aging.  So I was the expert on phytoestrogens
13   in that -- on that team.  I was not an expert on
14   bone.  So the primary -- the principal
15   investigator was an expert on bone, and so she
16   knew how to design the study with respect to the
17   bone endpoints, but I was an expert on how the
18   supplement should be taken, how compliance should
19   be evaluated, how the measurements would be made
20   to determine what the levels were, et cetera.
21           Q.    Did any of the trials that you
22   worked on as part of your research program involve
23   any aspect of cognitive function?
24           A.    No.
25           Q.    How about any of the classes

29

1    you've taught?  Did any of them involve cognitive
2    function?
3         A.    You know, I've done a little bit
4    of work on cognitive function.  I wrote a paper on
5    food and mood many years ago, which is in my list
6    of publications.  I was asked -- I was asked to
7    write that paper, and so I wrote a paper on it,
8    and it was called food and mood, and this is many,
9    many years ago.  And in my classes, occasionally
10   the subject of diet and cognitive function does
11   come up.  Diet and mental health, et cetera, for
12   example, in my class that I teach Introductory
13   Nutrition, the issue of the effect of
14   micronutrients on mental health is something that
15   we discuss.  So it is something that I have -- I
16   have had the opportunity to -- to look at, to
17   think about, to talk about, to teach about in the
18   context of nutrition as a small part of my work
19   that I've done.
20        Q.    And in writing that paper on
21   food and mood, did you conduct research for it?
22        A.    No, I didn't.  That was a --
23   that was a literature review, so that was a review
24   of what was known at that time.
25        Q.    You also mentioned an institute

30

1    that focused on food and health?
2         A.    Yes.
3         Q.    Can you -- did any of -- has any
4    of your work for the institute involved cognitive
5    function?
6         A.    The work that I've done at the
7    institute has involved cognitive function
8    peripherally.  So one of the things that I -- that
9    I've done as director of the institute is to work
10   with a local Native American tribe to host a
11   conference on Native American nutrition.  And
12   we've held four of those conferences, and the
13   fifth one is going to be held next May.  It's a
14   two-and-a-half-day conference with about 600
15   people coming from all over the country and
16   Canada, some other countries as well.  And there
17   is a lot -- a great interest in the effect of food
18   on mental health for Native Americans, the effect
19   of trauma on -- on -- the effect of trauma on
20   mental health and how that's affect- -- and how
21   the loss of traditional foods has affected mental
22   health.
23              So we've talked about mental
24   health not cognitive function in the sense of
25   detailed studies of cognitive function, but in a

31

1    more general sense mental health.  We've had
2    speakers.  We've had scientific sessions on those
3    topics which -- which I've invited the speakers to
4    and, et cetera, got to know the speakers well.
5         Q.    So you've mentioned research
6    program, your teaching, your institute while at
7    the University of Minnesota.  Is there any other
8    work experiences in your position?
9         A.    My position is primarily
10   education, research, and then, of course, service
11   or public engagement.  And so I have done a lot --
12   quite a lot of service at the University of
13   Minnesota.  I've chaired many committees.  I've
14   chaired search committees for dean positions, for
15   departments head positions, for faculty positions.
16   I've been on the -- I am currently on the college
17   promotion and tenure committee, which I've served
18   on twice before, where we evaluate faculty to
19   determine whether or not they deserve promotion
20   and/or tenure.  So I've been highly involved in
21   that.
22              Some of my teaching -- I also
23   for ten years was director of the nutrition
24   graduate program.  And in that capacity, I oversaw
25   the entire graduate program.  We had about -- I

32

1    believe about 50 graduate students at that time,
2    and I taught an introductory class to the graduate
3    students in which we discussed good research
4    practices, we discussed examples of fraud in
5    science and how to avoid it and integrity in
6    science and what the best way is to work with data
7    to make sure that it is presented in the most
8    objective, honest way.  So -- and, of course, we
9    critiqued papers in that -- in that class where
10   the students would read research papers and we
11   would go through and critique them.  I would have
12   this -- I would lead the students and -- and teach
13   them.  And then I would have them do presentations
14   on topics so they got some experience putting
15   presentations together.  And then the other
16   students in the class would question them and
17   challenge them on different ideas.
18        Q.    You mentioned earlier that you
19   had funding for your research.  You mentioned
20   corporate sponsors, correct?
21        A.    Yes.
22        Q.    And who were those corporate
23   sponsors?
24        A.    I have gotten some funding early
25   in my career from -- from -- can I -- is it okay

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

---

33

1    if I look at my CV --
2         Q.    Sure.
3         A.    -- which we have up here?  Okay.
4         Q.    Yes.
5         A.    Okay.  So early in my career I
6    received a grant from a company called Humanetics
7    Corporation to -- it was a very small grant of
8    less than $4,000 to look at the effect of a
9    particular compound on DNA synthesis in mouse
10   melanoma cells.  So that was a very, very small in
11   vitro study which was early in my career.
12        I also have more recently
13   received funding through my work as director of
14   the Healthy Food, Healthy Lives Institute from the
15   Cargill Foundation, and that grant was an
16   education grant, the purpose of which was to bring
17   high school students to the university to
18   introduce them to food and agriculture careers.
19   It was a trial -- it's a -- it's a project, the
20   purpose of which is to bring more diversity to
21   food and agriculture which we have unfortunately
22   an unacceptably low rate of -- of diversity within
23   the field.  And so the purpose of that study is to
24   try to introduce students who might not think
25   about it as a career to come to the university and

---

34

1    get to know it a little bit.  So that was from
2    Cargill.  Those are the only ones I can really see
3    on my résumé.
4         I've also had some foundation
5    support from the -- the Susan -- the Susan G.
6    Komen Foundation and -- and then some -- a few
7    other sources, state funds, et cetera.  But as you
8    can see from my CV, it's mainly federal funding.
9         Q.    I believe you mentioned soy as
10   one of the products that was involved that you
11   focused on during your clinical research?
12        A.    Yes.
13        Q.    Are there any other products or
14   ingredients that were -- that were involved in
15   your research?
16        A.    Yes.  So I would say that for
17   much of my career I focused on the health effects
18   of soy consumption.  I also have looked at the
19   health effects of consumption and flaxseed and
20   green tea extract.  I was a collaborator on a
21   project looking at omega-3 fatty acids and on
22   another project looking at the interaction between
23   soy and seaweed.  And I've done a study looking at
24   the interaction between soy and probiotics.  So
25   I've looked at probiotics as well in my own

---

35

1    research.  And then, as I said, the collaborative
2    project was on soy and bone health, and I've done
3    quite a few collaborative projects further looking
4    at flaxseed.
5         Q.    Have you ever conducted any
6    research involving Prevagen?
7         A.    No, I have not.
8         Q.    Have you ever conducted any
9    research involving apoaequorin?
10        A.    I have not, no.
11        Q.    Have you ever been involved in
12   research involving vitamin D?
13        A.    No, I have not.
14        Q.    Your CV also mentions some work
15   involving journals.  Could you describe that,
16   please?
17        A.    I have acted as a reviewer for
18   many, many scientific journals, nutrition
19   journals.  I am contacted a few times a month to
20   review papers, so I've done quite a few peer
21   review of manuscripts.  In addition, I have served
22   as a member of the editorial board for the Journal
23   of Nutrition, which is one of the premier journals
24   in nutrition, and the Journal of the Society of
25   Nutritional Sciences, which is the American

---

36

1    Society of Nutrition.
2         Currently I am -- I am an
3    academic editor for another scientific journal called
4    Current Developments in Nutrition which -- which
5    is an open-access online journal of the American
6    Society of Nutrition.  And because of the work
7    that I've done in Native American communities with
8    scholarship involving work with triable
9    communities, I helped launch a new section in that
10   journal on the food and nutrition of indigenous
11   peoples, and I'm the academic editor for that
12   section.  In that role, I supervise the peer
13   review of any papers that come through on that
14   topic.  So I assign reviewers, I read their
15   reviews, and I make the final decision about
16   publication, whether or not the paper needs to
17   be -- needs to be revised and whether or not the
18   paper can be published.
19        Q.    Okay.  Have you ever been
20   involved in any academic journals that focused on
21   cognitive function?
22        A.    No, I have not.
23        Q.    Your CV also mentioned you were
24   involved in some professional organizations.
25   Could you describe that involvement, please?

---

9 (Pages 33 to 36)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

---

37

1        A.    I've been involved with my main
2   professional society which is, as I said, the
3   American Society for Nutrition.  I have served on
4   the graduate education committee of that
5   organization.  I have served on a couple of
6   different award committees.  And I was -- last
7   year, the year before, I was elected as a fellow
8   of the American Society of Nutrition which is a
9   limited group of people.  It's not an automatic
10  thing.  Only about five to ten or so people per
11  year are elected to be fellows of that society.
12       Q.    Have you ever been involved in any
13  professional organizations that involve cognitive
14  function?
15       A.    I have not.
16       Q.    And except for the article you
17  drafted involving mood, have you ever been
18  involved in any other articles that involve any
19  aspect of cognitive function?
20       A.    No, I have not to my knowledge.
21  I don't recall any.
22       Q.    In your professional career,
23  have you ever evaluated someone's cognitive
24  function?
25       A.    No, I have not.

---

38

1        Q.    Do any of the articles listed on
2   your CV involve vitamin D?
3        A.    No, they do not.
4        Q.    Dr. Kurzer, what areas do you
5   consider yourself to be an expert in?
6        A.    I'm an expert in nutritional
7   science.  This is what my Ph.D. is in.  Nutritional
8   science is a combination really of biochemistry
9   and physiology as they apply to nutrients.  And so
10  this is my general area of expertise.
11            I teach basic nutrition, and so
12  I'm in a position to keep up with the literature
13  in nutrition and -- and so I would say that that's
14  my general area of expertise.
15            I have more specific subareas of
16  expertise which include dietary supplements, which
17  include reproductive hormones and their
18  interaction with -- with nutrition.  I have done a
19  great deal of work on the nutrition of women and
20  gender differences and sex differences in response
21  to nutrition, and that's another area of expertise
22  for me.  Cancer prevention is another subarea of
23  interest to me.
24            So within the general area of
25  nutritional science, I have these subareas of

---

39

1   expertise.  And then --
2        Q.    Any other --
3        A.    -- clinical -- clinical trials
4   in nutrition.  I consider myself an expert on
5   that.
6        Q.    Anything else?
7        A.    Those are the main areas.
8   Something else may come up again.
9        Q.    So you don't consider yourself
10  to be an expert in cognitive function, correct?
11       A.    I -- in -- in my professional
12  capacity, no.
13       Q.    Do you consider yourself to be
14  an expert in statistics?
15       A.    I consider myself to be an
16  expert in utilizing statistics in the -- in the --
17  in the context of nutrition studies.  I've worked
18  very closely with statisticians.  I have -- I have
19  not done very many statistical analyses on my own
20  because I don't have a Ph.D. or formal training in
21  statistics other than a series of classes that I
22  took as a graduate student.  So in every study
23  that I have ever worked on, I've worked very
24  closely with statisticians.  I have never just
25  handed the data over to them, asked them to

---

40

1   analyze it and send it back to me.  I always
2   discuss with them various techniques, methods.  We
3   argue back and forth.  I might recommend something
4   else.  They agree or don't and tell me why.
5            So I've been heavily involved in
6   most of the statistical analyses for my research,
7   although I would not say that I'm the primary
8   driver.  I'm the primary driver of the -- the --
9   the design of the study, the analytical work, the
10  biochemical work, et cetera.  But I work with
11  others who have Ph.Ds in biostatistics.
12       Q.    And I take it you've never done
13  any research in the area of biostatistics?
14       A.    That's correct, I have not.
15       Q.    And have you ever taught any
16  classes on biostatistics?
17       A.    I have taught classes that
18  included sections on biostatistics.  So as a
19  graduate student, I was a teaching assistant in a
20  laboratory class in which we had the students do
21  statistical analyses.  And I recall having the
22  students do an analysis of variance by hand.  So
23  they had to do all of the calculations by hand
24  because it's -- it was extremely important to me,
25  and it still is, that students who are in science

---

10 (Pages 37 to 40)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

---

41

1    don't -- don't use a sort of black box approach to
2    the work that they do.  It's very easy to just put
3    data into a computer and it spits out the results,
4    and the person doing it may or may not really
5    understand what the program did.  So it was very
6    important to me in that capacity.  And I've talked
7    about it also in some of the seminars that I've
8    taught as well and some of the graduate classes,
9    the importance of actual looking at the data and
10   understanding the data, not just putting it into a
11   machine, getting the results out.
12          And -- and so the ideas of
13   statistics and how they're properly used has been
14   a thread throughout my career, something very
15   important.  So I've never taught a statistics
16   course.
17          But in the context of all of the
18   other things I teach, for example, in -- even in
19   my introductory class I teach the students how to
20   evaluate information because, as you can imagine,
21   we are bombarded with so much nutrition
22   information from the internet.  Before computers,
23   it was from magazines and newspaper articles and
24   advertisements and radio and -- and so now it's
25   computers.  And students don't understand how to

---

42

1    evaluate the data that they see, which one should
2    they believe, this magazine article or this
3    professor.  And so I talk a little bit about
4    statistical analyses and how important that is and
5    how important it is to understand how to interpret
6    statistics and how statistics can be interpreted
7    in numerous ways.  So I do talk about it in my
8    courses, although it is not the primary focus of
9    my teaching.
10       Q.    Are you involved in any
11   professional organizations relating to statistics?
12       A.    No, I am not.
13       Q.    Have you ever been involved in
14   any academic journals that focus on biostatistics?
15       A.    No, I have not.
16       Q.    Earlier today we -- we -- you
17   mentioned protocols in one of your responses.
18   Could you describe what a protocol is?
19       A.    A protocol is the detailed
20   description of what is going to be done in an
21   experiment.  So in a protocol, the methods that
22   are going to be used are described, the -- in a --
23   in a human study.  There are many various things
24   that could be described, including what the
25   subject study population is going to be, inclusion

---

43

1    and exclusion criteria, et cetera, how the data --
2    how the samples are going to be analyzed, what
3    they're going to be analyzed for.  If it's an
4    animal experiment, how many animals there are
5    going to be, et cetera.  And so it's a -- it's a
6    map.  It's a map of how to go about doing the
7    research.
8        Q.    And what do people conducting
9    the clinical trial use the protocol for?
10            MS. METZINGER:  Objection to
11       form.
12            You can answer, Dr. Kurzer, if
13       you understand the question.
14            THE WITNESS:  Okay.
15            The protocol is used, as I said,
16       as a map, as a basic skeleton for
17       conducting the study.
18   BY MR. WONE:
19       Q.    And is RCT another -- an
20   abbreviation from randomized control trial?
21       A.    Yes.  It is a randomized control
22   trial, yes.
23       Q.    And so today I'm going to use
24   RCT as an abbreviation when I'm referring to
25   randomized control trials.

---

44

1        A.    Okay.  Sure.
2        Q.    Did the RCTs you were involved
3    in use protocols?
4        A.    Yes.
5        Q.    And would the RCTs you were
6    involved in follow the protocol?
7             MS. METZINGER:  Objection to
8        form.
9             THE WITNESS:  The RCTs that I've
10       been involved in, the -- for the RCTs
11       that I've been involved in, the
12       protocols were written in the context
13       of a grant application.  And so they
14       were written for the reviewers to
15       understand what -- what we were going
16       to do for purposes of decision about
17       whether or not to fund the project.  So
18       we followed the protocol as best we
19       could, but there are always changes to
20       the protocol that happen during the
21       clinical trial because the actual
22       reality of what happens once you start
23       may be slightly different from the
24       theoretical framework that you've
25       established.  So that very often will

---

11 (Pages 41 to 44)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

---

45

1        vary from the protocol, the initial
2        protocol.
3    BY MR. WONE:
4        Q.    And when you varied from the
5    initial protocol, were there any -- were there any
6    future updates to the protocol?
7             MS. METZINGER:  Objection to
8        form.
9             THE WITNESS:  Sometimes we would
10       update the protocol, but we wouldn't
11       necessarily have a -- we wouldn't have
12       to report back to the funding agency.
13       So there wasn't -- we -- we didn't have
14       to have a formal document that was
15       updated.  That was not necessary and
16       not required.
17   BY MR. WONE:
18       Q.    Would you ever mention any of
19   the changes that were made in the -- in the
20   future -- in the later study reports?
21            MS. METZINGER:  Objection to
22       form.
23            THE WITNESS:  If I considered
24       them to be extremely important, I would
25       mention them.  But I would not

---

46

1        necessarily mention other -- it
2        would -- I -- it was my judgment to
3        decide whether or not I thought it was
4        substantive enough -- substantive
5        enough to be mentioned.  So it depended
6        on the study and it depended on the
7        variation from the protocol.
8    BY MR. WONE:
9        Q.    Could you give an example of
10   something you would consider substantive enough to
11   warrant mentioning?
12            MS. METZINGER:  Objection to
13       form.
14            THE WITNESS:  An example might
15       be the study population in -- I have
16       performed clinical trials in which it
17       was very difficult to recruit
18       participants, and so we had to expand
19       our recruitment network from what we
20       had originally proposed and we had to
21       go to other clinics and other sites and
22       use other mechanisms for recruitment
23       other than what we had put in the
24       protocol.  And so we did report that.
25            When -- every year when I write

---

47

1        an annual report to NIH for their --
2        for their records, one of the things
3        that they ask is have there been
4        substantive changes to the protocol,
5        and I would put the change to the
6        protocol in that report if it was
7        substantive.
8    BY MR. WONE:
9        Q.    So would a protocol from an RCT
10   identify who the participants or who the study
11   population would be?
12            MS. METZINGER:  I'm sorry.  Can
13       you repeat that, Mr. Wone?
14   BY MR. WONE:
15       Q.    Would an RCT protocol identify
16   who the study participants would be?
17            MS. METZINGER:  Objection to
18       form.
19            THE WITNESS:  Yes, the protocol
20       will identify the study participants.
21   BY MR. WONE:
22       Q.    And would the protocol describe
23   the study design?
24       A.    Yes, the protocol will describe
25   the study design, but there are many, many levels

---

48

1    of detail.  So a protocol can describe it in much
2    less design or in much less detail or much greater
3    detail.  So, for example, I've written grants
4    where there was a page limit on the grant
5    application, and so I was limited in what I
6    could -- how much detail I could put in.  So I had
7    to select which -- which points I wanted to put
8    into that protocol and which I would leave out.
9        Q.    Did you ever write any protocols
10   that were not for a grant -- in connection with a
11   grant application?
12       A.    I think that all of my protocols
13   have been in connection to grant applications.
14   And as I -- as I -- I would have to look in great
15   detail at all of my studies, but I'm pretty sure
16   that they were virtually all in relation to grant
17   applications.
18       Q.    So focusing on the instances
19   where you didn't have a page limitation for the
20   protocol, did those protocols provide details
21   about the study design?
22       A.    Yes.  And -- and there's always
23   a page limitation.  So there's no such thing as no
24   page limitation.  Sometimes you have lots more
25   pages than other times.  But even for NIH where

---

12 (Pages 45 to 48)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

---

49

1     there is a greater page limit than for some of the
2     other agencies, you're still -- you still have to
3     keep your study design within -- within a small
4     enough number of pages so that you can write the
5     rest of -- the rest of what you need to write
6     within the page limit. So the -- I -- I put as
7     much detail as I can fit into that -- into that
8     grant application.
9           Q.    And the protocols you worked on,
10    would they also describe the treatment that was
11    being administered in the study?
12          A.    Yes.
13          Q.    And the protocols you've written
14    for RCTs, would they also describe the measures
15    that would be used to evaluate efficacy?
16          A.    Yes.
17          Q.    Would the protocols that you've
18    written for RCTs also describe the screening
19    criteria for participants?
20          A.    Yes.
21          Q.    And so there would be inclusion
22    criteria?
23          A.    Yes.
24          Q.    As well as exclusion criteria?
25          A.    Yes.

---

50

1           Q.    And would participants that
2     don't meet the screening criteria be excluded from
3     the studies you've worked on?
4           MS. METZINGER:  Objection to
5     form.
6           THE WITNESS:  In general they
7     would.  But it's not always possible to
8     make sure of that.  I've had instances
9     where, for example, I was recruiting
10    postmenopausal women.  And after I
11    looked at the data and had measured
12    hormones, I realized that some of them
13    were not actually postmenopausal.  And
14    so they had to be eliminated from the
15    data analysis because in the end it
16    turned out they didn't fit the original
17    criteria.  So I analyzed the
18    participants who fit what I was most
19    interested in, but in recruiting I
20    actually recruited other people as
21    well.
22    BY MR. WONE:
23          Q.    In the RCTs you've worked on,
24    did the protocol describe the control?
25          A.    Yes.

---

51

1           Q.    And what kind of details would
2     it provide about the control?
3           MS. METZINGER:  Objection to
4     form.
5           THE WITNESS:  I would say the
6     detail about the control would be much
7     less than the detail about the
8     treatment.  I might just have a
9     sentence or two about the control being
10    used.
11    BY MR. WONE:
12          Q.    And in the RCTs you've worked
13    on, would the protocol describe the blinding?
14          MS. METZINGER:  Objection to
15    form.
16          THE WITNESS:  I would say that
17    we don't necessarily describe the
18    blinding.  We say that it will be
19    blinded but don't necessarily describe
20    in detail what that -- how we're going
21    to make sure that that happens.  There
22    is an assumption, I would say, that
23    folks know what blinding means, and so
24    we don't have to say in great detail
25    this is exactly what we're going to do

---

52

1     to make sure that things are blinded.
2     We say it's going to be double-blind or
3     single-blind, and that's really what
4     we -- all we'd have to say.  It's not
5     necessary to describe it in more detail
6     than that.
7     BY MR. WONE:
8           Q.    For the RCTs you worked on,
9     would the protocol describe whether there was any
10    randomization used?
11          A.    Yes.
12          Q.    And would it describe how the
13    randomization was to occur?
14          A.    In some cases it would.  I think
15    for -- for an NIH grant where a great deal of
16    detail is required, I would probably have put
17    details about the kind of randomization that I was
18    going to use.  But I know that I've written other
19    grants and I've written other protocols where I
20    said that they were going to be randomized but not
21    necessarily -- I didn't necessarily describe the
22    technique that I was going to use to perform that
23    randomization.
24          Q.    In the RCTs you worked on, would
25    the protocol describe the ratio of participants in

---

13 (Pages 49 to 52)

Kurzer, Ph.D. - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                                          9/29/2021

---

53

1    the treatment group to the ratio of -- to the
2    participants in the placebo group?
3         A.    I'm not sure what you're asking,
4    Mr. Wone.  Can you maybe rephrase that a little
5    bit?  I'm not sure what --
6         Q.    Sure.
7         A.    -- you mean by "ratio."
8         Q.    For example, if there was to be,
9    you know, 4 to 2 or something like that, so 4 to 2
10   in terms of participants and treatment versus
11   placebo and it wasn't just 1 to 1, is that
12   something that the protocol would describe?
13        A.    I have not done those kinds of
14   studies.  My studies have always had an equal
15   number of people in each group.
16        Q.    Have you ever used
17   stratification in any of your RCTs?
18        A.    Yes.
19        Q.    And can you describe what
20   stratification is?
21        A.    Stratification is -- if -- if
22   I'm understanding your use of the word, my
23   interpretation of your -- of stratification is
24   looking at particular groups of people.  For
25   example, if body weight -- if we think that body

---

54

1    weight is an important co-variable, we might
2    stratify the data on the basis of -- of obesity,
3    let's say, you know, average of normal weight,
4    underweight, overweight, or percentages of
5    overweight, and we might look at the data
6    differently in each of those groups because we
7    suspect that the responses will differ on the
8    basis of the participants belonging in those
9    stratifications.
10        Q.    And would the -- in the RCTs you
11   worked on, would the protocol describe any
12   stratification?
13        A.    Sometimes they would.  If we
14   think about it in advance, we would say that the
15   data will be stratified in this kind of way.  But
16   sometimes we decide to do that after the fact
17   because while we're doing the trial, we realize
18   that, you know, information -- information comes
19   up during trials especially if they're long
20   trials.  I've done a trial that took five years.
21   And it is very limiting to force yourself to stick
22   to the knowledge that you had on that -- on --
23   during that week when you submitted that protocol.
24   It's very important to use the most up-to-date,
25   current information and be flexible.  And so we

---

55

1    have stratified data after the fact when we
2    realized that this might be a variable that's very
3    important to look at differently in -- you know,
4    to see if the effect is different based on this
5    co-variable.
6         Q.    And when you stratified after
7    the fact, was it after you analyzed the study
8    data?
9              MS. METZINGER:  Objection to
10        form.
11             MR. WONE:  I'll rephrase that.
12   BY MR. WONE:
13        Q.    In the instances where you've
14   stratified after the fact, was it after the study
15   had concluded?
16        A.    Yes, it was after the study had
17   concluded because we don't usually -- we're --
18   we're so busy while the study is being conducted
19   that all we can do is problem solve and deal with
20   recruitment and making sure the subjects are
21   compliant and collecting the samples.  It's an
22   enormous amount of work to conduct these clinical
23   trials.  And so we usually then think about the
24   statistical analysis, yes, after the study is
25   done.  The data -- the samples may not have been

---

56

1    analyzed yet.  So if we're collecting biological
2    samples such as -- such as urine or blood,
3    et cetera, we don't necessarily have those data
4    yet.  But we think about -- we -- we think more
5    deeply about the statistics before we perform them
6    at the end of the study, and we may make some
7    changes.
8         Q.    And is stratification something
9    you would discuss with the biostatistician that
10   you worked with to analyze the data?
11        A.    Yes, I would.
12        Q.    Have there ever been any
13   instances where you stratified the data after you
14   had already started analyzing it?
15             MS. METZINGER:  Objection to
16        form.
17             THE WITNESS:  I don't recall
18        any.  I'd have to look at the
19        individual papers themselves and -- you
20        know, because my career goes back
21        30 years.  So I would have to really
22        look at data to be able to analyze it,
23        to be able to answer that question.
24   BY MR. WONE:
25        Q.    If an RCT was going to have

---

14 (Pages 53 to 56)

Kurzer, Ph.D. - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                                                            9/29/2021

---

57

1   subgroups, is that something that would be
2   identified in the protocol?
3           MS. METZINGER:  Objection to
4   form.
5           THE WITNESS:  Can you rephrase
6   that question, please?
7   BY MR. WONE:
8       Q.   Sure.
9           If a study was going to focus on
10  a particular subset of the entire study
11  population, is that something that would be
12  identified in the protocol?
13          MS. METZINGER:  Objection to
14  form.
15          THE WITNESS:  It might be
16  identified or it might not be because
17  if it's something that we think about
18  in advance, then it would be in the
19  protocol.  But if it's something that
20  comes up during the conduct of the
21  study which, as I said, could take a
22  very long time, then it might be
23  something that we decide to do after
24  the protocol is written originally.
25  And this is -- this is extremely

---

58

1   important to remember, that clinical
2   trials are incredibly expensive,
3   incredibly difficult to do, and time
4   consuming for many, many, many people.
5   And so we try to get as much
6   information.
7           My -- my green tea clinical
8   trial cost $5 million or $6 million,
9   and we felt that it was extremely
10  important to try to get as much
11  information from this population as
12  possible.  And so as information about
13  the -- about green tea developed in the
14  course of the study, things came up
15  that we realized we could look at that
16  we hadn't thought about in advance.
17  And it would be, I think, neglectful to
18  not pursue those additional
19  opportunities.
20  BY MR. WONE:
21      Q.   And the things that came up
22  during the green tea study, was it while the study
23  was ongoing or after the study had already
24  concluded?
25          MS. METZINGER:  Objection to

---

59

1   form.
2           THE WITNESS:  I would say both,
3   that it could be -- some of it would
4   have come up during the study and some
5   of it might have come up after the
6   study.  But it would not have come up
7   after we analyzed the data and looked
8   at it and then decided, okay, now we're
9   going to do some other additional
10  things.  This is something that would
11  have come up before we knew what the
12  primary results were.
13  BY MR. WONE:
14      Q.   Okay.  And would the study
15  protocol -- strike that.
16          For the RCTs you worked on,
17  would the protocols describe when the
18  interventions were to be given?
19      A.   Yes.
20      Q.   And would the protocols describe
21  how long the study period is going to be?
22      A.   Yes.
23      Q.   And would the study protocols
24  state when the testing of the participants was to
25  occur?

---

60

1       A.   Yes.
2       Q.   And should the protocol identify
3   the outcome measures being used to evaluate
4   efficacy?
5           MS. METZINGER:  Objection to
6   form.
7           THE WITNESS:  The protocol would
8   identify the outcome measures as we saw
9   them at the time of writing the
10  protocol, but we very often would add
11  and modify that as the study goes along
12  as we realize that there may be other
13  indicators of efficacy that we had
14  neglected to put into the protocol that
15  were important and would be very
16  valuable information to have.  So we
17  might modify that -- those.
18  BY MR. WONE:
19      Q.   And if you were to modify the --
20  the measures, is that something you would consider
21  to be a substantive change and would later report
22  to an NIH report?
23      A.   Yes, I would add that we have
24  expanded our aims to include additional questions
25  and additional endpoints.

---

15 (Pages 57 to 60)

Case 1:17-cv-00124-LLS  Document 259-9  Filed 06/16/22  Page 18 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

61

1    Q.    And after -- if after the study
2  had started, before you analyzed the data you were
3  to -- you mentioned you sometimes change the
4  stratification.  Is that also something you would
5  consider a substantive change to be reflected in
6  a -- in an NIH report?
7         MS. METZINGER:  Objection.
8         MR. de LEEUW:  Objection.
9         THE WITNESS:  I would not
10        necessarily put that in an NIH report,
11        but it would go into the results of the
12        study and when I report the results.
13        But I wouldn't feel a need to put that
14        kind of a change into an interim report
15        to NIH, an annual report, no.  They
16        don't care about that kind of stuff.
17        They're not that interested in it.
18        They wouldn't -- they're -- they're
19        more interested in -- you know, that I
20        accomplish what I initially said that I
21        was going to.
22  BY MR. WONE:
23    Q.    And if you were to make any
24  changes to the subgroups that -- that weren't in
25  the original protocol, is that something you would

62

1  consider a substantive change and would include it
2  in an NIH report?
3         MS. METZINGER:  Objection to
4        form.
5         THE WITNESS:  No, I would not --
6        I would -- again, I would -- that would
7        be part of the results that we
8        reported.  But it would not be
9        considered a change in the study
10        design.
11  BY MR. WONE:
12    Q.    For the RCTs you've worked on,
13  did the protocols include a statistical analysis
14  plan?
15    A.    Yes.
16    Q.    And have there ever been any
17  instances where you made any changes later to the
18  statistical analysis plan?
19        MS. METZINGER:  Objection to
20        form.
21        THE WITNESS:  There may have
22        been.  I really don't recall at the
23        moment.  Again, I'd have to look at my
24        work in great detail to be able to
25        answer that question.

63

1  BY MR. WONE:
2    Q.    And would you consider a change
3  to how you analyze the data to be a substantive
4  change?
5         MS. METZINGER:  Objection to
6        form.
7         THE WITNESS:  It depends on what
8        the change is.  I can't make a blanket
9        statement on that.
10  BY MR. WONE:
11    Q.    Have you ever heard someone
12  describe a change being made to an RCT as post
13  hoc?
14    A.    Yes.
15    Q.    And what is your understanding
16  of what post hoc means in that context?
17    A.    Post hoc is -- my understanding
18  of the use of the term "post hoc" in this context
19  is that it is analyses that are done that were not
20  planned, preplanned, that were decided after the
21  study was -- was complete.
22    Q.    Do you believe it's important to
23  distinguish when an analysis has been
24  predetermined versus post hoc?
25        MS. METZINGER:  Objection to

64

1        form.
2         THE WITNESS:  I think it depends
3        on the context.  There are situations
4        in which it's important because of
5        the -- for example, if you're
6        submitting a paper to a very, very
7        rigorous journal, they might insist on
8        that kind of clarification.  But
9        certainly there are many studies, many,
10        many, many studies published that do
11        not declare if an analysis is post hoc
12        or not.  So, you know, it really
13        depends on where the publication is
14        going to be and what the context is.
15  BY MR. WONE:
16    Q.    And do you know why those
17  rigorous publications insist on identifying a
18  particular change as post hoc?
19        MS. METZINGER:  Objection to
20        form.
21        THE WITNESS:  I believe that
22        it's because in the strictest sense of
23        using statistics, when statistics are
24        interpreted very narrowly and strictly,
25        that it is considered best practice to

16 (Pages 61 to 64)

Kurzer, Ph.D. - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

---

65

1    identify what your hypothesis was up
2    front and what you might have changed
3    or added afterwards in order to avoid
4    the perception or -- that a -- that a
5    researcher might be doing what might be
6    called data mining, et cetera, which is
7    not considered good practice.
8         But there are many, many, many
9    researchers who do not necessarily
10   declare if something was post hoc and
11   they are not data mining.  There is no
12   data mining.  They are with good
13   conscious and with great integrity,
14   they are realizing that there are other
15   endpoints that are important, and so
16   they report on them, which I think in
17   many cases and in most cases is good
18   practice.
19   BY MR. WONE:
20        Q.    When you are evaluating a study,
21   how do you know what the results are, the product
22   of data mining versus someone who had found
23   something new?
24        MS. METZINGER:  Objection to
25   form.

---

66

1         THE WITNESS:  Very often it's
2    not -- it -- it -- I don't believe it's
3    always possible to tell.  There may be
4    researchers who -- who do data mining
5    and publish papers and don't -- you
6    know, and they don't say anything about
7    it.  And so I suspect that it's done
8    quite a bit and we don't -- we just
9    don't know about it.
10   BY MR. WONE:
11        Q.    In the context of an RCT, are
12   you familiar with the term "statistically
13   significant"?
14        A.    Yes.
15        Q.    And what does it mean when the
16   results of an RCT are statistically significant?
17        A.    A p-value is -- is chosen, and
18   usually the p-value is .05.  And if a statistical
19   test is performed which shows that the -- that the
20   product that you're studying or the treatment is
21   effective at the level of .05, it achieves
22   significance, that means that there's only a
23   5 percent chance that the results were due to
24   random effects.  So it's a -- it's a mathematical
25   technique to determine probability -- the

---

67

1    probability that your results are true versus they
2    occurred by chance.
3         Q.    And when evaluating clinical
4    studies, is statistical significance something you
5    look for?
6         A.    Yes, it is.  But it isn't the
7    only thing I look for.  I look for statistical
8    significance along with other things as well.
9         Q.    And what are some of those other
10   things?  What are the other things you look for?
11        A.    I always look at the data.  I
12   always, with my own studies, graph the data so
13   that I can see exactly what's happened in a visual
14   reputation, and I always look at trends.  And the
15   reason I always look at trends is because in human
16   studies, there are so many variables affecting
17   outcomes, many of which we don't know.
18        So we control for the variables
19   that we know about.  But there are many, many,
20   variables that we don't know about because we're
21   discovering new ones all the time.
22        So you can see in studies, for
23   example, in population studies, epidemiological
24   studies, the data may be controlled for five to
25   ten different variables that they think may be

---

68

1    affecting the endpoint.  And there are many that
2    we don't know about.
3         And so the -- everything is
4    stacked against our ability to see a true result.
5    It's very, very difficult in human studies, in
6    clinical studies as opposed to in vitro studies or
7    animal studies where you can, you know, lock these
8    creatures up in a box and control everything in
9    their environment.
10        With humans, particularly if
11   they're free living, there are so many things that
12   we can't control that it's very, very difficult to
13   get a highly significant, statistically
14   significant result.
15        So in my opinion and the opinion
16   of a number of my colleagues and many
17   statisticians who I've work with, it is important
18   to talk about trends because sometimes you may not
19   be -- you may not have enough statistical power to
20   achieve significance.  But if the trends of a
21   number of endpoints are in the same direction,
22   that -- that is meaningful and that is worth
23   reporting.
24        MS. METZINGER:  Mr. Wone, we've
25   been going for just about an hour and a

---

17 (Pages 65 to 68)

Case 1:17-cv-00124-LLS   Document 259-9   Filed 06/16/22   Page 20 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

---

69

1    half.  I don't need to take a break at
2    this moment, but I think we should
3    think about taking one in the next few
4    minutes if you get to a natural point.
5         MR. WONE:  Yeah, I've got a
6    couple more questions.  But, yeah, we
7    can take a break after that.
8         MS. METZINGER:  Okay.  Thank
9    you.
10   BY MR. WONE:
11        Q.   When you're looking at data, how
12   do you weigh the trends versus data that's
13   statistically significant?
14        MS. METZINGER:  Objection to
15   form.
16        THE WITNESS:  That's a difficult
17   question to answer because statistical
18   significance, of course, is considered
19   the sort of, you know, kind of proof in
20   a way to show degree.  But in my
21   opinion, it's very narrow.  The choice
22   of .05 is an arbitrary choice.  And
23   even statisticians will agree to that.
24   And the American Statistical Society
25   agrees that .05 is -- is an arbitrary

---

70

1    cutoff.  Why not .01 or why not .1?
2         I have worked with statisticians
3    who did a lot of clinical trial work
4    who told me that they felt that for
5    clinical studies a p-value of .1 or .2
6    even should be used because of all of
7    the variability that makes it so
8    difficult to get a statistically
9    significant result with a .05 cutoff.
10        So, therefore, I consider the --
11   the showing of trends to be very, very
12   important, and I very often will report
13   trends along with significance.
14        So I can't say that one is more
15   important than the other or that one
16   would invalidate the other.  I would
17   look at them together.  And I would
18   look at the p-values and the trends in
19   the context of the p-values and, you
20   know, if -- if there are p-values that
21   show no -- many -- if there are -- if
22   my statistical analysis shows across
23   the board nothing but then I show some
24   trends, depends on how strong the
25   trends are.  If the trends are weak

---

71

1    trends, then I wouldn't value them as
2    much as I would strong trends.  If the
3    trends occur with a number of
4    endpoints, that would be more valuable
5    than if the trends occur with just a
6    couple of endpoints.
7         So, again, it's looking -- it's
8    standing back and looking at the whole
9    picture.  That's how -- that's my
10   approach to working with data, is that
11   I -- I try not to be very narrow and
12   try to be a little bit more broad in my
13   thinking and -- in what I present.
14   BY MR. WONE:
15        Q.   Do you use a p-value of .05 in
16   your research?
17        A.   Yes, I do.  I use a p-value of
18   .05 because that is the -- the most widely
19   accepted p-value.  But my way of dealing with that
20   is to show trends.  So I don't change the p-value
21   because I have no way of knowing what I should
22   change it to.  It's all arbitrary.
23        Q.   And in the context of an RCT,
24   have you heard the term "clinical significance"?
25        A.   Yes.

---

72

1         Q.   And what is your understanding
2    of what clinical significance means?
3         A.   Clinical significance as opposed
4    to statistical significance refers to the --
5    importance with respect to health, disease, and
6    the biological endpoints that you're talking about
7    as opposed to the significance of the numbers on
8    paper.
9         Q.   Is it possible for something --
10   for a result to be statistically significant but
11   not clinically significant?
12        MS. METZINGER:  Objection to
13   form.
14        THE WITNESS:  Yes, it is.  It is
15   possible.  It's certainly possible, but
16   I would qualify that by saying that
17   there are very often arguments about
18   that among clinicians so that there
19   might be some clinicians who would say
20   it's an important result and others who
21   say that it's not clinically
22   significant.  So, yes, that does occur.
23   BY MR. WONE:
24        Q.   And what camp do you find
25   yourself falling in?  Do you believe that every

---

18 (Pages 69 to 72)

Kurzer, Ph.D. - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

73

1    change is clinically significant?
2            MS. METZINGER: Objection to
3    form.
4            THE WITNESS: I am not an expert
5    on -- I'm not a clinician myself. I'm
6    not an expert on clinical significance,
7    so I wouldn't be able to comment on
8    that.
9    BY MR. WONE:
10           Q.    And so in the research that
11   you've conducted, how do you determine whether the
12   statistically significant results were clinically
13   significant?
14           MS. METZINGER: Objection to
15   form.
16           THE WITNESS: It hasn't always
17   come up in my research, but there have
18   been a few times when it has come up.
19   And in that -- in those times, I often
20   have clinical collaborators who help me
21   interpret the clinical significance
22   of -- of the result.
23   BY MR. WONE:
24           Q.    So if I remember right, you did
25   some research focusing on endpoints related to

74

1    cancer?
2            A.    Yes.
3            Q.    And so if there was an issue of
4    clinical significance, you would consult with
5    someone who has -- who considers himself an expert
6    in cancer? Is --
7            A.    Yes.
8            Q.    -- that what you mean?
9            THE WITNESS: Yes.
10           MS. METZINGER: Objection to
11   form.
12           THE WITNESS: But -- but I
13   wouldn't -- I must -- I must say -- I
14   must add to that, Mr. Wone, that that
15   isn't something that I consider to be
16   necessary. Very often there are not
17   clinicians who are part of research
18   teams and papers. Data can be
19   published, and then it's up to the
20   readers to reach their own conclusions.
21   And so readers then have the
22   opportunity to interpret the
23   significance, the clinical significance
24   of the results.
25

75

1    BY MR. WONE:
2            Q.    So you would publish the data
3    without saying one way or the other whether you
4    thought it was clinically significant?
5            A.    That's right. That is exactly
6    right. I wouldn't always talk about the clinical
7    significance. And most scientists -- many
8    scientists do not. And then that becomes a topic
9    for conversation in the scientific community.
10           Q.    When you were conducting your
11   RCTs on endpoints involving cancer, why did you
12   choose to use human clinical trials rather than
13   animal studies?
14           A.    Honestly, for me, I mean, this
15   is -- I know this is not what you're asking, but I
16   have much more fun with human clinical trials than
17   I do with animal trials. Personally, I don't like
18   killing animals, and so I've never done -- I'm a
19   little bit unique as a scientist in that I've not
20   spent a good portion of my career working on
21   animal studies just because -- I think they're
22   extremely important and they provide very, very
23   critically important data, but personally, I -- I
24   don't want to -- I don't want to chop the head off
25   a rat, you know, and put it in a guillotine, which

76

1    is what is done. So I don't do it.
2            But I also think that clinical
3    trials are important. It's -- it's very important
4    in -- in many situations, not all situations, to
5    have verification of results in humans because the
6    results of animal studies may or may not be
7    extrapolatable to humans. So I appreciate the
8    importance of doing human studies.
9            Q.    And would the same be true
10   versus for human studies versus in vitro studies,
11   the result from an in vitro study may not be -- it
12   may not apply to humans?
13           A.    Yes.
14           Q.    And would you agree that if you
15   wanted to make a claim about a product having an
16   effect in humans, that you would need human
17   clinical trials?
18           MS. METZINGER: Objection to
19   form.
20           THE WITNESS: That actually
21   depends on the situation. I think very
22   often I would agree that human trials
23   are needed, but there are situations in
24   which you can't do human trials. So,
25   for example, with tobacco, with tobacco

19 (Pages 73 to 76)

Kurzer, Ph.D. - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

---

77

1    effects, it wouldn't be considered
2    ethical to have two groups one of which
3    smokes -- one which you give cigarettes
4    to and the other one you don't.
5           Or cancer trials.  It would not
6    be considered ethical to take two
7    groups of people, give one group cancer
8    and the other group no and then see
9    what happens.
10          So there are situations in which
11   it's either not ethical, not feasible
12   too expensive.  And, frankly, I think
13   that because of the expense of clinical
14   trials of -- especially the very big
15   clinical trials, they're going to be
16   funded less and less.  And, in fact,
17   in -- when you look at NIH funding,
18   they have been funded less and less,
19   and there's more and more research
20   going into developing animal models and
21   alternative models to working with
22   humans because they're so impractical
23   and -- and difficult and expensive to
24   do.
25          MR. WONE:  Well, we certainly

---

78

1    don't want to give cancer or heart
2    attacks to anyone.
3           Okay.  I think we can take a
4    break here, if that's fine with you,
5    Jaclyn.
6           MS. METZINGER:  Sure, that would
7    be great.
8           MR. WONE:  Okay.  We'll go off
9    the record.
10          THE VIDEOGRAPHER:  We are going
11   off the record at 10:09 A.M.
12          (Off the record from 10:09 until
13   10:28.)
14          THE VIDEOGRAPHER:  We are going
15   back on the record at 10:28 A.M.
16   BY MR. WONE:
17      Q.    Hello, Mr. Kurzer.
18      A.    Hello.
19      Q.    I just wanted to go back to
20   something we had talked about before the break.
21   Is it possible to have an RCT investigating
22   whether a dietary supplement causes change in
23   memory in humans?
24          MS. METZINGER:  Objection to
25   form.

---

79

1           THE WITNESS:  Yes, it is.
2    BY MR. WONE:
3      Q.    When were you retained by the
4    defendants as an expert, Dr. Kurzer?
5      A.    I'm not sure how to answer that.
6    I've been retained for over the course of a number
7    of years because there have been various cases
8    dealing with this issue.  So my original -- I was
9    retained originally probably about maybe five to
10   seven years ago.  I don't know exactly.  I'd have
11   to look it up to see.
12      Q.    And when you were retained five
13   to seven years ago, was it in connection with this
14   case or something else?
15      A.    In connection with -- with -- I
16   guess I'm -- not being a lawyer, I'm not sure how
17   specific about the case that you want to be there.
18   There's been some litigation.  There's been -- I
19   have met with the FTC about this previously.  I
20   met with some commissioners previously maybe
21   for -- or a few year -- two to three years ago, I
22   think, so -- so there have been -- it's all been
23   related to the same issues but in different
24   contexts as far as the litigation goes.
25      Q.    Have you ever done any work for

---

80

1    any of the defendants that was not related to
2    litigation?
3           MS. METZINGER:  Objection to
4    form.
5           THE WITNESS:  I'm not sure how
6    to answer that.  I -- I don't believe
7    that I have.  But, again, I don't
8    understand the technical legal terms,
9    so I'm not exactly sure what the answer
10   to that is.
11   BY MR. WONE:
12      Q.    Have you ever done any research
13   for the defendants?
14      A.    Yes.
15      Q.    What kinds of research?
16      A.    I've done literature reviews as
17   summarized in the report that I've written.
18      Q.    Any other kind of research?
19          MS. METZINGER:  Objection to
20   form.
21          THE WITNESS:  I believe that all
22   of my research is summarized in the
23   report.
24   BY MR. WONE:
25      Q.    Have you ever had any

---

20 (Pages 77 to 80)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                         9/29/2021

---

81

1    communications with any other experts that have
2    been retained by defendants in this case?
3         A.   I have not.
4         Q.   Did you review any of the
5    reports by any of the other defendants' experts?
6         A.   Yes, I have.
7         Q.   Do you recall which reports
8    you've reviewed?
9         A.   I reviewed, I believe, all of
10   the other reports, Dr. Goodman, Dr. Schwartz, I
11   think. I can't -- I've read the FTC reports and
12   the -- the defendants' reports. And so I'm not
13   recalling offhand whose name is which.
14        Q.   Okay.
15        A.   But I believe I've read them
16   all.
17        Q.   Okay. Aside from attorneys
18   representing the defendants, have you ever had
19   communications with any other person relating to
20   your work in this case?
21        A.   No, I have not.
22             MS. METZINGER:  Your audio is
23        not coming through, Mr. Wone.
24             MR. WONE:  Okay.
25

---

82

1    BY MR. WONE:
2         Q.   Have you ever interacted with
3    anyone affiliated with Quincy Bioscience?
4              MS. METZINGER:  Objection to
5         form.
6              THE WITNESS:  I don't believe I
7         have. It's possible that someone from
8         Quincy was at the FTC meeting. I don't
9         recall. But that would have been the
10        only interaction, was at that meeting.
11        I have not had other interactions.
12   BY MR. WONE:
13        Q.   And does your report, what's
14   been marked as Exhibit MK1, contain a complete
15   statement of all of the opinions you're offering
16   in this case?
17             MS. METZINGER:  Objection.
18             THE WITNESS:  Yes. All of the
19        opinions that I was asked to offer at
20        the time that I wrote my report are
21        present. I may have other opinions in
22        addition to that that aren't in the
23        report.
24   BY MR. WONE:
25        Q.   Did anyone assist you in writing

---

83

1    the report?
2         A.   No. I wrote the report myself.
3         Q.   And the other opinions that you
4    have you mention that were not in the report, are
5    they opinions that you intend to offer that are
6    going to be offered in this case by defendants?
7              MS. METZINGER:  Objection.
8              THE WITNESS:  They would be
9         opinions that I would offer if I'm
10        asked a question related to them. If
11        I'm asked a question related to
12        something that's not in my report, I
13        will offer the opinion.
14   BY MR. WONE:
15        Q.   In connection with your work in
16   this case, did you review any advertising for
17   Prevagen?
18        A.   I did, yes.
19        Q.   Do you recall which ads you
20   reviewed?
21        A.   I recall reviewing the -- the
22   label in particular. And that's the main thing I
23   can recall right now. I may have reviewed other
24   things, so you may have some documents that if
25   you'd like me to look at them, I can -- I can look

---

84

1    at them.
2         Q.   Okay. Have you ever been
3    involved in the marketing of Prevagen?
4         A.   I have not, no.
5              MS. METZINGER:  Objection to
6         form.
7    BY MR. WONE:
8         Q.   Do you consider yourself an
9    expert in marketing?
10        A.   No, I do not.
11        Q.   Do you consider yourself an
12   expert in advertising?
13        A.   No, I do not.
14        Q.   If you'd please go to
15   paragraph 8 of your report which has been marked
16   as Exhibit MK1.
17        A.   Yes, I see that right here,
18   paragraph 8.
19        Q.   And does paragraph 8 identify
20   the claims for Prevagen that you evaluated in this
21   case?
22        A.   Yes.
23        Q.   And in paragraph 9, you state
24   that the defendants provided you with a definition
25   of competent and reliable scientific evidence,

---

21 (Pages 81 to 84)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                              9/29/2021

85

1   correct?
2       A.   Yes.
3       Q.   Aside from this litigation, is
4   that definition, a competent and reliable
5   scientific evidence, something you use to
6   determine about -- in other -- sorry.  Strike
7   that.
8            Aside from this litigation, have
9   you ever used the definition of competent and
10  reliable scientific evidence?
11           MS. METZINGER:  Objection to
12      form.
13           THE WITNESS:  I have used that
14      in other situations in which I've
15      written expert reports.
16  BY MR. WONE:
17      Q.   Have you ever used that
18  definition, "a competent and reliable scientific
19  evidence," outside of the litigation context?
20      A.   No, I have not.
21           MS. METZINGER:  Objection to
22      form.
23  BY MR. WONE:
24      Q.   Instead of the definition of
25  competent and reliable scientific evidence in

86

1   paragraph 9 of your report, if I said the human --
2   that competent and reliable scientific evidence
3   meant human clinical testing that was randomized,
4   double-blinded and placebo-controlled conducted by
5   qualified researchers, would it still be your
6   opinion that the claims are supported by confident
7   and reliable scientific evidence?
8            MS. METZINGER:  Objection to
9       form.
10           THE WITNESS:  Could you repeat
11      that question, please, Mr. Wone?
12           (Reporter read back requested
13      material.)
14           MS. METZINGER:  Note the
15      objection again.
16           THE WITNESS:  I'm not
17      comfortable answering that question
18      because you're creating a hypothetical
19      that doesn't exist.  So if you'd like
20      to ask that question in another way,
21      you know, that -- that isn't quite so
22      hypothetical, I'd be happy to answer
23      it.
24  BY MR. WONE:
25      Q.   I'm going to refer to the claims

87

1   that you listed in paragraph 8 as the "challenged
2   claims," which is the abbreviation that you used.
3   Okay?
4       A.   Yes.
5       Q.   Do you believe there's human
6   clinical testing that was randomized,
7   double-blinded placebo-controlled and conducted by
8   qualified researchers to support the challenged
9   claims?
10           MS. METZINGER:  Objection to
11      form.
12           THE WITNESS:  Yes, I do.
13  BY MR. WONE:
14      Q.   If you could please go to
15  paragraph 10, Doctor.  It's on the next page,
16  page 3 of your --
17           MR. de LEEUW:  You have to keep
18      your voice up.  You have to keep your
19      voice up.  I don't know if you can
20      adjust your microphone, but --
21           MR. WONE:  Sure.
22           MR. de LEEUW:  -- sometimes you
23      fade out.
24           MR. WONE:  I'll try to move it
25      closer.

88

1   BY MR. WONE:
2       Q.   Paragraph 10 of your report --
3       A.   Yes.
4       Q.   -- MK1 --
5       A.   Yes.
6       Q.   -- you state in this -- in this
7   paragraph that you conducted a literature search
8   on the general topic of cognitive function as well
9   as the affects of apoaequorin/Prevagen and vitamin
10  D3 on brain function and memory.
11           Do you see that?
12      A.   Yes, I do.
13      Q.   So the first search you -- if
14  I'm understanding right, was the first search you
15  did on the general topic of cognitive function?
16      A.   That's correct.
17      Q.   And how did you perform this
18  literature search?
19      A.   I used a database at the
20  University of Minnesota in which I put in keywords
21  related to cognitive function, dementia, mild
22  cognitive function, Alzheimer's disease, et
23  cetera, and looked at papers related to that in
24  order to provide a background and context for the
25  report.

22 (Pages 85 to 88)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

---

89

1    Q.    Was "memory" one of the search
2  terms you used?
3    A.    Yes.
4    Q.    Do you recall the name of the
5  database?
6    A.    The database I usually use is
7  Ovid, O-V-I-D.  Very similar to PubMed.
8    Q.    And did anyone assist you with
9  your literature search?
10   A.    No.
11   Q.    And did you review all of the
12 results from your search?
13   A.    Yes, I did.  I reviewed the
14 relevant results, right?  So I might have gotten
15 hundreds of papers, and I reviewed the ones that
16 were the most relevant to what I was writing.
17   Q.    And did your search terms
18 include cognitive decline?
19   A.    I don't recall, but I think
20 probably had, cognitive function, memory,
21 dementia.  I may have had cognitive decline in
22 there, but it would have been picked up by the
23 other words.
24   Q.    And your second search was on
25 the effects of apoaequorin/Prevagen?

---

90

1    A.    Yes.
2    Q.    Okay.  And how did you conduct
3  this literature search?
4    A.    Using the term "apoaequorin,"
5  seeing -- seeing what else is out there in the
6  literature.
7    Q.    And did you use the same -- the
8  same database, Ovid?
9    A.    Yes.
10   Q.    Were there any other search
11 terms besides apoaequorin?
12   A.    You know, I -- I don't have a
13 record in front of me of what search terms I used,
14 but I probably used apoaequorin, brain, memory,
15 cognitive function, et cetera.
16   Q.    And did anyone assist you with
17 this literature search?
18   A.    No.
19   Q.    And did you review all of the
20 articles that you believed to be relevant?
21   A.    Yes.
22   Q.    And how about your search for
23 vitamin D?  What search term did you use for that?
24   A.    Vitamin D and then various forms
25 of vitamin D.  I would have put in there brain,

---

91

1  memory, cognitive function, Alzheimer's, dementia.
2  Those kinds of terms would have been in there.
3    Q.    And it was also done -- the
4  vitamin D search was also with the same
5  database, Ovid?
6    A.    Yes.
7    Q.    And did anyone assist you with
8  the vitamin D --
9    A.    No.
10   Q.    -- literature search?
11   A.    Nobody assisted me, no.
12   Q.    And did you review all of the
13 results from the vitamin D -- vitamin D literature
14 search that you believed to be relevant?
15   A.    Yes.
16   Q.    And do you know whether the
17 vitamin D literature search included cognitive
18 decline?
19   A.    It probably did, but I'm sure
20 that I used "mild cognitive impairment" as a
21 search term and "cognitive function" and "memory."
22 Those would have all picked up a paper on
23 cognitive decline.
24   Q.    You previously stated that you
25 don't consider yourself to be an expert in

---

92

1  cognitive function.  How do you know that the
2  studies you found in your literature search
3  represent the current view among experts in
4  cognitive function?
5    MS. METZINGER:  Objection to
6  form.
7    THE WITNESS:  The way that I
8  know is that I'm a very, very
9  well-trained, experienced scientist,
10 and I'm able to evaluate data outside
11 of my area of expertise.  I often have
12 to do this for grant applications, for
13 writing up of publications, et cetera.
14 I never have the luxury of just staying
15 within a very narrow area.
16   And so I explained before that
17 one of the things that I have taught in
18 my career is I've taught students how
19 to interpret data, how to interpret
20 papers.  They aren't necessarily
21 published in the exact area of
22 expertise of the person who is reading
23 them.  So a person who is experienced
24 at clinical trials, for example, has to
25 be able to interpret and understand

---

23 (Pages 89 to 92)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

93

1    animal studies and in vitro studies
2    even though that may not be where they
3    put most of their time and energy in
4    their own work.  It is basic
5    understanding of science.
6        I also understand how to
7    evaluate the quality of journals, the
8    quality of authors of journals, and the
9    quality of -- of papers from the study
10   design, et cetera.
11       So I believe that I am very
12   qualified to evaluate the current
13   understanding about cognitive function
14   despite the fact that I don't have a
15   Ph.D. in a related science.
16   BY MR. WONE:
17       Q.    Did anyone assist you in
18   analyzing the results of your literature search?
19       A.    No.
20       Q.    If you could turn to page 37 of
21   your expert report which we marked as Exhibit MK1,
22   please.  And when I say "page 37," I'm referring
23   to the pages that are printed at the bottom of the
24   document, not the page number in the -- in the
25   AgileLaw viewer.

94

1        A.    Okay.  Yes.
2        Q.    And is page 37 the first page of
3    your bibliography of your report?
4        A.    It is, yes.
5        Q.    Does this bibliography contain
6    sources that you found through your literature
7    search?
8        A.    Yes, it does.
9        Q.    Aside from documents related to
10   the Madison Memory Study, did you include any
11   other documents on your -- in your bibliography
12   that did not come from your literature search?
13       A.    I included some of my own
14   publications as references to comments that I made
15   about my experience in my introduction to my -- in
16   my introductory paragraphs.
17       Q.    Okay.  Anything else?
18       A.    I don't believe so.  Well, I may
19   have -- no, I believe that this is all from my
20   literature search.  I think that I may have
21   been -- I may have been provided with some
22   unpublished papers by the attorneys representing
23   the defendant, but I don't recall if I referenced
24   them in the bibliography.
25       Q.    Did you rely on those

95

1    unpublished papers as the basis for any of the
2    opinions in your report?
3        A.    The only unpublished paper that
4    I relied on was the reanalysis of the Madison
5    Memory Study data because the publication
6    evidently had some errors in the data analysis,
7    and so it was redone.  And there was a subsequent
8    paper written which I did rely on because I wanted
9    to use the most current, accurate results.
10       Q.    Okay.  And do you recall what
11   the errors were in the original publication?
12       A.    You know, I don't recall.  There
13   were some statistical errors, I believe, and so I
14   didn't really go into great detail with the
15   attorneys about exactly what they were, but that
16   they -- but that I -- I did trust that when they
17   gave me the reanalyzed data, that that was
18   accurate.
19       Q.    So the opinions about the
20   Madison Memory Study in your report are based on
21   the Lerner reanalysis?
22       A.    Yes.
23       Q.    And to clarify, I don't know if
24   we covered it, when I said "Lerner," do you know
25   who that is?

96

1        A.    I believe it's Kenneth Lerner,
2    the author of the papers, yes.
3        Q.    Okay.
4        A.    I know the name.
5        Q.    Okay.  And he was the -- he was
6    the principal investigator for the reanalysis,
7    correct?
8        A.    Yes.
9            MS. METZINGER:  Objection to
10   form.
11   BY MR. WONE:
12       Q.    Okay.  If we could turn to
13   section 4 of your report, please, Exhibit MK1.
14       A.    What page would that be?
15       Q.    If you'll give me second, I will
16   let you know.
17       I believe it starts on page 4 of
18   your report.
19       A.    Okay.  I see it.
20       Q.    Section 4 titled "Cognitive
21   Function and Its Measurement"?
22       A.    Yes.
23       Q.    Are the opinions expressed in
24   this section based on the results of your
25   literature search?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

---

97

1      A.    Yes.
2      Q.    Are they based on any other
3  experiences you've had in your career?
4      A.    No.  They're based on the
5  literature search.
6      Q.    And that's all on Section 4,
7  correct?
8      A.    Excuse me?  Can you repeat that?
9      Q.    The -- all -- when you said it's
10  based on your literature search, you're referring
11  to all of Section 4, correct?
12      A.    Yes.  Let me look at the...
13          Yes.
14      Q.    Okay.  How about Section 5 of
15  your report?  It's on page 6.  Is Section 5 also
16  based solely on your literature search?
17      A.    Yes, it is.
18      Q.    In paragraph 28 of Exhibit MK1,
19  also on page 6, do you see a mention of the
20  Cogstate?
21      A.    Yes.
22      Q.    And what is your understanding
23  of what Cogstate is?
24      A.    Cogstate is a group of tests
25  that test various aspects of cognitive function.

---

98

1  And my understanding is that it's been validated
2  and that it is listed in the NIH database of
3  acceptable cognitive testing techniques.
4      Q.    Have you ever used the Cogstate
5  in any of your research?
6      A.    No, I have not.
7      Q.    Have you ever reviewed any
8  journal articles -- strike that.
9          Aside from this case, have you
10  ever reviewed any journal articles that used the
11  Cogstate?
12      A.    Not in great detail.  I did -- I
13  remember looking at the literature to get a feel
14  for when Cogstate has been used in other
15  situations to make sure that I was confident that
16  this is something that's been used in other -- in
17  other published papers, and I did find that it had
18  been used.  So that was not something that I --
19  that I cited in the -- in the report, but I
20  remember that I did look into that.
21      Q.    Okay.  So did you also do a
22  literature search on Cogstate?
23      A.    I believe that I did, yes, for
24  just for that purpose.  It was really just to get
25  a feel for the -- whether or not it had been used

---

99

1  in other situations.  I wanted to make sure of
2  that.
3      Q.    Okay.  And did anyone assist you
4  in the literature search regarding Cogstate?
5      A.    No.
6      Q.    If you could go down to
7  paragraph 30 of your expert report.
8      A.    Yes.
9      Q.    The first paragraph of
10  Section 6.
11      A.    Yes.
12      Q.    And do you see the first
13  sentence were you're just starting with "both in
14  vitro"?
15      A.    Yes, I see that sentence.
16      Q.    And so in reviewing the evidence
17  in this case, you reviewed in vitro studies
18  related -- involving apoaequorin, correct?
19      A.    Yes.
20      Q.    And would any of the in vitro
21  studies that you reviewed show that Prevagen
22  improves memory in humans?
23      A.    No, there would not be that
24  direct connection.  What the in vitro studies show
25  was that apoaequorin is neuro protective in a --

---

100

1  in a situation in which the tissue has been
2  removed.  So it's not in a living human.  It's in
3  tissue in a cell culture model.
4      Q.    And do you know whether the --
5  sorry.  Strike that.
6          The tissue that was used in the
7  in vitro studies was not human tissue, correct?
8      A.    I think that it -- that is
9  correct, but I'd have to see the paper because I
10  have -- you know, I have 150 or 160 references
11  here, so I'd have to -- if you want to show me the
12  paper, I can look at it.  But my recollection is
13  that it was not human brain tissue.
14      Q.    Okay.
15      A.    But I'm not certain of that.
16      Q.    Okay.  I'm showing you what's
17  been marked as Exhibit MK2.
18          (Marked Exhibit MK2.)
19  BY MR. WONE:
20      Q.    Do you see that, Dr. Kurzer?
21      A.    Okay.  I'm sorry.  MK2.  Yes.
22      Q.    Is that the -- is that the
23  research article you were citing to when you
24  discussed in vitro studies?
25      A.    Yes, it is.

---

25 (Pages 97 to 100)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

101

1      Q.    And did the research in
2    Exhibit MK2 involve human cells?
3         A.   No.  It was a rat brain slice
4    preparation.
5         Q.    And do you agree that the
6    effects seen in the study in a rat brain cell may
7    not be the same in a human cell?
8              MS. METZINGER:  Objection to
9         form.
10             THE WITNESS:  I would say that
11        the rat results may be the same in a
12        human or may not be.  We don't know.
13   BY MR. WONE:
14        Q.    Okay.  Going back to -- if you
15   could go back to Exhibit MK1.
16        A.   Yes.
17        Q.    Paragraph 30 again.
18        A.   Okay.
19        Q.    Do you see in that paragraph you
20   mention animal studies?
21        A.   Yes.
22        Q.    Do you agree that the animal
23   studies cited in paragraph 30 do not show that
24   Prevagen improves memory in humans?
25             MS. METZINGER:  Objection to

102

1         form.
2              THE WITNESS:  I would -- I would
3         say that the animal -- the canine
4         studies prove that Prevagen exerts this
5         function in canines.  And in this
6         situation, I would trust the data to
7         apply to humans quite a bit more than
8         with rats because canines are
9         considered an excellent model for human
10        brain function.
11             The structure of the brain in
12        canines is very similar.  Canines
13        experience age-related cognitive
14        decline.  Canines have a lot of human
15        behavioral characteristics.  And, in
16        fact, human drugs are used in canines.
17        For example, antidepressants.  Prozac
18        is used in canines successfully.
19             So canine -- the canines brain
20        is thought to be an excellent model for
21        the human brain.  And so in this case,
22        although it is not -- you could not
23        conclude -- conclusively say that these
24        results show that the same thing would
25        occur in humans, I do believe that the

103

1         data are very, very strongly suggestive
2         because the model is so close to the
3         human brain.
4    BY MR. WONE:
5         Q.    What do you mean when you say
6    "strongly suggestive"?
7         A.   That's a very -- it's -- that's
8    kind of a subjective comment.  What I mean is that
9    I would expect that these results would be
10   confirmed in human studies.  I would expect that
11   to be the case.  In the case of rat studies, in my
12   opinion, it could go either way.  But in this
13   situation, because of these results and because of
14   the similarity of brain function and structure
15   between canines and humans, I would expect that
16   the same thing would occur in humans.
17        Q.    Do you agree that humans are not
18   biologically identical to canines?
19             MS. METZINGER:  Objection to
20        form.
21             THE WITNESS:  I do agree that
22        humans are not biologically identical
23        to canines.  I also agree that humans
24        are not biologically identical to each
25        other.  There's a certain amount of

104

1         variability even between humans.
2              But, yes, of course canines and
3         humans are not biologically identical,
4         but the genetic makeup, as I'm sure you
5         know, of -- of canines and humans are
6         large -- have an enormous amount of
7         overlap.
8    BY MR. WONE:
9         Q.    And do you know whether we
10   would -- whether the effects seen in the Milgram
11   study would happen in humans over the same
12   duration and dose?
13             MS. METZINGER:  Objection to
14        form.
15             THE WITNESS:  Can you repeat
16        your question, please, Mr. Wone?
17   BY MR. WONE:
18        Q.   Sure.
19             Do you know whether the effect
20   that was seen in the Milgram study would happen in
21   humans when you -- considering the same duration
22   and dose?
23        A.   I do not know that for certain.
24   I would expect that to be the case, but I
25   certainly did not know that for certain because

26 (Pages 101 to 104)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

---

105

1   the study was done in canines.
2           Q.    I've marked and introduced
3   what's been labeled as Exhibit MK3.
4           (Marked Exhibit MK3.)
5   BY MR. WONE:
6           Q.    Do you see that, Doctor?
7       A.   I do.
8           Q.    And is this one of the documents
9   you analyzed for your report?
10      A.   Yes, it is.
11          Q.    And is this the Lerner
12  reanalysis that we discussed earlier?
13      A.   Yes, it is.
14          Q.    I've marked another document
15  which has been labeled as Exhibit MK4.
16          (Marked Exhibit MK4.)
17  BY MR. WONE:
18          Q.    Do you see that, Doctor?
19      A.   Yes, I do.
20          Q.    And is this another document
21  that you reviewed in connection with the -- in
22  connection with your report?
23      A.   Yes, it is.
24          Q.    And is Exhibit 4, MK4, the
25  analysis that you said had errors?

---

106

1       A.   Yes, it is.  I was told that.
2           Q.    You were told that by the -- by
3   the defendants' attorneys?
4       A.   Yes.
5           MS. METZINGER:  Objection to
6   form.
7           And, Dr. Kurzer, I would just
8   caution you not to divulge the
9   substance of any communications that
10  you've had with counsel.
11          THE WITNESS:  Thank you.
12  BY MR. WONE:
13          Q.    If you would go to paragraph 33
14  of your report, please, Exhibit MK1.
15      A.   Yes.
16          Q.    In the first sentence, you
17  wrote, "After initial publication in the Madison
18  Memory Study results, it was discovered that
19  transformation and dataset errors had been made in
20  the data analyses."
21          Do you see that, Doctor?
22      A.   Yes.
23          Q.    And that's your understanding
24  of -- of the errors that were in Exhibit --
25      A.   Yes.

---

107

1           Q.    -- MK4?
2       A.   That's correct.
3           Q.    You mentioned that the
4   reanalysis was done by Georgetown Economic
5   Services in paragraph 33.  Do you see that?
6       A.   Yes.
7           Q.    And were you involved in any way
8   in this reanalysis?
9       A.   I was not.
10          Q.    Have you ever had any
11  interactions with anyone affiliated with
12  Georgetown Economic Services?
13          MS. METZINGER:  Objection.
14          Dr. Kurzer, again, I would
15  caution you not to divulge the
16  substance of any communications that
17  you may have had with Georgetown
18  Economic Services to the extent that
19  counsel may have been involved in those
20  communications.
21          THE WITNESS:  Okay.
22          Best that I don't answer the
23  question, I guess.
24  BY MR. WONE:
25          Q.    Well, I'm not asking for the

---

108

1   substance of the communications.  I'm just asking
2   now whether you've had any interactions with
3   anyone affiliated with Georgetown Economic
4   Services.
5       A.   You know, actually, honestly, I
6   don't recall.  I may have, but I don't recall.
7           Q.    Have you ever had any
8   interactions with someone named Howard Beales in
9   connection with your work in this case?
10      A.   What's the name?
11          Q.    Howard Beales.
12      A.   Howard Bealed.  I don't believe
13  so.
14          Q.    Beales.
15      A.   Spelled, please.
16          Q.    B-E-A-L-E-S.
17      A.   Beales.  I don't believe so.
18          Q.    And were you involved in any way
19  with the Madison Memory Study?
20      A.   I was not.
21          MS. METZINGER:  Objection to
22  form.
23  BY MR. WONE:
24          Q.    Have you ever spoken with anyone
25  who was involved with conducting the Madison

---

27 (Pages 105 to 108)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

---

109

1    Memory Study?
2         A.   I don't believe I have.
3         Q.   Have you ever had any
4    interactions with anyone involved in analyzing
5    data from the Madison Memory Study?
6              MS. METZINGER:  Objection to
7         form.
8              And, again, Dr. Kurzer, I would
9         just caution you not to divulge the
10        substance of any communications that
11        you have had with counsel.  If you can
12        answer Mr. Wone's question without
13        doing so, you're free to answer the
14        question.
15             THE WITNESS:  Okay.
16             Mr. Wone, can you repeat the
17        question, please?
18   BY MR. WONE:
19        Q.   Sure.
20             Have you ever had any
21   interactions with anyone who was involved in
22   analyzing the Madison Memory Study data?
23        A.   I don't believe so.
24        Q.   Okay.  I'm introducing what has
25   been marked as Exhibit MK5.

---

110

1              (Marked Exhibit MK5.)
2              THE WITNESS:  Yes.
3    BY MR. WONE:
4         Q.   Do you see that, Dr. Kurzer?
5         A.   I do.
6         Q.   And have you seen this document
7    before?
8         A.   I have.
9         Q.   And could you describe what
10   Exhibit MK5 is?
11        A.   MK5 is a protocol, I believe,
12   for the Madison Memory Study.
13        Q.   And who is listed as the
14   principal investigator for the Madison Memory
15   Study?
16        A.   KC Lerner is listed.
17        Q.   And based on this protocol, what
18   was the Madison Memory Study's population?
19             MS. METZINGER:  Objection to
20        form.
21             THE WITNESS:  The study
22        population on this protocol is adults
23        between the ages of 40 and 95, 100
24        adults between the ages of 40 and 95.
25

---

111

1    BY MR. WONE:
2         Q.   I'm sorry.  I missed it.  What
3    was the last part of your response, Dr. Kurzer?
4         A.   100 adults between the ages of
5    40 and 95.
6         Q.   Thank you.
7              When the Madison Memory Study
8    was conducted, do you know how many participants
9    were in the study?
10        A.   I believe they recruited over
11   200 people.
12        Q.   In your experience, is it common
13   to recruit more than double the population for a
14   given study?
15             MS. METZINGER:  Objection to
16        form.
17             THE WITNESS:  I don't believe
18        it's common, but I believe that it does
19        happen.  There are many reasons why
20        investigators might want to do so.
21   BY MR. WONE:
22        Q.   And do you know why the -- why
23   the investigators in the Madison Memory Study
24   recruited over 200 participants?
25        A.   I don't know their reason.

---

112

1         Q.   ████████████████████████
2    █████████████████████████████████████████
3              MS. METZINGER:  Objection to
4         form.
5              THE WITNESS:  ███████████
6    ██████████████████████████████████
7
8    BY MR. WONE:
9         Q.   And what did -- sorry.  Strike
10   that.
11   ██████████████████████████████████████
12   ██████████████████████████████████████
13   ██████████████████████████████████████
14        A.   ████████████████████
15   ██████████████████████████████████████
16   ██████████████████████████████████████
17        Q.   ████████████████
18   specific Cogstate measures to be used?
19        A.   No, it doesn't.
20        Q.   In your experience, is it good
21   methodological practice to not identify the
22   specific measures to be used in a study in the
23   protocol?
24             MS. METZINGER:  Objection to
25        form.

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                     9/29/2021

---

113

1       THE WITNESS: I don't think that
2   it's -- I can't really comment on that.
3   I think there were many reasons -- and
4   there are many situations in which
5   investigators will speak more generally
6   in a protocol rather than very
7   specifically.
8       So, for example, I could imagine
9   writing up a protocol in which I say
10  that I'm going to be measuring estrogen
11  metabolites without listing the exact
12  ones that I'm going to be measuring.
13  So I don't think it's -- it is good
14  practice or bad practice. I think it
15  is practice that I've seen before.
16  BY MR. WONE:
17      Q.   In the protocols you worked on,
18  have you had protocols where you didn't list --
19  didn't identify the primary efficacy variables?
20      MS. METZINGER: Objection to
21  form.
22      THE WITNESS: No, I would say
23  that I have identified the primary
24  efficacy variables, but there are
25  degrees of detail that I may or may not

---

114

1   have gone into in describing them.
2   BY MR. WONE:
3       Q.   And is that because when you're
4   drafting your protocols you -- you always have
5   page limitations?
6       A.   It's page limitations. Also the
7   methodology that I'm using. I might not be
8   certain which of them I'm going to be able to
9   analyze, you know, chemically what's going to be
10  practical, et cetera. And so there are various
11  reasons why I might not go into as much detail.
12      And some protocols would -- you
13  know, in some situations if I'm writing a protocol
14  for an organization like NIH, they might have
15  certain requirements of their own regarding the
16  detail. But I wouldn't say that it is broadly
17  accepted that every protocol has to go into a
18  certain amount of detail. There's variability in
19  that, and that's accepted, widely accepted.
20      Q.   When you say "widely accepted,"
21  you mean -- what do you mean? By who?
22      A.   I mean, I see it all the time in
23  -- in scientific in -- in grants that I've reviewed,
24  in -- in papers that are -- that are reporting on
25  protocols on study design where they -- the whole

---

115

1   paper is describing the study design. They may or
2   may not go into great detail. Of course in the
3   results, they then will list exactly what they
4   were evaluating. But in the message section,
5   they -- there are variations in the amount of
6   detail that people go into.
7       Q.   Do you know whether the
8   investigators in the Madison Memory Study had any
9   space limitations in drafting their protocol?
10      A.   I do not know.
11      Q.   Do you know which Cogstate
12  measures were used in the Madison Memory Study?
13      A.   I -- I don't -- I know that
14  there were eight or nine different -- different
15  measures, and I'd have to look at the paper to be
16  able to name them all. But I -- you know, I did
17  look at them very closely.
18      Q.   So if you'd like to refer back
19  to Exhibit MK3.
20      A.   Okay.
21      Q.   Does Exhibit MK3 identify the
22  Cogstate measures that you believe --
23      A.   Yes.
24      Q.   -- were used in the Madison
25  Memory Study?

---

116

1       A.   Yes, it does. In table 1, it
2   lists nine different tests that were used.
3       Q.   And do you know whether there
4   are any other Cogstate measures that were used in
5   the Madison Memory Study that are not included in
6   table 1?
7       A.   I don't recall.
8       Q.   In table 1 of Exhibit MK3,
9   there's two columns, correct?
10      A.   Yes.
11      Q.   One labeled "Task," the other
12  one labeled "Cognitive Domain Measured"?
13      A.   Yes.
14      Q.   Is it your understanding that
15  the column under Cognitive Domain Measured
16  identifies which domain corresponds to a specific
17  task?
18      A.   Yes, I -- that's my
19  understanding.
20      I also understand that there's
21  tremendous overlap among these, that they're not
22  entirely discrete. Discrete memory is not
23  entirely independent and separate from executive
24  function. Verbal learning obviously requires
25  memory. So there's tremendous overlap among

---

29 (Pages 113 to 116)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

117

1    these, but I do agree and understand that they are
2    thought to represent primarily these particular
3    cognitive domains.
4        Q.    And is it your understanding --
5    what is your understanding that they're not --
6    that the cognitive domains are not discrete based
7    on?
8            MS. METZINGER:  Objection to
9    form.
10           THE WITNESS:  It's based on my
11   evaluation of the literature and
12   reading general papers that discuss
13   cognitive function and measurements of
14   cognitive function and what contributes
15   to memory and what factors contribute
16   to memory and what memory is important
17   for.
18        So in the background reading
19   that I -- that I did, which was
20   significant for this, it was very clear
21   that these are -- have enormous
22   overlap.  Plus, there are a number
23   of -- of studies and there are a number
24   of publications that state very clearly
25   that these measures are not

118

1    independent.
2    BY MR. WONE:
3        Q.    And you're referring back to
4    publications or information that you obtained from
5    your literature search that we --
6        A.    Yes.
7        Q.    -- discussed earlier?
8        A.    Yes.
9        Q.    If we could go back to
10   Exhibit MK5.
11       A.    Okay.
12       Q.    What is the investigational
13   product identified in Exhibit MK5?
14       A.    Well, the -- in the title, it
15   states Prevagen apoaequorin dietary supplement.
16       Q.    So Prevagen is the product being
17   studied in the Madison Memory Study?
18       A.    That's correct.  Yes, here we
19   go.  Prevagen 10 milligrams.
20       Q.    And did the protocol in
21   Exhibit MK5 discuss how the data from the study
22   would be analyzed?
23           MS. METZINGER:  Objection to
24   form.
25           THE WITNESS:  There is a brief

119

1        description of the statistical analysis
2        on page 5.
3    BY MR. WONE:
4        Q.    Did the protocol identify the
5    specific statistical test that would be used to
6    analyze the data?
7            MS. METZINGER:  Objection.
8            THE WITNESS:  It did not.
9    BY MR. WONE:
10       Q.    Did the protocol in Exhibit MK5
11   identify how the data would be analyzed?
12           MS. METZINGER:  Objection to
13   form.
14           THE WITNESS:  If you mean does
15   it describe the specific statistical
16   tests that will be used, it does not.
17   BY MR. WONE:
18       Q.    Did the protocol identify
19   whether the tests would be analyzed separately or
20   collectively?
21           MS. METZINGER:  Objection to
22   form.
23           THE WITNESS:  I don't believe
24   that it does.
25

120

1    BY MR. WONE:
2        Q.    ████████████████████
3    ████████████████████████████████████
4    ████████████████████████████████████
5    ████████████████████████████
6            MS. METZINGER:  Objection to
7    form.
8            THE WITNESS:  ████████████
9    ████████████████████████████
10   BY MR. WONE:
11       Q.    Do you know whether subgroups
12   were used in the Madison Memory Study?
13           MS. METZINGER:  Objection to
14   form.
15           THE WITNESS:  I don't believe
16   that subgroups were used in the sense
17   that they analyzed the group that they
18   were intending to analyze.  They -- the
19   intent of the study was to look at
20   healthy people, and so they analyzed
21   the AD 0-2 group, which was a group
22   that I focused on, because that was the
23   intent of the study.  So they
24   over-recruited.  And in the
25   recruitment, they included additional

30 (Pages 117 to 120)

Case 1:17-cv-00124-LLS   Document 259-9   Filed 06/16/22   Page 33 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

121

1    people.  But when they did the
2    statistical analysis, they did it on
3    the population which they were aiming
4    to study at the beginning of the study.
5  BY MR. WONE:
6        Q.    Were all of the participants in
7  the Madison Memory Study in the AD8 0-2 group?
8        A.    No, they were not.
9        Q.    And what is -- what do you mean
10  when you say "AD8"?
11       A.    That's the -- the -- the
12  Alzheimer's disease screening form which has eight
13  questions related to changes in memory over time.
14  And if there are eight questions and if someone
15  says yes to all eight saying that they've had
16  changes and problems with all eight areas of
17  memory, then that would be viewed -- an 8 or 7
18  would be viewed as, you know, severe dementia.
19              0-2 is viewed where you just
20  have nothing you answer yes to or maybe you answer
21  yes to one or two of the questions.  That would be
22  considered normal cognitive decline with aging or
23  possibly mild cognitive impairment.  But basically
24  healthy people would be in the -- in my opinion,
25  healthy people would be in the 0-2 on the AD8

122

1  form.
2        Q.    And prior to reviewing the
3  Madison Memory Study, were you familiar with the
4  AD8 tool?
5              MS. METZINGER:  Objection to
6  form.
7              THE WITNESS:  I was familiar
8  with it, yes.
9  BY MR. WONE:
10       Q.    Have you ever used the AD8 in
11  your own research?
12       A.    I have not.
13       Q.    How did you become familiar with
14  the AD8 tool?
15       A.    My mother had dementia, and so
16  I -- I learned about it in the context of her
17  clinical experience, just from my family personal
18  experience.
19       Q.    Okay.  Have you ever used the
20  AD8 tool in your professional work?
21       A.    I have not.
22       Q.    Is the AD8 tool mentioned in the
23  protocol that's in Exhibit MK5?
24       A.    It's not.
25       Q.



123

1
2
3        A.
4
5
6
7
8
9
10
11       Q.
12
13       A.
14
15
16
17       Q.    And would somebody who scored a
18  3 on the AD8 tool have significant neurological
19  disease?
20              MS. METZINGER:  Objection to
21  form.
22              THE WITNESS:  My understanding
23  is that the -- at the level of AD8 3,
24  it is the beginning of more severe
25  cognitive dysfunction.  Therefore, a

124

1  cutoff of 2 is the appropriate place to
2  differentiate healthy people from
3  people who are beginning to develop
4  more serious dementia and cognitive
5  dysfunction.
6  BY MR. WONE:
7        Q.    So if somebody is beginning to
8  develop, does that mean they have a history of
9  significant neurological disease?
10              MS. METZINGER:  Objection to
11  form.
12              THE WITNESS:  Yes, in the sense
13  that patient has a history, could be
14  synonymous with patient has existing
15  significant neurological disease.
16              So the history implies long in
17  the past, but my interpretation of this
18  is patient has a history of significant
19  neurological disease means we don't
20  want to recruit people with significant
21  neurological disease.  And history is
22  used often -- it's a medical term, and
23  it's often used in these protocols.
24  But what we mean is existing.
25

Kurzer, Ph.D. - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

125

1    BY MR. WONE:
2         Q.    And what is your basis for
3    the -- your interpretation of what significant
4    neurological disease means?
5         A.    Can you rephrase that question,
6    please, Mr. Wone?
7         Q.    Sure.
8              How do you know -- so you've
9    given me your interpretation of significant
10   neurological disease and what you think it means,
11   correct?
12             MS. METZINGER: Objection.
13             THE WITNESS: I don't have --
14   I'm not exactly sure what you're
15   asking. I understand that -- that AD8
16   0-2 is the categorization of people who
17   are generally healthy and that once you
18   get to 3 and above, you're moving into
19   the territory of people who have more
20   than normal aging cognitive decline and
21   more than mild cognitive decline. And
22   this I know from the reading that I've
23   done from the literature review.
24   BY MR. WONE:
25         Q.    And do you know whether the

126

1    investigators of the Madison Memory Study had the
2    same understanding of what significant
3    neurological disease means in Exhibit 5, MK5?
4         A.    I assume yes. I assume that
5    they had the same understanding. It seems to me
6    to be fairly obvious.
7         Q.    Did the protocol mention in
8    Exhibit MK5 -- sorry, strike that.
9              Did the protocol in Exhibit MK5
10   mention any interim analysis?
11        A.    I don't believe that it did, no.
12        Q.    And in your experiences
13   conducting RCTs, is an interim analysis something
14   you would include in a protocol?
15             MS. METZINGER: Objection to
16   form.
17             THE WITNESS: Not necessarily,
18   no. In fact -- in fact, in the green
19   tea trial that I did, the clinical
20   trial with a thousand participants who
21   consumed green tea for -- for a year,
22   green tea supplement for a year, we did
23   not state in the protocol that we were
24   going to do an interim analysis, but we
25   decided to, to do an interim analysis.

127

1              And in our case, it was to look for
2    adverse events, to make sure that there
3    weren't any adverse events. And so we
4    did do an interim analysis even though
5    it was not stated in the protocol. And
6    that was approved by the data safety
7    and monitoring board and it was
8    approved by NIH. It was not a problem
9    that it was not in the original
10   protocol.
11   BY MR. WONE:
12        Q.    And so you reported the interim
13   analysis to NIH when you --
14        A.    Yes.
15        Q.    Correct?
16        A.    Yes. Yes.
17        Q.    Do you know whether any interim
18   analysis was done in the Madison Memory Study?
19        A.    I believe that they did do some
20   interim analyses after -- possibly after 30 days
21   and 60 days in addition to the final reported
22   analysis on day 90.
23        Q.    And do you know whether those
24   interim analyses were related to safety or looking
25   for adverse events?

128

1         A.    I don't believe so. I believe
2    that they were looking for efficacy. And in many
3    clinical trials, that -- it's -- it's -- it's not
4    uncommon to do an interim analysis to look at
5    efficacy because in the case of very important
6    drug studies, for example, if something is found
7    to be efficacious partway through the study, they
8    might be so -- feel that this is such an important
9    finding that they feel like the study should be
10   stopped and the drug should be, you know, moved to
11   approval. So it's not unheard of to do interim
12   analyses for efficacy as well as for adverse
13   events.
14        Q.    And in those situations when the
15   interim analysis is performed, would it be later
16   discussed in the study report?
17             MS. METZINGER: Objection to
18   form.
19             THE WITNESS: Not necessarily.
20   In fact, we published -- for the green
21   tea trial, we published at least two
22   papers on adverse events, and I don't
23   believe that we talked about the
24   interim analysis in either one because
25   it was more of -- you know, it was not

32 (Pages 125 to 128)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Kurzer, Ph.D. - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

129

1    something that we felt was a primary
2    endpoint, and so it was not in the
3    final publication.
4    BY MR. WONE:
5         Q.    Could you explain that further?
6    What was not considered the primary endpoint?
7         A.    The interim -- the results of
8    the interim report.  So in the case of the green
9    tea trial where we did an interim analysis of
10   adverse events, we didn't feel that it was
11   necessary to put that interim analysis in the
12   final report because what was of most interest to
13   people reading the report are the final results.
14        Q.    And did you find any adverse
15   events in that green tea trial?
16        A.    We found minimal adverse events.
17   We found some, but not enough to -- to be viewed
18   as a problem by FDA or NIH.
19        Q.    Would you describe -- would you
20   agree that the results of the Madison Memory Study
21   were related to cognitive function?
22        A.    Yes.
23        Q.    And would you agree that those
24   results were the primary focus of the Madison
25   Memory Study?

130

1         A.    Yes.
2         Q.    And is it your -- is it your
3    understanding that the interim analysis looked at
4    efficacy related to cognitive function?
5              MS. METZINGER:  Objection to
6    form.
7              THE WITNESS:  I believe that
8         they did.  But I think that the primary
9         interest was what happened at the end
10        of the study.  So in the report, the
11        focus was on the end of the study.  And
12        I have done studies where I analyzed
13        endpoints during the study, but the
14        report focused on the end-of-study data
15        because that's what is of most
16        interest.  And when you write a
17        publication, you don't want to flood
18        the reader with so much stuff that it's
19        going to be difficult for them to get
20        the main gist of what you're trying to
21        say.
22             So there's a balance between
23        being -- being honest and having
24        integrity and presenting what you found
25        and at the same time not putting so

131

1    much stuff into the -- into the -- into
2    the report that it's really hard to
3    read and difficult to -- for the reader
4    to understand what the most important
5    thing is.
6    BY MR. WONE:
7         Q.    But you agree that the Madison
8    Memory Study's interim analysis related to the
9    primary interest of the study?
10        A.    Yes.  Oh, excuse me.  I'm sorry.
11   Can you repeat that question?  I'm not sure I
12   heard it correctly.
13             MR. WONE:  Could the court
14        reporter please read that back.
15             (Reporter read back requested
16        material.)
17             THE WITNESS:  I -- I need to --
18        to change my response on that.  I think
19        that it related to it in the sense that
20        it was focused on the same endpoints
21        of -- that -- that reflect cognitive
22        function.  But I don't think that the
23        30-day or 60-day endpoints were the
24        primary interest for the reader.  I
25        think that the 90-day end of study

132

1         endpoint would be the primary interest.
2    BY MR. WONE:
3         Q.    Did the protocol mentioned in
4    Exhibit MK5 state whether the Madison Memory Study
5    was blinded?
6         A.    Yes, it said it was blinded.
7         Q.    And did the protocol in
8    Exhibit MK5 describe how the blinding was done?
9         A.    No, it did not describe it.  And
10   I would be surprised if it did.  It's -- it's not
11   common for researchers to put in the protocol
12   exactly what the mechanism of blinding is going to
13   be.  You know, there are many, many methods of
14   blinding, and I'm not familiar -- I think that
15   it's -- it's more detail than is of interest to
16   most either reviewers or -- or, you know, grant
17   reviewers, manuscript reviewers, et cetera.  It's
18   not usually put in.  That's -- that's -- that's
19   drilling down very, very into the weeds, in my
20   opinion.
21        Q.    Okay.  Going back to the AD8 for
22   a moment, do you know how the AD8 was administered
23   in the Madison Memory Study?
24        A.    The AD8 was administered to the
25   prospective participants.

33 (Pages 129 to 132)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

133

1          Q.    And did the participants
2  complete the AD8 tool themselves?
3          A.    I believe that they did, yes.
4          Q.    Do you agree that it's
5  preferable to have the AD8 administered with an
6  informant?
7              MS. METZINGER:  Objection --
8              THE WITNESS:  Yes.
9              MS. METZINGER:  -- to form.
10              THE WITNESS:  Yes.  I -- I -- I
11       know that I have read that is it
12       preferable to have it administered by
13       an informant, but I have also read that
14       in instances where that is not
15       practical or possible, it is acceptable
16       to have it administered directly to the
17       participant.
18  BY MR. WONE:
19          Q.    And do you know in the case of
20  the Madison Memory Study whether it was possible
21  to have the AD8 administered through an informant?
22          A.    I do not know that.
23          Q.    Do you know whether it was
24  practical in the Madison Memory Study to have the
25  AD8 administered through an informant?

134

1          A.    I do not.
2          Q.    Do you agree that the results of
3  the AD8 when administered directly to the
4  participant may not be as reliable versus when
5  it's administered through an informant?
6              MS. METZINGER:  Objection to
7       form.
8              THE WITNESS:  I believe that the
9       reliability is thought to be best when
10       administered by an informant, but at
11       the same time it doesn't mean that it's
12       unreliable when administered to the
13       participant.
14  BY MR. WONE:
15          Q.    A few moments ago you mentioned
16  that the AD8 0-2 was the group of primary
17  interest, correct?
18          A.    Yes.
19          Q.    I wanted to ask, what was --
20  what was your basis of that understanding?
21          A.    The basis of that understanding
22  is my reading of the protocol which states that
23  they want healthy people and not people who
24  have -- who are exhibiting neurological symptoms
25  coupled with my understanding that interpreting

135

1  the -- the AD8 -- interpretation of the AD8 is
2  such that the 0-2 group is what would be
3  considered the healthy population without
4  significant neurological changes.
5          Q.    What would be the difference
6  between the 0-1 group versus the 0-2 group in
7  terms of neurological condition?
8              MS. METZINGER:  Objection to
9       form.
10              THE WITNESS:  My understanding
11       is that the 0-1 group would be viewed
12       as having no cognitive dysfunction, and
13       the 0-2 group might include some people
14       with some very mild cognitive
15       dysfunction.
16  BY MR. WONE:
17          Q.    Did the protocol in Exhibit MK5
18  discuss randomization?
19          A.    I believe that they say that the
20  subjects will be randomized, but they don't
21  describe in detail how that will be.  I'm glancing
22  through it right now, so -- to try to better
23  recall.
24              Yes, they do say that -- that it
25  is randomized.  They say in the methodology that

136

1  the participants will be randomized.
2          Q.    Did the protocol state how the
3  randomization would be done?
4          A.    The protocol did not state
5  exactly how the randomization would be done.  And
6  this is extremely acceptable, in my opinion.
7  There are many ways to do randomization.  It can
8  be done by computer.  It can be done by a number
9  of different programs.  You can Google
10  randomization and there are websites that will
11  help you randomize.  You can pick names out of a
12  hat to randomize.  There are lots of different
13  ways.  And it would be very unusual for the
14  principal -- the -- the investigators to describe
15  exactly what their method of randomization is.
16  Usually saying "randomized" is good enough for us
17  when we're reading a protocol or a paper.
18          Q.    And did the -- did the protocol
19  in Exhibit MK5 discuss stratification of the
20  participants?
21          A.    No, they did not.  But as I
22  said, I don't believe that the participants were
23  stratified in the sense that the group that they
24  analyzed, the 0-2 group, in my opinion, was the
25  group of interest from the start.  So I don't

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Case 1:17-cv-00124-LLS   Document 259-9   Filed 06/16/22   Page 37 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

137

1    think this is a stratification in the sense that
2    we were discussing before.
3         Q.    If the 0-2 group was the group
4    of interest, do you know where the Madison Memory
5    Study included participants outside of that group?
6            MR. de LEEUW:  Object to the
7    form.
8            THE WITNESS:  I do not know
9    that.  I do not know that.  But there
10   are many possible reasons that would be
11   completely legitimate.
12   BY MR. WONE:
13        Q.    Does the protocol in Exhibit MK5
14   identify the ratio of participants in the
15   treatment versus placebo groups?
16        A.    No, they don't.
17        Q.    And do you know how the
18   participants with AD8 scores of 0, 1, and 2 were
19   distributed between the placebo and treatment
20   groups?
21        A.    I don't recall.  I would have to
22   look at the paper.  Ratio 3 to 2 is the -- is they
23   reported.
24        Q.    And do you know whether that 3
25   to 2 ratio was in place at each of the AD8 levels,

138

1    so 3 to 2 ratio at 8D8 0 and 3 to 2 ratio AD8 1
2    and a 3 to 2 ratio at AD8 2?
3            MS. METZINGER:  Objection to
4    form.
5            THE WITNESS:  I do not know.  I
6    don't think that they stated that.  I'm
7    looking at the study design right now.
8    I don't believe they said any -- I
9    don't believe that they commented on
10   that.
11   BY MR. WONE:
12        Q.    And would you expect that the 3
13   to 2 ratio would be consistent across each of the
14   specific AD8 levels?
15           MS. METZINGER:  Objection to
16   form.
17           THE WITNESS:  I would not
18   require that or expect that.  I think
19   it would be good if the ratio was met
20   what they were -- what they were
21   looking for within the group of
22   interest, which is the 0-2.  So that's
23   where I would want this 3 to 2 applied
24   within the 0 to 2 group.  I wouldn't be
25   as concerned with the rest of the

139

1        population.
2    BY MR. WONE:
3         Q.    If the treatment and placebo
4    groups are not following the 3 to 2 ratio at each
5    specific AD8 score, could that affect the study
6    results?
7            MS. METZINGER:  Objection to
8    form.
9            THE WITNESS:  Can you rephrase
10   the question, please, Mr. Wone?
11   BY MR. WONE:
12        Q.    Sure.
13           So you testified you don't know
14   whether the 3 to 2 ratio was in place at each of
15   the specific AD8 0, 1, and 2 levels, correct?
16        A.    That's correct.
17        Q.    And would it affect -- could it
18   affect the results if there were different numbers
19   of participants at each of those levels between
20   the treatment of placebo groups that didn't follow
21   the 3 to 2 ratio?
22           MS. METZINGER:  Objection to
23   form.
24           THE WITNESS:  In looking at
25   table number 2 in Exhibit -- in

140

1        document MK3, you can see that in the
2    AD8 0-2 group that ratio is followed.
3    And that is the place where I would
4    want it to be followed because I
5    believe that that is the main outcome
6    of interest.  The main outcome of
7    interest is the AD8 0-2.  So that's
8    where that ratio would need to be
9    applied.
10   BY MR. WONE:
11        Q.    But it's your understanding that
12   there could be different numbers of AD8 1 in the
13   treatment and placebo groups that are not
14   following the 3 to 2 ratio at that specific score,
15   correct?
16           MS. METZINGER:  Objection to
17   form.
18           THE WITNESS:  I'd have to take
19   out my calculator and do a calculation,
20   but the 0-1 group is listed right next
21   to it.  And there are 24 in the placebo
22   and 37 in the apoaequorin, so the ratio
23   may be slightly different in the 0-1
24   rather than the 0-2.  But you can see
25   that it's very -- there are more in the

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                              9/29/2021

141

1    apoaequorin, significantly more.
2    BY MR. WONE:
3        Q.    No.  I was asking about just AD8
4    1, for example.  In the 0-2 group, do you know
5    whether the 3 to 2 ratio was followed for
6    participants with AD8 1?
7              MS. METZINGER:  Objection to
8        form.
9              THE WITNESS:  Tell me if I'm --
10       if I'm misunderstanding you, but if you
11       look at table 2 on page 5, the
12       right-hand side has AD8 0-1.
13   BY MR. WONE:
14       Q.    So I'm not including the 0.  I'm
15   just asking --
16       A.    I see.  I see.
17       Q.    -- specific level.
18       A.    I see.  0 -- rather -- just --
19   just the level 1.
20       Q.    Yes.
21       A.    From the paper -- from the
22   paper, it is not apparent what the ratio was for
23   each individual level of 0, 1, 2, 3, 4.
24       Q.    Okay.  And could it affect the
25   results if the ratio was not the same at each

142

1    specific level within the AD8 0-2 group?
2              MS. METZINGER:  Objection to
3        form.
4              THE WITNESS:  I don't know if it
5        would affect the results.  I really
6        can't comment on that.  I think it's
7        possible that it would.  It's possible
8        that it wouldn't.  And, you know, there
9        were many other things that could
10       affect the results too.  So personally
11       I'm not concerned about that.
12   BY MR. WONE:
13       Q.    Is it your understanding that
14   Cogstate measures when given at baseline indicated
15   the participant's level of cognitive function?
16       A.    Yes.
17       Q.    And would you expect in the
18   Madison Memory Study for the participants AD8
19   scores to be correlated with their performance on
20   the Cogstate measures at baseline?
21             MS. METZINGER:  Objection to
22       form.
23             THE WITNESS:  Maybe you can
24       clarify that question for me because
25       you're asking a statistical question by

143

1    using the word "correlation."  But I
2    think maybe you're asking something
3    that's a little bit more general than a
4    statistical question which is could the
5    baseline value influence how they
6    respond later.  Is that what you're
7    asking?
8    BY MR. WONE:
9        Q.    I'm asking whether -- would you
10   expect -- here, I'll rephrase.  Hold on a second.
11             Would you expect the people who
12   did better in the AD8 -- well, I should qualify.
13             Would you expect the people who
14   are lower scores in the AD8 measure to do better
15   in Cogstate tests at baseline?
16             MS. METZINGER:  Objection to
17       form.
18             THE WITNESS:  I think that
19       that's possible.  They probably would.
20       And that's why it was important for
21       them to compare baseline values on
22       Cogstate between the placebo and the
23       treatment group.  And you can see on
24       table 2 when you look at the AD8 0-2
25       group, there is no difference at

144

1    baseline in -- in the scores that they
2    have on the tests.  So that is
3    important.
4              And I also believe that they
5    took baseline into account in their
6    data analysis so that they -- they used
7    baseline as a co-variable so that that
8    was taken into account because that is
9    important.
10   BY MR. WONE:
11       Q.    Did you look at any data to see
12   how participants in the Madison Memory Study did
13   on the AD8 scores versus how they did at Cogstate
14   tests at baseline?
15             MS. METZINGER:  Objection to
16       form.
17             THE WITNESS:  I don't recall
18       that they did that comparison or that
19       they reported it.
20   BY MR. WONE:
21       Q.    And it wasn't something that you
22   looked at?
23       A.    No.
24       Q.    Do you know when the Madison
25   Memory Study began?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

---

145

1      A.    I believe that it began in 2009.
2      Q.    And do you know when it ended?
3      A.    2011.
4      Q.    I think you've said this before,
5  how long was the Madison Memory Study?
6            MS. METZINGER: Objection.
7  Form.
8            MR. WONE: Sorry. I'll rephrase
9  that.
10 BY MR. WONE:
11     Q.    What was the study period in the
12 Madison Memory Study?
13     A.    The entire study took 90 days.
14           MS. METZINGER: Mr. Wone, we've
15 been going for about another hour and a
16 half. I just wanted to get a sense of
17 when you think you might want to take
18 the next break.
19           MR. WONE: I've got a handful of
20 questions more, and then I think we can
21 break for lunch.
22           MS. METZINGER: Okay.
23           MR. WONE: Is that okay?
24           MS. METZINGER: That's fine with
25 me.

---

146

1            Dr. Kurzer, does that work for
2  you?
3            THE WITNESS: Absolutely.
4            MS. METZINGER: Thank you.
5  BY MR. WONE:
6      Q.    Okay. I've introduced and
7  marked Exhibit MK6.
8            (Marked Exhibit MK6.)
9  BY MR. WONE:
10     Q.    Do you see that, Dr. Kurzer?
11     A.    Yes, I do.
12     Q.    Does this document, MK6, relate
13 to the Madison Memory Study?
14     A.    Yes, it does.
15     Q.    Does Exhibit MK6 mention an
16 interim analysis?
17           MS. METZINGER: Objection to
18 form.
19           THE WITNESS: It talks about
20 preliminary data.
21 BY MR. WONE:
22     Q.    And what -- what is the year
23 depicted on the document in Exhibit MK6 in the
24 first paragraph?
25           MS. METZINGER: Objection to

---

147

1  form.
2            THE WITNESS: I'm sorry. Can
3  you rephrase that question, please,
4  Mr. Wone?
5  BY MR. WONE:
6      Q.    Sure.
7            What is the year depicted in the
8  first sentence or the first paragraph of
9  Exhibit MK6?
10     A.    What is the year depicted?
11     Q.    Yes. Yes.
12     A.    2010.
13     Q.    So if the study was still being
14 conducted in 2010, is it possible for an
15 investigator to analyze preliminary data without
16 breaking the blinding?
17           MS. METZINGER: Objection to
18 form.
19           THE WITNESS: The blinding has
20 to be broken, but there are ways to do
21 it that secures the blindness of the
22 study, and we did that in the green tea
23 trial. What you do is you have a
24 statistician who's not intimately
25 involved with the study do the analysis

---

148

1  so that the investi- -- the real
2  purpose of blinding isn't so much to
3  blind the investigators of -- of
4  preliminary results, it's to blind
5  investigators to which person is on
6  which treatment. That's what you don't
7  want the investigators or the people to
8  know. And interim unblinding can be
9  done in a way in which the
10 investigators are kept blinded to who
11 is taking what.
12           I'll tell with you the green tea
13 study, when we did that, it was
14 enormously frustrating for me because I
15 desperately wanted to know, you know.
16 But nobody could know until the end of
17 the study. We -- the participants
18 wanted to know. They were emailing us
19 and saying "I think I'm on this because
20 I'm having these effects." We could --
21 we had no idea. Until the very end of
22 the study we had no idea. In fact, we
23 didn't unblind the study until, you
24 know, after -- you know, after we had
25 the results in terms of us knowing

---

37 (Pages 145 to 148)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

149

1    which person was on which treatment.
2          That's the real purpose of
3    blinding, and it's very -- it's
4    entirely possible to maintain that even
5    with an interim analysis.
6    BY MR. WONE:
7          Q.   And do you know whether those
8    safeguards to prevent that were done in the
9    Madison Memory Study?
10         A.   I don't know.  I assume that
11   they were because they say that it was a blinded
12   study.  So my assumption when reading it is that
13   they did it properly and did not unblind it to
14   them -- to the -- to the people who were working
15   with the participants, interpreting the data, et
16   cetera.
17         Q.   But you haven't reviewed any
18   documents to inform you as to how the blinding was
19   broken for the preliminary --
20         A.   No.
21         Q.   -- analysis?
22         A.   I do not -- right, I have not
23   seen any documents --
24         MS. METZINGER:  Objection to
25   form.

150

1          THE WITNESS:  -- related to
2    that.
3    BY MR. WONE:
4          Q.   Does the document in Exhibit MK6
5    mention the AD8 0-1 subgroup?
6          A.   They do not mention the -- the
7    AD8 subgroup.  They do say in the second paragraph
8    that Prevagen is a new tool for staying
9    cognitively fit, which to me means that the people
10   in the study started out cognitively fit.  I think
11   that's the main point.
12         In this kind of a press release,
13   it would be way more detail than people would be
14   interested in to hear something about AD8 0-2.
15   They'd have to then explain what that means.
16   That's -- that's something that is more
17   appropriate for a much more detailed scientific
18   report.  For this kind of thing, you would not
19   expect to see that.
20         Q.   Do you know whether the data
21   that's reported in Exhibit MK6 was from a specific
22   subgroup?
23         MS. METZINGER:  Objection to
24   form.
25         THE WITNESS:  I do not know for

151

1    sure.  But as I said a few minutes ago,
2    because they talk about staying
3    cognitively fit, my interpretation of
4    this is that the people in this study
5    started out cognitively fit.
6    BY MR. WONE:
7          Q.   So the data that's depicted
8    could be from the 0-2 group, right?
9          A.   Yes.
10         Q.   It could be also from the 0-1
11   group --
12         A.   Yes.
13         Q.   -- right?
14         And it also could be some
15   other -- some other group, correct?
16         A.   Correct.  And this is -- this
17   is -- this is not a scientific report, so I would
18   not expect the level of -- of rigor that you might
19   expect in a scientific paper.  I just -- you just
20   wouldn't.
21         Q.   And if the procedures that you
22   discussed earlier to maintain blinding during a
23   preliminary analysis were not -- were not
24   followed, would that affect how you would
25   interpret the results?

152

1          MS. METZINGER:  Objection to
2    form.
3          THE WITNESS:  Can you rephrase
4    that question, please, for me?
5    BY MR. WONE:
6          Q.   Sure.
7          Earlier you discussed procedures
8    that -- that an investigator could use to maintain
9    blinding during a preliminary or interim analysis,
10   right?
11         A.   Yes.
12         Q.   And so if those procedures were
13   not followed, would it affect how you interpret
14   the result?
15         MS. METZINGER:  Objection to
16   form.
17         THE WITNESS:  You know, it would
18   depend.  You -- I -- it might or it
19   might not.  There are levels of rigor
20   that vary across studies.  And I think
21   that applying this very, very high
22   level of rigor that I would say applies
23   to a drug trial or an NIH-funded study
24   is just not appropriate for this kind
25   of dietary supplement that the -- I --

38 (Pages 149 to 152)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

153

1  my understanding is that the FTC
2  guidance allows for much more
3  flexibility in interpretation of
4  research used to substantiate claims.
5          And so, you know, I would be
6  much more concerned about some of the
7  things that you're talking about and
8  some of the things that you've asked me
9  about if this was a drug trial and
10  with -- with very serious implications,
11  very serious cost if -- if there are
12  errors, very serious health -- adverse
13  health events if there are errors, et
14  cetera.
15          But for something that's safe
16  and is a nutritional supplement meant
17  to supplement the body's intake of
18  food, I just wouldn't be nearly as
19  concerned with some of the kinds of
20  things that you're asking me about
21  as -- as -- as you might be -- as I
22  would be if it were a drug trial.
23          I know that's not exactly a
24  direct answer to your question, but,
25  you know, I just wanted to say that

154

1  because you're asking me about
2  interpreting and would I be worried
3  about this.
4          And, you know, if -- if -- if
5  they had unblinded themselves in this
6  study, that might be a little bit of a
7  concern, but it can still be a very,
8  very well-done study.  In fact, I think
9  that enjoying blinding is a very
10  extreme requirement that, in many
11  cases, is not necessary in -- in -- on
12  a level of scientific rigor and
13  accuracy that blinding -- the study
14  would -- the results would still be
15  accurate if the study were blinded.
16  BY MR. WONE:
17      Q.    Would you describe the RCTs that
18  you've conducted in your career as being
19  methodologically rigorous?
20          MS. METZINGER:  Objection to
21  form.
22          THE WITNESS:  I think that they
23  have, but they have not all been
24  blinded.  So, for example, the soy
25  protein studies that I've done, you

155

1  can't blind soy protein.  There isn't
2  something else that you can give that
3  is not identified -- not -- that cannot
4  be distinguished.  Soy protein has a
5  flavor.  People who are take --
6  drinking a soy protein drink, no.  And
7  so in my soy protein studies, we --
8  we've used casing milk protein as the
9  control.  And neither we nor the
10  participants were blinded.  They knew.
11  We didn't tell them, but they knew
12  because they could taste the
13  difference.  So they knew if they were
14  consuming the soy.  And that was really
15  the only way to do the study.  There
16  isn't -- when you're doing a study with
17  foods, there isn't a way to blind the
18  participants and -- or the -- or the
19  researchers.  And yet, I think it's
20  still a very rigorous -- it was still a
21  very -- those are still rigorous
22  studies published in very, very good
23  scientific journals having gone through
24  extensive peer review.
25

156

1  BY MR. WONE:
2      Q.    And those studies that didn't
3  have blinding, the lack of binding was part of
4  their design.  That was how they were designed,
5  correct?
6      A.    Yes.  We knew in the beginning
7  that they wouldn't -- that it wouldn't be blinded.
8      Q.    And the RCTs you worked on
9  involved health claims for nutritional
10  supplements, correct?
11          MS. METZINGER:  Objection to
12  form.
13          THE WITNESS:  The RCTs that I've
14  worked on and the clinical trials that
15  I've worked in -- on that weren't --
16  that weren't necessarily blinded have
17  involved the effect of dietary
18  constituents which could be considered
19  supplements, but soy protein isn't
20  exactly a supplement, but it's a --
21  it's a food constituent on various
22  health endpoints.
23  BY MR. WONE:
24      Q.    You've also worked on RCTs that
25  were blinded and did involve a dietary supplement?

39 (Pages 153 to 156)

157

1    A.   Yes, particularly the green tea
2 study that I was talking about.  In that case, we
3 gave pills, and the pills for the placebo and the
4 treatment group were identical, and they were
5 blinded and we were blinded.
6    Q.   And would you agree that
7 blinding -- double-blinding is something that's
8 possible with a dietary supplement like Prevagen?
9         MS. METZINGER:  Objection --
10        THE WITNESS:  Yes --
11        MS. METZINGER:  -- to form.
12        THE WITNESS:  -- it is.
13 BY MR. WONE:
14    Q.   I'm sorry.  I didn't hear your
15 answer, Doctor.
16    A.   Yes.
17        MR. WONE:  Okay.  I think we can
18 go off the record.
19        THE VIDEOGRAPHER:  We are going
20 off the record at 12:15 P.M.
21      (Off the record from 12:15 until
22 1:01.)
23        THE VIDEOGRAPHER:  We are going
24 back on the record at 1:01 P.M.
25

158

1 BY MR. WONE:
2    Q.   Good afternoon, Dr. Kurzer.
3    A.   Good afternoon, Mr. Wone.
4    Q.   I'd like to go back to some
5 things that we talked about earlier this morning.
6    A.   Sure.
7    Q.   If you could go back to your
8 report, what's been marked as Exhibit MK1 --
9    A.   Yes.
10   Q.   -- paragraph 33, please.
11   A.   Yes.  I have it here.
12   Q.   Do you see in the second line
13 where you discussed the initial publication that
14 it was discovered that transformation and data set
15 errors had been made in the data analysis?
16   A.   Yes, I see that.
17   Q.   I was wondering what -- what do
18 you mean by "transformation"?
19   A.   I don't know what the exact
20 problem was.  This is a very long time ago and
21 I -- I don't recall getting into the details about
22 it.  There -- the way that the data were analyzed
23 I guess involved some kind of transformation, and
24 I'm not sure what the transformation was.  And
25 that was caught later on.  So I really can't

159

1 answer that.  I'm sorry.
2    Q.   Do you have any recollection as
3 to what the data set errors were?
4    A.   No, I don't.  I don't remember.
5 I think I -- I think we talked about it.  I may
6 have talked about it at the time, but I just don't
7 remember right now.
8    Q.   Did you review any documents
9 that would have told you what those transformation
10 or data set errors were?
11   A.   No, I did not.
12   Q.   Earlier this morning, it's my
13 understanding, you testified that it's your belief
14 that Prevagen is intended for healthy older
15 adults; is that right?
16   A.   Yes, it is.
17   Q.   And so if Prevagen is intended
18 for healthy older adults, when you were conducting
19 your literature search, why did you use the term
20 "Alzheimer's"?
21   A.   Why did I use the term
22 "Alzheimer's."  Because sometimes cognitive
23 decline and cognitive function in a
24 larger setting in which Alzheimer's is also
25 evaluated.  So I wanted to pick up the broadest

160

1 number of papers that I could.  I wasn't
2 interested in Alzheimer's as an endpoint, per se.
3 But the purpose of a literature review is to pull
4 in as many papers as you can and then select from
5 them the ones that you think are the most
6 appropriate.
7    Q.   And would that also be the
8 reason why you included dementia in your
9 literature search?
10   A.   Exactly.  I wasn't sure how much
11 I would get from just looking at cognitive
12 function or cognitive decline because what you get
13 from a literature review is dependent upon the
14 keywords that the authors of the papers put in,
15 and so sometimes you miss things because the key
16 word isn't exactly right.  So that is the reason.
17   Q.   And if Prevagen is intended for
18 healthy older adults, why did you discuss
19 Alzheimer's disease in paragraph 25 of your
20 report?
21   A.   The reason I discussed it is
22 because Alzheimer's disease is the -- the end of
23 the spectrum of cognitive decline.  And when
24 people who experience the mild cognitive decline
25 and early signs, it often progresses to full-on

40 (Pages 157 to 160)

Case 1:17-cv-00124-LLS   Document 259-9   Filed 06/16/22   Page 43 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

161

1    Alzheimer's disease.  And so because Alzheimer's
2    disease is such an incredible concern in the
3    United States in terms of cost socially and
4    financially, anything that can slow the decline of
5    cognitive function might wind up reducing this
6    very devastating end result or slowing its
7    progression.  So I thought it was interesting to
8    put in something about Alzheimer's disease to give
9    the context in which this particular problem of
10   mild cognitive decline is -- is important.  It's
11   just to fill out the context.
12        Q.    And would that be the same
13   reason why you included paragraph 24 on dementia?
14        A.    Yes.
15        Q.    And are you offering any
16   opinions related to the efficacy of Prevagen and
17   dementia?
18        A.    No.
19        Q.    How about are you referring any
20   opinions related to the efficacy of Prevagen and
21   Alzheimer's disease?
22        A.    No, I'm not.  I -- I'm offering
23   opinions on the efficacy of Prevagen for mild
24   cognitive dysfunction and the -- you know, a
25   mild -- the milder level of decline.  Dementia --

162

1         Q.    When you say --
2         A.    Dementia is a further
3    deterioration, and then Alzheimer's disease is one
4    cause of dementia, but then there are other causes
5    as well.
6         Q.    When you say "mild cognitive
7    dysfunction," is that the same thing as mild
8    cognitive impairment --
9         A.    Yes.
10        Q.    -- that you discuss in
11   paragraph 23?
12        A.    Yes.
13        Q.    So you are offering opinions in
14   your report related to Prevagen and mild cognitive
15   impairment?
16        A.    Yes.  I think that -- you know,
17   it may -- it may be difficult to -- to form a red
18   line between the normal cognitive decline of aging
19   and mild cognitive impairment.  The point is
20   that -- that the question is will Prevagen help
21   slow or reduce this trajectory.
22        Q.    So are you offering opinions
23   that Prevagen slows the progression of mild
24   cognitive impairment?
25              MS. METZINGER:  Objection to

163

1    form.
2              THE WITNESS:  I think that I
3    wouldn't make the claim.  I wouldn't
4    necessarily support a claim related to
5    mild cognitive impairment because that
6    would be a disease claim.  So I used
7    evidence on mild cognitive impairment
8    to support the idea that Prevagen has a
9    beneficial effect on cognitive decline.
10   But I wouldn't support a claim for
11   preventing mild cognitive impairment or
12   Alzheimer's disease or dementia because
13   those are disease claims not permitted
14   under the guidance.
15   BY MR. WONE:
16        Q.    Which guidance are you referring
17   to?
18        A.    FTC guidance, FDA guidance
19   related to claims that are permitted.  This is a
20   structure function claim, not a disease claim.
21        Q.    Earlier when we were talking
22   about the Madison Memory Study, I believe you
23   mentioned that there would be legitimate reasons
24   to include people who scored a 3 or above on the
25   AD8.  Do you remember that?

164

1              MS. METZINGER:  Objection to
2    form.
3              THE WITNESS:  I believe that I
4    said there that investigators might
5    have a reason to recruit those folks
6    into the study.
7    BY MR. WONE:
8         Q.    And what would be some of those
9    reasons?
10        A.    Well, one reason for
11   over-recruitment is to -- to account for dropouts.
12   That could be 20 or 25 percent extra that you
13   recruit because you want to have a final number of
14   a hundred, so you might have to recruit 25 percent
15   extra.
16              It's possible, and I don't know
17   this because I haven't spoken with the
18   researchers, so I don't know, but I could imagine
19   that are situations where, when a clinical trial
20   is being done, it's very expensive and very -- as
21   I said, very time consuming, that with thinking
22   towards the future, that an investigator might
23   say, "Well, let's just kind of do the study on --
24   on everybody because maybe in the future, if it
25   turns out we have people who have more serious

Case 1:17-cv-00124-LLS   Document 259-9   Filed 06/16/22   Page 44 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

165

1    cognitive decline, we'll want to look at those
2    results." But for now, those -- that -- that --
3    those data are just going to be sitting because
4    it's not our primary concern.
5            So I could imagine doing that as
6    a scientist, trying to make the most of the
7    resources that I have. I could imagine doing
8    that.
9        Q.    And in connection the Madison
10   Memory Study, did you ever look at any data for
11   participants who scored 3 and above on the AD8?
12       A.    I -- I believe that might have
13   been in one of the papers. I -- I guess I'm not
14   sure -- I'm not sure right now if I did. I guess
15   in the Advances paper they have data on AD8 2-5.
16   So they do those show those data in that paper.
17       Q.    Is it your understanding that
18   the Advances paper was written before the data set
19   was -- before the errors in the data set were
20   identified?
21       A.    Yes.
22       Q.    And so you don't know whether
23   the data that's presented in the Exhibit MK4 is
24   accurate or not?
25            MS. METZINGER: Objection to

166

1            form.
2            MR. WONE: I'll rephrase.
3    BY MR. WONE:
4        Q.    Do you know whether the data
5    depicted in Exhibit MK4 was accurate?
6            MS. METZINGER: Objection to
7            form.
8            THE WITNESS: I don't know. You
9            know, once I found out that there were
10           errors, then I focused my attention on
11           the corrected data and the results that
12           were -- that were generated by the
13           corrected data. So I don't know if
14           that first paper is correct or not.
15           I -- I didn't focus most of my
16           attention on that.
17   BY MR. WONE:
18       Q.    So you don't know whether
19   Exhibit MK4 has corrected data?
20           MS. METZINGER: Objection to
21           form.
22           THE WITNESS: I've been told
23           that the data was corrected after this
24           paper was published, so my assumption
25           is that this is the precorrected data.

167

1            Whether the results differ, I don't
2    know.
3    BY MR. WONE:
4        Q.    Okay. If a study had been
5    unblinded through an interim analysis and the
6    principal investigator had access to the
7    information as to -- the data including what
8    groups people were assigned to, would you agree
9    that the study would no longer be considered
10   double-blinded?
11           MS. METZINGER: Objection. Are
12           you talking about any study or the
13           Madison Memory Study?
14           MR. WONE: Hypothetically.
15           MS. METZINGER: Objection to
16           form.
17           THE WITNESS: Hypothetically if
18           a study were unblinded and the
19           researchers knew who was taking which
20           and/or the participants knew who were
21           taking -- who was taking what, it would
22           no longer be a blinded study.
23   BY MR. WONE:
24       Q.    I believe you testified
25   earlier --

168

1        A.    Mr. Wone -- Mr. Wone --
2        Q.    Yes?
3        A.    -- if I could add something to
4    that?
5        Q.    Sure.
6        A.    Just to sort of repeat something
7    that I said before, the fact that it is not a
8    blinded study does not mean that the results are
9    useless. The results may still be accurate even
10   if it is not a double-blind study.
11       Q.    Are you distinguishing between a
12   study that was -- that's not blinded from the
13   outset versus a study that was double-blinded but
14   in which -- for which the blinding was broken?
15       A.    I'm not distinguishing, no, no.
16   I'm -- I'm saying that a blinding of the study is
17   a very, very high threshold that's set for drugs
18   and is important to stick to for studies like drug
19   trials. But in my experience and in my opinion, I
20   don't think that the results of an unblinded study
21   or a not blinded study are false results. I've --
22   as I said before, I've published numerous papers
23   from studies I've done that were not blinded, and
24   I stand behind those results fully.
25       Q.    If a study was unblinded and the

42 (Pages 165 to 168)

Case 1:17-cv-00124-LLS   Document 259-9   Filed 06/16/22   Page 45 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

169

1    investigators knew which participants who were
2    assigned to each of the groups, could the data --
3    could the data from that study be biased?
4              MS. METZINGER:  Objection to
5         form.
6              THE WITNESS:  That really
7         depends on who is made aware of the
8         data.  If it's the principal
9         investigators who are not interacting
10        with the participants, that may not
11        have any effect at all.  I would be
12        more concerned if it was the study
13        coordinator, the person who is, for
14        example, giving the tests directly to
15        the participants.  If they -- if that
16        person, that staff member knew who was
17        in which group, I might be concerned
18        about that.
19             But I wouldn't -- if -- if it's
20        a principal investigator who, like me,
21        is a number of levels away from the
22        participants, my knowledge isn't going
23        to have any effect on the results.
24   BY MR. WONE:
25        Q.    Could it have an effect on how

170

1    you interpret the data?
2              MS. METZINGER:  Objection to
3         form.
4              THE WITNESS:  The concern I
5         would have would not be with the
6         interpretation of data because when --
7         when I have a data set as a principal
8         investigator, when I'm working on a
9         data set with a statistician, I -- it's
10        all numbers.  The data is de-identified
11        in the data analysis.  So I have no
12        idea who any individual person is.
13             The concern I would have here is
14        in the administration of the cognitive
15        tests if the person who is
16        administering the test knows which
17        group that participant is in, their
18        interpretation of the results might be
19        affected by that.  Theoretically, it
20        could be.  But I would not at all be
21        concerned at the level of data analysis
22        working with a data set.
23   BY MR. WONE:
24        Q.    Would your opinion change if
25   there wasn't a statistician analyzing the data and

171

1    the investigators were doing the analysis
2    themselves?
3              MS. METZINGER:  Objection to
4         form.
5              THE WITNESS:  No, my opinion
6         would not change.
7    BY MR. WONE:
8         Q.    I think we also mentioned that
9    it was your understanding that the Madison Memory
10   Study was 90 days?
11        A.    Yes.
12        Q.    And what was the basis for your
13   belief?
14        A.    I think it's stated in the
15   protocol that it's a 90-day study.  And in the
16   publication, it's -- the study is described as a
17   90-day study, so I think it's very clear.  I'm
18   looking at the protocol now, and study duration,
19   90 days.  And it says the same thing in the
20   manuscripts.
21        Q.    Okay.  In your expert report,
22   Exhibit MK1, you discussed corrections, correct?
23        A.    Can you --
24             MS. METZINGER:  Objection to
25        form.

172

1              THE WITNESS:  Can you tell me
2         which paragraph that is, please?
3    BY MR. WONE:
4         Q.    I'm looking at paragraph --
5    sorry.  Looking at Section 8.
6         A.    Is there a -- okay.  Section 8,
7    issues related to the use of Bonferroni.  Yes.
8         Q.    What is the correction in this
9    context?
10        A.    The correction in this context
11   is a correction for multiple comparisons, the idea
12   being that when you do many, many, many
13   comparisons, that some of those will show a
14   significant effect by chance because you're doing
15   so many.
16             And so in some situations,
17   statisticians view -- feel that it's important to
18   basically reduce your p-value so that you make it
19   more difficult to find a significant effect in
20   order to correct for the fact that there might be
21   some random effects that you see because of the
22   number of tests that you've done.  That's my
23   understanding.
24        Q.    And what are some situations
25   where you feel a correction would be appropriate?

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

173

1      A.    I think that Bonferroni -- I
2  would be -- I'm very, very reluctant to take a
3  general stand on Bonferroni.  I think that it
4  really needs to be decided on individual cases.
5  It's a very, very strict requirement and it's
6  fairly controversial.
7           And in the same sense that a
8  p-value is an arbitrary number, an arbitrary
9  cutoff, Bonferroni decreases the false positives,
10  but it can have a big increase in false negatives.
11  So it can reduce your ability enormously to see
12  a -- to see an effect.
13          So I'm sure that there are
14  situations with clinical drug trials where there's
15  the impact of a mistake on -- in the data analysis
16  is so critically important that you want to avoid
17  false positives at any -- you know, you want to
18  avoid at all cost false positives.
19          So, for example, you know, if
20  you have a drug that's going to cure cancer, you
21  know, you don't want false positives because you
22  don't want to approve this drug and you -- you
23  want to make it hard to see an effect for yourself
24  because you don't want it to be approved unless
25  you are a thousand percent sure that it's going to

174

1  work.  In that situation, I can see that a
2  correction would be appropriate to do.
3           The problem with Bonferroni, as
4  I say in my report, and I think it's a significant
5  problem, is that if you really believe in
6  Bonferroni and you feel that it should be used in
7  every situation, then what will happen is in most
8  cases we will never, ever be able to find a
9  significant result for anything because even with
10  some of the most widely respected and publicized
11  and published clinical studies or epidemiological
12  studies, there may be many, many, many papers
13  published.
14          So, for example, the AREDS
15  trial, which is an eye health -- eye supplement
16  trial, there are at least 30 or 40 or 50 papers
17  that have been published.  And when people report
18  data in the beginning, they don't account for
19  future papers.  They don't account -- you know, if
20  we were to go back, okay, and say now that the 50
21  papers have been published, let's redo the
22  statistics knowing how many different -- different
23  analyses we did, nothing would be significant.
24  We'd find zero significance.
25          And so people -- people tend

175

1  to -- researchers tend to break their studies down
2  into pieces in part because it's digestible for
3  the reader.  You just don't want to publish papers
4  where you have so much in there that it's
5  overwhelming.
6           You need to have theme to your
7  paper.  So you might publish your lipid results in
8  one paper and your hormone results in another
9  paper, and then you might publish some other --
10  you don't account for all of the comparisons in
11  every paper.  You can't do it because you
12  aren't -- you know, you don't know in advance.
13          And so really if you take
14  this -- if you take the Bonferroni -- if you
15  believe that it should be used in every situation,
16  then I think you have a real problem with finding
17  any significant results at all.
18          But as I said, in the case of a
19  situation like a drug that is critically important
20  for peoples lives, you want to make sure that you
21  reduce the pos- -- false positive as much as
22  possible and you don't care so much about the
23  false negatives.
24          So there's -- you know, it
25  really depends on the situation, in my opinion.

176

1  And in this situation where we're talking about a
2  dietary supplement, which has very little -- which
3  has no adverse effects, which is something which
4  may confer some benefit to some people, I'm not
5  worried about the false positive rate.  I just
6  wouldn't be worried about it in this situation.
7  And the FTC guidance on regulating -- you know, on
8  advertising for dietary supplements specifically
9  gives a lot of flexibility and suggests to me --
10  my interpretation of the guidance is that the kind
11  of rigor that's applied to clinical trials is
12  to -- to drugs is not necessary for dietary
13  supplements.
14          And so while in a clinical trial
15  of a -- of a drug that is potentially going to
16  lengthen or save someone's life who has cancer, I
17  might in that case say, no, I agree that
18  Bonferroni should be used.  But in this case, I
19  think it's really overkill.  It's -- it's way,
20  way, way more than necessary.
21      Q.    You mentioned one particular
22  type of correction, Bonferroni correction.
23      A.    Mm-hmm.
24      Q.    Are there other types of
25  corrections?

Kurzer, Ph.D. - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                          9/29/2021

177

1          A.    There -- I believe that there
2    are many types of corrections.  And the one that
3    I've used when I have used a correction has been
4    Bonferroni, so that's the one that I'm the most
5    familiar with, but they're all variations on the
6    same theme.  They're all versions of the same type
7    of correction, which is basically reducing your
8    p-value threshold to account for the number of
9    comparisons that you're making.
10         **Q.    And in the example you just gave**
11   **in your prior answer, you mentioned researchers**
12   **will have different papers, for example, a lipid**
13   **paper.  And so in that lipid paper, would you use**
14   **a correction to account for multiple comparisons?**
15             MS. METZINGER:  Objection to
16   form.
17             THE WITNESS:  It depends on the
18         number of comparisons that I've done,
19         and it depends on the statistician who
20         I'm working with and what their view is
21         because very well-respected,
22         well-trained professional statisticians
23         differ on this point.  And so I take
24         the advice often from the statistician
25         with whom I'm working, and so it really

178

1         would depend on the individual case.
2             There are many statisticians,
3         and I have worked with a number of
4         statisticians, and I find that the
5         statisticians who have the most
6         experience with biological data, with
7         human data, are much more flexible in
8         interpreting statistical results
9         because of the things that we talked
10        about before.
11   BY MR. WONE:
12        **Q.    And you've mentioned you --**
13   **you've used Bonferroni in your own research,**
14   **correct?**
15        A.    I believe that I have.  I'd have
16   to look at my papers to see where I might have
17   used it, but I -- I probably have used some kind
18   of multiple -- multiple comparison testing,
19   multiple comparison correction.  But not very
20   often for the reasons that I said because it
21   really reduces your ability to see a true effect.
22        **Q.    So I'm introducing what's been**
23   **marked as Exhibit MK7.**
24        A.    Yep.
25        **Q.    Do you see that, Doctor?**

179

1         A.    I do.
2             (Marked Exhibit MK7.)
3    BY MR. WONE:
4         **Q.    And it this one of your research**
5    **papers, Doctor?**
6         A.    It is.  It's a paper from
7    20 years ago, I see.  And my students are on it
8    who I'm very proud of.  Alison is a full professor
9    now, so, yes.
10        **Q.    If you could turn to page 227 of**
11   **that, of Exhibit MK7.  I'm referring to the page**
12   **numbers that are depicted in the top right corner.**
13        A.    227, yes.  Yes.
14        **Q.    Do you see the data analysis**
15   **section?**
16        A.    Yes.
17        **Q.    And the second paragraph of that**
18   **section, do you see a mention of the Bonferroni**
19   **correction?**
20        A.    Yes.
21        **Q.    And do you see that the**
22   **Bonferroni correction was applied to p-values to**
23   **adjust for multiple comparisons?**
24        A.    Yes.
25        **Q.    And what were the comparisons**

180

1    **being made in this study in Exhibit MK7?**
2         A.    So we were looking at three
3    different diets, and we were looking at LDL peak
4    particle diameter, LDL -- and concentrations of
5    triacylglycerol apo A-1, apo B, lipoprotein(a),
6    total ADL and HDL cholesterol.  So there were
7    eight different endpoints and three different
8    diets so that each of the diets was compared with
9    each of the other diets.
10        **Q.    And why did you use the**
11   **Bonferroni construction in this study?**
12        A.    I use the Bonferroni correction
13   in this study because the statistician I was
14   working with probably insisted that I use it
15   because that was his belief, and so I agreed that
16   we would use it.  But if I had been working --
17   frankly, if I had been working with a different
18   statistician, they might have said we don't need
19   to.
20            But this is probably more
21   comparisons than I often do in my studies, and so
22   it was -- I accept this recommendation.
23        **Q.    And do you know whether the**
24   **comparisons in this study were correlated?**
25        A.    Yeah, I think that some of them

181

1   are. Yes, some of them are correlated. Not all
2   of them.
3        Q.   And did this study involve a
4   dietary ingredient?
5        A.   Yes. It involved soy -- soy
6   protein intervention.
7        Q.   And what were you studying in
8   this article in relation to soy?
9        MS. METZINGER: Objection to
10  form.
11       THE WITNESS: What's that?
12  Excuse me? Can you ask --
13  BY MR. WONE:
14       Q.   What were you studying in
15  Exhibit MK7 in connection to soy?
16       A.   Oh, we were looking at the
17  effect of soy protein consumption on plasma
18  lipids.
19       Q.   Did the study involve any
20  investigation of a disease?
21       A.   No. No, it didn't. It -- we
22  looked at lipid levels in the blood which relate
23  to disease but are not a disease endpoint
24  themselves.
25       Q.   And did the study depicted in

182

1   MK7 involve a drug?
2        A.   No, it didn't. It involved a
3   food or, you know, dietary substance.
4        Q.   So I'd like to introduce what
5   has been marked as Exhibit MK8.
6        (Marked Exhibit MK8.)
7        THE WITNESS: Okay.
8   BY MR. WONE:
9        Q.   Do you see that, Doctor?
10       A.   I do.
11       Q.   And were you an author on this
12  study in Exhibit MK8?
13       A.   Yes.
14       Q.   And what did this study in
15  Exhibit MK8 involve?
16       A.   This involved the evaluation of
17  consumption of green tea, green tea extract with
18  the bioactives in green tea, the effect on serum
19  lipids in postmenopausal women.
20       Q.   And green tea extract is a
21  dietary ingredient?
22       A.   Yes, it is.
23       Q.   And the study depicted in
24  Exhibit MK8 did not involve a disease, correct?
25       A.   That's correct.

183

1        Q.   If you could turn to page 1673
2   in Exhibit MK8. And I'm referring to the page
3   numbers on the top corners of the page.
4        A.   Yes.
5        Q.   In the right hand column, the
6   last paragraph before the result section, do you
7   see that, Doctor?
8        A.   Yes.
9        Q.   And do you see in the last
10  sentence that the Bonferroni correction was used
11  to adjust for multiple comparisons?
12       A.   Yes.
13       Q.   Why did you apply the Bonferroni
14  correction in the study depicted in Exhibit MK8?
15       A.   Again, I was working with a
16  statistician whose name is Renwei Wang, and
17  Jiam-Min Yuan, who are -- their experience is with
18  enormous data sets. They're epidemiologists, and
19  their experience is with huge data sets in which
20  they look at every dietary substance that the
21  person consumes in relation to cancer risk. They
22  may do hundreds and hundreds and hundreds of
23  comparisons in their papers.
24       So my opinion is that this is a
25  standard practice for them, and they have -- I

184

1   don't believe they had ever done a clinical trial
2   before this. They were using statistical methods
3   that were -- that are probably more conservative
4   than necessary, but I accepted it because I -- you
5   know, I -- I relied on them and I didn't argue
6   with them. They also were difficult to argue with
7   as far as people. And so I accepted that
8   correction. I'm not sure that it was necessary
9   for this particular paper. Hang on one second.
10       In addition, this was one of
11  those studies that was not in the original
12  protocol. So the original protocol did not have
13  lipids in it. There wasn't part -- we added it on
14  because during the study, we realized that there
15  is some evidence that green tea may be associated
16  with beneficial effect on blood lipids, and so we
17  decided to add this on. It didn't change our
18  statistics. We did comment that it was an
19  ancillary study so that this was -- and we did a
20  subgroup analysis as well, I recall. We looked at
21  hypercholesterolemic women as well as normal
22  cholesterolemic women. I believe we separated
23  them out. Hang on one second.
24       Well, we looked at the -- in
25  table 5 on page 1679, you can see that we looked

46 (Pages 181 to 184)

Case 1:17-cv-00124-LLS   Document 259-9   Filed 06/16/22   Page 49 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

185

1    at blood lipids stratified by baseline BMI because
2    we thought that could be a factor that is
3    important to take into effect.
4                On the next table, 6, we
5    actually also separated out those who used statin
6    from those who didn't because we thought that is
7    probably an important factor.  It wasn't something
8    we thought about in the beginning of the study
9    because we weren't planning on looking at lipids,
10   so statins weren't something that we were thinking
11   about.
12               So this is something that we
13   added on and that we did do subgroup analysis
14   because ultimately -- my philosophy is -- and a
15   very, very strict statistician might disagree with
16   me, but I'm more concerned with getting the truth
17   and getting the result that's real and important
18   that I am about whether or not a particular test
19   which may or may not be appropriate for this data
20   set is used.
21               So, for example, looking at
22   people who are taking statins versus people who
23   aren't seemed like a really important way to look
24   at the data.
25        Q.    And you noted in the study

186

1    **report in Exhibit MK8 that this was an ancillary**
2    **study?**
3        A.    Yes.  But it didn't affect how
4    we did the statistics, but we did note that so
5    that the reader could see.
6        Q.    **And when you applied the**
7    **Bonferroni correction to the comparisons, do you**
8    **know whether the comparisons in the study in**
9    **Exhibit MK8 were correlated?**
10              MS. METZINGER:  Objection to
11       form.
12              THE WITNESS:  I don't -- I don't
13       remember.  I'm -- I'm sorry, I don't
14       remember that.  I'd have to --
15   BY MR. WONE:
16       Q.    **What were the --**
17       A.    -- study the paper a little
18   more.
19       Q.    **What were the comparisons that**
20   **were being made in -- in Exhibit MK8?**
21       A.    Okay.  So we were looking at the
22   effect of green tea extract on total cholesterol,
23   HDL cholesterol, and triglycerides.  And we had
24   the placebo group and we had the treatment group,
25   and we also stratified by a genotype, a genetic

187

1    polymorphism in the COMT gene which we thought
2    might affect metabolism of catechins and,
3    therefore, the biological effect of catechins.
4        Q.    **And do you know whether**
5    **triglycerides and HDL are correlated?**
6        A.    You know, right off the hat --
7    the bat, I -- I don't recall.  I think we probably
8    looked for that in here.  We probably did some
9    tests to determine whether or not they're
10   correlated because that would influence the
11   statistical -- the type of statistical test that's
12   used.  And I don't recall.  I'd have to study this
13   a little bit.
14       Q.    **You can look through the article**
15   **if you'd like.**
16       A.    Okay.  Thank you.
17              I'm sorry.  I don't see it.  I
18   don't see that we looked for it.  Unless you can
19   point me to something, I don't see that we looked
20   at correlation among those -- among those
21   endpoints.
22       Q.    **Okay.  When you worked --**
23       A.    But I would -- I will tell you
24   that this study reflects one of the weaknesses or
25   one of the limitations of clinical trials, which

188

1    is that despite the fact that we recruited a
2    thousand women and we randomized them really
3    perfectly, there was a difference in baseline
4    lipids between the two groups.  It's just -- and
5    that's happened to me in other studies too.  It's
6    just bad luck.  And that happens.  And it makes
7    your -- you know, the data analysis a little bit
8    more difficult.  And it's very disappointing when
9    that happens, but that's something you find out at
10   the end of the study.
11       Q.    **Okay.  And when you're working**
12   **on an RCT, you rely on the statistician to decide**
13   **whether a correction is appropriate?**
14              MS. METZINGER:  Objection to
15       form.  Mischaracterizes the witness'
16       testimony.
17              THE WITNESS:  I wouldn't say I
18       rely on a statistician.  I rely on my
19       relationship with them and
20       conversations with them.  So I take
21       their advice very, very seriously just
22       as when I'm a -- when I'm a
23       collaborator on a study where I'm the
24       only person who has a Ph.D. in
25       nutrition, I hope that they take my

47 (Pages 185 to 188)

Kurzer, Ph.D. - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

189

1    advice when I point out things.  But
2    that doesn't mean they shouldn't be
3    doing the study or, you know, they --
4    they -- we don't -- we -- these days we
5    work in teams, and people have
6    different areas of expertise, so it's
7    extremely common to have -- you know,
8    to have someone -- to have a
9    statistician or a nutritionist who
10   interacts with the others and the
11   decisions are made as a group
12   collectively.
13   BY MR. WONE:
14        Q.   We can go back to your expert
15   report, Exhibit MK1.
16        A.   Yes.
17        Q.   And go to paragraph 47, please.
18        A.   Okay.
19        Q.   In paragraph 47, you mention the
20   word "correlated."  Could you explain what you
21   meant by "correlated" in the context of
22   paragraph 47?
23        A.   What I meant is that they are
24   not independent of each other.  They are either
25   affected by the same underlying cause or they

190

1    are -- they move in parallel to each other so that
2    you would expect that an effect on one would
3    probably be similar to an effect on the other.
4    That's what I mean by "correlated."
5        Q.   Do you know whether all aspects
6    of cognitive function are correlated?
7             MS. METZINGER:  Objection to
8        form.
9             THE WITNESS:  I don't know in
10       the statistical sense whether they're
11       correlated, but I know in the common
12       sense that they're correlated because
13       the factors, if you -- if you look into
14       detail on each of these different
15       factors -- and I did do that for
16       this exact reason, you can see that
17       many of the same things contribute to
18       each of these endpoints.  So --
19   BY MR. WONE:
20       Q.   How --
21       A.   Yeah.
22       Q.   Go on.  I didn't mean to cut you
23   off.
24       A.   So that -- so that -- you know,
25   if attention -- as we said before, I think we

191

1    talked about this before, you know, in order to
2    learn, you have to have memory.  You have to have
3    a good memory to learn.  You have to be able to
4    pay attention.  So there's all -- there's a --
5    every -- I think that even the folks in this field
6    agree that there is overlap among these.  That
7    would result in them being highly correlated.
8    They're not independent if there's overlap.
9        Q.   So you described I think what
10   you meant by common sense correlation, but you
11   distinguished it from statistical correlation.
12   What is the difference?
13       A.   The difference is that I haven't
14   seen the statistical data to show that these --
15   I -- I didn't pay a lot of attention when I was
16   writing this up to the statistical data showing
17   that these endpoints are statistically correlated
18   with each other because there are methods of
19   statistical analysis that can determine
20   correlation independence.  And I don't recall
21   seeing those kinds of data that actually
22   statically prove the correlation.  But if
23   something -- if a measurement includes pieces of
24   another measurement, it just makes sense that
25   they're correlated, they're not independent.

192

1        Q.   And how do you know whether --
2    how do you know the level of correlation between
3    two things that are not independent?
4             MS. METZINGER:  Objection to
5        form.
6             THE WITNESS:  That would require
7        a statistical test to be able to see
8        the level of correlation.  But, you
9        know -- for example, you know, just out
10       of kind of real life, I think that I
11       can say pretty conclusively that it's
12       easier for tall people to reach my
13       upper cabinets than it is for short
14       people.  I don't need to do a
15       statistical test to prove that, you
16       know.  I just know that.  So that's
17       where I say common sense has to come
18       into this, that if you're a
19       statistician, you're going to go, oh,
20       my, do you have enough participants and
21       have you done the right tests.  There
22       are some things that are fairly
23       obvious.
24   BY MR. WONE:
25       Q.   So if I'm understanding you

48 (Pages 189 to 192)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                                    9/29/2021

193

1   right, you believe that memory and executive
2   function are correlated, correct?
3        A.    Memory and executive function, I
4   would say probably.  But certainly memory and
5   attention are correlated.  I'm certain of that.
6   And sometimes people talk about concentration, and
7   concentration and attention seem to be very, very
8   overlapping concepts.
9        So executive function is kind of
10  unique, so I would have to think about that a
11  little bit, whether executive function would be --
12  would be related but -- to some of these others.
13       But there's a concept of working
14  memory.  And they often talk about working memory
15  versus executive function.  They're very, very
16  overlapping.  You know, executive function is the
17  ability to manage many things in your brain at the
18  same time.  And working memory is very similar.
19  It's the ability to manipulate thoughts and ideas
20  and concepts.  So they're very, very similar
21  ideas.
22       Q.    And do you know the level of
23  correlation between memory and attention?
24       A.    I don't know the level of
25  correlation, no.

194

1        Q.    Do you know the level of
2   correlation between working memory and executive
3   function?
4        A.    I do not.
5        MR. WONE:  Can we go off the
6   record for a moment?
7        THE VIDEOGRAPHER:  We are going
8   off the record at 1:51 P.M.
9        (Off the record from 1:51 until
10  1:52.)
11       THE VIDEOGRAPHER:  We are going
12  back on the record at 1:52 P.M.
13  BY MR. WONE:
14       Q.    So in paragraph -- I'm sorry, on
15  page 11 of your expert report --
16       A.    Yes.
17       Q.    -- Exhibit MK1, you mentioned
18  that the -- you believed the data from the Madison
19  Memory Study should be analyzed as a whole,
20  correct?
21       A.    Yeah, it should be looked at as
22  a whole, yes.
23       Q.    And what did you mean by that?
24       A.    What I mean is that in the
25  context of my report that the statistical

195

1   comparisons are important, but it's also important
2   to look at trends.  And as I said before, I think
3   that trends are extremely important.  And many of
4   my colleagues who do human studies with dietary
5   substances agree that trends are important to
6   report because we often don't have the statistical
7   power to -- you know, we don't -- we don't have,
8   you know, the ability to recruit a thousand people
9   or 500 people.  And so it's very, very difficult
10  also with all of the factors that influence and
11  cause variability between people.  It's very
12  difficult for us to get statistical -- to
13  statistically significant results.  Everything is
14  stacked against us.  There's an enormous amount of
15  variability that humans have that we don't have
16  with animal experiments.  And because we don't
17  even know what some of the factors are
18  contributing to variability, we can't control for
19  them.
20       So because of that, I think it's
21  very important to not just very narrowly and very
22  strictly look at the p-values, but also to look at
23  trends.  And I don't know if you have any of my
24  papers pulled up, but I have many papers where I
25  talk about trends and I report them.  So that's

196

1   what I meant by looking at the data as a whole.
2        Look at the statistical
3   analysis, yes, it's important.  No question about
4   it.  But it's also important to see that the
5   trends that are observed are unlikely to occur
6   randomly.
7        Q.    Let's talk about the Madison
8   Memory Study.  Did you look at the entire
9   population of the Madison Memory Study?
10       MS. METZINGER:  Objection to
11  form.
12       MR. WONE:  I'll correct it.
13  BY MR. WONE:
14       Q.    Did you analyze the data for the
15  entire population of the Madison Memory Study?
16       MS. METZINGER:  Objection to
17  form.
18       THE WITNESS:  I don't believe
19  that I did.  I focused on the
20  manuscript, so I don't -- I don't --
21  that they reported on that.
22  BY MR. WONE:
23       Q.    Now, when you look at the entire
24  population in the Madison Memory Study, was there
25  statistically significant results between group on

49 (Pages 193 to 196)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                9/29/2021

197

1   any of the measures?
2        A.   Can you point me to the paper
3   where that would be and I'll -- I'll look at it
4   more closely?
5             MS. METZINGER:  I'll just note
6        my objection to the form of that
7        question as well.
8   BY MR. WONE:
9        Q.   So if you go to Exhibit MK3.
10       A.   MK3, mm-hmm.
11       Q.   And turn to page 5. And I'm
12  referring to the page numbers on the bottom
13  corners of the document.
14       A.   Yep.
15       Q.   First line of the result
16  section.
17       A.   Okay.  Mm-hmm.  I see that.
18       Q.   Do you understand that to --
19       A.   They did do -- they did do an
20  analysis of the entire population.
21       Q.   And do you agree that there were
22  no statistically significant results for the
23  entire population?
24            MS. METZINGER:  Objection to
25       form.

198

1             THE WITNESS:  I don't see the
2        data.  I believe their sentence.  I
3        believe their statement, but I don't
4        see the data, so I couldn't comment on
5        it.
6   BY MR. WONE:
7        Q.   You don't have any reason to
8   disagree with what's written in that sentence --
9        A.   That's correct.  That's correct.
10       Q.   Okay.  If we could go back to
11  your expert reports, Exhibit MK1.  If you could go
12  to paragraph 33.
13       A.   Okay.
14       Q.   Kind of in the middle of the
15  paragraph where you're discussing the results of
16  the AD8 0-2 group, you use the phrase
17  "significantly more."
18            Do you see that?
19       A.   Yes.
20       Q.   And when you said "significantly
21  more," what kind of significance did you mean?
22       A.   I meant statistically
23  significantly more.
24       Q.   Do you know whether the
25  improvement was clinically significant?

199

1        A.   I don't know if the improvement
2   is clinically significant, but I do believe that
3   the effect size is -- is a medium to high effect
4   size when you look at the effect size.  But -- but
5   I do not know whether or not -- what the level of
6   clinical significance of these differences are.
7        Q.   Could a medium to high effect
8   size still be clinically -- not clinically
9   significant?
10            MS. METZINGER:  Objection to
11       form.
12            THE WITNESS:  That's a hard
13       question to ask, Mr. Wone -- to answer,
14       Mr. Wone.  I think it depends on the
15       situation.
16  BY MR. WONE:
17       Q.   I'm talking about the situation
18  specifically in the Madison Memory Study.
19       A.   It is possible.  It is possible
20  that statically significant results are not
21  clinically significant.
22       Q.   Okay.  Further down in
23  paragraph 33, last full sentence starting with
24  within the AD8 0-1 group --
25       A.   Yes.

200

1        Q.   -- you again use the phrase
2   "significantly more."
3             Do you see that?
4        A.   Yes.
5        Q.   And were you referring to
6   statistical significance in this --
7        A.   Yes.
8        Q.   -- sentence?
9        A.   Yes.
10       Q.   Do you know whether the
11  improvement you mentioned in this sentence in
12  paragraph -- the last sentence of paragraph 33 was
13  clinically significant?
14       A.   I can't comment on that.
15       Q.   Do you know whether any of the
16  measures in the AD8 0-2 group that were
17  statistically significant measured memory?
18       A.   Okay.  So it was the -- so the
19  three tests that were statically significant were
20  tests that measured executive function, attention,
21  and visual learning.  Visual learning certainly
22  requires memory.  Right?  You can't learn
23  something unless you can remember it.  It requires
24  memory.  So memory is connected with visual
25  learning.

50 (Pages 197 to 200)

Kurzer, Ph.D. - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                                     9/29/2021

201

1    In addition, executive function,
2 your ability to -- to organize your thoughts
3 and -- requires that you can remember things.
4 Otherwise, you cannot organize them.
5    So the statistically significant
6 ones were not tests that focused on memory as a
7 primary outcome, but they certainly require good
8 memory in order to be good on those tests.
9    And the -- there are a couple of
10 other tests that do specifically point -- are
11 specifically said to test memory itself, which are
12 the delayed recall tests, and -- and those tests,
13 I believe, showed a trend towards being effective.
14    **Q.    Did any of the measures in the**
15 **AD8 0-2 group that focus on memory specifically**
16 **have statically significant results?**
17    A.    No.
18    MS. METZINGER:  Objection to
19 form.
20 BY MR. WONE:
21    **Q.    So even though none of the**
22 **measures for the 0-8 group -- 0 -- sorry.**
23    **Even though none of the measures**
24 **for the 0-2 group that had memory as a specific --**
25 **as a specific outcome was statically significant,**

202

1 **you would still conclude that Prevagen has**
2 **improved memory?**
3    A.    Yes.
4    MS. METZINGER:  Objection to
5 form.
6    THE WITNESS:  Yes, I would.  And
7 the -- and the reason, Mr. Wone, is a
8 couple of things.  One is that there's
9 a reason why a battery of tests is
10 being done.  There's a reason why they
11 don't just do one test because they
12 need to capture as many aspects of
13 memory and cognitive function as
14 possible.  So they do these battery of
15 tests.  And, in fact, some of them
16 supposedly focus on the same thing.  So
17 there are a few that focus on memory.
18    But that's why you do a battery
19 of tests, because no one test in itself
20 is going to tell you whether or not --
21 whether or not memory is affected.  You
22 have to look at all of them.  That's
23 why they do batteries of tests.
24    You know, you will never see
25 something related to brain function,

203

1 a -- a test given to humans related to
2 brain function.  It's very rare that
3 you'd ever see one.  All of the
4 different tests that are -- that are
5 used and have been validated and are
6 used in research studies have multiple
7 aspects of them, whether it's a
8 subjecting survey that's given or tests
9 like this.  You have to give a battery
10 to capture the result because any --
11 the result of any one is not nearly as
12 meaningful as the overall result of all
13 of them.
14    And because three out of nine
15 showed statistically significant
16 effects in the direction of a benefit
17 for apoaequorin and then five
18 additional tests showed a trend in the
19 direction of benefit, my interpretation
20 of that is that that is extremely
21 unlikely to happen by chance, that if
22 everything were random, you'd expect to
23 see not only five tests that show no
24 results, but you'd accept -- you'd
25 expect to see as many tests showing the

204

1 placebo is better than apoaequorin as
2 you see showing that apoaequorin is
3 better than the placebo, and you just
4 don't in these data.  The data as a
5 whole then you look at it is pointing
6 in the direction of a benefit
7 statically and also via trends.
8 BY MR. WONE:
9    **Q.    I'm sorry.  What was the last**
10 **word you said?  Via?**
11    A.    Statically and also by looking
12 at trends.  Looking at the statistics and the
13 trends together for all nine of these tests, to me
14 the conclusion I reach is that there is a benefit.
15    **Q.    You've mentioned trends, so why**
16 **don't we return to a page in your report where we**
17 **discuss that further.  If you could turn to**
18 **page 11, paragraph 50, please.**
19    A.    Yes.
20    **Q.    And in this section, you state**
21 **that conclusions should be drawn logically?**
22    A.    Mm-hmm.
23    **Q.    What did you mean by that?**
24    A.    Well, by logic, what I mean is
25 what I was talking about before, that there's a

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Case 1:17-cv-00124-LLS   Document 259-9   Filed 06/16/22   Page 54 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                          9/29/2021

205

1    certain amount of common sense and logic that
2    needs to be applied in the context of statistical
3    analysis.
4              It's very easy for statisticians
5    to get caught up with numbers and to forget the
6    bigger picture of what they're looking at, and all
7    they care about is the p-value and the corrections
8    and that's where they stop.  And they may not have
9    any knowledge of the biology at all.  They may
10   completely not know anything about biology.  All
11   they know is mathematics and -- and that's where
12   their knowledge ends.
13             What I mean by logic or common
14   sense is that, as I said -- and this could even
15   potentially be a statistical point, is that when
16   you look at table 1, which is on the next page,
17   and you see the nine tests and you see that --
18   that three of them show a statistical benefit in
19   the direction of effectiveness, one of them shows
20   exactly the same effect, so there's no -- no
21   difference.  And the other five show the direction
22   of the difference is in direction of benefit of
23   apoaequorin.
24             And what I mean by logic is that
25   is very unlikely to have happened by chance, that

206

1    if you were expecting the effects to be totally
2    random, that if you see three statically
3    significant results in the direction of benefit of
4    apoaequorin, you ought to see three statistically
5    significant effects in the direction of benefit of
6    the placebo.  That would be random.  And the
7    trends should also be showing trends in both
8    directions.  That would be random.
9              If what you see is statistical
10   significance with a few of these and most of the
11   others show the direction of a benefit, my
12   interpretation of this, and this is using my
13   logic, not using a statistical analysis, it's
14   using other parts of my brain to understand this,
15   is that the totality of the data here point very
16   clearly in the direction of a benefit.
17        Q.    Are there standards that experts
18   in your field use to draw conclusions logically?
19             MS. METZINGER:  Objection to
20   form.
21             MR. de LEEUW:  Objection to
22   form.
23             THE WITNESS:  No, there aren't
24   and standards for logic.  And I would
25   say that -- but I would say that many,

207

1    many of my colleagues would agree with
2    me about this.  Many colleagues who
3    work in nutrition, who work in the
4    fields -- some field related to dietary
5    supplements who would look at this
6    would agree that trends are very, very
7    important, people who do human
8    experimentation and understand the
9    variability.  Particularly, researchers
10   who are looking at very, very low risk
11   substances, the trends would be
12   extremely important.
13             So I don't think that there is a
14   standard.  But, in my view, the fact
15   that there isn't a standard doesn't
16   mean that it's not right.
17   BY MR. WONE:
18        Q.    And so it's possible that
19   another expert in your field could draw a
20   different conclusion even though both of you are
21   looking at something logically?
22             MS. METZINGER:  Objection to
23   form.
24             THE WITNESS:  Anything is
25   possible.

208

1    BY MR. WONE:
2         Q.    Okay.  In paragraph 50, you also
3    use the phrase, and we've -- you've used it
4    earlier today, "nonsignificant trend towards
5    efficacy."
6         A.    Yes.
7         Q.    Do you see that?
8         A.    Yes.
9         Q.    And when does something trend
10   towards efficacy?
11        A.    The trend reflects the direction
12   of the absolute changes.  And, you know, I will
13   say that I know that one of the -- one of the
14   statistical experts, FTC experts, said it's not
15   statically significant, end of story, you don't
16   even talk about it.  And I disagree with that very
17   strongly.
18             I -- I certainly feel, and I
19   teach my students this all the time because they
20   make the mistake of saying simply this -- the
21   treatment differs from the placebo because the
22   absolute number is different without clarifying
23   that they're not -- they are actually not
24   statically significant.  So that's true, in a
25   statistical sense they're not different.  But --

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

---

209

1   and so you should never ever say that they're just
2   flat-out that they're different if it's only the
3   absolute differences.
4           But you certainly can say, and
5   it's perfectly permissible to say, there is a
6   difference, but it's not statistically significant
7   especially when in the context of what we're
8   talking about here, which is a number that are all
9   trending in the same direction.  That's when
10  trends really interest me.
11          If it's just a one-off thing
12  that is a trend, I probably wouldn't comment on
13  it.  If one of them was going in the direction of
14  benefit, I wouldn't have valued that very much.
15  But when almost all of them do, to me, that's
16  where I say we got to look at this and take
17  this -- take this, you know, as important -- an
18  important result.
19      Q.   And would even a small amount of
20  improvement in the direct -- sorry.
21          Would even a small increase
22  towards the direction of improvement mean that
23  something trend towards efficacy?
24          MS. METZINGER:  Objection to
25      form.

---

210

1           THE WITNESS:  Yes, I think that
2   it does in the context of having nine
3   tests here.  So you have to keep
4   remembering context that we're talking
5   about.  You know, if there was one
6   small change in the direction of
7   efficacy in -- in a large group, I
8   would not say that that's important.
9   But the fact that five out of nine of
10  these or -- or let's say there were
11  three significant results and five out
12  of six of the other results go in the
13  direction of efficacy, as I said
14  before, I hate to keep repeating
15  myself, it is unlikely to be random, a
16  random effect.
17          So in the context of all of
18  these tests being done, I would make
19  that statement.  But I would not
20  necessarily make that statement about
21  one result.  I wouldn't look at one
22  result necessarily and say it's
23  trending in a certain direction.  But
24  because it's a group of results, then
25  it becomes more interesting.

---

211

1   BY MR. WONE:
2       Q.   You used the expression earlier
3   that something cannot -- that it can't be
4   explained by chance.  So I'd like to I guess
5   understand, when you say it can't be explained by
6   chance, what do you mean?
7       A.   What I -- what I said was that
8   it's very unlikely to be explained by chance.  And
9   what I mean by that is if you have -- if you have
10  eight tests that you're giving, that randomness,
11  if the effects are entirely random, you would not
12  expect to see any kind of pattern.  You'd expect
13  to see results going in every direction.  And that
14  would -- that is what randomness means.  It means
15  there is equal probability of the result going in
16  one direction as there is of the result going in
17  the other direction.  And so because of that, you
18  should see the results going in both directions.
19  But -- and that's what I mean by -- by unlikely to
20  be explained by chance.
21      Q.   And so if you don't see the
22  results going in both directions, you believe it's
23  unlikely, but it's not impossible that it's -- it
24  could still be related to chance, correct?
25          MS. METZINGER:  Objection to

---

212

1   form.
2           THE WITNESS:  Well, Mr. Wone, it
3   could be related -- it could be a
4   result of chance in the same way that
5   even if you get a p-value of .05, it's
6   possible that that really was a result
7   of chance too.  As I said, anything is
8   possible when you're talking in the --
9   in the world of hypotheticals.  But
10  it's very, very unlikely, which I think
11  is a more relevant -- a more relevant
12  approach to this than -- than using
13  whether it's possible or not.
14  BY MR. WONE:
15      Q.   And in the -- in the Madison
16  Memory Study when you describe measures as
17  trending towards efficacy, do you know whether
18  those improvements were clinically significant?
19      A.   I do not.  I cannot -- I cannot
20  answer regarding clinical significance.
21      Q.   Well, let's look at one of your
22  tables.  If you could turn to page 12, table 1.
23  Do you see that, Doctor?
24      A.   Yes, I do.
25          And I apologize if you can hear

---

53 (Pages 209 to 212)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                     9/29/2021

213

1    the lawn mower in the background.  They'll be gone
2    in a couple of minutes.
3        Q.    I cannot, so --
4        A.    Okay.  Good.
5        Q.    -- we're fine.
6              And so in the second column,
7    when you say "Direction of Improvement, Increase"
8    or "Decrease," what did you -- how did you decide
9    whether to put increase or decrease?
10       A.    The direction of improvement in
11   this particular -- in this particular column
12   refers to the direction -- some of these tests, if
13   you -- if the -- if the number goes down, it's a
14   good thing.  And others of the tests, if the
15   number goes up, it's a good thing.  So that's what
16   this is saying, that with the ISL and the ISRL, if
17   the numbers increase, that shows improvement.
18   With the GML and the GMR, if the numbers decrease,
19   that shows improvement.  So that's what that
20   column is referring to.
21       Q.    Okay.
22       A.    I'm sorry if it wasn't clear.
23       Q.    And so for the last two, ONB, a
24   decrease means that if the number went down, that
25   would be an improvement?

214

1        A.    That's correct.
2        Q.    So I'd like to introduce what's
3    been marked as Exhibit MK9.
4              (Marked Exhibit MK9.)
5              THE WITNESS:  Okay.
6    BY MR. WONE:
7        Q.    Do you see that, Doctor?
8        A.    Yes.
9        Q.    Okay.  And just to, I guess, go
10   back.  When you said in your report in table 1,
11   ONB, what measure was ONB?
12       A.    They -- I think the one -- the
13   one card back.  Is that the one that it is?
14       Q.    Okay.  And do you know what TWOB
15   was?
16       A.    The two card back.
17       Q.    And if you could go to -- back
18   to Exhibit MK9 and turn to page 4.
19       A.    Okay.
20       Q.    Do you see the -- under the task
21   name "One Back"?
22       A.    Yes.
23       Q.    And do you see the fourth column
24   under description?
25       A.    Yes.

215

1        Q.    And what does under
2    description -- under description, what does the
3    document say a higher score means on the One Back?
4        A.    Higher score is better
5    performance.
6        Q.    Going back to your report in
7    Exhibit MK1, what did you write in the direction
8    of improvement for the One Back?
9        A.    I wrote decrease.
10       Q.    And so does the document I've
11   shown you in Exhibit MK9 change your opinion about
12   whether a decrease or increase is the direction of
13   improvement?
14             MS. METZINGER:  Objection to
15   form.
16             THE WITNESS:  Hang on one
17   second.
18             It looks like that's correct.
19   It looks like that there's an error
20   somewhere because this does not agree
21   with what I had in my report.  And I
22   did not have access to this Cogstate
23   document when I was writing my report.
24   I've not seen this Cogstate document
25   before.  And so I was using other

216

1    documents in order to -- to determine
2    which direction the benefit or
3    effectiveness would be shown.  But it
4    looks as though you're correct, that
5    the One Back test -- in the One Back
6    test, the Cogstate document says that a
7    higher score is better performance.
8    BY MR. WONE:
9        Q.    Okay.
10       A.    And in my document, I wrote that
11   a lower score is better -- is better performance.
12   So there does seem to be some kind of error
13   between the two.
14       Q.    And so when you report in table
15   1, the direction of improvement for the One Back
16   should be increase, not decrease?
17       A.    Yeah, if the Cogstate document
18   is correct, then you're right, it should be
19   increase rather than decrease.
20             I would want to see the -- not
21   just the Cogstate document -- which, of course, is
22   probably correct.  I don't doubt that.  But I
23   would want to look at some of the other sources I
24   had to try to see why I put decrease and see if
25   it's possible that there's some other kind of

54 (Pages 213 to 216)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

217

1    error.
2              But assuming that the Cogstate
3    document is correct, then you're right, that's --
4    that's a mistake.
5         Q.    And assuming that the Cogstate
6    document is correct, does it also mean that in
7    table 1 the -- when you change increase --
8    decrease to increase, that the placebo
9    outperformed the treatment group on the One Back?
10        A.    That's correct.
11             MS. METZINGER:  Objection to
12        form.
13   BY MR. WONE:
14        Q.    And is it also correct to say
15   that instead of "effective" in the last column on
16   the right, it should say "placebo better"?
17        A.    Yes.
18             MS. METZINGER:  Objection to
19        form.
20   BY MR. WONE:
21        Q.    I'd like to go back to
22   Exhibit MK9.  If you could go back to page 4 and
23   look at the task for Two Back.  Do you see that,
24   Doctor?
25        A.    I do.

218

1         Q.    And do you see what the
2    description column says for the Two Back regarding
3    higher score?
4         A.    Yes.  Higher score, better
5    performance.
6         Q.    And what did you say -- Two Back
7    in table 1 of your report in Exhibit MK1?
8              MS. METZINGER:  Eric, your audio
9         cut out for that question.
10             MR. WONE:  Sure.
11   BY MR. WONE:
12        Q.    What did you say the direction
13   of improvement should be in table 1 of your expert
14   report --
15        A.    The same thing as --
16        Q.    -- for the Two Back?
17        A.    -- the other, decrease.  And it
18   looks as though it should actually be increase if
19   the Cogstate report is correct.
20        Q.    And if the direction improvement
21   for the Two Back should be increase, does that
22   mean that the placebo group outperformed the
23   treatment group?
24             MS. METZINGER:  Objection to
25        form.

219

1              THE WITNESS:  I would say that
2         the trend would be in that direction.
3    BY MR. WONE:
4         Q.    And so the trend should say,
5    instead of "effective" for the Two Back in table
6    1, it should say "placebo better," correct?
7         A.    Yes.
8              MS. METZINGER:  Objection to
9         form.
10   BY MR. WONE:
11        Q.    And going on to table 2 of your
12   expert report, which is on page 13, should the
13   direction of improvement for the One Back in
14   table 2 also say "increase"?
15             MS. METZINGER:  Objection to
16        form.
17             THE WITNESS:  Yes.
18   BY MR. WONE:
19        Q.    And with that change to say
20   "increase," did the placebo group outperform the
21   treatment group on the One Back measure in
22   table 2?
23        A.    Yes.
24             MS. METZINGER:  Objection to
25        form.

220

1    BY MR. WONE:
2         Q.    And so instead of "effective,"
3    it should say "placebo better" in the trend column
4    for the One Back, correct?
5         A.    Correct.
6              MS. METZINGER:  Objection to
7         form.
8    BY MR. WONE:
9         Q.    And how about the Two Back in
10   table 2?  Instead of "decrease," should it also
11   say "increase"?
12             MS. METZINGER:  Objection to --
13             THE WITNESS:  Yes.
14             MS. METZINGER:  -- form.
15   BY MR. WONE:
16        Q.    What was your answer, Doctor?
17        A.    Yes.
18        Q.    And with that change to
19   increase, did the placebo group outperform the
20   treatment group on the Two Back in table 2?
21             MS. METZINGER:  Objection to
22        form.
23             THE WITNESS:  Yes.
24   BY MR. WONE:
25        Q.    And should the trend for the Two

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Case 1:17-cv-00124-LLS   Document 259-9   Filed 06/16/22   Page 58 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

221

1    Back in table 2 say "placebo better" instead of
2    "effective"?
3        A.   Yes.
4            MS. METZINGER:  Objection to
5    form.
6    BY MR. WONE:
7        Q.   So with these changes to
8    table 2, how many measures trend towards placebo?
9            MS. METZINGER:  Objection to
10   form.
11           THE WITNESS:  In table 2, which
12   is the 0-1 group, which is not the
13   exact group of interest, then what we
14   find is that three of the endpoints
15   are -- show statically significant
16   effectiveness.  And of the other six,
17   three of them, the trend -- I would --
18   I would say that the trends are not --
19   don't -- are not helpful in -- because
20   they cancel each other out.
21           So there were -- in the trends,
22   there were three that go in the
23   direction of apoaequorin effectiveness
24   and there are three that go in the
25   direction of the placebo being better.

222

1            But that doesn't take away from the
2    fact that the only statistically
3    significant effects that were seen are
4    three in the direction of -- of
5    apoaequorin.
6    BY MR. WONE:
7        Q.   Wouldn't there be four measures
8    that are placebo better?
9        A.   Oh, I'm --
10       Q.   One --
11       A.   -- sorry.
12       Q.   -- Back --
13       A.   Right.
14       Q.   One Back, Two Back --
15       A.   Ah --
16       Q.   -- ISLR --
17       A.   -- yes.
18       Q.   -- and the --
19       A.   Yes.
20       Q.   -- IDN?
21       A.   Yes, that's right.  And the --
22           MS. METZINGER:  Objection to
23   form.
24           Dr. Kurzer, just give me a
25   moment to state my objection before

223

1    you --
2            THE WITNESS:  I'm sorry.
3            MS. METZINGER:  Thank you.  You
4    can go ahead.
5    BY MR. WONE:
6        Q.   What was your response to my
7    question, Doctor?
8        A.   That's correct, in the 0-1
9    group, if what you're saying is correct, that the
10   One Back and Two Back should be increased in the
11   direction of improvement, then there are three
12   tests that show statically significant benefit of
13   apoaequorin.  And of the six other tests that do
14   not show statistical significance, two are
15   trending in the direction of effectiveness of
16   apoaequorin and four are trending in the direction
17   of the placebo being better.
18       Q.   So if -- if five measures
19   overall trend toward treatment and four measures
20   trend towards placebo, would you agree that that
21   is close to what you would expect for a random
22   effect?
23           MS. METZINGER:  Objection to
24   form and mischaracterizes the witness'
25   testimony.

224

1            THE WITNESS:  In this case, with
2    this table, I think the fact that we
3    find three to be statically significant
4    in the direction of efficacy and we
5    find none to be statically significant
6    in the direction of the placebo being
7    better, it still provides evidence
8    providing towards efficacy of -- of
9    apoaequorin.
10           And if you look at the A
11   through 2 group on the previous table,
12   table 1, I think it's even more the --
13   what I just said is even more apparent
14   because there are only what -- in table
15   1, when we look at the 0-2, which in my
16   view, my interpretation of the methods
17   and the protocol is that this is the
18   group of interest, that there are three
19   tests that show statistical
20   significance in the direction of
21   effectiveness, that show statistically
22   significant effectiveness, that there's
23   one that shows no difference, that
24   there are two that show a trend towards
25   the placebo being better, and there are

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

225

1    then three that show a trend towards
2    the apoaequorin being better.
3         So this table 1 is more relevant
4    than table 2, although I think they
5    both provide evidence that apoaequorin
6    is effective.  I think table 1 is more
7    relevant and the data are a little bit
8    stronger.
9    BY MR. WONE:
10        Q.    Are participants in the AD8 0-1
11   group healthy older adults?
12        A.    Yes, in my opinion they are.
13        Q.    And it's your opinion that
14   Prevagen is intended for healthier older adults?
15        A.    Yes.
16             MS. METZINGER:  Objection to
17   form.
18   BY MR. WONE:
19        Q.    If we could go to paragraph 52
20   of your report --
21        A.    Mm-hmm.
22        Q.    -- Exhibit MK1.
23        A.    Yes, I'm here.
24        Q.    In your second to last sentence,
25   you say that the -- starting with "As is true," do

226

1    you see that sentence?
2         A.    Yes, I do.
3         Q.    You use the phrase "strongly
4    suggestive of a benefit of treatment."
5              What did you mean by "strongly
6    suggestive"?
7         A.    What I mean is that the data
8    suggests a benefit of treatment.  And the word
9    "strongly" is meant to sort of emphasize that a
10   little bit.
11        Q.    And given the changes we've
12   discussed, is it still your opinion that the data
13   is strongly suggestive of a benefit of treatment?
14             MS. METZINGER:  Objection.
15             THE WITNESS:  I would
16   probably --
17             MS. METZINGER:  Go ahead.  Thank
18   you.
19             THE WITNESS:  I would probably
20   take out the word "strongly" and I
21   would say it is suggestive of a
22   benefit.  I still believe that
23   table 1 -- that table 2, excuse me, is
24   suggestive of a benefit, although not
25   as strongly as table 1.

227

1    BY MR. WONE:
2         Q.    And when something is suggestive
3    of a benefit, does that mean it's not proven?
4              MS. METZINGER:  Objection to
5    form.
6              THE WITNESS:  To me, the word
7    "proven" is not a very useful word
8    because in science, as you well know
9    with -- there is a -- a spectrum of
10   proof, and you have to decide what your
11   threshold is for accepting that
12   evidence.  It's very hard to say that
13   anything is proven in the sense that --
14   you know, that absolutely a hundred
15   percent.  It's really what is the
16   threshold of evidence.  And in this
17   case, I would say that the threshold is
18   met for it to be -- for there to be a
19   benefit from apoaequorin.
20   BY MR. WONE:
21        Q.    So if I'm understanding you
22   correctly, you believe the threshold for showing a
23   benefit of apoaequorin is met when the data is
24   suggestive?
25             MS. METZINGER:  Objection to

228

1    form.
2              THE WITNESS:  I think that the
3    word "suggestive," you're interpreting
4    it as meaning -- you're interpreting it
5    a little bit differently than me.  I'm
6    using the word "suggestive" because we
7    haven't proven statistical significance
8    for all of the endpoints, and so I'm
9    using that word to soften my conclusion
10   a little bit.  But I could have written
11   it differently and said it is
12   suggestive of a benefit of treatment,
13   but I wanted to acknowledge that there
14   were some results that did not
15   statically show benefit.
16   BY MR. WONE:
17        Q.    And you also don't know whether
18   the benefits that you saw were clinically
19   significant?
20        A.    That's correct.
21             MS. METZINGER:  Objection.
22   Asked and answered.
23             MR. WONE:  Can we go off the
24   record for a moment?
25             MS. METZINGER:  Sure.

57 (Pages 225 to 228)

Case 1:17-cv-00124-LLS   Document 259-9   Filed 06/16/22   Page 60 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                          9/29/2021

229

1      THE VIDEOGRAPHER:  We are going
2  off the record at 2:36 P.M.
3      (Off the record from 2:36 until
4  3:07.)
5      THE VIDEOGRAPHER:  We are going
6  back on the record at 3:07 P.M.
7  BY MR. WONE:
8      **Q.   Dr. Kurzer, if you could go back**
9  **to your expert report, Exhibit MK1, please, and**
10 **turn to paragraph 47.**
11     A.   Okay.
12     **Q.   In that paragraph, do you see an**
13 **article by Eichstaedt cited?**
14     A.   Yes.
15     **Q.   Hold on a second.  Sorry.**
16     **Okay.  I'm introducing what has**
17 **been mark as Exhibit MK10.**
18     (Marked Exhibit MK10.)
19 BY MR. WONE:
20     **Q.   Do you see that, Dr. Kurzer?**
21     A.   I do.
22     **Q.   And is this the Eichstaedt**
23 **article that you cited in your expert report?**
24     A.   I assume that it is because
25 you're telling me so.  So, you know, it is --

230

1  Eichstaedt is the first author, so I assume that
2  that's correct, yes.
3      **Q.   In this article, Eichstaedt**
4  **discusses an alternative to Bonferroni --**
5      A.   Mm-hmm.
6      **Q.   -- correct?**
7      A.   Yes.
8      **Q.   And what was the alternative**
9  **that Eichstaedt mentioned?**
10     A.   It's a different type of -- of
11 correction called "The Holm's sequential
12 Bonferroni procedure."
13     **Q.   And do you agree that Eichstaedt**
14 **believes that Holm is better because it protects**
15 **against heightened type 1 error without**
16 **increasing -- unnecessarily increasing type 2**
17 **error?**
18     MS. METZINGER:  Objection to
19     form.
20     THE WITNESS:  I believe that
21     that's what they are saying.
22 BY MR. WONE:
23     **Q.   And was Eichstaedt recommending**
24 **use of the Holm correction in -- in**
25 **neuropsychological studies?**

231

1      A.   They're saying that it may be a
2  better test than the Bonferroni.
3      **Q.   Do you believe that Holm would**
4  **be an appropriate correction to apply in the**
5  **Madison Memory Study?**
6      A.   I can't answer that from just
7  seeing one paper making this suggestion.  My
8  reason for citing this was just to add to the
9  literature showing that there isn't necessarily a
10 consensus among statisticians.  But I haven't seen
11 the Holm's sequential Bonferroni applied to these
12 data and so I can't comment on if it would be
13 appropriate or not.
14     It may be that it's -- that
15 it's -- that it turns out to be overly strict just
16 as Bonferroni is, although they say that it -- it
17 doesn't cause an increased type 2 error rate.  I
18 would need to really see it done to be able to see
19 that.
20     **Q.   Have you ever used the Holm**
21 **Bonferroni in any of your research?**
22     A.   I have not.
23     **Q.   Do you have any other**
24 **experiences with the Holm Bonferroni correction?**
25     A.   I do not.

232

1      **Q.   I'd like to introduce what's**
2  **been marked as Exhibit MK11.**
3      (Marked Exhibit MK11.)
4  BY MR. WONE:
5      **Q.   Do you see that, Dr. Kurzer?**
6      A.   I do.
7      **Q.   Do you recognize the document in**
8  **Exhibit MK11, Doctor?**
9      A.   No, I don't.
10     **Q.   For the Madison Memory Study,**
11 **have you ever seen data for any of the AD8 groups**
12 **listed in Exhibit MK11?**
13     MS. METZINGER:  Objection to
14     form.
15     THE WITNESS:  The manuscript
16     shows the 0-1 and the 0-2.  And then I
17     think we also saw the 3-5.  I don't
18     recall seeing the other data.
19 BY MR. WONE:
20     **Q.   How about outside of the**
21 **manuscript?  Have you seen any of the other AD8**
22 **groups besides the ones you just mentioned?**
23     A.   I don't recall.  I don't recall
24 seeing them.
25     **Q.**   ████████████████████

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                          9/29/2021



233

```
 1
 2
 3
 4          MS. METZINGER:  Objection to
 5     form.
 6          THE WITNESS:
 7
 8     BY MR. WONE:
 9          Q.
10
11          MS. METZINGER:  Objection to
12     form.
13          THE WITNESS:
14
15     BY MR. WONE:
16          Q.
17
18
19          MS. METZINGER:  Objection to
20     form.
21          THE WITNESS:
22
23     BY MR. WONE:
24          Q.  Yes.
25          MS. METZINGER:  What was the
```

234

```
 1     question, Mr. Wone?
 2          (Reporter read back requested
 3     material.)
 4          MS. METZINGER:  Objection to
 5     form.
 6          THE WITNESS:
 7
 8
 9     BY MR. WONE:
10          Q.
11          A.
12
13
14
15          Q.
16
17
18          A.
19          Q.
20          A.
21          Q.
22
23
24          MS. METZINGER:  Objection to
25     form.
```

235

```
 1          THE WITNESS:
 2
 3
 4     BY MR. WONE:
 5          Q.    Do you know why the Madison
 6     Memory Study investigators would conduct all of
 7     the analyses in Exhibit MK11?
 8          MS. METZINGER:  Objection to
 9     form.  Mischaracterizes the document.
10          THE WITNESS:  So are you telling
11     me that they did do all of these
12     analyses?  Is that what you're saying?
13     BY MR. WONE:
14          Q.    Let's assume that they did.  Do
15     you know why the investigators for the Madison
16     Memory Study would --
17          MS. METZINGER:  I'm going to --
18          MR. WONE:  -- analyses?
19          MS. METZINGER:  I'm going to
20     object to that question, Mr. Wone.  If
21     you want to make that representation to
22     her, fine.  But I would object to that
23     question both as to form and on the
24     grounds that it's misleading.
25
```

236

```
 1     BY MR. WONE:
 2          Q.    I'm asking you to make the
 3     assumption that they -- that the Madison Memory
 4     Study researchers did.
 5          MS. METZINGER:  And at what
 6     point in time?
 7          MR. WONE:  I'm sorry?
 8          MS. METZINGER:  At what point in
 9     time is Dr. Kurzer to assume that these
10     analyses were conducted?
11          MR. WONE:  Assume that they were
12     conducted after the Madison Memory
13     Study had been completed.
14          MS. METZINGER:  Okay.  And --
15     and how about in comparison with other
16     analyses that may have been run and
17     before or after the data was looked at?
18          MR. WONE:  I'm not asking -- I'm
19     not asking about other analyses.  I'm
20     asking about the ones in Exhibit MK11.
21          MS. METZINGER:  And if you
22     can -- if you're asking her a
23     hypothetical, I would appreciate you
24     completing that hypothetical so that
25     Dr. Kurzer is aware of exactly the
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

237

1    hypothetical that you're posing to her.
2          MR. WONE:  I'm asking Dr. Kurzer
3    assuming that the Madison Memory Study
4    investigators completed the analyses
5    displayed in Exhibit MK11 after the
6    study was completed, do you know why
7    they would do that.
8          MS. METZINGER:  Are you saying
9    after the study was completed but
10   before any analyses were conducted?
11         MR. WONE:  At any point after
12   the study was completed.
13         MS. METZINGER:  Okay.  Well, I
14   think those are two different
15   scenarios.
16         MR. WONE:  That's the scenario
17   I'm asking.
18   BY MR. WONE:
19     Q.   Dr. Kurzer?
20         MS. METZINGER:  Well, I don't
21   understand -- I don't understand the
22   scenario you're asking.  That's what
23   I'm saying.
24         MR. WONE:  I'm asking if any --
25   I'm asking -- saying assume that

238

1    base -- the analyses in Exhibit 11 in
2    MK11 were completed -- were conducted
3    after the study was completed, does
4    Dr. Kurzer know why these subgroup
5    analyses would be done.
6          MS. METZINGER:  Well, I'm going
7    to continue to object on the fact that
8    that's an incomplete hypothetical.
9          But, Dr. Kurzer, if you
10   understand the question and you have an
11   opinion on that, you can go ahead and
12   answer.
13         THE WITNESS:  Yes, I'll answer
14   that.
15         I think that, Mr. Wone, if you
16   really want the answer to that, you
17   need to ask the people who did the
18   study why they did those analyses.  It
19   does make a difference whether it
20   was -- whether they were done in the
21   original -- with the original data set
22   or whether they were done after
23   publication of the -- of the papers.
24   That all would make a difference.
25         But, again, as a hypothetical,

239

1    I'll respond to you with a
2    hypothetical.  I don't know why they
3    did all of those analyses.  I think
4    that it's reasonable.  They were very
5    clear in the manuscripts and in the
6    protocol that healthy people were their
7    primary -- were their primary targeted
8    population.
9          It's possible that they --
10   because they had people with more --
11   with higher cognitive dysfunction that
12   they did some exploratory analyses for
13   the purposes of seeing if it would be
14   interesting to further study
15   apoaequorin in people who have
16   neurological dysfunction.  That's a
17   reasonable thing to do.  They
18   didn't publi- -- I'm not aware that
19   they published these data, in which
20   case they would have had to say --
21   should have said this is -- was this
22   was a post hoc analysis which was not
23   part of our original hypothesis.
24         But -- but it's very, very
25   common to use a data set in order to

240

1    generate other hypotheses to get a
2    feeling for what else you might want to
3    study.  You have all this data.  Why
4    not look at it and see what's going on.
5    Maybe you'll get a clue.  And that
6    could help put you in a new direction.
7          So I think that there are
8    reasonable, acceptable reasons why they
9    would have done those other analyses.
10   BY MR. WONE:
11     Q.   Go back to your expert report,
12   Exhibit MK1.
13     A.   Okay.
14     Q.   And go to page -- page 14,
15   please.
16     A.   Okay.
17     Q.   In your report, you reached
18   conclusions relating to vitamin D in cognitive
19   function, correct?
20     A.   Yes.
21     Q.   Do you know when -- sorry.
22         Does Prevagen contain vitamin D?
23     A.   Yes, it does, I believe.
24     Q.   And do you know when vitamin D
25   first appeared in Prevagen?

60 (Pages 237 to 240)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Case 1:17-cv-00124-LLS   Document 259-9   Filed 06/16/22   Page 63 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

241

1          MS. METZINGER:  Objection to
2    form.
3          THE WITNESS:  I don't recall
4    when it was added.
5    BY MR. WONE:
6          Q.    If you could look at
7    paragraph 17 of your report, does that refresh
8    your recollection as to when vitamin D was added
9    to Prevagen?
10         A.    Yes.  2016.
11         Q.    Was vitamin D in the Prevagen
12   that was used during the Madison Memory Study?
13         A.    I don't believe so.
14         Q.    If you could go back to the
15   vitamin D section which was page 14.
16         A.    Page 14.
17         Q.    Yes.
18         A.    15.
19         Okay.  I'm here.
20         Q.    Did any of the studies cited in
21   your report involving vitamin D use Prevagen?
22         A.    No, they did not.
23         Q.    Did any of the vitamin D studies
24   used cited in your report include apoaequorin?
25         A.    No, they did not.

242

1          Q.    If you could look at
2    paragraph 61.  It's on the bottom of page 15.  Do
3    you see that, Doctor?
4          A.    I do.
5          Q.    And does this paragraph list
6    studies that you believe show beneficial
7    associations between vitamin D and brain
8    structure?
9          A.    Yes.
10         Q.    And what did you mean by
11   "beneficial associations"?
12         A.    What I meant was that vitamin D
13   helps preserve healthy brain structure.
14         Q.    What was the word you said after
15   "helps"?
16         A.    "Preserve" healthy brain
17   structure.
18         Q.    When you say "healthy, helps
19   preserve," could you explain what you mean?
20         A.    What I mean is that these
21   studies showed that people with vitamin D
22   deficiency had brain changes that reflect atrophy
23   of the brain so that vitamin D deficiency is
24   harmful to the brain.  So in order to preserve
25   brain structure, health -- a healthy brain

243

1    structure, you would want to make sure not to be
2    vitamin D deficient -- deficient.
3          Q.    And is brain structure different
4    from cognitive function?
5          A.    Brain structure contributes to
6    cognitive function so that brain atrophy would --
7    is certainly likely to have a negative affect on
8    cognitive function.
9          Q.    Can something preserve brain
10   structure but not have any effect on cognitive
11   function?
12         MS. METZINGER:  Objection to
13   form.
14         THE WITNESS:  I couldn't answer
15   that.
16   BY MR. WONE:
17         Q.    How come?
18         A.    I don't know the answer to that.
19   Are there things that -- you know, are there
20   specific examples of things that preserve brain --
21   are good for the brain or preserve brain structure
22   but don't affect cognitive function?  I'm not
23   aware of examples of that.  There may be some, but
24   I'm not aware of them.
25         Q.    Does having beneficial

244

1    associations mean that vitamin D causes cognitive
2    improvement in humans?
3          MS. METZINGER:  Objection to
4    form.
5          THE WITNESS:  These studies
6    alone do not prove that vitamin D
7    improves cognitive function.  These
8    studies I listed here as part, again,
9    of the totality of evidence showing
10   that vitamin D has an effect on the
11   brain because that's important to
12   understand when you look at the other
13   studies that I refer to later.
14         So I'm not suggesting that --
15   you know, all I'm suggesting is what I
16   say, there's a beneficial association
17   between vitamin D and brain structure.
18   And so what we -- we know that vitamin
19   D has an effect on the brain.  There's
20   no question about that.  That's what
21   I'm trying to get across here.
22   BY MR. WONE:
23         Q.    And you mentioned vitamin D
24   deficient.  Is the effect the same in people who
25   are not vitamin D deficient?

61 (Pages 241 to 244)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

245

1          MS. METZINGER:  Objection to
2     form.
3          THE WITNESS:  That I don't know
4     because these five studies that I cite
5     all use vitamin D deficient people.  So
6     I can't reach a conclusion about that
7     question.
8     BY MR. WONE:
9          Q.   Okay.  If you could go to
10    paragraph 63.
11         A.   Mm-hmm.
12         Q.   It's on the next -- on page 16
13    of your expert report.
14         A.   Yes.
15         Q.   And then in this paragraph you
16    discuss cross-sectional studies; is that right?
17         A.   That's right.
18         Q.   And what is a cross-sectional
19    study?
20         A.   A cross-sectional study is a
21    study that looks at one time point and evaluates
22    the relationship in this context, the relationship
23    between vitamin D levels in the people and
24    cognitive function at one time point.
25         Q.   And when you used the phrase

246

1     "beneficial associations" in paragraph 63, what
2     did you mean?
3          A.   What I meant is that vitamin D
4     helps that -- in the case of the enhanced study,
5     low levels of vitamin D were significantly
6     associated with increased risk of cognitive
7     impairment.  So vitamin D is negatively associated
8     with cognitive function.  Excuse me.  Wait a
9     second.  I said that wrong.  With cognitive
10    impairment.  Vitamin D levels are positively
11    associated with cognitive function so that low
12    levels of vitamin D are associated with lower
13    cognitive function or more cognitive impairments.
14         Q.   Lower levels of vitamin D are
15    associated with cognitive impairment?
16         A.   Yes.
17         Q.   Is that what you said?
18         A.   Yes.
19         Q.   Does that mean -- do these
20    studies show -- do these studies in paragraph 63
21    show that increasing vitamin D improves cognitive
22    function?
23         A.   These are associate -- studies
24    of association.  So basically what they're saying
25    is that there's an association between -- it's not

247

1     causation, but there's an association between
2     vitamin D levels and cognitive function
3     particularly in the case of deficiency.
4          But in some of these studies,
5     and I'd have to look at each study individually,
6     the vitamin D levels may not -- may not have been
7     deficiency.  In other words, they may have done
8     sort of a correlation where they look at the full
9     spectrum of vitamin D levels and they see that the
10    lower the vitamin D the poorer the cognition, and
11    the higher the vitamin D the better the cognition.
12         Q.   Do cross-sectional studies
13    control for other factors that could influence the
14    outcome?
15         MS. METZINGER:  Objection to
16    form.
17         THE WITNESS:  In cross-sectional
18    studies, most epidemiologists will
19    control for as much as they can, so
20    they will control for other factors
21    that may affect cognitive function.
22    For example, something like
23    socioeconomic status would be something
24    that might be controlled for in these
25    studies.  So they do control for

248

1     factors that might confound the
2     results.
3     BY MR. WONE:
4          Q.   Would they control for factors
5     that could affect someone's vitamin D levels like
6     diet?
7          A.   They should.  They should.  They
8     should account for -- for things that affect
9     vitamin D, other things that affect vitamin D
10    levels, yes.  But, again, I'd have to look at
11    these studies.  And I would -- I would suggest
12    that it's very likely that the high quality papers
13    did control for things or they would not have
14    passed peer review and they would not have been
15    published.
16         So, for example, in paragraph C
17    on page 17, you can see that they adjusted for
18    age, race, sex, body mass index, and education.
19    So they adjusted for things that are well known to
20    affect either cognitive function or vitamin D
21    levels.
22         Q.   And that study in paragraph C
23    involved people who are vitamin -- involved
24    vitamin D deficiency, correct?
25         A.   Yes, they particular -- in

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

249

1    particular, they focused on people who are vitamin
2    D deficient.
3          Q.   Do any of the studies cited in
4    paragraph 63 show that vitamin D improves
5    cognitive function?
6              MS. METZINGER:  Objection to
7          form.
8              THE WITNESS:  No.  As I said,
9          this is an observational study which
10         shows association.  So lower vitamin D
11         levels were associated with poorer
12         cognitive function.
13   BY MR. WONE:
14         Q.   Okay.  If we could go to
15   paragraph 64, please.
16         A.   Okay.
17         Q.   And in paragraph 64, you discuss
18   studies that show beneficial associations between
19   higher vitamin D intake and cognitive function,
20   correct?
21         A.   Yes, intake rather than levels.
22         Q.   And what is the difference
23   between intake and levels?
24         A.   In a study in which they're
25   looking at the relationship or the association

250

1    between vitamin D levels and cognitive function,
2    they're taking blood and measuring the amount of
3    vitamin D in the blood.  In the -- in the studies
4    in paragraph 64, they're not measuring the vitamin
5    D in the blood, they're measuring through
6    questionnaires vitamin D intake.  And they showed
7    that a higher vitamin D intake was associated with
8    better cognitive function.
9          Q.   And is your -- when you said
10   "beneficial associations" in paragraph 64, did you
11   have a similar meaning as to when you said
12   "beneficial associations" in your prior paragraphs
13   in this section?
14         A.   Yes.  What I meant was that
15   higher vitamin D intake is associated with better
16   cognitive functioning.  Lower vitamin D intake is
17   associated with poorer cognitive function.
18         Q.   And do any of the studies in
19   paragraph 64 show that vitamin D -- increasing
20   vitamin D improves cognitive function?
21         A.   They show association, not
22   causation.
23         Q.   Do any of the studies cited in
24   paragraph 64 show that vitamin D -- increases in
25   vitamin D causes improvement in memory?

251

1          A.   I'd have to look at the studies
2    again to be reminded of exactly which cognitive
3    function tests that they did.  In this -- for this
4    review of the literature, I looked at many aspects
5    of cognitive function, so it's very likely that
6    memory was -- was part of what they were -- what
7    they were evaluating.
8          Q.   When I asked about cognitive
9    function, you said that these studies in
10   paragraph 64 did not show causation, they
11   showed --
12         A.   Right.
13         Q.   -- association.
14         A.   That's right.  They don't show
15   causation, the show association.  That's correct.
16         Q.   And so -- and so I -- my second
17   question was, do any of the studies in
18   paragraph 64 show causation in terms of improving
19   memory or is it just association?
20         A.   Again, my response would be that
21   they don't show causation.  I wouldn't say just
22   association because I think association is
23   important.  I think that these studies are
24   important as part of the totality of the data.
25   Otherwise, they wouldn't be published if they were

252

1    meaningless.  So I think that the data are
2    important and significant, but they do not show
3    causation.  I agree with you on that.
4          Q.   All right.  If we could go to
5    paragraph 66.  It's on page 21.  Do you see that?
6          A.   Yes, I do.
7          Q.   And in this paragraph,
8    paragraph 66 of Exhibit MK1, you mention -- you
9    used the phrase "prospective studies."  Do you see
10   that?
11         A.   Yes.
12         Q.   And what is a prospective study?
13         A.   A prospective study is a study
14   in which you do your measurements before people --
15   you do your measurements at the point when, as far
16   as you know, everyone is healthy.  And then you
17   follow them over some period of time either by
18   giving an intervention or by observing them to see
19   if there are groups of people who may have had --
20   experienced cognitive decline, and then you look
21   back and what their measurements were before they
22   became -- before their cognitive function
23   declined.  And so these kinds of studies are
24   considered much -- to provide much stronger data
25   than the cross-sectional studies because it --

63 (Pages 249 to 252)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

253

1    they're not looking at one time point, they're
2    looking at a change over a long period of time.
3         Q.   And do you agree that the
4    studies you cited in paragraph 66 relate to
5    association not causation?
6              MS. METZINGER:  Objection to
7    form.
8              THE WITNESS:  So this is -- this
9    is a little bit more nuanced, the
10   interpretation of these kinds of
11   studies.  They are observational.  They
12   are very, very strong observational
13   studies.  They are the best kind of
14   epidemiological studies that can be
15   done.  And although they -- the data
16   are not as strong as randomized
17   clinical trials in certain ways, in
18   other ways they're better because
19   clinical trials have limitations.  And
20   I -- I know that the RCT is considered
21   the gold standard, but there is a great
22   disagreement about that.
23             There are epidemiologists who
24   will tear clinical trials to shreds
25   because of limitations in clinical

254

1    trials.  You have a smaller group.  You
2    might not be capturing people who
3    respond to the drug.  You're isolating
4    this and it's not in a real-world
5    situation.
6              So prospective studies like this
7    are looking at enormous numbers of
8    people in real-life situations, and
9    that is a tremendous strength above
10   that of a randomized clinical trial.
11   So the dogma is that prospective
12   study -- prospective epidemiological
13   studies don't show causation and
14   randomized clinical trials are
15   necessary to show causation, but they
16   both have strengths and they both have
17   weaknesses.
18             And I would say that when you
19   have ten or 15 prospective studies that
20   all point to the same thing, that that
21   is very, very strong data in the
22   direction of causation, although
23   technically the dogma would say you
24   cannot say that that shows causation.
25   To me, it's very strong data.

255

1    BY MR. WONE:
2         Q.   And the studies cited in
3    paragraph 66 relate to vitamin D levels, not
4    supplementation, correct?
5         A.   That's correct, I don't believe
6    any of them were supplemented.  I don't believe
7    any of them were supplemented.
8         Q.   So during the course of the
9    studies, none of the participants in the studies
10   cited in paragraph 66 took vitamin D as part of
11   the study?
12        A.   Not as part of the study, but
13   they may have been taking it on their own.
14   That's -- that's very possible.  And that's why
15   it's a real-world situation.
16        Q.   Okay.  If we could go on to
17   paragraph 67.  It's on page 26.
18        A.   Okay.
19        Q.   And in this paragraph, you also
20   discuss prospective studies, correct?
21        A.   Yes.
22        Q.   And you used the phrase
23   "beneficial associations"?
24        A.   Yes.
25        Q.   And does that have -- does that

256

1    phrase have the same meaning?
2         A.   Yes.  Higher vitamin D
3    consumption was associated with better cognitive
4    function.  And in this case, there are some
5    randomized clinical trials that are included in
6    this because they are a type of prospective study
7    in which you give a treatment to the person and
8    then see what the impact of that treatment is
9    rather than measuring their natural levels and
10   following them over time.
11        Q.   And is the study mentioned in
12   paragraph 67B one of the RCT studies you
13   mentioned?
14        A.   Did you say B or D?
15        Q.   B as in boy.
16        A.   B as in boy.
17             Yes.  So study -- the study in
18   b, study b is a double-blind placebo-controlled
19   RCT.
20        Q.   Okay.  I'd like to introduce
21   what's been marked as Exhibit MK12.
22             (Marked Exhibit MK12.)
23   BY MR. WONE:
24        Q.   Do you see that exhibit, Doctor?
25        A.   I do.  I'm going to open it

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Kurzer, Ph.D. - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

257

1    right now.
2         Okay.
3         Q.    And is the study in Exhibit MK12
4    the study you were referring to in paragraph 67B
5    of your expert report?
6         A.    Yes.
7         Q.    And I'll refer to this as the
8    Grung study, if that's okay.
9         A.    As the what?
10        Q.    As the Grung study?
11        A.    The Grung study, yes.  Yes.
12        Q.    Did the Grung study look at
13   vitamin D deficient adolescents?
14        A.    I don't believe that they were
15   deficient.  I think they were Norwegian
16   adolescents broken into two groups who either
17   consumed vitamin D or not.  This is a little bit
18   small on my screen, so I'm trying to...
19        Q.    There's a magnifying glass in
20   your viewer you can use to increase it.
21        A.    Okay.  Here we go.  Got it.
22   Thank you.  Thank you so much.  That really helps.
23        So there were 50 adolescents who
24   were assigned -- randomly assigned to either take
25   vitamin D or placebo and -- so that they were not

258

1    recruited to be vitamin D deficient.  They went --
2    when they measured the -- the vitamin D, it turned
3    out that the -- the average consumption was
4    deficient, but it doesn't look to me that they
5    intentionally recruited deficient participants.
6         Q.    But the participants were
7    deficient?
8         A.    Yes.
9         Q.    Vitamin D deficient?
10        A.    Yes.  And that reflects the
11   population at large because in Scandinavia and in
12   the United States, there is a huge problem with
13   vitamin D deficiency.  So it's not at all
14   surprising that when they recruited these healthy
15   kids, that many of them were deficient.
16        Q.    Are adolescents the target
17   audience for Prevagen?
18        A.    No, they're not.
19        Q.    And do adolescents typically
20   experience age-related cognitive decline?
21        A.    No, they don't.
22        Q.    How about mild cognitive
23   impairment?
24        A.    No, they don't.  Again, this
25   paper was cited to give the view of the totality

259

1    of the evidence showing that vitamin D seems to
2    have an impact on cognitive function and brain
3    function.  I think that most of the papers that I
4    have referred to were in the target population.
5    There may be a few that were not.  And I included
6    them just because it's more evidence to show that
7    vitamin D does have this effect.  But most of the
8    papers that I -- that I -- the vast majority of
9    them are in the target population.
10        Q.    And could there be cognitive
11   function differences between adolescents and older
12   adults with age-related cognitive decline?
13             MS. METZINGER:  Objection to
14        form.
15             THE WITNESS:  Can you rephrase
16        that, please?
17   BY MR. WONE:
18        Q.    Are there differences in the
19   cognitive function of adolescents versus older
20   adults with age-related cognitive decline?
21             MS. METZINGER:  Objection to
22        form.
23             THE WITNESS:  I would suspect
24        so.  I can't answer conclusively that
25        question, but I would suspect that

260

1         that's the case, that there are
2         differences.
3    BY MR. WONE:
4         Q.    And is the reason why you can't
5    answer conclusively because cognitive function is
6    not your expertise?
7              MS. METZINGER:  Objection to
8         form and argumentative.
9              THE WITNESS:  The reason I can't
10        answer is because I'm not familiar with
11        this particular question, which is the
12        difference in cognitive function
13        between adolescents and adults with
14        cognitive decline.  There may be
15        experts in cognitive function who
16        aren't aware of that, and so it's --
17        it's -- I'm just not aware of that
18        particular question that you asked.
19   BY MR. WONE:
20        Q.    Okay.  If you could go back to
21   paragraph 67 of your expert report, please.
22        A.    Yes.
23        Q.    Are there any other RCT studies
24   cited in paragraph 67 that would show that taking
25   vitamin D improves cognitive function?

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

261

1        A.    Yes, I believe that there are.
2        Q.    And which ones?  If you could
3    point me to the paragraph.
4        A.    67c, this was an RCT of over
5    18 weeks of 82 healthy adults who were
6    supplemented with either 400 or 4,000
7    international units of vitamin D.  They had two
8    doses, which is an extremely sophisticated way to
9    do a study if it's -- if -- if you have the
10    resources to do a dose-response study.  So they
11    wanted to look at both of these two different
12    doses.  And they found that -- that there were
13    improvements in cognitive function in the
14    high-dose group.  And the improvements were
15    greater in people who had lower levels at
16    baseline.
17            So there was improvement in the
18    high-dose group as a whole, but the improvements
19    were better in those with -- who started out with
20    lower vitamin D.  They did not see this effect on
21    nonverbal memory in the low-dose group.
22        Q.    And do you know the amount of
23    vitamin D in the high-dose group in the study that
24    you're referencing in paragraph C?
25        A.    4,000 international units.

262

1        Q.    And how much vitamin D is in
2    Prevagen?
3        A.    2,000 international units.
4        Q.    So the dose -- the high-dose
5    used in that RCT in paragraph C was more than what
6    is contained in Prevagen, correct?
7        A.    Yes, that's correct.
8        Q.    Was there a placebo group in the
9    study that's -- that you're referring to in
10    paragraph C?
11        A.    There was not a placebo group.
12    There were -- there were two test groups.  And so
13    the lower group took 400, the higher group took
14    4,000.  So there was not a zero -- a zero group.
15        Q.    Okay.  Are there any other
16    studies in paragraph 67 that you would say show
17    that vitamin D improves cognitive function?
18        A.    So in 67D, this is an RCT of 181
19    participants who have mild cognitive impairment,
20    and they were randomized to receive either 400 IUs
21    or placebo for 12 months and they -- these --
22    those researchers saw a significant improvement in
23    cognitive function in the vitamin D supplemented
24    group.  And you'll note that this was published in
25    one of the best neurology journals that exists.

263

1        Q.    And the participants in the
2    study that you're referring to in paragraph D,
3    they had mild cognitive impairment, correct?
4        A.    Yes, they did.  Yes, they did.
5        Q.    And do you know what cognitive
6    function measure was used in that study?
7        A.    I'd have to look at the study.
8    I don't recall right now.
9        Q.    I'm marking what's introduced as
10    Exhibit MK13.
11            (Marked Exhibit MK13.)
12    BY MR. WONE:
13        Q.    Do you see that, Doctor?
14        A.    Yes.
15        Q.    And is this the study that you
16    were referring to in paragraph 67D?
17        A.    Yes, it is.
18        Q.    And what cognitive function
19    measure was used in Exhibit MK13?
20            MS. METZINGER:  Mr. Wone, your
21        voice dropped a bit during that
22        question.  Can you repeat it, please?
23            MR. WONE:  Sure.
24    BY MR. WONE:
25        Q.    What cognitive function or --

264

1    I'll start again.
2            How was cognitive function
3        measured in the study in MK13?
4        A.    It was -- the main outcome was
5    evaluated using the Chinese version of the
6    Wechsler Adult Intelligence Scale-Revised.  And so
7    they had 11 tests that evaluated -- hang on a
8    second.  Yeah, cognitive domains were evaluated
9    using 11 different tests involving vocabulary,
10    comprehension, arithmetic, digit span, et cetera.
11        Q.    And do you know whether the
12    Wechsler Adult Intelligence Scale-Revised tests
13    memory?
14        A.    I don't know.  I don't know the
15    answer to that.  They also used the Mini-Mental
16    State Examination, which is very, very frequently
17    used as a measure of general cognitive function.
18    Again, offhand, I don't recall if memory is a
19    focus of that.
20            But there's no question that
21    memory and cognitive function are very, very
22    intertwined.  You know, memory is a part of
23    cognitive function.  Memory affects cognitive
24    function.  I'm not sure that you can actually
25    separate them very well.

66 (Pages 261 to 264)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                     9/29/2021

265

1    Q.   Did the study in Exhibit MK13
2 mention any results for the -- that second measure
3 you mentioned, the Mini-Mental State Examination?
4    A.   Hang on a sec.
5       I don't see it referred to.
6 Hang on a second.  I don't see them referred to
7 those results.
8    Q.   Going back to paragraph 67 of
9 your expert report, are there any other studies
10 that you would say show that vitamin D intake
11 improves cognitive function?
12    A.   Yes, there's one more.  I do
13 want to -- if I -- if I might make a comment on
14 the previous study.
15    Q.   Sure.
16    A.   As I -- as I said a few minutes
17 ago, that study was published in a very, very
18 high-quality clinical neurology psychiatry
19 journal.  And assuming that the peer review is
20 excellent, which I think is a reasonable
21 assumption with a journal of that quality, then I
22 would assume that the methodologies that were used
23 were very likely to be appropriate for that
24 population.  So I just wanted to point that out.
25    Q.   Okay.

266

1    A.   The next one is E?
2    Q.   Yes.
3    A.   An RKTC performed in 55
4 overweight or obese women, 58 years, with low
5 vitamin D levels.  They took either 600, 2000, or
6 4,000 IUs for one year and cognitive testing was
7 done at the end of the year.
8    Q.   So this study involved
9 overweight or obese women, correct?
10    A.   That's correct.  That's correct.
11    Q.   And the -- and the women were --
12 had vitamin D deficiencies?
13    A.   You know, there's some argument
14 as to where 30 is a cut- -- is actually -- would
15 fall within the vitamin D deficient.  It's
16 certainly on the low side.  But some clinicians
17 would consider that deficient and some clinicians
18 would not.
19       And the other thing that I want
20 to point out about this trial and the other trial
21 that did not have a placebo, it's possible that
22 the researchers -- and I've been involved in
23 studies for which this was the case, or at least
24 I've been involved in discussions of studies where
25 this was the case.  The researchers may have felt

267

1 that it was unethical not to give everyone vitamin
2 D because it's such an important nutrient.  So
3 many people are -- are deficient and it's such an
4 important nutrient for older women because of its
5 importance in bone health, particularly.  So they
6 may have felt that they really needed to give --
7 that it was not ethical to have a zero group
8 because they would have had to tell woman who were
9 already taking vitamin D to stop taking it, and
10 that would probably be viewed as unethical and it
11 wouldn't get past the -- the Institutional Review
12 Board.
13    Q.   Okay.  If we could turn to
14 paragraph 68.
15    A.   Yes.
16    Q.   You mentioned a case control
17 study --
18    A.   That's right.
19    Q.   -- that show beneficial
20 associations between higher vitamin D levels and
21 cognitive function.  Do you see that?
22    A.   That -- that's right, yes.
23    Q.   And does the case control study
24 cited in paragraph 68 show that vitamin -- taking
25 vitamin D causes improvement in cognitive

268

1 function?
2    A.   Again, this is a study that
3 shows association, so it is -- this -- and these
4 kinds of studies have fallen out of favor a little
5 bit because there are too many confounders with
6 these retrospective case control studies.  And so
7 I threw this study in here just to add to the
8 data, but I would say that this is not one of the
9 stronger studies that -- that we've -- we're
10 discussing today.  But they did show that using --
11 they used electronic medical records and they
12 showed that -- that people with dementia tended to
13 have lower levels of vitamin D.
14    Q.   Okay.  And in paragraph 69, you
15 state that meta-analyses that show beneficial
16 association between higher vitamin D levels and
17 cognitive function.  Do you --
18    A.   Mm-hmm.
19    Q.   -- see that?
20    A.   Yes.
21    Q.   And do any of the meta-analyses
22 cited in paragraph 69 show that taking vitamin D
23 causes improvement in memory?
24    A.   No.  Let's see.  A is
25 cross-sectional associations, B is cross-sectional

67 (Pages 265 to 268)

Kurzer, Ph.D. - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

---

269

1  and longitudinal.  Then there's a systematic
2  review.  Observational with three interventional
3  studies.  So the interventional studies are the
4  ones that are generally considered to show
5  causation.  The observationals are generally
6  considered to show -- to show -- to show
7  association.  And so the -- the -- whether the
8  meta-analyses can show or prove, as you say,
9  causation versus association depends on what kinds
10  of studies were included in the metanalysis.  And
11  it looks as the -- as though most of these were --
12  were observational studies, and so they have all
13  of the strengths and limitations of other
14  observational studies, only increased power to see
15  a different -- to see a change or an effect.
16          MR. WONE:  Can we go off the
17      record for a moment?
18          THE VIDEOGRAPHER:  We are going
19      off the record at 4:09 P.M.
20          (Off the record from 4:09 until
21      4:10.)
22          THE VIDEOGRAPHER:  We are going
23      back on the record at 4:10 P.M.
24  BY MR. WONE:
25      Q.    If you could turn to

---

270

1  paragraph 78 of your report, Doctor, please.
2      A.    Yes, I'm there.
3      Q.    And in your -- in the first
4  sentence, you state that it's your expert opinion
5  that a supplement containing 500 to a thousand IUs
6  per day would be sufficient to achieve cognitive
7  benefits.  Do you see that?
8      A.    Yes, I do.
9      Q.    And what cognitive benefits were
10  you referring to?
11      A.    I'm referring to in this case
12  numerous cognitive benefits, including memory.
13      Q.    Does any of the evidence in
14  Section 10 of your report show that vitamin D
15  causes improvement in any aspect of cognitive
16  function?
17      A.    Can you say -- re- -- can you
18  rephrase that question, please?
19      Q.    Does any of the evidence that
20  you cited in Section 10 of your report show that
21  vitamin D causes improvement in any aspect of
22  cognitive function?
23          MS. METZINGER:  Objection to
24      form.
25          THE WITNESS:  Yes, I believe

---

271

1  that it does.  There are some
2  randomized clinical trials that show
3  improvement.  And then there is an
4  enormous amount of epidemiological data
5  showing very strong associations, and
6  that data should not be ignored.  And
7  so I consider that data.  And I know
8  that -- that, you know, there -- there
9  may be others who don't.
10          But I think that when you have
11  an enormous amount of epidemiological
12  data, it really points in the
13  direction, especially when it's -- when
14  they're very well-done prospective
15  studies, they certainly point in the
16  direction of causation.  They don't
17  prove it, but they provide very, very
18  strong evidence.
19          And so I do believe that the
20  data that I have summarized shows that
21  vitamin D supplementation will help
22  with cognitive benefits, including
23  memory.
24  BY MR. WONE:
25      Q.    And when you say "will help with

---

272

1  cognitive benefits," do you mean that it causes
2  improvement in memory?
3      A.    Yes.  Yes.  And -- and, again,
4  you know, as we -- as I said before, I -- I -- I
5  hope it's okay that I'm kind of repeating myself.
6  I think that this threshold of evidence is
7  intended to be different by regulators for dietary
8  supplements than for drugs.  And if this were a
9  drug that was being evaluated, particularly a drug
10  that had potential very harmful side effects where
11  you have to be really careful with it, then the --
12  my threshold for evidence might be higher.  For a
13  dietary supplement which has no adverse events
14  which is very likely to cause improvements for
15  people, in my opinion this evidence meets that
16  threshold.
17      Q.    And what is the basis for your
18  belief that the standard for dietary supplements
19  is different?
20      A.    Because in -- in the early
21  1990s, the Dietary Supplement Act was created in
22  order for dietary supplements to be regulated
23  differently than drugs and foods, and particularly
24  differently than drugs.  And so -- and in the
25  guidance, as I said before, there are parts of the

---

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

273

```
1    guidance that you can pull out that very clearly
2    intend there to be flexibility in interpreting
3    data, flexibility in applying data that they
4    are -- if they wanted these trials of dietary
5    supplements to be held to the same standards as
6    drugs, they would not have created separate
7    regulation for supplements.
8         Q.   Can a dietary supplement have a
9    harmful effect?
10            MS. METZINGER:  Objection to
11       form.
12            MR. de LEEUW:  Do you mean --
13       I'm going to object as well.  I mean,
14       maybe you want to put a little meat on
15       that question.
16   BY MR. WONE:
17        Q.   Do you understand my question,
18   Doctor?
19        A.   Yes.  You asked if it's possible
20   that there could be dietary supplements that have
21   harmful effects.  Yes, it is possible.  And
22   even -- even with, as I said, the green tea trial,
23   the green tea catechin supplements are known to
24   have potentially harmful effects on the liver.
25   But in our study that we did, our clinical trial,
```

274

```
1    we looked at that, and it was determined, and the
2    data and safety monitoring board agreed with it,
3    that the level of adverse events was so low that
4    it was nothing to be concerned about.
5         So in general, I think we think
6    of dietary supplements as supplements that are
7    very safe.
8         Q.   Would you go to paragraph 84 of
9    your report, Exhibit MK1, please.
10        A.   Yes.
11        Q.   In the second to last sentence,
12   you used the phrase "reasonable degree of
13   scientific certainty."  What did you mean by that?
14        A.   Which -- which -- are we in 80?
15   In paragraph 80?
16        Q.   I'm sorry.  Paragraph 84.
17        A.   Oh, I'm sorry.  Paragraph 84.
18        Q.   Sorry, Doctor.
19        A.   Okay.  On page 35 -- or 37.  35.
20        Q.   You used the phrase "reasonable
21   degree of scientific certainty" --
22        A.   Yes.
23        Q.   -- on the second to last line.
24        A.   Yes.
25        Q.   What did you mean by that?
```

275

```
1         A.   What I mean by that is that I
2    don't think that we can ever be 100 percent
3    certain of anything in life, including science.
4    And so I am being honest here in saying that I am
5    not a hundred percent certain, but I think that I
6    have a reasonable degree of scientific certainty,
7    meaning I believe that there's enough evidence
8    that the statements are supported by competent and
9    reliable scientific evidence.
10        Q.   And when you say "statement,"
11   you're referring to -- are you referring to the
12   challenge claims?
13        A.   Yes.
14        Q.   Could you quantify what you mean
15   by what is a reasonable degree of evidence?
16        A.   I --
17            MS. METZINGER:  Objection --
18            THE WITNESS:  -- can't quant- --
19            MS. METZINGER:  -- to form.
20            THE WITNESS:  Go ahead.
21            MS. METZINGER:  Objection.
22       Objection to the form.
23       Go ahead, Dr. Kurzer.
24            THE WITNESS:  I can't -- I can't
25   quantify that.  You know, this is
```

276

```
1    basically saying that it's my judgment
2    as a scientist, as, you know, a leader
3    in my field, it is my judgment that the
4    evidence is supported, that the
5    evidence supports the claims.  That's
6    what I'm saying.  I can't quantify it.
7    I can just say that I with my judgment
8    and my background, my knowledge, my
9    experience, I can say that I believe
10   these statements to be valid.
11            MR. WONE:  Okay.  Could we go
12       off the record?
13            THE VIDEOGRAPHER:  We are going
14       off the record at 4:18 P.M.
15            (Off the record from 4:18 until
16   4:40.)
17            THE VIDEOGRAPHER:  We are going
18       back on the record at 4:40 P.M.
19            MR. WONE:  Thank you for your
20       time this afternoon, Dr. Kurzer.  We
21       don't have any further questions.
22            And I will turn it over to
23   co-counsel, Kate Matuschak.
24            THE WITNESS:  Thank you,
25   Mr. Wone.
```

69 (Pages 273 to 276)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

277

1              E X A M I N A T I O N
2    BY MS. MATUSCHAK:
3        Q.   Good afternoon, Dr. Kurzer.
4        A.   Good afternoon, Ms. Matuschak.
5        Q.   So as you know, my name is Kate
6    Matuschak, and I am co-plaintiff with the Federal
7    Trade Commission on behalf of the New York State
8    Attorney General's Office, and I just wanted to
9    ask you a few questions.
10            Could you please turn to
11   paragraph 56 of your report, which is Exhibit 1.
12   It's -- it's on numbered page 13, which is --
13       A.   Yes, I see.
14       Q.   Great.
15       A.   Mm-hmm.
16       Q.   And in the first line of
17   paragraph 56, you say "I believe that it is
18   unlikely that intact AQ is absorbed and enters the
19   brain."
20            Is "AQ" apoaequorin in this
21   context?
22       A.   Yes, it is.
23       Q.   Okay.  And why do you believe
24   that it is unlikely that intact apoaequorin is
25   absorbed and enters the brain?

278

1        A.   Generally large molecules like
2    apoaequorin are not -- do not pass the blood brain
3    barrier.  I've subsequently learned that there are
4    mechanisms through which apoaequorin can combine
5    with cholesterol and that there are examples of
6    other large molecules that are able to get past
7    the blood brain barrier this way, making them more
8    lipophilic.  So I might modify that and say
9    that -- I mean, I still believe it's unlikely, but
10   I think it's more plausible than I -- than I
11   thought when I wrote the report.
12       Q.   Okay.  But you did not offer the
13   opinion that you believe the mechanism by which
14   apoaequorin active -- by entering the brain,
15   correct?
16       A.   That's correct.
17       Q.   And are you aware of the theory
18   that apoaequorin can exert effects on the brain
19   because of its calcium binding properties?
20       A.   Yes.  I understand that those
21   were the original -- I think that those were the
22   original hypothesis about how apoaequorin might
23   exert its effects.
24       Q.   And whose hypotheses were those?
25       A.   I believe that they were the

279

1    hypotheses of Moran and the authors of the earlier
2    papers on apoaequorin in -- in vitro and in vivo.
3        Q.   Do you recall the authors of any
4    of those earlier papers?
5        A.   Right now, I don't.
6        Q.   Okay.
7        A.   I think -- you know, Moran I
8    know for sure is one.  And the others I don't
9    recall right offhand.  I'd have to look at my
10   reference list.
11       Q.   So for apoaequorin to have this
12   calcium binding effect, it would need to be in the
13   brain intact.  Would you agree with that?
14            MS. METZINGER:  Objection to
15   form.
16            THE WITNESS:  I would say that
17            that's -- it's possible that that's
18            true.  It's also possible it's not true
19            because if there are segments of
20            apoaequorin that are released in di- --
21            during digestion, they might -- the
22            segments might be able to enter the
23            brain and exert this effect.  So there
24            are other plausible mechanisms besides
25            that the whole molecule of apoaequorin

280

1            enters the brain.
2    BY MS. MATUSCHAK:
3        Q.   Right.
4            But the question is just about
5    the calcium binding.  So my question is, would
6    intact -- the full protein intact need to be
7    present to have a calcium binding effect?
8        A.   And what I'm saying is I don't
9    know.
10            MS. METZINGER:  Objection to
11   form.
12            Go ahead.
13            THE WITNESS:  Hmm?
14            MS. METZINGER:  I just objected
15   to the form.  But you can go ahead,
16   Dr. Kurzer.
17            THE WITNESS:  I'm sorry.
18            MS. METZINGER:  That's all
19   right.
20            THE WITNESS:  I'm falling into
21            thinking this is just a conversation
22            between friends.
23            What I'm trying to say is that
24            it's possible that there are segments
25            of apoaequorin that are released during

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

281

1          digestion that have calcium binding
2          properties and that perhaps they could
3          move into the brain and exert a calcium
4          binding effect.
5    BY MS. MATUSCHAK:
6          Q.    What --
7          A.    And I -- I -- I don't -- I'm
8    just -- I'm just hypothesizing something that
9    could be plausible.
10         Q.    And what's the basis for your
11   belief that that is plausible?
12         A.    The basis of my belief is basic
13   understanding of digestion and physiology of many
14   substances and the fact that we know that there
15   are metabolites of other substances that do go
16   into the brain even though the whole substance
17   cannot.  And so it's not based on evidence.  It's
18   not based on studies that have been done.  It's
19   just a possibility.
20         Q.    Okay.  So just to be clear,
21   you're not referring to any evidence that there is
22   some --
23         A.    That's --
24         Q.    -- derivative --
25         A.    -- right.

282

1          Q.    -- of apoaequorin that has a
2    calcium binding effect?
3          A.    That's right.  That's right.
4                MS. METZINGER:  Objection to the
5          form.
6    BY MS. MATUSCHAK:
7          Q.    And later on in this
8    paragraph 56 in your report, you discuss gut-brain
9    axis theory, correct?
10         A.    Yes, I do.
11         Q.    And if you could just turn to
12   page 14 where the paragraph spills over.  In the
13   third --
14         A.    Yes.
15         Q.    -- line -- in the third line
16   down, you refer to peripheral intestinal
17   substances.  What do you mean by that phrase?
18         A.    What I mean is by -- that there
19   are dozens and dozens and dozens of substances
20   that are synthesized in the gastrointestinal
21   tract, in the stomach and largely in the small
22   intestine, so some degree in the large intestine,
23   that exert an effect on the brain.
24                In fact, the gastrointestinal
25   tract is considered by some people to be the

283

1    largest endocrine organ system in the body.  And
2    this is fairly new knowledge.  It's just the last
3    few decades that we've understood this, that --
4    that we have -- that there is a very clear
5    pathway - and there's no debate about this in the
6    nutritional science world in which I reside,
7    there's no controversy about this - substances,
8    hormones are secreted in the -- In the
9    gastrointestinal tract?
10               The best understood relate to
11   how we control food intake.  How is food intake
12   controlled.  How is it that we stop eating when
13   we've had -- we've eaten enough food.  Well, one
14   thing is the stomach gets full and we feel a
15   little bit fuller.  That's part of it.  But in
16   addition, there are hormones that are secreted by
17   the -- by the cells of the stomach and the cells
18   lining the small intestine that -- that attach to
19   chemoreceptors on the vagus nerve which travels
20   from the intestine to the brain, and they actually
21   exert effects on the center in the brain which is
22   responsible for appetite.
23               So we -- we very quickly have a
24   regulatory system that tells us when we're -- when
25   we should be hungry because there hasn't been any

284

1    food in a while or when we should be -- when we
2    should stop eating because we've eaten recently.
3    And it's these -- these chemical secreted in the
4    gastrointestinal tract that -- that signal the --
5    the nervous system through the vagus nerve which
6    then signals the -- the hypothalamus, the cells in
7    the appetite center.  So this is well known.
8    We've known this a few decades.
9                But there are other substances
10   as well.  Serotonin is secreted in the
11   gastrointestinal tract, and we know that serotonin
12   is a brain bioactive.  And there are many, many
13   other examples of -- of neurotransmitters and
14   hormones that we know are active in the brain that
15   are actually secreted in the gastrointestinal
16   tract.  So this is something that's very, very
17   well known, and I would say that we're getting
18   more and more and more and more data on this all
19   the time.
20               And the most recent --
21         Q.    Thank you.  Thank you,
22   Dr. Kurzer.
23         A.    Okay.
24         Q.    I'm sorry.  I just -- we're
25   running short on time, so I --

71 (Pages 281 to 284)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

285

1    A.    Sorry.
2    Q.    -- just want to make sure I
3  cover the -- the topics --
4    A.    Okay.
5    Q.    -- I want to cover.
6    A.    I'm sorry.
7    Q.    So I'm sorry to cut you off.  I
8  just would just ask if you could just answer the
9  question.  And -- and, you know, if your attorneys
10  want to ask you questions if you want to add
11  anything at the end, they can do that.
12    A.    Okay.
13          MR. de LEEUW:  I object to that
14    characterization.  She was actually
15    answering your question.
16          MS. METZINGER:  I agree with
17    that and second that, Mr. de Leeuw.
18    Thank you.
19  BY MS. MATUSCHAK:
20    Q.    So I would like you to look at
21  paragraph 57 on this page 14 of your report.
22    A.    Yes.
23    Q.    And I just want to clarify.  The
24  references cited in this paragraph, number of them
25  address apoaequorin specifically, correct?

286

1    A.    Right, yes.
2    Q.    And none of them address
3  products of apoaequorin specifically --
4    A.    That's correct.
5    Q.    -- correct?
6    A.    That's correct.
7    Q.    No -- so no peptides derived
8  from apoaequorin are addressed in these
9  references?
10    A.    That's correct.
11    Q.    And so none of them demonstrate
12  any bioactive peptides resulting from apoaequorin,
13  correct?
14    A.    That's correct.
15          MS. METZINGER:  Objection.
16    Objection to form.
17  BY MS. MATUSCHAK:
18    Q.    I'd like you to turn now to
19  paragraph 82 of your report.  And that's page --
20  it's numbered page 35, which I believe is page 37
21  of this exhibit.
22    A.    Is this the bibliography?
23    Q.    Oh, I'm sorry.  We may not be on
24  the page.
25          MR. de LEEUW:  What's the

287

1  paragraph number?  What's the paragraph
2  number?
3          MS. MATUSCHAK:  Paragraph 82.
4          THE WITNESS:  I have it.
5          MR. de LEEUW:  Paragraph 82.
6    It's on -- okay.
7          THE WITNESS:  I have that.
8          MS. MATUSCHAK:  Okay.  Great.
9  BY MS. MATUSCHAK:
10    Q.    So in the fourth line of this
11  paragraph, you say "substances in the GI tract can
12  signal the brain through the vagal nerve and/or
13  gut microbiota."  And this is the theory you were
14  just describing in your last answer, correct?
15    A.    Yes.
16    Q.    I'm sorry, not in your last
17  answer but in your discussion of paragraph 56, the
18  gut-brain axis, correct?
19    A.    Yes.
20    Q.    So are there -- does this mean
21  there are two parts to your gut-brain axis theory,
22  one involving vagal nerve and the other involving
23  gut microbiota?
24          MS. METZINGER:  Objection to
25    form.

288

1          THE WITNESS:  This is exactly
2    where I was going when I was talking a
3    little bit too much a few minutes ago.
4  BY MS. MATUSCHAK:
5    Q.    Okay.
6    A.    The more recent understanding of
7  the gut-brain axis is that the microbiota are
8  extremely active that the -- that there are --
9  that there are compounds synthesized by the
10  bacteria in the gut, including serotonin and a
11  number of hormones are synthesized by the
12  bacteria.  So the bacteria are -- they secrete and
13  synthesize very, very bioactive compounds.  And
14  this is very, very new, exciting work that's being
15  funded at enormous levels at the -- by the federal
16  government because we now know that the microbiome
17  really has a huge impact on health.
18    Q.    And you haven't cited any
19  evidence that apoaequorin can have an effect via
20  the gut-brain axis theory, correct?
21    A.    That's correct.
22          MS. METZINGER:  Objection to
23    form.
24          THE WITNESS:  I haven't.  And my
25    understanding of the guidance is that a

72 (Pages 285 to 288)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

289

1    mechanism is not required.  And that's
2    why, despite the fact, that I haven't
3    identified a mechanism for sure for
4    apoaequorin because there are plausible
5    mechanisms.  My interpretation of the
6    FTC guidance is that the -- the -- this
7    is acceptable evidence, the fact that
8    there are plausible mechanisms.
9  BY MS. MATUSCHAK:
10       Q.    So in -- back to paragraph 82,
11   in the fifth line down, you say "products of AQ,"
12   apoaequorin, "digestion in the stomach and
13   intestine could be absorbed and exert effects on
14   the brain."  This is your bioactive peptide
15   theory, correct?
16       A.    Yes.
17       Q.    But you don't -- as -- as I
18   think we've established, you don't -- you haven't
19   cited any evidence that apoaequorin actually
20   produces bioactive peptide, correct?
21       A.    That's correct.
22            MS. METZINGER:  Objection to the
23   form.
24  BY MS. MATUSCHAK:
25       Q.    Okay.  I'd like to go back now

290

1    to paragraph 56 of your report.  So paragraph 56
2    where you discuss the gut-brain axis theory, you
3    cite a biochemistry textbook, correct?
4        A.    Yes, I do.
5        Q.    And you believe that this is a
6    good reference to rely upon in general?
7        A.    In general, it's a -- it's a
8    good reference.  It is an old reference and
9    probably outdated.  And I know that I made a
10   mistake with that reference.  And I think the
11   reason is because -- I actually wrote three or
12   four different reports that got merged into one
13   report, and I had to redo all of the references in
14   order to create one report.  And it is very
15   possible that there was some kind of a mistake
16   made with the reference because of that.  So I
17   apologize for that error.
18       Q.    No need to apologize.  I just
19   want to make sure I understand, you know, the --
20   the basis for -- what you're citing as the basis
21   for the gut-brain axis theory.
22       A.    There are lots I could provide,
23   if you were interested, lots of other references.
24   So, really, I chose -- you know, in -- in many of
25   the points that I'm making, there are multiple

291

1    references that could be cited.  And in this case,
2    I certainly could provide other -- additional
3    references.
4        Q.    But here you cite just the
5    biochemistry book, correct?
6        A.    That's correct.  But it's a
7    mistake.  As I said, I think some references got
8    mixed up and that -- that is not the correct
9    reference for that comment.
10       Q.    But you would agree that this
11   reference doesn't support the statements in this
12   paragraph?
13       A.    Yes.
14            MS. METZINGER:  Objection to
15   form.
16  BY MS. MATUSCHAK:
17       Q.    And were you familiar with
18   Dr. Berg, Dr. Jeremy Berg, before your work on
19   this case?
20       A.    No.
21       Q.    And in paragraph 57, I believe
22   you also cite Dr. Berg's book, and I'll just point
23   you to it.  It's in the fifth line of that
24   paragraph.
25       A.    Same problem.  This -- this

292

1    reference got put in there and it shouldn't have
2    been.  And I think it was the work -- it took me
3    many, many hours to redo all of the references
4    when the reports got merged, and so the wrong
5    reference was put here.  So that reference that's
6    cited does not support that sentence.  But as I
7    said, I could provide other references that would.
8    And, frankly, that 20 -- that 20-year-old textbook
9    is probably outdated, so I -- it would also be
10   interesting to look at a more current version of
11   it to see if they include these statements.
12       Q.    You don't cite any evidence of
13   amino acid small peptides containing, say, four
14   or more amino acid units that are -- that can be
15   absorbed in the small intestine, correct?
16            MS. METZINGER:  Objection to the
17   form.
18            THE WITNESS:  I -- I may not
19   have a citation here, but there
20   certainly are some that I know of and
21   that I could easily provide references
22   for.  For example, lunasin is a peptide
23   found in soy protein, which is 43
24   amino acids.  And there have been
25   studies done because it's been shown to

73 (Pages 289 to 292)

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

293

1          exert anticancer properties, so there's
2          a lot of interest in it.  There have
3          been studies done where people have
4          been given lunasin and it's measured in
5          the blood.  That shows --
6    BY MS. MATUSCHAK:
7          Q.    But you don't --
8          A.    -- it's absorbed.
9          Q.    But you don't refer to that in
10   your report, correct?
11         A.    I don't.  I don't, no.
12         Q.    Did you review the -- the report
13   of Dr. Jeremy Berg that was submitted in this
14   matter?
15         A.    I did.
16         Q.    Did you consider offering a
17   rebuttal opinion to that report?
18               MS. METZINGER:  Objection.  I'm
19         going to instruct the witness not to
20         answer that question on the grounds of
21         attorney-client privilege and work
22         product.
23   BY MS. MATUSCHAK:
24         Q.    Are you going to follow that
25   instruction?

294

1          A.    I am.
2          Q.    Would you consider yourself to
3    be a biochemist?
4          A.    I am a nutritional scientist,
5    and biochemistry is a fundamental -- a
6    fundamental -- it's a foundational discipline for
7    nutritional science.  Nutritional science is
8    basically a combination of biochemistry and
9    physiology as it applies to nutrition and to
10   nutrients.  How are they absorbed, how are they
11   digested, what happens to them after, what about
12   metabolism, these are things that I'm an expert
13   in.
14               And I have, as a nutritional
15   scientist, I think a much broader understanding of
16   nutrition and what happens to things that we
17   consume than many biochemists who have -- tend to
18   have very, very narrow approach, very narrow
19   understanding of their particular field of
20   expertise.
21               So I am not trained in
22   biochemistry at the Ph.D. level.  I do not have a
23   Ph.D. in biochemistry.  I have taken many
24   biochemistry classes.  I have taught biochemistry
25   classes.  And I certainly consider myself to be an

295

1    expert in nutritional biochemistry.
2          Q.    And, yes, I appreciate that
3    background, and I heard a lot of it earlier on
4    today when we were talking about your background
5    in general.
6                The question is simply would you
7    consider yourself to be a biochemist.
8                MS. METZINGER:  Objection.
9          Asked and answered.
10               THE WITNESS:  As I said, I
11         consider myself to be a nutritional
12         scientist.  I have an expertise in
13         nutritional biochemistry, yes.  I know
14         more nutritional biochemistry than most
15         biochemists do.
16   BY MS. MATUSCHAK:
17         Q.    Other than reviewing literature,
18   do you have any experience studying the mechanics
19   of protein digestion?
20               MS. METZINGER:  Objection to
21         form.
22               THE WITNESS:  Can you explain
23         what you mean by "experience"?
24   BY MS. MATUSCHAK:
25         Q.    Any -- any type of study of --

296

1    of the mechanics of protein digestion.
2          A.    I have not done studies on
3    protein digestion.  I have done studies on -- in
4    fact, I was involved in studies that were done at
5    UC Berkeley on the protein requirements of women.
6    And, in fact, they're cited in the international
7    guidelines for protein requirements.  And so I've
8    been involved in studies that looked at whole body
9    protein utilization.  I have not done studies on
10   protein digestion per se myself.
11         Q.    And other than reviewing
12   literature, do you have any experience studying
13   the mechanics of protein metabolism?
14               MS. METZINGER:  Objection to
15         form.
16               THE WITNESS:  I have not
17         performed research on protein
18         metabolism, but I have taught it to
19         graduate students at the University of
20         Minnesota.  So I have enough of an
21         understanding of the literature and the
22         most current information that I can --
23         that I can teach classes on that
24         involve protein digestion and protein
25         utilization.  I have not done research

74 (Pages 293 to 296)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Case 1:17-cv-00124-LLS   Document 259-9   Filed 06/16/22   Page 77 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                9/29/2021

297

1      on that myself.
2  BY MS. MATUSCHAK:
3      Q.   Can you tell me the general
4  subject matter of the classes that you taught that
5  involve protein metabolism or protein digestion?
6      A.   I teach an introductory
7  nutrition class which is an overview of all
8  nutrition, and we go through every nutrient
9  category in great detail.  Two weeks ago I gave a
10  lecture to University of Minnesota students, to
11  150 students, on digestion and absorption.  And
12  then as we talk about each category of
13  macronutrients when we -- when we talk about
14  protein, which we'll be doing I think next week,
15  then there will be lectures on pro- -- more
16  deeper, a deeper look at protein digestion,
17  absorption, metabolism.
18      Q.   Anything other than the lec- --
19  the intro -- introductory nutrition class and --
20      A.   I --
21      Q.   -- the lecture --
22      A.   Yeah, I've -- I've --
23      Q.   Sorry.  Go ahead.
24      A.   I just didn't want to jump in
25  too quickly.

298

1      I have taught a class a number
2  of times on protein and energy utilization where I
3  focus on the relationship between protein needs
4  and energy needs in humans, and so that's another
5  class that I've taught.  And I've taught a class
6  on nutrition and endocrinology where I focus on --
7  and this is a high level class, this is for
8  doctoral students, focusing on the hormones that
9  influence nutrition and how nutrition influences
10  hormones.  So I do consider myself an expert in
11  that subject.
12      Q.   Have you ever conducted a study
13  to determine whether a compound has entered the
14  bloodstream?
15      MS. METZINGER:  Objection to
16  form.
17      THE WITNESS:  Yes, I have.  In
18  the -- in the soy studies that I've
19  done with soy protein, we have been
20  very interested in bioactive compounds
21  in soy protein called isoflavones.  And
22  I have done numerous studies in which
23  we have given -- we have given people
24  known amounts of isoflavones and then
25  measured them in the blood and in the

299

1      urine to evaluate the, you know,
2  digestion and absorption.
3  BY MS. MATUSCHAK:
4      Q.   And what was your role in that
5  study?
6      A.   Principal investigator.
7      Q.   And do you have any other
8  studies that -- in which you have studied whether
9  a compound has entered the bloodstream?
10      A.   In the green tea trial that I
11  did which I also was a principal investigator of,
12  we -- those are both -- these are all NIH-funded
13  trials.  We gave a capsule with a -- an extract of
14  green tea that contains catechins, which are the
15  bioactive compounds -- thought to be the bioactive
16  compounds in green tea, and we measured -- we --
17  we gave people a known amount of catechins, and we
18  measured them in the blood and in the urine.  So
19  we know that they were absorbed and we know how
20  much they were excreted.
21      Q.   Have you ever conducted a study
22  involving a supplement that contains a protein?
23      A.   I've done lots of studies with
24  soy protein.  So that is a protein.  And in that
25  case, it is a protein that contains bioactive

300

1  substances in it that are released when it's
2  consumed and when it's digested.  The bioactive
3  substances are released.
4      Q.   Yes.  But that is not a dietary
5  supplement containing a protein, is it?
6      A.   I don't know.  I think you
7  should give me an example of a dietary supplement
8  containing a protein.  Do you mean -- are you
9  speaking about apoaequorin in particular like -- a
10  dietary supplement that is a protein?  Is that
11  what you mean?
12      Q.   Right, right.  Well, I mean, I
13  think you were speaking with Mr. Wone earlier
14  about the difference between, you know, dietary
15  supplements, studies involving dietary supplements
16  in which you could have, you know, some people
17  getting the placebo and other people getting the
18  active ingredient versus studies involving food
19  product where people know what they're getting.
20  And so I'm trying to draw a distinction between
21  those two in asking whether you've done any
22  studies in which the active ingredient in a
23  dietary supplement is a protein.
24      MS. METZINGER:  Objection to
25  form.

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                   9/29/2021

301

1          THE WITNESS:  No.  Given the way
2   that you're phrasing this question, my
3   answer would be no.  I have not -- you
4   know, I've given -- I've done studies
5   with supplements that were given as
6   pills.  They were not proteins.
7   BY MS. MATUSCHAK:
8          Q.    Do you know how one might go
9   about testing apoaequorin to determine what
10  products result from digestion?
11         MR. de LEEUW:  Object to form.
12         THE WITNESS:  I think the best
13  way to do that would be to do a human
14  study in which you -- you -- you
15  provide apoaequorin to people and then
16  you -- you remove fluid from the
17  stomach, from the small intestine, et
18  cetera, to see what is released.
19         There are other ways to do this.
20  You could use a radiolabeled
21  apoaequorin where you have a -- you
22  know, it's called a -- you know, not --
23  not radioactive but a heavy -- an
24  isotope so that when apoaequorin is
25  consumed, if it is absorbed, digested

302

1   and parts of it are absorbed, you can
2   measure this isotope in the blood and
3   you can follow it to see where it goes.
4          So there are ways to do it.
5   They're difficult studies, but it's
6   possible to do those.
7   BY MS. MATUSCHAK:
8          Q.    Are you aware of such studies
9   being conducted by anyone?
10         A.    I am not aware that such studies
11  have been conducted.  I'm also not aware that the
12  FTC guidance requires those kinds of studies.  So,
13  you know, you're right, I don't think they've been
14  conducted.  But despite that, I still stand behind
15  my conclusions.
16         Q.    Just to be clear, you're not
17  aware of any studies such as the ones you just
18  described being conducted with respect to
19  apoaequorin, right?
20         MR. de LEEUW:  Objection.
21         THE WITNESS:  Yes.
22         MR. de LEEUW:  Object to --
23         MS. METZINGER:  Objection.
24         MR. de LEEUW:  -- the form of
25  the question.

303

1          MS. METZINGER:  Asked and
2   answered and to the form.
3   BY MS. MATUSCHAK:
4          Q.    Have -- are you familiar with
5   something called a PeptideCutter?
6          A.    A PeptideCutter?  I'm not
7   familiar with that term.  Yeah, I'm not familiar
8   with that term.
9          Q.    Okay.  Are you familiar with an
10  Expasy tool?  It's spelled E-X-P-A-S-Y.
11         A.    No, I'm not familiar with that.
12         Q.    Are you familiar with high
13  performance liquid chromatography or HPLC
14  analysis?
15         A.    Yes, I've used HPLC analysis and
16  I've used -- that's liquid chromatography.  I've
17  also used GCMS, which is gas chromatography–mass
18  spectrometry.  So they're -- they're methods of
19  analysis, and I have used them all.
20         Q.    Are those methods of analysis
21  expensive?
22         A.    Very.
23         MS. METZINGER:  Objection to the
24  form.
25

304

1   BY MS. MATUSCHAK:
2          Q.    How expense effective would you
3   say an HPLC analysis is?
4          A.    You know, I really can't say
5   because it depends on what you're analyzing.  The
6   machines are very expensive.  So the machine that
7   you need to accomplish the analysis could be a few
8   hundred thousand dollars.  Then when you're doing
9   the analysis of particular substances, you have to
10  get reagents and chemicals that could be quite
11  expensive in addition to the machine.  It's also
12  fairly labor intensive, so you need staff who can
13  spend time.
14         So I can't really give you an
15  answer to how much it costs.  It depends on the
16  particular substance that you're analyzing.
17         Q.    If the substance you were
18  analyzing is apoaequorin, would that help you
19  estimate what the cost would be to conduct such an
20  analysis?
21         A.    Personally, I could speak with
22  colleagues and get advice from people about what
23  it would cost if you -- if you wanted to know that
24  information.  There are some things that you need
25  to have in order to do this kind of analysis.  You

76 (Pages 301 to 304)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

305

1   have to have a standard.  So you have to have a --
2   a known amount of this substance which you can
3   use, and then they -- they could be quite
4   expensive to develop.  I've known people who have
5   paid companies to create standards for them, and
6   that is a very large upfront cost.
7           So that's something that I would
8   have to look into.  I wouldn't know that off the
9   top of my head.
10      Q.   Okay.  Because I just -- sitting
11  here today, you -- you don't have enough
12  information to provide a cost estimate?
13      A.   That's correct.
14      Q.   And are you aware of anyone ever
15  conducting an HPLC analysis on apoaequorin?
16      A.   You know, I'm not.  I'd have to
17  look at the papers again to see if -- if the -- if
18  the published papers analyzed apoaequorin.  I
19  don't recall right now.
20      Q.   Okay.  But just -- just sitting
21  here today, you're not aware of such an analysis
22  having been conducted?
23      A.   Yes.
24           MS. METZINGER:  Objection.
25  Asked and answered.

306

1   BY MS. MATUSCHAK:
2       Q.   And your opinion is that the
3   mechanism of action does not need to be known in
4   order for a dietary supplement to be effective,
5   correct?
6       A.   Yes.  In order for it to be
7   effective and really in order -- yeah, in order
8   for it to make a claim of effectiveness, a
9   structure function claim.
10      Q.   And so the mechanism action
11  theories that you're advancing are possibilities
12  but not proven mechanisms, correct?
13      A.   That's correct.
14           MS. METZINGER:  Objection to
15  form.
16           THE WITNESS:  And -- and there
17  are -- there are lots of examples of
18  substances that are used even as drugs
19  for which we don't know the mechanism
20  of action.
21           You know, aspirin was -- has
22  been utilized since the late 1800s, and
23  it's only in the 1970s or '80s that the
24  mechanism of action was -- was used.  I
25  remember when I was in graduate school

307

1   learning about this, the teacher used
2   the word "miracle," that it was
3   considered a miracle drug.  It did all
4   kinds of stuff but we didn't know why.
5   But doctors still recommended it.
6           And corticosteroids, cortisone,
7   is another one.  Prednisone.  For many
8   years, that was prescribed without
9   understanding the mechanism of action
10  at all.  Now we understand what the
11  mechani- -- mechanism of action is of
12  that.
13          So there are lots of examples
14  even of drugs that are shown to be
15  effective and are therefore utilized
16  without knowing the mechanism of
17  action.
18  BY MS. MATUSCHAK:
19      Q.   Why did you think it was
20  important to opine on the mechanism of action in
21  this case?
22           MS. METZINGER:  Objection.
23  And I would caution Dr. Kurzer
24  that she not divulge any communications
25  with counsel in providing an answer to

308

1   this question.  If she's able to answer
2   the question without divulging such
3   information, she's free to do so.
4           THE WITNESS:  I would choose not
5   to answer the question.
6   BY MS. MATUSCHAK:
7       Q.   Do you think that the mechanism
8   of action is relevant to an issue in this case?
9           MS. METZINGER:  Objection.
10          THE WITNESS:  I'm sorry.  Can
11  you repeat the question?  I didn't
12  catch one part of it.
13  BY MS. MATUSCHAK:
14      Q.   Sure.
15          Do you think the mechanism of
16  action is relevant to an issue in this case?
17      A.   Is it relevant --
18          MS. METZINGER:  Objection.
19          THE WITNESS:  Is it relevant to
20  the primary issue in this case?
21  BY MS. MATUSCHAK:
22      Q.   To any issue in this case.
23          MR. de LEEUW:  Object to the
24  form.  You're asking for a legal
25  opinion?

77 (Pages 305 to 308)

Case 1:17-cv-00124-LLS   Document 259-9   Filed 06/16/22   Page 80 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

309

1          THE WITNESS:  My --
2    BY MS. MATUSCHAK:
3        Q.    Sorry.
4        A.    My interpretation of the
5    guidance, the FTC guidance, is that a mechan- -- a
6    mechanism of action is not necessary, therefore it
7    is not relevant.
8          MS. MATUSCHAK:  Let's go off the
9    record, please.
10          THE VIDEOGRAPHER:  We are going
11    off the record at 5:17 P.M.
12          (Off the record from 5:17 until
13    5:26.)
14          THE VIDEOGRAPHER:  We're going
15    back on the record at 5:26 P.M.
16          MS. MATUSCHAK:  Thank you for
17    your time, Dr. Kurzer.  I don't have
18    further questions at this time.
19          THE WITNESS:  You're very
20    welcome.
21          MS. METZINGER:  I do not have
22    any questions for Dr. Kurzer.
23          MR. de LEEUW:  No questions.
24    Thank you.
25          THE VIDEOGRAPHER:  This

310

1    concludes the video deposition Mindy
2    Kurzer.  We are going off the record at
3    5:26 P.M.
4          (Deposition concluded at 5:26 P.M.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

311

1    STATE OF TENNESSEE    )
2    COUNTY OF DAVIDSON    )  SS:
3          I, Gary Schneider, TLCR No. 676, in and
4    for the State of Tennessee, do hereby certify:
5          That, prior to being examined, the
6    witness named in the foregoing deposition was by
7    me duly sworn to testify the truth, the whole
8    truth and nothing but the truth;
9          That said deposition was taken down by
10    me stenographically at the time and place therein
11    named, and thereafter transcribed via
12    computer-aided transcription under my direction,
13    and the same is a true, correct and complete
14    transcript of said proceedings;
15          Before completion of the deposition,
16    review of the transcript was not requested.  If
17    requested, any changes made by the deponent (and
18    provided to the reporter) during the period
19    allowed are appended hereto.
20          I further certify that I am not
21    interested in the outcome of the action.
22          Witness my hand this October 5, 2021.
23
24    s/Gary Schneider
     GARY SCHNEIDER, TLCR No. 676
25    Certified Shorthand Reporter

312

1          CERTIFICATE OF DEPONENT
2
3
4          I hereby certify that I have read and examined
5    the foregoing transcript, and the same is a true and
6    accurate record of the testimony given by me.
7
8
9          Any additions or corrections that I feel are
10    necessary, I will attach on a separate sheet of paper to
11    the original transcript.
12
13
14          I hereby certify, under penalty of perjury, that
15    I have affixed my signature hereto
16    on the date so indicated.
17
18
19          DATED:
20
21
22
23    _____
24    MINDY KURZER, Ph.D.
25

78 (Pages 309 to 312)

Case 1:17-cv-00124-LLS   Document 259-9   Filed 06/16/22   Page 81 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                9/29/2021

313

```
1    WITNESS:  MINDY KURZER, Ph.D.
2    DATE:  SEPTEMBER 29, 2021
3    CASE:  FTC, et al., v. QUINCY BIOSCIENCE HOLDING, ET AL.
4    Please note any errors and the corrections thereof on
5    this errata sheet.  The rules require a reason for any
6    change or correction.  It may be general, such as "To
7    correct stenographic error," or "To clarify the record,"
8    or "To conform with the facts."
9    PAGE LINE  CORRECTION    REASON FOR CHANGE
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**A**

A-1 180:5
A.M 1:22 6:21 78:11
  78:15
abbreviation 43:20
  43:24 87:2
ability 68:4 173:11
  178:21 193:17,19
  195:8 201:2
able 10:19 13:1
  56:22,23 62:24
  73:7 92:10,25
  114:8 115:16
  174:8 191:3 192:7
  231:18 278:6
  279:22 308:1
absolute 208:12,22
  209:3
absolutely 146:3
  227:14
absorbed 277:18,25
  289:13 292:15
  293:8 294:10
  299:19 301:25
  302:1
absorption 297:11
  297:17 299:2
academic 36:3,11,20
  42:14
accept 180:22
  203:24
acceptable 98:3
  133:15 136:6
  240:8 289:7
accepted 71:19
  114:17,19,19,20
  184:4,7
accepting 227:11
access 10:19 167:6
  215:22
accommodate 9:21
accomplish 61:20
  304:7
account 144:5,8
  164:11 174:18,19
  175:10 177:8,14
  248:8

accuracy 154:13
accurate 95:9,18
  154:15 165:24
  166:5 168:9 312:6
achieve 68:20 270:6
achieves 66:21
acid 292:13,14
acids 34:21 292:24
acknowledge 228:13
Act 272:21
acted 35:17
acting 19:19
action 306:3,10,20
  306:24 307:9,11
  307:17,20 308:8
  308:16 309:6
  311:21
active 278:14
  284:14 288:8
  300:18,22
actual 41:9 44:21
AD 120:21
AD8 121:7,10,25
  122:4,10,14,20,22
  123:9,18,23
  125:15 132:21,22
  132:24 133:2,5,21
  133:25 134:3,16
  135:1,1 137:18,25
  138:1,2,14 139:5
  139:15 140:2,7,12
  141:3,6,12 142:1
  142:18 143:12,14
  143:24 144:13
  150:5,7,14 163:25
  165:11,15 198:16
  199:24 200:16
  201:15 225:10
  232:11,21 233:17
  234:21
add 60:10,23 74:14
  168:3 184:17
  231:8 268:7
  285:10
added 65:3 184:13
  185:13 241:4,8
addition 35:21

82:22 127:21
  184:10 201:1
  283:16 304:11
additional 58:18
  59:9 60:24,25
  120:25 203:18
  291:2
additions 312:9
address 285:25
  286:2
addressed 286:8
adipose 21:1
adjust 87:20 179:23
  183:11
adjusted 248:17,19
ADL 180:6
administered 49:11
  132:22,24 133:5
  133:12,16,21,25
  134:3,5,10,12
administering
  170:16
administration
  24:20 170:14
adolescents 257:13
  257:16,23 258:16
  258:19 259:11,19
  260:13
ads 83:19
Adult 264:6,12
adults 110:22,24
  111:4 159:15,18
  160:18 225:11,14
  259:12,20 260:13
  261:5
advance 54:14
  57:18 58:16
  175:12
Advances 165:15,18
advancing 306:11
adverse 127:2,3,25
  128:12,22 129:10
  129:14,16 153:12
  176:3 272:13
  274:3
advertisements
  41:24

advertising 83:16
  84:12 176:8
advice 177:24
  188:21 189:1
  304:22
advisor 16:5
affect 139:5,17,18
  141:24 142:5,10
  151:24 152:13
  186:3 187:2 243:7
  243:22 247:21
  248:5,8,9,20
affect- 30:20
affiliated 82:3
  107:11 108:3
affixed 312:15
afternoon 158:2,3
  276:20 277:3,4
age 233:22 234:17
  248:18
age-related 102:13
  258:20 259:12,20
agencies 24:6 49:2
agency 45:12
ages 22:7 110:23,24
  111:4
AgileLaw 10:20
  11:16 93:25
aging 28:12 121:22
  125:20 162:18
ago 29:5,9 79:10,13
  79:21 134:15
  151:1 158:20
  179:7 265:17
  288:3 297:9
agree 40:4 69:23
  76:14,22 101:5,22
  103:17,21,23
  117:1 129:20,23
  131:7 133:4 134:2
  157:6 167:8
  176:17 191:6
  195:5 197:21
  207:1,6 215:20
  223:20 230:13
  235:1 252:3 253:3
  279:13 285:16

291:10
agreed 180:15 274:2
agrees 69:25
agriculture 24:24
  25:1,2 33:18,21
Ah 222:15
ahead 12:8 223:4
  226:17 238:11
  275:20,23 280:12
  280:15 297:23
aiming 121:3
aims 60:24
al 1:14 6:15 313:3,3
Alison 179:8
allied 24:25
allowed 311:19
allows 153:2
alternative 77:21
  230:4,8
Alzheimer's 88:22
  91:1 121:12
  159:20,22,24
  160:2,19,22 161:1
  161:1,8,21 162:3
  163:12
American 30:10,11
  35:25 36:5,7 37:3
  37:8 69:24
Americans 30:18
amino 292:13,14,24
amount 17:5 55:22
  103:25 104:6
  114:18 115:5
  195:14 205:1
  209:19 250:2
  261:22 271:4,11
  299:17 305:2
amounts 298:24
analyses 5:5 39:19
  40:6,21 42:4 63:19
  106:20 127:20,24
  128:12 174:23
  234:22 235:7,12
  235:18 236:10,16
  236:19 237:4,10
  238:1,5,18 239:3

239:12 240:9
**analysis** 40:22 50:15
  55:24 62:13,18
  63:23 64:11 70:22
  95:6 105:25 119:1
  121:2 126:10,13
  126:24,25 127:4
  127:13,18,22
  128:4,15,24 129:9
  129:11 130:3
  131:8 144:6
  146:16 147:25
  149:5,21 151:23
  152:9 158:15
  167:5 170:11,21
  171:1 173:15
  179:14 184:20
  185:13 188:7
  191:19 196:3
  197:20 205:3
  206:13 239:22
  303:14,15,19,20
  304:3,7,9,20,25
  305:15,21
**Analysis_QUINC...**
  4:23
**analytical** 40:9
**analyze** 25:24 40:1
  56:10,22 63:3
  114:9 119:6
  120:18 123:9
  147:15 196:14
  233:1
**analyzed** 16:11 43:2
  43:3 50:17 55:7
  56:1 59:7 61:2
  105:9 118:22
  119:11,19 120:17
  120:20 130:12
  136:24 158:22
  194:19 305:18
**analyzing** 19:15,18
  19:20 56:14 93:18
  109:4,22 170:25
  304:5,16,18
**ancillary** 184:19
  186:1

**and/or** 31:20 167:20
  287:12
**Andrew** 2:3 7:9
**animal** 43:4 68:7
  75:13,17,21 76:6
  77:20 93:1 101:20
  101:22 102:3
  195:16
**animals** 43:4 75:18
**Annette** 2:4 7:13
**annual** 47:1 61:15
**answer** 9:14,22 10:1
  10:6,14,15 13:1
  43:12 56:23 62:25
  69:17 79:5 80:6,9
  86:22 107:22
  109:12,13 121:20
  121:20 153:24
  157:15 159:1
  177:11 199:13
  212:20 220:16
  231:6 238:12,13
  238:16 243:14,18
  259:24 260:5,10
  264:15 285:8
  287:14,17 293:20
  301:3 304:15
  307:25 308:1,5
**answered** 228:22
  295:9 303:2
  305:25
**answering** 86:17
  285:15
**anticancer** 293:1
**antidepressants**
  102:17
**apo** 180:5,5
**apoaequorin** 35:9
  90:4,11,14 99:18
  99:25 118:15
  140:22 141:1
  203:17 204:1,2
  205:23 206:4
  221:23 222:5
  223:13,16 224:9
  225:2,5 227:19,23
  239:15 241:24

277:20,24 278:2,4
  278:14,18,22
  279:2,11,20,25
  280:25 282:1
  285:25 286:3,8,12
  288:19 289:4,12
  289:19 300:9
  301:9,15,21,24
  302:19 304:18
  305:15,18
**apoaequorin/Prev...**
  88:9 89:25
**apologize** 212:25
  290:17,18
**apparent** 141:22
  224:13
**appeared** 240:25
**appearing** 7:9,11
**appended** 311:19
**appetite** 283:22
  284:7
**application** 44:13
  48:5,11 49:8
**applications** 48:13
  48:17 92:12
**applied** 15:14
  138:23 140:9
  176:11 179:22
  186:6 205:2
  231:11
**applies** 152:22
  294:9
**apply** 38:9 76:12
  102:7 183:13
  231:4
**applying** 152:21
  273:3
**appreciate** 76:7
  236:23 295:2
**approach** 41:1
  71:10 212:12
  294:18
**appropriate** 124:1
  150:17 152:24
  160:6 172:25
  174:2 185:19
  188:13 231:4,13

265:23
**approval** 128:11
**approve** 173:22
**approved** 127:6,8
  173:24
**approximately**
  13:25
**AQ** 277:18,20
  289:11
**arbitrary** 69:22,25
  71:22 173:8,8
**area** 27:10 38:10,14
  38:21,24 40:13
  92:11,15,21
**areas** 15:21 38:4
  39:7 121:16 189:6
**AREDS** 174:14
**argue** 40:3 184:5,6
**argument** 266:13
**argumentative**
  260:8
**arguments** 72:17
**arithmetic** 264:10
**arm** 16:20
**article** 37:16 42:2
  100:23 181:8
  187:14 229:13,23
  230:3
**articles** 37:18 38:1
  41:23 90:20 98:8
  98:10
**Aside** 81:17 85:3,8
  94:9 98:9
**asked** 29:6,6 39:25
  82:19 83:10,11
  153:8 228:22
  251:8 260:18
  273:19 295:9
  303:1 305:25
**asking** 9:9 53:3
  75:15 107:25
  108:1 125:15
  141:3,15 142:25
  143:2,7,9 153:20
  154:1 233:21
  236:2,18,19,20,22
  237:2,17,22,24,25

300:21 308:24
**asoberates@ftc.gov**
  2:13
**aspect** 21:9 28:23
  37:19 270:15,21
**aspects** 16:10 26:19
  97:25 190:5
  202:12 203:7
  251:4
**aspirin** 306:21
**assign** 36:14
**assigned** 167:8
  169:2 257:24,24
**assist** 82:25 89:8
  90:16 91:7 93:17
  99:3
**assistant** 2:20 23:10
  40:19
**assisted** 91:11
**associate** 246:23
**associated** 184:15
  246:6,7,11,12,15
  249:11 250:7,15
  250:17 256:3
**association** 244:16
  246:24,25 247:1
  249:10,25 250:21
  251:13,15,19,22
  251:22 253:5
  268:3,16 269:7,9
**associations** 242:7
  242:11 244:1
  246:1 249:18
  250:10,12 255:23
  267:20 268:25
  271:5
**assume** 10:2 126:4,4
  149:10 229:24
  230:1 235:14
  236:9,11 237:25
  265:22
**assuming** 217:2,5
  237:3 265:19
**assumption** 51:22
  149:12 166:24
  236:3 265:21
**Atrium** 3:18

Kurzer, Ph.D. - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.

9/29/2021

[ 316 ]

**atrophy** 242:22
243:6
**attach** 283:18
312:10
**attacks** 78:2
**attention** 166:10,16
190:25 191:4,15
193:5,7,23 200:20
**Attorney** 1:7 2:18
2:20 6:13 7:18
277:8
**attorney-client**
293:21
**attorneys** 7:13 11:9
11:14 81:17 94:22
95:15 106:3 285:9
**attorneys'** 1:18
12:13
**audience** 258:17
**audio** 8:23 81:22
218:8
**author** 96:2 182:11
230:1
**authors** 93:8 160:14
279:1,3
**automatic** 37:9
**Avenue** 2:8 3:7
**average** 54:3 258:3
**avoid** 32:5 65:3
173:16,18
**award** 37:6
**aware** 169:7 236:25
239:18 243:23,24
260:16,17 278:17
302:8,10,11,17
305:14,21
**awone@ftc.gov** 2:11
**axis** 282:9 287:18,21
288:7,20 290:2,21

**B**

**b** 3:16 180:5 256:14
256:15,16,18,18
268:25
**B-E-A-L-E-S**
108:16
**back** 40:1,3 45:12

56:20 71:8 78:15
78:19 86:12
101:14,15 115:18
118:3,9 131:14,15
132:21 157:24
158:4,7 174:20
189:14 194:12
198:10 214:10,13
214:16,17,21
215:3,6,8 216:5,5
216:15 217:9,21
217:22,23 218:2,6
218:16,21 219:5
219:13,21 220:4,9
220:20 221:1
222:12,14,14
223:10,10 229:6,8
234:2 240:11
241:14 252:21
260:20 265:8
269:23 276:18
289:10,25 309:15
**background** 88:24
117:18 213:1
276:8 295:3,4
**bacteria** 288:10,12
288:12
**bad** 113:14 188:6
**balance** 130:22
**barrier** 278:3,7
**base** 238:1
**based** 55:4 95:20
96:24 97:2,4,10,16
110:17 112:1
117:6,10 281:17
281:18
**baseline** 142:14,20
143:5,15,21 144:1
144:5,7,14 185:1
188:3 261:16
**basic** 20:16 21:2
38:11 43:16 93:4
281:12
**basically** 19:21
121:23 172:18
177:7 246:24
276:1 294:8

**basis** 16:10 17:10,12
54:2,8 95:1 125:2
134:20,21 171:12
272:17 281:10,12
290:20,20
**bat** 187:7
**batteries** 202:23
**battery** 202:9,14,18
203:9
**Bealed** 108:12
**Beales** 108:8,11,14
108:17
**beans** 18:15,17,20
18:21
**beds** 17:4
**began** 144:25 145:1
**beginning** 7:6 27:5
121:4 123:24
124:3,7 156:6
174:18 185:8
**begins** 6:8
**behalf** 2:2 3:1,15
6:25 7:2,10,11,21
8:5 13:16 277:7
**behavioral** 102:15
**belief** 159:13 171:13
180:15 272:18
281:11,12
**believe** 32:1 34:9
42:2 63:22 64:21
66:2 72:25 80:6,21
81:9,15 82:6 87:5
93:11 94:18,19
95:13 96:1,7
98:23 102:25
108:12,17 109:2
109:23 110:11
111:10,17,18
115:22 119:23
120:15 126:11
127:19 128:1,1,23
130:7 133:3 134:8
135:19 136:22
138:8,9 140:5
144:4 145:1
163:22 164:3
165:12 167:24

174:5 175:15
177:1 178:15
184:1,22 193:1
196:18 198:2,3
199:2 201:13
211:22 226:22
227:22 230:20
231:3 240:23
241:13 242:6
255:5,6 257:14
261:1 270:25
271:19 275:7
276:9 277:17,23
278:9,13,25
286:20 290:5
291:21
**believed** 90:20
91:14 194:18
**believes** 230:14
**belonging** 54:8
**beneficial** 163:9
184:16 242:6,11
243:25 244:16
246:1 249:18
250:10,12 255:23
267:19 268:15
**benefit** 176:4 203:16
203:19 204:6,14
205:18,22 206:3,5
206:11,16 209:14
216:2 223:12
226:4,8,13,22,24
227:3,19,23
228:12,15
**benefits** 228:18
270:7,9,12 271:22
272:1
**Berg** 291:18,18
293:13
**Berg's** 291:22
**Berkeley** 14:22 15:9
15:11 16:24 18:7
20:12,14 21:19
296:5
**best** 10:3 32:6 44:18
64:25 107:22
134:9 253:13

262:25 283:10
301:12
**better** 135:22
143:12,14 204:1,3
215:4 216:7,11,11
217:16 218:4
219:6 220:3 221:1
221:25 222:8
223:17 224:7,25
225:2 230:14
231:2 247:11
250:8,15 253:18
256:3 261:19
**biased** 169:3
**bibliography** 94:3,5
94:11,24 286:22
**big** 24:3,19 77:14
173:10
**bigger** 205:6
**binding** 156:3
278:19 279:12
280:5,7 281:1,4
282:2
**bioactive** 284:12
286:12 288:13
289:14,20 298:20
299:15,15,25
300:2
**bioactives** 182:18
**biochemical** 40:10
**biochemist** 294:3
295:7
**biochemistry** 15:12
38:8 290:3 291:5
294:5,8,22,23,24
294:24 295:1,13
295:14
**biochemists** 294:17
295:15
**biological** 56:1 72:6
178:6 187:3
**biologically** 103:18
103:22,24 104:3
**biology** 205:9,10
**biomarkers** 23:23
**Bioscience** 1:12 6:14
7:21,22,24 82:3

313:3
**biostatistician** 56:9
**biostatistics** 40:11
40:13,16,18 42:14
**bit** 8:23 9:6 22:8
24:7 26:15 29:3
34:1 42:3 53:5
66:8 71:12 75:19
102:7 143:3 154:6
187:13 188:7
193:11 225:7
226:10 228:5,10
253:9 257:17
263:21 268:5
283:15 288:3
**black** 41:1
**blanket** 63:8
**blind** 148:3,4 155:1
155:17
**blinded** 51:19 52:1
132:5,6 148:10
149:11 154:15,24
155:10 156:7,16
156:25 157:5,5
167:22 168:8,12
168:21,23
**blinding** 51:13,18
51:23 132:8,12,14
147:16,19 148:2
149:3,18 151:22
152:9 154:9,13
156:3 157:7
168:14,16
**blindness** 147:21
**blood** 56:2 181:22
184:16 185:1
250:2,3,5 278:2,7
293:5 298:25
299:18 302:2
**bloodstream** 298:14
299:9
**BMI** 185:1
**board** 35:22 70:23
127:7 267:12
274:2
**body** 53:25,25
248:18 283:1

296:8
**body's** 153:17
**bombarded** 41:21
**bone** 28:9,11,14,15
28:17 35:2 267:5
**Bonferroni** 172:7
173:1,3,9 174:3,6
175:14 176:18,22
177:4 178:13
179:18,22 180:11
180:12 183:10,13
186:7 230:4,12
231:2,11,16,21,24
**book** 291:5,22
**bottom** 93:23
197:12 242:2
**box** 41:1 68:8
**boy** 256:15,16
**brain** 88:10 90:14
90:25 100:13
101:3,6 102:10,11
102:19,21 103:3
103:14 193:17
202:25 203:2
206:14 242:7,13
242:16,22,23,24
242:25,25 243:3,5
243:6,9,20,21,21
244:11,17,19
259:2 277:19,25
278:2,7,14,18
279:13,23 280:1
281:3,16 282:23
283:20,21 284:12
284:14 287:12
289:14
**break** 9:19,23 69:1
69:7 78:4,20
145:18,21 175:1
**breaking** 147:16
**breaks** 11:13,13
**brief** 118:25
**bring** 25:2 33:16,20
**broad** 71:12
**broader** 294:15
**broadest** 159:25
**broadly** 114:16

**Broadway** 3:18
**broken** 147:20
149:19 168:14
257:16
**Buffalo** 14:10,12,24
**Bureau** 2:21
**busy** 55:18

— C —

**C** 2:1 6:1 248:16,22
261:24 262:5,10
**cabinets** 192:13
**Caitlin** 3:5 8:3
**calcium** 278:19
279:12 280:5,7
281:1,3 282:2
**calculation** 140:19
**calculations** 40:23
**calculator** 140:19
**California** 14:21
15:9,11 16:24
20:15,23
**called** 8:12 24:21
28:7 29:8 33:6
36:3 65:6 230:11
298:21 301:22
303:5
**calls** 27:3
**calories** 17:17
**camera** 7:1
**camp** 72:24
**Canada** 30:16
**cancel** 221:20
**cancer** 23:22 38:22
74:1,6 75:11 77:5
77:7 78:1 173:20
176:16 183:21
**canine** 102:3,19
**canines** 102:5,8,12
102:12,14,16,18
102:19 103:15,18
103:23 104:2,5
105:1
**capacity** 31:24
39:12 41:6
**capsule** 299:13
**capture** 202:12

203:10
**capturing** 254:2
**card** 214:13,16
**care** 61:16 175:22
205:7
**career** 32:25 33:5,11
33:25 34:17 37:22
41:14 56:20 75:20
92:18 97:3 154:18
**careers** 33:18
**careful** 272:11
**Cargill** 33:15 34:2
**case** 1:10 13:17 19:4
79:14,17 81:2,20
82:16 83:6,16
84:21 98:9 99:17
102:21 103:11,11
104:24 108:9
127:1 128:5 129:8
133:19 157:2
175:18 176:17,18
178:1 224:1
227:17 239:20
246:4 247:3 256:4
260:1 266:23,25
267:16,23 268:6
270:11 291:1,19
299:25 307:21
308:8,16,20,22
313:3
**cases** 25:17,18,19
26:5 52:14 65:17
65:17 79:7 154:11
173:4 174:8
**casing** 155:8
**Castello** 3:3 8:2
**catch** 308:12
**catechin** 273:23
**catechins** 187:2,3
299:14,17
**categorization**
125:16
**category** 297:9,12
**caught** 158:25 205:5
**causation** 247:1
250:22 251:10,15
251:18,21 252:3

253:5 254:13,15
254:22,24 269:5,9
271:16
**cause** 162:4 189:25
195:11 231:17
272:14
**causes** 78:22 162:4
244:1 250:25
267:25 268:23
270:15,21 272:1
**caution** 106:8
107:15 109:9
307:23
**cell** 21:5 100:3 101:6
101:7
**cellphones** 11:2
**cells** 21:1 33:10
101:2 283:17,17
284:6
**center** 283:21 284:7
**centers** 15:3
**Central** 6:21
**certain** 100:15
103:25 104:23,25
114:8,15,18 193:5
205:1 210:23
253:17 275:3,5
**certainly** 64:9 72:15
77:25 104:25
193:4 200:21
201:7 208:18
209:4 243:7
266:16 271:15
291:2 292:20
294:25
**certainty** 274:13,21
275:6
**CERTIFICATE**
312:1
**Certified** 311:25
**certify** 311:4,20
312:4,14
**cetera** 16:7 23:23
27:17 28:20 29:11
31:4 34:7 40:10
43:1,5 56:3 65:6
88:23 90:15 92:13

93:10 114:10
132:17 149:16
153:14 264:10
301:18
**chaired** 31:13,14
**challenge** 32:17
275:12
**challenged** 87:1,8
**chance** 9:18 11:17
66:23 67:2 172:14
203:21 205:25
211:4,6,8,20,24
212:4,7
**change** 47:5 60:21
61:3,5,14 62:1,9
63:2,4,8,12 64:18
71:20,22 73:1
78:22 131:18
170:24 171:6
184:17 210:6
215:11 217:7
219:19 220:18
253:2 269:15
313:6,9
**changed** 65:2
**changes** 44:19 45:19
47:4 56:7 61:24
62:17 112:6
121:13,16 135:4
208:12 221:7
226:11 242:22
311:17
**characteristics**
102:15
**characterization**
285:14
**chemical** 284:3
**chemically** 114:9
**chemicals** 304:10
**chemoreceptors**
283:19
**chickey@kelleydr...**
3:13
**children** 22:6,8
**Chinese** 264:5
**choice** 69:21,22
**cholesterol** 180:6

186:22,23 278:5
**cholesterolemic**
184:22
**choose** 75:12 308:4
**chop** 75:24
**chose** 290:24
**chosen** 66:17
**chromatography**
303:13,16
**chromatography–...**
303:17
**chronologically**
21:15
**cigarettes** 77:3
**citation** 292:19
**cite** 245:4 290:3
291:4,22 292:12
**cited** 98:19 101:23
229:13,23 241:20
241:24 249:3
250:23 253:4
255:2,10 258:25
260:24 267:24
268:22 270:20
285:24 288:18
289:19 291:1
292:6 296:6
**citing** 100:23 231:8
290:20
**claim** 76:15 163:3,4
163:6,10,20,20
306:8,9
**claims** 84:20 86:6,25
87:2,9 153:4 156:9
163:13,19 275:12
276:5
**clarification** 64:8
**clarify** 95:23 142:24
285:23 313:7
**clarifying** 208:22
**CLARITY** 5:22
**class** 29:12 32:2,9
32:16 40:20 41:19
297:7,19 298:1,5,5
298:7
**classes** 28:25 29:9
39:21 40:16,17

41:8 294:24,25
296:23 297:4
**clear** 117:20 171:17
213:22 239:5
281:20 283:4
302:16
**clearly** 117:24
206:16 273:1
**clinical** 15:19,24
17:25 18:9,13
19:14 23:19 25:15
26:18 34:11 39:3,3
43:9 44:21 46:16
55:22 58:1,7 67:3
68:6 70:3,5 71:24
72:2,3 73:6,20,21
74:4,23 75:6,12,16
76:2,17 77:13,15
86:3 87:6 92:24
122:17 126:19
128:3 156:14
164:19 173:14
174:11 176:11,14
184:1 187:25
199:6 212:20
234:13 253:17,19
253:24,25 254:10
254:14 256:5
265:18 271:2
273:25
**clinically** 72:11,21
73:1,12 75:4
198:25 199:2,8,8
199:21 200:13
212:18 228:18
**clinician** 73:5
**clinicians** 72:18,19
74:17 266:16,17
**clinics** 46:21
**close** 103:2 223:21
**closely** 25:24 39:18
39:24 115:17
197:4
**closer** 87:25
**clue** 240:5
**co-counsel** 276:23
**co-investigator**

26:19
**co-plaintiff** 277:6
**co-variable** 54:1
55:5 144:7
**cognition** 247:10,11
**cognitive** 20:3 21:9
22:22 28:23 29:1,4
29:10 30:4,7,24,25
36:21 37:13,19,23
39:10 88:8,15,21
88:22 89:18,20,21
90:15 91:1,17,20
91:21,23 92:1,4
93:13 96:20 97:25
98:3 102:13 112:7
112:15 116:12,15
117:3,6,13,14
121:22,23 123:25
124:4 125:20,21
129:21 130:4
131:21 135:12,14
142:15 159:22,23
160:11,12,23,24
161:5,10,24 162:6
162:8,14,18,19,24
163:5,7,9,11 165:1
170:14 190:6
202:13 239:11
240:18 243:4,6,8
243:10,22 244:1,7
245:24 246:6,8,9
246:11,13,13,15
246:21 247:2,21
248:20 249:5,12
249:19 250:1,8,16
250:17,20 251:2,5
251:8 252:20,22
256:3 258:20,22
259:2,10,12,19,20
260:5,12,14,15,25
261:13 262:17,19
262:23 263:3,5,18
263:25 264:2,8,17
264:21,23,23
265:11 266:6
267:21,25 268:17
270:6,9,12,15,22

271:22 272:1
**cognitively** 150:9,10
151:3,5
**Cogstate** 4:21 97:20
97:23,24 98:4,11
98:14,22 99:4
112:16,18 115:11
115:22 116:4
142:14,20 143:15
143:22 144:13
215:22,24 216:6
216:17,21 217:2,5
218:19
**collaborative** 26:16
26:23 27:22 35:1,3
**collaborator** 26:18
34:20 188:23
**collaborators** 73:20
**colleagues** 25:17
68:16 195:4 207:1
207:2 304:22
**collected** 18:17
**collecting** 55:21
56:1
**collectively** 119:20
189:12
**college** 25:1 31:16
**column** 116:15
183:5 213:6,11,20
214:23 217:15
218:2 220:3
**columns** 116:9
**combination** 15:12
38:8 294:8
**combine** 278:4
**come** 29:11 33:25
36:13 39:8 59:4,5
59:6,11 73:17,18
94:12 192:17
243:17
**comes** 54:18 57:20
**comfortable** 86:17
**coming** 30:15 81:23
**commencing** 1:21
**comment** 73:7 103:8
113:2 142:6
184:18 198:4

Case 1:17-cv-00124-LLS   Document 259-9   Filed 06/16/22   Page 87 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

[319]

200:14 209:12
231:12 265:13
291:9
**commented** 138:9
**comments** 94:14
**Commission** 1:4 2:7
6:11 7:11,12 277:7
**commissioners**
79:20
**committee** 31:17
37:4
**committees** 31:13
31:14 37:6
**common** 111:12,18
132:11 189:7
190:11 191:10
192:17 205:1,13
239:25
**communicate** 11:8
**communications**
81:1,19 106:9
107:16,20 108:1
109:10 307:24
**communities** 36:7,9
**community** 75:9
**companies** 305:5
**company** 1:13 6:15
7:22 33:6
**compare** 143:21
**compared** 180:8
**comparison** 144:18
178:18,19 236:15
**comparisons** 172:11
172:13 175:10
177:9,14,18
179:23,25 180:21
180:24 183:11,23
186:7,8,19 195:1
**competent** 84:25
85:4,9,18,25 86:2
275:8
**complete** 63:21
82:14 133:2
311:13
**completed** 236:13
237:4,6,9,12 238:2
238:3

**completely** 137:11
205:10
**completing** 236:24
**completion** 311:15
**compliance** 28:18
**compliant** 55:21
**compound** 33:9
298:13 299:9
**compounds** 20:25
288:9,13 298:20
299:15,16
**comprehension**
264:10
**computer** 41:3
136:8
**computer-aided**
311:12
**computers** 11:2
41:22,25
**COMT** 187:1
**concentration** 193:6
193:7
**concentrations**
180:4
**concept** 193:13
**concepts** 193:8,20
**concern** 154:7 161:2
165:4 170:4,13
**concerned** 138:25
142:11 153:6,19
169:12,17 170:21
185:16 274:4
**conclude** 102:23
202:1
**concluded** 55:15,17
58:24 310:4
**concludes** 310:1
**conclusion** 204:14
207:20 228:9
245:6
**conclusions** 74:20
204:21 206:18
240:18 302:15
**conclusively** 102:23
192:11 259:24
260:5
**condition** 135:7

**conduct** 16:2 29:21
55:22 57:20 90:2
235:6 304:19
**conducted** 35:5,8
55:18 73:11 86:4
87:7 88:7 111:8
147:14 154:18
236:10,12 237:10
238:2 298:12
299:21 302:9,11
302:14,18 305:22
**conducting** 43:8,17
75:10 108:25
126:13 159:18
305:15
**confer** 176:4
**conference** 27:3
30:11,14
**conferences** 30:12
**confident** 86:6
98:15
**CONFIDENTIAL**
1:18
**confirmed** 103:10
**conform** 313:8
**confound** 248:1
**confounders** 268:5
**connected** 200:24
**connection** 48:10,13
79:13,15 83:15
99:24 105:21,22
108:9 165:9
181:15
**conscious** 65:13
**consensus** 231:10
**conservative** 184:3
**consider** 24:25 38:5
39:4,9,13,15 46:10
60:20 61:5 62:1
63:2 70:10 74:15
84:8,11 91:25
233:2,9 234:7,12
234:21 266:17
271:7 293:16
294:2,25 295:7,11
298:10
**considered** 45:23

62:9 64:25 65:7
69:18 77:1,6 102:9
121:22 129:6
135:3 156:18
167:9 252:24
253:20 269:4,6
282:25 307:3
**considering** 104:21
**considers** 74:5
**consistent** 138:13
**constituent** 156:21
**constituents** 28:6
156:18
**construction** 180:11
**consult** 11:1 74:4
**consultant** 27:13,24
**consulted** 27:7
**consume** 294:17
**consumed** 17:14
18:16 19:1,4,6,6
126:21 257:17
300:2 301:25
**Consumer** 2:21
**consumes** 183:21
**consuming** 18:25
58:4 155:14
164:21
**consumption** 18:15
34:18,19 181:17
182:17 256:3
258:3
**contacted** 35:19
**contain** 82:14 94:5
240:22
**contained** 262:6
**containing** 270:5
292:13 300:5,8
**contains** 299:14,22
299:25
**context** 29:18 39:17
41:17 44:12 63:16
63:18 64:3,14
66:11 70:19 71:23
85:19 88:24
122:16 161:9,11
172:9,10 189:21
194:25 205:2

209:7 210:2,4,17
245:22 277:21
**contexts** 79:24
**continuation** 21:22
**continue** 238:7
**Continued** 5:1
**contribute** 117:15
190:17
**contributes** 117:14
243:5
**contributing** 195:18
**control** 16:18,19
43:20,21,25 50:24
51:2,6,9 67:18
68:8,12 155:9
195:18 247:13,19
247:20,25 248:4
248:13 267:16,23
268:6 283:11
**controlled** 16:14
19:9,9 22:19 25:9
25:12 67:24
247:24 283:12
**controversial** 173:6
**controversy** 283:7
**conversation** 75:9
280:21
**conversations**
188:20
**coordinator** 169:13
**corner** 11:20 179:12
**corners** 183:3
197:13
**corporate** 3:1 24:7
32:20,22
**corporation** 1:13
33:7
**correct** 9:17 32:20
39:10 40:14 85:1
88:16 96:7 97:7,11
99:18 100:7,9
107:2 116:9
118:18 125:11
127:15 134:17
139:15,16 140:15
151:15,16 156:5
156:10 166:14

171:22 172:20
178:14 182:24,25
193:2 194:20
196:12 198:9,9
211:24 214:1
215:18 216:4,18
216:22 217:3,6,10
217:14 218:19
219:6 220:4,5
223:8,9 228:20
230:2,6 240:19
248:24 249:20
251:15 255:4,5,20
262:6,7 263:3
266:9,10,10
278:15,16 282:9
285:25 286:4,5,6
286:10,13,14
287:14,18 288:20
288:21 289:15,20
289:21 290:3
291:5,6,8 292:15
293:10 305:13
306:5,12,13
311:13 313:7
**corrected** 166:11,13
166:19,23
**correction** 172:8,10
172:11,25 174:2
176:22,22 177:3,7
177:14 178:19
179:19,22 180:12
183:10,14 184:8
186:7 188:13
230:11,24 231:4
231:24 313:6,9
**corrections** 171:22
176:25 177:2
205:7 312:9 313:4
**correctly** 25:7
131:12 227:22
**correlated** 142:19
180:24 181:1
186:9 187:5,10
189:20,21 190:4,6
190:11,12 191:7
191:17,25 193:2,5

**correlation** 143:1
187:20 191:10,11
191:20,22 192:2,8
193:23,25 194:2
247:8
**corresponds** 116:16
**corticosteroids**
307:6
**cortisone** 307:6
**cost** 58:8 153:11
161:3 173:18
304:19,23 305:6
305:12
**costs** 304:15
**counsel** 6:4 7:4
106:10 107:19
109:11 307:25
**countries** 30:16
**country** 30:15
**COUNTY** 311:2
**couple** 18:10,13
37:5 69:6 71:6
201:9 202:8 213:2
**coupled** 134:25
**course** 11:21 31:10
32:8 41:16 58:14
69:18 79:6 104:2
115:2 216:21
255:8
**courses** 24:12 42:8
**coursework** 20:3
**court** 1:1 6:6,16,24
8:8 10:4,7 131:13
**cover** 285:3,5
**covered** 95:24
**Cozen** 3:17 8:5
**create** 290:14 305:5
**created** 272:21
273:6
**creating** 86:18
**creatures** 68:8
**criteria** 43:1 49:19
49:22,24 50:2,17
123:4,12,13,14
**critically** 75:23
173:16 175:19
**critique** 32:11

**critiqued** 32:9
**cross-sectional**
245:16,18,20
247:12,17 252:25
268:25,25
**CRR** 1:23
**culture** 21:5 100:3
**cure** 173:20
**current** 36:4 54:25
92:3 93:12 95:9
292:10 296:22
**currently** 31:16
36:2
**curriculum** 14:5
**cut** 190:22 218:9
285:7
**cut-** 266:14
**cutoff** 70:1,9 124:1
173:9
**CV** 33:1 34:8 35:14
36:23 38:2
**cycle** 17:20,21

_____

**D**

**D** 4:1 6:1 35:12 38:2
90:23,24,25 91:4,8
91:13,13,17
240:18,22,24
241:8,11,15,21,23
242:7,12,21,23
243:2 244:1,6,10
244:17,19,23,25
245:5,23 246:3,5,7
246:10,12,14,21
247:2,6,9,10,11
248:5,9,9,20,24
249:2,4,10,19
250:1,3,5,6,7,15
250:16,19,20,24
250:25 255:3,10
256:2,14 257:13
257:17,25 258:1,2
258:9,13 259:1,7
260:25 261:7,20
261:23 262:1,17
262:23 263:2
265:10 266:5,12

266:15 267:2,9,20
267:25 268:13,16
268:22 270:14,21
271:21
**D.C** 2:9
**D3** 88:10
**daily** 16:10
**data** 4:16,21 16:11
19:15,18,20 25:24
32:6 39:25 41:3,9
41:10 42:1 43:1
50:11,15 54:2,5,15
55:1,8,25 56:3,10
56:13,22 59:7 61:2
63:3 65:6,11,12,22
66:4 67:11,12,24
69:11,12 71:10
74:18 75:2,23
92:10,19 95:5,6,17
102:6 103:1
106:20 109:5,22
118:21 119:6,11
127:6 130:14
144:6,11 146:20
147:15 149:15
150:20 151:7
158:14,15,22
159:3,10 165:3,10
165:15,16,18,19
165:23 166:4,11
166:13,19,23,25
167:7 169:2,3,8
170:1,6,7,9,10,11
170:21,22,25
173:15 174:18
178:6,7 179:14
183:18,19 185:19
185:24 188:7
191:14,16,21
194:18 196:1,14
198:2,4 204:4,4
206:15 225:7
226:7,12 227:23
231:12 232:11,18
233:1 236:17
238:21 239:19,25
240:3 251:24

252:1,24 253:15
254:21,25 268:8
271:4,6,7,12,20
273:3,3 274:2
284:18
**database** 88:19 89:5
89:6 90:8 91:5
98:2
**dataset** 106:19
**date** 6:19 312:16
313:2
**DATED** 312:19
**DAVIDSON** 311:2
**day** 17:18,23 127:22
270:6
**daycare** 15:3
**days** 127:20,21
145:13 171:10,19
189:4
**de** 3:16 8:4,4 61:8
87:17,22 137:6
206:21 273:12
285:13,17 286:25
287:5 301:11
302:20,22,24
308:23 309:23
**de-identified** 170:10
**deal** 38:19 52:15
55:19
**dealing** 71:19 79:8
**dean** 31:14
**debate** 283:5
**decades** 283:3 284:8
**decide** 46:3 54:16
57:23 188:12
213:8 227:10
**decided** 59:8 63:20
126:25 173:4
184:17
**decision** 36:15 44:16
**decisions** 189:11
**declare** 64:11 65:10
**decline** 89:18,21
91:18,23 102:14
121:22 125:20,21
159:23 160:12,23
160:24 161:4,10

161:25 162:18
163:9 165:1
252:20 258:20
259:12,20 260:14
**declined** 252:23
**decrease** 213:8,9,18
213:24 215:9,12
216:16,19,24
217:8 218:17
220:10
**decreases** 173:9
**deeper** 297:16,16
**deeply** 56:5
**defendant** 3:15
94:23
**defendants** 1:15 3:1
13:17 79:4 80:1,13
81:2,18 83:6 84:24
**defendants'** 81:5,12
106:3
**Defense** 24:6
**deficiencies** 266:12
**deficiency** 242:22
242:23 247:3,7
248:24 258:13
**deficient** 243:2,2
244:24,25 245:5
249:2 257:13,15
258:1,4,5,7,9,15
266:15,17 267:3
**define** 17:1
**definition** 84:24
85:4,9,18,24
**degree** 14:8,9 15:7
15:13 69:20
274:12,21 275:6
275:15 282:22
**degrees** 113:25
**delayed** 201:12
**dementia** 88:21
89:21 91:1 121:18
122:15 124:4
160:8 161:13,17
161:25 162:2,4
163:12 268:12
**demonstrate** 286:11
**Denmark** 21:21

22:12
**department** 18:12
24:6
**departments** 31:15
**depend** 152:18
178:1
**depended** 46:5,6
**dependent** 160:13
**depends** 63:7 64:2
64:13 70:24 76:21
169:7 175:25
177:17,19 199:14
269:9 304:5,15
**depicted** 146:23
147:7,10 151:7
166:5 179:12
181:25 182:23
183:14
**deponent** 311:17
312:1
**deposition** 1:20 6:9
6:21 7:7 10:5,25
11:4,7,15,21 310:1
310:4 311:6,9,15
**depositions** 12:12
**deprivation** 17:20
**derivative** 281:24
**derived** 286:7
**describe** 15:4,20
23:12 26:24 35:15
36:25 42:18 47:22
47:24 48:1 49:10
49:14,18 50:24
51:13,17,19 52:5,9
52:12,21,25 53:12
53:19 54:11 59:17
59:20 63:12 110:9
119:15 120:9
129:19 132:8,9
135:21 136:14
154:17 212:16
**described** 42:22,24
171:16 191:9
302:18
**describing** 114:1
115:1 287:14
**description** 42:20

119:1 214:24
215:2,2 218:2
**deserve** 31:19
**design** 18:2 27:8,13
27:24 28:16 40:9
47:23,25 48:2,21
49:3 62:10 93:10
114:25 115:1
138:7 156:4
**designate** 12:12
**designated** 13:21
**designations** 12:16
**designed** 17:7 19:10
27:5 156:4
**desperately** 148:15
**despite** 93:14 188:1
289:2 302:14
**detail** 48:1,2,3,6,15
49:7 51:6,7,20,24
52:5,16 62:24
95:14 98:12
113:25 114:11,16
114:18 115:2,6
132:15 135:21
150:13 190:14
297:9
**detailed** 30:25 42:19
150:17
**details** 48:20 51:1
52:17 158:21
**deterioration** 162:3
**determine** 18:20
28:20 31:19 66:25
73:11 85:6 187:9
191:19 216:1
298:13 301:9
**determined** 274:1
**devastating** 161:6
**develop** 124:3,8
305:4
**developed** 58:13
**developing** 77:20
**Developments** 36:4
**device** 11:3
**di-** 279:20
**diameter** 180:4
**diet** 15:25 17:14,16

17:21 18:25 19:4,6
20:18 22:7 29:10
29:11 248:6
**dietary** 23:20,20
28:6 38:16 78:22
118:15 152:25
156:17,25 157:8
176:2,8,12 181:4
182:3,21 183:20
195:4 207:4 272:7
272:13,18,21,22
273:4,8,20 274:6
300:4,7,10,14,15
300:23 306:4
**diets** 180:3,8,8,9
**differ** 54:7 167:1
177:23
**difference** 135:5
143:25 155:13
188:3 191:12,13
205:21,22 209:6
224:23 238:19,24
249:22 260:12
300:14
**differences** 38:20,20
199:6 209:3
259:11,18 260:2
**different** 18:13,19
18:19 22:2,7 23:15
24:12 32:17 37:6
44:23 55:4 67:25
79:23 115:14,14
116:2 136:9,12
139:18 140:12,23
174:22,22 177:12
180:3,7,7,17 189:6
190:14 203:4
207:20 208:22,25
209:2 230:10
237:14 243:3
261:11 264:9
269:15 272:7,19
290:12
**differentiate** 124:2
**differently** 54:6
55:3 228:5,11
272:23,24

**differs** 208:21
**difficult** 46:17 58:3
68:5,12 69:16 70:8
77:23 130:19
131:3 162:17
172:19 184:6
188:8 195:9,12
302:5
**digested** 294:11
300:2 301:25
**digestible** 175:2
**digestion** 279:21
281:1,13 289:12
295:19 296:1,3,10
296:24 297:5,11
297:16 299:2
301:10
**digit** 264:10
**direct** 5:22 24:20
99:24 123:11
153:24 209:20
**directing** 25:6
**direction** 68:21
203:16,19 204:6
205:19,21,22
206:3,5,11,16
208:11 209:9,13
209:22 210:6,13
210:23 211:13,16
211:17 213:7,10
213:12 215:7,12
216:2,15 218:12
218:20 219:2,13
221:23,25 222:4
223:11,15,16
224:4,6,20 240:6
254:22 271:13,16
311:12
**directions** 206:8
211:18,22
**directly** 21:16
133:16 134:3
169:14
**director** 22:5 30:9
31:23 33:13
**disagree** 185:15
198:8 208:16

Kurzer, Ph.D. - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.

9/29/2021

[ 322 ]

**disagreement** 253:22

**disappointing** 188:8

**discipline** 294:6

**discovered** 106:18 158:14

**discovering** 67:21

**discrete** 116:22,22 117:6

**discuss** 27:3,16 29:15 40:2 56:9 117:12 118:21 135:18 136:19 160:18 162:10 204:17 245:16 249:17 255:20 282:8 290:2

**discussed** 10:23 32:3,4 100:24 105:12 118:7 123:2 128:16 151:22 152:7 158:13 160:21 171:22 226:12

**discusses** 230:4

**discussing** 137:2 198:15 268:10

**discussion** 287:17

**discussions** 266:24

**disease** 23:24 72:5 88:22 121:12 123:7,16,19 124:9 124:15,19,21 125:4,10 126:3 160:19,22 161:1,2 161:8,21 162:3 163:6,12,13,20 181:20,23,23 182:24

**diseases** 23:25

**disk** 6:9

**display** 10:24

**displayed** 237:5

**distinction** 300:20

**distinguish** 63:23

**distinguished** 155:4 191:11

**distinguishing** 168:11,15

**distributed** 137:19

**District** 1:1,2 6:16 6:16

**diversity** 33:20,22

**divulge** 106:8 107:15 109:9 307:24

**divulging** 308:2

**DNA** 33:9

**doc** 4:14

**Doctor** 8:16 87:15 105:6,18 106:21 157:15 178:25 179:5 182:9 183:7 212:23 214:7 217:24 220:16 223:7 232:8 242:3 256:24 263:13 270:1 273:18 274:18

**doctoral** 15:23 298:8

**doctorate** 15:16

**doctors** 307:5

**document** 11:3,23 45:14 93:24 105:14,20 110:6 140:1 146:12,23 150:4 197:13 215:3,10,23,24 216:6,10,17,21 217:3,6 232:7 235:9

**documents** 10:24 11:16,18 83:24 94:9,11 105:8 149:18,23 159:8 216:1

**dogma** 254:11,23

**doing** 22:10 41:4 43:6 54:17 65:5 76:8 109:13 155:16 165:5,7 171:1 172:14 189:3 297:14

304:8

**dollars** 304:8

**domain** 116:12,15 116:16

**domains** 117:3,6 264:8

**dose** 104:12,22 262:4

**dose-response** 261:10

**doses** 261:8,12

**double** 111:13

**double-blind** 52:2 168:10 256:18

**double-blinded** 86:4 87:7 167:10 168:13

**double-blinding** 157:7

**doubt** 216:22

**dozens** 282:19,19,19

**Dr** 7:25 12:21 13:13 14:4 38:4 43:12 79:4 81:10,10 100:20 106:7 107:14 109:8 110:4 111:3 146:1 146:10 158:2 222:24 229:8,20 232:5 236:9,25 237:2,19 238:4,9 275:23 276:20 277:3 280:16 284:22 291:18,18 291:22 293:13 307:23 309:17,22

**draft** 26:7

**drafted** 37:17

**drafting** 114:4 115:9

**draw** 206:18 207:19 300:20

**drawn** 204:21

**drilling** 132:19

**drink** 155:6

**drinking** 155:6

**driver** 27:14 40:8,8

**dropouts** 164:11

**dropped** 263:21

**drug** 128:6,10 152:23 153:9,22 168:18 173:14,20 173:22 175:19 176:15 182:1 254:3 272:9,9 307:3

**drugs** 102:16 168:17 176:12 272:8,23 272:24 273:6 306:18 307:14

**Drye** 3:6 7:20 8:1

**Ducklow** 2:6 7:15

**due** 66:23

**duly** 8:13 311:7

**duration** 104:12,21 171:18

**dysfunction** 123:25 124:5 135:12,15 161:24 162:7 239:11,16

**E**

**E** 2:1,1 4:1 6:1,1 8:14 266:1 277:1

**E-X-P-A-S-Y** 303:10

**E5** 5:4

**E7** 4:15

**earlier** 9:15 32:18 42:16 105:12 118:7 151:22 152:7 158:5 159:12 163:21 167:25 208:4 211:2 279:1,4 295:3 300:13

**early** 32:24 33:5,11 160:25 272:20

**easier** 9:6 26:6 192:12

**easily** 292:21

**easy** 41:2 205:4

**eaten** 283:13 284:2

**eating** 283:12 284:2

**Economic** 107:4,12 107:18 108:3

**edited** 27:19

**editor** 36:3,11

**editorial** 35:22

**education** 31:10 33:16 37:4 248:18

**educator** 26:3

**Edward** 2:5 7:13

**effect** 15:24 17:19 18:14 28:6 29:13 30:17,18,19 33:8 55:4 76:16 104:19 156:17 163:9 169:11,23,25 172:14,19 173:12 173:23 178:21 181:17 182:18 184:16 185:3 186:22 187:3 190:2,3 199:3,3,4 199:7 205:20 210:16 223:22 243:10 244:10,19 244:24 259:7 261:20 269:15 273:9 279:12,23 280:7 281:4 282:2 282:23 288:19

**effective** 66:21 201:13 217:15 219:5 220:2 221:2 225:6 304:2 306:4 306:7 307:15

**effectiveness** 205:19 216:3 221:16,23 223:15 224:21,22 306:8

**effects** 20:24 23:20 28:8 34:17,19 66:24 77:1 89:25 101:6 104:10 148:20 172:21 176:3 203:16 206:1,5 211:11 222:3 272:10 273:21,24 278:18

278:23 283:21
289:13
**efficacious** 128:7
**efficacy** 49:15 60:4
60:13 112:12,14
113:19,24 128:2,5
128:12 130:4
161:16,20,23
208:5,10 209:23
210:7,13 212:17
224:4,8
**eglennon@ftc.gov**
2:15
**Eichstaedt** 229:13
229:22 230:1,3,9
230:13,23
**eight** 25:15 115:14
121:12,14,15,16
180:7 211:10
**either** 17:14 77:11
103:12 128:24
132:16 189:24
248:20 252:17
257:16,24 261:6
262:20 266:5
**elected** 37:7,11
**electronic** 268:11
**eliminated** 50:14
**emailing** 148:18
**emphasize** 226:9
**employee** 19:13
**end-of-study** 130:14
**ended** 145:2
**endocrine** 283:1
**endocrinology**
20:17 298:6
**endpoint** 68:1 112:6
129:2,6 132:1
160:2 181:23
**endpoints** 23:21
27:9 28:17 60:25
65:15 68:21 71:4,6
72:6 73:25 75:11
130:13 131:20,23
156:22 180:7
187:21 190:18
191:17 221:14

228:8
**ends** 205:12
**energy** 17:20 22:14
22:14,16 93:3
298:2,4
**engagement** 31:11
**enhanced** 246:4
**enormous** 55:22
104:6 117:21
183:18 195:14
254:7 271:4,11
288:15
**enormously** 148:14
173:11
**enter** 279:22
**entered** 298:13
299:9
**entering** 278:14
**enters** 277:18,25
280:1
**entire** 25:18 31:25
57:10 145:13
196:8,15,23
197:20,23
**entirely** 116:22,23
149:4 211:11
**environment** 19:9
68:9
**epidemiological**
22:6 67:23 174:11
253:14 254:12
271:4,11
**epidemiologists**
183:18 247:18
253:23
**equal** 53:14 211:15
**Eric** 3:24 7:1 218:8
**errata** 313:5
**error** 215:19 216:12
217:1 230:15,17
231:17 290:17
313:7
**errors** 95:6,11,13
105:25 106:19,24
153:12,13 158:15
159:3,10 165:19
166:10 313:4

**especially** 54:19
77:14 209:7
271:13
**ESQ** 2:3,4,5,17 3:2
3:3,4,5,16
**establish** 123:10
**established** 44:25
289:18
**estimate** 304:19
305:12
**estrogen** 20:22,25
113:10
**estrogens** 28:8
**et** 1:14 6:15 16:7
23:23 27:17 28:20
29:11 31:4 34:7
40:10 43:1,5 56:3
65:6 88:22 90:15
92:13 93:10
114:10 132:17
149:15 153:13
264:10 301:17
313:3,3
**ethical** 77:2,6,11
267:7
**Europe** 21:18 22:1
22:19,22,22 23:1
**evaluate** 18:14
31:18 41:20 42:1
49:15 60:3 92:10
93:7,12 299:1
**evaluated** 28:19
37:23 84:20
159:23,25 264:5,7
264:8 272:9
**evaluates** 245:21
**evaluating** 23:19
65:20 67:3 115:4
251:7
**evaluation** 117:11
182:16
**events** 127:2,3,25
128:13,22 129:10
129:15,16 153:13
272:13 274:3
**everybody** 164:24
**evidence** 84:25 85:5

85:10,19,25 86:2,7
99:16 163:7
184:15 224:7
225:5 227:12,16
244:9 259:1,6
270:13,19 271:18
272:6,12,15 275:7
275:9,15 276:4,5
281:17,21 288:19
289:7,19 292:12
**evidently** 95:6
**exact** 92:21 113:11
158:19 190:16
221:13
**exactly** 18:25 23:3
51:25 67:13 75:5
79:10 80:9 95:15
115:3 125:14
132:12 136:5,15
153:23 156:20
160:10,16 205:20
236:25 251:2
288:1
**Examination** 264:16
265:3
**EXAMINATIONS**
4:3
**examined** 311:5
312:4
**example** 27:2 29:12
41:18 46:9,14 48:3
50:9 53:8,25 64:5
67:23 76:25 92:24
102:17 113:8
128:6 141:4
154:24 169:14
173:19 174:14
177:10,12 185:21
192:9 247:22
248:16 292:22
300:7
**examples** 32:4
243:20,23 278:5
284:13 306:17
307:13
**excellent** 102:9,20
265:20

**exception** 11:12
**exciting** 288:14
**excluded** 50:2
**exclusion** 43:1 49:24
123:6,14
**excreted** 299:20
**excuse** 97:8 131:10
181:12 226:23
246:8
**executive** 116:23
193:1,3,9,11,15,16
194:2 200:20
201:1
**exert** 278:18,23
279:23 281:3
282:23 283:21
289:13 293:1
**exerts** 102:4
**exhibit** 4:9,10,11,12
4:13,15,19,20,21
5:3,4,7,8 11:20,22
13:9,10,15,20,24
14:3,5 82:14 84:16
93:21 96:13 97:18
100:17,18 101:2
101:15 105:3,4,15
105:16,24 106:14
106:24 109:25
110:1,10 112:2,17
115:19,21 116:8
118:10,13,21
119:10 120:3
122:23 123:1
126:3,8,9 132:4,8
135:17 136:19
137:13 139:25
146:7,8,15,23
147:9 150:4,21
158:8 165:23
166:5,19 171:22
178:23 179:2,11
180:1 181:15
182:5,6,12,15,24
183:2,14 186:1,9
186:20 189:15
194:17 197:9
198:11 214:3,4,18

215:7,11 217:22
218:7 225:22
229:9,17,18 232:2
232:3,8,12 233:2
233:18 235:7
236:20 237:5
238:1 240:12
252:8 256:21,22
256:24 257:3
263:10,11,19
265:1 274:9
277:11 286:21
**exhibiting** 134:24
**exhibits** 4:7 5:1
10:17
**exist** 86:19
**existing** 124:14,24
**exists** 262:25
**exogenous** 28:11
**expand** 46:18
**expanded** 60:24
**Expasy** 303:10
**expect** 103:9,10,15
104:24 138:12,18
142:17 143:10,11
143:13 150:19
151:18,19 190:2
203:22,25 211:12
211:12 223:21
**expecting** 206:1
**expenditure** 22:14
22:16
**expense** 77:13 304:2
**expensive** 58:2
77:12,23 164:20
303:21 304:6,11
305:4
**experience** 22:9
23:1 26:4 32:14
94:15 102:13
111:12 112:20
122:17,18 160:24
168:19 178:6
183:17,19 258:20
276:9 295:18,23
296:12
**experienced** 92:9,23

252:20
**experiences** 31:8
97:3 126:12
231:24
**experiment** 42:21
43:4
**experimentation**
207:8
**experiments** 195:16
**expert** 13:15,20
22:13 28:12,13,15
28:17 38:5,6 39:4
39:10,14,16 73:4,6
74:5 79:4 84:9,12
85:15 91:25 93:21
99:7 171:21
189:14 194:15
198:11 207:19
218:13 219:12
229:9,23 240:11
245:13 257:5
260:21 265:9
270:4 294:12
295:1 298:10
**expertise** 27:10
38:10,14,16,21
39:1 92:11,22
189:6 260:6
294:20 295:12
**experts** 81:1,5 92:3
206:17 208:14,14
260:15
**explain** 129:5
150:15 189:20
242:19 295:22
**explained** 92:16
211:4,5,8,20
**exploratory** 239:12
**expressed** 96:23
**expression** 211:2
**extensive** 155:24
**extent** 107:18
**extra** 164:12,15
**extract** 34:20
182:17,20 186:22
299:13
**extrapolatable** 76:7

**extreme** 154:10
**extremely** 40:24
45:24 57:25 58:9
75:22 136:6 189:7
195:3 203:20
207:12 261:8
288:8
**eye** 174:15,15
**eyes** 1:18 12:14

---

**F**

F01-QBS-0088137
4:17
F01-QBS-009562...
5:6
**facility** 17:25 18:1
**fact** 54:16 55:1,7,14
77:16 93:14
102:16 126:18,18
128:20 148:22
154:8 168:7
172:20 188:1
202:15 207:14
210:9 222:2 224:2
238:7 281:14
282:24 289:2,7
296:4,6
**factor** 185:2,7
**factors** 22:16 117:15
190:13,15 195:10
195:17 247:13,20
248:1,4
**facts** 313:8
**faculty** 31:15,18
**fade** 87:23
**fairly** 126:6 173:6
192:22 283:2
304:12
**fall** 266:15
**fallen** 268:4
**falling** 72:25 280:20
**false** 168:21 173:9
173:10,17,18,21
175:21,23 176:5
**familiar** 66:12 122:3
122:7,13 132:14
177:5 260:10

291:17 303:4,7,7,9
303:11,12
**family** 122:17
**far** 79:24 184:7
252:15
**fatty** 34:21
**favor** 268:4
**FDA** 129:18 163:18
**feasible** 77:11
**federal** 1:4 2:7 6:11
7:10,12 24:5,9
34:8 277:6 288:15
**feel** 26:9 61:13
98:13,25 128:8,9
129:10 172:17,25
174:6 208:18
283:14 312:9
**feeling** 240:2
**fellow** 20:14 37:7
**fellows** 37:11
**fellowship** 21:18
**felt** 58:9 70:4 129:1
266:25 267:6
**field** 20:22 33:23
191:5 206:18
207:4,19 276:3
294:19
**fields** 207:4
**fifth** 30:13 289:11
291:23
**fill** 161:11
**final** 36:15 127:21
129:3,12,13
164:13
**financially** 161:4
**find** 72:24 98:17
129:14 172:19
174:8,24 178:4
188:9 221:14
224:3,5
**finding** 128:9
175:16
**fine** 8:25 9:1 78:4
145:24 213:5
235:22
**finish** 10:13,14
**finished** 20:12,13

21:12,13 22:25
**first** 8:13 11:20 13:9
21:23 22:1 26:7
88:13,14 94:2 99:9
99:12 106:16
146:24 147:8,8
166:14 197:15
230:1 240:25
270:3 277:16
**fit** 49:7 50:16,18
150:9,10 151:3,5
**five** 37:10 54:20
67:24 79:9,12
203:17,23 205:21
210:9,11 223:18
245:4
**flat-out** 209:2
**flavor** 155:5
**flaxseed** 34:19 35:4
**flexibility** 153:3
176:9 273:2,3
**flexible** 54:25 178:7
**flood** 130:17
**fluid** 301:16
**focus** 22:1 42:8,14
57:9 129:24
130:11 166:15
201:15 202:16,17
264:19 298:3,6
**focused** 15:15,21
23:17,19 27:9 30:1
34:11,17 36:20
120:22 130:14
131:20 166:10
196:19 201:6
249:1
**focuses** 24:22
**focusing** 48:18
73:25 298:8
**folks** 51:23 164:5
191:5
**follow** 44:6 139:20
252:17 293:24
302:3
**follow-up** 12:15
**followed** 17:15
44:18 140:2,4

Case 1:17-cv-00124-LLS Document 259-9 Filed 06/16/22 Page 93 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.
9/29/2021

[325]

141:5 151:24
152:13
**following** 8:24 139:4
140:14 256:10
**follows** 8:13
**food** 24:21,22 25:3
29:5,8,21 30:1,17
33:14,18,21 36:10
153:18 156:21
182:3 283:11,11
283:13 284:1
300:18
**foods** 30:21 155:17
272:23
**force** 54:21
**foregoing** 311:6
312:5
**forget** 205:5
**form** 43:11 44:8
45:8,22 46:13
47:18 50:5 51:4,15
55:10 56:16 57:4
57:14 59:1 60:6
62:4,20 63:6 64:1
64:20 65:25 69:15
72:13 73:3,15
74:11 76:19 78:25
80:4,20 82:5 84:6
85:12,22 86:9
87:11 92:6 96:10
101:9 102:1
103:20 104:14
106:6 108:22
109:7 110:20
111:16 112:4,25
113:21 117:9
118:24 119:13,22
120:7,14 121:12
122:1,6 123:21
124:11 126:16
128:18 130:6
133:9 134:7 135:9
137:7 138:4,16
139:8,23 140:17
141:8 142:3,22
143:17 144:16
145:7 146:18

147:1,18 149:25
150:24 152:2,16
154:21 156:12
157:11 162:17
163:1 164:2 166:1
166:7,21 167:16
169:5 170:3 171:4
171:25 177:16
181:10 186:11
188:15 190:8
192:5 196:11,17
197:6,25 199:11
201:19 202:5
206:20,22 207:23
209:25 212:1
215:15 217:12,19
218:25 219:9,16
219:25 220:7,14
220:22 221:5,10
222:23 223:24
225:17 227:5
228:1 230:19
232:14 233:5,12
233:20 234:5,25
235:9,23 241:2
243:13 244:4
245:2 247:16
249:7 253:7
259:14,22 260:8
270:24 273:11
275:19,22 279:15
280:11,15 282:5
286:16 287:25
288:23 289:23
291:15 292:17
295:21 296:15
298:16 300:25
301:11 302:24
303:2,24 306:15
308:24
**formal** 39:20 45:14
**forms** 90:24
**forth** 40:3
**found** 65:22 92:2
94:6 128:6 129:16
129:17 130:24
166:9 261:12

292:23
**foundation** 33:15
34:4,6
**foundational** 294:6
**four** 22:3 30:12
222:7 223:16,19
290:12 292:13
**fourth** 214:23
287:10
**fractions** 18:19
**framework** 44:24
**Francisco** 20:15,16
20:23 21:17,20,24
23:2,4,7,9
**frankly** 77:12
180:17 292:8
**fraud** 32:4
**Frauds** 2:21
**free** 11:13 68:11
109:13 308:3
**frequently** 264:16
**freshmen** 24:14
**friends** 280:22
**front** 65:2 90:13
**frustrating** 148:14
**FTC** 79:19 81:11
82:8 153:1 163:18
176:7 208:14
289:6 302:12
309:5 313:3
**full** 179:8 199:23
247:8 280:6
283:14
**full-on** 160:25
**fuller** 283:15
**fully** 13:2 168:24
**fun** 75:16
**function** 20:3 22:23
28:23 29:2,4,10
30:5,7,24,25 36:21
37:14,19,24 39:10
88:8,10,15,21,22
89:20 90:15 91:1
91:21 92:1,4 93:13
96:21 97:25 102:5
102:10 103:14
116:24 117:13,14

129:21 130:4
131:22 142:15
159:23 160:12
161:5 163:20
190:6 193:2,3,9,11
193:15,16 194:3
200:20 201:1
202:13,25 203:2
240:19 243:4,6,8
243:11,22 244:7
245:24 246:8,11
246:13,22 247:2
247:21 248:20
249:5,12,19 250:1
250:8,17,20 251:3
251:5,9 252:22
256:4 259:2,3,11
259:19 260:5,12
260:15,25 261:13
262:17,23 263:6
263:18,25 264:2
264:17,21,23,24
265:11 267:21
268:1,17 270:16
270:22 306:9
**functioning** 112:7
250:16
**functions** 21:9
**fund** 44:17
**fundamental** 294:5
294:6
**funded** 24:4 77:16
77:18 288:15
**funding** 32:19,24
33:13 34:8 45:12
77:17
**funds** 34:7
**further** 35:3 129:5
162:2 199:22
204:17 239:14
276:21 309:18
311:20
**future** 45:6,20
164:22,24 174:19

—————————
**G**
—————————
**G** 6:1 34:5

**gap** 18:10
**Garbi** 22:13
**Gary** 1:22 6:24
311:3,24
**gas** 18:15,17,22
303:17
**gastrointestinal**
282:20,24 283:9
284:4,11,15
**gcastello@kelleyd...**
3:11
**GCMS** 303:17
**gears** 17:11
**gender** 38:20 233:22
234:16
**gene** 187:1
**general** 1:7 2:18,20
6:13 31:1 38:10,14
38:24 50:6 88:8,15
117:12 123:14
143:3 173:3
264:17 274:5
290:6,7 295:5
297:3 313:6
**General's** 7:18
277:8
**generally** 19:5 26:24
113:5 123:5
125:17 269:4,5
278:1
**generate** 240:1
**generated** 166:12
**genetic** 104:4
186:25
**genotype** 186:25
**Geoffrey** 3:3 8:2
**Georgetown** 107:4
107:12,17 108:3
**gestures** 10:8
**getting** 21:15 41:11
158:21 185:16,17
284:17 300:17,17
300:19
**ggraham@kelley...**
3:12
**GI** 287:11
**gist** 130:20

give 46:9 77:3,7
78:1 96:15 155:2
161:8 203:9
222:24 256:7
258:25 267:1,6
300:7 304:14
given 10:2 59:18
111:14 125:9
142:14 203:1,8
226:11 293:4
298:23,23 301:1,4
301:5 312:6
gives 176:9
giving 169:14
211:10 252:18
glancing 135:21
glass 257:19
Glenn 3:4 8:2
Glennon 2:5 7:13
GML 213:18
GMR 213:18
go 9:4 12:7,9 32:11
43:6 46:21 61:11
78:8,19 84:14
87:14 95:14 99:6
101:15 103:12
106:13 114:11,17
115:2,6 118:9,19
157:18 158:4,7
174:20 189:14,17
190:22 192:19
194:5 197:9
198:10,11 210:12
214:9,17 217:21
217:22 221:22,24
223:4 225:19
226:17 228:23
229:8 238:11
240:11,14 241:14
245:9 249:14
252:4 255:16
257:21 260:20
269:16 274:8
275:20,23 276:11
280:12,15 281:15
289:25 297:8,23
301:8 309:8

goes 56:20 60:11
79:24 213:13,15
302:3
going 12:10 27:16
30:13 42:20,22,25
43:2,3,5,23 44:15
51:20,25 52:2,18
52:20,22 56:25
57:9 59:9,21 61:21
64:14 68:25 77:15
77:20 78:10,14
83:6 86:25 101:14
113:10,12 114:8,9
126:24 130:19
132:12,21 145:15
157:19,23 165:3
169:22 173:20,25
176:15 192:19
194:7,11 202:20
209:13 211:13,15
211:16,18,22
215:6 219:11
229:1,5 235:17,19
238:6 240:4
256:25 265:8
269:18,22 273:13
276:13,17 288:2
293:19,24 309:10
309:14 310:2
gold 253:21
good 7:8 8:16,17
32:3 65:7,12,17
75:20 112:20
113:13 123:5,14
136:16 138:19
155:22 158:2,3
191:3 201:7,8
213:4,14,15
243:21 277:3,4
290:6,8
Goodman 81:10
Google 136:9
gotten 32:24 89:14
government 288:16
graduate 14:15 15:4
15:6 25:22 26:4
31:24,25 32:1,2

37:4 39:22 40:19
41:8 296:19
306:25
graduated 14:16,18
14:19
graduating 14:24
Graham 3:4 8:2
grant 17:9 27:6,8
33:6,7,15,16 44:13
48:4,10,11,13,16
49:8 52:15 92:12
132:16
grants 25:14 48:3
52:19 114:23
graph 67:12
great 9:2 30:17
38:19 48:14 51:24
52:15 62:24 65:13
78:7 95:14 98:12
115:2 253:21
277:14 287:8
297:9
greater 48:2 49:1
261:15
green 34:20 58:7,13
58:22 126:18,21
126:22 128:20
129:8,15 147:22
148:12 157:1
182:17,17,18,20
184:15 186:22
273:22,23 299:10
299:14,16
grounds 235:24
293:20
group 18:16 37:9
53:1,2,15 77:7,8
97:24 120:17,21
120:21 121:7
123:10 134:16
135:2,6,6,11,13
136:23,24,25
137:3,3,5 138:21
138:24 140:2,20
141:4 142:1
143:23,25 151:8
151:11,15 157:4

169:17 170:17
186:24,24 189:11
196:25 198:16
199:24 200:16
201:15,22,24
210:7,24 217:9
218:22,23 219:20
219:21 220:19,20
221:12,13 223:9
224:11,18 225:11
234:22 254:1
261:14,18,21,23
262:8,11,13,13,14
262:24 267:7
groups 16:20 53:24
54:6 77:2,7 137:15
137:20 139:4,20
140:13 167:8
169:2 188:4
232:11,22 252:19
257:16 262:12
Grung 257:8,10,11
257:12
guess 79:16 107:23
158:23 165:13,14
211:4 214:9
guidance 153:2
163:14,16,18,18
176:7,10 272:25
273:1 288:25
289:6 302:12
309:5,5
guidelines 4:22
296:7
guillotine 75:25
gut 287:13,23
288:10
gut-brain 282:8
287:18,21 288:7
288:20 290:2,21

—————————

H

half 23:5,7,8 69:1
145:16
hand 10:7 40:22,23
183:5 311:22
handed 39:25

handful 145:19
handler 15:1
hang 184:23 215:16
264:7 265:4,6
happen 44:20
104:11,20 111:19
174:7 203:21
happened 67:13
130:9 188:5
205:25
happens 44:22
51:21 77:9 188:6,9
294:11,16
happy 86:22
hard 131:2 173:23
199:12 227:12
harmful 242:24
272:10 273:9,21
273:24
hat 136:12 187:6
hate 210:14
HDL 180:6 186:23
187:5
head 31:15 75:24
305:9
heads 10:8
health 23:21,23 24:5
24:23,23,25 25:3,4
28:9 29:11,14 30:1
30:18,20,22,24
31:1 34:17,19 35:2
72:5 123:5,14
153:12,13 156:9
156:22 174:15
242:25 267:5
288:17
healthier 225:14
healthy 24:21,22
33:14,14 120:20
121:24,25 123:9
124:2 125:17
134:23 135:3
159:14,18 160:18
225:11 239:6
242:13,16,18,25
252:16 258:14
261:5

Kurzer, Ph.D. - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.

9/29/2021

[ 327 ]

**hear** 8:25 9:1,10
150:14 157:14
212:25
**heard** 10:2 63:11
71:24 131:12
295:3
**heart** 23:23 78:1
**heavily** 40:5
**heavy** 301:23
**heightened** 230:15
**held** 1:21 6:22 30:12
30:13 273:5
**Hello** 78:17,18
**help** 73:20 136:11
162:20 240:6
271:21,25 304:18
**helped** 22:5 36:9
**helpful** 221:19
**helps** 242:13,15,18
246:4 257:22
**hereto** 311:19
312:15
**Hickey** 3:5 8:3
**high** 33:17 152:21
168:17 199:3,7
248:12 298:7
303:12
**high-dose** 261:14,18
261:23 262:4
**high-quality** 265:18
**higher** 215:3,4
216:7 218:3,4
239:11 247:11
249:19 250:7,15
256:2 262:13
267:20 268:16
272:12
**highly** 20:1 31:20
68:13 191:7
**history** 14:13 123:6
123:15 124:8,13
124:16,18,21
**Hmm** 280:13
**hoc** 63:13,16,17,18
63:24 64:11,18
65:10 233:3,10
234:8,12,23

239:22
**Hold** 143:10 229:15
**Holding** 1:12 6:14
7:22 313:3
**Holm** 230:14,24
231:3,20,24
**Holm's** 230:11
231:11
**home** 23:4
**honest** 32:8 130:23
275:4
**honestly** 75:14
108:5
**hope** 188:25 272:5
**hopefully** 9:5
**hormone** 175:8
**hormones** 15:25
17:18,22,23 20:19
20:20 22:7 38:17
50:12 283:8,16
284:14 288:11
298:8,10
**host** 30:10
**hour** 68:25 145:15
**hours** 292:3
**Howard** 108:8,11,12
**HPLC** 303:13,15
304:3 305:15
**huge** 183:19 258:12
288:17
**human** 15:15,18
21:5,6 23:19 25:4
25:8 42:23 67:15
68:5 75:12,16 76:8
76:10,16,22,24
86:1,3 87:5 100:2
100:7,13 101:2,7
101:12 102:9,14
102:16,21 103:3
103:10 178:7
195:4 207:7
301:13
**Humanetics** 33:6
**humans** 23:21 68:10
76:5,7,12,16 77:22
78:23 99:22
101:24 102:7,25

103:15,16,17,22
103:23 104:1,3,5
104:11,21 195:15
203:1 244:2 298:4
**hundred** 164:14
227:14 275:5
304:8
**hundreds** 89:15
183:22,22,22
**hungry** 283:25
**hypercholesterole...**
184:21
**hypotheses** 240:1
278:24 279:1
**hypothesis** 65:1
235:3 239:23
278:22
**hypothesizing** 281:8
**hypothetical** 86:18
86:22 236:23,24
237:1 238:8,25
239:2
**Hypothetically**
167:14,17
**hypotheticals** 212:9

_____

**I**

**idea** 148:21,22
163:8 170:12
172:11
**ideas** 32:17 41:12
193:19,21
**identical** 103:18,22
103:24 104:3
157:4
**identified** 57:2,12
57:16 113:23
118:13 155:3
165:20 289:3
**identifies** 116:16
**identify** 47:10,15,20
60:2,8 65:1 84:19
112:17,21 113:19
115:21 119:4,11
119:18 137:14

**identifying** 64:17
**IDN** 222:20
**ignored** 271:6
**III** 3:3
**imagine** 41:20 113:8
164:18 165:5,7
**impact** 173:15 256:8
259:2 288:17
**impairment** 91:20
121:23 162:8,15
162:19,24 163:5,7
163:11 246:7,10
246:15 258:23
262:19 263:3
**impairments** 246:13
**implications** 153:10
**implies** 124:16
**importance** 41:9
72:5 76:8 267:5
**important** 10:6,11
26:3 40:24 41:6,15
42:4,5 45:24 54:1
54:24 55:3 58:1,10
60:15 63:22 64:4
65:15 68:17 70:12
70:15 72:20 75:22
75:23 76:3,3
117:16 128:5,8
131:4 143:20
144:3,9 161:10
168:18 172:17
173:16 175:19
185:3,7,17,23
195:1,1,3,5,21
196:3,4 207:7,12
209:17,18 210:8
244:11 251:23,24
252:2 267:2,4
307:20
**impossible** 211:23
**impractical** 77:22
**improved** 202:2
**improvement**
198:25 199:1
200:11 209:20,22
213:7,10,17,19,25
215:8,13 216:15

218:13,20 219:13
223:11 244:2
250:25 261:17
262:22 267:25
268:23 270:15,21
271:3 272:2
**improvements**
212:18 261:13,14
261:18 272:14
**improves** 99:22
101:24 244:7
246:21 249:4
250:20 260:25
262:17 265:11
**improving** 251:18
**inaccurate** 9:15
**include** 27:24 38:16
38:17 60:24 62:1
62:13 89:18 94:10
123:4 126:14
135:13 163:24
233:14 241:24
292:11
**included** 40:18
91:17 94:13 116:5
120:25 137:5
160:8 161:13
256:5 259:5
269:10
**includes** 123:6
191:23
**including** 11:9
42:24 141:14
167:7 270:12
271:22 275:3
288:10
**inclusion** 42:25
49:21 123:4,13
**inclusive** 123:10
**incomplete** 9:15
238:8
**increase** 173:10
209:21 213:7,9,17
215:12 216:16,19
217:7,8 218:18,21
219:14,20 220:11
220:19 257:20

increased 223:10
231:17 246:6
269:14
increases 250:24
increasing 230:16
230:16 246:21
250:19
incredible 161:2
incredibly 58:2,3
independence
191:20
independent 116:23
118:1 189:24
191:8,25 192:3
index 4:3,7 5:1
248:18
indicated 142:14
312:16
indicators 60:13
indigenous 36:10
individual 56:19
141:23 170:12
173:4 178:1
individually 247:5
influence 22:17
143:5 187:10
195:10 247:13
298:9
influences 298:9
inform 149:18
informant 133:6,13
133:21,25 134:5
134:10
information 11:1
41:20,22 54:18,18
54:25 58:6,11,12
60:16 118:4 167:7
296:22 304:24
305:12 308:3
ingredient 181:4
182:21 300:18,22
ingredients 34:14
initial 45:1,5 106:17
158:13
initially 61:20
insist 64:7,17
insisted 180:14

instances 48:18 50:8
55:13 56:13 62:17
133:14
institute 22:4 24:20
24:22 25:5 29:25
30:4,7,9 31:6
33:14
Institutes 24:5
Institutional 267:11
instruct 293:19
instruction 293:25
instructions 12:1,3
12:22,24
intact 277:18,24
279:13 280:6,6
intake 153:17
249:19,21,23
250:6,7,15,16
265:10 283:11,11
integration 24:23
integrity 32:5 65:13
130:24
Intelligence 264:6
264:12
intend 83:5 273:2
intended 159:14,17
160:17 225:14
272:7
intending 120:18
intensive 304:12
intensively 17:6
intent 120:19,23
intentionally 258:5
interacted 82:2
interacting 25:23
169:9
interaction 34:22,24
38:18 82:10
interactions 82:11
107:11 108:2,8
109:4,21
interacts 189:10
interest 23:22 30:17
38:23 129:12
130:9,16 131:9,24
132:1,15 134:17
136:25 137:4

138:22 140:6,7
209:10 221:13
224:18 293:2
interested 17:19
20:17 50:19 61:17
61:19 150:14
160:2 290:23
298:20 311:21
interesting 161:7
210:25 239:14
292:10
interim 4:15 61:14
126:10,13,24,25
127:4,12,17,20,24
128:4,11,15,24
129:7,8,9,11 130:3
131:8 146:16
148:8 149:5 152:9
167:5
international 261:7
261:25 262:3
296:6
internet 41:22
interpret 42:5 73:21
74:22 92:19,19,25
151:25 152:13
170:1
interpretation 53:23
123:8 124:17
125:3,9 135:1
151:3 153:3 170:6
170:18 176:10
203:19 206:12
224:16 253:10
289:5 309:4
interpreted 42:6
64:24
interpreting 134:25
149:15 154:2
178:8 228:3,4
273:2
intertwined 264:22
intervention 181:6
252:18
interventional 269:2
269:3
interventions 59:18

intestinal 18:17
282:16
intestine 282:22,22
283:18,20 289:13
292:15 301:17
intimately 147:24
intro 297:19
introduce 7:4 33:18
33:24 182:4 214:2
232:1 256:20
introduced 10:18
13:8 105:2 146:6
263:9
introducing 109:24
178:22 229:16
introduction 94:15
introductory 24:14
29:12 32:2 41:19
94:16 297:6,19
invalidate 70:16
investi- 148:1
investigating 15:24
78:21
investigation 181:20
investigational
118:12
investigator 7:14
16:5,6 25:13,15
28:15 96:6 110:14
147:15 152:8
164:22 167:6
169:20 170:8
299:6,11
investigators 26:17
111:20,23 113:5
115:8 126:1
136:14 148:3,5,7
148:10 164:4
169:1,9 171:1
233:1 235:6,15
237:4
invited 31:3
involve 19:15 20:3
21:9 22:19,22
28:22 29:1 37:13
37:18 38:2 101:2
156:25 181:3,19

182:1,15,24
234:22 296:24
297:5
involved 18:2,5
19:18,20,21,22,25
25:8 26:19,24 27:1
27:7,13,20 28:2
30:4,7 31:20 34:10
34:14 35:11 36:20
36:24 37:1,12,18
40:5 42:10,13 44:2
44:6,10,11 84:3
107:7,19 108:18
108:25 109:4,21
147:25 156:9,17
158:23 181:5
182:2,16 248:23
248:23 266:8,22
266:24 296:4,8
involvement 36:25
involving 35:6,9,12
35:15 36:8 37:17
75:11 99:18
241:21 264:9
287:22,22 299:22
300:15,18
ISL 213:16
ISLR 222:16
isoflavones 28:7
298:21,24
isolating 254:3
isotope 301:24
302:2
ISRL 213:16
issue 29:13 74:3
79:8 308:8,16,20
308:22
issues 79:23 172:7
iterations 26:8
IUs 262:20 266:6
270:5

___
                 J
___
Jaclyn 3:2 7:19 78:5
James 1:6 6:13
Jeremy 291:18
293:13

**Jiam-Min** 183:17
**jmetzinger@kelle...**
  3:10
**joining** 9:4
**journal** 35:22,24
  36:3,5,10 64:7
  98:8,10 265:19,21
**journals** 35:15,18
  35:19,23 36:20
  42:14 93:7,8
  155:23 262:25
**judgment** 46:2
  276:1,3,7
**jump** 297:24

**K**

**K-U-R-Z-E-R** 13:7
**Kate** 2:17 7:16
  276:23 277:5
**kate.matuschak@...**
  2:25
**KC** 110:16
**keep** 38:12 49:3
  87:17,18 210:3,14
**Kelley** 3:6 7:20 8:1
**Kenneth** 96:1
**kept** 148:10
**key** 160:15
**keywords** 88:20
  160:14
**kids** 258:15
**killing** 75:18
**kind** 16:16 22:8 51:1
  52:17 54:15 61:14
  61:16 64:8 69:19
  80:18 103:8
  150:12,18 152:24
  158:23 164:23
  176:10 178:17
  192:10 193:9
  198:14,21 211:12
  216:12,25 253:13
  272:5 290:15
  304:25
**kinds** 14:20 53:13
  80:15 91:2 153:19
  191:21 252:23

253:10 268:4
269:9 302:12
307:4
**knew** 28:16 59:11
  155:10,11,13
  156:6 167:19,20
  169:1,16
**know** 9:16,20 17:11
  29:3 31:4 34:1
  51:23 52:18 53:9
  54:3,18 55:3 56:20
  61:19 64:12,16
  65:21 66:6,9 67:17
  67:19,20 68:2,7
  69:19 70:20 75:15
  75:25 79:10 86:21
  87:19 90:12 91:16
  92:1,8 95:12,23,24
  96:4,16 100:4,10
  101:12 104:5,9,19
  104:23,25 108:5
  111:8,22,25 114:9
  114:13 115:7,10
  115:11,13,16
  116:3 120:11
  121:18 125:8,22
  125:25 127:17,23
  128:10,25 132:13
  132:16,22 133:11
  133:19,22,23
  137:4,8,9,17,24
  138:5 139:13
  141:4 142:4,8
  144:24 145:2
  148:8,15,15,16,18
  148:24,24 149:7
  149:10 150:20,25
  152:17 153:5,23
  153:25 154:4
  158:19 161:24
  162:16 164:16,18
  165:22 166:4,8,9
  166:13,18 167:2
  173:17,19,21
  174:19 175:12,12
  175:24 176:7
  180:23 182:3

184:5 186:8 187:4
187:6 188:7 189:3
189:7 190:5,9,11
190:24 191:1
192:1,2,9,9,16,16
193:16,22,24
194:1 195:7,8,17
195:23 198:24
199:1,5 200:10,15
202:24 205:10,11
208:12,13 209:17
210:5 212:17
214:14 227:8,14
228:17 229:25
235:5,15 237:6
238:4 239:2
240:21,24 243:18
243:19 244:15,18
245:3 252:16
253:20 261:22
263:5 264:11,14
264:14,22 266:13
271:7,8 272:4
275:25 276:2
277:5 279:7,8
280:9 281:14
284:11,14 285:9
288:16 290:9,19
290:24 292:20
295:13 299:1,19
299:19 300:6,14
300:16,19 301:4,8
301:22,22 302:13
304:4,23 305:8,16
306:19,21 307:4
**knowing** 71:21
  148:25 174:22
  307:16
**knowledge** 37:20
  54:22 169:22
  205:9,12 276:8
  283:2
**known** 29:24 248:19
  273:23 284:7,8,17
  298:24 299:17
  305:2,4 306:3
**knows** 170:16

**Komen** 34:6
**Kurzer** 1:20 4:2,9
  6:10 7:25 8:11,20
  8:21 12:21 13:6,13
  14:4,8 38:4 43:12
  78:17 79:4 100:20
  106:7 107:14
  109:8 110:4 111:3
  146:1,10 158:2
  222:24 229:8,20
  232:5 236:9,25
  237:2,19 238:4,9
  275:23 276:20
  277:3 280:16
  284:22 307:23
  309:17,22 310:2
  312:24 313:1

**L**

**lab** 21:5 22:13
**label** 83:22
**labeled** 105:3,15
  116:11,12
**labor** 304:12
**laboratory** 40:20
**lack** 156:3
**large** 104:6 210:7
  258:11 278:1,6
  282:22 305:6
**largely** 282:21
**larger** 159:24
**largest** 283:1
**late** 306:22
**launch** 36:9
**lawn** 213:1
**lawyer** 79:16
**LDL** 180:3,4
**lead** 32:12
**leader** 276:2
**leadership** 25:20
**leading** 25:19
**learn** 191:2,3 200:22
**learned** 122:16
  278:3
**learning** 116:24
  200:21,21,25
  307:1

**leave** 48:8
**lec-** 297:18
**lecture** 297:10,21
**lectures** 297:15
**Leeuw** 3:16 8:4,4
  61:8 87:17,22
  137:6 206:21
  273:12 285:13,17
  286:25 287:5
  301:11 302:20,22
  302:24 308:23
  309:23
**legal** 80:8 308:24
**legitimate** 137:11
  163:23
**legumes** 18:15
**lengthen** 176:16
**Lerner** 95:21,24
  96:1 105:11
  110:16
**let's** 54:3 164:23
  174:21 196:7
  210:10 212:21
  235:14 268:24
  309:8
**Letitia** 1:6 6:12
**level** 66:21 123:23
  141:17,19,23
  142:1,15 151:18
  152:22 154:12
  161:25 170:21
  192:2,8 193:22,24
  194:1 199:5 274:3
  294:22 298:7
**levels** 28:20 47:25
  137:25 138:14
  139:15,19 152:19
  169:21 181:22
  245:23 246:5,10
  246:12,14 247:2,6
  247:9 248:5,10,21
  249:11,21,23
  250:1 255:3 256:9
  261:15 266:5
  267:20 268:13,16
  288:15
**Liberty** 2:22

**life** 176:16 192:10 275:3
**limit** 48:4 49:1,6
**limitation** 48:19,23 48:24
**limitations** 114:5,6 115:9 187:25 253:19,25 269:13
**limited** 37:9 48:5 112:16
**limiting** 54:21
**line** 158:12 162:18 197:15 274:23 277:16 282:15,15 287:10 289:11 291:23 313:9
**lining** 283:18
**lipid** 175:7 177:12 177:13 181:22
**lipids** 181:18 182:19 184:13,16 185:1,9 188:4
**lipophilic** 278:8
**lipoprotein(a)** 180:5
**liquid** 19:4 303:13 303:16
**list** 5:4 29:5 113:18 115:3 242:5 279:10
**listed** 38:1 87:1 98:2 110:13,16 112:6 140:20 232:12 244:8
**listing** 113:11
**lists** 116:2
**literature** 29:23 38:12 80:16 88:7 88:18 89:9 90:3,6 90:17 91:10,13,17 92:2 93:18 94:6,12 94:20 96:25 97:5 97:10,16 98:13,22 99:4 117:11 118:5 125:23 159:19 160:3,9,13 231:9 251:4 295:17 296:12,21

**litigation** 79:18,24 80:2 85:3,8,19
**little** 8:23 9:6 22:8 24:7,8 29:3 34:1 42:3 53:4 71:12 75:19 143:3 154:6 176:2 186:17 187:13 188:7 193:11 225:7 226:10 228:5,10 253:9 257:17 268:4 273:14 283:15 288:3
**live-in** 17:3
**lived** 19:2 21:20,21
**liver** 273:24
**lives** 24:22 33:14 175:20
**living** 68:11 100:2
**LLC** 7:21,23,24
**local** 30:10
**lock** 68:7
**logic** 204:24 205:1 205:13,24 206:13 206:24
**logically** 204:21 206:18 207:21
**long** 54:19 57:22 59:21 124:16 145:5 158:20 253:2
**longer** 167:9,22
**longitudinal** 269:1
**look** 11:17 29:16 33:1,8 48:14 54:5 55:3 56:18,22 58:15 62:23 67:5,7 67:7,10,11,14,15 70:17,18 77:17 79:11 83:25,25 97:12 98:20 100:12 115:15,17 120:19 127:1 128:4 137:22 141:11 143:24 144:11 165:1,10 178:16 183:20

185:23 187:14 190:13 195:2,22 195:22 196:2,8,23 197:3 199:4 202:22 204:5 205:16 207:5 209:16 210:21 212:21 216:23 217:23 224:10,15 240:4 241:6 242:1 244:12 247:5,8 248:10 251:1 252:20 257:12 258:4 261:11 263:7 279:9 285:20 292:10 297:16 305:8,17
**looked** 34:18,25 50:11 59:7 88:23 130:3 144:22 181:22 184:20,24 184:25 187:8,18 187:19 194:21 236:17 251:4 274:1 296:8
**looking** 11:23 20:24 22:6,16 23:23,24 23:25 28:8 34:21 34:22,23 35:3 41:9 53:24 69:11 71:7,8 98:13 127:24 128:2 138:7,21 139:24 160:11 171:18 172:4,5 180:2,3 181:16 185:9,21 186:21 196:1 204:11,12 205:6 207:10,21 249:25 253:1,2 254:7
**looks** 215:18,19 216:4 218:18 245:21 269:11
**Loris** 22:13
**loss** 28:11 30:21
**lot** 24:1 25:5 30:17 31:11,12 70:3

102:14 176:9 191:15 293:2 295:3
**lots** 48:24 136:12 290:22,23 299:23 306:17 307:13
**low** 33:22 207:10 246:5,11 266:4,16 274:3
**low-calorie** 15:25 17:16,21
**low-dose** 261:21
**lower** 11:19 143:14 216:11 246:12,14 247:10 249:10 250:16 261:15,20 262:13 268:13
**luck** 188:6
**lunasin** 292:22 293:4
**lunch** 145:21
**luxury** 92:14

**M**

**M** 3:2 8:14 277:1
**M-I-N-D-Y** 13:7
**machine** 41:11 304:6,11
**machines** 304:6
**macronutrients** 297:13
**Madison** 94:10 95:4 95:20 106:17 108:19,25 109:5 109:22 110:12,14 110:18 111:7,23 112:13 115:8,12 115:24 116:5 118:17 120:4,12 121:7 122:3 126:1 127:18 129:20,24 131:7 132:4,23 133:20,24 137:4 142:18 144:12,24 145:5,12 146:13 149:9 163:22 165:9 167:13

171:9 194:18 196:7,9,15,24 199:18 212:15 231:5 232:10,25 235:5,15 236:3,12 237:3 241:12
**magazine** 42:2
**magazines** 41:23
**magnifying** 257:19
**mail** 15:1
**main** 24:13,13,17 37:1 39:7 83:22 130:20 140:5,6 150:11 264:4
**maintain** 149:4 151:22 152:8
**major** 16:5 23:15
**majority** 259:8
**makeup** 104:4
**making** 55:20 177:9 231:7 278:7 290:25
**manage** 193:17
**manipulate** 193:19
**Manufacturing** 7:24
**manuscript** 132:17 196:20 232:15,21
**manuscripts** 35:21 171:20 239:5
**map** 43:6,6,16
**mark** 8:5 229:17
**marked** 11:18 13:9 13:10 82:14 84:15 93:21 100:17,18 105:2,4,14,16 109:25 110:1 146:7,8 158:8 178:23 179:2 182:5,6 214:3,4 229:18 232:2,3 256:21,22 263:11
**markers** 23:25
**marketing** 84:3,9
**marking** 263:9
**MARKS** 5:22
**mass** 248:18
**master's** 14:21,22

Kurzer, Ph.D. - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.

9/29/2021

[ 331 ]

14:25 15:7,16 18:6
18:11 19:17
**material** 86:13
131:16 234:3
**mathematical** 66:24
**mathematics** 205:11
**matter** 6:10,17
293:14 297:4
**Matuschak** 2:17 4:6
7:16,17 276:23
277:2,4,6 280:2
281:5 282:6
285:19 286:17
287:3,8,9 288:4
289:9,24 291:16
293:6,23 295:16
295:24 297:2
299:3 301:7 302:7
303:3 304:1 306:1
307:18 308:6,13
308:21 309:2,8,16
**mdeleeuw@cozen...**
3:21
**meal** 18:16
**mean** 21:3,4 53:7
66:15 74:8 75:14
103:5,8 114:21,21
114:22 119:14
121:9 124:8,24
134:11 158:18
168:8 189:2 190:4
190:22 194:23,24
198:21 204:23,24
205:13,24 207:16
209:22 211:6,9,19
217:6 218:22
226:5,7 227:3
242:10,19,20
244:1 246:2,19
272:1 273:12,13
274:13,25 275:1
275:14 278:9
282:17,18 287:20
295:23 300:8,11
300:12
**meaning** 20:8 228:4
250:11 256:1

275:7
**meaningful** 68:22
203:12
**meaningless** 252:1
**means** 51:23 63:16
66:22 72:2 124:19
125:4,10 126:3
150:9,15 211:14
211:14 213:24
215:3
**meant** 86:3 153:16
189:21,23 191:10
196:1 198:22
226:9 242:12
246:3 250:14
**measure** 143:14
214:11 219:21
263:6,19 264:17
265:2 302:2
**measured** 17:18,23
18:18 50:11
116:12,15 200:17
200:20 258:2
264:3 293:4
298:25 299:16,18
**measurement** 96:21
191:23,24
**measurements**
28:19 117:13
252:14,15,21
**measures** 49:14
60:3,8,20 112:18
112:22 115:12,15
115:22 116:4
117:25 142:14,20
197:1 200:16
201:14,22,23
212:16 221:8
222:7 223:18,19
**measuring** 113:10
113:12 250:2,4,5
256:9
**meat** 273:14
**mechan-** 309:5
**mechani-** 307:11
**mechanics** 295:18
296:1,13

**mechanism** 132:12
278:13 289:1,3
306:3,10,19,24
307:9,11,16,20
308:7,15 309:6
**mechanisms** 46:22
278:4 279:24
289:5,8 306:12
**medical** 124:22
268:11
**medium** 199:3,7
**meet** 50:2
**meeting** 82:8,10
**meetings** 27:16
**meets** 272:15
**melanoma** 33:10
**member** 19:20 27:1
35:22 169:16
**memory** 10:17
78:23 88:10 89:1
89:20 90:14 91:1
91:21 94:10 95:5
95:20 99:22
101:24 106:18
108:19 109:1,5,22
110:12,14,18
111:7,23 112:6,13
115:8,12,25 116:5
116:22,25 117:15
117:16,16 118:17
120:4,12 121:7,13
121:17 122:3
126:1 127:18
129:20,25 131:8
132:4,23 133:20
133:24 137:4
142:18 144:12,25
145:5,12 146:13
149:9 163:22
165:10 167:13
171:9 191:2,3
193:1,3,4,14,14,18
193:23 194:2,19
196:8,9,15,24
199:18 200:17,22
200:24,24 201:6,8
201:11,15,24

202:2,13,17,21
212:16 231:5
232:10,25 235:6
235:16 236:3,12
237:3 241:12
250:25 251:6,19
261:21 264:13,18
264:21,22,23
268:23 270:12
271:23 272:2
**men** 18:16
**menstrual** 17:20,21
**mental** 29:11,14
30:18,20,21,23
31:1
**mention** 45:18,25
46:1 83:4 97:19
101:20 123:1,3
126:7,10 146:15
150:5,6 179:18
189:19 252:8
265:2
**mentioned** 25:8
29:25 31:5 32:18
32:19 34:9 36:23
42:17 46:5 61:3
107:3 122:22
132:3 134:15
163:23 171:8
176:21 177:11
178:12 194:17
200:11 204:15
230:9 232:22
244:23 256:11,13
265:3 267:16
**mentioning** 46:11
**mentions** 35:14
**merged** 290:12
292:4
**message** 115:4
**met** 79:19,20 138:19
227:18,23
**meta-analyses**
268:15,21 269:8
**metabolic** 16:24
17:4,4,7,8 18:24
19:3

**metabolism** 20:22
22:14 187:2
294:12 296:13,18
297:5,17
**metabolites** 113:11
281:15
**metanalysis** 269:10
**method** 136:15
**methodological**
112:21
**methodologically**
154:19
**methodologies**
265:22
**methodology** 114:7
135:25
**methods** 40:2 42:21
132:13 184:2
191:18 224:16
303:18,20
**Metzinger** 3:2 7:19
7:20 12:5,7,10,19
43:10 44:7 45:7,21
46:12 47:12,17
50:4 51:3,14 55:9
56:15 57:3,13
58:25 60:5 61:7
62:3,19 63:5,25
64:19 65:24 68:24
69:8,14 72:12 73:2
73:14 74:10 76:18
78:6,24 80:3,19
81:22 82:4,17 83:7
84:5 85:11,21 86:8
86:14 87:10 92:5
96:9 101:8,25
103:19 104:13
106:5 107:13
108:21 109:6
110:19 111:15
112:3,24 113:20
117:8 118:23
119:7,12,21 120:6
120:13 122:5
123:20 124:10
125:12 126:15
128:17 130:5

133:7,9 134:6
135:8 138:3,15
139:7,22 140:16
141:7 142:2,21
143:16 144:15
145:6,14,22,24
146:4,17,25
147:17 149:24
150:23 152:1,15
154:20 156:11
157:9,11 162:25
164:1 165:25
166:6,20 167:11
167:15 169:4
170:2 171:3,24
177:15 181:9
186:10 188:14
190:7 192:4
196:10,16 197:5
197:24 199:10
201:18 202:4
206:19 207:22
209:24 211:25
215:14 217:11,18
218:8,24 219:8,15
219:24 220:6,12
220:14,21 221:4,9
222:22 223:3,23
225:16 226:14,17
227:4,25 228:21
228:25 230:18
232:13 233:4,11
233:19,25 234:4
234:24 235:8,17
235:19 236:5,8,14
236:21 237:8,13
237:20 238:6
241:1 243:12
244:3 245:1
247:15 249:6
253:6 259:13,21
260:7 263:20
270:23 273:10
275:17,19,21
279:14 280:10,14
280:18 282:4
285:16 286:15

287:24 288:22
289:22 291:14
292:16 293:18
295:8,20 296:14
298:15 300:24
302:23 303:1,23
305:24 306:14
307:22 308:9,18
309:21
**Michael** 3:16 8:4
**microbiome** 288:16
**microbiota** 287:13
287:23 288:7
**micronutrients**
29:14
**microphone** 87:20
**middle** 198:14
**mild** 88:21 91:20
121:23 125:21
135:14 160:24
161:10,23,25
162:6,7,14,19,23
163:5,7,11 258:22
262:19 263:3
**milder** 161:25
**Milgram** 104:10,20
**milk** 155:8
**milligrams** 118:19
**million** 58:8,8
**Mindy** 1:20 4:2 6:9
8:11 13:6 310:1
312:24 313:1
**Mini-Mental** 264:15
265:3
**minimal** 129:16
**mining** 65:6,11,12
65:22 66:4
**Minnesota** 23:10,13
23:15 24:21 31:7
31:13 88:20
296:20 297:10
**minutes** 69:4 151:1
213:2 265:16
288:3
**miracle** 307:2,3
**mischaracterizes**
188:15 223:24

235:9
**misleading** 235:24
**missed** 111:2
**mistake** 173:15
208:20 217:4
290:10,15 291:7
**misunderstanding**
141:10
**mixed** 21:15 291:8
**MK1** 4:9 13:9,10,15
13:21 82:14 84:16
88:4 93:21 96:13
97:18 101:15
106:14 158:8
171:22 189:15
194:17 198:11
215:7 218:7
225:22 229:9
240:12 252:8
274:9
**MK10** 5:3 229:17,18
**MK11** 5:4 232:2,3,8
232:12 233:2,18
235:7 236:20
237:5 238:2
**MK12** 5:7 256:21,22
257:3
**MK13** 5:8 263:10,11
263:19 264:3
265:1
**MK2** 4:10 100:17,18
100:21 101:2
**MK3** 4:11 105:3,4
115:19,21 116:8
140:1 197:9,10
**MK4** 4:12 105:15,16
105:24 107:1
165:23 166:5,19
**MK5** 4:13 109:25
110:1,10,11 112:2
112:17 118:10,13
118:21 119:10
120:3 122:23
123:1 126:3,8,9
132:4,8 135:17
136:19 137:13
**MK6** 4:15 146:7,8

146:12,15,23
147:9 150:4,21
**MK7** 4:19 178:23
179:2,11 180:1
181:15 182:1
**MK8** 4:20 182:5,6
182:12,15,24
183:2,14 186:1,9
186:20
**MK9** 4:21 214:3,4
214:18 215:11
217:22
**mm-hmm** 176:23
197:10,17 204:22
225:21 230:5
245:11 268:18
277:15
**MMS** 4:15 5:4
**model** 100:3 102:9
102:20 103:2
**models** 77:20,21
**modify** 60:11,17,19
278:8
**molecule** 279:25
**molecules** 278:1,6
**moment** 8:24 11:24
62:23 69:2 132:22
194:6 222:25
228:24 269:17
**moments** 134:15
**monitor** 6:20
**monitoring** 127:7
274:2
**month** 35:19
**months** 19:2,3 22:3
262:21
**mood** 29:5,8,21
37:17
**Moran** 279:1,7
**morning** 7:8 8:16,17
9:3 158:5 159:12
**mother** 122:15
**mouse** 33:9
**move** 87:24 190:1
281:3
**moved** 128:10
**moving** 125:18

**mower** 213:1
**multiple** 172:11
177:14 178:18,18
178:19 179:23
183:11 203:6
290:25

---

**N**

**N** 2:1 4:1 6:1 8:14
8:14 277:1,1
**N.W** 2:8
**name** 7:9 8:19 13:5
13:6,7 27:21 81:13
89:4 96:4 108:10
115:16 183:16
214:21 277:5
**name's** 26:9
**named** 108:8 311:6
311:11
**names** 5:24 136:11
**narrow** 69:21 71:11
92:15 294:18,18
**narrowly** 64:24
195:21
**National** 22:4 24:5
**Native** 30:10,11,18
36:7
**NATO** 21:17
**natural** 69:4 256:9
**nature** 14:23
**nearly** 153:18
203:11
**necessarily** 5:22
45:11 46:1 51:17
51:19 52:21,21
56:3 61:10 65:9
92:20 126:17
128:19 156:16
163:4 210:20,22
231:9
**necessary** 45:15
52:5 74:16 129:11
154:11 176:12,20
184:4,8 254:15
309:6 312:10
**need** 49:5 61:13
69:1 76:16 131:17

140:8 175:6
180:18 192:14
202:12 231:18
238:17 279:12
280:6 290:18
304:7,12,24 306:3
**needed** 76:23 267:6
**needs** 36:16,17
173:4 205:2 298:3
298:4
**negative** 243:7
**negatively** 246:7
**negatives** 173:10
175:23
**neglected** 60:14
**neglectful** 58:17
**neither** 155:9
**nerve** 283:19 284:5
287:12,22
**nervous** 284:5
**network** 46:19
**neuro** 99:25
**neurological** 123:7
123:16,18 124:9
124:15,19,21
125:4,10 126:3
134:24 135:4,7
239:16
**neurology** 262:25
265:18
**neuropsychological**
230:25
**neurotransmitters**
284:13
**never** 39:24 40:12
41:15 75:18 92:14
174:8 202:24
209:1
**new** 1:2,6,8 2:19,23
2:23 3:8,8,19,19
6:12,14,17 7:17
14:10 36:9 65:23
67:21 150:8 240:6
277:7 283:2
288:14
**newspaper** 41:23
**NIH** 47:1 48:25

52:15 60:22 61:6
61:10,15 62:2
77:17 98:2 114:14
127:8,13 129:18
**NIH-funded** 152:23
299:12
**nine** 115:14 116:2
203:14 204:13
205:17 210:2,9
**nodding** 10:8
**nonsignificant**
208:4
**nonverbal** 261:21
**normal** 54:3 121:22
125:20 162:18
184:21
**Norwegian** 257:15
**Notary** 1:23
**note** 86:14 186:4
197:5 262:24
313:4
**noted** 185:25
**notes** 5:21 11:2
**noticing** 7:7
**nuanced** 253:9
**number** 6:17 11:20
17:13 49:4 53:15
68:16,21 71:3 79:6
93:24 117:22,23
123:14,15 136:8
139:25 160:1
164:13 169:21
172:22 173:8
177:8,18 178:3
208:22 209:8
213:13,15,24
285:24 287:1,2
288:11 298:1
**numbered** 277:12
286:20
**numbers** 11:22 72:7
139:18 140:12
170:10 179:12
183:3 197:12
205:5 213:17,18
254:7
**numerous** 42:7

168:22 270:12
298:22
**nutrient** 267:2,4
297:8
**nutrients** 17:1 38:9
294:10
**nutrition** 14:22
15:15 20:18 21:21
22:4 24:12,14
29:13,18 30:11
31:23 35:18,23,24
36:1,4,6,10 37:3,8
38:11,13,18,19,21
39:4,17 41:21
188:25 207:3
294:9,16 297:7,8
297:19 298:6,9,9
**nutritional** 15:7,8
15:10,11 24:16
35:25 38:6,7,25
153:16 156:9
283:6 294:4,7,7,14
295:1,11,13,14
**nutritionist** 189:9

_____

## O

**O** 6:1 8:14 277:1
**O'Connor** 3:17 8:5
**O-V-I-D** 89:7
**obese** 266:4,9
**obesity** 54:2
**object** 137:6 235:20
235:22 238:7
273:13 285:13
301:11 302:22
308:23
**objected** 280:14
**objection** 43:10 44:7
45:7,21 46:12
47:17 50:4 51:3,14
55:9 56:15 57:3,13
58:25 60:5 61:7,8
62:3,19 63:5,25
64:19 65:24 69:14
72:12 73:2,14
74:10 76:18 78:24
80:3,19 82:4,17

83:7 84:5 85:11,21
86:8,15 87:10 92:5
96:9 101:8,25
103:19 104:13
106:5 107:13
108:21 109:6
110:19 111:15
112:3,24 113:20
117:8 118:23
119:7,12,21 120:6
120:13 122:5
123:20 124:10
125:12 126:15
128:17 130:5
133:7 134:6 135:8
138:3,15 139:7,22
140:16 141:7
142:2,21 143:16
144:15 145:6
146:17,25 147:17
149:24 150:23
152:1,15 154:20
156:11 157:9
162:25 164:1
165:25 166:6,20
167:11,15 169:4
170:2 171:3,24
177:15 181:9
186:10 188:14
190:7 192:4
196:10,16 197:6
197:24 199:10
201:18 202:4
206:19,21 207:22
209:24 211:25
215:14 217:11,18
218:24 219:8,15
219:24 220:6,12
220:21 221:4,9
222:22,25 223:23
225:16 226:14
227:4,25 228:21
230:18 232:13
233:4,11,19 234:4
234:24 235:8
241:1 243:12
244:3 245:1

247:15 249:6
253:6 259:13,21
260:7 270:23
273:10 275:17,21
275:22 279:14
280:10 282:4
286:15,16 287:24
288:22 289:22
291:14 292:16
293:18 295:8,20
296:14 298:15
300:24 302:20,23
303:23 305:24
306:14 307:22
308:9,18
**objective** 32:8 112:2
**observational** 249:9
253:11,12 269:2
269:12,14
**observationals**
269:5
**observed** 196:5
**observing** 252:18
**obtained** 118:4
**obvious** 126:6
192:23
**obviously** 116:24
**occasionally** 29:9
**occur** 52:13 59:25
71:3,5 72:22
102:25 103:16
196:5
**occurred** 67:2
**October** 311:22
**Odense** 22:11,12
**offer** 82:19 83:5,9
83:13 278:12
**offered** 83:6
**offering** 82:15
161:15,22 162:13
162:22 293:16
**offhand** 81:13
264:18 279:9
**Office** 7:18 15:2
277:8
**oh** 20:5 131:10
181:16 192:19

222:9 274:17
286:23
**okay** 8:25 9:7 10:22
12:18 13:8 14:2
19:22 20:2,11 23:6
32:25 33:3,5 36:19
43:14 44:1 59:8,14
69:8 78:3,8 81:14
81:17,24 84:2 87:3
90:2 94:1,17 95:10
96:3,5,12,19 97:14
98:21 99:3 100:14
100:16,21 101:14
101:18 107:21
109:15,24 115:20
118:11 122:19
132:21 141:24
145:22,23 146:6
157:17 167:4
171:21 172:6
174:20 182:7
186:21 187:16,22
188:11 189:18
197:17 198:10,13
199:22 200:18
208:2 213:4,21
214:5,9,14,19
216:9 229:11,16
236:14 237:13
240:13,16 241:19
245:9 249:14,16
255:16,18 256:20
257:2,8,21 260:20
262:15 265:25
267:13 268:14
272:5 274:19
276:11 277:23
278:12 279:6
281:20 284:23
285:4,12 287:6,8
288:5 289:25
303:9 305:10,20
**old** 290:8
**older** 159:14,18
160:18 225:11,14
259:11,19 267:4
**omega-3** 34:21

**ONB** 213:23 214:11
214:11
**once** 12:16 44:22
125:17 166:9
**one-off** 209:11
**ones** 34:2 67:21
89:15 113:12
160:5 201:6
232:22 233:9,13
234:16 236:20
261:2 269:4
302:17
**ongoing** 58:23
**online** 36:5
**open** 256:25
**open-access** 36:5
**operator** 7:1
**opine** 307:20
**opinion** 68:15,15
69:21 83:13 86:6
103:12 121:24
132:20 136:6,24
168:19 170:24
171:5 175:25
183:24 215:11
225:12,13 226:12
238:11 270:4
272:15 278:13
293:17 306:2
308:25
**opinions** 82:15,19
82:21 83:3,5,9
95:2,19 96:23
161:16,20,23
162:13,22
**opportunities** 58:19
**opportunity** 25:2
29:16 74:22
**opposed** 21:6 68:6
72:3,7
**order** 12:15 18:18
18:20 28:10 65:3
88:24 172:20
191:1 201:8 216:1
239:25 242:24
272:22 290:14
304:25 306:4,6,7,7

**organ** 283:1
**organization** 37:5
114:14
**organizations** 36:24
37:13 42:11
**organize** 201:2,4
**original** 50:16 61:25
79:8 95:11 127:9
184:11,12 235:2
238:21,21 239:23
278:21,22 312:11
**originally** 46:20
57:24 79:9
**ought** 206:4
**outcome** 60:3,8
140:5,6 201:7,25
247:14 264:4
311:21
**outcomes** 67:17
**outdated** 290:9
292:9
**outpatient** 17:10,12
17:24
**outperform** 219:20
220:19
**outperformed** 217:9
218:22
**outset** 168:13
**outside** 19:1,7 85:19
92:10 137:5
232:20
**over-recruited**
120:24
**over-recruitment**
164:11
**overall** 203:12
223:19
**overkill** 176:19
**overlap** 104:7
116:21,25 117:22
191:6,8
**overlapping** 193:8
193:16
**overly** 231:15
**oversaw** 31:24
**overview** 24:16
297:7

**overweight** 54:4,5
266:4,9
**overwhelming**
175:5
**Ovid** 89:7 90:8 91:5

—————————

**P**

**P** 2:1,1 6:1
**p-value** 66:17,18
70:5 71:15,17,19
71:20 172:18
173:8 177:8 205:7
212:5
**p-values** 70:18,19
70:20 179:22
195:22
**P.M** 157:20,24
194:8,12 229:2,6
269:19,23 276:14
276:18 309:11,15
310:3,4
**page** 11:20 14:1
48:4,19,23,24 49:1
49:6 87:15,16
93:20,22,24 94:2,2
96:14,17 97:15,19
114:5,6 119:2
123:13 141:11
179:10,11 183:1,2
183:3 184:25
194:15 197:11,12
204:16,18 205:16
212:22 214:18
217:22 219:12
240:14,14 241:15
241:16 242:2
245:12 248:17
252:5 255:17
274:19 277:12
282:12 285:21
286:19,20,20,24
313:9
**Page/Line** 4:4,8 5:2
**pages** 48:25 49:4
93:23
**paid** 305:5
**paper** 26:6,10 29:4

29:7,7,20 36:16,18
64:6 72:8 91:22
95:3,8 100:9,12
115:1,15 136:17
137:22 141:21,22
151:19 165:15,16
165:18 166:14,24
175:7,8,9,11
177:13,13 179:6
184:9 186:17
197:2 231:7
258:25 312:10
**papers** 11:2 15:17
32:9,10 35:20
36:13 56:19 66:5
74:18 88:23 89:15
92:20 93:9 94:22
95:1 96:2 98:17
114:24 117:12
128:22 160:1,4,14
165:13 168:22
174:12,16,19,21
175:3 177:12
178:16 179:5
183:23 195:24,24
238:23 248:12
259:3,8 279:2,4
305:17,18
**paragraph** 84:15,18
84:19,23 86:1 87:1
87:15 88:2,7 97:18
99:7,9 101:17,19
101:23 106:13
107:5 146:24
147:8 150:7
158:10 160:19
161:13 162:11
172:2,4 179:17
183:6 189:17,19
189:22 194:14
198:12,15 199:23
200:12,12 204:18
208:2 225:19
229:10,12 241:7
242:2,5 245:10,15
246:1,20 248:16
248:22 249:4,15

Case 1:17-cv-00124-LLS   Document 259-9   Filed 06/16/22   Page 103 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

[335]

249:17 250:4,10
250:19,24 251:10
251:18 252:5,7,8
253:4 255:3,10,17
255:19 256:12
257:4 260:21,24
261:3,24 262:5,10
262:16 263:2,16
265:8 267:14,24
268:14,22 270:1
274:8,15,16,17
277:11,17 282:8
282:12 285:21,24
286:19 287:1,1,3,5
287:11,17 289:10
290:1,1 291:12,21
291:24
**paragraphs** 94:16
250:12
**parallel** 16:20 190:1
**Park** 3:7
**part** 18:20 19:17
27:14 28:1,3,22
29:18 62:7 74:17
111:3 156:3 175:2
184:13 239:23
244:8 251:6,24
255:10,12 264:22
283:15 308:12
**participant** 133:17
134:4,13 170:17
**participant's** 142:15
**participants** 16:9
18:24 19:2,12,12
25:23 46:18 47:10
47:16,20 49:19
50:1,18 52:25 53:2
53:10 54:8 59:24
111:8,24 121:6
126:20 132:25
133:1 136:1,20,22
137:5,14,18
139:19 141:6
142:18 144:12
148:17 149:15
155:10,18 165:11
167:20 169:1,10

169:15,22 192:20
225:10 255:9
258:5,6 262:19
263:1
**participated** 18:9
**particle** 180:4
**particular** 11:23
23:22 28:1,5 33:9
53:24 57:10 64:18
83:22 117:2 161:9
176:21 184:9
185:18 213:11,11
248:25 249:1
260:11,18 294:19
300:9 304:9,16
**particularly** 20:20
68:10 157:1 207:9
247:3 267:5 272:9
272:23
**parts** 18:19 206:14
272:25 287:21
302:1
**partway** 128:7
**party** 7:6
**pass** 278:2
**passed** 248:14
**pathway** 283:5
**patient** 123:15
124:13,14,18
**patients** 123:6
**pattern** 211:12
**pay** 191:4,15
**peak** 180:3
**peer** 35:20 36:12
155:24 248:14
265:19
**penalty** 312:14
**pending** 9:22
**Pennsylvania** 2:8
**people** 1:5 6:11
16:22 17:3,5,13
22:17 30:15 37:9
37:10 43:8 50:20
53:15,24 58:4 77:7
111:11 115:6
120:20 121:1,24
121:25 123:5,9

124:2,3,20 125:16
125:19 129:13
134:23,23 135:13
143:11,13 148:7
149:14 150:9,13
151:4 155:5
160:24 163:24
164:25 167:8
174:17,25,25
176:4 184:7
185:22,22 189:5
192:12,14 193:6
195:8,9,11 207:7
238:17 239:6,10
239:15 242:21
244:24 245:5,23
248:23 249:1
252:14,19 254:2,8
261:15 267:3
268:12 272:15
282:25 293:3
298:23 299:17
300:16,17,19
301:15 304:22
305:4
**peoples** 36:11
175:20
**peptide** 289:14,20
292:22
**PeptideCutter**
303:5,6
**peptides** 286:7,12
292:13
**percent** 17:16 66:23
164:12,14 173:25
227:15 275:2,5
**percentages** 54:4
**perception** 65:4
**perfectly** 188:3
209:5
**perform** 52:22 56:5
88:17
**performance** 142:19
215:5 216:7,11
218:5 303:13
**performed** 15:17
17:7 46:16 66:19

128:15 266:3
296:17
**performing** 21:21
**perimenopausal**
28:10
**period** 19:1 59:21
145:11 252:17
253:2 311:18
**periodically** 27:3
**peripheral** 282:16
**peripherally** 30:8
**perjury** 312:14
**permissible** 209:5
**permitted** 163:13,19
**person** 10:12 16:8
16:18,21 41:4
81:19 92:22,23
148:5 149:1
169:13,16 170:12
170:15 183:21
188:24 256:7
**personal** 122:17
**personally** 75:17,23
142:10 304:21
**Ph.D** 1:20 6:10 8:11
15:9 18:6,11 19:17
20:12,13 21:16
38:7 39:20 93:15
188:24 294:22,23
312:24 313:1
**Ph.D.s** 40:11
**philosophy** 14:14
185:14
**PHONETICALLY**
5:24
**phrase** 21:2 198:16
200:1 208:3 226:3
245:25 252:9
255:22 256:1
274:12,20 282:17
**phrasing** 301:2
**physiology** 15:12
38:9 281:13 294:9
**phytoestrogens**
27:11 28:7,11,12
**pick** 136:11 159:25
**picked** 89:22 91:22

**picture** 71:9 205:6
**pieces** 175:2 191:23
**pills** 157:3,3 301:6
**pivot** 17:11
**place** 124:1 137:25
139:14 140:3
311:10
**placebo** 53:2,11
137:15,19 139:3
139:20 140:13,21
143:22 157:3
186:24 204:1,3
206:6 208:21
217:8,16 218:22
219:6,20 220:3,19
221:1,8,25 222:8
223:17,20 224:6
224:25 257:25
262:8,11,21
266:21 300:17
**placebo-controlled**
86:4 87:7 256:18
**Plaintiffs** 1:9,21 2:2
**plan** 62:14,18
**planned** 63:20
**planning** 185:9
**plant** 28:7
**plasma** 181:17
**plausible** 278:10
279:24 281:9,11
289:4,8
**played** 26:23
**please** 7:4 8:8 9:11
9:12,16,20 10:12
13:4,21 35:16
36:25 57:6 84:14
86:11 87:14 93:22
96:13 104:16
106:14 108:15
109:17 123:12
125:6 131:14
139:10 147:3
152:4 158:10
172:2 189:17
204:18 229:9
240:15 249:15
259:16 260:21

FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

263:22 270:1,18
274:9 277:10
309:9 313:4
**Plus** 117:22
**point** 9:20 19:24
69:4 150:11
162:19 177:23
187:19 189:1
197:2 201:10
205:15 206:15
236:6,8 237:11
245:21,24 252:15
253:1 254:20
261:3 265:24
266:20 271:15
291:22
**pointing** 204:5
**points** 48:7 271:12
290:25
**polymorphism**
187:1
**poorer** 247:10
249:11 250:17
**population** 42:25
46:15 47:11 57:11
58:11 67:23
110:18,22 111:13
121:3 135:3 139:1
196:9,15,24
197:20,23 239:8
258:11 259:4,9
265:24
**populations** 17:2
**portion** 18:21 75:20
**pos-** 175:21
**posing** 237:1
**position** 23:9 25:21
31:8,9 38:12
**positions** 31:14,15
31:15
**positive** 175:21
176:5
**positively** 246:10
**positives** 173:9,17
173:18,21
**possibilities** 306:11
**possibility** 281:19

**possible** 50:7 58:12
66:3 72:9,15,15
78:21 82:7 133:15
133:20 137:10
142:7,7 143:19
147:14 149:4
157:8 164:16
175:22 199:19,19
202:14 207:18,25
212:6,8,13 216:25
239:9 255:14
266:21 273:19,21
279:17,18 280:24
290:15 302:6
**possibly** 121:23
127:20
**post** 15:1 63:12,16
63:17,18,24 64:11
64:18 65:10 233:3
233:10 234:7,12
234:23 239:22
**postdoc** 21:23,24
22:1
**postdoctoral** 20:14
21:17
**postdoctorate** 23:1
**postgraduate** 21:8
21:12,14
**postmenopausal**
28:9 50:10,13
182:19
**potential** 272:10
**potentially** 176:15
205:15 273:24
**power** 68:19 195:7
269:14
**practical** 114:10
133:15,24
**practice** 64:25 65:7
65:18 112:21
113:14,14,15
183:25
**practices** 32:4
**precorrected** 166:25
**predetermined**
63:24
**Prednisone** 307:7

**preferable** 133:5,12
**preliminary** 146:20
147:15 148:4
149:19 151:23
152:9
**premier** 35:23
**preparation** 101:4
**prepared** 13:16
**preplanned** 63:20
**prescribed** 307:8
**present** 3:23 6:4
7:15 71:13 82:21
280:7
**presentations** 32:13
32:15
**presented** 32:7
165:23
**presenting** 130:24
**preserve** 242:13,16
242:19,24 243:9
243:20,21
**press** 150:12
**pretty** 24:3 48:15
192:11
**Prevagen** 7:23 35:6
83:17 84:3,20
99:21 101:24
102:4 118:15,16
118:19 150:8
157:8 159:14,17
160:17 161:16,20
161:23 162:14,20
162:23 163:8
202:1 225:14
240:22,25 241:9
241:11,21 258:17
262:2,6
**Prevagen-QBQ-0...**
4:13
**prevent** 28:11 149:8
**preventing** 163:11
**prevention** 23:22
38:22
**previous** 224:11
265:14
**previously** 79:19,20
91:24

**primarily** 15:18
20:25 24:4,15 31:9
117:2
**primary** 15:2 26:14
26:20 27:18 28:14
40:7,8 42:8 59:12
112:2,5,12,14
113:19,23 129:1,6
129:24 130:8
131:9,24 132:1
134:16 165:4
201:7 239:7,7
308:20
**principal** 16:5,6
25:13,15 26:17
28:14 96:6 110:14
136:14 167:6
169:8,20 170:7
299:6,11
**printed** 93:23
**prior** 12:11 122:2
177:11 250:12
311:5
**privilege** 293:21
**pro-** 297:15
**probability** 66:25
67:1 211:15
**probably** 52:16 79:9
89:20 90:14 91:19
143:19 178:17
180:14,20 184:3
185:7 187:7,8
190:3 193:4
209:12 216:22
226:16,19 267:10
290:9 292:9
**probiotics** 34:24,25
**problem** 27:17
55:19 127:8
129:18 158:20
161:9 174:3,5
175:16 258:12
291:25
**problems** 121:16
**procedure** 230:12
**procedures** 9:5
151:21 152:7,12

**proceedings** 311:14
**processed** 18:19
**produces** 289:20
**producing** 18:21
**product** 65:21 66:20
76:15 118:13,16
293:22 300:19
**production** 18:15
25:3
**products** 34:10,13
286:3 289:11
301:10
**professional** 36:24
37:2,13,22 39:11
42:11 122:20
177:22
**professor** 23:10
42:3 179:8
**program** 10:22,23
14:21,25 15:5,6
23:16,17 24:4,10
25:8 28:22 31:6,24
31:25 41:5
**programs** 18:6
136:9
**progresses** 160:25
**progression** 161:7
162:23
**project** 15:23 33:19
34:21,22 35:2
44:17
**projects** 35:3
**promotion** 31:17,19
**pronounce** 8:18
**proof** 69:19 227:10
**PROPER** 5:24
**properly** 41:13
149:13
**properties** 278:19
281:2 293:1
**proposed** 46:20
**prospective** 132:25
252:9,12,13 254:6
254:11,12,19
255:20 256:6
271:14
**Protection** 2:21

Case 1:17-cv-00124-LLS   Document 259-9   Filed 06/16/22   Page 105 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

[ 337 ]

**protective** 12:14
99:25
**protects** 230:14
**protein** 17:1 154:25
155:1,4,6,7,8
156:19 181:6,17
280:6 292:23
295:19 296:1,3,5,7
296:9,10,13,17,24
296:24 297:5,5,14
297:16 298:2,3,19
298:21 299:22,24
299:24,25 300:5,8
300:10,23
**proteins** 301:6
**protocol** 25:17
27:25 28:2 42:18
42:19,21 43:9,15
44:6,18,20 45:1,2
45:5,6,10 46:7,24
47:4,6,9,15,19,22
47:24 48:1,8,20
50:24 51:13 52:9
52:25 53:12 54:11
54:23 57:2,12,19
57:24 59:15 60:2,7
60:10,14 61:25
110:11,17,22
112:1,11,23 113:6
113:9 114:13,17
115:9 118:20
119:4,10,18 120:2
120:9 122:23,25
126:7,9,14,23
127:5,10 132:3,7
132:11 134:22
135:17 136:2,4,17
136:18 137:13
171:15,18 184:12
184:12 224:17
239:6
**protocols** 42:17 44:3
44:12 48:9,12,20
49:9,13,17 52:19
59:17,20,23 62:13
113:17,18 114:4
114:12,25 124:23

**proud** 179:8
**prove** 102:4 191:22
192:15 244:6
269:8 271:17
**proven** 227:3,7,13
228:7 306:12
**provide** 48:20 51:2
75:22 88:24 225:5
252:24 271:17
290:22 291:2
292:7,21 301:15
305:12
**provided** 84:24
94:21 311:18
**provides** 224:7
**providing** 224:8
307:25
**provisionally** 12:13
**Prozac** 102:17
**psychiatry** 265:18
**publi-** 239:18
**public** 1:23 31:11
**publication** 16:12
36:16 64:13 95:5
95:11 106:17
129:3 130:17
158:13 171:16
238:23
**publications** 25:25
26:5 27:19,20 29:6
64:17 92:13 94:14
117:24 118:4
**publicized** 174:10
**publish** 66:5 75:2
175:3,7,9
**published** 15:17
26:9 36:18 64:10
74:19 92:21 98:17
128:20,21 155:22
166:24 168:22
174:11,13,17,21
239:19 248:15
251:25 262:24
265:17 305:18
**PubMed** 89:7
**pull** 160:3 273:1
**pulled** 195:24

**purpose** 19:7 33:16
33:20,23 98:24
148:2 149:2 160:3
**purposes** 16:6 44:16
239:13
**pursuant** 12:14
**pursue** 58:18
**put** 17:15 41:2 46:23
47:5 48:6,7 49:6
52:16 60:14 61:10
61:13 75:25 88:20
90:25 93:3 129:11
132:11,18 160:14
161:8 213:9
216:24 240:6
273:14 292:1,5
**putting** 32:14 41:10
130:25

———————————
**Q**
———————————
**qualified** 86:5 87:8
93:12
**qualify** 72:16
143:12
**quality** 93:7,8,9
248:12 265:21
**quant-** 275:18
**quantify** 275:14,25
276:6
**quantitative** 112:15
**question** 9:11,12,21
9:22 10:1,13,15
32:16 43:13 56:23
57:6 62:25 69:17
83:10,11 86:11,17
86:20 104:16
107:23 109:12,14
109:17 125:5
131:11 139:10
142:24,25 143:4
147:3 152:4
153:24 162:20
196:3 197:7
199:13 218:9
223:7 234:1,7
235:20,23 238:10
244:20 245:7

251:17 259:25
260:11,18 263:22
264:20 270:18
273:15,17 280:4,5
285:9,15 293:20
295:6 301:2
302:25 308:1,2,5
308:11
**questionnaires**
250:6
**questions** 9:10 10:6
11:18 13:1 60:24
69:6 121:13,14,21
145:20 276:21
277:9 285:10
309:18,22,23
**QUI-FTCNY-001...**
4:18
**quickly** 283:23
297:25
**Quincy** 1:12 6:14
7:21,22,24 82:3,8
313:3
**quite** 26:15 31:12
35:3,20 66:8 86:21
102:7 304:10
305:3
**QUOTATION** 5:22
**QUOTE** 5:22

———————————
**R**
———————————
**R** 2:1 6:1
**race** 248:18
**radio** 41:24
**radioactive** 301:23
**radiolabeled** 301:20
**ran** 16:8 18:9,13
19:11
**random** 66:24
172:21 203:22
206:2,6,8 210:15
210:16 211:11
223:21
**randomization**
52:10,13,17,23
135:18 136:3,5,7
136:10,15

**randomize** 136:11
136:12
**randomized** 16:13
16:19 22:19 25:9
25:12 43:20,21,25
52:20 86:3 87:6
135:20,25 136:1
136:16 188:2
253:16 254:10,14
256:5 262:20
271:2
**randomly** 196:6
257:24
**randomness** 211:10
211:14
**rare** 203:2
**rat** 75:25 101:3,6,11
103:11
**rate** 33:22 176:5
231:17
**ratio** 52:25 53:1,7
137:14,22,25
138:1,1,2,13,19
139:4,14,21 140:2
140:8,14,22 141:5
141:22,25
**rats** 102:8
**RCT** 43:19,24 47:9
47:15 56:25 63:12
66:11,16 71:23
78:21 188:12
253:20 256:12,19
260:23 261:4
262:5,18
**RCTs** 44:2,5,9,10
49:14,18 50:23
51:12 52:8,24
53:17 54:10 59:16
62:12 75:11
126:13 154:17
156:8,13,24
**re-** 270:17
**reach** 74:20 192:12
204:14 245:6
**reached** 240:17
**read** 27:19 32:10
36:14 81:11,15

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                        9/29/2021

[338]

86:12 131:3,14,15
133:11,13 234:2
312:4
**reader** 130:18 131:3
131:24 175:3
186:5
**readers** 74:20,21
**reading** 92:22
117:12,18 125:22
129:13 134:22
136:17 149:12
**reagents** 304:10
**real** 148:1 149:2
175:16 185:17
192:10
**real-life** 19:8 254:8
**real-world** 254:4
255:15
**reality** 44:22
**realize** 9:14 54:17
60:12
**realized** 50:12 55:2
58:15 184:14
**realizing** 65:14
**really** 34:2 38:8 41:4
52:3 56:21 62:22
64:12 95:14 98:24
113:2 131:2 142:5
155:14 158:25
169:6 173:4 174:5
175:13,25 176:19
177:25 178:21
185:23 188:2
209:10 212:6
227:15 231:18
238:16 257:22
267:6 271:12
272:11 288:17
290:24 304:4,14
306:7
**reanalysis** 95:4,21
96:6 105:12 107:4
107:8
**reanalyzed** 95:17
**reason** 12:6,25 13:3
16:23 67:15
111:25 160:8,16

160:21 161:13
164:5,10 190:16
198:7 202:7,9,10
231:8 260:4,9
290:11 313:5,9
**reasonable** 239:4,17
240:8 265:20
274:12,20 275:6
275:15
**reasons** 111:19
113:3 114:11
137:10 163:23
164:9 178:20
240:8
**rebuttal** 293:17
**recall** 37:21 40:21
56:17 62:22 81:7
82:9 83:19,21,23
89:4,19 94:23
95:10,12 108:6,6
116:7 135:23
137:21 144:17
158:21 184:20
187:7,12 191:20
201:12 232:18,23
232:23 241:3
263:8 264:18
279:3,9 305:19
**recalling** 81:13
**receive** 12:16
262:20
**received** 21:17
25:14 33:6,13
**recognize** 232:7
**recollection** 10:3
100:12 159:2
241:8
**recommend** 40:3
**recommendation**
180:22
**recommended**
307:5
**recommending**
230:23
**record** 5:24 6:25 7:2
10:7 11:8 13:5
78:9,11,12,15

90:13 157:18,20
157:21,24 194:6,8
194:9,12 228:24
229:2,3,6 269:17
269:19,20,23
276:12,14,15,18
309:9,11,12,15
310:2 312:6 313:7
**records** 47:2 268:11
**recruit** 46:17 111:13
124:20 164:5,13
164:14 195:8
**recruited** 16:8 19:11
50:20 111:10,24
188:1 258:1,5,14
**recruiting** 50:9,19
**recruitment** 46:19
46:22 55:20
120:25
**red** 162:17
**redo** 174:21 290:13
292:3
**redone** 95:7
**reduce** 162:21
172:18 173:11
175:21
**reduces** 178:21
**reducing** 161:5
177:7
**refer** 86:25 115:18
244:13 257:7
282:16 293:9
**reference** 279:10
290:6,8,10,16
291:9,11 292:1,5,5
**referenced** 94:23
**references** 94:14
100:10 285:24
286:9 290:13,23
291:1,3,7 292:3,7
292:21
**referencing** 261:24
**referred** 259:4
265:5,6
**referring** 11:22
43:24 93:22 97:10
118:3 161:19

163:16 179:11
183:2 197:12
200:5 213:20
257:4 262:9 263:2
263:16 270:10,11
275:11,11 281:21
**refers** 72:4 213:12
**reflect** 5:22 131:21
242:22
**reflected** 61:5
**reflects** 187:24
208:11 258:10
**refresh** 241:7
**regarding** 99:4
114:15 212:20
218:2
**regular** 17:14 27:15
**regulated** 272:22
**regulating** 176:7
**regulation** 16:7
273:7
**regulators** 272:7
**regulatory** 283:24
**relate** 146:12 181:22
253:4 255:3
283:10
**related** 73:25 79:23
80:1 83:10,11
88:21,23 93:15
94:9 99:18 121:13
127:24 129:21
130:4 131:8,19
150:1 161:16,20
162:14 163:4,19
172:7 193:12
202:25 203:1
207:4 211:24
212:3 233:17
234:16
**relating** 42:11 81:19
240:18
**relation** 27:10 48:16
181:8 183:21
**relationship** 20:18
188:19 245:22,22
249:25 298:3
**release** 150:12

**released** 279:20
280:25 300:1,3
301:18
**relevant** 89:14,16
90:20 91:14
212:11,11 225:3,7
308:8,16,17,19
309:7
**reliability** 134:9
**reliable** 84:25 85:4
85:10,18,25 86:2,7
134:4 275:9
**relied** 95:4 184:5
**reluctant** 173:2
**rely** 94:25 95:8
188:12,18,18
290:6
**remember** 58:1
73:24 98:13,20
159:4,7 163:25
186:13,14 200:23
201:3 306:25
**remembering** 210:4
**reminded** 251:2
**remotely** 1:21 6:5
6:22 10:5
**remove** 301:16
**removed** 100:2
**renewed** 17:9
**Renwei** 183:16
**repeat** 9:11 47:13
86:10 97:8 104:15
109:16 131:11
168:6 263:22
308:11
**repeating** 210:14
272:5
**rephrase** 9:13 53:4
55:11 57:5 125:5
139:9 143:10
145:8 147:3 152:3
166:2 259:15
270:18
**report** 4:9 13:15,20
45:12 46:24 47:1,6
60:21,22 61:6,10
61:12,14,15 62:2

Case 1:17-cv-00124-LLS   Document 259-9   Filed 06/16/22   Page 107 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.

9/29/2021

[339]

65:16 70:12 80:17
80:23 82:13,20,23
83:1,2,4,12 84:15
86:1 88:2,25 93:21
94:3 95:2,20 96:13
96:18 97:15 98:19
99:7 105:9,22
106:14 128:16
129:8,12,13
130:10,14 131:2
150:18 151:17
158:8 160:20
162:14 171:21
174:4,17 186:1
189:15 194:15,25
195:6,25 204:16
214:10 215:6,21
215:23 216:14
218:7,14,19
219:12 225:20
229:9,23 240:11
240:17 241:7,21
241:24 245:13
257:5 260:21
265:9 270:1,14,20
274:9 277:11
278:11 282:8
285:21 286:19
290:1,13,14
293:10,12,17
**reported** 62:8
127:12,21 137:23
144:19 150:21
196:21
**reporter** 6:6,24 8:8
10:4,7 86:12
131:14,15 234:2
311:18,25
**REPORTER'S** 5:21
**reporting** 16:7
68:23 114:24
**reports** 16:11 45:20
81:5,7,10,11,12
85:15 198:11
290:12 292:4
**represent** 7:6 92:3
117:2

**representation**
235:21
**representing** 81:18
94:22
**reproductive** 15:25
17:18,22 20:20
22:7 38:17
**reputation** 67:14
**request** 9:21
**requested** 86:12
131:15 234:2
311:16,17
**require** 138:18
192:6 201:7 313:5
**required** 17:17
45:16 52:16 289:1
**requirement** 154:10
173:5
**requirements** 17:1
114:15 296:5,7
**requires** 116:24
200:22,23 201:3
302:12
**requiring** 154:9
**research** 15:15,17
15:18,21 18:6,12
19:16,17,18 20:2
21:19,21 22:18,21
23:16,17 24:2,3,8
24:10 25:8,20
28:22 29:21 31:5
31:10 32:3,10,19
34:11,15 35:1,6,9
35:12 40:6,13 43:7
71:16 73:10,17,25
74:17 77:19 80:12
80:15,18,22 98:5
100:23 101:1
122:11 153:4
178:13 179:4
203:6 231:21
296:17,25
**researcher** 65:5
**researchers** 26:17
65:9 66:4 86:5
87:8 132:11
155:19 164:18

167:19 175:1
177:11 207:9
236:4 262:22
266:22,25
**reside** 283:6
**resources** 165:7
261:10
**respect** 28:16 72:5
302:18
**respected** 174:10
**respond** 143:6 239:1
254:3
**response** 38:20
111:3 131:18
223:6 251:20
**responses** 42:17
54:7
**responsibilities**
23:16
**responsibility** 24:13
24:17,19 25:19
26:21 27:18
**responsible** 18:21
20:1 25:16 283:22
**rest** 49:5,5 138:25
**result** 17:10 68:4,14
70:9 72:10,20
73:22 76:11
152:14 161:6
174:9 183:6
185:17 191:7
197:15 203:10,11
203:12 209:18
210:21,22 211:15
211:16 212:4,6
301:10
**resulting** 286:12
**results** 19:8 41:3,11
59:12 61:11,12
62:7 65:21 66:16
66:23 67:1 73:12
74:24 76:5,6 89:12
89:14 91:13 93:18
95:9 96:24 101:11
102:24 103:9,13
106:18 115:3
129:7,13,20,24

134:2 139:6,18
141:25 142:5,10
148:4,25 151:25
154:14 165:2
166:11 167:1
168:8,9,20,21,24
169:23 170:18
175:7,8,17 178:8
195:13 196:25
197:22 198:15
199:20 201:16
203:24 206:3
210:11,12,24
211:13,18,22
228:14 248:2
265:2,7
**résumé** 34:3
**retained** 79:3,6,9,12
81:2
**retrospective** 268:6
**return** 204:16
**review** 29:23,23
35:20,21 36:13
81:4 83:16 89:11
90:19 91:12
125:23 155:24
159:8 160:3,13
248:14 251:4
265:19 267:11
269:2 293:12
311:16
**reviewed** 81:8,9
83:20,23 89:13,15
98:7,10 99:17,21
105:21 114:23
149:17
**reviewer** 35:17
**reviewers** 36:14
44:14 132:16,17
132:17
**reviewing** 83:21
99:16 122:2
295:17 296:11
**reviews** 36:15 80:16
**revised** 36:17
**right** 23:3 73:24
75:5,6 83:23 84:17

88:14 89:14
135:22 138:7
140:20 149:22
151:8,13 152:10
159:7,15 160:16
165:14 179:12
183:5 187:6
192:21 193:1
200:22 207:16
216:18 217:3,16
222:13,21 245:16
245:17 251:12,14
252:4 257:1 263:8
267:18,22 279:5,9
280:3,19 281:25
282:3,3 286:1
300:12,12 302:13
302:19 305:19
**right-hand** 11:19
141:12
**rigor** 151:18 152:19
152:22 154:12
176:11
**rigorous** 64:7,17
154:19 155:20,21
**risk** 183:21 207:10
246:6
**RKTC** 266:3
**RMR** 1:23
**role** 25:11 26:12,23
36:12 299:4
**Rome** 21:20 22:3,3
22:4
**RPR** 1:23
**rules** 313:5
**run** 10:23 236:16
**running** 19:14,21,23
25:21 284:25

**S**

**S** 2:1 6:1
**s/Gary** 311:24
**safe** 153:15 274:7
**safeguards** 149:8
**safety** 127:6,24
274:2
**Samavat** 4:20

Kurzer, Ph.D. - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                                     9/29/2021

[ 340 ]

**samples** 43:2 55:21
55:25 56:2
**San** 20:15,16,23
21:17,20,24 23:2,4
23:7,9
**save** 176:16
**saw** 11:19 60:8
228:18 232:17
262:22
**saying** 72:16 75:3
121:15 136:16
148:19 168:16
208:20 213:16
223:9 230:21
231:1 234:16
235:12 237:8,23
237:25 246:24
275:4 276:1,6
280:8
**says** 121:15 171:19
216:6 218:2
**Scale-Revised** 264:6
264:12
**Scandinavia** 258:11
**scenario** 237:16,22
**scenarios** 237:15
**Schneider** 1:23 6:25
311:3,24,24
**scholarship** 36:8
**school** 33:17 306:25
**Schwartz** 81:10
**science** 7:23 15:7,8
15:10,11,14 20:16
21:3 24:16,23,25
32:5,6 38:7,8,25
40:25 93:5,15
227:8 275:3 283:6
294:7,7
**science-based** 15:13
**Sciences** 35:25
**scientific** 31:2 35:18
75:9 84:25 85:5,10
85:18,25 86:2,7
114:23 150:17
151:17,19 154:12
155:23 274:13,21
275:6,9

**scientist** 18:12 20:21
75:19 92:9 165:6
276:2 294:4,15
295:12
**scientists** 21:22 75:7
75:8
**score** 139:5 140:14
215:3,4 216:7,11
218:3,4
**scored** 123:17
163:24 165:11
**scores** 112:15
137:18 142:19
143:14 144:1,13
**screen** 13:13 257:18
**screening** 49:18
50:2 112:15
121:12
**se** 160:2 296:10
**search** 31:14 88:7
88:13,14,18 89:1,9
89:12,17,24 90:3
90:10,13,17,22,23
91:4,10,14,17,21
92:2 93:18 94:7,12
94:20 96:25 97:5
97:10,16 98:22
99:4 118:5 159:19
160:9
**seaweed** 34:23
**sec** 265:4
**second** 21:24 89:24
96:15 143:10
150:7 158:12
179:17 184:23
213:6 215:17
225:24 229:15
246:9 251:16
264:8 265:2,6
274:11,23 285:17
**secrete** 288:12
**secreted** 283:8,16
284:3,10,15
**section** 36:9,12
96:13,20,24 97:6
97:11,14,15 99:10
115:4 172:5,6

179:15,18 183:6
197:16 204:20
241:15 250:13
270:14,20
**sections** 40:18
**secures** 147:21
**see** 13:12 22:9 28:10
34:2,8 42:1 55:4
67:13,22 68:4 77:8
79:11 84:17 88:11
96:19 97:19 99:12
99:15 100:9,20
101:19 105:6,18
106:21 107:5
110:4 114:22
140:1,24 141:16
141:16,18 143:23
144:11 146:10
150:19 158:12,16
172:21 173:11,12
173:23 174:1
178:16,21,25
179:7,14,18,21
182:9 183:7,9
184:25 186:5
187:17,18,19
190:16 192:7
196:4 197:17
198:1,4,18 200:3
202:24 203:3,23
203:25 204:2
205:17,17 206:2,4
206:9 208:7
211:12,13,18,21
212:23 214:7,20
214:23 216:20,24
216:24 217:23
218:1 226:1
229:12,20 231:18
231:18 232:5
240:4 242:3 247:9
248:17 252:5,9,18
256:8,24 261:20
263:13 265:5,6
267:21 268:19,24
269:14,15 270:7
277:13 292:11

301:18 302:3
305:17
**seeing** 90:5,5 191:21
231:7 232:18,24
239:13
**seen** 101:6 104:10
104:20 110:6
113:15 149:23
191:14 215:24
222:3 231:10
232:11,21 233:2
**segments** 279:19,22
280:24
**select** 48:7 160:4
**self-culture** 20:24
**seminars** 41:7
**send** 40:1
**senior** 24:15
**sense** 30:24 31:1
64:22 120:16
124:12 131:19
136:23 137:1
145:16 173:7
190:10,12 191:10
191:24 192:17
205:1,14 208:25
227:13
**sentence** 51:9 99:13
99:15 106:16
147:8 183:10
198:2,8 199:23
200:8,11,12
225:24 226:1
270:4 274:11
292:6
**separate** 16:20
116:23 264:25
273:6 312:10
**separated** 184:22
185:5
**separately** 119:19
**September** 1:22
6:19 313:2
**sequential** 230:11
231:11
**series** 9:10 39:21
**serious** 124:4

153:10,11,12
164:25
**seriously** 188:21
**serotonin** 284:10,11
288:10
**serum** 182:18
**served** 31:17 35:21
37:3,5
**service** 31:10,12
**Services** 107:5,12,18
108:4
**sessions** 31:2
**set** 158:14 159:3,10
165:18,19 168:17
170:7,9,22 185:20
238:21 239:25
**sets** 183:18,19
**setting** 159:24
**seven** 25:15 79:10
79:13
**severe** 121:17
123:24
**sex** 38:20 248:18
**shaking** 10:8
**sheet** 312:10 313:5
**shift** 17:11
**shifted** 23:18
**short** 192:13 284:25
**Shorthand** 311:25
**show** 70:21,23 71:20
99:21,24 100:11
101:23 102:24
165:16 172:13
191:14 203:23
205:18,21 206:11
221:15 223:12,14
224:19,21,24
225:1 228:15
242:6 246:20,21
249:4,18 250:19
250:21,24 251:10
251:14,15,18,21
252:2 254:13,15
259:6 260:24
262:16 265:10
267:19,24 268:10
268:15,22 269:4,6

Case 1:17-cv-00124-LLS   Document 259-9   Filed 06/16/22   Page 109 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021
[ 341 ]

269:6,6,8 270:14
270:20 271:2
**showed** 201:13
203:15,18 242:21
250:6 251:11
268:12
**showing** 11:16
70:11 100:16
191:16 203:25
204:2 206:7
227:22 231:9
244:9 259:1 271:5
**shown** 215:11 216:3
292:25 307:14
**shows** 66:19 70:22
205:19 213:17,19
224:23 232:16
249:10 254:24
268:3 271:20
293:5
**shreds** 253:24
**side** 141:12 266:16
272:10
**signal** 284:4 287:12
**signals** 284:6
**signature** 312:15
**significance** 66:22
67:4,8 68:20 69:18
70:13 71:24 72:2,3
72:4,7 73:6,21
74:4,23,23 75:7
174:24 198:21
199:6 200:6
206:10 212:20
223:14 224:20
228:7
**significant** 66:13,16
68:13,14 69:13
70:9 72:10,11,22
73:1,12,13 75:4
117:20 123:7,15
123:18 124:9,15
124:18,20 125:3,9
126:2 135:4
172:14,19 174:4,9
174:23 175:17
195:13 196:25

197:22 198:25
199:2,9,20,21
200:13,17,19
201:5,16,25
203:15 206:3,5
208:15,24 209:6
210:11 212:18
221:15 222:3
223:12 224:3,5,22
228:19 252:2
262:22
**significantly** 141:1
198:17,20,23
200:2 246:5
**signs** 160:25
**similar** 89:7 102:12
190:3 193:18,20
250:11
**similarity** 103:14
**simply** 208:20 295:6
**single-blind** 52:3
**sites** 46:21
**sitting** 165:3 305:10
305:20
**situation** 76:21
100:1 102:6
103:13 174:1,7
175:15,19,25
176:1,6 199:15,17
254:5 255:15
**situations** 64:3 76:4
76:4,23 77:10
85:14 98:15 99:1
113:4 114:13
128:14 164:19
172:16,24 173:14
254:8
**six** 16:22 17:3,3,13
17:15,17 210:12
221:16 223:13
**size** 199:3,4,4,8
**skeleton** 43:16
**slice** 101:3
**slightly** 44:23
140:23
**slow** 161:4 162:21
**slowing** 161:6

**slows** 162:23
**small** 16:22 17:2,5
17:13 29:18 33:7
33:10 49:3 209:19
209:21 210:6
257:18 282:21
283:18 292:13,15
301:17
**smaller** 254:1
**smokes** 77:3
**Soberats** 2:4 7:14
**socially** 161:3
**society** 35:24 36:1,3
36:6 37:2,3,8,11
69:24
**socioeconomic**
247:23
**soften** 228:9
**software** 112:16
**solely** 97:16
**solve** 27:17 55:19
**somebody** 123:17
124:7
**someone's** 37:23
176:16 248:5
**somewhat** 23:18
**sophisticated** 261:8
**sorry** 8:22 12:7 20:9
21:14 47:12 85:6
100:5,21 111:2
112:9 126:8
131:10 145:8
147:2 157:14
159:1 172:5
186:13 187:17
194:14 201:22
204:9 209:20
213:22 222:11
223:2 229:15
236:7 240:21
274:16,17,18
280:17 284:24
285:1,6,7 286:23
287:16 297:23
308:10 309:3
**sort** 41:1 69:19
168:6 226:9 247:8

**sources** 11:1 24:9
34:7 94:6 216:23
**Southern** 1:2 6:16
**soy** 28:6 34:9,18,23
34:24 35:2 154:24
155:1,4,6,7,14
156:19 181:5,5,8
181:15,17 292:23
298:18,19,21
299:24
**space** 115:9
**span** 264:10
**speak** 10:12 113:5
304:21
**speakers** 31:2,3,4
**speaking** 300:9,13
**specific** 12:16 38:15
79:17 112:18,22
116:16 119:5,15
138:14 139:5,15
140:14 141:17
142:1 150:21
201:24,25 243:20
**specifically** 113:7
176:8 199:18
201:10,11,15
234:16 285:25
286:3
**spectrometry**
303:18
**spectrum** 160:23
227:9 247:9
**spell** 13:4
**spelled** 5:24 108:15
303:10
**spend** 304:13
**spending** 25:5
**spent** 22:15 75:20
**spills** 282:12
**spits** 41:3
**spoken** 108:24
164:17
**sponsors** 32:20,23
**sponsorship** 24:7
**SS** 311:2
**stacked** 68:4 195:14
**staff** 19:19 169:16

304:12
**stand** 26:10 168:24
173:3 302:14
**standard** 183:25
207:14,15 234:13
234:19 253:21
272:18 305:1
**standards** 206:17,24
273:5 305:5
**standing** 71:8
**start** 9:3 13:25
44:22 136:25
264:1
**started** 14:20 23:4
56:14 61:2 150:10
151:5 261:19
**starting** 14:24 99:13
199:23 225:25
**starts** 96:17
**state** 1:5,7,24 2:18
6:12,13 7:5,18
13:4 14:10 34:7
59:24 84:23 88:6
117:24 126:23
132:4 136:2,4
204:20 222:25
264:16 265:3
268:15 270:4
277:7 311:1,4
**stated** 5:24 91:24
127:5 138:6
171:14
**statement** 63:9
82:15 198:3
210:19,20 275:10
**statements** 275:8
276:10 291:11
292:11
**states** 1:1 6:15 23:24
118:15 134:22
161:3 258:12
**statically** 191:22
199:20 200:19
201:16,25 204:7
204:11 206:2
208:15,24 221:15
223:12 224:3,5

Kurzer, Ph.D. - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

[342]

228:15
statin 185:5
statins 185:10,22
statistical 39:19
    40:6,21 42:4 55:24
    62:13,18 66:18
    67:4,7 68:19 69:17
    69:24 70:22 72:4
    95:13 119:1,5,15
    121:2 142:25
    143:4 178:8 184:2
    187:11,11 190:10
    191:11,14,16,19
    192:7,15 194:25
    195:6,12 196:2
    200:6 205:2,15,18
    206:9,13 208:14
    208:25 223:14
    224:19 228:7
statistically 66:12
    66:16 68:13 69:13
    70:8 72:10 73:12
    191:17 195:13
    196:25 197:22
    198:22 200:17
    201:5 203:15
    206:4 209:6 222:2
    224:21
statistician 147:24
    170:9,25 177:19
    177:24 180:13,18
    183:16 185:15
    188:12,18 189:9
    192:19
statisticians 25:24
    39:18,24 68:17
    69:23 70:2 172:17
    177:22 178:2,4,5
    205:4 231:10
statistics 39:14,16
    39:21 41:13,15
    42:6,6,11 56:5
    64:23,23 174:22
    184:18 186:4
    204:12
status 247:23
staying 92:14 150:8

151:2
stenographic 313:7
stenographically
    311:10
stick 54:21 168:18
stipulate 6:4
STIPULATION 6:3
stomach 282:21
    283:14,17 289:12
    301:17
stop 205:8 267:9
    283:12 284:2
stopped 128:10
story 208:15
stratification 53:17
    53:20,21,23 54:12
    56:8 61:4 136:19
    137:1
stratifications 54:9
stratified 54:15 55:1
    55:6,14 56:13
    136:23 185:1
    186:25
stratify 54:2
Street 2:22
strength 254:9
strengths 254:16
    269:13
strict 173:5 185:15
    231:15
strictest 64:22
strictly 64:24
    195:22
strike 59:15 85:6
    98:8 100:5 112:9
    126:8
strong 70:24 71:2
    253:12,16 254:21
    254:25 271:5,18
stronger 225:8
    252:24 268:9
strongly 103:1,6
    208:17 226:3,5,9
    226:13,20,25
structure 102:11
    103:14 163:20
    242:8,13,17,25

243:1,3,5,10,21
244:17 306:9
student 16:4 20:1
    39:22 40:19
students 25:22 26:1
    26:4,7 32:1,3,10
    32:12,16 33:17,24
    40:20,22,25 41:19
    41:25 92:18 179:7
    208:19 296:19
    297:10,11 298:8
studied 14:13
    118:17 299:8
studies 15:19 16:25
    19:25 20:24 21:7
    22:6,15 23:19
    26:22 27:12,22
    30:25 39:17 48:15
    50:3 53:14,14 64:9
    64:10 67:4,12,16
    67:22,23,24 68:5,6
    68:6,7 70:5 75:13
    75:21 76:6,8,10,10
    92:2 93:1,1 99:17
    99:21,24 100:7,24
    101:20,23 102:4
    103:10,11 117:23
    128:6 130:12
    152:20 154:25
    155:7,22 156:2
    168:18,23 174:11
    174:12 175:1
    180:21 184:11
    188:5 195:4 203:6
    230:25 241:20,23
    242:6,21 244:5,8
    244:13 245:4,16
    246:20,20,23
    247:4,12,18,25
    248:11 249:3,18
    250:3,18,23 251:1
    251:9,17,23 252:9
    252:23,25 253:4
    253:11,13,14
    254:6,13,19 255:2
    255:9,9,20 256:12
    260:23 262:16

265:9 266:23,24
268:4,6,9 269:3,3
269:10,12,14
271:15 281:18
292:25 293:3
296:2,3,4,8,9
298:18,22 299:8
299:23 300:15,18
300:22 301:4
302:5,8,10,12,17
study 14:11 15:24
    16:2,8,10,13,16,17
    16:20,22 17:4,5,6
    17:6,9,24 18:3,22
    18:23,23 19:5,8,9
    19:10,11 26:20,21
    26:25 27:4,5,6,8
    27:10,12,15,16,25
    28:5,6,8,16 33:11
    33:23 34:23 39:22
    40:9 42:23,25
    43:17 45:20 46:6
    46:15 47:10,16,20
    47:23,25 48:21
    49:3,11 55:7,14,16
    55:18,24 56:6 57:9
    57:10,21 58:14,22
    58:22,23 59:4,6,14
    59:21,23 60:11
    61:1,12 62:9 63:21
    65:20 76:11 93:9
    94:10 95:5,20
    101:6 104:11,20
    105:1 106:18
    108:19 109:1,5,22
    110:12,15,21
    111:7,9,14,23
    112:13,22 114:25
    115:1,8,12,25
    116:5 118:17,21
    120:4,12,19,23
    121:4,4,7 122:3
    126:1 127:18
    128:7,9,16 129:20
    129:25 130:10,11
    130:13 131:9,25
    132:4,23 133:20

133:24 137:5
138:7 139:5
142:18 144:12,25
145:5,11,12,13
146:13 147:13,22
147:25 148:13,17
148:22,23 149:9
149:12 150:10
151:4 152:23
154:6,8,13,15
155:15,16 157:2
163:22 164:6,23
165:10 167:4,9,12
167:13,18,22
168:8,10,12,13,16
168:20,21,25
169:3,12 171:10
171:15,16,17,18
180:1,11,13,24
181:3,19,25
182:12,14,23
183:14 184:14,19
185:8,25 186:2,8
186:17 187:12,24
188:10,23 189:3
194:19 196:8,9,15
196:24 199:18
212:16 231:5
232:10,25 235:6
235:16 236:4,13
237:3,6,9,12 238:3
238:18 239:14
240:3 241:12
245:19,20,21
246:4 247:5
248:22 249:9,24
252:12,13,13
254:12 255:11,12
256:6,11,17,17,18
257:3,4,8,10,11,12
261:9,10,23 262:9
263:2,6,7,15 264:3
265:1,14,17 266:8
267:17,23 268:2,7
273:25 295:25
298:12 299:5,21
301:14

FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

[ 343 ]

**Study's** 110:18
131:8
**studying** 66:20
181:7,14 295:18
296:12
**stuff** 61:16 130:18
131:1 307:4
**subarea** 38:22
**subareas** 38:15,25
**subgroup** 5:4 123:1
150:5,7,22 184:20
185:13 233:2
238:4
**subgroups** 57:1
61:24 120:3,9,11
120:16 233:16
**subgroups'** 233:3
**subject** 29:10 42:25
297:4 298:11
**subjecting** 203:8
**subjective** 103:8
**subjects** 21:5 55:20
135:20
**submitted** 54:23
293:13
**submitting** 64:6
**subsequent** 95:7
**subsequently** 278:3
**subset** 57:10
**substance** 106:9
107:16 108:1
109:10 182:3
183:20 281:16
304:16,17 305:2
**substances** 23:20
195:5 207:11
281:14,15 282:17
282:19 283:7
284:9 287:11
300:1,3 304:9
306:18
**substantiate** 153:4
**substantive** 46:4,4
46:10 47:4,7 60:21
61:5 62:1 63:3
**substitute** 15:3
**successfully** 102:18

**sufficient** 270:6
**suggest** 248:11
**suggesting** 244:14
244:15
**suggestion** 231:7
**suggestive** 103:1,6
226:4,6,13,21,24
227:2,24 228:3,6
228:12
**suggests** 176:9
226:8
**Suite** 3:18
**summarized** 80:17
80:22 271:20
**supervise** 36:12
**supervised** 19:11
**supervising** 25:22
25:25
**supplement** 9:17
28:18 78:22
118:15 126:22
152:25 153:16,17
156:20,25 157:8
174:15 176:2
270:5 272:13,21
273:8 299:22
300:5,7,10,23
306:4
**supplementation**
255:4 271:21
**supplemented** 255:6
255:7 261:6
262:23
**supplements** 23:21
38:16 156:10,19
176:8,13 207:5
272:8,18,22 273:5
273:7,20,23 274:6
274:6 300:15,15
301:5
**support** 34:5 87:8
163:4,8,10 291:11
292:6
**supported** 86:6
275:8 276:4
**supports** 276:5
**supposed** 120:4

**supposedly** 202:16
**sure** 10:14 15:22
32:7 33:2 44:1
48:15 50:8 51:21
52:1 53:3,5,6
55:20 57:8 78:6
79:5,16 80:5,9
87:21 91:19 98:15
99:1 104:4,18
109:19 125:7,14
127:2 131:11
139:12 147:6
151:1 152:6 158:6
158:24 160:10
165:14,14 168:5
173:13,25 175:20
184:8 218:10
228:25 243:1
263:23 264:24
265:15 279:8
285:2 289:3
290:19 308:14
**surprised** 132:10
234:14
**surprising** 258:14
**survey** 203:8
**Susan** 34:5,5
**suspect** 54:7 66:7
259:23,25
**swear** 8:8
**sworn** 6:5 8:13
311:7
**symptoms** 134:24
**synonymous** 124:14
**synthesis** 20:25 33:9
**synthesize** 288:13
**synthesized** 282:20
288:9,11
**system** 283:1,24
284:5
**systematic** 269:1

———————
**T**
———————
**T** 3:4 8:14 277:1
**table** 116:1,6,8
139:25 141:11
143:24 184:25

185:4 205:16
212:22 214:10
216:14 217:7
218:7,13 219:5,11
219:14,22 220:10
220:20 221:1,8,11
224:2,11,12,14
225:3,4,6 226:23
226:23,25
**tables** 212:22
**tablets** 11:2
**take** 9:19,23 27:17
40:12 57:21 69:1,7
77:6 78:3 140:18
145:17 155:5
173:2 175:13,14
177:23 185:3
188:20,25 209:16
209:17 222:1
226:20 257:24
**taken** 1:21 6:10 10:5
28:18 144:8
294:23 311:9
**talk** 11:13 29:17
42:3,7 68:18 75:6
151:2 193:6,14
195:25 196:7
208:16 297:12,13
**talked** 30:23 41:6
78:20 123:12
128:23 158:5
159:5,6 178:9
191:1
**talking** 26:13 72:6
153:7 157:2
163:21 167:12
176:1 199:17
204:25 209:8
210:4 212:8 288:2
295:4
**talks** 146:19
**tall** 192:12
**target** 258:16 259:4
259:9
**targeted** 239:7
**task** 116:11,17
214:20 217:23

**taste** 155:12
**taught** 24:12 29:1
32:2 40:15,17 41:8
41:15 92:17,18
294:24 296:18
297:4 298:1,5,5
**tea** 34:20 58:7,13,22
126:19,21,22
128:21 129:9,15
147:22 148:12
157:1 182:17,17
182:18,20 184:15
186:22 273:22,23
299:10,14,16
**teach** 24:11,11,14
29:12,17 32:12
38:11 41:18,19
208:19 296:23
297:6
**teacher** 15:3 307:1
**teaching** 24:17 31:6
31:22 40:19 42:9
**team** 25:20 27:2,14
28:13
**teams** 74:18 189:5
**tear** 253:24
**technical** 80:8
**technically** 254:23
**technique** 52:22
66:25
**techniques** 40:2
98:3
**teleconference** 6:23
**tell** 40:4 66:3 141:9
148:12 155:11
172:1 187:23
202:20 267:8
297:3
**telling** 229:25
235:10
**tells** 283:24
**ten** 24:18 25:6 31:23
37:10 67:25
254:19
**tend** 174:25 175:1
294:17
**tended** 268:12

Case 1:17-cv-00124-LLS   Document 259-9   Filed 06/16/22   Page 112 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                         9/29/2021

[ 344 ]

**Tennessee** 1:24
311:1,4
**tenure** 31:17,20
**term** 63:18 66:12
71:24 90:4,23
91:21 124:22
159:19,21 303:7,8
**terms** 53:10 80:8
89:2,17 90:11,13
91:2 135:7 148:25
161:3 251:18
**territory** 125:19
**test** 66:19 97:25
119:5 170:16
185:18 187:11
192:7,15 201:11
202:11,19 203:1
216:5,6 231:2
262:12
**testified** 8:13 139:13
159:13 167:24
**testify** 10:16 311:7
**testimony** 188:16
223:25 312:6
**testing** 59:24 86:3
87:6 98:3 178:18
266:6 301:9
**tests** 97:24 116:2
119:16,19 143:15
144:2,14 169:14
170:15 172:22
187:9 192:21
200:19,20 201:6,8
201:10,12,12
202:9,15,19,23
203:4,8,18,23,25
204:13 205:17
210:3,18 211:10
213:12,14 223:12
223:13 224:19
251:3 264:7,9,12
**textbook** 290:3
292:8
**Thank** 12:19 69:8
106:11 111:6
146:4 187:16
223:3 226:17

257:22,22 276:19
276:24 284:21,21
285:18 309:16,24
**thanking** 9:4
**theme** 175:6 177:6
**theoretical** 44:24
**Theoretically**
170:19
**theories** 306:11
**theory** 278:17 282:9
287:13,21 288:20
289:15 290:2,21
**thereof** 313:4
**They'd** 150:15
**thing** 37:10 48:23
67:7 83:22 102:24
103:16 131:5
150:18 162:7
171:19 202:16
209:11 213:14,15
218:15 239:17
254:20 266:19
283:14
**things** 9:6 21:15
22:2 30:8 41:18
42:23 47:2 52:1
58:14,21 59:10
67:8,10,10 68:11
83:24 92:17 142:9
153:7,8,20 158:5
160:15 178:9
189:1 190:17
192:3,22 193:17
201:3 202:8
243:19,20 248:8,9
248:13,19 294:12
294:16 304:24
**think** 12:25 29:17
33:24 48:12 52:14
53:25 54:14 55:23
56:4,4 57:17 58:17
64:2 65:16 67:25
69:2,3 75:21 76:2
76:21 77:12 78:3
79:22 81:11 89:19
94:20 100:8 113:1
113:3,13,14

125:10 130:8
131:18,22,25
132:14 137:1
138:6,18 142:6
143:2,18 145:4,17
145:20 148:19
150:10 152:20
154:8,22 155:19
157:17 159:5,5
160:5 162:16
163:2 168:20
171:8,14,17 173:1
173:3 174:4
175:16 176:19
180:25 187:7
190:25 191:5,9
192:10 193:10
195:2,20 199:14
207:13 210:1
212:10 214:12
224:2,12 225:4,6
228:2 232:17
237:14 238:15
239:3 240:7
251:22,23 252:1
257:15 259:3
265:20 271:10
272:6 274:5,5
275:2,5 278:10,21
279:7 289:18
290:10 291:7
292:2 294:15
297:14 300:6,13
301:12 302:13
307:19 308:7,15
**thinking** 28:5 71:13
164:21 185:10
280:21
**third** 282:13,15
**thought** 46:3 58:16
75:4 102:20 117:2
134:9 161:7 185:2
185:6,8 187:1
278:11 299:15
**thoughts** 193:19
201:2
**thousand** 126:20

173:25 188:2
195:8 270:5 304:8
**thread** 41:14
**three** 19:3 79:21
180:2,7 200:19
203:14 205:18
206:2,4 210:11
221:14,17,22,24
222:4 223:11
224:3,18 225:1
269:2 290:11
**threshold** 168:17
177:8 227:11,16
227:17,22 272:6
272:12,16
**threw** 268:7
**time** 6:20 10:12 25:6
29:24 32:1 57:22
58:3 60:9 67:21
82:20 93:3 114:22
121:13 130:25
134:11 158:20
159:6 164:21
193:18 208:19
236:6,9 245:21,24
252:17 253:1,2
256:10 276:20
284:19,25 304:13
309:17,18 311:10
**times** 35:19 48:25
73:18,19 298:2
**tissue** 100:1,3,6,7,13
**title** 118:14
**titled** 96:20
**TLCR** 1:23 311:3
311:24
**tobacco** 76:25,25
**today** 8:1 9:4,6,9
10:16 13:2 42:16
43:23 208:4
268:10 295:4
305:11,21
**today's** 6:19 10:25
**told** 70:4 106:1,2
159:9 166:22
**tool** 122:4,14,20,22
123:10,18 133:2

150:8 303:10
**top** 179:12 183:3
305:9
**topic** 36:14 75:8
88:8,15
**topics** 15:20 31:3
32:14 285:3
**total** 180:6 186:22
**totality** 206:15
244:9 251:24
258:25
**totally** 206:1
**tract** 282:21,25
283:9 284:4,11,16
287:11
**Trade** 1:4 2:7 6:11
7:10,12 277:7
**traditional** 30:21
**trained** 294:21
**training** 21:23 22:9
39:20
**trajectory** 162:21
**transcribed** 311:11
**transcript** 12:12,17
311:14,16 312:5
312:11
**transcription**
311:12
**transforation**
106:19
**transformation**
158:14,18,23,24
159:9
**trauma** 30:19,19
**travels** 283:19
**treatment** 49:10
51:8 53:1,10 66:20
137:15,19 139:3
139:20 140:13
143:23 148:6
149:1 157:4
186:24 208:21
217:9 218:23
219:21 220:20
223:19 226:4,8,13
228:12 256:7,8
**tremendous** 116:21

Case 1:17-cv-00124-LLS   Document 259-9   Filed 06/16/22   Page 113 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.
9/29/2021

[345]

116:25 254:9
**trend** 201:13 203:18
208:4,9,11 209:12
209:23 219:2,4
220:3,25 221:8,17
223:19,20 224:24
225:1
**trending** 209:9
210:23 212:17
223:15,16
**trends** 67:14,15
68:18,20 69:12
70:11,13,18,24,25
70:25 71:1,2,3,5
71:20 195:2,3,5,23
195:25 196:5
204:7,12,13,15
206:7,7 207:6,11
209:10 221:18,21
**triable** 36:8
**triacylglycerol**
180:5
**trial** 10:23 16:14,19
19:21 26:18 27:4
33:19 43:9,20,22
44:21 54:17,20
58:8 70:3 126:19
126:20 128:21
129:9,15 147:23
152:23 153:9,22
164:19 174:15,16
176:14 184:1
234:14 254:10
266:20,20 273:22
273:25 299:10
**trials** 18:10,13 19:15
19:23 22:19 25:9
25:12,16,21 26:13
28:21 39:3 43:25
46:16 54:19,20
55:23 58:2 75:12
75:16,17 76:3,17
76:22,24 77:5,14
77:15 92:24 128:3
156:14 168:19
173:14 176:11
187:25 253:17,19

253:24 254:1,14
256:5 271:2 273:4
299:13
**tribe** 30:10
**triglycerides** 186:23
187:5
**true** 67:1 68:4 76:9
178:21 208:24
225:25 279:18,18
311:13 312:5
**trust** 95:16 102:6
**truth** 185:16 311:7,8
311:8
**truthfully** 13:2
**try** 9:13 19:7 33:24
58:5,10 71:11,12
87:24 135:22
216:24
**trying** 130:20 165:6
244:21 257:18
280:23 300:20
**turn** 13:19 93:20
96:12 179:10
183:1 197:11
204:17 212:22
214:18 229:10
267:13 269:25
276:22 277:10
282:11 286:18
**turned** 50:16 258:2
**turns** 164:25 231:15
**twice** 31:18
**two** 16:19 19:2,3
21:15 22:2 23:5,7
23:8 51:9 77:2,6
79:21 116:9
121:21 128:21
188:4 192:3
213:23 214:16
216:13 217:23
218:2,6,16,21
219:5 220:9,20,25
222:14 223:10,14
224:24 237:14
257:16 261:7,11
262:12 287:21
297:9 300:21

**two-and-a-half-day**
30:14
**TWOB** 214:14
**type** 176:22 177:6
187:11 230:10,15
230:16 231:17
256:6 295:25
**types** 176:24 177:2
**typically** 258:19

___

**U**

**UC** 296:5
**ultimately** 185:14
**unacceptably** 33:22
**unblind** 148:23
149:13
**unblinded** 154:5
167:5,18 168:20
168:25
**unblinding** 148:8
**uncommon** 128:4
**undergraduate** 14:8
14:9
**underlying** 189:25
**understand** 9:12,24
10:9 11:5,6,10,25
12:2,21,23 20:10
41:5,25 42:5 43:13
44:15 80:8 92:25
93:6 116:20 117:1
125:15 131:4
197:18 206:14
207:8 211:5
237:21,21 238:10
244:12 273:17
278:20 290:19
307:10
**understanding**
41:10 53:22 63:15
63:17 72:1 88:14
93:5,13 97:22 98:1
106:23 116:14,19
117:4,5 123:22
126:2,5 130:3
134:20,21,25
135:10 140:11
142:13 153:1

159:13 165:17
171:9 172:23
192:25 227:21
281:13 288:6,25
294:15,19 296:21
307:9
**understood** 10:2
25:7 283:3,10
**underweight** 54:4
**Underwood** 3:15 8:6
**unethical** 267:1,10
**unfortunately** 17:8
33:21
**unheard** 128:11
**unique** 25:2 75:19
193:10
**unit** 16:24 17:3,8,8
**United** 1:1 6:15
161:3 258:12
**units** 261:7,25 262:3
292:14
**university** 14:10,21
15:8,10 16:23
20:15,22 22:12
23:10,13,14 24:15
24:21 31:7,12
33:17,25 88:20
296:19 297:10
**unnecessarily**
230:16
**unpublished** 94:22
95:1,3
**unreliable** 134:12
**unusual** 136:13
**up-to-date** 54:24
**update** 45:10
**updated** 45:15
**updates** 45:6
**upfront** 305:6
**upper** 192:13
**urine** 56:2 299:1,18
**use** 10:25 41:1 43:9
43:23 44:3 46:22
52:18,22 53:22
54:24 63:18 71:15
71:17 75:12 85:5
89:6 90:7,23 95:9

152:8 159:19,21
172:7 177:13
180:10,12,14,16
198:16 200:1
206:18 208:3
226:3 230:24
239:25 241:21
245:5 257:20
301:20 305:3
**useful** 227:7
**useless** 168:9
**usually** 55:17,23
66:18 89:6 132:18
136:16
**utilization** 296:9,25
298:2
**utilized** 306:22
307:15
**utilizing** 39:16

___

**V**

**v** 6:14 313:3
**vagal** 287:12,22
**vagus** 283:19 284:5
**valid** 276:10
**validate** 19:8
**validated** 98:1 203:5
**valuable** 60:16 71:4
**value** 71:1 143:5
**valued** 209:14
**values** 143:21
**variability** 70:7
104:1 114:18
195:11,15,18
207:9
**variable** 55:2
112:12,14
**variables** 67:16,18
67:20,25 113:19
113:24
**variance** 40:22
**variation** 46:7
**variations** 115:5
177:5
**varied** 45:4
**various** 14:20 20:25
40:2 42:23 79:7

Kurzer, Ph.D. - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                                      9/29/2021

[ 346 ]

90:24 97:25
114:10 156:21
**vary** 45:1 152:20
**vast** 259:8
**Vavrasek** 3:24 7:2
**Verbal** 116:24
**verbally** 10:7
**verification** 76:5
**version** 264:5
292:10
**versions** 177:6
**versus** 53:10 63:24
65:22 67:1 69:12
76:10,10 134:4
135:6 137:15
144:13 168:13
185:22 193:15
259:19 269:9
300:18
**video** 6:9,20,22 7:1
8:24 310:1
**Videographer** 3:24
6:8 8:7 78:10,14
157:19,23 194:7
194:11 229:1,5
269:18,22 276:13
276:17 309:10,14
309:25
**VIDEOTAPED**
1:20
**view** 92:3 172:17
177:20 207:14
224:16 258:25
**viewed** 121:17,18,19
129:17 135:11
267:10
**viewer** 93:25 257:20
**virtually** 48:16
**visual** 67:13 200:21
200:21,24
**vitae** 14:6
**vitamin** 35:12 38:2
88:9 90:23,24,25
91:4,8,13,13,17
240:18,22,24
241:8,11,15,21,23
242:7,12,21,23

243:2 244:1,6,10
244:17,18,23,25
245:5,23 246:3,5,7
246:10,12,14,21
247:2,6,9,10,11
248:5,9,9,20,23,24
249:1,4,10,19
250:1,3,4,6,7,15
250:16,19,20,24
250:25 255:3,10
256:2 257:13,17
257:25 258:1,2,9
258:13 259:1,7
260:25 261:7,20
261:23 262:1,17
262:23 265:10
266:5,12,15 267:1
267:9,20,24,25
268:13,16,22
270:14,21 271:21
**vitro** 21:6,6 33:11
68:6 76:10,11 93:1
99:14,17,20,24
100:7,24 279:2
**vivo** 279:2
**vocabulary** 264:9
**voice** 87:18,19
263:21
**vs** 1:10

─────────

**W**

**W** 3:3
**Wait** 246:8
**Wang** 183:16
**Wangen** 4:19
**want** 9:4,16 75:24
75:24 78:1 79:17
100:11 111:20
124:20 130:17
134:23 138:23
140:4 145:17
148:7 164:13
165:1 173:16,17
173:21,22,23,24
175:3,20 216:20
216:23 235:21
238:16 240:2

243:1 265:13
266:19 273:14
285:2,5,10,10,23
290:19 297:24
**wanted** 48:7 76:15
78:19 95:8 99:1
123:8 134:19
145:16 148:15,18
153:25 159:25
228:13 261:11
265:24 273:4
277:8 304:23
**ward** 18:24 19:3
**warrant** 46:11
**Warren** 3:6 7:29
**Washington** 3:9
**wasn't** 8:23 27:14
45:13 53:11
144:21 160:1,10
170:25 184:13
185:7 213:22
**way** 27:13 32:6,8
54:15 69:20 71:19
71:21 75:3 86:20
92:7 103:12 107:7
108:18 148:9
150:13 155:15,17
158:22 176:19,20
176:20 185:23
212:4 261:8 278:7
301:1,13
**ways** 42:7 136:7,13
147:20 253:17,18
301:19 302:4
**we'll** 11:21 78:8
165:1 297:14
**we're** 11:8 51:20,25
54:17 55:17,18
56:1 59:8 67:20
136:17 176:1
209:7 210:4 213:5
268:9 283:24
284:17,24 309:14
**we've** 12:11 30:12
30:23 31:1,2 68:24
145:14 155:8
208:3 226:11

268:9 283:3,13,13
284:2,8 289:18
**weak** 70:25
**weaknesses** 187:24
254:17
**websites** 136:10
**Wechsler** 264:6,12
**weeds** 132:19
**week** 10:23 11:19
54:23 297:14
**weeks** 17:15,17
261:5 297:9
**weigh** 69:12
**weight** 53:25 54:1,3
**welcome** 309:20
**well-done** 154:8
271:14
**well-known** 20:20
20:21
**well-respected**
177:21
**well-trained** 92:9
177:22
**went** 21:16 22:11
23:2 213:24 258:1
**weren't** 61:24 127:3
156:15,16 185:9
185:10
**wet** 21:5
**widely** 71:18 114:19
114:20 174:10
**William** 2:6 7:14
**wind** 161:5
**witness** 4:2 6:5 8:9
8:12 43:14 44:9
45:9,23 46:14
47:19 50:6 51:5,16
56:17 57:5,15 59:2
60:7 61:9 62:5,21
63:7 64:2,21 66:1
69:16 72:14 73:4
73:16 74:9,12
76:20 79:1 80:5,21
82:6,18 83:8 85:13
86:10,16 87:12
92:7 101:10 102:2
103:21 104:15

106:11 107:21
109:15 110:2,21
111:17 112:5
113:1,22 117:10
118:25 119:8,14
119:23 120:8,15
122:7 123:22
124:12 125:13
126:17 128:19
130:7 131:17
133:8,10 134:8
135:10 137:8
138:5,17 139:9,24
140:18 141:9
142:4,23 143:18
144:17 146:3,19
147:2,19 150:1,25
152:3,17 154:22
156:13 157:10,12
163:2 164:3 166:8
166:22 167:17
169:6 170:4 171:5
172:1 177:17
181:11 182:7
186:12 188:17
190:9 192:6
196:18 198:1
199:12 202:6
206:23 207:24
210:1 212:2 214:5
215:16 219:1,17
220:13,23 221:11
223:2 224:1
226:15,19 227:6
228:2 230:20
232:15 233:6,13
233:21 234:6
235:1,10 238:13
241:3 243:14
244:5 245:3
247:17 249:8
253:8 259:15,23
260:9 270:25
275:18,20,24
276:24 279:16
280:13,17,20
287:4,7 288:1,24

Case 1:17-cv-00124-LLS   Document 259-9   Filed 06/16/22   Page 115 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    9/29/2021

[ 347 ]

292:18 293:19
295:10,22 296:16
298:17 301:1,12
302:21 306:16
308:4,10,19 309:1
309:19 311:6,22
313:1
**witness'** 188:15
223:24
**woman** 17:13 267:8
**women** 16:1 17:22
17:23 28:9,10
38:19 50:10
182:19 184:21,22
188:2 266:4,9,11
267:4 296:5
**wondering** 158:17
**Wone** 2:3 4:5 7:8,9
8:15,22 12:6,9,18
12:20 13:11 43:18
45:3,17 46:8 47:8
47:13,14,21 50:22
51:11 52:7 53:4
55:11,12 56:24
57:7 58:20 59:13
60:18 61:22 62:11
63:1,10 64:15
65:19 66:10 68:24
69:5,10 71:14
72:23 73:9,23
74:14 75:1 77:25
78:8,16 79:2 80:11
80:24 81:23,24
82:1,12,24 83:14
84:7 85:16,23
86:11,24 87:13,21
87:24 88:1 93:16
96:11 100:19
101:13 103:4
104:8,16,17 105:5
105:17 106:12
107:24 108:23
109:16,18 110:3
111:1,21 112:8
113:16 114:2
118:2 119:3,9,17
120:1,10 121:5

122:9 124:6 125:1
125:6,24 127:11
129:4 131:6,13
132:2 133:18
134:14 135:16
137:12 138:11
139:2,10,11
140:10 141:2,13
142:12 143:8
144:10,20 145:8
145:10,14,19,23
146:5,9,21 147:4,5
149:6 150:3 151:6
152:5 154:16
156:1,23 157:13
157:17 158:1,3
163:15 164:7
166:2,3,17 167:3
167:14,23 168:1,1
169:24 170:23
171:7 172:3
178:11 179:3
181:13 182:8
186:15 189:13
190:19 192:24
194:5,13 196:12
196:13,22 197:8
198:6 199:13,14
199:16 201:20
202:7 204:8
207:17 208:1
211:1 212:2,14
214:6 216:8
217:13,20 218:10
218:11 219:3,10
219:18 220:1,8,15
220:24 221:6
222:6 223:5 225:9
225:18 227:1,20
228:16,23 229:7
229:19 230:22
232:4,19 233:8,15
233:23 234:1,6,9
235:4,13,18,20
236:1,7,11,18
237:2,11,16,18,24
238:15 240:10

241:5 243:16
244:22 245:8
248:3 249:13
255:1 256:23
259:17 260:3,19
263:12,20,23,24
269:16,24 271:24
273:16 276:11,19
276:25 300:13
**Wone's** 109:12
**word** 53:22 143:1
160:16 189:20
204:10 226:8,20
227:6,7 228:3,6,9
242:14 307:2
**words** 89:23 247:7
**work** 14:20,24 15:2
20:3,16 21:6,6,9
21:12,14,18 23:1
23:12 26:8,16 29:4
29:18 30:4,6,9
31:8 32:6 33:13
35:14 36:6,8 38:19
40:9,10,10 41:2
55:22 62:24 68:17
70:3 79:25 81:20
83:15 93:4 108:9
122:20 146:1
174:1 189:5 207:3
207:3 288:14
291:18 292:2
293:21
**worked** 16:9 18:12
19:12 20:19,21
22:3,12 28:22
39:17,23,23 49:9
50:3,23 51:12 52:8
52:24 54:11 56:10
59:16 62:12 70:2
113:17 156:8,14
156:15,24 178:3
187:22
**working** 22:15
25:17,23 27:24
71:10 75:20 77:21
149:14 170:8,22
177:20,25 180:14

180:16,17 183:15
188:11 193:13,14
193:18 194:2
**world** 212:9 283:6
**worried** 154:2 176:5
176:6
**worth** 68:22
**wouldn't** 13:1 45:10
45:11 61:13,18
71:1 73:7 74:13
75:6 77:1 114:16
138:24 142:8
151:20 153:18
156:7,7 163:3,3,10
169:19 176:6
188:17 209:12,14
210:21 222:7
251:21,25 267:11
305:8
**write** 26:6,7 29:7
46:25 48:9 49:4,5
130:16 215:7
**Write-up** 4:15
**writing** 25:16,25,25
26:4 27:7,18,20
29:20 60:9 82:25
89:16 92:13 113:9
114:13 191:16
215:23
**written** 27:6 44:12
44:14 48:3 49:13
49:18 52:18,19
57:24 80:17 85:15
95:8 165:18 198:8
228:10
**wrong** 246:9 292:4
**wrote** 16:11 29:4,7
82:20 83:2 106:17
215:9 216:10
278:11 290:11

---

**X**

**X** 4:1 8:14 277:1

---

**Y**

**yeah** 69:5,6 180:25
190:21 194:21
216:17 264:8

297:22 303:7
306:7
**year** 21:18,19 22:15
37:7,7,11 46:25
79:21 126:21,22
146:22 147:7,10
266:6,7
**years** 18:10 23:5,7,8
23:11,17,18 24:19
25:6 29:5,9 31:23
54:20 56:21 79:7
79:10,13,21 179:7
266:4 307:8
**Yep** 178:24 197:14
**York** 1:2,6,8 2:19,23
2:23 3:8,8,19,19
6:12,14,17 7:18
14:10 277:7
**young** 15:25 17:22
22:17
**Yuan** 183:17

---

**Z**

**zero** 174:24 262:14
262:14 267:7
**Zoom** 6:22

---

**0**

**0** 137:18 138:1,24
139:15 141:14,18
141:23 201:22
**0-1** 135:6,11 140:20
140:23 141:12
150:5 151:10
199:24 221:12
223:8 225:10
232:16
**0-2** 120:21 121:7,19
121:25 123:1
125:16 134:16
135:2,6,13 136:24
137:3 138:22
140:2,7,24 141:4
142:1 143:24
150:14 151:8
198:16 200:16
201:15,24 224:15
232:16 233:14

Case 1:17-cv-00124-LLS   Document 259-9   Filed 06/16/22   Page 116 of 120
Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

[348]

234:22
**0-8** 201:22
**001_AdvMindBo...**
    4:12
**01** 70:1
**042_detert2013.pdf**
    4:10
**05** 4:12 66:18,21
    69:22,25 70:9
    71:15,18 212:5
**050_Eichstaedt20...**
    5:3
**070_Grung2017.p...**
    5:7
**077_Hu2018.pdf**
    5:8
**092_Lerner(2016)...**
    4:11

_____ 1 _____

**1** 4:13 6:9 53:11,11
    70:1,5 116:1,6,8
    137:18 138:1
    139:15 140:12
    141:4,6,19,23
    205:16 212:22
    214:10 216:15
    217:7 218:7,13
    219:6 224:12,15
    225:3,6 226:23,25
    230:15 277:11
**1:01** 157:22,24
**1:17-cv-00124-LLS**
    1:11 6:18
**1:51** 194:8,9
**1:52** 194:10,12
**10** 4:9 87:15 88:2
    118:19 270:14,20
**10:09** 78:11,12
**10:28** 78:13,15
**100** 4:10 110:23
    111:4 275:2
**10005** 2:23
**10006** 3:19
**101** 3:7
**10178** 3:8
**105** 4:11

**11** 5:8 194:15
    204:18 238:1
    264:7,9
**110** 4:13
**12** 212:22 262:21
**12:15** 157:20,21
**13** 4:9 219:12
    277:12
**14** 240:14 241:15,16
    282:12 285:21
**146** 4:15
**15** 4:5 241:18 242:2
    254:19
**150** 100:10 297:11
**16** 4:12 245:12
**160** 100:10
**1600** 3:18
**1673** 183:1
**1679** 184:25
**17** 241:7 248:17
**179** 4:19
**18** 4:10 5:3 261:5
**1800s** 306:22
**181** 262:18
**182** 4:20
**1970s** 306:23
**1973** 14:16
**1990s** 272:21

_____ 2 _____

**2** 4:6,19 53:9,9 70:5
    123:15 124:1
    137:18,22,25
    138:1,1,2,2,13,23
    138:24 139:4,14
    139:15,21,25
    140:14 141:5,11
    219:11,14,22
    220:10,20 221:1,8
    221:11 224:11
    225:4 226:23
    230:16 231:17
**2-5** 165:15
**2,000** 262:3
**2:36** 229:2,3
**20** 164:12 179:7

292:8
**20-year-old** 292:8
**200** 111:11,24
**2000** 266:5
**2001** 4:19
**2009** 145:1
**2010** 147:12,14
**2011** 145:3
**2016** 4:20 241:10
**202** 2:10,12,14
**2021** 1:22 6:20
    311:22 313:2
**20850** 2:9
**21** 252:5
**212** 2:24 3:9,20
**214** 4:21
**22** 5:7
**227** 179:10,13
**229** 5:3
**23** 162:11
**232** 5:4
**24** 140:21 161:13
**25** 160:19 164:12,14
**256** 5:7
**26** 255:17
**263** 5:8
**277** 4:6
**28** 2:22 97:18
**29** 1:22 313:2
**29th** 6:19

_____ 3 _____

**3** 5:4 87:16 123:13
    123:18,23 125:18
    137:22,24 138:1,1
    138:2,12,23 139:4
    139:14,21 140:14
    141:5,23 163:24
    165:11
**3-5** 232:17
**3:07** 229:4,6
**30** 23:11,17,18
    56:21 99:7 101:17
    101:23 127:20
    174:16 266:14
**30-day** 131:23
**326-2921** 2:12

**326-2934** 2:10
**326-3126** 2:14
**33** 106:13 107:5
    158:10 198:12
    199:23 200:12
**35** 274:19,19 286:20
**37** 93:20,22 94:2
    140:22 274:19
    286:20

_____ 4 _____

**4** 4:11,21 53:9,9
    96:13,17,20 97:6
    97:11 105:24
    123:14 141:23
    214:18 217:22
**4,000** 33:8 261:6,25
    262:14 266:6
**4:09** 269:19,20
**4:10** 269:21,23
**4:18** 276:14,15
**4:40** 276:16,18
**40** 17:16 110:23,24
    111:5 174:16
**400** 261:6 262:13,20
**416-6189** 2:24
**43** 292:23
**45** 3:18
**47** 189:17,19,22
    229:10

_____ 5 _____

**5** 58:8 66:23 97:14
    97:15 119:2 126:3
    141:11 184:25
    197:11 311:22
**5:17** 309:11,12
**5:26** 309:13,15
    310:3,4
**50** 14:1,1 32:1
    174:16,20 204:18
    208:2 257:23
**500** 195:9 270:5
**52** 225:19
**55** 266:3
**56** 277:11,17 282:8
    287:17 290:1,1
**57** 285:21 291:21

**58** 266:4

_____ 6 _____

**6** 4:20 58:8 97:15,19
    99:10 185:4
**60** 127:21
**60-day** 4:16 131:23
**600** 2:8 30:14 266:5
**61** 242:2
**63** 245:10 246:1,20
    249:4
**64** 249:15,17 250:4
    250:10,19,24
    251:10,18
**65** 14:1
**66** 252:5,8 253:4
    255:3,10
**67** 255:17 260:21,24
    262:16 265:8
**676** 311:3,24
**67B** 256:12 257:4
**67c** 261:4
**67D** 262:18 263:16
**68** 267:14,24
**69** 268:14,22

_____ 7 _____

**7** 4:21 121:17
**78** 270:1

_____ 8 _____

**8** 4:5,15 84:15,18,19
    87:1 121:17 172:5
    172:6
**8:32** 1:22 6:21
**80** 274:14,15
**808-7800** 3:9
**80s** 306:23
**82** 261:5 286:19
    287:3,5 289:10
**84** 274:8,16,17
**8D8** 138:1

_____ 9 _____

**9** 84:23 86:1
**90** 127:22 145:13
    171:10,19
**90-day** 131:25

Kurzer, Ph.D. - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    9/29/2021

171:15,17
**908-1331** 3:20
**95** 110:23,24 111:5

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FEDERAL TRADE COMMISSION and

THE PEOPLE OF THE STATE OF NEW
YORK, by LETITIA JAMES,
Attorney General of the State of New York,

        Plaintiffs,

        v.

QUINCY BIOSCIENCE HOLDING
COMPANY, INC., a corporation;

QUINCY BIOSCIENCE, LLC, a limited
liability company;

PREVAGEN, INC., a corporation
d/b/a SUGAR RIVER SUPPLEMENTS;

QUINCY BIOSCIENCE
MANUFACTURING, LLC, a limited liability
company;

MARK UNDERWOOD, individually and as
an officer of QUINCY BIOSCIENCE
HOLDING COMPANY, INC., QUINCY
BIOSCIENCE, LLC, and PREVAGEN, INC.;
and

        Defendants.

Case No. 1:17-cv-00124-LLS

**ERRATA SHEET FOR THE TRANSCRIPT**
**OF THE DEPOSITION OF MINDY KURZER, Ph.D.**

I, Mindy Kurzer, hereby make the following corrections to the transcript of my deposition, which occurred on September 29, 2021:

| PAGE | LINE(S) | CORRECTION | REASON |
|------|---------|------------|--------|
| 14 | 16 | Replace "1973" with "1974" | Incorrect |
| 20 | 24 | Replace "self-culture" with "cell-culture" | Transcription error |
| 22 | 13 | Replace "Loris Garby" with "Lars Garby" | Transcription error |
| 34 | 19 | Replace "and" with "of" | Transcription error |
| 36 | 8 | Replace "triable" with "tribal" | Transcription error |
| 65 | 13 | Replace "conscious" with "conscience" | Transcription error |
| 102 | 19 | Replace "canines" with "canine" | Transcription error |
| 115 | 4 | Replace "message" with "methods" | Transcription error |
| 155 | 8 | Replace "casing" with "casein" | Transcription error |
| 180 | 6 | Replace "ADL" with "LDL" | Transcription error |
| 183 | 17 | Replace "Jiam-Min" with "Jian-Min" | Transcription error |
| 204 | 5 | Replace "then" with "when" | Transcription error |
| 246 | 4 | Replace "enhanced" with "NHANES" | Transcription error |
| 265 | 6 | Replace "referred" to "refer" | Transcription error |
| 266 | 3 | Replace "RKTC" with "RCT" | Transcription error |

1

| 283 | 8 | Replace "?" with "." | Incorrect. |
|-----|---|------|-----------|

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 29, 2021.

_____
MINDY KURZER

2