# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FEDERAL TRADE COMMISSION and | Case No. 1:17-cv-00124-LLS |

FEDERAL TRADE COMMISSION and

THE PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York,

      Plaintiffs,

      v.

QUINCY BIOSCIENCE HOLDING COMPANY, INC., a corporation;

QUINCY BIOSCIENCE, LLC, a limited liability company;

PREVAGEN, INC., a corporation

d/b/a/ SUGAR RIVER SUPPLEMENTS;

QUINCY BIOSCIENCE MANUFACTURING, LLC, a limited liability company; and

MARK UNDERWOOD, individually and as an officer of QUINCY BIOSCIENCE HOLDING COMPANY, INC., QUINCY BIOSCIENCE, LLC, and PREVAGEN, INC.,

      Defendants.

Case No. 1:17-cv-00124-LLS

**RESPONSE OF MARY SANO, Ph.D. TO EXPERT REPORTS OF DAVID L. KATZ, MD, MPH; MINDY S. KURZER, Ph.D.; DAVID H. SCHWARTZ, Ph.D.; AND DOMINIK D. ALEXANDER, Ph.D., MSPH**

## I.    SCOPE OF RESPONSE

1. The FTC and NYAG have asked that I evaluate four expert reports, submitted by the defendants in this case, addressing the question of whether there exists competent and reliable scientific evidence to support the claims that Prevagen improves memory,

1

reduces memory problems associated with aging, or provides other cognitive benefits ("the challenged claims").

2. In preparing this rebuttal report, I reviewed the April 22, 2021 expert reports of David L. Katz, MD, MPH; Mindy S. Kurzer, Ph.D.; David H. Schwartz, Ph.D.; and Dominik D. Alexander, Ph.D., MSPH, from my perspective as an expert in the fields of memory, cognitive impairment, neurosciences of aging and dementia, and clinical trials (design, implementation, and interpretation). My credentials and expertise are described fully in my April 22, 2021 expert report in this case and the accompanying curriculum vitae.

## II.    SUMMARY OF CONCLUSIONS

3. Having reviewed the defendants' expert reports, I find no basis for revising my original conclusions that there is no competent and reliable scientific evidence to support any of the challenged claims, including claims that Prevagen improves memory or provides any other cognitive benefit. Specifically:

   a) The major flaws in the design, implementation, and data analysis of the Madison Memory Study make its purported findings wholly unreliable.

   b) Even if one were to accept its findings as valid, the Madison Memory Study wouldn't support the challenged claims because there was no statistically significant benefit of apoaequorin over placebo for any cognitive task in the study population as a whole. This is specifically stated in multiple write-ups of the study results.[1]

---

[1] M. Underwood et al., The Effects of the Calcium Binding Protein Apoaequorin on Memory and Cognitive Functioning in Older Adults, Quincy Bioscience, LLC (2014), at QUI-FTCNY-00091507; K. Lerner, Clinical Trial Synopsis QB-0011: Madison Memory Study: A Randomized, Double-Blinded, Placebo-Controlled Trial of Apoaequorin in Community-Dwelling, Older Adults, Quincy Bioscience, LLC (2016), at QUI-FTCNY-00003700.

c)  The Madison Memory Study results purportedly showing a benefit of Prevagen in two subgroups of normal to mildly impaired adults also are unreliable because they are based on improper, extensive, and statistically flawed unplanned *post hoc* mining of the data after the study as a whole failed to produce any statistically significant results.

d)  Even if the subgroups had been prespecified as the study's target population, the results of the subgroup analyses would be unreliable because the study authors failed to properly correct for the multiplicity of outcomes.

e)  At least one well-conducted, randomized, placebo-controlled study on humans is necessary to support the challenged claims.  Studies that lack a placebo-control, use only self-reported subjective outcome measures (*e.g.*, quality of life questionnaires), or examine an effect on animals do not constitute competent and reliable scientific evidence sufficient to support the challenged claims.

f)  There is no basis to believe that the addition of Vitamin D to Prevagen products in 2016 would result in improvement in memory or provide any other cognitive benefit in aging adults without significant cognitive impairment.

   i.  The large majority of studies cited by Dr. Kurzer in favor of her argument that Vitamin D supplementation benefits memory and cognition are observational studies.  Such studies do not show causation; rather, they provide only preliminary evidence that researchers must follow up with randomized, controlled trials (RCTs) to establish a causal effect.  In fact, there are many examples of results from observational studies—including

3

some involving Vitamin D supplementation and cognition—not being borne out by subsequent RCTs.

ii. The four RCTs that Dr. Kurzer cites as support for her argument regarding a positive effect from Vitamin D supplementation do not constitute competent and reliable scientific evidence supporting the challenged claims. The studies suffered from significant flaws, reported inconsistent results, and/or involved specific populations, so their findings cannot be extrapolated to a more general population.

4. I also disagree with Dr. Katz's assessment of Prevagen in relation to the factors he lists as part of his Clinical Utility of Research Evidence. (Katz at ¶¶ 45-49). In addition to taking issue with the assertions that the efficacy of Prevagen is "suggested" and that the science behind Prevagen is "supportive," I disagree that there are no other options superior to Prevagen for people concerned about their memory or cognitive function. There are many possible causes of cognitive impairment, including depression, medication issues, cerebrovascular events, thyroid dysfunction, and hypoperfusion from heart failure. A qualified clinician would be able to use a broad array of tools—including blood work, brain imaging, medical history research, and thorough neuro-psychological evaluation—to diagnose and potentially treat these causes. Additionally, as Dr. Katz acknowledges, there is "some evidence that diet and lifestyle interventions can reduce the risk of developing MCI and the risk of progression to dementia." (Katz at ¶ 44). There is a danger that persons suffering from memory or cognition deficit might delay or completely forgo seeking help from qualified clinicians and receiving effective treatment in favor of taking Prevagen.

### III.    MADISON MEMORY STUDY

a.  <u>Target Population</u>

5.  Dr. Katz suggests that the subgroups of subjects with AD8 scores of 0-1 and 0-2 in fact were the original target population of the Madison Memory Study and that the subjects with AD8 scores of 3-8 constituted a "supra-sample" or "expanded group" outside the intended population.  (Katz at ¶ 55).  Additionally, Drs. Schwartz and Alexander seem to imply that the subgroups were prespecified, as they state in describing the structure of the Madison Memory Study that a "cutoff" score of AD8 2 was used to distinguish between cognitively normal subjects and those with a higher level of impairment.  (Schwartz at ¶¶ 20, 27; Alexander at ¶ 9).  To the extent that these experts do intend to suggest that the subgroups were the study's original target population or were prespecified, their opinions are belied by the evidence, including the defendants' own documents.  For example, their views are inconsistent with the written reports of the study, which refer to both 211 and 218 subjects.[2]  They also conflict with the testimony of the principal investigator of the Madison Memory Study, Kenneth Lerner, who testified there were as many as 273 enrolled subjects.[3]  While the study protocol refers to 100 subjects, it makes no mention of screening subjects by AD8 score or dividing the subjects into subgroups (primary or otherwise).  Dr. Katz admits that "there is a legitimate question as to why the authors enrolled individuals with higher AD8 scores if the intended target population was individuals with minimal to no impairment."  (Katz at §IX.b).  He states that, because the

---

[2] K. Lerner, Clinical Trial Synopsis QB-0011: Madison Memory Study: A Randomized, Double-Blinded, Placebo-Controlled Trial of Apoaequorin in Community-Dwelling, Older Adults, Quincy Bioscience, LLC (2016), at QUI-FTCNY-00003699 (stating that 218 participants were enrolled in the study and 211 participants completed the study).

[3] Deposition of Kenneth Lerner, August 6, 2020, at 43.

authors first obtained individuals' consent to participate before screening for AD8 scores, it might have been problematic to explain to persons scoring between 3 and 8 on the AD8 screening interview that they couldn't participate because they weren't cognitively "normal." (*Id.* at n.5)  As an expert in the fields of clinical study design and implementation, however, I can state that it is standard practice when conducting human clinical trials to first obtain consent from persons willing to volunteer for the trial and to then exclude those persons who do not meet the study's screening criteria.  In my 30 plus years of experience in the fields of clinical study design and implementation, I am not aware of any instance in which persons conducting a study knowingly included subjects who were not part of the intended target population, let alone doubled the size of the subject group by doing so.

6.  The fact that Mr. Lerner did not describe stratified randomization by AD8 score, or by particular combinations of AD8 scores, also suggests that the AD8 subsets were not the primary focus of the study.

7.  My opinion therefore remains that the defendants' analyses of the results for the AD8 0-1 and 0-2 subgroups were unplanned *post hoc* analyses, conducted after the Madison Memory Study failed to find a statistically significant difference between the Prevagen and placebo groups in the study population as a whole.  For the reasons cited in my initial report, results of unplanned *post hoc* analyses do not constitute competent and reliable scientific evidence sufficient to support the challenged claims.

    b.  <u>Need to Correct for Multiplicity</u>

8.  Even if the defendants had prespecified the AD8 0-1 and 0-2 subgroups as the intended target population, the results for those groups would have no validity because the

defendants failed to correct for the study's multiple outcomes. As noted in my initial report, by looking at multiple outcomes among the Cogstate tasks and various subgroups, the study authors greatly increased the probability that they would find a positive result by chance alone.

9.  Drs. Katz and Kurzer argue that use of the Bonferroni correction is not appropriate because the Cogstate tasks are correlated. (Katz at ¶¶ 57-61; Kurzer at ¶ 47). However, even though the Bonferroni method is conservative in that it preserves the study's Type I error rate ("alpha") for all outcomes, it is statistically valid even with correlated measures. Furthermore, if the defendants believed that the tasks were correlated, they could have used a composite score for all tasks, or for all the memory-related tasks, a method that is described in Cogstate's analysis guidelines.[4] Having chosen instead to look at the outcomes of individual tasks, the defendants were obliged to correct for the multiple outcomes that entailed.

10. Dr. Katz states that a "seemingly unrelated regression" ("SUR") analysis is more appropriate than the Bonferroni method when multiple outcomes are correlated. (Katz at ¶¶ 35-37, 61). Even if this is true, the study's authors should have prespecified its use in the study protocol. Failure to prespecify a method allows researchers to "shop" among various methods to find one that produces a favorable result. Additionally, I can state that I have not come across a SUR analysis in my over 30 years of working and researching in the areas of memory and cognition.

---

[4] Cogstate Research:  Guidelines for Analysis, Version 2 (Feb. 2020), at COGSTATE 0000025-26.

11. Dr. Kurzer states that, instead of performing a correction for multiplicity, one should "investigate the individual test results." (Kurzer at ¶ 50). However, even this approach fails to reveal credible evidence that Prevagen benefits memory. If Prevagen truly provided a benefit to memory and cognition, one would expect there to be a statistically significant benefit for most, if not all, of the relevant Cogstate tasks. Additionally, one would expect there to be similar scores for tasks of a similar nature, *e.g.*, the recall tasks, which are two of the tasks that measure memory most directly. As explained below, however, neither was true for the Madison Memory Study.

    a) First, for each of the two subgroups (AD8 0-1 and 0-2), there purportedly was a significant result only for three of the nine tasks. Additionally, only one of these tasks was the same for both groups, which is particularly unusual given the overlap in membership between the groups.

    b) Second, of the six purported statistically positive results between the two subgroups, only one was for a recall task, which most directly measures memory, and it was positive in only one of the two subgroups.

        i. As background, the Cogstate tasks that measure memory most directly are the One Back (ONB), Two Back (TWB), International Shopping List - Delayed Recall (ISRL), and Groton Maze Learning - Delayed Recall (GMR) tests. Three other Cogstate tasks measure learning: the International Shopping List (ISL), One Card Learning (OCL), and Groton Maze Learning (GML) tasks measure verbal learning, visual learning, and executive function (akin to strategizing to learn), respectively. The Identification task (IDN) measures attention, which is necessary for

8

learning. While the ability to learn is a necessary part of having an effective memory, improvement on these learning-related tasks would not necessarily indicate an improved memory. Finally, the Detection test (DET) measures psychomotor function, which is not directly related to memory.[5]

    ii. Of the three tasks for which there purportedly was a statistically significant effect in the AD8 0-1 subgroup (GMR, DET, and OCL), only one, GMR, directly measured memory. For the AD8 0-2 subgroup, *none* of the three tasks purportedly showing a statistically significant beneficial effect (GML, IDN, OCL) directly measured memory. Thus, even accepting the validity of the subgroup findings (which I do not), there was a statistically significant effect for only 1 of the 8 outcomes most directly related to memory for the two subgroups.

c) In sum, the inconsistency and unexpected nature of the Madison Memory Study results further undermine the conclusion that Prevagen confers a memory or cognitive benefit.

12. Dr. Kurzer also states that the subgroup results for some of the tasks showed a "non-significant trend toward efficacy." (Kurzer at ¶¶ 50, 52). This phrase has no scientific meaning; results that do not reach statistical significance do not constitute competent and reliable scientific evidence of efficacy.

---

[5] K. Lerner, Clinical Trial Synopsis QB-0011: Madison Memory Study: A Randomized, Double-Blinded, Placebo-Controlled Trial of Apoaequorin in Community-Dwelling, Older Adults, Quincy Bioscience, LLC (2016), at QUI-FTCNY-00003697 (Table 1) (listing domains measured by the Cogstate tasks).

13. Finally, with regard to the results of the Madison Memory Study, I see no evidence that any purported improvements on the Cogstate tasks would be clinically meaningful.  As a general matter, the concept of clinical meaningfulness has no real meaning in the context of a population purportedly focused on for its lack of clinical impairment.[6]  In other words, it is difficult to say how any test improvement would translate to an improvement in the real world for a person who has no clinical deficit.  Evaluation of clinical meaningfulness would require comparison to typical Cogstate scores for people with relevant characteristics similar to the Madison Memory Study subjects (*e.g.*, age).  In sum, I am aware of no evidence that any of the purported improvements for the Cogstate tasks would be clinically meaningful.

### IV.    OPEN-LABEL AND ANIMAL STUDIES

14. Experts in the relevant fields of memory and cognition would require at least one randomized, well-controlled, double-blind clinical trial on humans to support the challenged claims.  I noted in my initial report that studies lacking a control and blinding ("open label" studies), using only self-reported subjective outcome measures (*e.g.*, quality of life questionnaires), or examining an effect on animals do not constitute competent and reliable scientific evidence.  I comment further on such insufficient

---

[6] K. Lerner, Clinical Trial Synopsis QB-0011: Madison Memory Study: A Randomized, Double-Blinded, Placebo-Controlled Trial of Apoaequorin in Community-Dwelling, Older Adults, Quincy Bioscience, LLC (2016), at QUI-FTCNY-00003697 (stating that AD8 score of 2 was used as to distinguish subjects who were cognitively normal or very mildly impaired from those with a higher level of impairment); D. Moran et al., Effects of a Supplement Containing Apoaequorin on Verbal Learning in Older Adults in the Community, 30 Advances in Mind-Body Medicine 4 (2016), at QUI-FTCNY-00003813 ("An ADS score of 2 was used as a cut-off value to discriminate between cognitively normal individuals and those with some level of cognitive impairment.").  Dr. Katz also cites studies that he states "have demonstrated that AD8 scores of 0, 1, or 2 are consistent with generally healthy cognitive function." (Katz at ¶ 22).

studies because Drs. Katz and Schwartz discuss a number of them in their reports.  (Katz at ¶¶ 12-16; Schwartz at ¶¶ 36-58).

a)  Impact of Prevagen on Memory (Prevagen Quality of Life Study).  The Impact of Prevagen on Memory was a study conducted by the defendants on 56 subjects who took 10 mg of Prevagen/day for 90 days.  The study sought to measure changes in overall cognition, quality of sleep, energy, mood, pain, and general health.  The study was open label, meaning that the persons administering the study and all participants knew what they were taking.  There was no control group to which to compare the subjects taking Prevagen.  At days 0, 30, 60, and 90, the subjects were asked to answer a battery of questions, including "Are you forgetful?" and "Do you have trouble finding the words you want to say, finishing sentences or naming people or things?"  Subjects could answer "Always," "Very Frequently," "Frequently," "Occasionally," "Seldom," "Very Seldom," or "Never."

b)  In my opinion, the Impact of Prevagen on Memory study does not constitute competent and reliable scientific evidence in support of the challenged claims.  The study lacked both blinding and a control group.  Blinding, as I noted in my initial report, is important to prevent bias in both study administrators and subjects.  Subjects who know that they are taking a purportedly active agent are susceptible to an "expectation effect," and without a control group, it is impossible to attribute a positive effect to the agent being tested.  The study's lack of a validated measure for detecting change in memory also renders its results unreliable.  The questions the participants answered were adapted from a

11

screening tool used with caregivers or other informants to detect Alzheimer's disease, rather than measure changes in memory over time.

c) Sunsho Pharmaceutical Study.  The Sunsho Pharmaceutical Study was a 15 person, open-label study in which the subjects took 10 mg of Prevagen per day for 30 days.  Subjects were tested on a "memory match" card game before the test, at day 15, and at day 30.  Subjects also were administered a questionnaire regarding cognitive function and quality of sleep.

d)  In my opinion, the Sunsho Pharmaceutical Study does not constitute competent and reliable scientific evidence in support of the challenged claims.  This small study suffered from the same flaws as the Impact of Prevagen on Memory study, in that it lacked both blinding and a control group.  The study also contains no reference to a reliable method for measuring cognitive function.  The study also reported serious compliance issues, stating, for example, that only 5 of the 15 subjects took Prevagen every day, as directed.  The study's authors also acknowledged the "placebo effect" and practice effect inherent in games such as the memory match used in the study.

e) The Milgram beagle studies.  Drs. Katz and Schwartz also cite two studies conducted on 24 aged beagles as supportive evidence for the challenged claims. These studies also do not constitute competent and reliable scientific evidence in support of the challenged claims.  Even assuming that these studies were conducted correctly and capable of measuring cognition in dogs, results from animal studies, while potentially helpful for forming hypotheses for additional study, cannot be directly extrapolated to humans.  Additionally, the authors of the

12

studies themselves note that the results show that apoaequorin "may have" cognitively beneficial effects and that "[f]urther controlled studies in clinically diagnosed patients are needed to validate which signs might be improved and whether apoequorin may have an effect early in cognitive decline."

15. In sum, none of the open-label or animal studies cited by the defendants' experts cause me to rethink my opinion that the challenged claims are not supported by competent and reliable scientific evidence.

### V.    VITAMIN D

16. Dr. Kurzer references a number of studies relating to Vitamin D and memory and/or cognition. (Kurzer at ¶¶ 58-78). After reviewing her report, my opinion remains unchanged that there is no competent and reliable scientific evidence showing that Vitamin D improves memory or provides any other cognitive benefit.

17. The large majority of Dr. Kurzer's referenced studies are observational studies, which measure association, rather than causation. Observational studies look at data created in an uncontrolled setting and look for relationships between variables, while attempting to account for potentially confounding factors. As it is impossible to account for all confounding factors, however, observational studies cannot show causation. Randomized, controlled studies (RCTs), by contrast, account for confounding variables through the process of randomization. Randomization, combined with the other characteristics of an RCT, such as blinding, allow researchers to attribute any significant effect directly to the studied intervention. The differing ability to measure causative effect is demonstrated by numerous examples of initial observational study results not being born out in subsequent RCTs. For example:

13

a) Menopausal Hormone Therapy (MHT) studies.  While observational studies indicated that MHT reduced the risk of dementia, RCTs found no such benefit and, in fact, in some instances showed some harm from MHT.[7]  The findings of these RCTs led to the development of guidelines specifically advising against the use of MHT therapy for the sole purpose of maintaining or treating current cognitive function.[8]

b) Non-Steroidal Anti-Inflammatory Drug (NSAID) studies.  Similarly, numerous observational studies had shown a reduced incidence of Alzheimer's disease in users of NSAIDs.  Subsequent RCTs, however, failed to show benefit and instead showed harm to some groups.[9]

18. Dr. Kurzer referenced only 7 RCTs relating to Vitamin D and memory and/or cognition. As described below, the studies suffered from significant flaws, reported inconsistent results, and/or involved specific populations, so their findings cannot be extrapolated to a more general population.  However, even accepting all of the study results as credible, only 4 showed positive results, while 3 showed negative results.  Additionally, of the 6 studies that she states were published in journals with impact factors in the top 25% of their disciplines, half reported negative results.  Experts in the fields of memory and

---

[7] *See* Lee, S., et al., The 2020 Menopausal Hormone Therapy Guidelines, *Journal of Menopausal Med.*, 26:69-98, at 81-82 (2020).

[8] *See id.* at 82.

[9] *See* Meyer, P., et al., INTREPAD, A randomized trial of naproxen to slow progress of presymptomatic Alzheimer disease, *Neurology*, Vol. 92, No. 18, e2070, e2071 (Apr. 30, 2019).

cognition would not find competent and reliable scientific evidence of efficacy where half of the reportedly higher quality RCTs failed to find a beneficial effect.

a)  Grung, B., et al.[10]:  This study looked at whether Vitamin D supplementation improved cognition in Vitamin-D deficient adolescents.  Given the specific nature of the population, both in terms of age and Vitamin-D deficiency, the results of this study cannot be extrapolated to a more general population.

b)  Petterson, J.[11]:  This study compared the effect of high-dose Vitamin D supplementation to low-dose Vitamin D supplementation.  The benefits that the study reported were inconsistent.  The study reported that the high dose produced a statistically significant benefit compared to the low dose on a visual memory task in subjects who were Vitamin D insufficient.  However, the study also reported that, in the general population, the low dose produced a statistically significant benefit compared to the high dose on a verbal memory task.  The study thus did not show a systemic dose effect, which indicates that the model of benefit from Vitamin D supplementation is not biologically feasible.  Finally, the study authors stated that subsequent, larger RCTs should utilize a comprehensive battery of tasks "in order to appropriately evaluate and confirm this potential cognitive benefit of vitamin D."[12]

---

[10] Grung, B., et al., Linking vitamin D status, executive functioning and self-perceived mental health in adolescents through multivariate analysis: A randomized double-blind placebo control trial, *Scandinavian Journal of Psychol*. 2017;58:123-130.

[11] Pettersen, J., Does high dose vitamin D supplementation enhance cognition?: A randomized trial in healthy adults, *Experimental Gerontology*, 2017;90:90-97.

[12] *Id.* at 97.

c)  Hu, J., et al.[13]:  The study looked at the effect of Vitamin D supplementation on adults diagnosed with mild cognitive impairment.  Given the specific nature of the population, the results of the study cannot be extrapolated to a more general population.  Furthermore, the researchers used IQ tests to evaluate cognition.  Such tests primarily measure crystalized intelligence, which is old, well-learned knowledge; they are not good measures of new learning and are not well suited to test recent memory.[14]

d)  Castle, M., et al[15]:  This study examined the effect of high-, medium-, and low-dose Vitamin D supplementation on cognition in overweight/obese postmenopausal women with low Vitamin D levels.  Given the very specific nature of the population, the results of this study cannot be extrapolated to a more general population.

19. Finally, Dr. Kurzer discusses a number of meta-analyses that she says show a beneficial association between higher Vitamin D levels and cognitive function.  (Kurzer at ¶ 69.a-l).  The cited meta-analyses, however, in large part involved observational studies.  A more recent meta-analysis looked at the results of RCTs, the best means of determining causative effect, in examining the effect of Vitamin D supplementation on preventing Alzheimer's disease.  That analysis found that supplementation failed to produce a

---

[13] Hu, J., et al., Effects of vitamin D3 supplementation on cognition and blood lipids: a 12-month randomised, double-blind, placebo-controlled trial, *J Neurol Neurosurg Psychiatry*, 2018; 89:1341-1347.

[14] Cattell, R., Theory of Fluid and Crystallized Intelligence: A Critical Experiment, *Journal of Educ. Psychology*, 54(1):1–22 (1963).

[15] Castle, M., et al., Three Doses of Vitamin D and Cognitive Outcomes in Older Women: A Double-Blind Randomized Controlled Trial, *Journals of Gerontology: Biological Sciences*, 2020;75(5):835-842.

statistically significant benefit on any measure of cognition, including verbal memory, visual ability, and attention.[16]

### VI.    CLINICAL UTILITY OF RESEARCH EVIDENCE

20. In his construct of Clinical Utility of Research Evidence, Dr. Katz lists five factors that play into how frequently a treatment would be used: safety, efficacy, science, other alternatives, and patient preference. (Katz at ¶¶ 46-47). For the reasons cited in my initial report and above, I disagree with Dr. Katz's characterization of the efficacy of Prevagen as suggested and the science behind Prevagen as supportive. (*Id.* at ¶ 46). I also disagree with his statement that there are no superior alternatives to Prevagen for people concerned about their memory and cognitive function.

21. There are many possible causes of cognitive impairment, including depression, medication issues, cerebrovascular events, thyroid dysfunction, and hypoperfusion from heart failure.[17] Qualified clinicians can use a broad array of tools—including blood work, brain imaging, medical history research, and thorough neuro-psychological evaluation—to diagnose and treat these causes. Dr. Katz himself acknowledges that treatments exist for mild cognitive impairment (MCI). He states that there exists "some evidence that diet and lifestyle interventions can reduce the risk of developing MCI and the risk of progression to dementia." (Katz at ¶ 44). He also states that the guideline developed by the American Academy of Neurology "suggests that clinicians address underlying conditions and recommend physical exercise, and cognitive training to

---

[16] Du, Y., et al., Vitamin D Supplement for Prevention of Alzheimer's Disease: A Systematic Review and Meta-Analysis, *Amer. J. of Therapeutics*, 0, 1-11 (2020).

[17] Falk, N., et al., Evaluation of Suspected Dementia, *Amer. Family Physician*, Vol. 97, No. 6, at 400, 402 (March 15, 2018).

underlying conditions and recommend physical exercise, and cognitive training to patients with MCI." (*Id.*) There is a danger that persons suffering from memory or cognition deficit might delay or completely forgo seeking help from qualified clinicians and receiving effective treatment in favor of taking Prevagen. Delay in seeking diagnosis and treatment could result in worsening symptoms and poorer health. For example, if the cognitive impairment were due to medication toxicity (*e.g.*, from anti-cholinergic, sleep, or pain medications) or other medical condition (*e.g.*, thyroid disease, metabolic disease, sleep disturbance), not removing the drug or treating the underlying condition could cause the impairment to worsen.

## VII.    CONCLUSION

22. My expert opinion remains unchanged is that there is no competent and reliable scientific evidence to support any of the challenged claims, including claims that Prevagen improves memory or provides any other cognitive benefit.

Dated: _____7/16/2021_____

Signed: _____

Mary Sano, Ph.D.

18