# EXHIBIT C

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    --------------------------------X
     FEDERAL TRADE COMMISSION
4    and THE PEOPLE OF THE STATE
     OF NEW YORK, by LETITIA
5    JAMES, Attorney General of
     the State of New York,
6
                    Plaintiffs,              Case Number
7          vs.                               1:17-cv-00124-LLS

8    QUINCY BIOSCIENCE HOLDING
     COMPANY, INC., a
9    corporation, et al.,

10                  Defendants.
     --------------------------------X
11

12   VIDEOTAPED DEPOSITION OF PETER A. MALASPINA, Ph.D.

13                    Taken Remotely

14              Friday, October 1, 2021

15

16

17

18

19

20

21

22

23   Reported by

24   JEFFREY BENZ, CRR, RMR

25   JOB NO. 200428

1

2

3

4

5                      October 1, 2021

6                      10:02 a.m.

7

8

9      Videotaped Deposition of PETER A. MALASPINA,

10  Ph.D., taken remotely, before Jeffrey Benz, a

11  Certified Realtime Reporter, Registered Merit

12  Reporter and Notary Public of the State of New

13  York.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2   A P P E A R A N C E S:

 3

 4        FEDERAL TRADE COMMISSION

 5        Attorneys for Plaintiff Federal Trade Commission

 6             600 Pennsylvania Avenue, NW

 7             Washington, D.C.  20580

 8   BY:   EDWARD GLENNON, ESQ.

 9             ANNETTE SOBERATS, ESQ.

10             ANDREW WONE, ESQ.

11

12        OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL

13        Attorneys for Plaintiff the People of the State

14        of New York

15             28 Liberty Street

16             New York, New York  10005

17   BY:   KATE MATSUCHAK, ESQ.

18

19

20

21

22

23

24

25
```

```
 1

 2    A P P E A R A N C E S:  (Ctd.)

 3

 4         KELLEY DRYE & WARREN

 5         Attorneys for Defendants Quincy Bioscience Holding

 6         Company, Inc.; Quincy Bioscience, LLC; Prevagen, Inc.,

 7         d/b/a Sugar River Supplements; and Quincy Bioscience

 8         Manufacturing, LLC

 9              175 Greenwich Street

10              New York, New York  10007

11         BY:  DAMON SUDEN, ESQ.

12              JACLYN METZINGER, ESQ.

13              GEOFFREY CASTELLO, ESQ.

14              CAITLIN HICKEY, ESQ.

15                  -and-

16              One Jefferson Road

17              Parsippany, New Jersey  07054

18         BY:  GLENN GRAHAM, ESQ.

19

20         COZEN O'CONNOR

21         Attorneys for Defendant Mark Underwood

22              175 Greenwich Street

23              New York, New York  10007

24         BY:  TAMAR WISE, ESQ.

25              MICHAEL De LEEUW, ESQ.
```

1

2     A P P E A R A N C E S: (Ctd.)

3

4     ALSO PRESENT:

5          LARRY MOSKOWITZ, Videographer

6          JIMMY ROYER, Analysis Group

7          DAVID OVADIA, Federal Trade Commission

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      Malaspina
 2            Where did you go to college and what
 3   was -- what degree did you get?
 4       A.   I went to undergrad at Vassar.  And
 5   there I had a double major in math and
 6   economics.
 7       Q.   Okay.  And as part of your math or
 8   economics degrees, did you study statistics at
 9   all?
10       A.   I did.  Yes.
11       Q.   Do you remember what you studied in
12   particular?  That was a while ago.
13       A.   It was.  But I remember it.  It was
14   one my favorite classes.
15            So, I think there was a -- like a
16   mathematical probability class which had a
17   sprinkling of statistics.
18            Then in economics, I took at least one
19   semester of econometrics, which is, you know, a
20   lot of statistics.
21            I took an advanced -- it's supposed to
22   be graduate-level mathematical statistics course
23   through the math department.  And in terms of
24   pure stats classes, I think that's about it.
25       Q.   Okay.  And you mentioned econometrics.
```

1                    Malaspina

2    Can you just explain what that is.

3         A.   Yeah.  So I'd just say it's a -- a

4    branch of statistics where -- that invites more

5    economic theory and economic concepts in.  In a

6    lot of cases I think that the term statistics

7    and econometrics can be used interchangeably.

8    Some people might think of econometrics as

9    being -- having -- including more sophisticated

10   economic modeling.

11        Q.   Okay.  And then after college what did

12   you do?

13        A.   For statistics?

14        Q.   Just in life.  Jobs, I guess,

15   employment.

16        A.   Yeah.  I mean I took a year off.  I

17   drove across the country.  But then, after that

18   year, I went to get my Ph.D. at the University

19   of North Carolina at Chapel Hill.

20        Q.   What did you study there?

21        A.   I studied economics.

22        Q.   And as part of your studies in

23   graduate school, did any of that involve

24   statistics?

25        A.   Yes.

1                        Malaspina

2        Q.   What kind of statistics did you study

3    there?

4        A.   A lot.

5             So their first course was an advanced

6    probability and statistics course.  I think it

7    was my first semester there.

8             Then -- I'm trying to remember the

9    sequence here because I actually took it out of

10   sequence slightly.

11            I think the second course, I ended up

12   take a third-year statistics course, which is

13   like an advanced financial econometrics.  And it

14   was -- I took it out of sequence because they

15   only offered it every other year.

16            And, then, next I took an advanced

17   econometric theory course, which dealt with,

18   like, proofs, essentially mathematical proofs

19   using linear algebra of various statistical

20   models, econometric models.

21            And then I think the last course I

22   took was the advanced microeconomic models,

23   which would teach you a lot of applied --

24   basically walked through a bunch of applied

25   modeling and said, like, if the situation looks

1                        Malaspina

2    like this, here's a model you might consider.

3              Yeah.  So I think that's a -- it was

4    four courses in graduate econometrics.

5         Q.   As part of either your undergraduate

6    or your graduate studies, did you use SAS

7    software or statistical software?

8         A.   SAS.  I don't think I used SAS.  If I

9    did, it would be like a one off.  Most of the

10   work in grad school was either done in MATLAB,

11   Stata, Excel, and there was Fortran.  Ooph.

12        Q.   I remember Fortran.  But you don't

13   remember specifically using S-A-S or SAS?

14        A.   No.  I think my exposure to SAS came

15   in the consulting work that I did afterwards.

16        Q.   Okay.

17             So after you graduated, got your

18   Ph.D., what did you do after that?

19        A.   So, I went to work at Freeman,

20   Sullivan & Company, which they do, I call it,

21   electricity consulting out in San Francisco.

22        Q.   And then what type of work did you do

23   for them?

24        A.   So, I would call it just basically

25   economic consulting.

1                        Malaspina

2              So let's see.  I started off basically

3    gathering data and running econometric analyses

4    under the direction of other experts there.

5              So, I was learning about -- I would

6    say mostly about electricity demand and sort of

7    like daily demand, consumer behavior about

8    demand.

9              And as I got more experience there, I

10   started, you know, either conducting the

11   analyses myself or having analysts under my

12   direction conduct them, coming up to them with

13   analysis plans, things like that.

14        Q.   And I take it that your work for this

15   company, Freeman, Sullivan, did not involve any

16   statistical analysis of drug trials or

17   supplement studies?

18        A.   It did not.

19        Q.   And did you do any statistical

20   analysis of either drug trials or supplement

21   clinical trials or supplement studies in college

22   or graduate school?

23        A.   Not that I can recall.

24             Yeah.  Not that I can recall.  I think

25   there was, like, one time around the time I was

```
 1                     Malaspina
 2   whereas what I was doing before was more like, I
 3   would say, working for regulatory agencies,
 4   slash, utilities.  I had the opportunity to work
 5   in, say, intellectual property and litigation.
 6             And so it seemed like a cool
 7   opportunity.  My dissertation dealt with
 8   intellectual property.
 9             So, came out to Boston.
10       Q.   And is that the Quantitative Economic
11   Solutions company?
12       A.   Yes.
13       Q.   And you started as a senior economist
14   there?
15       A.   Yes.
16       Q.   And what type of work did you do for
17   that company?
18       A.   So, started off kind of learning the
19   ropes.  I think playing a similar role to -- as
20   I -- how I did starting out at Freeman and
21   Sullivan, conducting analyses under the
22   direction of the expert, and then over time it
23   became more about, instead of carrying out the
24   direction of the expert, it was sort of like,
25   okay, here's the question.  What do we do?  You
```

```
 1                     Malaspina
 2   figure it out.
 3             I was developing econometric models,
 4   telling the analysts how to carry them out,
 5   writing a ton, writing up sections of reports.
 6             Yeah, so that's a brief summary.
 7        Q.   What areas of focus did you have while
 8   you were working there?
 9        A.   Areas of focus.  Like -- so
10   intellectual property and antitrust I would say
11   were two that stuck out.
12        Q.   Okay.  Anything else that you
13   remember?
14        A.   I mean, as a general topic, if you say
15   damages calculation, I think there were some
16   that weren't related to either intellectual
17   property or antitrust.  Like there were contract
18   disputes, stuff like that.
19        Q.   Did you work on any false
20   advertising-type litigation?
21        A.   Not that I can recall.  Not at -- not
22   at QES.
23        Q.   Did any of your work there involve
24   analysis of either drug trials or supplement
25   studies?
```

```
 1                     Malaspina
 2      A.   I -- so it -- there -- a lot of the
 3 work we do is in pharmaceuticals, so there would
 4 be -- I think we would see reports that dealt
 5 with the clinical trial analyses.  I don't ever
 6 remember, like, working with -- with clinical
 7 trial data itself.
 8      Q.   So in those pharmaceutical cases you
 9 were dealing with damages, for example, or
10 antitrust issues?
11           MR. GLENNON:  Objection.  Form.
12      A.   I --
13      Q.   I guess what were you working on in
14 those pharmaceutical cases?
15      A.   Yeah.  I -- I'll -- got to be careful
16 not to give away confidential information, I
17 guess --
18      Q.   Sure.
19      A.   -- but -- so a lot of things.  But
20 generally it related to intellectual property --
21 infringement and damages.
22           In some cases it would be like -- you
23 know, like a commercial success report is where
24 you're trying to show that a -- this is my
25 understanding of the law.
```

```
 1                    Malaspina
 2           So this is not my wheelhouse, but
 3   you're trying to show that a product is
 4   commercially successful, and that, according to
 5   my understanding of the law, is an indicator
 6   that it -- a patent is valid.
 7           So, I think that's another -- in terms
 8   of the pharmaceutical work we did, part of --
 9   yeah, I think that's -- that's another area of
10   the pharmaceutical work we did.
11           And then there would be some contract
12   disputes in there also related to damages,
13   though.
14      Q.   Okay.  So you weren't studying or
15   analyzing the results of clinical trial data to
16   determine whether there were treatment effects
17   for the various pharmaceuticals or anything like
18   that?
19      A.   No.  The closest thing I would -- I
20   did something like that would be looking at
21   performance of a product over time and then
22   seeing whether or not like a -- you know what a
23   line extension is?
24      Q.   No.
25      A.   So when there's a change to a drug,
```

1                        Malaspina

2    maybe they added an extended release formulation

3    of it.

4        Q.    Sure.

5        A.    You would see like, okay, does that

6    have an impact in demand or sales or number of

7    prescriptions.

8              So you might use an econometric model

9    to try to figure out that impact.  But that's

10   not -- yeah, you -- I think you asked about

11   specifically clinical trial data.  That's not

12   that.

13       Q.    Right.

14             Okay.  So then -- so -- right.  So you

15   had -- you didn't have any involvement or work

16   on clinical trial data analyzing such studies?

17       A.    No.  I may have come across them in --

18   when we were, like, going through the documents

19   in some of these cases, but I myself did not

20   analyze clinical trial data there.

21       Q.    And it's -- are you still working at

22   this company?

23       A.    I -- I -- I am.  I -- I haven't been

24   the entire time.

25       Q.    Okay.  So, I guess, what happened

```
 1                    Malaspina
 2  after -- you were a senior economist for how
 3  long?
 4       A.   I forget really.  I want to say three
 5  years?
 6       Q.   Okay.
 7       A.   Maybe four.
 8       Q.   What did you do after that?
 9       A.   So I was senior economist.  At some
10  point I became a VP.  And then I went from there
11  to New York to work at the New York Attorney
12  General's office as their chief economist.
13            And the reason for the confusion is --
14  and then after two years there I came back to
15  QES.  So --
16       Q.   I see.  So you left Quantitative
17  Economic Solutions to go to the New York
18  Attorney General's office?
19       A.   Yes.
20       Q.   And what does the chief economist for
21  the New York AG do?
22       A.   What don't they do?
23            A lot of things.  I mean it's one of
24  the -- one of the cool parts about that job is
25  you sort of make it what you want it to be.
```

```
 1                        Malaspina
 2              I'm not sure if that's how it was
 3  intended, but that was my experience there.
 4              I think primarily you're there to
 5  offer guidance to the attorney general, and any
 6  of the attorneys working for her or him.  And
 7  that can take a variety of forms.
 8              Sometimes I was doing a calculation
 9  quickly to get a rough idea of what -- you know,
10  what might be at stake for a certain case that
11  the office was thinking about.
12              And other times I would be sitting in
13  the room with lawyers negotiating a potential
14  settlement.  Sometimes I was helping the data
15  analytics team actually program analyses,
16  working with Excel.
17              It was -- yeah, there was just so many
18  facets to the job.  I could probably go on for a
19  long time, but I don't know if that's what
20  you're looking for.
21      Q.    You said you worked with Excel.  Did
22  you work with SAS while you were at the New
23  York -- with the New York AG?
24      A.    Yeah.  I think there was one thing I
25  did in SAS.
```

1                          Malaspina

2              They had -- there -- the way they were

3    set up this, they had access to all the -- every

4    program you could ever possibly want.

5         Q.   You remember working with it one time?

6         A.   I think so, yeah.

7              I think it was a situation where an

8    opposing expert had used it, and so it was --

9    make -- I think -- you know, when you first look

10   at something you use the program that they're --

11   that they're using.

12        Q.   And is that something you generally

13   try to do, use the same program that opposing

14   experts use?

15        A.   When you're first looking at it.  You

16   know, you want to see what did they see when

17   they were programming their model.

18        Q.   And what types of litigations did you

19   work on at the AG's office?

20              MS. MATUSCHAK:  I just want to caution

21         the witness not to reveal anything that

22         might be privileged, work product or

23         confidential.

24        Q.   Sure.

25              You can answer.

1                    Malaspina

2        A.    A lot of -- do you mean like the types

3   of --

4        Q.    I guess areas of, like, antitrust or

5   other types of --

6        A.    Yeah.  So a lot of it was in

7   antitrust, but since I was the chief for the

8   whole office, I got dragged into environmental.

9   There were, I'd say, a finance -- personal care

10  matters.

11       Q.    Sorry.  I didn't hear that last.

12       A.    Health care.

13       Q.    Health care.  Yeah.

14       A.    Yeah.  There was one matter where I

15  provided an expert report.  It was a health

16  care, slash -- I think there was a bureau of tax

17  or taxation.  I forget what it is.

18            But, yeah, there was -- I was kind of

19  involved in a bunch of different areas of all

20  the office's work.  I think the only thing that

21  I -- well, only broad bureau that I didn't get

22  involved with -- and this may actually be a

23  division, not a bureau, was like the criminal

24  division.

25       Q.    You did have any involvement with

1                         Malaspina

2    know, the names of everybody involved in this

3    matter.  I'm just trying to be -- it would be

4    very surprising to me if I was involved in

5    anything like that.

6         Q.   Okay.  Anything involving Quincy or

7    this litigation?

8         A.   Yes.

9         Q.   All right.  And what did you do after

10   your time at the New York Attorney General's

11   office?

12        A.   I came back to QES.

13        Q.   Is that where you still are today?

14        A.   Yes.

15        Q.   What types -- did you do any different

16   type of work when you went back to QES than you

17   did -- than what we discussed earlier?

18        A.   I mean, subject matter is mostly the

19   same.  There's a lot of antitrust and

20   intellectual property.

21             There's been some -- so some of the

22   work, I guess, that would be unique this time

23   around.  I've done some consulting where I've

24   been helping pharmaceutical companies develop

25   their -- I would say like a licensing plan and

1                        Malaspina

2    for licensing some of their intellectual

3    property with other firms.

4               And that's not in the context of

5    litigation.  It's more just saying, here are

6    some things you -- you know, think about in the

7    long run for your -- for how you want to, you

8    know, structure a royalty rate or a loss of

9    exclusivity term, something like that.

10        Q.   Okay.  And since you've been back at

11   QES, have you been involved in the analysis of

12   any clinical trial data for either drugs or

13   supplements?

14        A.   Again, if I -- I may have seen

15   documents that dealt with clinical trials, but

16   I -- I wasn't analyzing the underlying clinical

17   trial data.

18        Q.   Okay.  I think I forgot to ask

19   earlier, but either your first time at QES or

20   since you've been back have you used SAS?

21        A.   Yes.

22        Q.   In what capacity?

23        A.   A lot.  I think the first thing I did

24   when I got to QES, the first big thing, was --

25   I'm just trying to be careful I don't give away

```
1                        Malaspina
2    confidential information.  But we were working
3    with very large health -- health insurance
4    claims data set.  And I quickly realized that
5    my -- my tool of choice, Stata, wasn't going to
6    do it.  There was a memory issue where you can't
7    get enough information into it.
8              So I -- you know, my -- I think SAS
9    might be my -- one of my second tools of choice.
10             So I said, okay, well, let's figure
11   out whether SAS can do it.  And that was when I
12   learned that -- at least at that time, SAS is a
13   big advantage in terms of dealing with large
14   data sets, the way it handles memory.  So, we
15   used SAS extensively on that health insurance
16   matter, which went on for a couple years.
17             And there -- I think at that point,
18   just as -- it's a relatively small firm, right?
19   So if somebody like me or another seniorish
20   manager type feels strongly about a methodology,
21   we kind of -- it becomes the rule of how to
22   handle things.
23             So I think we sort of developed a best
24   practice of when we've got large data sets, at
25   least the initial phases of importing data,
```

1                    Malaspina

2   merging it, any of the big steps where you're

3   trying to maybe even chop up the data again or

4   append large data sets, that's all done in SAS.

5            And, in fact, I got to -- I guess, by

6   necessity, I could build, like, the hardware

7   or -- I didn't build it physically myself, but

8   got to, you know, choose all the attributes of a

9   SAS server that we had built so we could handle

10  large data sets like that.  Again.

11           It was specifically for SAS.

12       Q.   Right.

13           Would you say that you used SAS while

14  you were at QES mostly for data manipulation as

15  opposed to statistical modeling?

16       A.   It's hard to say most.  You mean,

17  like, time spent programming?

18       Q.   Sure.  Like your -- I mean your use of

19  SAS.  Would you describe it as mostly to

20  manipulate the data or to do statistical

21  modeling?

22       A.   Yeah.  I'm not trying to split hairs,

23  but when you do the data manipulation on large

24  data sets, sometimes it's like -- I can program

25  the import and merging and then export in five

1                    Malaspina

2       the record.  The time is 11:05 a.m.

3            (Recess from 11:05 a.m. to

4       11:13 a.m..)

5            THE VIDEOGRAPHER:  The time is

6       11:13 a.m.  We are back on the record.

7       Q.   Just to go back for a second,

8   Dr. Malaspina, to your work history and

9   education, you said that you did use SAS in your

10  work with your current company, Quantitative

11  Economic Solutions; is that correct?

12      A.   Yes.

13      Q.   In using SAS at that company, did you

14  use the proc mixed statement at all?  Or

15  procedure?

16      A.   Where -- I'm not sure if I've used it

17  before the present matter.  I've used several

18  things like it.  It's possible that I used it at

19  some point during that.  It's hard to remember

20  every single instance where I've used SAS.

21      Q.   You don't recall, sitting here today,

22  using it prior to this litigation?

23      A.   Again, you know, there's -- when it

24  comes to econometrics and statistics, there are

25  many different programs and many different tools

1                    Malaspina

2      A.    I do.

3      Q.    And is it fair to say that this is

4  your main criticism of Dr. Beales' model?

5            Does this kind of sum it up?

6      A.    I wouldn't say that.  Yeah, I -- I

7  think there are several criticisms.  I'm not

8  sure this captures everything.

9      Q.    Okay.  But one of your criticisms is

10  that, in your view, Dr. Beales' model assumes no

11  correlation in error terms across the

12  observations, right?

13      A.    Yes.

14      Q.    And just to clarify, it's your opinion

15  that the model should allow for correlation and

16  test scores for the same individual; is that

17  right?

18      A.    So, when it comes to my opinions about

19  the model, it's really about what did Dr. Beales

20  say he was trying to do, and how did he describe

21  what he did.  And so, I'm just trying to

22  demonstrate that what he actually did, in his

23  analysis that he presented, wasn't that.

24            So, I'm not saying that this is the

25  right or wrong way to conduct an analysis of the

```
 1                    Malaspina
 2   underlying data, merely correcting what the --
 3   serious mistakes made by Dr. Beales.
 4        Q.   I get it.  But one of those mistakes
 5   that you're saying he made, in your opinion that
 6   he made, is his model assumes no correlation in
 7   error terms across any observations, right?
 8        A.   Yes.  He said that he was going to
 9   address correlation, and he didn't.  So that's a
10   mistake.
11        Q.   And the correlation he wanted to
12   address would be within individual results.  In
13   other words, if somebody does well on one test,
14   you might expect them to do well on another
15   test?
16        A.   That was one form of the correlation
17   that he was trying to address.
18        Q.   Right.  So that would be within
19   subject or within participant correlation?
20        A.   That would be one form, yes.
21        Q.   Take a look at Figure 2 of your
22   report, which is on the top of page 10.  And
23   this is a snapshot of Dr. Beales' SAS code; is
24   that right?
25        A.   Yes.
```

1                     Malaspina

2          to what went into your report and why, then

3          I would ask me -- instruct you not to

4          answer.

5          A.    Yeah, I don't think -- I think this is

6     a, you know, determination I made by myself.

7               It didn't go in my report, because it

8     wasn't necessary to reach the opinions I was

9     making.

10         Q.    Okay.  Do you remember what the

11    outcome was when you ran the model with the

12    unstructured variance structure for the R

13    matrix?

14         A.    I want to be careful here, because

15    it's been a bit.  And these are obviously fine

16    details.  I think it was on structuring the R.

17    It may have been a broader unstructuring of what

18    is the -- the -- essentially the -- the V

19    matrix, which is the combination of R and Z.

20              But my recollection was, is that

21    the -- the program didn't even -- it couldn't

22    find a solution.  It basically hung up, which is

23    not -- it's not too surprising when you're --

24    when you're using a very flexible model and

25    you're giving a lot of freedom, which -- that's

1                        Malaspina

2    sort of what you're trying to do when you're --

3    freeing up choice of variances.

4            Sometimes the model can get confused.

5    And again, it's probably also a symptom of mixed

6    model and SAS being very flexible.  So, maybe

7    not that surprising.

8        Q.   When you say "hung up," is that sort

9    of a technical issue, not enough sort of

10   computing power to finish, or what?

11       A.   I mean -- technical issue.  I mean it

12   could be one of those things where just the --

13   the way SAS tries to reach solution, it gets

14   caught in the local -- a local minimum, stuck at

15   the bottom of a well, basically, and when it's

16   trying to find a solution and it can't, it can't

17   go -- there's nowhere else to go from there.

18           So I'm not sure.  It's just a question

19   of like computational firepower.  Like if I put

20   it on a NEC supercomputer it might solve.

21           Does that answer the question?

22       Q.   Sure.  Did you -- did you try any

23   other types of variance structures for the R

24   matrix other than going all the way to an

25   unstructured matrix?

```
 1                      Malaspina

 2        A.   I don't think so.

 3        Q.   For example, did you try a compound

 4   symmetry?

 5        A.   I don't think so.

 6             I mean, let me just make sure I

 7   remember what compound symmetry looks like.

 8        Q.   Sure.

 9        A.   Yeah.  I'm fairly certain I never

10   attempted compound symmetry.

11        Q.   Okay.  Why don't we take another five

12   minutes, and then we'll continue.

13        A.   Great.

14             THE VIDEOGRAPHER:  We are going off

15        the record.  The time is 12:07 p.m.

16             (Recess from 12:07 to 12:16.)

17             THE VIDEOGRAPHER:  We are back on the

18        record.  The time is 12:16 p.m.

19        Q.   Great.  So before the break we were

20   talking about another analysis that you did or

21   tried to do using the unstructured variance R

22   matrix.

23             Were there any other -- and sorry.

24             And that analysis did not find its way

25   into your report.  Are there any other analyses
```

1                          Malaspina

2    that you performed or attempted to perform that

3    are not in your report?

4         A.   Yes.  So there's probably other -- as

5    you're programming this stuff up and trying to

6    make sure that your, you know, results are

7    correct, you may run small permutations of stuff

8    just to see what's going on with the data.

9    Stuff like that.

10              Things that weren't -- obviously

11   weren't essential to my opinion, things like

12   looking at the data in summary form.  So like,

13   actually literally just pulling all the data

14   into -- I may have started in Excel, but just

15   like looking at a pivot table and what does the

16   stuff even look like.

17              Those are important steps for just

18   getting yourself comfortable and knowing what

19   you're working with.  But again, it's -- this is

20   sort of preliminary and -- and not essential for

21   the ultimate opinion.

22   RQ         MR. SUDEN:  Okay.  I think we're

23        going to ask that you produce all analyses

24        that you performed in working on -- on

25        whether it's included in your report or

1                      Malaspina

2    more time?

3         Q.   Do you agree that -- do you agree that

4    the only reason your modified model finds no

5    statistical significance for the joint tests is

6    because she used a completely different

7    approach -- i.e., the bootstrap method -- to

8    model the variance, covariants metrics?

9              MR. GLENNON:  Objection.

10        A.   So, the reason why -- my corrections

11   to Dr. Beales produces different results is

12   because it's -- doing what he said he was doing

13   and what he failed to program, so that has to do

14   in part with the way you model -- you allow the

15   model to account for correlation across

16   equations and also across -- within individuals.

17        Q.   Okay.  I asked you -- and I guess,

18   just to be clear, Dr. Beales doesn't use or

19   mention the bootstrap model in his report,

20   right?

21        A.   He talks about random effects, and

22   then does not use them, and so the bootstrap

23   method is one way to incorporate the random

24   effects.

25        Q.   Right.  But he doesn't do that or

1                       Malaspina

2   recollection.  But that's sort of where I'm

3   sitting here.  I think it's highly unlikely I

4   received anything related to Quincy.

5        Q.   Okay.

6            MR. SUDEN:  I'm going to that ask the

7        New York AG's office produce any documents

8        that were sent to, cc'd, bcc'd,

9        Dr. Malaspina, while he was the chief

10        economist that have anything to do with

11        Quincy or the issues in this case.

12            MS. MATUSCHAK:  I can just represent

13        to you on the record that Dr. Malaspina did

14        not work on Quincy matters while he was at

15        the AG.

16            MR. SUDEN:  Right.  I appreciate that,

17        but the doctor seems to be saying that he

18        may have received emails, on/off emails or

19        something that have to do with Quincy or

20        Prevagen.  So we would just ask that you

21        confirm that either no such emails were

22        sent to him or, if they were, that he

23        produce them.

24            MS. MATUSCHAK:  We can deal with that

25        off the record.

1

2                    C E R T I F I C A T E

3

4    STATE OF NEW YORK      )
                            )  Ss.:
5    COUNTY OF NEW YORK     )

6            I JEFFREY BENZ, a Certified Realtime

7        Reporter, Registered Merit Reporter and

8        Notary Public within and for the State of

9        New York, do hereby certify:

10           That PETER A. MALASPINA, Ph.D., the

11       witness whose examination is hereinbefore

12       set forth, was duly sworn by me and that

13       this transcript of such examination is a

14       true record of the testimony given by such

15       witness.

16           I further certify that I am not

17       related to any of the parties to this

18       action by blood or marriage; and that I am

19       in no way interested in the outcome of this

20       matter.

21           IN WITNESS WHEREOF, I have hereunto

22       set my hand this 13th of October, 2021.

23

24       _____

25                    JEFFREY BENZ, CRR, RMR

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FEDERAL TRADE COMMISSION and<br><br>THE PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York,<br><br>Plaintiffs,<br><br>v.<br><br>QUINCY BIOSCIENCE HOLDING COMPANY, INC., a corporation;<br><br>QUINCY BIOSCIENCE, LLC, a limited liability company;<br><br>PREVAGEN, INC., a corporation d/b/a/ SUGAR RIVER SUPPLEMENTS;<br><br>QUINCY BIOSCIENCE MANUFACTURING, LLC, a limited liability company; and<br><br>MARK UNDERWOOD, individually and as an officer of QUINCY BIOSCIENCE HOLDING COMPANY, INC., QUINCY BIOSCIENCE, LLC, and PREVAGEN, INC.,<br><br>Defendants. | Case No. 1:17-cv-00124-LLS |

I, Peter A. Malaspina, hereby make the following corrections to the transcript of my deposition, which occurred on October 1, 2021:

| PAGE | LINE(S) | CORRECTION | REASON |
|---|---|---|---|
| 56 | 18 | "I test" to "ith test" | Typographical error |
| 57 | 13 | "01" to "0/1" | Typographical error |
| 90 | 16 | "on structuring" to "unstructuring" | Typographical error |

| 91 | 18 | "So I'm not sure. It's just a question"<br>to<br>"So, I'm not sure it's just a question" | Typographical error |
|---|---|---|---|
| 135 | 4 | "guesses one" to "guess it's one" | Typographical error |
| 135 | 20 | "Type 2 fixed" to "Type 3 fixed" | Typographical error |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 12, 2021.

PETER A. MALASPINA