# EXHIBIT B

# In the Matter of:

# FTC, et al. v. Quincy Bioscience Holding, et al.

*October 5, 2021*
*Lee-Jen Wei, Ph.D. - Confidential*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Page 1**

```
 1            UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF NEW YORK
 3
 4   FEDERAL TRADE COMMISSION and  )
 5   THE PEOPLE OF THE STATE OF    )
 6   NEW YORK, BY LETITIA JAMES,   )
 7   ATTORNEY GENERAL OF THE STATE )
 8   OF NEW YORK,                  )
 9         Plaintiffs,             )
10         -vs-                    ) Case No.
11   QUINCY BIOSCIENCE HOLDING     ) 1:17-CV-00124-LLS
12   COMPANY, INC., a corporation, )
13   et al.,                       )
14         Defendants.             )
15   -----------------------------)
16
17          CONFIDENTIAL - ATTORNEYS' EYES ONLY
18
19          The videotape deposition of LEE-JEN
20   WEI, PH.D., was taken on Tuesday, October 5,
21   2021, commencing at 9:33 a.m., remotely, before
22   Tammy S. Newton, Notary Public.
23
24
25
```

**Page 2**

```
 1               A P P E A R A N C E S
 2         ON BEHALF OF PLAINTIFFS:
 3             ANNETTE SOBERATS, ESQUIRE
 4             EDWARD GLENNON, ESQUIRE
 5             ANDREW WONE, ESQUIRE
 6             Federal Trade Commission
 7             600 Pennsylvania Avenue, N.W.
 8             Washington, D.C. 20850
 9             asoberats@ftc.gov
10                and
11             KATE MATUSCHAK, ESQUIRE
12             Attorney General of the State of
13             New York
14             Assistant Attorney General
15             Consumer Frauds and Protection Bureau
16             28 Liberty Street
17             New York, New York 10005
18             (212) 416-6189
19             kate.matuschak@ag.ny.gov
20
21
22
23
24
25
```

**Page 3**

```
 1         ON BEHALF OF CORPORATE DEFENDANTS:
 2             GLENN T. GRAHAM, ESQUIRE
 3             GEOFFREY W. CASTELLO, III, ESQUIRE
 4             JACLYN M. METZINGER, ESQUIRE
 5             Kelley Drye & Warrent
 6             101 Park Avenue
 7             New York, New York 10178
 8             (212) 808-7800
 9             ggraham@kelleydrye.com
10
11         ON BEHALF OF DEFENDANT UNDERWOOD:
12             MICHAEL B. de LEEUW, ESQUIRE
13             TAMAR WISE, ESQUIRE
14             Cozen O'Connor
15             45 Broadway Atrium, Suite 1600
16             New York, New York 10006
17             (212) 908-1331
18             mdeleeuw@cozen.com
19
20         ALSO PRESENT:
21             Pat Ruffner, Videotape Operator
22             Will Ducklow, FTC Investigator
23             David Ovadia, FTC Economist
24
25
```

**Page 4**

```
 1                    C O N T E N T S
 2   EXAMINATION OF LEE-JEN WEI, PH.D.       PAGE:
 3       By Ms. Soberats                         6
 4       By Ms. Matuschak                      279
 5
 6   DEPOSITION EXHIBITS                     PAGE:
 7   LJ-1 - Rebuttal Expert Report of
 8          Professor Lee-Jen Wei               33
 9   LJ-2 - Complaint for Permanent Injunction
10          and Other Equitable Relief          41
11   LJ-3 - Madison Memory Study               135
12   LJ-4 - Lerner MMS Write-up                188
13   LJ-5 - E-mail                             204
14   LJ-6 - AD8 2-3 Subgroup Analysis          219
15   LJ-7 - Cogstate Data Guidelines for
16          Analysis                           239
17   LJ-8 - JAMA Open Article                  241
18   LJ-9 - Viewpoint Article                  259
19   LJ-10 - MMS Write-up Interim Data         262
20
21
22
23
24
25
```

45

1 language in this paragraph containing the
2 complaint allegations referring to relatively
3 healthy, non-demented adults?
4      MR. GRAHAM:  Objection.
5      THE WITNESS:  Well, ma'am, I'm not
6 expert in neuroscience.  I cannot quantify this
7 paragraph it's related to healthy adults or not.
8 I'm basically a statistician.  I'm not in a
9 position to say to you by reading this paragraph
10 using applicable to the healthy subject or not.
11 BY MS. SOBERATS:
12    Q    Please turn to the next page, page 27,
13 and I'd like you to scroll to Count II of the
14 complaint.
15    A    Yes, ma'am.
16    Q    This count contains the false proof
17 claims that the Federal Trade Commission is
18 challenging.
19      MR. GRAHAM:  Objection.
20 BY MS. SOBERATS:
21    Q    And here the Federal Trade Commission
22 alleges that defendants claimed "Prevagen is
23 clinically shown to improve memory.  Prevagen is
24 clinically shown to improve memory in 90 days.
25 Prevagen is clinically shown to reduce memory

46

1 problems associated with aging.  And Prevagen is
2 clinically shown to provide other cognitive
3 benefits, including but not limited to healthy
4 brain function, a sharper mind, and clearer
5 thinking."
6      Do you see those claims in Count II of
7 this complaint?
8      MR. GRAHAM:  Objection.
9      THE WITNESS:  Well, ma'am, with all
10 due respect, I see that you put me in a very
11 difficult position.  I'm not a neuroscientist.  I
12 cannot convert what you're saying ABCD into the
13 clinical meaning for Wei.
14      Because if you think about it, you're
15 saying Prevagen is clinically shown.  I cannot
16 say that.  I'm not clinical person.  Please also,
17 everywhere you use the word "clinically shown,"
18 "clinically shown," how can I tell you it's
19 clinically shown.  I can tell you from a
20 statistical point of view, statistically shown or
21 not.
22      I'm really sorry.  This is not my
23 actual -- the expertise.  I can tell you Prevagen
24 is a clinically meaningful dietary supplement to
25 any of the functional CNS function.  Basically I

47

1 can't.
2 BY MS. SOBERATS:
3    Q    Understood.  Were you aware that the
4 Federal Trade Commission was challenging claims
5 that Prevagen is clinically shown to provide
6 these benefits?
7      MR. GRAHAM:  Objection.
8      THE WITNESS:  Well, ma'am, you show me
9 this document.  You said this is FTC filed a
10 complaint against the sponsor.  I said, Well
11 that's correct.  You show me this document
12 including those claims, probably false proof
13 claims.  I'm not in a position to say Prevagen is
14 or not clinically shown.
15      I don't even know when you're talking
16 about clinically, how do you define this word
17 "clinically"?  Are you telling me from all those
18 nine tests what kind of improvement from the
19 treatment will be classified as a clinically
20 meaningful benefit?  You know, you tell me.  Then
21 I would be happy to entertain your question.
22      I bet you, you ask 10 different
23 clinical people, they would give you 10 different
24 opinions.  What are you talking about?  Right.
25 This is such a gray area.

48

1      I think, ma'am, with all due respect,
2 you should get the clinical expertise to confirm
3 what you are asking me at this moment.
4 BY MS. SOBERATS:
5    Q    Had you seen these claims before
6 today, Dr. Wei?
7    A    Ma'am, I -- I am sorry.  I don't
8 remember I read this complaint.
9    Q    Dr. Wei, in your report, you included
10 a citation to the Prevagen.com website.  Did you
11 review that website?
12    A    I believe I read that website even
13 before the -- I put a -- the report together.
14 Since then, I didn't go back to the website to
15 refresh my memory.  So I don't recall what
16 exactly it is saying now.
17      Basically, ma'am, my report are based
18 on the material I provide in Appendix B, and I --
19 my assignments, as you know very well,
20 two-folded.  One is to assess what Dr. Wittes and
21 Dr. Sano's report, if they actually -- their
22 claims are correct or not.  That's the first
23 assignment I had.
24      The second assignment, based on all
25 the reports I received from Quincy Bioscience,

12 (Pages 45 to 48)

185

1  You're using totality of nine outcomes
2  as the primary endpoint, instead of you pick up a
3  separate -- one is a primary and the rest eight
4  guys are secondary.  They don't do that.  Right.
5  They wanted to look at the data totality, but
6  unfortunately, when they analyze data, they
7  didn't do that using totality of evidence.
8       Q   They analyzed each task separately?
9       A   Yeah.  That was a mistake.  Actually,
10 but -- those guys are not -- they were not expert
11 in statistics back in 2011.  And I don't think
12 they understand it how to combine information.
13 Nowadays we know.  We know how to do that.
14      Q   So how would you combine the nine
15 tasks into one primary endpoint?  Would you
16 calculate a composite score?
17      A   Yeah.  That's a very good question.
18 You -- one approach is just like saying for each
19 patient, I get a composite score, whichever they
20 want to call it.  From a clinical utility point
21 of view, I have a nine tests.  Each test has a
22 score.  You add it up and say, This is beautiful.
23 You are doing very well.  Right.
24      Another way is more like a statistical
25 argument.  You're saying I have a nine tests.  I

186

1  still following your convention wisdom.  For each
2  outcome, I get a summary, right, for the
3  difference between the two groups.  Then I say, I
4  have a nine summary numbers in front of me.
5      Then I ask myself, Hey, listen, look
6  at this nine outcomes, how they actually
7  correlate with each other.  If those nine
8  outcomes, they all tended to go to your direction
9  in favor of your treatment.  I said, Wow, this is
10 beautiful.  You know, if there is no difference,
11 my -- my outcomes should be fluctuated around
12 zero, right, back and forth, back and forth.
13 It's random.
14     Now you say the majority of outcome
15 result, they only in favor of yours.  You think
16 there's a very strong signal.  The answer is yes
17 actually.  In fact, we can quantify this idea by
18 the paper cited below, and it's one of my
19 students Daniel Li where he publish in I think --
20 I see it two years ago in JAMA, JAMA Open.
21     COURT REPORTER:  What was that?
22     THE WITNESS:  In JAMA.  J-A-M-A,
23 O-P-E-N.
24 BY MS. SOBERATS:
25     Q   And the paper you're referring to, is

187

1  it in your materials reviewed list?
2       A   That was my paper.
3       Q   You're referring to the Li Daniel
4  paper from JAMA?
5       A   Yes, ma'am.
6       Q   Okay.  Did you calculate a composite
7  score for the nine Cogstate tasks in the Madison
8  Memory Study?
9       A   I need clinical folks help me
10 construct a composite score across nine.
11 Statistician cannot construct so-called score --
12 composite score, as you know very well, ma'am.
13      Q   Did you attempt to conduct the other
14 analysis that you just described about looking at
15 how the nine outcomes, I think you said,
16 correlate together?
17          MR. GRAHAM:  Objection.
18          THE WITNESS:  They actually go
19 together, right.  For example, if you have nine
20 outcomes, like seven outcomes, they are all in
21 favor of yours.  Now you ask yourself and say,
22 can you quantify the chance.  And if there is no
23 difference between the two arms, what will be the
24 chance of observing this pretty interesting
25 positive trend.  That's the method Daniel Li

188

1  presented.
2      Actually, it was older method where he
3  published back in 1984.  The method was called
4  Wei and Lachin, which was a very popular clinical
5  trial.  You know, but unfortunately, I don't have
6  the data from Bio -- Quincy Bioscience, and that
7  was not my assignment either.  So I didn't -- I
8  didn't analyze it using this very nice way to do
9  it.
10 BY MS. SOBERATS:
11     Q   Dr. Wei, I just revealed a new
12 exhibit.  It should load on the left side of your
13 screen for Agile Law.  I'm showing you what I
14 marked as exhibit LJ-4.
15         (Deposition Exhibit Number LJ-4 was
16 marked for identification and attached to the
17 transcript.)
18         THE WITNESS:  Yes, ma'am.
19 BY MS. SOBERATS:
20     Q   At various points throughout the day
21 you've referred to a document with the title
22 "Clinical Trial Synopsis" from 2016.  Is this the
23 document you were referring to?
24     A   Yes, ma'am.
25     Q   Okay.  So this is a write-up titled

297

1 Right. And the corresponding treatment arm, Day
2 90 is 27.25. Okay. It's like the previous
3 counsel took a difference between 27.25 minus
4 25.19. That's a single number and you put aside.
5 And then you start to figure out what's the
6 standard error. Right.
7     So the standard error is very simple.
8 So you have standard deviation for placebo arm
9 5.163. Right. Okay. That's a standard
10 deviation. You take a square of this value, so
11 roughly 25. 25 divided by 40, which is sample
12 size for this group, and then you plus the
13 similar quantity using the treated arm standard
14 deviation 5.102. You also square this guy. By
15 this time, you divide it by 60. Right.
16     So that's -- you add it up, that's two
17 variances. Take a square root of this two guys
18 to sum it up, multiply by two. So you plus this
19 quantity, this upper bound, minus this quantity,
20 that's lower bound. That's it. That's 95
21 percent confidence interval.
22     Unfortunately, you know, neither Dr.
23 Wittes or Dr. Sano noticed this part. Right.
24 They didn't even calculate the confidence
25 interval, just like me. They actually

298

1 concentrate on p-values.
2     MS. MATUSCHAK: Thank you, Dr. Wei. I
3 have no further questions.
4     THE WITNESS: Okay.
5     MS. MATUSCHAK: Do the defendants have
6 any questions?
7     MR. de LEEUW: I have nothing.
8     THE WITNESS: Sorry. Glenn, I cannot
9 hear you.
10     MR. GRAHAM: Nothing from our end,
11 L.J.
12     MR. de LEEUW: Nothing here either.
13 Thanks.
14     VIDEOTAPE OPERATOR: Here ends today's
15 deposition. Off the record at 5:50 p.m.
16 (Whereupon, the deposition concluded at 5:50
17 p.m.)

299

1     * * *
2     ACKNOWLEDGMENT OF DEPONENT
3
4 I, Lee-Jen Wei, do hereby acknowledge I have read
5 and examined the foregoing pages of testimony,
6 and the same is a true, correct and complete
7 transcription of the testimony given by me, and
8 any changes and/or corrections, if any, appear in
9 the attached errata sheet signed by me.
10
11
12 _____ _____
13 Date    Lee-Jen Wei

300

1 CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2     I, Tammy S. Newton, the officer before
3 whom the foregoing proceedings was taken, do
4 hereby certify that the foregoing transcript is a
5 true and correct record of the proceedings; that
6 said proceedings were taken by me
7 stenographically and thereafter reduced to
8 typewriting under my supervision; and that I am
9 neither counsel for, related to, nor employed by
10 any of the parties to this case and have no
11 interest, financial or otherwise, in its outcome.
12     IN WITNESS WHEREOF, I have hereunto set
13 my hand and affixed my notarial seal this 13th
14 day of October, 2021.
15 My commission expires:
16 3/05/2022
17
18     s/Tammy S. Newton
19     Notary Public in and for the
20     State of Maryland