# EXHIBIT C

# In the Matter of:

# FTC, et al. v. Quincy Bioscience Holding, et al.

*October 20, 2021*
*David Katz, M.D., MPH - Confidential*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Case 1:17-cv-00124-LLS   Document 316-3   Filed 10/03/22   Page 3 of 9
Katz, M.D., MPH - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                           10/20/2021

```
                                  1
 1            UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF NEW YORK
 3
 4   FEDERAL TRADE COMMISSION and    )
 5   THE PEOPLE OF THE STATE OF      )
 6   NEW YORK, BY LETITIA JAMES,     ) Case No.
 7   ATTORNEY GENERAL OF THE STATE   ) 1:17-cv-00124-LLS
 8   OF NEW YORK,                    )
 9         Plaintiffs,               )
10      vs.                          )
11   QUINCY BIOSCIENCE HOLDING       )
12   COMPANY, INC., a corporation,   )
13   et al.,                         )
14         Defendants.               )
15
16          CONFIDENTIAL - ATTORNEYS' EYES ONLY
17
18   Wednesday, October 20, 2021, Via Zoom Videoconference
19
20         The above-entitled matter came on for
21   deposition, pursuant to notice, at 9:30 a.m., for the
22   testimony of:
23              DAVID KATZ, M.D., MPH
24
25   Reported by:  Deborah Wehr, RPR
```

```
                                  2
 1   APPEARANCES:
 2
 3   ON BEHALF OF PLAINTIFFS:
 4        ANNETTE SOBERATS, ESQUIRE
 5        EDWARD GLENNON, ESQUIRE
 6        ANDREW WONE, ESQUIRE
 7        WILLIAM DUCKLOW, INVESTIGATOR
 8        DAVID OVADIA, ECONOMIST
 9        600 Pennsylvania Avenue, N.W.
10        Washington, D.C.  20850
11        (202) 326-3148
12        annette.soberats@ftc.gov
13
14   KATE MATUSCHAK, ESQUIRE
15        Attorney General of the State of New York
16        Consumer Frauds and Protection Bureau
17        28 Liberty Street
18        New York, New York  10005
19        (212) 416-6189
20        kate.matuschak@ag.ny.gov
21
22
23
24
25   (Appearances continued on next page.)
```

```
                                  3
 1   (Appearances continued.)
 2
 3   ON BEHALF OF CORPORATE DEFENDANTS:
 4        GEOFFREY W. CASTELLO, ESQUIRE
 5        JACLYN M. METZINGER, ESQUIRE
 6        GLENN GRAHAM, ESQUIRE
 7        CAITLIN R. HICKEY, ESQUIRE
 8        Kelley Drye & Warren, LLP
 9        101 Park Avenue
10        New York, New York 10178
11        (212) 808-7800
12        gcastello@kelleydrye.com
13
14   ON BEHALF OF DEFENDANT UNDERWOOD:
15        MICHAEL B. de LEEUW, ESQUIRE
16        TAMAR S. WISE, ESQUIRE
17        Cozen O'Connor
18        45 Broadway Atrium
19        Suite 1600
20        New York, New York  10006
21        (212) 908-1331
22        mdeleeuw@cozen.com
23
24   ALSO PRESENT:
25   ERIC VAVRASEK, VIDEOGRAPHER
```

```
                                  4
 1                  I N D E X
 2
 3   EXAMINATION BY                              PAGE
 4   Ms. Soberats                                 6
 5   Ms. Matuschak                              228
 6
 7   EXHIBIT       DESCRIPTION                   PAGE
 8   DK-1          Expert report                  10
 9   DK-2          Western Sugar order            44
10   DK-3          2001 textbook                  81
11   DK-4          Article                        88
12   DK-5          MMS protocol                  114
13   DK-6          Lerner transcript             122
14   DK-7          Clinical Trial Synopsis       134
15   DK-8          Jeckel's Epidemiology         146
16   DK-9          Rebuttal report               155
17   DK-10         11/23/16 e-mail               165
18   DK-11         Moran article                 167
19   DK-12         Complaint                     179
20   DK-13         Dietary supplements           180
21   DK-14         SUR analysis                  205
22   DK-15         FDA news release              218
23   DK-16         GRAS notification             244
24   DK-17         Retraction Watch              262
25
```

25

nutraceuticals and evidence-based integrative medicine practice. Can you give me examples of some of the nutraceuticals that you most widely used during the 15 years that you were at the Integrative Medicine Center?

A. These were highly personalized to address individual patient concerns. So all I can do to be efficient here would offer a representative list, but curcumin was routinely used as an anti-inflammatory. Concentrated omega 3s were used as anti-inflammatories and to ameliorate autoimmune disease. Glycyrrhiza was routinely used as a slight stimulant for blood pressure, some use in people with something called orthostatic hypotension. A number of nutraceuticals and botanicals were used to facilitate sleep and alleviate anxiety. Among those we made use of most routinely was L-theanine which is a modified amino acid. Echinacea was used sometimes as an immune stimulant to help people who had frequently recurring viral infections. Lysine was used as a suppressant for recurrent herpes simplex. Coenzyme Q10 was used routinely for support of cardiac function. I can keep going, but a wide array of personally directed nutraceuticals often in combination with one another, often in combination with pharmacotherapy and other

26

modalities.

Q. Were any of the nutraceuticals that you used at the Integrative Medicine Center intended for memory or cognitive impairment?

A. Probably so. Certainly there were people who were interested in enhancing cognition and asked questions about availability of products to help with that. So in the mix was the use of various things to support cognitive function, although generally, the focus there was on overall aspects of health that potentially contributed to brain function. So circulation, for example. And the use of nutraceuticals to support cognition would sometimes be what we might call indirect. So by addressing enhanced circulatory health, you are enhancing the function of all body organs, brain included.

Q. Can you give me a couple of examples of nutraceuticals that you would have recommended for memory or cognitive improvement during this time?

MR. CASTELLO: Objection.

THE WITNESS: You are asking what I would have recommended and you noted in your introduction that this was team care. So very often the specific recommendations for nutraceuticals came from naturopathic colleagues seeing the same patient at the

27

same time. As the senior physician, I needed to approve all such recommendations. We essentially managed patient care jointly, and I signed off on all the cases.

So examples would include some of the compounds I already mentioned. Omega 3 is in particular one of the prevalent, omega 3 fatty acids, docosahexaenoic acid is concentrated in the brain as associated with both mood stability and cognitive function. We used that routinely. B complex is associated with neuronal activity. So B6, B12 and sometimes the full suite of B vitamins were used. Arginine is an amino acid that is a precursor to nitric oxide which facilitates vasodilation, enhances blood flow. That was in the mix and a range of many others.

BY MS. SOBERATS:

Q. Thank you. It is my understanding that the Integrative Medicine Center ceased operations in November of 2014; is that correct?

A. I recall it being approximately 2015, but November 2014 certainly wouldn't be far wrong.

Q. And why did it close?

A. The cost of this care model was very high, and the hospital essentially was pushing for a more profitable model of care. Seeing very difficult,

28

challenging patients who more often than not have been everywhere, tried everything, still needed help in a team care model was obviously not compatible with the prevailing reimbursement for medical care in the United States. We were often left to bill patients out of pocket, but we wanted to help patients who really couldn't afford this model of care. So historically, the Integrative Medicine Center lost money for the hospital. So they were tired of carrying the economic burden. They no longer had the time, because my career was shifting more toward aspects of public health, to devote to trying to create new means of making the Integrative Medicine Center more profitable. So we agreed that it had run its course after the better part of 15 years.

Q. Dr. Katz, have you obtained a degree in statistics?

A. No.

Q. Have you completed any coursework or training in statistics?

A. Yes.

Q. Can you describe that for me?

A. A master's in public health involves fairly extensive training in biostatistics. In my case, I focused especially on statistical elements useful for

29

1   me in the clinical research career. I was trained in
2   SAS programming language and trained in routine methods
3   of biostatistics and actually went on to become the
4   course director in biostatistics for Yale medical
5   students for roughly a decade and have coauthored now
6   five editions of a textbook on epidemiology,
7   biostatistics, preventive medicine in public health.
8       Q. You mentioned you were the course director of
9   biostatistics at the Yale University School of
10  Medicine. Do you actually -- did you actually teach
11  biostatistics courses while you were at Yale?
12      A. I don't understand the question.
13      Q. Did you teach biostatistics courses while you
14  were at the Yale School of Medicine?
15      A. I'm sorry, I don't understand the question. I
16  taught biostatistics at the Yale School of medicine.
17  But you mean while I was a student?
18      Q. No, no, you have answered my question. I
19  understand your answer. Did you teach seemingly
20  unrelated regressions in that class?
21      A. No.
22      Q. And were you -- did you cover seemingly
23  unrelated regressions while you were undergoing your
24  biostatistics training as part of your master's of
25  public health program?

30

1       A. I don't recall ever encountering that method at
2   that time.
3       Q. Do you have any academic appointments at Yale
4   currently?
5       A. No.
6       Q. In what year was your last academic appointment
7   at the Yale School of Medicine?
8       A. I stepped down -- the final position I held was
9   director of the Yale University Prevention Research
10  Center, and I stepped down in 2019 to run my own
11  company.
12      Q. Do you have any appointments at Yale currently?
13      A. No.
14      Q. And were you ever a full professor at Yale?
15      A. No.
16      Q. Have you obtained a degree in economics?
17      A. No.
18      Q. Have you obtained any coursework or training in
19  econometrics?
20      A. Coursework, it's possible. I did take
21  economics as an undergraduate, and that may have
22  figured in the content, but to be honest, it was a very
23  long time ago.
24      Q. Do you have a law degree?
25      A. No.

31

1       Q. Have you obtained a degree in biochemistry?
2       A. No.
3       Q. Did you complete any coursework or training in
4   biochemistry?
5       A. Yes.
6       Q. Can you describe that for me.
7       A. Biochemistry is a requirement in medical
8   school.
9       Q. How many semesters of biochemistry did you
10  obtain during medical school?
11      A. I don't recall.
12      Q. Outside of medical school, have you completed
13  any coursework or training in biochemistry?
14      A. Chemistry per se, which included some
15  biochemistry, was a premedical requirement as well.
16      Q. And you --
17      A. In my case --
18      Q. You would have fulfilled that in your
19  undergraduate studies?
20      A. I was going to say in my case, I think I
21  fulfilled it in an AP course in high school.
22      Q. Okay. What specific training do you have in
23  the field of memory or cognition?
24      A. The training that any medical student and
25  internal medicine trainee would receive, a general

32

1   understanding of neuroanatomy, neurophysiology, the
2   anatomy of the brain, the mechanisms of short-term and
3   long-term memory, pathophysiology that can impair
4   those.
5       Q. Do you belong to any professional organizations
6   in the field of memory or cognition?
7       A. Not per se.
8       Q. Do you belong to any professional organizations
9   in the field of statistics?
10      A. Again, not per se.
11      Q. Have you ever conducted any clinical trials
12  involving treatment of memory loss or cognitive
13  decline?
14      A. Never as the primary study focus.
15      Q. Have you ever conducted any clinical trials
16  examining how a protein is digested in the human body?
17      A. No.
18      Q. Have you ever conducted any clinical trials
19  involving the gut-brain access?
20      A. Arguably, yes. We conducted studies of
21  probiotics and were looking at potential systemic
22  effects at least once, possibly twice. So the
23  gut-brain access --
24      Q. When you say at least once or twice, are you
25  referring to one or two studies?

8 (Pages 29 to 32)

205

1 to recommend that universally. Whether or not you can
2 get everybody to do it is another story.
3    Q. I would like to move on to the SUR analysis.
4 **Is SUR an econometric model?**
5    A. It can be used in econometrics. I don't know
6 that that is the limitations of its use. Can it be an
7 econometric model? Is that what you are asking or did
8 it originate as an econometric model?
9    **Q. I understand your point. I think I can move**
10 **on, actually. And just to be clear for the record,**
11 **when I say SUR, I'm referring to the seemingly**
12 **unrelated regressions model.**
13    A. Yeah, I recognized that as opposed to suddenly
14 getting more formal with me.
15    **Q. In your opinion is SUR a method for correcting**
16 **for multiplicity?**
17    A. That's not my understanding, no.
18       (Katz Deposition Exhibit Number DK-14 was
19 marked for identification.)
20       BY MS. SOBERATS:
21    **Q. I have just revealed a new exhibit which has**
22 **been marked as Exhibit DK-14. This is titled**
23 **Exhibit B, Madison Memory Study: An Expanded Analysis.**
24 **And the authors are J. Howard Beales, III, Janet Liang,**
25 **Ph.D., and Robert Fenili, Ph.D., and it is dated**

206

1 **July 18, 2019. Have you seen this document before?**
2    A. I have.
3    **Q. And the seemingly unrelated regression analysis**
4 **that you referred to in your report is contained within**
5 **this paper, correct?**
6    A. Yes, this was the reference. This and direct
7 conversation with Dr. Beales.
8    **Q. Did you ever have discussions with Dr. Beales**
9 **about the SUR analysis outside presence of counsel?**
10    A. No.
11    **Q. Can you turn to page 5 of this paper, Exhibit**
12 **DK-14. And there are two tables listed here, Table 2.1**
13 **and Table 2.2. And they report F values. Do you see**
14 **that?**
15    A. Yes.
16    **Q. What is an F test in the context of this paper?**
17    A. I profess no specific expertise in this
18 analytical method. But the statistic in this case, the
19 F statistic in the case of T tests, T statistic is
20 essentially some critical ratio of effect that is used
21 as the basis to determine statistical significance. So
22 with any given analytical test, you generate some
23 quantity. It may relate to error terms. It may relate
24 to the primary effect terms. It may relate to a ratio
25 of observe to expected as in chi-square testing. There

207

1 are many different test statistics across the expanse
2 of hypothesis and they'll take many different numerical
3 forms. So the F statistic is one of those. It is
4 apparently the one that emanates from seemingly
5 unrelated regression, which is a technique I have never
6 used and do not know intimately.
7       And then that statistic is interpreted in light
8 of the analysis run, which usually involves things like
9 degrees of freedom to generate the threshold of
10 statistical significance.
11    **Q. Now -- were you done?**
12    A. I'm sorry, I was going to say the associated
13 statistical significance is in the column in both Table
14 2.1 and 2.2.
15    **Q. That's Pr less than F column?**
16    A. Probability, that's right.
17    **Q. And do you agree that the F values reported in**
18 **these two tables do not indicate whether Prevagen**
19 **outperforms placebo or vice versa?**
20    A. I would have to spend a lot more time working
21 on the details of these tables. I think, frankly, they
22 are quite abstruse. We see a whole host of
23 statistically significant test statistics here. So we
24 would have to spend time attempting to interpret that.
25 I can't give you an answer.

208

1    **Q. Do you agree that you would need to assess the**
2 **individual Cogstate task to determine the magnitude of**
3 **the treatment effect for each task?**
4    A. Do I agree that you would need to study a given
5 task to determine the magnitude of treatment effect for
6 that specific task?
7    **Q. Yes.**
8    A. That makes sense, sure.
9    **Q. Let's go back to your report. This is**
10 **Exhibit DK-1. And I would like you to turn to page 18**
11 **of the PDF, which is page 16 of your report. I would**
12 **like you to turn to paragraph 35. Here you state, "We**
13 **have also reviewed the 'seemingly unrelated regression'**
14 **analysis. That analysis based on the full array of**
15 **cognitive measures produces decisively significant**
16 **results for those study participants without overt**
17 **cognitive impairment." Do you see that?**
18    A. I do.
19    **Q. And you relied upon the SUR analysis reported**
20 **in Exhibit DK-14 to reach that opinion, correct?**
21    A. And additional guidance from Dr. Beales to help
22 me understand it.
23    **Q. What guidance from Dr. Beales did you receive**
24 **to help you understand this?**
25    A. Our discussions were about the general utility

209

1  of the method, what it was used to do. It was
2  certainly not a tutorial in how to conduct it
3  independently, but why he did it, why he thought it was
4  relevant, what results he, as an expert in the method,
5  thought it produced. I was guided in this particular
6  matter by his expertise.
7      Q. Would you have been able to reach the opinion
8  you express here without speaking with Dr. Beales?
9      A. A related conclusion just by reading the paper
10 that this enhanced the conviction that there was an
11 important therapeutic effect by aggregating across
12 components of the Cogstate, but I think somewhat less
13 emphatic than stated here because, again, I received
14 additional insights directly from the source that
15 helped to inform my determination.
16     Q. When you spoke with Dr. Beales, did you review
17 any other documents related to his SUR analysis?
18     A. Not that I recall.
19     Q. Do you agree that this SUR analysis is a post
20 hoc analysis of the Madison Memory Study data?
21         MR. CASTELLO: Objection.
22         THE WITNESS: I think that's difficult to
23 answer, because as you noted earlier today, there's
24 reference to the Cogstate battery of tests, and if we
25 want to get the terminology just right, we'll have to

210

1  go back to the protocol document again. But there's
2  reference to the Cogstate software and there is no
3  explicit mention in the protocol of using only one
4  component of the Cogstate battery of tests. By
5  implication, then, one presumes you are going to use
6  them all. And that begs the question how are you going
7  to put them together. Admittedly, the protocol didn't
8  tell us what analytical technique would be used to
9  aggregate those component measures into the single
10 parent measure. But there certainly was at least the
11 suggestion that the single parent measure was of
12 interest.
13     BY MS. SOBERATS:
14     Q. And scrolling back to page 1 of Exhibit DK-14,
15 which contains the SUR analysis, you see that it's
16 dated 2019, correct?
17     A. I see that.
18     Q. And so this analysis was conducted after the
19 data for the Madison Memory Study was examined,
20 correct?
21     A. I don't recall the exact date the data were
22 examined. I don't know that I was involved in that,
23 but that's my understanding, yes, this was after.
24     Q. If you can scroll back to your initial expert
25 report, that's Exhibit DK-1, and I would like you to

211

1  scroll to page 28 of the PDF, which is page 26 of your
2  report, and if you could navigate to paragraph 61.
3      A. I'm actually seeing that on page 27.
4      Q. Just a moment. Okay. In paragraph 61, you
5  write, "Thus, the expected movement in one relative to
6  the other would not be an independent measure but a
7  confirmatory one. Similarly, measures of different
8  dimensions of cognitive function are likely to be
9  highly correlated. The 'seemingly unrelated
10 regression' approach is a more appropriate method to
11 deal with related measures as opposed to the Bonferroni
12 correction." Is it your opinion that SUR and the
13 Bonferroni correction are mutually exclusive
14 statistical techniques?
15     A. No, not within the context of the given study.
16 No, rather the opposite. It's my impression they do
17 very different things.
18     Q. And what issue does the Bonferroni correction
19 account for?
20     A. It's a correction for multiplicity, testing
21 multiple hypotheses or using multiple independent
22 outcome measures in the same study. I won't embellish,
23 but I certainly could imagine a study that would
24 warrant something like a SUR analysis and a Bonferroni.
25     Q. Thank you. If you could turn back to Exhibit

212

1  DK-14, and scroll to page 2 of that exhibit which is
2  also -- page 2 of the PDF, which is also page 2 of the
3  exhibit, in the first sentence of section 2 which is
4  titled Mixed-Effect Seemingly Unrelated Regression
5  Model, the author states, "In previous analyses, the
6  nine measures of cognitive efficacy were analyzed
7  separately for each group. These tests were done under
8  the assumption that each measure was independent of
9  other measures." Do you see that?
10     A. I do.
11     Q. Do you agree that in prior analyses of the
12 Madison Memory Study, the nine Cogstate measures were
13 analyzed separately for each subgroup?
14     A. They were analyzed separately, yes.
15     Q. And do you agree that in prior analyses of the
16 Madison Memory Study, the researchers assumed each of
17 the nine Cogstate measures were independent of the
18 other measures?
19     A. I don't have any basis to reach that
20 conclusion.
21     Q. Going back to your expert report, Exhibit DK-1,
22 I would like you to turn to page 18 of the PDF, which
23 is page 16 of your report. And if you could navigate
24 to paragraph 36, here you state, "The analysis also
25 shows a dose-response curve seen for the full array and

213

1  for many of the individual test components of that
2  array." Do you see that statement?
3     A. I do.
4     Q. What do you mean by dose-response curve in this
5  context?
6     A. Generally a greater effect with increased
7  exposure to the treatment, in this case, Prevagen. So
8  for example, if you are looking at curves to represent
9  treatment response versus response in a control group,
10 hit those curves splay over time, and that would be
11 consistent with a dose response. Obviously, another
12 expression of this would be a study that willfully
13 tests different doses of a given compound. That was
14 not done here.
15    MS. SOBERATS: Can we go off the record for a
16 moment.
17    THE VIDEOGRAPHER: We are going off the record
18 at 5:00 p.m.
19    (A recess was taken.)
20    THE VIDEOGRAPHER: We are going back on the
21 record at 5:13 p.m.
22    BY MS. SOBERATS:
23    Q. Dr. Katz, are you rendering an opinion about
24 whether Quincy has sufficient evidence to substantiate
25 its advertising claims?

214

1     MR. CASTELLO: Objection.
2     THE WITNESS: No, not specifically.
3     BY MS. SOBERATS:
4     Q. Do you consider yourself an expert in the AD8
5  questionnaire?
6     A. No.
7     Q. Do you consider yourself an expert in
8  neuropsychology?
9     A. No.
10    Q. Do you consider yourself an expert in cognitive
11 impairment?
12    MR. CASTELLO: Objection.
13    THE WITNESS: I'm tempted to go with I hope
14 not. You know, it's a relevant consideration for
15 anyone practicing internal medicine. So I don't have
16 dedicated expertise in that area. I have, if you will,
17 the generalist's expertise. It's a condition I need to
18 address or needed to address as a clinician.
19    BY MS. SOBERATS:
20    Q. And do you consider yourself an expert in
21 memory?
22    MR. CASTELLO: Objection.
23    THE WITNESS: I don't really know how to
24 interpret that. I understand the importance of it, the
25 impact it has on patients, and once again, it falls or

215

1  rather fell within my clinical purview. But I'm not
2  someone who has devoted a career to the study of
3  memory.
4     BY MS. SOBERATS:
5     Q. Do you consider yourself to be an expert in
6  statistics or biostatistics?
7     A. More than many, less than some.
8     Q. Going back to Exhibit DK-14, I would like you
9  to turn to page 5 of this exhibit. The very first
10 paragraph on that page states, "There are no
11 statistically significant differences between the
12 treatment and control groups in the time pattern of
13 score improvements (Model x Arm x Time)." Do you see
14 that?
15    A. I do.
16    Q. I'm trying to understand how that statement is
17 consistent with your statement that there is a
18 dose-response curve according to this analysis. I read
19 those two statements to be contradictory. Can you
20 explain how there's evidence of a dose-response curve
21 in light of this statement that there are no
22 statistically significant differences between the
23 treatment and control groups in the time pattern of
24 score improvements?
25    A. What I interpret this to mean is that time did

216

1  not alter the relationship between the treatment arm
2  and the other elements of the model. So the general
3  slope of change was established by the particular
4  treatment. But without looking at specific curves and
5  getting into details here, to me it begs questions
6  about the slope of change. But this is what it
7  indicates, that there isn't a meaningful change in the
8  slope of the curves.
9        So for example, if you had a treatment effect
10 which was modest but consistent for some period of
11 time, a month, six weeks, and then suddenly took a
12 dramatic departure and the pace of improvement rapidly
13 accelerated or decelerated, there would be an
14 independent effect of time on the slope of the curve.
15 This statement to me indicates that that was not
16 observed.
17    Q. What information -- moving on to another topic,
18 you discussed Aduhelm and its approval in your rebuttal
19 report. I want to ask you a few questions about that.
20 What information did you review in preparing your
21 statements relating to Aduhelm for your expert rebuttal
22 report?
23    A. Little other than the mainstream media coverage
24 of FDA decisionmaking in reversals. My primary source,
25 since this was not until recently an FDA-approved

54 (Pages 213 to 216)

265

1    CERTIFICATION OF REPORTER
2    DOCKET/FILE NUMBER: 1:17-cv-00124-LLS
3    CASE TITLE: FTC and THE PEOPLE OF THE STATE OF NEW
4    YORK v. QUINCY BIOSCIENCE HOLDING COMPANY, INC., et al,
5    DATE: OCTOBER 20, 2021
6
7        I HEREBY CERTIFY that the transcript contained
8    herein is a full and accurate transcript of the notes
9    taken by me at the hearing on the above cause before
10   the FEDERAL TRADE COMMISSION to the best of my
11   knowledge and belief.
12            DATED: 10/27/2021
13
14
15
16
17            s/Deborah Wehr
18            DEBORAH WEHR, RPR

266

1            CERTIFICATE OF WITNESS
2
3        I hereby certify that I have read and examined
4    the foregoing transcript, and the same is a true and
5    accurate record of the testimony given by me.
6        Any additions or corrections that I feel are
7    necessary, I will attach on a separate sheet of paper
8    to the original transcript.
9        I hereby certify, under penalty of perjury,
10   that I have affixed my signature hereto on the date so
11   indicated.
12
13
14
15   DATED: _____
16            DAVID KATZ, M.D., MPH

267

1    WITNESS: DAVID KATZ, M.D., MPH
2    DATE: OCTOBER 20, 2021
3    CASE: FTC v. QUINCY BIOSCIENCE, ET AL.
4    Please note any errors and the corrections thereof on
5    This errata sheet. The rules require a reason for any
6    Change or correction. It may be general, such as "To
7    Correct stenographic error," or "To clarify the
8    Record," or "To conform with the facts."
9    PAGE LINE    CORRECTION    REASON FOR CHANGE