Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL TRADE COMMISSION and<br><br>THE PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York,<br><br>Plaintiffs,<br><br>v.<br><br>QUINCY BIOSCIENCE HOLDING COMPANY, INC., a corporation;<br><br>QUINCY BIOSCIENCE, LLC, a limited liability company;<br><br>PREVAGEN, INC., a corporation d/b/a/ SUGAR RIVER SUPPLEMENTS;<br><br>QUINCY BIOSCIENCE MANUFACTURING, LLC, a limited liability company; and<br><br>MARK UNDERWOOD, individually and as an officer of QUINCY BIOSCIENCE HOLDING COMPANY, INC., QUINCY BIOSCIENCE, LLC, and PREVAGEN, INC.,<br><br>Defendants. | Case No. 1:17-cv-00124-LLS |

## DECLARATION OF GLENN T. GRAHAM

I, Glenn T. Graham, declare as follows:

1.      I am a member of the Bars of the States of New York, New Jersey, and California, and am a Partner with the law firm of Kelley Drye & Warren LLP.

2.      I submit this declaration in connection with Defendants' Trial Brief.

3.      Attached hereto as **Exhibit A** is a true and correct copy of Plaintiffs' Second Supplemental Responses and Objections to Defendants' Second Set of Interrogatories, dated May 19, 2021.

4.      Attached hereto as **Exhibit B** is a true and correct copy of correspondence from Geoffrey W. Castello to Annette Soberats, Edward Glennon, Andrew Wone, and Kate Matuschak, dated August 30, 2022.

5.      Attached hereto as **Exhibit C** is a true and correct copy of correspondence from Annette Soberats and Kate Matuschak to Geoffrey W. Castello, dated September 21, 2022.

6.      Attached hereto as **Exhibit D** is a true and correct copy of correspondence from Michelle K. Rusk to Geoffrey W. Castello, dated September 16, 2020.

7.      Attached hereto as **Exhibit E** is a true and correct copy of excerpts of the transcript of the individual deposition of Mark Underwood, dated August 21, 2020.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 17, 2022.

GLENN T. GRAHAM

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FEDERAL TRADE COMMISSION and | Case No. 1:17-cv-00124-LLS |
| THE PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, | |
| Plaintiffs, | |
| v. | |
| QUINCY BIOSCIENCE HOLDING COMPANY, INC., a corporation; | |
| QUINCY BIOSCIENCE, LLC, a limited liability company; | |
| PREVAGEN, INC., a corporation d/b/a/ SUGAR RIVER SUPPLEMENTS; | |
| QUINCY BIOSCIENCE MANUFACTURING, LLC, a limited liability company; and | |
| MARK UNDERWOOD, individually and as an officer of QUINCY BIOSCIENCE HOLDING COMPANY, INC., QUINCY BIOSCIENCE, LLC, and PREVAGEN, INC., | |
| Defendants. | |

**PLAINTIFFS' SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO CORPORATE DEFENDANTS' SECOND SET OF INTERROGATORIES**

Plaintiffs, the Federal Trade Commission ("FTC") and the People of the State of New York by New York State Attorney General Letitia James ("NYAG"), hereby submit their second supplemental responses and objections to the Second Set of Interrogatories served by Defendants Quincy Bioscience Holding Company, Inc., Quincy Bioscience, LLC, Prevagen, Inc., and Quincy Bioscience Manufacturing, LLC.

## DEFINITIONS

1.      **"Defendants"** refers to Individual Defendant Mark Underwood and Corporate Defendants Quincy Bioscience Holding Company, Inc., Quincy Bioscience, LLC, Prevagen, Inc., doing business as Sugar River Supplements, and Quincy Bioscience Manufacturing, LLC.

2.      **"Challenged Claims"** means the claims listed in Counts I through IV of Plaintiffs' Complaint filed on or about January 9, 2017 (Dkt. 1).

3.      **"Cogstate Test"** means any of the tests that are part of the Cogstate Research Battery of neuropsychological tests.

4.      **"Madison Memory Study"** means the human clinical study conducted by Defendants in which subjects took either 10 milligrams of apoaequorin or a placebo and were tested at several intervals on Cogstate Tests from the Cogstate Research Battery.

5.      **"Plaintiffs"** refers to the Federal Trade Commission and the People of the State of New York.

6.      **"Prevagen" or "Prevagen Products,"** means any product manufactured by Quincy Bioscience that contains "Prevagen" in the name of the product, including but not limited to Prevagen Regular Strength Capsules (10 mg. apoaequorin), Prevagen Regular Strength 60 Capsules (10 mg. apoaequorin), Prevagen Extra Strength Capsules (20 mg. apoaequorin), Prevagen Mixed Berry Chewable (10 mg. apoaequorin), Prevagen Extra Strength Chewable (20 mg. apoaequorin), and Prevagen Professional Strength (40 mg. apoaequorin).

## GENERAL OBJECTIONS

A.      Plaintiffs reserve the right to assert additional objections to production of information as appropriate and to supplement these objections and responses.

B.      Plaintiffs' willingness to provide information or documents, notwithstanding the objectionable nature of the Interrogatories, shall not be construed as (a) an acknowledgment or admission that the material is relevant, material, or admissible in evidence, (b) a waiver of the General Objections or the objections asserted in response to specific Interrogatories, or (c) an agreement that requests for similar information will be treated in a similar manner.

C.      Plaintiffs' objections and responses to these Interrogatories are based on information now known to them. Plaintiffs have not yet completed their discovery of the facts in this lawsuit, engaged in expert discovery, or prepared for trial and therefore reserve their rights under the Federal Rules and Local Rules to amend, modify, or supplement their objections and responses if they learn of new information.

D.      Plaintiffs object to the definition of "Action" to the extent that it mischaracterizes the caption of the case.

E.      Plaintiffs object to the definitions of "Concerning," "Concern," "Document," "Documents," and "Person" to the extent that they are inconsistent with Local Rule 26.3(c). For the purposes of their responses to these Interrogatories, Plaintiffs will treat each of these terms consistently with Local Civil Rule 26.3(c).

F.      Plaintiffs object to the definition of "Correspondence" to the extent that it is inconsistent with the definitions of "communication" and "document" referenced in Local Civil Rule 26.3(c).

G.      Plaintiffs object to the definition of "Relating to" and "Regarding" to the extent that they are inconsistent with the definition of "concerning" referenced in Local Civil Rule 26.3.

H.      Each of the foregoing General Objections is incorporated into each of the Responses hereinafter set forth. Subject to and without waiving any such objections and the additional objections set forth below, Plaintiffs respond as follows:

## INTERROGATORIES

**INTERROGATORY NO. 3**:

Identify each label, package, packaging insert, point-of-sale display, advertisement, television commercial, marketing material, and/or promotional material concerning Prevagen that You allege is false, misleading, and/or unsubstantiated.

**RESPONSE TO INTERROGATORY NO. 3**:

Plaintiffs object to this Interrogatory on the grounds that such information is in the possession of Defendants or their counsel. This Interrogatory is unduly burdensome in that it requests that Plaintiffs identify all labels, packages, packaging inserts, point-of-sale displays, advertisements, television commercials, marketing materials, and/or promotional materials that may violate the FTC Act as well as New York Executive Law § 63(12) and General Business Law §§ 349 and 350. Plaintiffs object given that Defendants have indicated that they produced only a sample of these materials and have refused to produce every label, package, packaging insert, point-of-sale display, advertisement, television commercial, marketing material, and/or promotional material concerning the Prevagen Products that was disseminated and contained the Challenged Claims.

Plaintiffs also object on the grounds that the request is not relevant to any party's claims or defenses or proportional to the needs of the case. Plaintiffs further object to this request to the extent it seeks information protected from disclosure, including information protected by the work product doctrine, deliberative process privilege, law enforcement privilege, common interest privilege, and non-testifying expert privilege; to the extent it is designed to force an exhaustive or oppressive catalogue of information and a detailed narrative of Plaintiffs' case; and to the extent it seeks production of an exhibit list prior to the time and manner set out in this Court's Joint Report Pursuant to Fed. R. Civ. P. 26(f) and Scheduling Order (Dkt. 59) and

- 4 -

Stipulated Order Allowing Remote Depositions and Revising Fact Discovery Schedule (Dkt. 110).

Subject to and without waiving their General and foregoing objections, Plaintiffs allege that any representation made by Defendants, whether directly or indirectly, expressly or by implication, that the Prevagen Products improve memory, improve memory within 90 days, reduce memory problems associated with aging, or provide any other cognitive benefits, including but not limited to healthy brain function, a sharper mind, or clearer thinking, are false, misleading, or unsubstantiated. Plaintiffs further allege that any representation made by Defendants, whether directly or indirectly, expressly or by implication, that the Prevagen Products are clinically shown to provide such memory and cognitive benefits constitute false proof claims.

The specific labeling, television commercials, and marketing materials concerning Prevagen quoted in ¶¶ 27 and 30 of Plaintiffs' Complaint, and attached as Exhibits to Plaintiffs' Complaint, are illustrative and not exhaustive. As explained in the responses to Interrogatories 5 and 6 below, any advertising statement that creates the net impression of the Challenged Claims violates Sections 5(a) and 12 of the FTC Act and New York Executive Law § 63(12) and General Business Law §§ 349 and 350.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3**:

Subject to and without waiving Plaintiffs' initial objections and responses, Plaintiffs provide the following supplemental response:

Pursuant to the Court's December 3, 2020 Order, with the understanding that Plaintiffs will be allowed to amend in good faith prior to trial, Plaintiffs further respond to this Interrogatory by providing the sampling attached hereto as Amended Exhibit A.

**INTERROGATORY NO. 4**:

For each label, package, packaging insert, point-of-sale display, advertisement, television commercial, marketing material, and promotional material identified in response to Interrogatory No. 3, state Your position as to whether the material is false, misleading, or unsubstantiated and set forth in full and complete detail the facts supporting Your position.

**RESPONSE TO INTERROGATORY NO. 4**:

Plaintiffs object to this Interrogatory on the grounds that such information is in the possession of Defendants or their counsel. Moreover, Plaintiffs object given that Defendants have indicated that they produced only a sample of these materials and have refused to produce every label, package, packaging insert, point-of-sale display, advertisement, television commercial, marketing material, and/or promotional material concerning the Prevagen Products that was disseminated and contained the Challenged Claims.

Plaintiffs further object on the grounds that the request is not relevant to any party's claims or defenses or proportional to the needs of the case. Plaintiffs further object to this request to the extent it seeks information protected from disclosure, including information protected by the work product doctrine, deliberative process privilege, law enforcement privilege, common interest privilege, and non-testifying expert privilege; to the extent it is designed to force an exhaustive or oppressive catalogue of information and a detailed narrative of Plaintiffs' case; and to the extent it seeks production of any exhibit list prior to the time and manner set out in this Court's Joint Report Pursuant to Fed. R. Civ. P. 26(f) and Scheduling Order (Dkt. 59) and Stipulated Order Allowing Remote Depositions and Revising Fact Discovery Schedule (Dkt. 110).

Subject to and without waiving their General and foregoing objections, Plaintiffs allege that any representation made by Defendants, whether directly or indirectly, expressly or by

implication, that the Prevagen Products improve memory, improve memory within 90 days, reduce memory problems associated with aging, or provide any other cognitive benefits, including but not limited to healthy brain function, a sharper mind, or clearer thinking, are false, misleading, or unsubstantiated. Plaintiffs further allege that any representation made by Defendants, whether directly or indirectly, expressly or by implication, that the Prevagen Products are clinically shown to provide such memory and cognitive benefits constitute false proof claims.

The representations are false to the extent that Defendants claimed there was human clinical testing to substantiate those claims. Defendants have produced documentation of only two human clinical studies of Prevagen using objective and quantitative measures of cognitive function. Neither of these studies showed any statistically significant benefit of Prevagen over placebo on any cognitive task, either for the study populations as a whole or for any subgroups analyzed by Defendants as part of their post hoc analyses. Nor have Defendants produced any research to follow-up on any post hoc data examined from the initial research.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4**:

Subject to and without waiving Plaintiffs' initial objections and responses, Plaintiffs provide the following supplemental response:

Pursuant to the Court's December 3, 2020 Order, with the understanding that Plaintiffs will be allowed to amend in good faith prior to trial, Plaintiffs further respond to this Interrogatory by providing the sampling attached hereto as Amended Exhibit A.

**INTERROGATORY NO. 5**:

Identify each Product Descriptor, marketing statement, advertising statement, and/or claim You contend Defendants made relating to Prevagen that You are challenging in this Action as false, misleading, and/or or unsubstantiated.

- 7 -

**RESPONSE TO INTERROGATORY NO. 5**:

Plaintiffs object to this Interrogatory to the extent that it calls for information that is protected from disclosure by the attorney-client privilege, work product doctrine, law enforcement privilege, common interest privilege, and deliberative process privilege. Plaintiffs further object to the extent it is designed to force an exhaustive or oppressive catalogue of every element of every advertising and marketing piece disseminated by Defendants and to force Plaintiffs' to provide a detailed narrative of the case. Subject to and without waiving their General and foregoing objections, Plaintiffs respond as follows:

As set forth in the Complaint, ¶¶ 24-26, Defendants have engaged in an extensive national marketing campaign claiming memory and other cognitive benefits for the Prevagen Products through materials on their websites, materials disseminated to healthcare practitioners, infomercials, television advertisements, radio advertisements, social media, promotional tours, press releases, booklets, and other means. In identifying claims conveyed by a particular advertisement or other marketing material, Plaintiffs do not parse out individual phrases or statements in isolation, but rather consider the material as a whole, assessing the "net impression" conveyed by all elements of the material, including the text, product name, charts, graphs, images, consumer and expert testimonials, and other elements. FTC Policy Statement on Deception, 103 F.T.C. 174-75, 179 (1984) (appended to *In re Cliffdale Assocs., Inc.,* 103 F.T.C. 110 (1984)) ("FTC Deception Statement"). *See also Direct Mktg. Concepts, Inc*., 569 F. Supp. 2d 285, 298 (D. Mass. 2008); *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989).

Complaint ¶ 27 details several representative excerpts and imagery from Defendants' marketing materials that contribute to the net impression that the Prevagen Products provide memory and other cognitive benefits. Plaintiffs contend that the net impression of Defendants'

individual advertising and marketing materials, and the marketing campaign as a whole, communicate false, misleading, or unsubstantiated claims that the Prevagen Products provide memory and other cognitive benefits. Specifically, Plaintiffs allege that any representation made by Defendants, whether directly or indirectly, expressly or by implication, that the Prevagen Products improve memory, improve memory within 90 days, reduce memory problems associated with aging, or provide any other cognitive benefits, including but not limited to healthy brain function, a sharper mind, or clearer thinking, are false, misleading, and/or unsubstantiated. Plaintiffs further allege that any representation made by Defendants, whether directly or indirectly, expressly or by implication, that the Prevagen Products are clinically shown to provide such memory and cognitive benefits constitute false proof claims.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5**:

Subject to and without waiving Plaintiffs' initial objections and responses, Plaintiffs provide the following supplemental response:

Pursuant to the Court's December 3, 2020 Order, with the understanding that Plaintiffs will be allowed to amend in good faith prior to trial, Plaintiffs further respond to this Interrogatory by providing the sampling attached hereto as Amended Exhibit A.

**INTERROGATORY NO. 6**:

For each Product Descriptor, marketing statement, advertising statement and/or claim identified in response to Interrogatory No. 5, state Your position as to whether the material is false, misleading or unsubstantiated, and set forth in full and complete detail the basis for Your position.

**RESPONSE TO INTERROGATORY NO. 6**:

Plaintiffs object to this Interrogatory on the grounds that such information is set forth in Defendants' production or is otherwise in the possession of Defendants or their counsel; that the request is overbroad; and that the request is not relevant to any party's claims or defenses or

proportional to the needs of the case. Plaintiffs further object to this request to the extent it seeks information protected from disclosure, including the work product doctrine, deliberative process privilege, law enforcement privilege, common interest privilege, and non-testifying expert privilege; to the extent it is designed to force an exhaustive or oppressive catalogue of information and a detailed narrative of Plaintiffs' case; and to the extent it seeks production of any witness list or exhibit list prior to the time and manner set out in this Court's Joint Report Pursuant to Fed. R. Civ. P. 26(f) and Scheduling Order (Dkt. 59) and Stipulated Order Allowing Remote Depositions and Revising Fact Discovery Schedule (Dkt. 110). Subject to and without waiving their General and foregoing objections, Plaintiffs respond as follows:

The challenged memory and cognitive benefit claims for the Prevagen Products are false, misleading, or not substantiated in violation of Sections 5 and 12 of the FTC Act,[1] and New York Executive Law § 63(12), and New York General Business Law §§ 349 and 350. Marketing and advertising is deceptive if:  (i) there is a representation, omission, or practice (ii) that is likely to mislead consumers acting reasonably under the circumstances and (iii) that is material to consumers. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994); *see also POM Wonderful, LLC v. FTC*, 777 F.3d 478, 490 (D.C. Cir. 2015).

Defendants' representations about memory and other cognitive benefits of Prevagen are communicated both through express statements and by the net impression of the challenged advertising and marketing materials. Claims are likely to mislead consumers acting reasonably under the circumstances if they are false or unsubstantiated. Claims are false if they are untrue; they are unsubstantiated if the advertiser lacks a reasonable basis for the claim at the time it is

---

[1]     Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce," and Section 12 prohibits the dissemination of false advertisements for foods, drugs, devices, services, or cosmetics. 15 U.S.C. §§ 45 and 52. Section 15 defines "false advertisement" as "advertising that is misleading in a material respect." 15 U.S.C. § 55(a)(1).

disseminated. *See, e.g.*, *FTC v. US Sales Corp.*, 785 F. Supp. 737, 748 (N.D. Ill. 1992). A reasonable basis for the memory and cognitive benefit claims at issue here is "competent and reliable scientific evidence" substantiating the claims. *See, e.g.*, *FTC v. Nat'l Urological Group, Inc.*, 645 F. Supp. 2d 1167, 1202 (N.D. Ga. 2008) (finding that claims regarding the safety and efficacy of dietary supplements must be substantiated with competent and reliable scientific evidence).

A material claim is one that "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *In re Cliffdale Assocs.*, 103 F.T.C. 110, 165 (1984). Some categories of claims are presumed material, including: (1) all express claims, (2) intentional implied claims, and (3) claims that "significantly involve health, safety, or other areas with which the reasonable consumer would be concerned," including a claim that "concerns the purpose, safety, efficacy, or cost of the product or service," its "durability, performance, warranties or quality" or "a finding by another agency regarding the product." *See* FTC Deception Statement, 103 F.T.C. at 190.

In this case, Defendants' claims of memory and cognitive benefits for the Prevagen Products are clearly stated across all advertising and marketing and are the central focus of the entire ad campaign. In fact, the Prevagen Products are promoted solely for their memory and cognitive benefits. The claims are likely to mislead consumers because they are false or unsubstantiated. Defendants have produced documentation of only two human clinical studies of Prevagen using objective and quantitative measures of cognitive function. Neither of these studies showed any statistically significant benefit of Prevagen over placebo on any cognitive task, either for the study populations as a whole or for any subgroups analyzed by Defendants as part of their post hoc analyses of subgroups. Nor have Defendants produced any research to follow-up on any post hoc data examined from the initial research.

- 11 -

Any statements or depictions referencing scientific research or any clinical study in connection with any memory or other cognitive benefits are false. Defendants have produced no human clinical study showing such benefits. In addition, by their own admission in submissions to the Food and Drug Administration (FDA), Defendants' *in vitro* testing shows that the apoaequorin in the Prevagen Products is rapidly digested in the stomach like any other protein. Furthermore, Defendants' tests of orally-administered apoaequorin in canines failed to show that the substance reached the dogs' cerebral spinal fluid or blood. Defendants themselves have acknowledged in writing to the FDA that the mechanism of action for Prevagen is not understood. Plaintiffs contend that, in fact, there is no plausible mechanism by which the principal ingredient in Prevagen could have any effect on the human brain.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6**:

Subject to and without waiving Plaintiffs' initial objections and responses, Plaintiffs provide the following supplemental response:

Pursuant to the Court's December 3, 2020 Order, with the understanding that Plaintiffs will be allowed to amend in good faith prior to trial, Plaintiffs further respond to this Interrogatory by providing the sampling attached hereto as Amended Exhibit A.

**INTERROGATORY NO. 10**:

State all facts in full and complete detail, and identify all documents, that support Your allegation that Quincy allegedly made false, misleading and/or unsubstantiated representations to any consumer in its advertising and marketing of Prevagen.

**RESPONSE TO INTERROGATORY NO. 10**:

Plaintiffs object to this Interrogatory on the grounds that such information is set forth in Defendants' production or is otherwise in the possession of Defendants or their counsel; that the request is overbroad, vague, and ambiguous; and that the request is not relevant to any party's

claims or defenses or proportional to the needs of the case. Plaintiffs further object to this request to the extent it seeks information protected from disclosure, including information protected by the work product doctrine, deliberative process privilege, law enforcement privilege, common interest privilege, and non-testifying expert privilege; to the extent it is designed to force an exhaustive or oppressive catalogue of information and a detailed narrative of Plaintiffs' case; and to the extent it seeks production of any witness list or exhibit list prior to the time and manner set out in this Court's Joint Report Pursuant to Fed. R. Civ. P. 26(f) and Scheduling Order (Dkt. 59) and Stipulated Order Allowing Remote Depositions and Revising Fact Discovery Schedule (Dkt. 110).

Subject to and without waiving their General and foregoing objections, Plaintiffs expressly incorporate their response to Interrogatory 6 above herein by reference.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10**:

Subject to and without waiving Plaintiffs' initial objections and responses, Plaintiffs provide the following supplemental response:

Pursuant to the Court's December 3, 2020 Order, with the understanding that Plaintiffs will be allowed to amend in good faith prior to trial, Plaintiffs further respond to this Interrogatory by providing the sampling attached hereto as Amended Exhibit A.

Dated:   May 19, 2021

/s/Annette Soberats
MICHELLE RUSK
ANNETTE SOBERATS
EDWARD GLENNON
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20850
202-326-3148, mrusk@ftc.gov
202-326-2921, asoberats@ftc.gov
202-326-3126, eglennon@ftc.gov

LETITIA JAMES
Attorney General of the State of New York

By:  /s/Kate Matuschak

JANE M. AZIA
Bureau Chief
KATE MATUSCHAK
Assistant Attorney General

202-326-3259 (facsimile)

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

STEPHEN MINDELL
Special Assistant Attorney General
Consumer Frauds and Protection Bureau
28 Liberty Street
New York, NY 10005
Tel: (212) 416-6189; Fax: (212) 416-6003
Email: kate.matuschak@ag.ny.gov

**CERTIFICATE OF SERVICE**

I CERTIFY that on this 19th day of May, 2021, I served the foregoing "Plaintiffs'

Second Supplemental Responses and Objections to Corporate Defendants' Second Set of

Interrogatories" to Defendants electronically by email to the attorneys of record on the Service

List below.

*/s/ Annette Soberats*
Annette Soberats

**SERVICE LIST**

Kate Matuschak
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-6189
kate.matuschak@ag.ny.gov
*Attorney for People of the State of New York*
*by New York State Attorney General Letitia James*

Geoffrey W. Castello, III.
Glenn T. Graham
Jaclyn M. Metzinger
Kelley Drye & Warren LLP
3 WTC, 175 Greenwich St
New York, NY 10007
(212) 808-7800
gcastello@kelleydrye.com
ggraham@kelleydrye.com
jmetzinger@kelleydrye.com
*Attorneys for Quincy Bioscience Holding*
*Co., Inc., et al.*

John H. Villafranco
Kelley Drye & Warren LLP
Washington Harbour, Suite 400
3050 K Street, NW
Washington, D.C.  20007
(202) 342-8423
jvillafranco@kelleydrye.com
*Attorney for Quincy Bioscience Holding*
*Co., Inc., et al.*

Michael B. de Leeuw
Tamar S. Wise
Cozen O'Connor
45 Broadway Atrium, Suite 1600
New York, NY 10006
(212) 908-1331
mdeleeuw@cozen.com
twise@cozen.com
*Attorneys for Mark Underwood*

John B. Kelly
Cozen O'Connor
1200 19th Street, NW
Washington, DC 20036
(202) 471-3148
jbkelly@cozen.com
*Attorney for Mark Underwood*

# EXHIBIT B



**Geoffrey W. Castello**

Kelley Drye & Warren LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007

Tel:  (973) 503-5922
Fax: (973) 503-5950
gcastello@kelleydrye.com

August 30, 2022

**Via Email**

| | |
|---|---|
| Annette Soberats (asoberats@ftc.gov) | Kate Matuschak (kate.matuschak@ag.ny.gov) |
| Edward Glennon (eglennon@ftc.gov) | State of New York |
| Andrew Wone (awone@ftc.gov) | Office of the Attorney General |
| Federal Trade Commission | 28 Liberty Street |
| 600 Pennsylvania Avenue, NW | New York, NY 10005 |
| Washington, D.C. 20850 | |

> Re:   *FTC, et al. v. Quincy Bioscience Holding Co., Inc., et al.*,
>        Case No. 1:17-cv-00124-LLS

Counsel:

We write in response to your letter dated August 16, 2022.

**<u>Defendants' Hearsay Objections to Pleadings and Discovery Responses</u>**

Defendants disagree with Plaintiffs' position regarding the admissibility of Defendants' answers. (PX-26 and PX-27).  The case you cite stands for the unremarkable proposition that "[a] party's assertion of fact in a pleading is a judicial admission."  *Peckham Materials Corp. v. Raima Corp.*, 1995 U.S. Dist. LEXIS 10046, at *1 (S.D.N.Y. Aug. 8, 1995).  To the extent Plaintiffs contend that Defendants made any factual or judicial admissions in their pleadings, such admissions should have been included in Plaintiffs' proposed findings of fact.

With respect to Defendants' discovery responses, the cases cited in your letter all involve discovery responses produced in a litigation context.  Here, however, PX-13, PX-14 and PX-15 were provided to the FTC in connection with the CID process.  Thus, the cases cited in your letter do not control.

**<u>Defendants' Objections to Marketing Material Obtained by Plaintiffs</u>**

Defendants also disagree with Plaintiffs' position regarding marketing materials that Plaintiffs obtained independently or from third parties, as well as your suggestion that Defendants have failed to comply with their discovery obligations.  From the earliest stages of the parties' meet and confer efforts, the parties agreed that Defendants would produce a sampling of advertising and marketing material relating to Prevagen®.  As Plaintiffs are well aware, Defendants have spent an enormous amount of time and money on discovery in this Action, having produced over 55,000 documents (and over 195,000

August 30, 2022

pages) and reviewed tens of thousands more for responsiveness and privilege.  While Defendants went above and beyond to capture, review and produce as much marketing material as reasonably possible, Defendants never represented that they produced each and every piece of marketing that was ever disseminated and no such production was or is required under the parties' agreement or the Federal Rules of Civil Procedure.  If anything, it is *Plaintiffs* that have abused this compromise, first by using it to improperly deny and/or object to many of Defendants' Requests for Admission (*see, e.g.,* Response Nos. 84-90 and 92-97), and now by attempting to flout their own obligations to authenticate documents they would like to use at trial.

Plaintiffs' position regarding ongoing discovery obligations is particularly egregious given Plaintiffs' own failure to abide by the Court's December 3, 2020 order to provide a fair and representative sampling of the advertisements and marketing materials that Plaintiffs intend to pursue at trial.  (Dkt. No. 148.)  Plaintiffs' January 22, 2021 "sampling" included over 1,600 pages of marketing material produced in discovery, as well as various categories of additional documents that are not identified by bates number.  Plaintiffs' trial exhibit list fares no better, as it contains over 250 potential trial exhibits of purportedly-challenged advertising and marketing material without any attempt to focus on the material they actually intend to use at trial, many of which were not included on Plaintiffs' "sampling."  Pursuant to the Court's December 3 Order and the Federal Rules of Evidence, the burden is on *Plaintiffs* to identify and authenticate the documents they actually intend to use at trial, not on Defendants to authenticate (or waive authentication objections to) thousands of pages of material that Plaintiff may (or may not) try to use at trial.  Accordingly, we request that Plaintiffs provide an updated sample in accordance with the Court's December 3, 2020 order that reflects the documents that Plaintiffs actually intend to use at trial no later than **September 13, 2022**.[1]

## Post-*Collins* Marketing Material

Defendants have updated their document production with representative samples of advertising and packaging for Prevagen disseminated after the *Collins* settlement went into effect.  (*See* June 14, 2022, Vols. 30 and 31, bates numbers QUI-FTCNY-00190440—QUI-FTCNY-00190520.)    In accordance with the parties' prior agreements and the Federal Rules of Civil Procedure, Defendants are not required to produce each and every piece of marketing that has been disseminated, and they will not agree to produce additional material that is almost sure to be duplicative of marketing that has already been produced.  *See Winfield v. City of New York*, No. 15-CV-05236, 2018 WL 1631336, at \*4 (S.D.N.Y. Mar. 29, 2018) (denying plaintiff's request to supplement data because "[e]ven relevant discovery should be limited if it is disproportionate to the needs of the case.").

## PX-41 (NYAG-QUINCY-0000001)

Defendants are still unable to access and determine the contents of this exhibit in its entirety. While parts of the purported website capture can be accessed by opening the file named index.html in a

---

[1] Many of the documents that Plaintiffs claim to be absent from Defendants' production were included in Defendants' production in substantially the same form.  (*See, e.g.,* QUI-FTCNY-00154502 and PX-482, 519, 562, 627; QUI-FTCNY-00161410 and PX-508, 520, 561, 625.)  To avoid authentication hurdles, Plaintiffs should simply use the versions of these documents produced by Quincy.

August 30, 2022

web browser, many pages of the website cannot be accessed.  Accordingly, we request that Plaintiffs re-produce this material in PDF format no later than **September 13, 2022**.

Respectfully submitted,

*/s/ Geoffrey W. Castello*

Geoffrey W. Castello
Kelley Drye & Warren LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel:    (212) 808-7800
Fax:    (212) 808-7897
gcastello@kelleydrye.com

*Counsel for Defendants*
*Quincy Bioscience Holding Company, Inc., Quincy*
*Bioscience, LLC, Prevagen, Inc. and Quincy Bioscience*
*Manufacturing, LLC*

cc:    All Counsel of Record (via Email)

# EXHIBIT C



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

JANE M. AZIA, CHIEF
CONSUMER FRAUDS AND PROTECTION BUREAU
KATE MATUSCHAK
ASSISTANT ATTORNEY GENERAL
E-MAIL: KATE.MATUSCHAK@AG.NY.GOV
(212) 416-6189

September 21, 2022

**By Email**

Geoffrey W. Castello, Esq.
Kelley Drye & Warren LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
(212) 808-7800
gcastello@kelleydrye.com

Re:     *FTC et al. v. Quincy Bioscience Holding Co., Inc. et al.* (No. 17-cv-00124-LLS)

Dear Mr. Castello:

We write in response to your August 30, 2022 letter regarding issues related to Plaintiffs' trial exhibit list.

First, we continue to disagree with Defendants' position that hearsay objections are appropriate for Defendants' answers, written discovery responses, or sworn financial statements. There is no basis in Rule 801 of the Federal Rules of Evidence or case law regarding party admissions to distinguish between responses to interrogatories served pursuant to the Federal Rules of Civil Procedure and those propounded pursuant to the Federal Trade Commission Act and related Procedures and Rules of Practice. Notably, Defendants have not provided any case law to support such a distinction. Should Defendants not withdraw their hearsay objections, we will raise this issue with the Court at the appropriate time.

Second, we do not see anything in your letter that explains why Defendants have been excused from their discovery obligations with respect to marketing materials. This case is about

Page 2 of 3
Matuschak & Soberats to Castello

Defendants' advertising claims and, given the number of years Defendants have engaged in their advertising as well as the various claims, and versions of claims, that Defendants have made about their product over the years, it is not surprising that Plaintiffs would require a number of advertisements in order to make their case.  It is surprising, however, that Defendants object to Plaintiffs' use of this material on hearsay and authentication grounds.

Contrary to the assertion in your letter, Plaintiffs did, in fact, comply with the Court's December 3, 2020 Order long ago.  We are, therefore, not required to provide an "updated sample" of the advertising that we "actually intend to use at trial."  In any event, we are not requesting that Defendants "produce[] each and every piece of marketing that was ever disseminated," as your letter seems to imply.  We have instead requested an updated production of two sets of materials. The first relates to the discrete set of exhibits that Plaintiffs have identified on their exhibit list and to which Defendants intend to lodge authenticity objections.  In our August 16 letter, we requested that Defendants either withdraw those objections or produce these advertisements from their own files.  Defendants have not articulated their basis for objecting to the authenticity of Plaintiffs' captures of Defendants' ads, nor does any valid basis exist.

The second set of advertising materials that Plaintiffs have requested relates to what you characterize as "post-*Collins* marketing material."   For those, Plaintiffs requested four advertisements that were obtained and produced by Plaintiffs as well as advertisements that were reviewed by Defendants in the course of the investigation referenced in Todd Olson's declaration in support of Defendants' Motion for Summary Judgment (ECF No. 280).  Such production is especially important where Defendants are apparently uncertain about whether such advertisements would be duplicative of marketing material that has already been produced. (Your letter states that such additional production would include material "that is almost sure to be duplicative of marketing that has already been produced.")  Please confirm that production of that material would, in fact, be duplicative, or produce any non-duplicative advertisements.

Plaintiffs reiterate their request that Defendants produce dissemination schedules for each of the advertisements that Plaintiffs identified in their proposed exhibit list; the advertisements included as Attachments 4 through 8 of Mr. Ducklow's Declaration (ECF No. 260); and any of the advertisements reviewed by Defendants as part of the investigation described by Mr. Olson in his declaration in support of Defendants' Motion for Summary Judgment (ECF No. 280).  The dissemination schedules should include a description of when and where the advertisement was disseminated, including the beginning and ending dates of dissemination in the United States and in New York State; an indication of whether the advertisement aired nationally or in New York State, or both; the number of times each advertisement aired in New York State; and the networks where the advertisement aired.  Defendants have failed to provide any dissemination information for their ads since October 2020—almost two years ago—and have yet to advance any reasonable basis for withholding this material.  As you know, Plaintiffs have been requesting this information for some time now, including most recently in our letters dated May 18, 2022 and August 16, 2022.

Finally, with respect to PX-41, the NYAG has produced the contents of its website capture and advised Defendants how to access the files.  Some pages might not be accessible because the NYAG did not capture every single page on Defendants' website.

Page 3 of 3
Matuschak & Soberats to Castello

Sincerely,

/s/ *Annette Soberats*            /s/ *Kate Matuschak*
Annette Soberats, Attorney        Kate Matuschak
Federal Trade Commission        Assistant Attorney General
                              New York State Office of the Attorney General

cc:     All Counsel of Record (via email)

# EXHIBIT D



UNITED STATES OF AMERICA
**FEDERAL TRADE COMMISSION**
WASHINGTON, D.C. 20580

Division of Advertising Practices
mrusk@ftc.gov
(202) 326-3148

September 16, 2020

<u>VIA ELECTRONIC MAIL</u>

Geoffrey Castello, Esq.
Kelley Drye & Warren LLP
One Jefferson Road
Parsippany, NJ  07054

      Re:    <u>FTC & NYAG v. Quincy Bioscience Holding Co., Inc., *et al*.</u>
              <u>Civil Action No. 1:17-cv-00124-LLS</u>

Dear Jeff:

      Pursuant to our meet and confer on September 15, 2020, I am writing on behalf of Plaintiffs, the Federal Trade Commission ("FTC") and the Office of the New York Attorney General ("NYAG"), regarding our agreement with respect to depositions of fact witnesses.

      Plaintiffs amended their initial disclosures as you requested on September 11, 2020 to provide updated information as to individuals at the FTC and NYAG who may have discoverable information.  Plaintiffs hereby stipulate that they do not intend to call any FTC or NYAG employees identified in the amended disclosures as trial witnesses.  Plaintiffs also stipulate that they do not intend to call any FDA employee identified in the amended disclosure as a trial witness.

      In the event Plaintiffs' intention with respect to any FTC, NYAG, or FDA witness changes, Plaintiffs will notify Defendants promptly and provide them with the opportunity to depose such witness notwithstanding the close of fact discovery.

                        Sincerely,

                        /s/Michelle K. Rusk

                        Michelle K. Rusk
                        Attorney
                        Federal Trade Commission

cc: All Parties (via email)

# EXHIBIT E

# In the Matter of:

# FTC, et al. v. Quincy Bioscience Holding, et al.

*August 21, 2020*
*Mark Underwood - Individual - Confidential*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Case 1:17-cv-00124-LLS   Document 327-1   Filed 11/17/22   Page 32 of 39
Underwood - Individual - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                                    8/21/2020

1

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF NEW YORK
 3
 4  FEDERAL TRADE COMMISSION and      )
 5  THE PEOPLE OF THE STATE OF        )
 6  NEW YORK, by LETITIA JAMES,       ) Matter No.
 7  Attorney General of the State     ) 1:17-cv-00124-LLS
 8  of New York,                      ) CONFIDENTIAL
 9              Plaintiffs,           ) ATTORNEYS' EYES
10        v.                          ) ONLY
11  QUINCY BIOSCIENCE HOLDING         )
12  COMPANY, et al.,                  )
13              Defendants.           )
14  ----------------------------------)
15
16                    Friday, August 21, 2020
17                    Via Zoom
18
19        The above-entitled matter came on for the
20  deposition of MARK YANCEY UNDERWOOD, in his individual
21  capacity, pursuant to notice, at 8:33 a.m., Central
22  time; 9:33 a.m., Eastern time.
23
24
25
```

2

```
 1  APPEARANCES:
 2
 3  ON BEHALF OF THE FEDERAL TRADE COMMISSION:
 4        ANNETTE SOBERATS, ESQ.
 5        MICHELLE RUSK, ESQ.
 6        EDWARD GLENNON, ESQ.
 7        Federal Trade Commission
 8        600 Pennsylvania Avenue, N.W.
 9        Washington, DC 20580
10        (202) 326-2921
11        asoberats@ftc.gov
12
13
14  ON BEHALF OF THE STATE OF NEW YORK:
15        KATE MATUSCHAK, ESQ.
16        Assistant Attorney General for the
17          State of New York
18        Consumer Frauds and Protection Bureau
19        120 Broadway
20        New York, New York 10271
21        (212) 416-6189
22        kate.matuschak@ag.ny.gov
23
24
25
```

3

```
 1  ON BEHALF OF DEFENDANTS:
 2        GEOFFREY W. CASTELLO, ESQ.
 3        JACLYN M. METZINGER, ESQ.
 4        GLENN T. GRAHAM, ESQ.
 5        Kelley Drye & Warren
 6        One Jefferson Road
 7        Second Floor
 8        Parsippany, New Jersey 07054
 9        (973) 503-5922
10        gcastello@kelleydrye.com
11
12
13  ON BEHALF OF THE WITNESS:
14        MICHAEL B. DeLEEUW, ESQ.
15        TAMAR WISE, ESQ.
16        Cozen O'Connor
17        45 Broadway
18        16th Floor
19        New York, New York 10006
20        (212) 908-1331
21        mdeleeuw@cozen.com
22
23
24  ALSO PRESENT:
25        William Ducklow, FTC
```

4

```
 1              FEDERAL TRADE COMMISSION
 2                  I N D E X
 3
 4  WITNESS:                               EXAMINATION:
 5  MARK YANCY UNDERWOOD
 6  BY MS. SOBERATS:                           9
 7
 8
 9  EXHIBITS         DESCRIPTION            FOR ID
10  Number MU-26 Underwood Notice of          13
                  Deposition
11
    Number MU-27 Underwood Biographical       14
12               Sketch
13  Number MU-28 Quincy Bioscience Holding    45
                 Company's Answers to the
14               Federal Trade Commission's
                 Civil Investigative Demand
15               Interrogatories
16  Number MU-29 8/24/16 Richards Group       47
                 Correspondence
17
    Number MU-30 2/25/16                      54
18               Underwood/Olson/Seney Email
                 Exchange
19
    Number MU-31 Alzheimer's Conference       99
20               Announcement
21  Number MU-32 8/29/11 Olson/Benson Email  101
                 Exchange
22
    Number MU-33 3/7/12 Olson/Benson Email   104
23               Exchange
24  Number MU-34 Advances Madison Memory     110
                 Study Publication
25
```

1 (Pages 1 to 4)

Underwood - Individual - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                                    8/21/2020

---

117

1    A. Well, they were interested in learning more
2  about the verbal learning results from the overall
3  study. So they weren't just interested in -- as you
4  know, with the Madison Memory Study, we explored nine
5  different aspects of cognition. Verbal learning was
6  just one of those. And so this is sort of taking a
7  little bit more of a microscope approach to that
8  particular data. And so I think the peer reviewers had
9  more interest in more details from the data we had from
10  the study. And as they looked at the data, they found
11  what they saw was, you know, interesting for this
12  publication.
13    **Q. Okay. And that's fine, but you haven't answered**
14  **my question.**
15    A. Oh, okay.
16    **Q. Did the peer reviewers ask Quincy to report**
17  **specifically on the AD8 2 to 5?**
18    A. I don't recall what their specific ask was, but
19  knowing that they guided this process, and the result is
20  here in front of us, I presume that they had an interest
21  in this, because if they weren't interested in it, it
22  wouldn't be there.
23    **Q. Do you recall seeing the original draft of the**
24  **Madison Memory Study that was submitted to Innovision?**
25    A. No, I don't recall. Not with exactness. I -- I

---

118

1  know that it was done.
2    **Q. Do you know if the AD8 2 to 5 data was in the**
3  **original draft submitted for publication?**
4    A. I don't know.
5        (Deposition Exhibit Number MU-35, 12/18/15
6  Underwood/Beaman Email Re: Prevagen Scientific Summary,
7  was marked for identification.)
8    BY MS. SOBERATS:
9    **Q. Mr. Underwood, I'm showing you what has been**
10  **marked as Exhibit MU-35. This is Bates labeled**
11  **QUI-FTCNY-00170680. Do you see that on your screen?**
12    A. Yes.
13    **Q. And do you recognize this document?**
14    A. I do not.
15    **Q. According to the email at the top, it is an**
16  **email from you, Mark Y. Underwood, to Michael J.**
17  **Beaman --**
18    A. Well, I'm sorry, I do recognize that. I'm
19  sorry. Yeah, I mean, I recognize that it's an email
20  piece of correspondence.
21    **Q. Okay.**
22    A. But I don't recall the context of it.
23    **Q. And do you see that it's dated December 18th,**
24  **2015?**
25    A. Yes.

---

119

1    **Q. And the subject line is, "Prevagen Scientific**
2  **Summary?"**
3    A. Yes.
4    **Q. If you scroll to page 2, there's a signature by**
5  **a James Lugo, Ph.D., MBA, vice president research and**
6  **business development, InterHealth Neutraceuticals,**
7  **Incorporated. Who is Dr. Lugo?**
8    A. I have no idea.
9    **Q. Did you not receive an email communication from**
10  **Dr. Lugo?**
11    A. I can't see where his -- who is his email
12  addressed to?
13    **Q. Let's go to the top of page 1.**
14    A. Okay.
15    **Q. This is the email from you to Michael Beaman.**
16  **And you write to Michael Beaman, "Comments in blue**
17  **within and following the paragraphs below." Do you see**
18  **that?**
19    A. I do, yes. But is Dr. Lugo's email cut and
20  pasted into this email? Because it doesn't look like
21  it's addressed to me. Right?
22    **Q. If you scroll to page 2, bottom of page 2.**
23    A. Right.
24    **Q. Let's look right above the signature line for**
25  **Dr. Lugo.**

---

120

1    A. Um-hmm.
2    **Q. "If you have any additional questions, I am**
3  **around all day. All the best, J," and signed, James**
4  **Lugo, Ph.D., MBA. Do you see that?**
5    A. I do see that, but in the message header, this
6  appears to be an email from me to Mike.
7    **Q. Correct.**
8    A. Copying myself.
9    **Q. Yes. And it also includes information provided**
10  **by Dr. Lugo, does it not?**
11    A. Yeah, but I don't know that Dr. -- I'm sorry?
12    MR. CASTELLO: Objection.
13    THE WITNESS: I'm sorry, I'm just not sure that
14  Dr. Lugo addressed this email to me. It could have been
15  to someone else.
16    BY MS. SOBERATS:
17    **Q. But your email to Mr. Beaman has the comments**
18  **from Dr. Lugo, correct?**
19    A. That appears to be correct, yes. I just don't
20  know that I was the recipient of the original
21  information from Dr. Lugo.
22    **Q. Okay. And that's fine. That wasn't my**
23  **question.**
24    A. Well, you had -- okay, I -- I just meant, before
25  you asked if I knew who this guy was, and when I said I

---

FTC, et al. v. Quincy Bioscience Holding, et al.                                    8/21/2020

---

121

1    didn't, you seemed shocked that I didn't.  I'm just sort
2    of explaining why I don't necessarily know who he is.
3        Q.  Okay.
4        A.  Because it wasn't like I was having
5    correspondence necessarily with this guy directly.
6        Q.  Okay.
7        A.  Okay.
8        Q.  But you see his signature line at the bottom of
9    page 2?
10       A.  Oh, yeah.  Yeah.  I do.  I do.  That's not --
11   I'm not disputing that, no.
12       MR. DELEEUW:  I just want to just say that you
13   guys are talking over each other quite a bit, and just a
14   little beat before jumping in would be great.
15       BY MS. SOBERATS:
16       Q.  And according to information that's publicly
17   available and included here on page 2, Mr. Lugo has a
18   Ph.D. and an MBA and he is the vice president of
19   research and business development at InterHealth
20   Neutraceuticals, Inc., correct?
21       A.  I -- that is what his signature line says, yes.
22       Q.  So having looked at that information on his
23   signature line, does that refresh your memory on who he
24   is?
25       A.  I -- it doesn't.  I -- I'll be glad to review

---

122

1    the email further.
2        Q.  I will give you a moment to review it.
3        A.  (Document review.)
4        Okay, I have finished.
5        Q.  Does this refresh your memory on who Dr. Lugo
6    is?
7        A.  No, other than he doesn't seem to be a fan.
8        Q.  Did you ever hear anything mentioned about
9    Dr. Lugo?
10       MR. CASTELLO:  Objection.
11       THE WITNESS:  I mean, clearly he has some
12   opinions about us, but I don't recall them of any
13   consequence besides this bullet list.
14       BY MS. SOBERATS:
15       Q.  And in this email, you are sharing Dr. Lugo's
16   opinions with Mr. Beaman, correct?
17       A.  Yes.
18       Q.  And in the first point here, it says, "I took a
19   long look at the science.  It is lacking."  Do you have
20   any idea why Dr. Lugo was looking at the science for
21   Quincy?
22       A.  Not specifically.  No, I don't.
23       Q.  Do you see how there's a comment here that was
24   added in parentheses "two weeks?"  That appears to be
25   your comment.  Is that correct?

---

123

1        A.  I presume, it's in blue, so likely, yes.
2        Q.  Let's look at this first point in greater
3    detail.  Dr. Lugo writes, "The pivotal clinical studies
4    that needed to be statistically significant versus PBO
5    were not.  Quincy reported statistical significance
6    versus baseline only.  These studies were completed back
7    in 2010 and white papers have appeared in 2011 and 2014.
8    While they vary a bit in the data crunching and in
9    population stratification, the main conclusions remain
10   unchanged.  Without statistical significance versus PBO
11   the FTC will come down hard on Quincy as they have no
12   scientifically valid basis for making a structure
13   function claim."
14       Do you see that?
15       A.  I do.
16       Q.  And does this statement refer to the Madison
17   Memory Study?
18       A.  I don't know.
19       Q.  Was the Madison Memory Study completed in 2010?
20       A.  Yes.
21       Q.  And were there white papers that appeared in
22   2011 and 2014?
23       A.  Yes.  He doesn't specifically say that it's from
24   the Madison Memory Study.  We could take our best guess
25   that it is.  Excuse me.

---

124

1        Q.  If I look at the paragraph right under that, you
2    responded, "The results were statistically significant
3    versus baseline in the treatment group but not the
4    placebo group, demonstrating the difference in
5    treatment, this is an acceptable technique for analysis.
6    We also have the evidence from every other type of study
7    to support claims."
8        Can you explain your reasoning as to this
9    statement specifically that it is acceptable to look at
10   within-group differences and not between-group
11   differences?
12       A.  I don't make any distinction between
13   within-group differences and between-group differences
14   in this statement.
15       Q.  Does it not say that this is an acceptable
16   technique for analysis?
17       A.  It does.  But it doesn't say what technique that
18   was.
19       Q.  It says, "The results were statistically
20   significant versus baseline in the treatment group but
21   not the placebo group."
22       A.  Um-hmm.
23       Q.  "Demonstrating the difference in treatment.
24   This is an acceptable technique for analysis."  What do
25   you mean by that statement?

---

31 (Pages 121 to 124)

Underwood - Individual - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    8/21/2020

---

125

1      A.  I think I was defending the contention that we
2  had done something wrong with the study to my business
3  partner, reminding him of the full statistical analysis
4  we had done on the entire study.
5      **Q.  Okay.**
6      A.  And basically that this gentleman was not fully
7  aware of what we had done or how we had done it.
8      **Q.  Now, I'm asking, though, about a specific**
9  **statement in your email.  I understand that perhaps your**
10 **goal was to defend the science, but specifically on this**
11 **statement, "the results were statistically significant**
12 **versus baseline in the treatment group but not the**
13 **placebo group, demonstrating the difference in**
14 **treatment, this is an acceptable technique for**
15 **analysis."**
16     **Can you explain what you meant by that**
17 **statement?**
18     MR. DELEEUW:  Object to form.  You can answer.
19     THE WITNESS:  I'm basically paraphrasing that we
20 did it appropriately to an individual that doesn't speak
21 the language of statistics.
22     BY MS. SOBERATS:
23     **Q.  Okay.  And why do you think you did it**
24 **appropriately?**
25     MR. CASTELLO:  Objection.

---

126

1      THE WITNESS:  Why do I think I communicated
2  appropriately?
3      BY MS. SOBERATS:
4      **Q.  Why do you think that the method that you**
5  **described here is an acceptable technique for analysis?**
6      A.  Because we followed normal conventions for doing
7  statistical analysis for any type of quantitative
8  research.
9      **Q.  And what are those normal methods?**
10     A.  Well --
11     MR. CASTELLO:  Object to the form.
12     THE WITNESS:  I mean, those are really laid out
13 in the study's methods of the Madison Memory Study.  So
14 following normal statistical I guess protocols for the
15 analysis of data is what we did in the Madison Memory
16 Study.
17     BY MS. SOBERATS:
18     **Q.  Mr. Underwood, is it your position that the**
19 **relevant analysis for determining statistical**
20 **significance is the difference within-group?**
21     MR. CASTELLO:  Object to the form.
22     THE WITNESS:  Well, it depends.  In some type of
23 research, within-group measures are fine, in some
24 between-group measures are fine.  So as you -- as you
25 know, I'm not the statistician for the company, so I

---

127

1  can't speak to every proper or improper use of
2  statistics.  It's just beyond my -- my skill set.
3      BY MS. SOBERATS:
4      **Q.  Are within-group measures appropriate in the**
5  **context of a study like the Madison Memory Study?**
6      MR. CASTELLO:  Objection.
7      THE WITNESS:  Well, I guess it would be up to
8  the debate between scientists and which statistical
9  measures they choose to implore for what type of study.
10     BY MS. SOBERATS:
11     **Q.  And according to the expert who wrote this**
12 **email, are within-group measures valid in the context of**
13 **the human clinical research at Quincy?**
14     MR. CASTELLO:  Object to the form.
15     THE WITNESS:  I didn't realize this individual
16 was an expert.
17     BY MS. SOBERATS:
18     **Q.  Mr. Underwood, according to Dr. Lugo's signature**
19 **line, he has a Ph.D. and a --**
20     A.  In what field?
21     **Q.  According to public records, he has --**
22     A.  Okay.
23     **Q.  -- a Ph.D. in immunology.**
24     A.  I would have no knowledge of his Ph.D. in
25 immunology.  As far as I know he could have a Ph.D. in

---

128

1  education, which while a noble field, is not really
2  relevant to our type of research.
3      **Q.  Do you have a Ph.D. in statistical analysis?**
4      A.  No, that's why I can't answer some of your
5  previous questions.
6      **Q.  But in the context of this email, you were, as**
7  **you stated, defending the point raised by Dr. Lugo with**
8  **Dr. Beaman [sic], correct?**
9      A.  Mike is not a doctor, so no, I was not
10 describing anything to Dr. Beaman.
11     **Q.  With Mr. Beaman.**
12     **Will the court reporter please read back my last**
13 **question.**
14     **(The record was read as follows:)**
15     "QUESTION:  But in the context of this email,
16 you were, as you stated, defending the point raised by
17 Dr. Lugo with Dr. Beaman [sic], correct?"
18     BY MS. SOBERATS:
19     **Q.  And I will correct that to say Mr. Beaman.  Can**
20 **you please answer the question?**
21     MR. CASTELLO:  Object to the form.
22     THE WITNESS:  Yes, I was explaining or defending
23 our position to Mike Beaman.
24     BY MS. SOBERATS:
25     **Q.  Going back to the discussion we were just having**

---

32 (Pages 125 to 128)

Underwood - Individual - Confidential
FTC, et al. v. Quincy Bioscience Holding, et al.                    8/21/2020

---

133

1    several other, many other types of enzymes.
2         So to try to just hypothesize on what type of
3    enzyme would affect apoaequorin, there could be many
4    different results.  You could be absolutely correct, but
5    you could be absolutely wrong.  So the data doesn't
6    exist for that, all we have is the -- I'm sorry, all we
7    have is the data from -- from the specific pepsin
8    digestion, and that test was implored to only answer the
9    question of the likelihood of the apoaequorin protein
10   being allergenic.
11        BY MS. SOBERATS:
12        **Q.  And the data -- when you said the data doesn't**
13   **exist, are you talking about the data on the digestion**
14   **of apoaequorin within the human body?**
15        A.  No, you had referenced the concept of would the
16   pancreatic enzymes further digest the apoaequorin, and
17   to my knowledge, that type of study has never been
18   completed, so that data doesn't exist.  To my knowledge.
19        **Q.  Okay.  Let's go to point 7.  Dr. Lugo writes,**
20   **"Finally, the pivotal human studies were carried out 5**
21   **years ago.  The results were not favorable for the brand**
22   **as they did not hit statistical significance.  But**
23   **having said this, there was a clear trend in the data.**
24   **Why didn't Quincy rush out to repeat the studies?  They**
25   **had a sufficiently large signal to suggest that a larger**

---

134

1    **study, better planned, could hit statistical**
2    **significance.  This is an open question that deserves an**
3    **answer."**
4         **Mr. Underwood, did Quincy ever consider doing**
5    **such a study?**
6         A.  Yes.
7         **Q.  And did it ever conduct such a followup study to**
8    **the Madison Memory Study?**
9         MR. CASTELLO:  I would caution the witness that
10   if in order to answer that question he be required to
11   divulge information communication between the company
12   and counsel, that he not answer that question.
13        THE WITNESS:  I'll have to follow Geoff's
14   counsel.
15        MS. SOBERATS:  And Mr. Castello, I will make a
16   determination at the end of the day, but because the
17   witness is not answering my question, I am entitled to
18   keep this deposition open, and I would like to provide
19   you with some notice on that.
20        MR. CASTELLO:  I disagree, but do as you -- do
21   as you choose.
22        BY MS. SOBERATS:
23        **Q.  Mr. Underwood, I am assuming that because you've**
24   **testified that you do not know who James Lugo is that he**
25   **was not retained as an expert by Quincy.  Is that**

---

135

1    **correct?**
2         MR. CASTELLO:  Objection.  Are you asking for
3    expert disclosures, Ms. Soberats?  I mean, I don't
4    understand the context of the question.
5         BY MS. SOBERATS:
6         **Q.  Let me rephrase.  Mr. Underwood, do you know why**
7    **Dr. Lugo was reviewing Quincy's science?**
8         MR. CASTELLO:  Objection.  I believe you've
9    already asked that question.
10        MS. SOBERATS:  I don't believe I have.  Are you
11   going to allow him to answer?
12        MR. CASTELLO:  He can answer, but I believe
13   you've already covered the subject matter of the
14   question.
15        BY MS. SOBERATS:
16        **Q.  Mr. Underwood, you can answer.**
17        A.  I don't recall why he was interested in us at
18   all.
19        **Q.  Did you and Mr. Beaman have further discussions**
20   **about Dr. Lugo's points as reflected in this email?**
21        A.  I don't recall having additional conversations,
22   no.
23        **Q.  And why were you forwarding these points by**
24   **Dr. Lugo to Mr. Beaman?**
25        MR. CASTELLO:  Before the witness answers,

---

136

1    counsel, can you make a representation or are you
2    willing to make a representation that, in fact, these
3    are Dr. Lugo's points?  Because I think the record
4    should be -- I think it needs to be clear as to whether
5    or not, in fact, these are Dr. Lugo's points, whoever
6    Dr. Lugo is.
7         MS. SOBERATS:  Counsel, Mr. Underwood has
8    indicated -- testified that it was clear from this that
9    Dr. Lugo is not a fan of the company, and at no point
10   has he disputed that these comments are from Dr. Lugo.
11        MR. CASTELLO:  And I'm asking for a proffer from
12   Plaintiffs as to whether this is, in fact, Dr. Lugo's
13   email.  It's a simple -- it's a fair question.  It's I'm
14   asking for a proffer.  I'm not directing the witness not
15   to answer, it's a fair proffer.  I'm not directing the witness not
16   answer it, but I, on the record, I want to make note now
17   that I've asked for that proffer.
18        MS. SOBERATS:  And, counsel, I'm not aware of
19   any obligation that I have as deposing counsel to
20   provide a proffer -- a factual proffer on documents that
21   I need to question the witness on.
22        MR. CASTELLO:  Then there's the record.  Thank
23   you.
24        MS. SOBERATS:  Mr. Underwood, you can answer the
25   question.

---

34 (Pages 133 to 136)

Underwood - Individual - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                                    8/21/2020

---

141

1    in parentheses, we have the "two weeks?".  My question
2    is how would you know how long it took Dr. Lugo to
3    review the science if you hadn't spoken with him?
4        MR. CASTELLO:  Object to the form.
5        BY MS. SOBERATS:
6        Q.  Mr. Underwood?  Are you able to hear me?  Hello?
7        A.  I'm sorry, is someone speaking?
8        Q.  Yes, are you able to hear us, Mr. Underwood?
9        A.  Sorry, I can't hear.  I see your lips, but I
10   can't hear anything.
11       Q.  Okay.  What about now, can you hear me?
12       A.  Oh, goodness.  I have a little volume thing on
13   here, and it must have went to mute sort of.
14       Q.  Okay.
15       A.  Or the opposite of mute, where I can't hear you.
16   Sorry about that.
17       Q.  Are you able to hear me now?
18       A.  I am, thank you.
19       Q.  Perfect.  Let's go back to Exhibit MU-35.  And
20   let's look at point 1 together again.
21       A.  I'm there.
22       Q.  So the statement "I took a long look at the
23   science" has a comment of yours in parentheses, it says,
24   "two weeks?".  Do you see that?
25       A.  I do.

---

142

1        Q.  My question is how would you know how long it
2    took Dr. Lugo to review the science if you hadn't spoken
3    to him?
4        MR. CASTELLO:  Object to the form.
5        THE WITNESS:  I see your point, but I don't
6    know, I could have been being sarcastic.  Without a
7    context, that's why I don't know for sure.
8        VIDEO TECHNICIAN:  Mr. Underwood, will you bring
9    your mic' down?
10       THE WITNESS:  Whoops, sorry about that.  Should
11   I repeat that?
12       VIDEO TECHNICIAN:  It was heard.
13       THE WITNESS:  Okay, thanks.
14       (Deposition Exhibit Number MU-36, 12/15/18
15   Underwood/Beaman Email Re:  Systemic Review of Prevagen
16   Science With Responses, was marked for identification.)
17       BY MS. SOBERATS:
18       Q.  Mr. Underwood, I have marked a new exhibit, it
19   is MU-36.  It is Bates labeled QUI-FTCNY-00114444.  Do
20   you recognize this document?
21       A.  Not specifically other than it's an email from
22   me to Mike.
23       Q.  And have you looked at the attachment?  I just
24   want to point out that this is a five-page document.
25   Have you looked through the document, Mr. Underwood?

---

143

1        A.  I'm working my way through it.  Okay.
2        Q.  So as you state, this is an email from you to
3    Michael Beaman and I'm just going to add that this is
4    dated December 18th, 2015.  It is -- the subject,
5    "Systemic Review of Prevagen Science With Responses."
6    Mr. Underwood, there are -- there's blue text throughout
7    the attachment starting at page 2 and the title of this
8    document as it appears on the first page is Systemic
9    Review of Prevagen Science With Responses.  Are these
10   comments in blue yours?
11       A.  They look like they could be.
12       Q.  Okay.  Counsel, I'm going to proffer here that
13   the metadata for this document, which was produced by
14   Defendants, shows that the author of this is James Lugo,
15   the same individual who signed the exhibit we were just
16   looking at, MU-35.  And you're free to look that up in
17   relativity, or in your platform as you wish.
18       Mr. Underwood --
19       MR. CASTELLO:  Mrs. Soberats, when you say the
20   author, which -- because we've got the black and the
21   blue.
22       MS. SOBERATS:  The document has a listed author
23   of James Lugo.  The author of the document is James
24   Lugo, and that appears in the metadata.  There's a
25   column for author, and James Lugo is listed.

---

144

1        MS. METZINGER:  Annette, can I just clarify that
2    it's the attachment to the email where the metadata
3    shows Lugo as the author?  So it's starting at the
4    114445 page.
5        MS. SOBERATS:  Thank you.
6        Mr. Underwood, does this attachment starting at
7    page 2 refresh your memory as to who Dr. Lugo is?
8        THE WITNESS:  Not specifically.  It looks like
9    someone who's doing a comprehensive assessment of our
10   science, but his relationship with the company still
11   confuses me.  I'm not sure who exactly he is with.
12       BY MS. SOBERATS:
13       Q.  And if you look at page 1 of this exhibit, you
14   shared this comprehensive assessment with Mr. Beaman,
15   correct?
16       A.  Yes.
17       Q.  And why did you share this comprehensive
18   assessment with Mr. Beaman?
19       A.  To explain the comments that were -- that were
20   made or outlined in the document that was sent to us.
21       Q.  Why did you choose to bring to his attention
22   these specific comments?
23       MR. CASTELLO:  Objection.
24       THE WITNESS:  Well, to overcome the objections
25   of the author of the document.

---

36 (Pages 141 to 144)

Underwood - Individual - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                              8/21/2020

213

1    **Q.  Sure.  Yes.**
2    A.  No.  No, we don't.  The -- the products we make
3    have several different dosages.  And then, of course, we
4    have the two formulations, the difference between a
5    capsule and a chewable.  And then, of course, the
6    flavorings that are -- that change the formulas.
7    **Q.  And am I correct that the dosages are 10**
8    **milligrams, 20 milligrams and 40 milligrams of**
9    **apoaequorin?**
10   A.  That's correct.
11   **Q.  So for purposes of this trial, were you going to**
12   **use a dosage of apoaequorin other than 10, 20 or 40**
13   **milligrams?**
14   A.  I don't recall what he had asked us to do.
15   **Q.  Okay.  Counsel, I'm going to take just a**
16   **five-minute break to make sure that I have covered**
17   **everything so that I can wrap up.**
18   MR. CASTELLO:  Great.  Thank you so much.  I
19   would just say I thought we did that already.  We took a
20   20-minute break and it turned into a 30-plus minute
21   break, so I would appreciate it if we could keep it to
22   five minutes so we can get done today.
23   MS. SOBERATS:  Thank you.
24   VIDEO TECHNICIAN:  Going off the record at 4:19.
25   (Whereupon, there was a recess in the

214

1    proceedings.)
2    VIDEO TECHNICIAN:  Going on the record at 4:23.
3    MS. SOBERATS:  Counsel, I am done with my
4    questions for today.  I would just note for the record
5    that Plaintiffs will keep this deposition open since Mr.
6    Underwood did not answer a question pertaining to
7    research started after the Madison Memory Study that is
8    a question and answer that relates to an ongoing
9    discovery dispute that is being briefed at the Southern
10   District of New York, and we will keep this deposition
11   open pending resolution of that dispute.
12   Kate, do you -- does the New York Attorney
13   General's Office have any questions that they would like
14   to ask at this time?
15   MS. MATUSCHAK:  Thank you, no, we don't have any
16   questions today, but we may have questions if and when
17   this deposition continuous.
18   MS. SOBERATS:  And, counsel, do you have any
19   redirect?
20   MR. CASTELLO:  This is Castello, no.
21   MR. DELEEUW:  DeLeeuw, we have a couple of
22   hours.  No, no, we're done.  We have nothing.
23   MS. SOBERATS:  Okay.
24   THE WITNESS:  Thank you very much.
25   MS. SOBERATS:  Thank you, Mr. Underwood.

215

1    THE WITNESS:  I hope you guys have a great
2    weekend.
3    VIDEO TECHNICIAN:  This concludes today's
4    deposition of Mark Underwood as an individual.  Going
5    off the record at 4:24.
6    (Reading and signature reserved.)
7    (Whereupon, at 4:25 p.m., Central time; 5:25
8    Eastern time, the deposition was adjourned.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

216

1    DISTRICT OF COLUMBIA, to wit:
2
3    I, Sally Jo Quade, CERT, the officer before whom
     the foregoing deposition was taken, do hereby certify
     that the within-named witness personally appeared before
4    me at the time and place herein set out, and after
     having been duly sworn by me, according to law, was
5    examined by counsel.
6    I further certify that the examination was
     recorded stenographically by me and this transcript is a
7    true record of the proceedings.
8    I further certify that I am not of counsel to
     any of the parties, nor an employee of counsel, nor
9    related to any of the parties, nor in any way interested
     in the outcome of this action.
10
     As witness my hand and notarial seal this 24th
11   day of August, 2020.
12
13
14
     s/Sally Jo Quade
15   Sally Jo Quade, CERT
     Notary Public
16
17
18   MY COMMISSION EXPIRES:
19   7/14/2023
20
21
22
23
24
25

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Underwood - Individual - Confidential

FTC, et al. v. Quincy Bioscience Holding, et al.                                    8/21/2020

217

1          CERTIFICATE OF DEPONENT
2
3
4          I hereby certify that I have read and examined
           the foregoing transcript, and the same is a true and
           accurate record of the testimony given by me.
5
6
7          Any additions or corrections that I feel are
           necessary, I will attach on a separate sheet of paper to
           the original transcript.
8
9
10         I hereby certify, under penalty of perjury, that
           I have affixed my signature hereto
           on the date so indicated.
11
12
13         DATED:
14
15
16
17         _____
           MARK YANCEY UNDERWOOD
18
19
20
21
22
23
24
25

218

1    WITNESS:  MARK YANCEY UNDERWOOD
2    DATE:  AUGUST 22, 2020
3    CASE:  FTC, et al., v. QUINCY BIOSCIENCE, et al.
4    Please note any errors and the corrections thereof on
     this errata sheet.  The rules require a reason for any
5    change or correction.  It may be general, such as "To
     correct stenographic error," or "To clarify the record,"
6    or "To conform with the facts."
7    PAGE LINE CORRECTION    REASON FOR CHANGE
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

55 (Pages 217 to 218)